IN THE UNITED STATES DISTRICT COURT

DISTRICT OF UTAH, CENTRAL DIVISION

\* \* \*

THE ESTATE OF MADISON JODY   :
JENSEN, by her personal      :  Deposition of:
representative Jared Jensen, :
                         :  KENNON C. TUBBS, M.D.
          Plaintiff,    :
                         :
vs.                        :
                         :
DUCHESNE COUNTY, a Utah     :  Civil No. 2:17-cv-01031
governmental entity; DAVID   :
BOREN, an individual; JARED  :  Judge Dale A. Kimball
HARRISON, an individual; JASON:
CURRY, an individual; JANA    :
CLYDE, an individual; LOGAN   :
CLARK, an individual; and JOHN:
DOES 1-20,                :
                         :  July 10, 2018
         Defendants.    :    1:34 p.m.
                         :

\* \* \*

Held at
Strong & Hanni
102 South 200 East,
Suite 800
Salt Lake City, Utah

\* \* \*

Jamie R. Brey
- Registered Professional Reporter -

1                  A P P E A R A N C E S

2
    For the Plaintiff:        SCOTT S. BRIDGE
3                             KESLER & RUST
                              Attorneys at Law
4                             200 McIntyre Building
                              68 South Main Street
5                             Salt Lake City, Utah  84101

6

7   For the Defendant        BRITTON R. BUTTERFIELD
      Duchesne County:       SUITTER AXLAND
8                             Attorneys at Law
                              200 Judge Building
9                             8 East Broadway
                              Salt Lake City, Utah  84111
10

11
    For the Defendant        FRANK D. MYLAR
12     Jana Clyde:           MYLAR LAW
                              Attorneys at Law
13                            2494 Bengal Boulevard
                              Salt Lake City, Utah  84121
14

15
    For the Defendant        KATHLEEN J. ABKE
16     Logan Clark:          STRONG & HANNI
                              Attorneys at Law
17                            102 South 200 East, Suite 800
                              Salt Lake City, Utah  84111
18

19
    For the Witness:         GEORGE T. NAEGLE
20                            RICHARDS BRANDT MILLER & NELSON
                              Attorneys at Law
21                            1500 Wells Fargo Center
                              299 South Main Street
22                            Salt Lake City, Utah  84111

23
    Also Present:            Tyler Allred
24

25                              * * *



1                        I N D E X

2    WITNESS                                          PAGE

3    KENNON C. TUBBS, M.D.

4         Examination by Mr. Bridge                     4
          Examination by Mr. Mylar                      87
5         Examination by Mr. Butterfield               91

6

7

8

9
                        E X H I B I T S
10
     NUMBER                DESCRIPTION               PAGE
11
       2     Pre-booking form                         55
12     5     Medical request                          56
      13     Opiate and/or heroin withdrawal policy   46
13    33     Contract for services                    75
      39     Jail opiate withdrawal policy            48
14

15

16                         * * *

17

18

19

20

21

22

23

24

25



         1                                          Salt Lake City, Utah
                                                    July 10, 2018
         2                                          1:34 p.m.

         3

         4                    P R O C E E D I N G S

         5                    KENNON C. TUBBS, M.D.,

         6   called as a witness for and on behalf of the plaintiff,

         7   being first duly sworn, was examined and testified as

         8   follows:

         9

        10                    E X A M I N A T I O N

        11

        12   BY MR. BRIDGE:

        13        Q.    Could you state your full name for the record.

        14        A.    Kennon Christopher Tubbs.

        15        Q.    What is your date of birth?

        16        A.    April 22nd, 1970.

        17        Q.    And what's your current business address?

        18        A.    13584 South Carolina Hill Court, Draper, Utah

        19   84020.

        20        Q.    Okay.  Is that also a personal residence for

        21   you?

        22        A.    Correct.

        23        Q.    What is your occupation?

        24        A.    Physician.

        25        Q.    And can you just give me a brief rundown of



1  your education?

2        A.    I went to Georgetown Medical School, graduated

3  in 1996.  I did residency at IHC, Intermountain Healthcare,

4  in Provo from 1996 to 1999.  I also went to Colorado State

5  University for undergrad from 1988 to 1992.

6        Q.    And what was your residency in?

7        A.    Family medicine.

8        Q.    Is that what you practice now?

9        A.    Correct.

10       Q.    Can you give me a brief rundown of your work

11 history post residency?

12       A.    In 1999, I started with the Utah State Prison.

13 I worked for Utah State Prison for 16 years.  After Utah

14 State Prison, I started work at Wasatch County.  I was

15 employed by Wasatch County as a physician for the jails for

16 years, but they decided to make me a County employee instead

17 of just a private contractor.

18       Q.    When did that happen?

19       A.    In 2016.

20       Q.    So now you're an employee of Wasatch County?

21       A.    Correct.

22             MR. MYLAR:  Someone finally took my advice to

23 employ doctors.

24 BY MR. BRIDGE:

25       Q.    Now, what --



 1        A.    But I also have medical contracts with ten
 2   different counties.  Well, nine and including -- nine -- I
 3   have medical contracts with nine counties, and I'm an
 4   employee of Wasatch County.
 5        Q.    Okay.  But you previously had a contract with
 6   Wasatch County before you were an employee?
 7        A.    Correct.
 8        Q.    Is the -- is your Wasatch County employment
 9   full time?
10        A.    Yes.
11        Q.    And then can you list off the nine counties
12   that you have contracts with?
13        A.    Yes.  Duchesne County, Juab County, Utah
14   County, Summit County, Wasatch -- well, not Wasatch County,
15   sorry.  Daggett County.  Uinta County, Wyoming; Teton County,
16   Wyoming; Sweet Water County, Wyoming, and Lincoln County,
17   Wyoming.
18        Q.    Lincoln?
19        A.    It's Kemmerer is the town.
20        Q.    But no longer Uintah County, Utah?
21        A.    No.
22        Q.    But at one point in time, you did have a
23   contract?
24        A.    I had a contract with them for 12 years.
25        Q.    When did that contract lapse?



 1          A.     Uhm, 2017.  April of 2017.

 2          Q.     Okay.  Can you sort of give me a broad sense of

 3   the type of medical services that you provide to Duchesne

 4   County under that contract?

 5          A.     We provide outpatient services once a week.  We

 6   provide on-site medical clinic evaluation for healthcare

 7   requests for the inmates.  We also provide on-call coverage

 8   seven days a week so that they can call us and provide

 9   over-the-phone services of whatever questions that they have

10   on patients.

11          Q.     Is the on-call limited to just telephone

12   contact?

13          A.     E-mail, text and phone.

14          Q.     But you wouldn't be making on-call visits --

15          A.     No.

16          Q.     -- in the middle of the week?

17          A.     Correct.  We would not make a non-scheduled

18   clinic visit.

19          Q.     Okay.  You do clinic one day a week --

20          A.     Correct.

21          Q.     -- in Duchesne?

22          A.     Correct.

23          Q.     What day of the week is that?

24          A.     Thursday.  Most of the time, it's Thursday.

25   Some weeks, it's a little different, but for the majority,



 1  it's Thursday.

 2       Q.    And do you ever take the clinic on any given

 3  week?  Or is that delegated to somebody else?

 4       A.    Logan Clark, my physician assistant, does the

 5  majority of the clinics, but he does take vacation, and I do

 6  clinics as well.

 7       Q.    So you --

 8       A.    Periodically but not -- infrequently.

 9       Q.    To fill in for Logan?

10       A.    Correct.

11       Q.    So if Logan called in sick, you'd have to fill

12  in?

13       A.    Correct.

14       Q.    Although Logan Clark does the clinic, are you

15  also -- do you make yourself available for on-call to

16  Duchesne County?

17       A.    I'm available by phone, yes.

18       Q.    Is it one of those things where they should

19  contact Logan Clark first and then you?  Or is there any

20  protocol there?

21       A.    They typically contact Logan first because he's

22  been to the clinic during that week and he's aware of the

23  patients or he'll be seeing those patients that week.  But

24  they usually call Logan first.  If they're not able to get a

25  hold of him or if he doesn't know the answer, then they



1 contact me.  Or Logan contacts me.

2        Q.     Can you describe your relationship with Logan

3 Clark as far as employee status?

4        A.     I hired Logan shortly after he began at the

5 prison in 2007.  And I was his physician supervisor in 2007

6 at the prison.  I asked him to start covering the county

7 jails as well.  And I've been his supervising physician for

8 ten years or 11 years.

9        Q.     Can you help me understand that term,

10 "supervising physician"?  If I don't know anything about a

11 relationship between a physician's assistant and a doctor,

12 help me understand what supervising physician is.

13        A.     Every physician assistant requires a

14 supervising physician to practice by law.  So no physician

15 assistant can work independently.  They have to have a

16 supervising physician in order to work.

17        Q.     Is that through -- is that a guideline through

18 the American Medical Association?

19        A.     It's Utah State law.

20        Q.     Oh, okay.  What sort of -- what do you

21 understand is the oversight that you have to have under that

22 supervising physician role?

23        A.     The Division of Public Licensing sets up the

24 rules for supervising physicians for physician assistants,

25 and it's basically an employee agreement or delegation



1   agreement between the physician and physician assistant as to

2   what the physician approves that the physician assistant can

3   or cannot do under his license.

4          Q.     Okay.  Do you have a written agreement between

5   you and Logan Clark?

6          A.     I do.

7          Q.     Okay.

8          A.     It's called a delegation of services agreement.

9          Q.     Does that outline all of the supervisory roles

10  and the delegation of Logan Clark?

11         A.     Correct.

12         Q.     So in what way do you supervise Logan Clark's

13  work at the Duchesne County Jail?  Can you give me sort of a

14  broad...

15         A.     Well, Logan and I have worked closely together

16  for many years.  Every time he sees a patient, he dictates a

17  note on that patient.  The dictation service provides me with

18  copies of those dictations of his client visits, and I read

19  through those.  Anytime he has a question on a specific

20  patient, he contacts me directly, and we discuss it verbally,

21  uhm, on any complicated cases that he feels he's unable to --

22  he needs more assistance on.

23         Q.     Do you provide Logan with any sort of regular

24  training or education?

25         A.     The physician assistant licensure requires that



 1  he has continuing medical education to maintain his

 2  licensure.  I rely on his continuing medical education

 3  credits for his own training.

 4      Q.    Okay.  So no additional formal training other

 5  than what's required by DOPL?  Or is -- yeah, the DOPL.

 6      A.    Formal training would include continuing

 7  medical education credits.

 8      Q.    Okay.

 9      A.    I do not teach any type of classes that would

10  allow CME credits.

11      Q.    Any other training that you yourself provide to

12  Logan?

13      A.    I do.  Uhm, once a month, I go to the staff

14  meeting at Utah County Jail and provide the nursing staff

15  there and Logan Clark in our monthly staff meeting; we do

16  different types of training.  Logan is the PA at Utah County

17  Jail as well.

18      Q.    Okay.  So that's once a month?

19      A.    Correct.

20      Q.    Can you -- I know you can't give me an idea of

21  every training you've done, but can you give me sort of a

22  broad scope of what might be discussed in those monthly staff

23  trainings?

24      A.    At Utah County Jail?

25      Q.    Yes.



 1        A.     We talk about chest pain protocols.  We talk

 2   about -- we do what's called a morbidity and mortality review

 3   where anyone who had a death or a complication while in the

 4   jail, we talk about those cases.  We talk about nursing

 5   triage and nursing intake procedures.  General medicine,

 6   dental evaluations, psychological evaluations, things like

 7   that.

 8        Q.     Have there been any trainings at the Utah

 9   County training meetings -- staff meetings, do you call them

10   staff meetings?

11        A.     Staff meetings.

12        Q.     On -- in 2016, or prior, on opioid withdrawal?

13        A.     Uhm, I don't recall.

14        Q.     Would you have any records that would refresh

15   your memory whether or not those trainings existed in 2016 or

16   prior?

17        A.     Dale Bench is the medical administrator and

18   keeps records of all the staff meeting minutes.

19        Q.     Dale Bench at the Utah County Jail?

20        A.     Yes.  I do know that in 2017, we've talked

21   about alcohol and opioid withdrawals.

22        Q.     Is that at the staff training?

23        A.     Yes.

24        Q.     What was discussed in that training?

25        A.     Uhm, the opioid and alcohol withdrawal



1  protocols and nursing training, nursing protocols.

2        Q.     In your contract with Duchesne County, do you

3  have an obligation to train the staff at Duchesne County?

4                MR. NAEGLE:  Which staff?  The jail officers?

5                MR. BRIDGE:  Well, I'm going to go as broad as

6  possible.  Any staff at Duchesne County with regard to

7  medical-related training?

8                MR. BUTTERFIELD:  Objection.  Vague.

9                THE WITNESS:  Uhm, I do not do generalized

10 training to the Duchesne County officers and staff.

11 BY MR. BRIDGE:

12       Q.     Okay.  Does Logan Clark do that?

13       A.     I guess my question is define "training."

14 Instructing?

15       Q.     Well, similar to what you do at Utah County

16 staff training meetings.

17       A.     So those staff meeting trainings at Utah County

18 are required.  The Utah County Sheriff's Department requires

19 that their nurses have a certain amount of officer training

20 hours, and that's how they obtain those officer training

21 hours.  That's how Utah County does it.  Other jails don't do

22 it that way.

23       Q.     So that's something that's dictated by Utah

24 County?

25       A.     Yes.



 1          Q.     Do you know of a similar requirement by

 2    Duchesne County?

 3          A.     No.  Of the ten jails I cover, Utah County is

 4    the only jail that does that.  But they do have a staff of 30

 5    nurses.

 6          Q.     Are those RNs?

 7          A.     Yes.  All of their nurses at Utah County are

 8    RNs.  And they have 30 nurses and they have 800 patients, and

 9    it's a much bigger operation.

10          Q.     Understood.

11          A.     Which is why it requires a staff meeting every

12    month so that all 30 nurses are on the same page.

13          Q.     Okay.

14          A.     Training at Duchesne County, where there's only

15    one nurse, would be more individualized.

16          Q.     Okay.  And --

17          A.     It wouldn't require a staff meeting.  It would

18    only require the nurse and the provider.

19          Q.     Do you have any of those types of trainings

20    with Duchesne County?

21          A.     We meet with -- Logan meets with the nursing

22    staff every week to talk to them and address any issues.

23          Q.     Other than the meetings between Logan and the

24    staff at Duchesne County, would you be involved in any

25    specific trainings?



 1        A.     No.

 2        Q.     Do you know Jana Clyde personally?

 3        A.     I do.

 4        Q.     You've met her in person?

 5        A.     I have.

 6        Q.     How long have you known her?

 7        A.     Four or five years.

 8        Q.     Is that the duration of her position as the

 9   nurse at Duchesne County?

10        A.     Correct.

11        Q.     Can you describe for me, in that four- to

12   five-year period, what sort of face-to-face contact

13   interactions you've generally had with Jana Clyde?

14        A.     The only interaction I've had with Jana is

15   during medical clinic hours.  There's been no contact outside

16   of clinical, no personal relationship.

17        Q.     That's just when you're filling in for Logan

18   Clark?

19        A.     Correct.

20        Q.     So could I assume -- how many times a year do

21   you believe you fill in for Logan Clark on average?

22        A.     Four times, three to four times.

23        Q.     You might have interacted face to face with

24   Jana Clyde four to five times a year?

25        A.     Yeah, four times as an estimate, yes.



 1          Q.     Okay.

 2                 And you had --

 3          A.     I have not interacted with her recently because

 4   she was placed on administrative leave for a period of time.

 5   So I have not seen her for a while.

 6          Q.     Who is the nurse at Duchesne County now?

 7          A.     Well, Jana Clyde is still -- still employed at

 8   Duchesne County.  She is back working now.

 9          Q.     Oh, I see.

10          A.     Yes.  She was on administrative leave for a

11   short period of time while she was being...

12                 MR. NAEGLE:  Investigated?

13                 THE WITNESS:  Investigated.  But then she was

14   cleared of that investigation, so now she's back working at

15   Utah.  And we just hired a third nurse.  Or Duchesne County

16   just hired a third nurse.

17   BY MR. BRIDGE:

18          Q.     An RN?

19          A.     Yes.

20          Q.     What's her name or his name?

21          A.     Kate -- it's Katie -- I don't know her last

22   name.

23          Q.     Do Katie and Jana Clyde work on the same days?

24   Or are they to be offsetting each other?

25          A.     I'm not, uhm, clear on their schedule.  I'm not



 1  involved in their scheduling.

 2        Q.     Were you involved in any way encouraging

 3  Duchesne County to hire a registered nurse?

 4        A.     Yes.

 5        Q.     What involvement did you have?

 6        A.     I recommended they hire a registered nurse.

 7        Q.     When did you make that recommendation?

 8        A.     2008.

 9        Q.     And did you renew that recommendation

10  periodically?

11        A.     Many times.

12        Q.     What was the obstacle in them not accepting

13  that advice?

14               MR. BUTTERFIELD:  Objection, foundation.

15               MR. NAEGLE:  Objection.  Lack of foundation.

16  Calls for speculation.

17               MR. MYLAR:  Join.

18               MS. ABKE:  Join.

19  BY MR. BRIDGE:

20        Q.     If you know?

21        A.     I don't know.  I make the recommendation to all

22  my county jails that they have nursing staff in the jails.

23  Some of the jails have nursing staff, other jails don't.  I

24  don't make the determination whether they have them or not.

25        Q.     When you recommended it to Duchesne County, did



 1  they give you a reason as to why they had not acted on that

 2  advice?

 3          A.      No.  They hired Jana Clyde.  And then after the

 4  Jensen incident, they hired another -- they've hired more

 5  nursing staff.

 6          Q.      Prior to Jana Clyde being hired, did Duchesne

 7  County not have any nurse?

 8          A.      That's correct.

 9          Q.      So it was just jail staff?

10          A.      That's correct.  That's why I made that

11  recommendation long ago.

12          Q.      Who do you believe is responsible for providing

13  Jana Clyde with training, and I'm talking back in 2016, with

14  training on how to treat and assess inmates?

15          A.      Well, she went to school, and the school that

16  she went to would be responsible for that training.

17          Q.      Okay.  Do you believe that there's anybody else

18  that is responsible for giving Jana Clyde training?

19          A.      We give her instruction as to how to do her job

20  more efficiently and more effectively.  And when we see -- in

21  any nurse, if I see a nurse that I feel like they may be

22  doing that wrong or they maybe need help, then we give them

23  advice and encouragement and instruction and training.

24          Q.      Do you believe that's part your contract with

25  Duchesne County?



1         A.      Yes, we would do that.  We would do that for

2    Jana.  But to the best of my knowledge, I've never seen an

3    incident where she -- you know, prior to this case, that I

4    would have said, Hey, you need specific training in that --

5    more training in that field or you need a remedial course or

6    further -- further training in the specific subject.

7         Q.      Okay.  Do you --

8         A.      But if I saw a deficiency, I would recommend to

9    her, yes.

10        Q.      Do you believe that that was your -- that if

11   you saw that deficiency, that it would be your obligation to

12   provide that training?

13        A.      Sure.

14        Q.      Do you have any sort of way of documenting the

15   advice or training or counsel that you provide anyone at the

16   Duchesne County Jail?

17        A.      No.

18        Q.      Is it sort of on the fly?

19        A.      Yes.

20        Q.      Verbal communications, I'd assume?

21        A.      Yes.

22        Q.      Okay.

23                As the contracted physician for Duchesne County

24   Jail, what access do you have to inmate records such as

25   booking forms, health questionnaires, that sort of thing?



 1        A.    We don't have access to those.  Well, I mean,

 2   the nursing staff can print them off and provide them to us

 3   if we -- if we need them.

 4        Q.    So is it you have access to them through the

 5   jail staff?

 6        A.    (No oral response.)

 7        Q.    Is that a yes?

 8        A.    Yes.

 9        Q.    I'm sorry.

10        A.    Those records would be available if we

11   requested them.

12        Q.    And have you ever had an instance in which you

13   were denied access to those documents when you asked for

14   them?

15        A.    No.

16        Q.    So the intake forms, the health questionnaires,

17   those are documents that you can rely on to the extent you

18   need to in your treatment of patients?

19        A.    Yes, as long as the information is valid.  Many

20   times detainees do not answer the questions truthfully --

21        Q.    Okay.

22        A.    -- when it comes to alcohol use or drug use or

23   other reasons.

24        Q.    Fair enough.

25              The information is only as good as the person



 1  providing it?

 2       A.     That's correct.

 3       Q.     Okay.  But that's true with any patient that

 4  you treat in any context.  Isn't that true?

 5       A.     Correct.

 6       Q.     At least the subjective findings?

 7       A.     Correct.  Objective findings can be faked as

 8  well.

 9       Q.     Okay.  What do you mean by that?

10       A.     Well, I mean I can fake an injury to my knee

11  and tell you my knee hurts.  And then you go to examine it,

12  and I can say that hurts, as well, and fake objective

13  findings like a limp.

14       Q.     Okay.

15              In your practice in contracting with Duchesne

16  County, do you ever review urine analyses like for drugs?

17       A.     No.  That's not part of our contract.

18       Q.     So you would never ask for UAs?

19       A.     No.

20       Q.     Are there any other jail records you review in

21  your duties of treating inmate patients?

22       A.     Not routinely.

23       Q.     Okay.  Are you familiar with the medical files

24  that are kept at the Duchesne County Jail?

25       A.     The dictations?



 1        Q.     Well, Logan Clark testified that there is
 2   typically a medical file that's created for each patient that
 3   has a medical concern or issue that they've been seen on?
 4        A.     Correct.
 5        Q.     And I'm wondering, are you familiar with
 6   those files, not the particular patient's files, but the fact
 7   that there are medical files?
 8        A.     Okay.  Yes.  I am aware that there are medical
 9   files at Duchesne County.
10        Q.     Okay.  What I want to ask of you is, what would
11   you expect to find in those medical files generally speaking?
12   What types of documents are kept in those files?
13              MR. BUTTERFIELD:  Objection.  Vague,
14   foundation.
15              THE WITNESS:  I would expect to find any
16   provider visits or dictations dictated by the providers.  Any
17   nursing notes that the nursing staff took and wrote in there.
18   Any vital signs that the nurses took would be written in
19   there.  Any healthcare requests that the detainee wrote would
20   be, you know, triaged and placed in the medical file.
21   BY MR. BRIDGE:
22        Q.     Anything else you can think of?
23        A.     Medication that -- any medications that have
24   been dispensed to the patient, or previous hospital records
25   that we've requested from the hospital or previous outpatient



 1  records.  Mental health evaluations from psychiatrists or

 2  others.

 3          Q.      Very good.  Thank you.

 4                  With respect to the hospital records that you

 5  mentioned, would it be your practice to, if a patient

 6  reported that they had been to the hospital fairly recently

 7  coming into the jail, that you would request those records

 8  from the hospital?  Or how do you approach those?

 9          A.      Well, when I see a patient in clinic and I'm

10  taking a medical history and they tell me, I was recently

11  released from the hospital for X,Y,Z, I ask them the

12  information.  If they're not able to give me all the

13  information or -- sometimes they are able to.  If they're not

14  able to or they don't know what happened at the hospital,

15  then we would request them, yes.

16          Q.      Okay.  But that's something that would be

17  initiated by you as the physician, not necessarily the staff

18  at the jail?

19          A.      The patients need to clear -- you know, they

20  have to give access to the medical records.  The -- there's

21  HIPAA laws, and they have to sign a document stating that

22  they would want their records released to the jail.

23          Q.      I see.  And my question is, that process would

24  only be initiated by you or Logan Clark, not the jail staff?

25          A.      The patient can request their own records as



 1   well.  Or have their records -- some patients bring their

 2   records to the jail.  Or say, I just had this procedure; here

 3   are my medical records.  Or I just had this operation, and

 4   I'd like the doctor to review my records.

 5        Q.    We got a little bit of this from Logan Clark

 6   this morning.  But can you help us understand some of the

 7   circumstances which clonidine would be prescribed for a

 8   patient?

 9        A.    Clonidine?

10        Q.    Clonidine, thank you.

11        A.    Clonidine is an anti-hypertension medication

12   for blood pressure.  So it's clinically indicated to reduce

13   blood pressure, but it also acts as an anti-anxiety agent,

14   because some patients would feel that it relieves some

15   anxiety.  Some patients use it for a smoking cessation, some

16   patients use it for withdrawal symptoms or agitation,

17   irritability.  But they -- it does not have a clinical

18   indication for that.  It only has a clinical indication for

19   hypertension.

20        Q.    Okay.  So if you had a patient that had high

21   blood pressure, could you -- would clonidine be one of the

22   medications you could prescribe?

23        A.    Yes.  It's a fast-acting alpha blocker.

24        Q.    And is high blood pressure one of the symptoms

25   of opiate withdrawal?



 1         A.      Yes, patients with opiate withdrawal do have

 2  high blood pressure at times.  One of the many.

 3         Q.      Would patients with the flu have high blood

 4  pressure?  Or can you say one way or the other?

 5         A.      Yes, they can have high blood pressure.

 6         Q.      Can it also be the opposite, low -- too low of

 7  blood pressure with the flu?

 8         A.      It's possible.  But most patients who are

 9  actively vomiting, when you vomit, it drives your blood

10  pressure up.

11         Q.      Okay.

12         A.      It's a stressful situation for a person, and

13  their blood pressure responds to that.

14         Q.      What's the process through which an inmate's

15  outside prescriptions get approved to be taken in the jail?

16         A.      Usually when the patient comes into jail, they

17  report, I'm taking X, Y, Z medications.  And then some

18  patients bring their medications with them, so we're able to

19  just look at the bottles and know they have prescriptions for

20  those.  Otherwise, we need to contact the pharmacy where they

21  got them filled and see if those medications were indeed

22  filled and are valid prescriptions.  Then nursing staff

23  typically calls the provider and gets approval for those

24  medications to be issued.

25         Q.      Can Logan Clark approve certain medications



CITICOURT
THE REPORTING GROUP

1   over the phone --

2          A.     Yes.

3          Q.     -- if contacted by Jana Clyde?

4          A.     Yes.

5          Q.     Is clonidine one of those prescriptions that

6   could be approved over the phone?

7          A.     Yes.

8          Q.     What sort of information do you believe Logan

9   Clark would need in order to give a thumbs-up or down on

10  approving a clonidine prescription?

11         A.     Well, he would need to know that she -- the

12  patient has an active prescription from a physician, whether

13  it's confirmed by the actual pill bottle that they have or

14  confirmed through the pharmacy.  Sometimes patients have

15  self-reported medications that we don't need to approve

16  through a bottle or -- because they're like over-the-counter

17  medications like Prilosec or -- or, you know, Prozac isn't

18  over the counter, but if someone needs to be on Prozac, they

19  can be on Prozac.  We don't have any heartburn about that.

20  And clonidine is one of those medications that we don't have

21  a lot of heartburn about.

22         Q.     Okay.  So you'd want --

23         A.     It's not abused in the jail or -- or it's not a

24  bad medication.

25         Q.     So you'd want to see an active prescription.



1  Anything else that Logan would want to know over the phone

2  before he gave the thumbs-up on any --

3          A.      Well, it would be nice to know her blood

4  pressure.  Meaning, you know, if her blood pressure was very

5  low, he wouldn't want to approve that medication.

6          Q.      Would you want to know why the clonidine was

7  prescribed by whatever provider?

8          A.      You mean whether it's being used for

9  hypertension, anxiety or other reasons?

10          Q.      Yes.

11          A.      That would be ideal.  But usually that's

12  patient self-reported.  We don't contact a physician who

13  prescribed it.  We ask the patient, Why are you taking that

14  medication?

15                  (Whereupon, Mr. Butterfield left the deposition

16  proceedings.)

17  BY MR. BRIDGE:

18          Q.      And because it's not one that's subject to

19  abuse, it's not a real concern about approving?

20          A.      Right.  That particular medication is not a

21  medication of abuse.

22                  There are medications that are more -- that are

23  abused, and we need to investigate those medications much

24  more closely.

25          Q.      And let me ask you --



 1                (Whereupon, Mr. Butterfield returned to the

 2   deposition proceedings.)

 3   BY MR. BRIDGE:

 4        Q.     -- is Wellbutrin one of those medications --

 5        A.     Yes.

 6        Q.     -- that's abused?

 7        A.     It is abused.

 8        Q.     What is Wellbutrin for?

 9        A.     Wellbutrin is an antidepressant.

10        Q.     And it can be taken recreational?

11        A.     Yes.  People crush it and snort it and abuse

12   it, and it gives you a methamphetamine type of high if used

13   recreationally.

14        Q.     What about tramadol?

15        A.     Tramadol is a narcotic medication, and we

16   regulate all narcotics coming into the jail.  Specifically in

17   patients who have had a history of narcotic use.

18        Q.     So it's unlikely that Wellbutrin or tramadol

19   would be approved for being taken at the Duchesne County

20   Jail?

21        A.     It's unlikely.  You know, and there are

22   patients who are on tramadol who have specific reasons to be

23   on them with acute hand fracture or, you know, injury that is

24   obvious that they need a specific pain medication.  And then

25   a patient who has a history of narcotic abuse and on a



 1  narcotic, it's unlikely that we would approve that without

 2  further investigation from the physician who prescribed it.

 3        Q.    Can tramadol be prescribed in the setting of

 4  opiate withdrawal?  Have you ever seen that?

 5        A.    It is not an opiate-withdrawal medication.  Not

 6  indicated for opioid withdrawal.

 7              Are you saying can it be or is it indicated to

 8  be?  There's a difference.

 9        Q.    Have you --

10        A.    There are physicians who prescribe all kinds of

11  narcotics in the sign of opiate withdrawal.

12        Q.    Really?

13        A.    But they're not indicated for that.

14        Q.    Okay.

15        A.    Methadone and buprenorphine are the only

16  medications that are indicated for narcotic withdrawal.

17        Q.    Is that latter one, is the brand name Sub...

18        A.    Subutex.

19        Q.    Subutex.

20        A.    Suboxone, correct.  That's buprenorphine.

21        Q.    Those are actually narcotic based, but they are

22  prescribed for situations of opiate withdrawal?

23        A.    Those two medications, methadone and

24  buprenorphine, have indications by the FDA for narcotic

25  withdrawal.  All other narcotics, like Percocet, Ultram,



 1  Lortab, fentanyl, do not have an indication for narcotic

 2  withdrawal.

 3       Q.    Could tramadol show up in a urinalysis as an

 4  opiate?

 5       A.    It shows up as tramadol.  Meaning you have to

 6  test specifically for tramadol.

 7       Q.    So if somebody tested positive for opiates,

 8  that would not be an indication they were on tramadol?

 9       A.    No.  It would be an indication that they were

10  taking either prescription pain pills, meaning like Lortab,

11  hydrocodone, OxyContin, Oxycodone, Percocet, or they're

12  taking heroin.  The tramadol does not test positive for the

13  traditional narcotics.  You have to test specifically for

14  tramadol.

15       Q.    Understood.  Okay.  That clears it up.

16             In November of 2016, what practices had you

17  implemented at the Duchesne County Jail to -- with regard to

18  reporting or documenting vomiting or diarrhea in patients?

19       A.    Uhm, what do you mean specifically by

20  "documenting"?

21       Q.    What sort of procedures or protocols had you

22  put in place so that the jail staff knows when to be

23  concerned about vomiting or diarrhea?

24       A.    I'm not involved in making policy or procedure

25  for Duchesne County Jail.



1          Q.      So if the jail staff is monitoring some

2    patient, whether it's flu-like symptoms or opiate withdrawal

3    symptoms, and it's chronic vomiting or diarrhea, you don't

4    have any protocol that's in place to make sure that

5    information gets passed on to Logan Clark or yourself?

6          A.      Our -- we don't have protocols.  What we have

7    is, if a patient wants to be seen, they put in a healthcare

8    request.  And that healthcare request is triaged, and the

9    provider is contacted to decide what to do with that

10   particular problem.

11         Q.      So it's really patient initiated?

12         A.      Yes.  Patient complaints are what -- why

13   patients see physicians.  Just like on the outside, if you

14   want to see a doctor, you go to the hill.

15         Q.      So if a patient didn't report vomiting or

16   diarrhea to jail staff, then you would have no expectation of

17   the jail staff taking it upon themselves to report that to

18   you?

19         A.      You mean if -- are you asking if an officer saw

20   someone throwing up?

21         Q.      Yes.

22         A.      I would expect if an officer saw someone

23   throwing up, I would expect that officer to contact the nurse

24   or us for further -- further orders or further evaluation.

25         Q.      Okay.  That's helpful.



1       A.      But I don't see a situation where someone is
2  throwing up and them saying, No, I don't need to see -- you
3  know, don't tell the doctor; I don't want to see the doctor
4  for that.  Now, if a patient does, say, they throw up, and
5  officer says, Hey, are you okay?  And the patient says, I
6  don't want to see a doctor, I wouldn't have that expectation
7  that the officer calls at that point.  But, you know, if the
8  officer said, Are you okay?  And they're like, No, I'm not
9  okay, they should call us.
10       Q.      Okay.  My question is, what have you instituted
11  with Duchesne County Jail to ensure that your expectation of
12  receiving a call under those circumstances is clearly defined
13  to Duchesne County Jail, that they know when they should be
14  calling you?
15       A.      I personally have not done anything to make
16  sure they know, I guess.
17       Q.      Do you know if Logan Clark has done anything?
18       A.      I --
19               MR. BUTTERFIELD:  Foundation.
20               Go ahead.
21               THE WITNESS:  You'll have to ask him.
22  BY MR. BRIDGE:
23       Q.      But you have no knowledge of that?
24       A.      I have no knowledge of what Logan has said.
25       Q.      Do you know of any policy or practice of asking



1  inmates to save their vomit or diarrhea so that the nurse or
2  jail staff can verify it?

3       A.      Do you ask if there's a policy for that?

4       Q.      If there's a practice or a policy.

5       A.      I don't know of any policy that states that
6  they need to save their vomit.  I'm unaware of that policy.
7  Do you have a copy of that policy?

8       Q.      No.

9       A.      Okay.

10      Q.      And when I say "policy," I'm using that term
11  very loosely.  It could be a policy and/or a practice.  When
12  I say "policy," I don't necessarily mean something that's
13  written.

14      A.      Well, there are incidences where I've requested
15  a patient have a stool sample or emesis to be cultured or be
16  evaluated for blood or to be evaluated -- you know, tested,
17  yes.

18      Q.      Sure.

19      A.      So that's a common practice where physicians
20  test vomit for blood or test vomit for bacteria or test feces
21  for the same situation.

22      Q.      Understood.  My question is more geared towards
23  checking the veracity of reports of actually vomiting or
24  diarrhea.

25      A.      I don't know what you mean by "veracity."



 1      Q.      The truth.

 2      A.      Checking the truth?

 3      Q.      Or reports of vomiting or diarrhea?

 4      A.      I don't -- I don't know of any policy for that.

 5      Q.      The reason I ask that --

 6      A.      It would be reasonable for any officer or

 7   nurse, if they see someone throwing up, to contact us.

 8      Q.      Do you know if there is any practice or

 9   procedure that would allow for officers who are coming on and

10   off shifts to be able to document that sort of a thing?  So

11   that, you know, maybe one officer sees vomiting, and another

12   one does and another one does, but nobody has seen it more

13   than twice, but over three days, it's chronic.

14              MR. BUTTERFIELD:  Objection.  Foundation.

15   BY MR. BRIDGE:

16      Q.      Is there any process or procedure by which that

17   could be documented?

18              MR. MYLAR:  Objection.  Calls for speculation.

19              MR. NAEGLE:  Lack of foundation.

20              THE WITNESS:  I don't know of what the officers

21   logs are and what they're required to write down.

22   BY MR. BRIDGE:

23      Q.      You haven't asked them to create any logs of

24   that nature?

25      A.      I have not asked the officers to create logs.



 1        Q.      Documenting vomiting or diarrhea?

 2        A.      (No oral response.)

 3        Q.      Is that a no?

 4        A.      No.  I have not asked them to do that.

 5        Q.      Sorry, she just can't take the shaking of the

 6  heads.

 7        A.      I understand.

 8        Q.      I don't mean to pick on you.

 9               The reason I asked you those previous questions

10  was Jana Clyde testified that if she didn't see the vomit --

11  if she actually didn't see the evidence of the vomit or the

12  diarrhea, then she did not believe the inmates' reports.

13               MR. MYLAR:  Objection.  Misstates testimony.

14  BY MR. BRIDGE:

15        Q.      Is that consistent with how you would operate

16  in treating inmate patients?

17               MR. NAEGLE:  I'm sorry, would you ask that

18  question again?

19               MR. BRIDGE:  Yes.

20  BY MR. BRIDGE:

21        Q.      Jana Clyde testified that if she didn't

22  actually see the vomit or diarrhea, she did not believe the

23  reports of such.

24               MR. MYLAR:  Same objection.

25                               *



 1  BY MR. BRIDGE:

 2        Q.      Is that how you operate in treating inmate

 3  patients?

 4        A.      Uhm, that's very vague question.  There are

 5  patients who have lied to me about blood in their urine,

 6  vomiting, diarrhea, all kinds of complaints.  And there are

 7  patients who have been very truthful with me.  It's a very

 8  independent patient-doctor interaction that I -- whether I

 9  would believe them or not.

10        Q.      Okay.  Fair enough.  But a blanket policy --

11        A.      There would not be a blanket policy.  That

12  would be individual per patient.

13        Q.      Because, of course, objective findings could

14  substantiate what they're telling you as far as the way they

15  looked, their skin color?  I mean, isn't that true?

16        A.      That's true.  And so could saving their vomit

17  is an objective finding.

18        Q.      Yes.  Do you have some sort of a container or

19  process by which inmates at Duchesne County Jail could save

20  their vomit or diarrhea to show the staff?

21        A.      Do I personally?

22        Q.      Do you know if there is that sort of a process

23  in place?  I mean, what are they supposed to do with it?

24        A.      Well, I do know that they're -- most jail

25  cells, the toilets can be flushed or not flushed or the water



 1  can be turned off or -- you know, they do have a toilet in

 2  there, in their cell, that they don't have to flush if they

 3  throw up.

 4          Q.    Okay.  So they could just not flush their

 5  toilet.  Anything else?

 6          A.    I'm sure they could be provided with an emesis

 7  basin of some sort.

 8          Q.    Do you know if that's something that's on hand

 9  at Duchesne County?

10          A.    I don't know.

11                But every cell is equipped with a toilet.

12          Q.    Do you know what procedures -- in November of

13  2016, what procedures there are for monitoring inmates when

14  they've placed -- when they've been placed on medical

15  observation in the court holding cell?

16          A.    I'm not sure what you mean by policy or

17  procedure.

18          Q.    If someone has been placed in -- well, what is

19  medical observation?  I've heard that term from the County,

20  that Madison Jensen was placed on medical observation in the

21  court holding cell.  Is that a term that carries some sort of

22  procedure or practice that follows?

23          A.    Well, that is not a term that I use.  But I

24  assume that that would mean that they would move her from the

25  housing unit down to a holding cell that's right in front of



 1  booking -- or the area where the officers can visually see

 2  her all the time.  Versus back in the housing unit where they

 3  would not be able to be visualized 24 hours a day.

 4        Q.      Okay.

 5        A.      And medical observation, it's my understanding

 6  that they would be moved to a housing situation where they

 7  could be more closely visualized by the officers.

 8        Q.      Would there be anything else that would

 9  accompany that sort of shift in the location?

10        A.      The nursing staff would most likely check on

11  that patient more frequently, and the officers would be

12  checking on that patient more frequently because they would

13  be able to see them.

14        Q.      When you say the nurse checking on that

15  patient, what do you mean by "checking"?  Just a visual check

16  or actually taking vitals and --

17        A.      I guess it depends on why the person is in

18  medical observation.

19        Q.      Okay.  What if it's for chronic vomiting and

20  diarrhea?

21        A.      Well --

22              MR. BUTTERFIELD:  Objection.  Speculation.

23              THE WITNESS:  So if I request, as a physician,

24  if I say, Okay, move that person down to medical observation

25  or holding cell where she could be visualized, I usually



 1 follow that order with specific requests like checking on

 2 her, do vital signs twice a day, give her medication three

 3 times a day, do a evaluation.  You know, and I'm more clear

 4 with the orders that I give when I tell someone -- tell the

 5 nursing staff to move the patient down.

 6 BY MR. BRIDGE:

 7       Q.    So the medical observation would be accompanied

 8 by very specific case-by-case directions by the physician?

 9       A.    If I ask for them to come down, I ask and I

10 give specific reasons why.

11       Q.    Okay.  What if it's initiated by the jail

12 staff?  Would you have any expectation of what would happen

13 once they're under medical observation?

14       A.    The jail can move patients anywhere they want

15 in the jail for any reason.

16       Q.    Okay.

17       A.    They can house a patient wherever they feel is

18 most beneficial to that person.

19       Q.    My question is, if the jail staff told you that

20 someone was moved for medical observation, would you know

21 exactly what was going to happen after that?  Or is that such

22 a vague term that there is no real practice --

23       A.    If the jail called me and said, We moved this

24 patient for medical observation, I would immediately say,

25 Why?



1    Q.    Okay.  Would you --

2    A.    What is the medical need?

3    Q.    Would you expect to get that phone call if they

4 were moved for medical observation?

5    A.    If they were moved for medical evaluation, I

6 would assume there's a medical problem.

7    Q.    You would expect to get a phone call?

8    A.    I would want to know what the medical problem

9 is as to why she needed to be moved.

10    Q.    Do you believe that expectation has been

11 clearly directed to Duchesne County by yourself in 2016?

12    A.    I did not verbally instruct every officer of

13 that expectation, no.

14    Q.    Okay.  But that would be your expectation?

15    A.    That would be my expectation.

16    Q.    Did you clearly identify that expectation in

17 2016 to Jana Clyde?

18    A.    I don't know what your definition of "clearly"

19 is.  There was no written or --

20    Q.    Did you communicate --

21    A.    -- formal documentation of that.

22    Q.    Did you communicate it in any way, that

23 expectation, to Jana Clyde in 2016?

24    A.    I think over the years of working with Jana,

25 it's been clear that I have -- I feel I have verbally told



 1  her she can call me for anything at any time.

 2        Q.     Okay.

 3        A.     Any medical concern, she can call me.

 4        Q.     But specifically, did you communicate to Jana

 5  Clyde that somebody moved for medical observation, you should

 6  get a phone call in 2016?

 7        A.     Not specifically, no.

 8        Q.     Are there any form or documentation that's

 9  filled out for when someone is moved for medical observation?

10        A.     Not that I know of.

11        Q.     As of November 2016, describe for me Duchesne

12  County Jail's opiate withdrawal policy, if any.

13               MR. BUTTERFIELD:  Foundation.

14               MR. MYLAR:  Join.

15               MR. NAEGLE:  If you know.

16               THE WITNESS:  I don't know of any policy.

17  BY MR. BRIDGE:

18        Q.     Okay.  As of November 2016, did you have -- had

19  you given any sort of directive to the Duchesne County Jail

20  with regard to opiate withdrawal?

21        A.     Duchesne County Jail is not an opiate treatment

22  center.  It is not a withdrawal medical facility.  We do not

23  have a policy or procedure for opiate withdrawals.  That is

24  not the intention of Duchesne County Jail.

25        Q.     You do now.



 1        A.     That's correct.

 2        Q.     So why didn't you have one in 2016?

 3        A.     I guess the bigger question is why do we have

 4   one now?

 5        Q.     Why do you have one now?

 6        A.     Because you're suing Duchesne County Jail for

 7   the death of Jensen.

 8        Q.     So it's to avoid lawsuits?

 9               MR. BUTTERFIELD:  Objection --

10               MR. NAEGLE:  Objection.  Lack of foundation.

11               MR. BUTTERFIELD:  Misstates prior testimony.

12               MR. MYLAR:  Join.

13               MS. ABKE:  Join.

14               THE WITNESS:  I don't know why they created the

15   policy.  But I can only assume.

16   BY MR. BRIDGE:

17        Q.     So as of November 2016, there is no opiate

18   withdrawal policy?

19               MR. NAEGLE:  If you know.

20               THE WITNESS:  Not that I know of.

21   BY MR. BRIDGE:

22        Q.     Was there some minimum expectation for someone

23   that's withdrawing from opiates as far as taking vitals in a

24   regular interval?

25        A.     In 2016?



 1        Q.    Correct.

 2        A.    No.

 3        Q.    If Logan Clark testified that that expectation

 4   was at least once a day, would you disagree with him?

 5             MR. MYLAR:  Objection.  Misstates prior

 6   testimony.

 7             MR. BUTTERFIELD:  Join.

 8             THE WITNESS:  I don't know what Logan Clark

 9   said.

10   BY MR. BRIDGE:

11        Q.    Well, if that's what he said, would you

12   disagree with that?

13        A.    That -- can you repeat the question?

14        Q.    If Logan Clark testified that patients

15   exhibiting opiate withdrawal should be -- have their vitals

16   checked at least once a day and recorded, would you disagree

17   with that?

18        A.    I would say that opiate withdrawal is a large

19   spectrum of symptoms.  And some symptoms -- some patients are

20   so sick they need their vitals checked every hour.  Some

21   patients are not sick at all, and they need their vitals

22   checked, if at all, once in a while, once every other day.

23   It really relates to how bad their symptoms are as to how

24   closely they need to be monitored.

25        Q.    So you don't believe there's a minimum standard



 1  for checking vitals with someone that is in opiate
 2  withdrawal?
 3          A.     I guess the minimum standard is if they were in
 4  mild withdrawal, they wouldn't need their vitals checked at
 5  all.  If they were in moderate to severe withdrawal, they
 6  would need their vitals checks much more frequently.
 7          Q.     Would you have an expectation that the jail
 8  staff would understand when someone is in a mild opiate
 9  withdrawal versus a severe opiate withdrawal?
10                 MR. BUTTERFIELD:  Foundation.
11                 MR. MYLAR:  Join.
12                 MR. NAEGLE:  Only if you know.
13                 THE WITNESS:  I don't know the answer to that.
14  BY MR. BRIDGE:
15          Q.     You never communicated an expectation of what
16  jail staff should monitor as far as what's a mild opiate
17  withdrawal versus a severe opiate withdrawal?
18          A.     No.
19          Q.     Prior to December 2016, did you provide Jana
20  Clyde with any training or education on opiate withdrawal?
21          A.     Not that I recall.
22                 MR. BRIDGE:  Take a quick break?
23                 MR. NAEGLE:  Sure.
24                 (Recess taken from 2:33 p.m. to 2:39 p.m.)
25                                *



 1  BY MR. BRIDGE:

 2       Q.    Dr. Tubbs, you testified you worked at the Utah

 3  State Prison from '99 until about 2016?

 4       A.    Correct.  No, 2015.

 5       Q.    2015.  Did the Utah State Prison have an opiate

 6  withdrawal policy or protocol at any point during that time?

 7       A.    No.

 8       Q.    Do you know if they have one now?

 9             MR. BUTTERFIELD:  Foundation.

10             THE WITNESS:  No.  Not that I know of.  At the

11  Utah State Prison, typically patients are long detoxed before

12  they ever make it to prison.  No one comes -- not no one, but

13  most individuals don't arrive at Utah State Prison without

14  already being detoxified through many of the State systems

15  before they arrive at the prison.

16  BY MR. BRIDGE:

17       Q.    That makes sense.  Through a county jail or --

18       A.    County jail or drug treatment programs or

19  things like that.

20       Q.    Through the legal process, they --

21       A.    Yeah, it takes --

22       Q.    -- get sentenced --

23       A.    -- so long before they make it to prison.

24       Q.    That makes sense.  If Utah State Prison were to

25  implement an opiate withdrawal policy during that period of



 1 | time, would you have been the one that would have had to
 2 | implement that?
 3 |             MR. MYLAR:  Calls for speculation.
 4 |             MR. BUTTERFIELD:  Join.
 5 |             THE WITNESS:  I did not -- what do you mean,
 6 | "implement it"?
 7 | BY MR. BRIDGE:
 8 |     Q.    In other words, do they not have one because
 9 | you were the physician that was there?
10 |     A.    I was one of four physicians and seven PAs.
11 |     Q.    Okay.  So if it would have --
12 |     A.    I was not the medical director of Utah State
13 | Prison.  That was Dr. Garden.
14 |     Q.    Okay.
15 |     A.    He would be responsible for implementing that.
16 |     Q.    I understand.  That's my question.
17 |           Have you implemented a opiate withdrawal
18 | protocol for all nine counties and Wasatch County now?
19 |     A.    Since this Jensen case, I have made it a
20 | prerogative to make sure that all the jails are involved in
21 | opiate withdrawals.
22 |     Q.    Let's go to Exhibit 13, which is in this binder
23 | right there.  Is Exhibit 13 a document that you've seen
24 | before?
25 |     A.    It's a single-page document?

 1        Q.     It is a single page.

 2        A.     Why does it end on No. 4 that says "without

 3   prior" and there's nothing more?

 4        Q.     I can't answer that question.  It was produced

 5   to us by the Uintah County Sheriff's Office.  So I'm not sure

 6   why it gets cut off there.

 7        A.     Why was this produced by the Uintah County

 8   Sheriff's Department when it says Duchesne County jail?

 9        Q.     Because the Uintah County Sheriff's Office did

10   the investigation, and we sent them a subpoena and they

11   produced it to us.

12        A.     Okay.

13        Q.     Have you ever seen that document before?

14        A.     I don't recall seeing this document before.

15        Q.     So it didn't come from your office?

16        A.     I did not draft this.

17        Q.     Do you know -- and do you know if Logan Clark

18   drafted this?

19               MR. BUTTERFIELD:  Foundation.

20               THE WITNESS:  I do not know if Logan Clark

21   drafted this or not.  I do not know the author.

22   BY MR. BRIDGE:

23        Q.     Or the time frame?

24        A.     It does not have a time frame.  It says here

25   5/23/18.  Well, the sticker right here.



 1                MR. BRIDGE:  We put that on there.

 2                THE WITNESS:  Okay.

 3    BY MR. BRIDGE:

 4        Q.    So this is an obvious question, but this would

 5    not have been a policy or procedure that was in place in

 6    November of 2016, then?

 7        A.    I do not know when this was generated.

 8        Q.    Let's go to Exhibit 39.  Do you recognize that

 9    document?

10        A.    I'm familiar with this document.

11        Q.    Did you prepare this document?

12        A.    I did not.

13        Q.    Who did, if you know?

14        A.    Uhm, I cannot be certain, but I think I know.

15        Q.    Who do you believe?

16        A.    I believe Logan Clark drafted this.

17        Q.    Okay.  Did you approve it?

18        A.    I have reviewed this document, and I do approve

19    of it.

20        Q.    Is this the current opiate withdrawal procedure

21    that's in place with Duchesne County Jail as of today?

22        A.    I believe so.

23        Q.    And when was that implemented?

24        A.    I don't know the exact date.

25        Q.    Do you know the year?



 1        A.    I don't know the exact year, but I would assume
 2   that it would be 2017.
 3        Q.    Is it your testimony that this policy was
 4   implemented as a result of the death of Madison Jensen?
 5              MR. BUTTERFIELD:  Foundation.
 6              MR. NAEGLE:  If you know.
 7              THE WITNESS:  I don't know.  It's my testimony
 8   that this policy would be implemented because there are
 9   patients that come into the jail with opiate withdrawal.
10              MR. BRIDGE:  Okay.
11   BY MR. BRIDGE:
12        Q.    So when I asked you that question previously,
13   you said, We have an opiate withdrawal policy because we're
14   getting sued.  And that's a modification of that answer.
15        A.    That is a modification of it.  We have many
16   patients who come into the -- into all the jails because of
17   narcotic use.  And it is a growing problem in America, opioid
18   addiction.  And it's been, you know, a tough disease to deal
19   with on all aspects.
20        Q.    Okay.
21        A.    And jail is not an opioid withdrawal place.  I
22   mean, you know, we're not a drug treatment center.  There
23   needs to be more drug treatment centers throughout Utah for
24   these types of people.  And jail is not the answer for them.
25        Q.    Okay.



 1              Did you have to get this -- when I say "this,"
 2  it's Exhibit 39, opiate withdrawal policy, did you have to
 3  get that approved through Duchesne County in some way or...
 4        A.    I do not believe it needed to be approved.
 5  These are physician orders.
 6        Q.    This is under your domain?
 7        A.    These are provider orders, yes.  Duchesne
 8  County does not require our physician orders to be approved
 9  by them.
10        Q.    Okay.
11        A.    I make a physician order, and it's followed.
12        Q.    Got it.
13              The term "nursing assessment" is used in the
14  policy.  Can you tell me, is that a term of art?
15        A.    A term of art?
16        Q.    Yeah.  Is that a term that comes with specific
17  duties, nursing assessments?
18        A.    Yeah.  A nurse goes and assesses the patient to
19  the best of her abilities.
20        Q.    Okay.  Is there anything specifically that if
21  an RN reads "nursing assessment," she knows she's got to do
22  five things?
23        A.    Nurses are trained in their training on how to
24  do appropriate assessments.
25        Q.    What does that include?



 1       A.      They're trained in their -- at nursing school

 2    on how to do assessments.

 3       Q.      What would those assessment include, if you

 4    know?

 5       A.      It would include a visual assessment of the

 6    patient.  It would include a mental assessment as to whether

 7    they're talking, walking, communicating, delusional,

 8    confused, alert, awake.  Vital signs.

 9       Q.      What vital signs?

10       A.      Well, there's many different types of vital

11    signs that you can take, and they would be specific to the

12    patient's complaint.  You wouldn't take vitals signs on

13    someone who was there for a mental health concern.  But if

14    they're there for a chest pain concern, you'd take a full set

15    of vital signs.

16       Q.      Okay.  Can an LPN do a nursing assessment?

17       A.      No.

18       Q.      Only an RN?

19       A.      Only RNs can do nursing assessments, which is

20    why this particular document was drafted after we hired an

21    RN.

22       Q.      Otherwise, it wouldn't make sense?

23       A.      Right.  In other jails, there are RNs available

24    to do nursing assessments.  But an LPN is not able to do an

25    assessment.



 1      Q.    Was Jana Clyde, in 2016, taking vital signs of

 2  patients without any supervision?

 3      A.    An LPN is able to take vital signs.  That is

 4  not an assessment.

 5      Q.    Okay.  Only a part of an assessment?

 6      A.    Vital signs are a -- an LPN is trained to take

 7  vital signs.  The difference between an assessment and what

 8  an LPN can do is an assessment actually gathers information

 9  and then makes a determination.

10      Q.    Okay.

11      A.    An LPN can only gather information.

12      Q.    But not take any course of action?

13      A.    But not make an assessment.

14      Q.    I see.

15      A.    It's the difference in their training.

16      Q.    Thank you.

17            With regard to Exhibit 39, how is it that an

18  inmate could be put on the opiate withdrawal protocol?

19  What's the procedure for vetting those inmates who are going

20  to be placed on this protocol?

21            MR. MYLAR:  I just object in that this isn't --

22  this is beyond the scope of the claims since it's clearly

23  implemented after Madison's death in 2016.  So it's beyond

24  the scope of the claims.

25            MR. BRIDGE:  You can answer.



 1            THE WITNESS:  Well, it says here at the very
 2   top line on the protocol, if an inmate complains of or is
 3   exhibiting signs or symptoms of opiate withdrawal.
 4   BY MR. BRIDGE:
 5        Q.    Okay.  What would that include?
 6        A.    So if they said, Hey, I'm exhibiting signs or
 7   symptoms of opioid withdrawal, then we would put them in
 8   withdrawal protocol.  Or if they said, I am a heavy user of
 9   narcotics; on the streets, I'm using OxyContin five times a
10   day, but they're not exhibiting any symptoms, but they're
11   self-reporting that they're a heavy user, then we would put
12   them in the protocol.
13        Q.    Okay.  Those are the obvious cases.  Right?
14        A.    (No oral response.)
15        Q.    But I'm talking about maybe the not-so-obvious
16   cases.  Because you're dealing with jail staff.  I mean,
17   perhaps the nurse isn't even on staff at the time, and you
18   have an inmate coming in who is exhibiting symptoms of opiate
19   withdrawal.  What sort of process or procedures is a jail
20   staff equipped with to assess whether or not this policy
21   should be followed?
22        A.    Officers can't --
23              MR. BUTTERFIELD:  Objection.  Foundation.
24              THE WITNESS:  -- make those types of
25   assessments.



 1              MR. MYLAR:  Join.

 2              THE WITNESS:  They're not qualified to make

 3   those types of assessments.

 4   BY MR. BRIDGE:

 5        Q.    Okay.  So it has to be a jail nurse?

 6        A.    A jail nurse is the only one qualified to make

 7   a nursing assessment.  An officer can't make a nursing

 8   assessment.

 9        Q.    And I'm not talking about a nursing assessment.

10   I'm saying as somebody is booked into the jail, not a nursing

11   assessment but a determination of who should or should not be

12   put on this protocol, who does the filtering?

13              MR. NAEGLE:  Asked and answered.

14              MR. MYLAR:  Join.

15              MR. NAEGLE:  I think he just answered that.

16              THE WITNESS:  I would say the patient is the

17   number one person who does the filtering, if the patient,

18   says, Hey, I've been using narcotics a lot.  Most patients

19   who undergo withdrawal symptoms, it's not their first rodeo.

20   They've done opiates, heroin, for a long time, they've had

21   many withdrawal episodes, and they know better than anyone in

22   the room what withdrawal symptoms are.

23              They know better than the officers, they know

24   better than the nursing staff, they know better than me.  An

25   opiate user knows what withdrawal symptoms are and can



 1 | self-diagnose that better -- are qualified to self-diagnose
 2 | that better than any other person.
 3 | BY MR. BRIDGE:
 4 |      Q.    Okay.  Let me have you turn to Exhibit No. 2.
 5 | This is a pre-booking form for Madison Jensen.  Are you
 6 | familiar with this type of a form?
 7 |      A.    I've seen these types of forms before.
 8 |      Q.    And Question No. 3 says, "Are you under the
 9 | influence or going through withdrawal from drugs or alcohol?"
10 | And she reportedly checked yes.  My question to you is, in
11 | November of 2016, do you know if there was a practice or
12 | procedure for, when an inmate checks yes on that box, how
13 | does that information get to Nurse Clyde?
14 |           MR. BUTTERFIELD:  Foundation.
15 |           MR. MYLAR:  Join.
16 |           MR. BRIDGE:  If you know.
17 |           THE WITNESS:  I don't know.  You'll have to ask
18 | her.
19 | BY MR. BRIDGE:
20 |      Q.    So you haven't provided any training or
21 | education with --
22 |      A.    I'm -- I'm not --
23 |      Q.    Hang on, hang on.  You haven't provided any
24 | education or training with regard to implementing some sort
25 | of procedure whereby Box No. 3 gets checked, then X, Y, Z



 1   happens?

 2         A.      I am not involved in the pre-booking process or

 3   the filtering of information from the officers to the medical

 4   staff.

 5         Q.      Okay.

 6                 In November 2016, with regard to people who are

 7   just sick, not necessarily withdrawing but exhibiting signs

 8   of diarrhea and vomiting, what sort of policy or protocols or

 9   procedures were in place for making sure that those were

10   reported to Logan Clark or yourself?

11         A.      The procedure or policy would be that the

12   patient fills out a healthcare request saying that they are

13   having nausea, vomiting, or their symptoms, and they would

14   submit that healthcare request to the nurse.  The nurse would

15   review the healthcare request and get some basic information

16   from the patient.  And then determine whether the patient

17   should be placed on the sick call list for that week or if

18   some, you know, more emergent thing needed to happen.  In

19   which case, they would contact us and send the patient to the

20   hospital.

21         Q.      Okay.  So flip to Exhibit No. 5.  Is this the

22   medical request form you were talking about?

23         A.      This is the medical request form I'm talking

24   about.

25         Q.      Did you prepare this form?



 1          A.     No.  It looks like Madison Jensen did.

 2          Q.     Let me clarify that.  Did you prepare the --

 3   the --

 4               MR. NAEGLE:  Did you author that form?

 5               MR. BRIDGE:  Yeah.  Did you --

 6               THE WITNESS:  I did not --

 7               MR. BRIDGE:  -- author the template?  I'm

 8   sorry.

 9               THE WITNESS:  I'm sorry, I did not author this

10   form.

11   BY MR. BRIDGE:

12          Q.     Do you know who authored the form?

13          A.     I do not.

14          Q.     Do you know if it's a form that came from

15   Duchesne County?

16          A.     I do not know who authored this form.

17          Q.     Is this the same form that you use at your nine

18   other counties?

19          A.     No.

20          Q.     Is this the medical request form that you were

21   talking about that would initiate a report of chronic

22   vomiting or diarrhea?

23          A.     This is the form the detainees use to access

24   care.  To notify the officers that they would like to seek

25   medical attention.



1            Q.      Okay.  Now, I know you don't -- you didn't know

2     anything about this request form at the time.  But I want to

3     ask you a question about, had Jana Clyde been provided this

4     medical request form -- and have you read it?  Do you know

5     what it says?  You can take a second.

6            A.      It says puking -- or pucking, it says pucking

7     for four days straight, runs, diarrhea, can't hold anything

8     down, not even water.  I know my body, and it is not -- I

9     don't know what that word is.

10           Q.      I think it says detoxing.

11           A.      Okay.  I am completely detoxed.  It says, My

12    remote -- or roommate haven't the stomach -- like caught the

13    stomach flu?  I don't know what that word is.

14           Q.      Bug, maybe?

15                   MR. NAEGLE:  It doesn't matter what it says.

16                   THE WITNESS:  Well, I thought he wanted me to

17    read it.

18                   MR. NAEGLE:  You're not here -- to yourself.

19    You're not here --

20                   THE WITNESS:  Oh, I thought he asked me to read

21    it.

22                   MR. NAEGLE:  You're not here to interpret that.

23                   THE WITNESS:  Okay.

24                   MR. BRIDGE:  I believe it says the stomach bug

25    from me, but...



 1              THE WITNESS:  Okay.

 2  BY MR. BRIDGE:

 3        Q.    The question I wanted to ask you is, if Jana

 4  Clyde was provided this medical request form and she read it,

 5  would this be the type of medical request form that you would

 6  have an expectation that Jana Clyde would have contacted

 7  Logan Clark about by telephone?

 8              MR. BUTTERFIELD:  Objection.  Foundation.

 9  Speculation.

10              MR. MYLAR:  Join.  And also incomplete

11  hypothetical.

12              MR. NAEGLE:  You can answer if you can.

13              THE WITNESS:  My expectation is when the inmate

14  places a healthcare request, that the nurse reads the

15  healthcare request and goes and talks to the patient and

16  triages the healthcare request.  And then after reading the

17  healthcare request and talking to the patient and obtaining

18  more information, make a determination as to whether she's

19  appropriate for sick call that week, needs to go to the

20  emergency room immediately or contact us.

21              MR. BRIDGE:  Okay.

22  BY MR. BRIDGE:

23        Q.    Is that based on the fact that I -- I mean, I

24  guess someone could just make this up.  Right?  And so if the

25  nurse never went and looked at the patient to sort of



 1  objectively verify whether these sort of symptoms were

 2  possible, then she would be wasting her time contacting Logan

 3  Clark.  Is that accurate?

 4        A.    No.  There are healthcare requests that are,

 5  uhm, minor, and there are healthcare requests that are

 6  emergent.  And so every healthcare request needs to be

 7  triaged.

 8        Q.    Where would you put this healthcare request on

 9  the spectrum of minor to urgent?

10        A.    Puking for four days is -- puking for four days

11  straight, runs, diarrhea, can't hold anything down, I would

12  say that's more emergent.

13        Q.    Would you have an expectation that if this was

14  true, if these symptoms were true and verified, that Jana

15  Clyde should have contacted Logan Clark about that?

16              MR. MYLAR:  Objection.  Again, incomplete

17  hypothetical and calls for speculation.

18              MR. BUTTERFIELD:  Join.

19              THE WITNESS:  My expectation is that the

20  healthcare request is triaged appropriately where the

21  patient -- you know, it's not just what she wrote here.  It's

22  when the nurse actually goes and talks to the patient and

23  gets more information, gets the story from the horse's mouth.

24              MR. BRIDGE:  Okay.

25              THE WITNESS:  And the reason I say that is that



 1  many times patients write very short things on their

 2  healthcare requests, and there's a lot more to the story.

 3  Obviously in this case, there's a lot more to the story.

 4  Because she ended up dying, right?  There's a lot more to the

 5  story.  So I would have to say that any time they write

 6  whatever they write on here, it has to be triaged.

 7  BY MR. BRIDGE:

 8       Q.    Would you expect that Jana Clyde, after reading

 9  this, would triage with the patient --

10       A.    That's my expectation.  That she would go and

11  triage that patient.

12       Q.    Would that triage be documented in some sort of

13  way?

14             MR. BUTTERFIELD:  Foundation.

15             MR. MYLAR:  Join.

16             MR. NAEGLE:  Do you mean should it or was it?

17             MR. BRIDGE:  Should it have?

18  BY MR. BRIDGE:

19       Q.    Yeah.  Is it your expectation that a triage on

20  this medical request should have been documented in some sort

21  of way?

22       A.    Uhm, I guess the question is, "in some sort of

23  way"?  Like -- she needs to make a determination as to what

24  she's going to do with this.

25       Q.    Correct.  Should she have documented it, that



 1  she went and saw the patient and did whatever triage she was

 2  doing?

 3          A.     I would expect that, yes.

 4          Q.     And you would expect that to be included in a

 5  inmate's medical file.  Correct?

 6          A.     Yes.  There needs to be documentation that this

 7  healthcare request has been addressed.

 8          Q.     Okay.

 9          A.     That they received the healthcare request and

10  they addressed it.  And as far as what -- how they addressed

11  it, whether they placed her on sick call to be seen, whether

12  they sent her to the ER, whether they called the doctor for

13  further information.

14          Q.     Okay.  Did you know that Logan Clark was never

15  able to find Madison Jensen's medical file at Duchesne

16  County?  Did he report that to you?

17                 MR. BUTTERFIELD:  Objection.  Misstates prior

18  testimony.

19                 MR. MYLAR:  Join.

20                 MR. NAEGLE:  And calls for speculation, I'm

21  sorry, if you don't know the answer.

22                 THE WITNESS:  I don't know what he was able to

23  find and what he was not able to find.

24                 MR. BRIDGE:  Okay.

25                        *



 1  BY MR. BRIDGE:

 2      Q.    Would you expect -- would you have had an

 3  expectation that the staff at Duchesne County should have

 4  placed this medical request form in a medical file for

 5  Madison Jensen?

 6      A.    It's my expectation that they obtain the

 7  healthcare request and they triage the patient.  That's my

 8  expectation.  And then they make a determination as to what

 9  they're going to do with that healthcare request.

10      Q.    Okay.  When you come to clinic, would you

11  expect to see this medical request form and the notes on the

12  triage in the medical file?

13      A.    Yes.  Typically the notes are on the healthcare

14  request.

15      Q.    Do you believe that in 2016 you appropriately

16  communicated that expectation to Jana Clyde?

17            MS. ABKE:  Object to form.

18            THE WITNESS:  I believe she understood how to

19  triage healthcare requests appropriately.

20  BY MR. BRIDGE:

21      Q.    Is that based on your experience with working

22  with her?

23      A.    Yes.

24      Q.    Is this the first time you've seen that medical

25  request form --



1      A.      It is.

2      Q.      -- in Exhibit 5?

3      A.      Yeah -- yes.

4      Q.      Is it your belief that you communicated an

5  expectation to the Duchesne County Jail that officers and

6  deputies could contact you, not just Jana Clyde, the nurse?

7      A.      I have created an environment through my

8  business that anyone can contact me anytime.  I have an open

9  phone line.  I've never told anyone, Don't call me.

10      Q.      Have you actually received phone calls from

11  officers, not just nursing staff, from various -- well, from

12  Duchesne County?

13      A.      Yes, I have.

14      Q.      Is that a pretty regular occurrence?

15      A.      It's not a regular occurrence.

16              In fact, it's very rare, because they usually

17  contact the nurse.  The normal chain of command is they

18  contact the nurse; the nurse contacts Logan or I for orders.

19  That's the normal way it goes.

20              Usually if an officer is contacting me, my

21  question is, Why is this patient not already at the hospital?

22  If it's so important that you called me, that they should

23  probably go to the hospital.  Or they're contacting me to let

24  me know that they're sending someone to the hospital.

25      Q.      And you would expect to be notified about that,



1  wouldn't you?

2       A.    Yes.  I like to know anytime someone goes to

3  the hospital.

4       Q.    Assuming what Madison reported in this medical

5  request form is true, what treatment options could you have

6  provided to Madison had you been provided the opportunity?

7            MR. MYLAR:  Objection.  Calls for speculation

8  and lack of foundation.

9            MR. BUTTERFIELD:  Join.

10           MS. ABKE:  Join.

11           THE WITNESS:  Well, the interesting thing about

12 this healthcare request is that she says here that she's not

13 detoxing.  I'm completely detoxed.  So if this healthcare

14 request was true, as you say it is, and she's completely

15 detoxed, then she wouldn't require any opiate withdrawal

16 treatment, but she would require treatment for her flu-like

17 symptoms.

18           MR. BRIDGE:  Correct.

19 BY MR. BRIDGE:

20      Q.    What type of treatment would you have provided

21 for those flu-like symptoms, assuming that they were flu-like

22 symptoms?

23      A.    I would need much more information about this

24 patient prior to ordering any type of treatments.

25      Q.    Would a liquid diet be one of the possibilities



1    of treatment?

2           A.      Possibility.

3           Q.      How about Zofran?

4           A.      Possibility.

5           Q.      Imodium?

6           A.      Possibility.

7           Q.      Now that the Duchesne County has an RN on

8    staff, do they have the ability to provide IV fluids on-site?

9           A.      I would never approve that.

10          Q.      Why not?

11          A.      Because if a patient is so sick that they need

12   IV fluid, they need to be at the hospital.

13          Q.      Okay.  So the equipment is not even there?

14          A.      We don't have an on-site provider at Duchesne

15   County.  Logan only goes out there once a week.  And to put

16   someone on IV therapy and not have a provider see them is not

17   appropriate.  If they're that sick, they need to go to the

18   ER.

19          Q.      So just having an RN on-site is not enough?

20          A.      I would expect -- so on the contrary to that

21   kind of question, I would require that they see a medical

22   provider prior to going -- undergoing IV therapy.  So let's

23   say we sent her to the hospital, they loaded her up there,

24   and that physician saw her and made some orders, and they

25   came back to the jail, well, then we could do that.  But, you



1  know, we would need a physician to see them before order -- a

2  physical interaction before ordering IV therapy.

3          Q.      Understood.

4                  Is there a practice or procedure that's in

5  place at the Duchesne County Jail in 2016 for when an inmate

6  is not eating meals?

7          A.      You're talking about they're trying to starve

8  themselves or...

9          Q.      Not necessarily.  I mean, it could be that.  It

10  could be a hunger strike or it could be --

11          A.      We have had hunger strikes at almost all the

12  jails at times.

13          Q.      And I'm more asking whether there's a practice

14  or procedure in tracking or monitoring whether or not an

15  inmate is actually ingesting the meals that are brought to

16  them?

17          A.      There's not a policy or procedure about that.

18  Unless they're on a hunger strike, which is different.  But

19  if they are on a hunger strike, then we do monitor until they

20  stop their hunger strike.

21          Q.      Jana Clyde testified that she had no knowledge

22  that Madison Jensen was not eating her meals.  Is that

23  something that you believe Jana should have been aware of?

24                  MR. MYLAR:  Objection.

25                  MR. NAEGLE:  Objection.  Calls for speculation.



1           MR. MYLAR:  Join.

2           MS. ABKE:  Join.

3           MR. BUTTERFIELD:  Join.

4           THE WITNESS:  I don't know the answer to that.

5    BY MR. BRIDGE:

6        Q.    Is there any sort of practice or procedure that

7    you have communicated or implemented that would make it so

8    the nurse would be alerted when someone has missed multiple

9    meals?

10        A.    Unless the patient self-reports it?  That would

11    be the policy and the procedure would be the patient would

12    report it and place a healthcare request stating that they

13    have not been able to eat for four days.  That would be the

14    policy.  Or the expectation.  I do not expect my nurse to go

15    around the cell block and ask every single patient if they

16    finished their dinner.

17        Q.    Would you have an expectation that even if it

18    wasn't inmate reported -- well, strike that.

19           Does the jail have the ability to send an

20    inmate to the hospital without contacting you first?

21        A.    Yes.

22        Q.    Have you communicated an expectation that that

23    is the case to Duchesne County Jail?

24        A.    Yes.

25        Q.    Have you communicated that expectation to Jana



 1  Clyde in 2016?

 2       A.    Yes.  There's no requirement that I be

 3  contacted prior to a patient going to the hospital.  I just

 4  want to know about it if they did.  If they went to the

 5  hospital, I want to know about it, but...

 6       Q.    Okay.  Should records recording vitals be

 7  included in the medical file?

 8       A.    Yes.

 9       Q.    Is that an expectation that you communicated to

10  Jana Clyde in 2016?

11       A.    Yes.

12       Q.    If there were no records of vitals in

13  Madison Jensen's medical file, would that be a violation of

14  that practice?

15            MR. MYLAR:  Objection.  Lack of foundation.

16  And calls for speculation.

17            MR. BUTTERFIELD:  Join.

18            MR. NAEGLE:  Join.

19            THE WITNESS:  When a nurse take vitals signs, I

20  would expect that they -- she record them somewhere.

21  BY MR. BRIDGE:

22       Q.    Have you ever seen the medical file for Madison

23  Jensen?

24       A.    No.

25       Q.    Have you ever asked to see it?



 1        A.     Yes.

 2        Q.     What were you told?

 3        A.     It's currently under investigation.

 4        Q.     Who did you ask to see it?

 5        A.     The sheriff's department and the district

 6    attorney.

 7        Q.     Did they ever communicate to you that one

 8    existed?  Or did they not say one way or the other?

 9        A.     The district attorney from Salt Lake called me

10    in for an interview, and he said that the medical file is

11    sealed and it's under investigation and you don't have access

12    to it.  And I left it at that.

13        Q.     Okay.  Did you ever ask Jana Clyde whether

14    there was a medical file for Madison Jensen?

15        A.     I was instructed not to talk to Jana Clyde

16    about it during the investigation.

17        Q.     Who instructed you on that?

18        A.     The district attorney who was doing the

19    investigation.

20        Q.     Prior to December 2016, had you had any

21    problems with Jana Clyde failing to adequately document or

22    maintain inmate medical files?

23        A.     Not that I know of.

24        Q.     Would you agree that an inmate that was

25    exhibiting flu-like symptoms, vomiting, diarrhea, would need



 1  some treatment that's similar to opiate withdrawal treatment?

 2                  MR. NAEGLE:  Objection.  Lack of foundation.

 3                  MR. MYLAR:  Join.

 4                  MR. NAEGLE:  Incomplete hypothetical.

 5                  MR. MYLAR:  Join.

 6                  MR. BUTTERFIELD:  Join.

 7                  THE WITNESS:  The flu and opiate withdrawal are

 8  treated very differently.

 9                  MR. BRIDGE:  Okay.

10  BY MR. BRIDGE:

11       Q.    Explain that for me.

12       A.    Well, the mechanism of the flu is viral

13  mediated.  The mechanism of opiate withdrawal is opioid

14  receptor depletion.  So they have to be treated differently.

15       Q.    How are they treated differently?

16       A.    Well, different medications.  Buprenorphine or

17  methadone are opiate medications.  You would not give those

18  to someone who has the flu.  I would not give Suboxone to

19  someone who has the flu.

20       Q.    What about Imodium?

21       A.    Imodium is a medication simply to stop the

22  bowels.

23       Q.    Would that be a treatment for both flu-like

24  symptoms and opiate withdrawal?

25       A.    Imodium is a symptom -- is a treatment for

1  diarrhea.  So anyone who is exhibiting diarrhea, which is a

2  symptom of the flu and a symptom of opiate withdrawal, I

3  would give them Imodium.

4         Q.     So that's a crossover.  What about Zofran?

5         A.     Zofran, I would give to someone who is

6  vomiting.  And whether they're vomiting from meningitis,

7  appendicitis, opiate withdrawal, you know, if they're

8  vomiting, or just pregnancy, we give, you know, antiemetic to

9  patients who are vomiting.

10        Q.     There is some crossover on the treatment?

11        A.     Yeah.  Those are symptomatic treatments,

12 treatment for a symptom.  Not for the overall disease.

13        Q.     Would you agree that an inmate who is brought

14 to medical should be given a full assessment that is recorded

15 in the medical file?

16               MR. NAEGLE:  "Brought to medical," what is

17 that?  What do you mean?

18               MR. BRIDGE:  Well, that's a term that's used by

19 the Duchesne County.

20               MR. MYLAR:  Objection.

21               THE WITNESS:  Anytime a patient is brought to

22 me as a provider, I dictate a note and I dictate my

23 assessment, my plan, my objective findings, my subjective

24 findings, my plan, my assessment, yes.  I make a medical

25 record of every patient visit I have.



 1  BY MR. BRIDGE:

 2       Q.     What about an inmate who is being brought to

 3  the jail nurse in Duchesne County?  What expectation would

 4  you have as far as recording and documenting that visit?

 5       A.     I guess it depends on the reason she -- they

 6  were brought there.

 7       Q.     Okay.  Why don't you explain --

 8       A.     Some patients are brought down to see the nurse

 9  for aspirin or ibuprofen.  Or they say, I have a cold; can I

10  have some cold medicine?  I don't have an expectation that

11  when a patient asks for cold medicine, over-the-counter cold

12  medicine, that a full note be provided or dictated.

13            MR. NAEGLE:  Can you tell us whether you're

14  talking about an RN or an LPN?

15            MR. BRIDGE:  I'm talking Jana Clyde, who is an

16  LPN.

17            THE WITNESS:  Okay.  My expectation for me or

18  my expectation for her?

19  BY MR. BRIDGE:

20       Q.     What is your expectation for if someone came to

21  Jana Clyde down to her office in the Duchesne County Jail and

22  was reporting chronic vomiting or diarrhea?  Would you have

23  an expectation that she would document that visit in some

24  way?

25            MR. MYLAR:  Objection.



1                MR. NAEGLE:  Asked and answered.

2                MR. MYLAR:  Misstates prior testimony.  And

3    incomplete hypothetical.

4                THE WITNESS:  My expectation with Jana say --

5    Jana would say, Would you please fill out a healthcare

6    request so you can access care?  And oftentimes the nurse

7    hands the patient a healthcare request to fill out.  They

8    fill out the healthcare request, and that gets the ball

9    rolling.

10   BY MR. BRIDGE:

11        Q.    You would expect Jana Clyde to triage the

12   medical request form?

13        A.    I would.  If patients don't fill out a

14   healthcare request, then they're not really requesting to see

15   the doctor.

16        Q.    Fair enough.

17              Have you ever had an occasion to read the

18   policies and procedures manual for Duchesne County Jail?

19        A.    No.  That would not be in my scope of practice.

20        Q.    Do you believe that Madison Jensen's death

21   could have been prevented had she been appropriately triaged

22   and contacted Logan Clark?

23                MR. NAEGLE:  Objection.  Lack of foundation.

24   Calls for speculation.

25                MR. BUTTERFIELD:  Join.



 1                 MR. MYLAR:  And also vague.  Join.

 2                 MS. ABKE:  Join.

 3                 MR. BRIDGE:  Must be a good question.

 4                 MR. NAEGLE:  Not in this case, it's not.

 5                 THE WITNESS:  My answer is I never saw Madison

 6   Jensen.  I can't make a medical determination having never

 7   laid eyes on her once.

 8   BY MR. BRIDGE:

 9        Q.    Have you undertaken any effort to determine

10   whether there was any failings on account of Duchesne County

11   Jail in their treatment of Madison Jensen?

12        A.    I have not reviewed the medical record.  I have

13   not reviewed any videos.  I have not reviewed any charts.  I

14   don't have an opinion on that.

15        Q.    Okay.

16        A.    I'm not an expert witness.

17        Q.    Don't sell yourself short.

18        A.    Okay.

19                 THE WITNESS:  Five hundred bucks an hour, I'll

20   be an expert witness.  You paid me $18 to be here.

21                 MR. BRIDGE:  18.50.

22                 THE WITNESS:  Okay.  Not 500.

23                 MR. BRIDGE:  Come on.

24                 Let's go to Exhibit 33.

25                 MR. NAEGLE:  33?



 1              MR. BRIDGE:  Yes.

 2              (Off-the-record discussion)

 3  BY MR. BRIDGE:

 4       Q.    Do you recognize that document?

 5       A.    I do.

 6       Q.    Is this your contract with Duchesne County?

 7       A.    It is.

 8       Q.    I just want to ask you a couple questions about

 9  it.

10              MR. MYLAR:  What number is this?

11              MR. BRIDGE:  33.

12              MR. MYLAR:  Okay.

13              THE WITNESS:  Okay.

14  BY MR. BRIDGE:

15       Q.    Okay.  On the first page there, down under

16  Section 2, Services, No. 1, it says quality of care for

17  inmates using the Utah Department of Correction and Utah

18  Medicaid guidelines for standards for the quality of medical

19  care.

20              Can you give me an idea of what that means?

21       A.    We use Medicaid guidelines as far as what

22  things that Medicaid will pay for or have approved payment

23  for, is the standard that the jail should provide.

24       Q.    Okay.

25       A.    So many times, patients are requesting



 1  services, medical services, that are not basic medical

 2  services.  And so we --

 3       Q.     Elective-like services?

 4       A.     Elective-type services.  You know, for

 5  instance, an inmate requested Botox, I would say, You know,

 6  Medicaid doesn't approve that, Utah State Prison doesn't

 7  approve that; we're not going to provide that here.

 8       Q.     Has that actually happened?

 9       A.     Yes, it has.  Yes.  I could say...

10       Q.     Did you keep a straight face?

11       A.     Many stories.

12       Q.     Okay.  On the next page, Page 2, No. 6, it says

13  Duchesne will employ a nurse to assist you with sick call.

14  I'm assuming that that includes an LPN?  Or do you know one

15  way or the other?

16       A.     It states Duchesne will employ a nurse to

17  assist with sick call.

18       Q.     Okay.

19       A.     An LPN is a nurse.

20       Q.     All right.

21              Okay.  Go over to Page 4, Section 7, records.

22       A.     I don't have a Section 7.

23       Q.     It's Roman numeral seven.

24       A.     Oh, okay.  I'm sorry.

25       Q.     And the last sentence says, Duchesne Detention



1 Center and their nursing staff will be responsible for

2 keeping records safe, secure and in orderly fashion and

3 within HIPAA standards.

4            Whose responsibility was it under this contract

5 to ensure that Duchesne County met that obligation?

6        A.    Well, it says Duchesne Detention Center.

7        Q.    Okay.  Did you ever give any training or

8 education regarding the safe, secure and orderly keeping of

9 records?

10       A.    Well, both Logan Clark and I would go through

11 the medical records, you know, for different patients.  And

12 if they weren't in an organized manner, or we wouldn't be

13 able to access the information that we need, we would say,

14 Hey, where are the medical records for this?  Where are the

15 medical records for that?  So we --

16       Q.    So you --

17       A.    -- we would all frequently make sure that the

18 medical records were in order and they were easily reviewed,

19 easily accessed, and --

20       Q.    And met your expectations?

21       A.    And maintained, yeah.

22       Q.    Okay.  The next page, Page 5.  It's under

23 Section 9 but it's No. 4.  M.D. will provide training,

24 instruction, support in a supervisory role of nursing staff

25 on how to appropriately handle triage, sick call, medical



 1  protocols and healthcare complaints, slash, grievances.

 2              In 2016 and prior, what efforts have you

 3  undertaken to satisfy your obligation under that Paragraph 4?

 4        A.     Well, every -- me personally, when I go out to

 5  do sick call, I look at the specific healthcare request, and

 6  I make sure they were handled, that they triage -- they were

 7  triaged appropriately; that they -- and if they weren't

 8  triaged appropriately, then give some instruction as to, hey,

 9  we need to triage this a little bit better, we need to change

10  this up, you know.  So I would give specific instruction and

11  training on how I wanted healthcare requests triaged.

12        Q.     Okay.

13        A.     Sick call, you know, we have our list of

14  patients, and we'll give training and instruction on how to

15  organize the patients and which ones need to be seen more

16  emergently and first and what type of procedures we want to

17  go through during sick calls as far as seeing the patients,

18  getting the vitals and --

19        Q.     And are you communicating all of this to Jana

20  Clyde?

21        A.     Yes.  She is present during sick call.

22        Q.     Okay.  Anything else?

23        A.     Medical protocols, it's in the contract;

24  however, you know, we don't have medical protocols at the

25  time in Duchesne because an LPN can't -- we have medical



 1  protocols at Utah County Jail because we have RNs available.

 2  It's hard to have medical protocols at a county jail where

 3  you have an LPN because they can't make assessments and do

 4  verbal orders from protocols.

 5          Q.      And can't implement standing orders?

 6          A.      Right.  So that's why we don't really have

 7  medical protocols at that time.  Now that we have an RN out

 8  at Duchesne County, we're able to have some standing orders.

 9          Q.      Anything else?

10          A.      And then healthcare complaints and grievances,

11  you know, I -- anytime there's a healthcare complaint or a

12  grievance, I want to specifically know about it.  And so I

13  did provide training to Jana as far as how I want those

14  grievances handled, how I want them reviewed and then brought

15  to me and how we would approach each grievance or inmate

16  complaint.

17          Q.      Okay.  Now, you testified earlier that you may

18  only make it out to Duchesne maybe four times a year.

19  Correct?

20          A.      Correct.

21          Q.      Did you delegate any of your duties to provide

22  training, instruction or support under this Paragraph 4 to

23  Logan Clark?

24          A.      Yes.

25          Q.      Okay.  And how does that work?



 1        A.     Well, when Logan acts as the provider, this
 2   particular contract, when it says M.D., it's not saying
 3   medical doctor, it's saying provider.  Because if you refer
 4   on the front of it, it just says M.D. means provider.  So
 5   M.D. can be used interchangeably between Logan Clark or
 6   myself.
 7        Q.     Okay.
 8        A.     And I expect him to teach and give instruction
 9   on how to handle triage, sick call, medical protocols and the
10   healthcare complaints and grievances as well.
11        Q.     And in 2016 or prior, did you follow up with
12   Logan Clark on those sorts of training duties?
13        A.     Yes.  So Logan Clark and I have worked closely
14   together for years, and we see eye to eye on how to run sick
15   call, how to run triage, how to address inmate complaints and
16   grievances.  And whenever there are these kinds of
17   complaints, then he calls me, and we talk about it.
18             Hey, how would you handle this?  You know, I'll
19   tell him, I'd handle it like this.  Sometimes he says, Hey,
20   what about handling it this way?  And we agree on it, and we
21   give the nursing staff instruction on, you know, any changes
22   that we'd like to implement.
23        Q.     Would that mostly flow through Logan Clark?
24        A.     Yeah.  Yes.
25        Q.     So the training -- the training or instruction



 1  is not really given in formal settings or any periodic

 2  intervals, it's more just sort of on-the-job training and

 3  instruction?

 4       A.     Right.  We're not contracted to provide formal

 5  continuing medical education to the nursing staff.

 6       Q.     Did Jana Clyde receive any training or

 7  instruction from you or Logan Clark, that you know of, as a

 8  result of Madison Jensen's death?

 9             MR. BUTTERFIELD:  Foundation.

10             MR. MYLAR:  Join.

11             THE WITNESS:  What was the question again?

12             MR. BRIDGE:  The question --

13             THE WITNESS:  As a result of Madison Jensen's

14  death?

15             MR. BRIDGE:  Yes.

16             THE WITNESS:  Uhm.

17             MR. NAEGLE:  Sorry, what was the question?

18             MR. BRIDGE:  The question was, did Dr. Tubbs

19  provide Jana Clyde any training or instruction from himself

20  or Logan Clark as a result of Madison Jensen's death?

21             MS. ABKE:  Object to form.

22             THE WITNESS:  So Jana Clyde was placed on

23  administrative leave shortly after the incident.  So we were

24  unable to give any specific training for a long period of

25  time until she returned.  By the time she returned, we now



1   hired an RN, who will help oversee her.  An RN kind of trumps

2   an LPN.  And we provided new opiate protocols for the RN, and

3   the RN helped train Jana, bring her up to speed when she came

4   back as to the new opiate protocol.

5           MR. NAEGLE:  For the record, I'll just note

6   that -- to the extent that subsequent remedial measures are

7   inadmissible.  Leave it at that.

8           MR. MYLAR:  Join.

9   BY MR. BRIDGE:

10          Q.     Can you explain to me what a COWS score is?

11          A.     A COWs score -- COWS is an opiate withdrawal

12  scale.  That's what COWS stands for, opioid withdrawal scale.

13  And what it is, is the --

14          Q.     What does the "C" stand for?

15          A.     I don't know what the "C" stands for.

16          Q.     Okay.

17          A.     Combined opioid withdrawal scale.  I don't

18  know.  These acronyms, I don't know what they are.  But we

19  call it a COWS scale.

20          Q.     Okay.

21          A.     And a COWS scale is conglomerate of symptoms --

22  of signs and symptoms of opiate withdrawal.  And it's a sheet

23  that basically asks about tremors, about agitation, about

24  sweating, uhm, about skin condition, about vomiting or

25  different symptoms that you would experience during opiate



 1  withdrawal.  And different grades of those symptoms.  And you

 2  simply give them a one, two or three on the score of

 3  different categories, and then you add up the total.  And to

 4  determine whether they're in mild, moderate or severe

 5  withdrawal.

 6          Q.    Do you have some sort of form that's like a

 7  checklist?

 8          A.    Yes.  The forms are available on the Internet

 9  and on Google.  If you just Google COWS score, it's a

10  nationally recognized scoring system.

11          Q.    I see.

12          A.    At Wasatch County Jail, they always called me.

13  Hey, where's the COWS?  I'm like, Google it and just pull it

14  and print it off because...

15          Q.    Got it.  In November of 2016, was Jana Clyde

16  trained on obtaining COWS scores?

17                MR. MYLAR:  Objection.  Lack of foundation.

18                MR. NAEGLE:  Join.  Calls for speculation.

19                THE WITNESS:  I did not provide her with that

20  education.

21  BY MR. BRIDGE:

22          Q.    Why not?

23                (Whereupon, Mr. Butterfield left the deposition

24  proceedings.)

25                THE WITNESS:  I don't have an answer for that.



 1  BY MR. BRIDGE:

 2       Q.     Have you provided her with that training since?

 3       A.     Yes, we're currently implementing the COWS

 4  protocol or the COWS scoring on opiate withdrawal patients at

 5  Duchesne County currently.

 6       Q.     Had Utah County -- when did Utah County --

 7  okay.  Does Utah County use the COWS score?

 8       A.     Yes.

 9       Q.     And when did they implement it?

10       A.     Well, we have RNs there, and we've been using

11  it there for quite some time.  I don't know.

12       Q.     Previous to 2016?

13       A.     Yes.

14       Q.     Was the reason why it wasn't implemented in

15  Duchesne was because there was no RN on staff?

16       A.     Uhm, again, LPNs can't make nursing

17  assessments.

18       Q.     Is it your opinion that a COWS score is a

19  nursing assessment?

20       A.     It is a type of assessment, yes.

21       Q.     In 2016, how many of the other counties that

22  you provide medical services to had implemented the COWS

23  score?

24       A.     In 2016?

25       Q.     Yes.



 1          A.      Uhm, Summit County and -- Summit County has an
 2    RN and Utah County has an RN.
 3          Q.      Those are the only two?
 4          A.      Uh-huh.  Well, Sweetwater County, as well, has
 5    RNs.
 6                  (Whereupon, Mr. Butterfield returned to the
 7    deposition proceedings.)
 8                  THE WITNESS:  I will say that since the Madison
 9    Jensen case, uhm, I personally feel it's important that the
10    COWS score now get done.  And I've asked officers in other
11    counties and in Wasatch County, as well, to -- I've trained
12    them to do COWS scores now.  Even though they're not licensed
13    to do it, still it's important that we get that assessment
14    done so that they can communicate to me how sick the patients
15    are.  So I do have officers do it.  In jails that I don't
16    have nursing staff at, I do have officers doing the COWS
17    scale and giving us the report.
18    BY MR. BRIDGE:
19          Q.      Okay.  When did --
20          A.      Even though they're not qualified to do so.
21          Q.      When did you implement that?
22          A.      2017.
23          Q.      All right.
24                  MR. BRIDGE:  Two-minute break.
25                  (Recess taken from 3:38 p.m. to 3:40 p.m.)



 1                    (Whereupon, Ms. Abke was absent from the

 2    deposition proceedings.)

 3                    MR. MYLAR:  I just have a couple questions,

 4    Dr. Tubbs.

 5

 6                    E X A M I N A T I O N

 7

 8    BY MR. MYLAR:

 9         Q.    When Jana Clyde -- she came into work on

10    Monday; Madison actually was booked on Sunday.  And she saw

11    she had a clonidine prescription and she called --

12                    (Whereupon, Ms. Abke returned to the deposition

13    proceedings.)

14    BY MR. MYLAR:

15         Q.    -- PA Logan to get that approved or not

16    approved, and apparently that was approved.  She said she

17    took her vital signs that day, and the vitals were slightly

18    elevated.  That's appropriate at that point, right, just

19    given those facts, her actions at that point?

20         A.    Yes.  I'd say that's appropriate.

21         Q.    And then she was only told basically, according

22    to her testimony, and other testimony, uhm, that she had --

23    that Madison had vomited the night before.  Didn't say she

24    had continuously vomited, just that she had vomited the night

25    before.  Her assumption was she had vomited once the night



1 before.  Again, is that any reason for her to call you or PA

2 Logan?

3        A.      Uhm.

4               MR. BRIDGE:  Objection.  Incomplete

5 hypothetical.

6 BY MR. MYLAR:

7        Q.      Just based upon that information?

8        A.      Based on that information, I would say I would

9 like more information before I make a decision as to whether

10 she should call me or not.

11        Q.      Okay.  She walked down on her own accord to the

12 sick call with another officer, and she saw her walk back and

13 she was appropriately asking -- answering questions.

14        A.      If she called me at that point, I would

15 immediately start asking her more questions.  So I would like

16 more information before --

17        Q.      Sure.

18        A.      Yeah.

19        Q.      But, I mean, there's nothing inherently wrong

20 with her not calling at that point.  Is that correct?

21        A.      That's correct.

22        Q.      All right.  And then she's continually watched

23 and seen.  Next day, her vitals were normal.  And to her, she

24 looked about the same.  On Wednesday, I think she got the

25 sick call request, and she went to see her before she got off



 1  shift at four, a little after 4:00.  And she knew in her mind
 2  that she was going to have Logan Clark see her the next day.
 3  She gives her a Gatorade, and she comes to the door, responds
 4  appropriately, and again she thought she looked like she was
 5  doing okay.
 6              Any need that she should have to have called
 7  you or Logan Clark at that point if she's going to see Logan
 8  Clark the next day?
 9              MR. BRIDGE:  Objection.  Incomplete statement
10  of the facts.
11              THE WITNESS:  Based on those facts, I would say
12  that that would be appropriate to wait until the next day to
13  be seen.
14              MR. MYLAR:  Okay.  Thanks.
15  BY MR. MYLAR:
16      Q.     And you had looked at earlier, in Exhibit 5 --
17  you don't need to turn to it -- but the fact that it says, I
18  know my body, I am not detoxing.  Apparently she had told
19  that to Jana Clark (sic), according to her testimony, Monday,
20  as well, and maybe on Tuesday.
21              If, in fact, Jana Clark (sic) believed that she
22  was not detoxing, as Madison was claiming to her very
23  strongly, would there be any reason to have called you or
24  Logan PA -- Logan Clark, I should say, absent her seeing any
25  deterioration from her visibly from Monday to Wednesday?



  1              MR. BRIDGE:  Objection.  Incomplete factual

  2   statement.

  3              THE WITNESS:  So my policy is that the jail

  4   staff and the nursing staff should call me when they're

  5   concerned or there's a concern.

  6              MR. MYLAR:  All right.

  7              THE WITNESS:  And based on your hypothetical

  8   situation that you're saying, you're saying there wasn't a

  9   concern.  So I don't want to be called when there's no

 10   concern.  I only want to be called when there's a concern.

 11              MR. MYLAR:  All right.  That's fair enough.

 12   BY MR. MYLAR:

 13       Q.     Prior to December of 2016, had you ever heard

 14   of anyone dying at the Duchesne County Jail because of opiate

 15   withdrawals?

 16       A.     No.

 17       Q.     Was that a common thing that happened in any of

 18   the jails that you worked -- that you worked in --

 19       A.     This is the --

 20       Q.     -- prior to that?

 21       A.     I have worked in the prison system and the jail

 22   system for now 19 years, and this is the only case of

 23   opiate-withdrawal-related death I'm familiar with, over a

 24   19-year career of hundreds of thousands of inmates booking in

 25   and out of jail over that time.



 1          MR. MYLAR:  I don't have any further questions.

 2

 3                    E X A M I N A T I O N

 4

 5   BY MR. BUTTERFIELD:

 6          Q.    Dr. Tubbs, how many inmates do you oversee

 7   between the ten counties?

 8          A.    I'm not prepared for that question.  I would...

 9          Q.    Maybe I can help you.  Thousands?

10          A.    I would say 1,600 is my best guess.

11          Q.    So half of them are probably in Utah County,

12   because you were saying --

13          A.    Eight hundred in Utah County.

14          Q.    Okay.

15          A.    Eighty in Sweetwater -- or in Summit County.

16   Sixty in Wasatch and Duchesne.  Two hundred and fifty in

17   Sweetwater County.  Juab County is like 20.  Teton County is

18   probably 20.  Kemmerer is 30.

19          Q.    So your best guess is 1,600?

20          A.    Best guess.

21          Q.    Do you get a call each time an inmate vomits?

22          A.    No.

23          Q.    You'd get a lot of calls if that was the case.

24   Right?

25          A.    I guess my answer would be I don't know every



 1  time someone vomits.  But I do get calls when some

 2  (inaudible) --

 3                  (Court reporter interrupted for clarification.)

 4                  THE WITNESS:  When some people vomit, I get

 5  calls.  But I can't verify the times that people vomited and

 6  I didn't get called.

 7                  MR. BUTTERFIELD:  Okay.

 8                  THE WITNESS:  I'm sure that happens.

 9  BY MR. BUTTERFIELD:

10        Q.    Okay.  And same with diarrhea?

11        A.    I'm sure that happens.

12                  MR. BUTTERFIELD:  That's all I have.  Thank

13  you.

14                  MR. NAEGLE:  We're done?  No questions for me.

15                  (Deposition concluded at 3:47 p.m.)

16                              * * *

17

18

19

20

21

22

23

24

25



1                    C E R T I F I C A T E

2    STATE OF _____)
                              : ss.
3    COUNTY OF _____)

4

5            I HEREBY CERTIFY that I have read the foregoing
     testimony consisting of 89 pages, numbered from 4 through 92,
6    inclusive, and the same is a true and correct transcription
     of said testimony with the exception of the corrections I
7    have listed below in ink, giving my reasons therefor.

8      1.   Page ____ Line ____ Correction_____
            Reason _____
9      2.   Page ____ Line ____ Correction_____
            Reason _____
10     3.   Page ____ Line ____ Correction_____
            Reason _____
11     4.   Page ____ Line ____ Correction_____
            Reason _____
12     5.   Page ____ Line ____ Correction_____
            Reason _____
13     6.   Page ____ Line ____ Correction_____
            Reason _____
14     7.   Page ____ Line ____ Correction_____
            Reason _____
15     8.   Page ____ Line ____ Correction_____
            Reason _____
16     9.   Page ____ Line ____ Correction_____
            Reason _____
17     10.  Page ____ Line ____ Correction_____
            Reason _____
18     11.  Page ____ Line ____ Correction_____
            Reason _____
19     12.  Page ____ Line ____ Correction_____
            Reason _____
20

21                                _____
                                  KENNON C. TUBBS, M.D.
22

                   SUBSCRIBED AND SWORN to at _____,
23   this _____ day of _____, 20___.

24

25                                _____
                                  NOTARY PUBLIC


CITICOURT
THE REPORTING GROUP

1                    C E R T I F I C A T E

2   STATE OF UTAH        )
                         :
3   COUNTY OF SALT LAKE )

4
              THIS IS TO CERTIFY that the deposition of
5   KENNON C. TUBBS, M.D., the witness in the foregoing
    deposition named, was taken before me, JAMIE R. BREY, a
6   Certified Shorthand Reporter and Registered Professional
    Reporter in and for the State of Utah, residing at Salt Lake
7   City, Utah.

8
              That the said witness was by me, before
9   examination, duly sworn to testify the truth, the whole truth
    and nothing but the truth in said cause.

10

11            That the testimony of said witness was reported
    by me in Stenotype and thereafter caused by me to be
12  transcribed into typewriting, and that a full, true and
    correct transcription of said testimony so taken and
13  transcribed is set forth in the foregoing pages numbered from
    4 through 92, inclusive, and said witness deposed and said as
14  in the foregoing annexed deposition.

15
              I further certify that I am not of kin or
16  otherwise associated with any of the parties to said cause of
    action, and that I am not interested in the events thereof.

17

18            WITNESS MY HAND at Salt Lake City, Utah, this
    19th day of July, 2018.

19

20                                  

21            _____
                   JAMIE R. BREY, CSR, RPR
22                 Utah license No. 361682

23

24

25

CitiCourt
THE REPORTING GROUP

**$**

$18 75:20

**1**

1 76:16
1,600 91:10,19
10 4:1
11 9:8
12 6:24
13 46:22,23
13584 4:18
16 5:13
18.50 75:21
19 90:22
19-year 90:24
1970 4:16
1988 5:5
1992 5:5
1996 5:3,4
1999 5:4,12
1:34 4:2

**2**

2 55:4 76:16 77:12
20 91:17,18
2007 9:5
2008 17:8
2015 45:4,5
2016 5:19 12:12,15 18:13
  30:16 37:13 40:11,17,23
  41:6,11,18 42:2,17,25 44:19
  45:3 48:6 52:1,23 55:11
  56:6 63:15 67:5 69:1,10
  70:20 79:2 81:11 84:15
  85:12,21,24 90:13
2017 7:1 12:20 49:2 86:22
2018 4:1
22nd 4:16
24 38:3
2:33 44:24
2:39 44:24

**3**

3 55:8,25
30 14:4,8,12 91:18
33 75:24,25 76:11
39 48:8 50:2 52:17
3:38 86:25

3:40 86:25
3:47 92:15

**4**

4 47:2 77:21 78:23 79:3
  80:22
4:00 89:1

**5**

5 56:21 64:2 78:22 89:16
5/23/18 47:25
500 75:22

**6**

6 77:12

**7**

7 77:21,22

**8**

800 14:8
84020 4:19

**9**

9 78:23
99 45:3

**A**

abilities 50:19
ability 66:8 68:19
Abke 17:18 42:13 63:17
  65:10 68:2 75:2 82:21 87:1,
  12
absent 87:1 89:24
abuse 27:19,21 28:11,25
abused 26:23 27:23 28:6,7
accepting 17:12
access 19:24 20:1,4,13
  23:20 57:23 70:11 74:6
  78:13
accessed 78:19
accompanied 39:7
accompany 38:9
accord 88:11
account 75:10
accurate 60:3
acronyms 83:18

acted 18:1
action 52:12
actions 87:19
active 26:12,25
actively 25:9
acts 24:13 81:1
actual 26:13
acute 28:23
add 84:3
addiction 49:18
additional 11:4
address 4:17 14:22 81:15
addressed 62:7,10
adequately 70:21
administrative 16:4,10
  82:23
administrator 12:17
advice 5:22 17:13 18:2,23
  19:15
agent 24:13
agitation 24:16 83:23
agree 70:24 72:13 81:20
agreement 9:25 10:1,4,8
ahead 32:20
alcohol 12:21,25 20:22
  55:9
alert 51:8
alerted 68:8
alpha 24:23
America 49:17
American 9:18
amount 13:19
analyses 21:16
and/or 33:11
answering 88:13
anti-anxiety 24:13
anti-hypertension 24:11
antidepressant 28:9
antiemetic 72:8
anxiety 24:15 27:9
anytime 10:19 64:8 65:2
  72:21 80:11
apparently 87:16 89:18
appendicitis 72:7
approach 23:8 80:15
appropriately 60:20 63:15,
  19 74:21 78:25 79:7,8 88:13
  89:4
approval 25:23
approve 25:25 26:15 27:5
  29:1 48:17,18 66:9 77:6,7
approved 25:15 26:6 28:19
  50:3,4,8 76:22 87:15,16

approves 10:2
approving 26:10 27:19
April 4:16 7:1
area 38:1
arrive 45:13,15
art 50:14,15
asks 73:11 83:23
aspects 49:19
aspirin 73:9
assess 18:14 53:20
assesses 50:18
assessment 50:13,21 51:3,
  5,6,16,25 52:4,5,7,8,13
  54:7,8,9,11 72:14,23,24
  85:19,20 86:13
assessments 50:17,24
  51:2,19,24 53:25 54:3 80:3
  85:17
assist 77:13,17
assistance 10:22
assistant 8:4 9:11,13,15
  10:1,2,25
assistants 9:24
Association 9:18
assume 15:20 19:20 37:24
  40:6 42:15 49:1
assuming 65:4,21 77:14
assumption 87:25
attention 57:25
attorney 70:6,9,18
author 47:21 57:4,7,9
authored 57:12,16
average 15:21
avoid 42:8
awake 51:8
aware 8:22 22:8 67:23

**B**

back 16:8,14 18:13 38:2
  66:25 83:4 88:12
bacteria 33:20
bad 26:24 43:23
ball 74:8
based 29:21 59:23 63:21
  88:7,8 89:11 90:7
basic 56:15 77:1
basically 9:25 83:23 87:21
basin 37:7
began 9:4
behalf 4:6
belief 64:4
believed 89:21



bench 12:17,19
beneficial 39:18
bigger 14:9 42:3
binder 46:22
birth 4:15
bit 24:5 79:9
blanket 36:10,11
block 68:15
blocker 24:23
blood 24:12,13,21,24 25:2,
  3,5,7,9,13 27:3,4 33:16,20
  36:5
body 58:8 89:18
booked 54:10 87:10
booking 19:25 38:1 90:24
Botox 77:5
bottle 26:13,16
bottles 25:19
bowels 71:22
box 55:12,25
brand 29:17
break 44:22 86:24
BRIDGE 4:12 5:24 13:5,11
  16:17 17:19 22:21 27:17
  28:3 32:22 34:15,22 35:14,
  19,20 36:1 39:6 41:17
  42:16,21 43:10 44:14,22
  45:1,16 46:7 47:22 48:1,3
  49:10,11 52:25 53:4 54:4
  55:3,16,19 57:5,7,11 58:24
  59:2,21,22 60:24 61:7,17,18
  62:24 63:1,20 65:18,19 68:5
  69:21 71:9,10 72:18 73:1,
  15,19 74:10 75:3,8,21,23
  76:1,3,11,14 82:12,15,18
  83:9 84:21 85:1 86:18,24
  88:4 89:9 90:1
bring 24:1 25:18 83:3
broad 7:2 10:14 11:22 13:5
brought 67:15 72:13,16,21
  73:2,6,8 80:14
bucks 75:19
bug 58:14,24
buprenorphine 29:15,20,
  24 71:16
business 4:17 64:8
Butterfield 13:8 17:14
  22:13 27:15 28:1 32:19
  34:14 38:22 41:13 42:9,11
  43:7 44:10 45:9 46:4 47:19
  49:5 53:23 55:14 59:8 60:18
  61:14 62:17 65:9 68:3 69:17
  71:6 74:25 82:9 84:23 86:6
  91:5 92:7,9,12

## C

call 7:8 8:24 12:9 32:9,12
  40:3,7 41:1,3,6 56:17 59:19
  62:11 64:9 77:13,17 78:25
  79:5,13,21 81:9,15 83:19
  88:1,10,12,25 90:4 91:21
called 4:6 8:11 10:8 12:2
  39:23 62:12 64:22 70:9
  84:12 87:11 88:14 89:6,23
  90:9,10 92:6
calling 32:14 88:20
calls 17:16 25:23 32:7
  34:18 46:3 60:17 62:20
  64:10 65:7 67:25 69:16
  74:24 79:17 81:17 84:18
  91:23 92:1,5
care 57:24 74:6 76:16,19
career 90:24
Carolina 4:18
carries 37:21
case 19:3 46:19 56:19 61:3
  68:23 75:4 86:9 90:22 91:23
case-by-case 39:8
cases 10:21 12:4 53:13,16
categories 84:3
caught 58:12
cell 37:2,11,15,21,25 38:25
  68:15
cells 36:25
center 41:22 49:22 78:1,6
centers 49:23
cessation 24:15
chain 64:17
change 79:9
charts 75:13
check 38:10,15
checked 43:16,20,22 44:4
  55:10,25
checking 33:23 34:2 38:12,
  14,15 39:1 44:1
checklist 84:7
checks 44:6 55:12
chest 12:1 51:14
Christopher 4:14
chronic 31:3 34:13 38:19
  57:21 73:22
circumstances 24:7 32:12
City 4:1
claiming 89:22
claims 52:22,24
clarification 92:3
clarify 57:2
Clark 8:4,14,19 9:3 10:5,10
  11:15 13:12 15:18,21 22:1

23:24 24:5 25:25 26:9 31:5
  32:17 43:3,8,14 47:17,20
  48:16 56:10 59:7 60:3,15
  62:14 74:22 78:10 80:23
  81:5,12,13,23 82:7,20 89:2,
  7,8,19,21,24
Clark's 10:12
classes 11:9
clear 16:25 23:19 39:3
  40:25
cleared 16:14
clears 30:15
client 10:18
clinic 7:6,18,19 8:2,14,22
  15:15 23:9 63:10
clinical 15:16 24:17,18
clinically 24:12
clinics 8:5,6
clonidine 24:7,9,10,11,21
  26:5,10,20 27:6 87:11
closely 10:15 27:24 38:7
  43:24 81:13
Clyde 15:2,13,24 16:7,23
  18:3,6,13,18 26:3 35:10,21
  40:17,23 41:5 44:20 52:1
  55:13 58:3 59:4,6 60:15
  61:8 63:16 64:6 67:21 69:1,
  10 70:13,15,21 73:15,21
  74:11 79:20 82:6,19,22
  84:15 87:9
CME 11:10
cold 73:9,10,11
color 36:15
Colorado 5:4
Combined 83:17
command 64:17
common 33:19 90:17
communicate 40:20,22
  41:4 70:7 86:14
communicated 44:15
  63:16 64:4 68:7,22,25 69:9
communicating 51:7
  79:19
communications 19:20
complains 53:2
complaint 51:12 80:11,16
complaints 31:12 36:6
  79:1 80:10 81:10,15,17
completely 58:11 65:13,14
complicated 10:21
complication 12:3
concern 22:3 27:19 41:3
  51:13,14 90:5,9,10
concerned 30:23 90:5
concluded 92:15
condition 83:24

confirmed 26:13,14
confused 51:8
conglomerate 83:21
consistent 35:15
contact 7:12 8:19,21 9:1
  15:12,15 25:20 27:12 31:23
  34:7 56:19 59:20 64:6,8,17,
  18
contacted 26:3 31:9 59:6
  60:15 69:3 74:22
contacting 60:2 64:20,23
  68:20
contacts 9:1 10:20 64:18
container 36:18
context 21:4
continually 88:22
continuing 11:1,2,6 82:5
continuously 87:24
contract 6:5,23,24,25 7:4
  13:2 18:24 21:17 76:6 78:4
  79:23 81:2
contracted 19:23 82:4
contracting 21:15
contractor 5:17
contracts 6:1,3,12
contrary 66:20
copies 10:18
copy 33:7
correct 4:22 5:9,21 6:7
  7:17,20,22 8:10,13 10:11
  11:19 15:10,19 18:8,10
  21:2,5,7 22:4 29:20 42:1
  43:1 45:4 61:25 62:5 65:18
  80:19,20 88:20,21
Correction 76:17
counsel 19:15
counter 26:18
counties 6:2,3,11 46:18
  57:18 85:21 86:11 91:7
county 5:14,15,16,20 6:4,6,
  8,13,14,15,16,20 7:4 8:16
  9:6 10:13 11:14,16,24 12:9,
  19 13:2,3,6,10,15,17,18,21,
  24 14:2,3,7,14,20,24 15:9
  16:6,8,15 17:3,22,25 18:7,
  25 19:16,23 21:16,24 22:9
  28:19 30:17,25 32:11,13
  36:19 37:9,19 40:11 41:12,
  19,21,24 42:6 45:17,18
  46:18 47:5,7,8,9 48:21 50:3,
  8 57:15 62:16 63:3 64:5,12
  66:7,15 67:5 68:23 72:19
  73:3,21 74:18 75:10 76:6
  78:5 80:1,2,8 84:12 85:5,6,7
  86:1,2,4,11 90:14 91:11,13,
  15,17
couple 76:8 87:3
court 4:18 37:15,21 92:3



cover 14:3
coverage 7:7
covering 9:6
COWS 83:10,11,12,19,21
    84:9,13,16 85:3,4,7,18,22
    86:10,12,16
create 34:23,25
created 22:2 42:14 64:7
credits 11:3,7,10
crossover 72:4,10
crush 28:11
cultured 33:15
current 4:17 48:20
cut 47:6

D

Daggett 6:15
Dale 12:17,19
date 4:15 48:24
day 7:19,23 38:3 39:2,3
    43:4,16,22 53:10 87:17
    88:23 89:2,8,12
days 7:8 16:23 34:13 58:7
    60:10 68:13
deal 49:18
dealing 53:16
death 12:3 42:7 49:4 52:23
    74:20 82:8,14,20 90:23
December 44:19 70:20
    90:13
decide 31:9
decided 5:16
decision 88:9
deficiency 19:8,11
define 13:13
defined 32:12
definition 40:18
delegate 80:21
delegated 8:3
delegation 9:25 10:8,10
delusional 51:7
denied 20:13
dental 12:6
department 13:18 47:8
    70:5 76:17
depends 38:17 73:5
depletion 71:14
deposition 27:15 28:2
    84:23 86:7 87:2,12 92:15
deputies 64:6
describe 9:2 15:11 41:11
detainee 22:19

detainees 20:20 57:23
Detention 77:25 78:6
deterioration 89:25
determination 17:24 52:9
    54:11 59:18 61:23 63:8 75:6
determine 56:16 75:9 84:4
detoxed 45:11 58:11 65:13,
    15
detoxified 45:14
detoxing 58:10 65:13
    89:18,22
diarrhea 30:18,23 31:3,16
    33:1,24 34:3 35:1,12,22
    36:6,20 38:20 56:8 57:22
    58:7 60:11 70:25 72:1 73:22
    92:10
dictate 72:22
dictated 13:23 22:16 73:12
dictates 10:16
dictation 10:17
dictations 10:18 21:25
    22:16
diet 65:25
difference 29:8 52:7,15
differently 71:8,14,15
dinner 68:16
directed 40:11
directions 39:8
directive 41:19
directly 10:20
director 46:12
disagree 43:4,12,16
discuss 10:20
discussed 11:22 12:24
discussion 76:2
disease 49:18 72:12
dispensed 22:24
district 70:5,9,18
Division 9:23
doctor 9:11 24:4 31:14
    32:3,6 62:12 74:15 81:3
doctors 5:23
document 23:21 34:10
    46:23,25 47:13,14 48:9,10,
    11,18 51:20 70:21 73:23
    76:4
documentation 40:21 41:8
    62:6
documented 34:17 61:12,
    20,25
documenting 19:14 30:18,
    20 35:1 73:4
documents 20:13,17 22:12
domain 50:6

door 89:3
DOPL 11:5
draft 47:16
drafted 47:18,21 48:16
    51:20
Draper 4:18
drives 25:9
drug 20:22 45:18 49:22,23
drugs 21:16 55:9
Duchesne 6:13 7:3,21 8:16
    10:13 13:2,3,6,10 14:2,14,
    20,24 15:9 16:6,8,15 17:3,
    25 18:6,25 19:16,23 21:15,
    24 22:9 28:19 30:17,25
    32:11,13 36:19 37:9 40:11
    41:11,19,21,24 42:6 47:8
    48:21 50:3,7 57:15 62:15
    63:3 64:5,12 66:7,14 67:5
    68:23 72:19 73:3,21 74:18
    75:10 76:6 77:13,16,25
    78:5,6 79:25 80:8,18 85:5,
    15 90:14 91:16
duly 4:7
duration 15:8
duties 21:21 50:17 80:21
    81:12
dying 61:4 90:14

E

E-mail 7:13
earlier 80:17 89:16
easily 78:18,19
eat 68:13
eating 67:6,22
education 5:1 10:24 11:1,
    2,7 44:20 55:21,24 78:8
    82:5 84:20
effectively 18:20
efficiently 18:20
effort 75:9
efforts 79:2
Eighty 91:15
Elective-like 77:3
Elective-type 77:4
elevated 87:18
emergency 59:20
emergent 56:18 60:6,12
emergently 79:16
emesis 33:15 37:6
employ 5:23 77:13,16
employed 5:15 16:7
employee 5:16,20 6:4,6
    9:3,25
employment 6:8

encouragement 18:23
encouraging 17:2
end 47:2
ended 61:4
ensure 32:11 78:5
environment 64:7
episodes 54:21
equipment 66:13
equipped 37:11 53:20
ER 62:12 66:18
estimate 15:25
evaluated 33:16
evaluation 7:6 31:24 39:3
    40:5
evaluations 12:6 23:1
evidence 35:11
exact 48:24 49:1
examine 21:11
examined 4:7
Exhibit 46:22,23 48:8 50:2
    52:17 55:4 56:21 64:2 75:24
    89:16
exhibiting 43:15 53:3,6,10,
    18 56:7 70:25 72:1
existed 12:15 70:8
expect 22:11,15 31:22,23
    40:3,7 61:8 62:3,4 63:2,11
    64:25 66:20 68:14 69:20
    74:11 81:8
expectation 31:16 32:6,11
    39:12 40:10,13,14,15,16,23
    42:22 43:3 44:7,15 59:6,13
    60:13,19 61:10,19 63:3,6,8,
    16 64:5 68:14,17,22,25 69:9
    73:3,10,17,18,20,23 74:4
expectations 78:20
experience 63:21 83:25
expert 75:16,20
explain 71:11 73:7 83:10
extent 20:17 83:6
eye 81:14
eyes 75:7

F

face 15:23 77:10
face-to-face 15:12
facility 41:22
fact 22:6 59:23 64:16 89:17,
    21
facts 87:19 89:10,11
factual 90:1
failing 70:21
failings 75:10



fair 20:24 36:10 74:16 90:11
fairly 23:6
fake 21:10,12
faked 21:7
familiar 21:23 22:5 48:10 55:6 90:23
Family 5:7
fashion 78:2
fast-acting 24:23
FDA 29:24
feces 33:20
feel 18:21 24:14 39:17 40:25 86:9
feels 10:21
fentanyl 30:1
field 19:5
fifty 91:16
file 22:2,20 62:5,15 63:4,12 69:7,13,22 70:10,14 72:15
files 21:23 22:6,7,9,11,12 70:22
fill 8:9,11 15:21 74:5,7,8,13
filled 25:21,22 41:9
filling 15:17
fills 56:12
filtering 54:12,17 56:3
finally 5:22
find 22:11,15 62:15,23
finding 36:17
findings 21:6,7,13 36:13 72:23,24
finished 88:16
five-year 15:12
flip 56:21
flow 81:23
flu 25:3,7 58:13 71:7,12,18, 19 72:2
flu-like 31:2 65:16,21 70:25 71:23
fluid 66:12
fluids 66:8
flush 37:2,4
flushed 36:25
fly 19:18
follow 39:1 81:11
form 41:8 55:5,6 56:22,23, 25 57:4,10,12,14,16,17,20, 23 58:2,4 59:4,5 63:4,11,17, 25 65:5 74:12 82:21 84:6
formal 11:4,6 40:21 82:1,4
forms 19:25 20:16 55:7 84:8
foundation 17:14,15 22:14 32:19 34:14,19 41:13 42:10

44:10 45:9 47:19 49:5 53:23 55:14 59:8 61:14 65:8 69:15 71:2 74:23 82:9 84:17
four- 15:11
fracture 28:23
frame 47:23,24
frequently 38:11,12 44:6 78:17
front 37:25 81:4
full 4:13 6:9 51:14 72:14 73:12

G

Garden 46:13
gather 52:11
gathers 52:8
Gatorade 89:3
gave 27:2
geared 33:22
General 12:5
generalized 13:9
generally 15:13 22:11
generated 48:7
Georgetown 5:2
give 4:25 5:10 7:2 10:13 11:20,21 18:1,19,22 23:12, 20 26:9 39:2,4,10 71:17,18 72:3,5,8 76:20 78:7 79:8,10, 14 81:8,21 82:24 84:2
giving 18:18 86:17
good 20:25 23:3 75:3
Google 84:9,13
grades 84:1
graduated 5:2
grievance 80:12,15
grievances 79:1 80:10,14 81:10,16
growing 49:17
guess 13:13 32:16 38:17 42:3 44:3 59:24 61:22 73:5 91:10,19,20,25
guideline 9:17
guidelines 76:18,21

H

half 91:11
hand 28:23 37:8
handle 78:25 81:9,18,19
handled 79:6 80:14
handling 81:20
hands 74:7
hang 55:23

happen 5:18 39:12,21 56:18
happened 23:14 77:8 90:17
hard 80:2
he'll 8:23
heads 35:6
health 19:25 20:16 23:1 51:13
healthcare 5:3 7:6 22:19 31:7,8 56:12,14,15 59:14, 15,16,17 60:4,5,6,8,20 61:2 62:7,9 63:7,9,13,19 65:12, 13 68:12 74:5,7,8,14 79:1,5, 11 80:10,11 81:10
heard 37:19 90:13
heartburn 26:19,21
heavy 53:8,11
helped 83:3
helpful 31:25
heroin 30:12 54:20
hey 19:4 32:5 53:6 54:18 78:14 79:8 81:18,19 84:13
high 24:20,24 25:2,3,5 28:12
hill 4:18 31:14
HIPAA 23:21 78:3
hire 17:3,6
hired 9:4 16:15,16 18:3,4,6 51:20 83:1
history 5:11 23:10 28:17,25
hold 8:25 58:7 60:11
holding 37:15,21,25 38:25
horse's 60:23
hospital 22:24,25 23:4,6,8, 11,14 56:20 64:21,23,24 65:3 66:12,23 68:20 69:3,5
hour 43:20 75:19
hours 13:20,21 15:15 38:3
house 39:17
housing 37:25 38:2,6
hundred 75:19 91:13,16
hundreds 90:24
hunger 67:10,11,18,19,20
hurts 21:11,12
hydrocodone 30:11
hypertension 24:19 27:9
hypothetical 59:11 60:17 71:4 74:3 88:5 90:7

I

ibuprofen 73:9
idea 11:20 76:20

ideal 27:11
identify 40:16
IHC 5:3
immediately 39:24 59:20 88:15
Imodium 66:5 71:20,21,25 72:3
implement 45:25 46:2,6 80:5 81:22 85:9 86:21
implemented 30:17 46:17 48:23 49:4,8 52:23 68:7 85:14,22
implementing 46:15 55:24 85:3
important 64:22 86:9,13
inadmissible 83:7
inaudible 92:2
incidences 33:14
incident 18:4 19:3 82:23
include 11:6 50:25 51:3,5,6 53:5
included 62:4 69:7
includes 77:14
including 6:2
incomplete 59:10 60:16 71:4 74:3 88:4 89:9 90:1
independent 36:8
independently 9:15
indication 24:18 30:1,8,9
indications 29:24
individual 36:12
individualized 14:15
individuals 45:13
influence 55:9
information 20:19,25 23:12,13 26:8 31:5 52:8,11 55:13 56:3,15 59:18 60:23 62:13 65:23 78:13 88:7,8,9, 16
infrequently 8:8
ingesting 67:15
inherently 88:19
initiate 57:21
initiated 23:17,24 31:11 39:11
injury 21:10 28:23
inmate 19:24 21:21 35:16 36:2 52:18 53:2,18 55:12 59:13 67:5,15 68:18,20 70:22,24 72:13 73:2 77:5 80:15 81:15 91:21
inmate's 25:14 62:5
inmates 7:7 18:14 33:1 36:19 37:13 52:19 76:17 90:24 91:6



inmates' 35:12
instance 20:12 77:5
instituted 32:10
instruct 40:12
instructed 70:15,17
Instructing 13:14
instruction 18:19,23 78:24
  79:8,10,14 80:22 81:8,21,25
  82:3,7,19
intake 12:5 20:16
intention 41:24
interacted 15:23 16:3
interaction 15:14 36:8 67:2
interactions 15:13
interchangeably 81:5
interesting 65:11
Intermountain 5:3
Internet 84:8
interpret 58:22
interrupted 92:3
interval 42:24
intervals 82:2
interview 70:10
investigate 27:23
Investigated 16:12,13
investigation 16:14 29:2
  47:10 70:3,11,16,19
involved 14:24 17:1,2
  30:24 46:20 56:2
involvement 17:5
irritability 24:17
issue 22:3
issued 25:24
issues 14:22
IV 66:8,12,16,22 67:2

J

jail 10:13 11:14,17,24 12:4,
  19 13:4 14:4 18:9 19:16,24
  20:5 21:20,24 23:7,18,22,24
  24:2 25:15,16 26:23 28:16,
  20 30:17,22,25 31:1,16,17
  32:11,13 33:2 36:19,24
  39:11,14,15,19,23 41:19,21,
  24 42:6 44:7,16 45:17,18
  47:8 48:21 49:9,21,24
  53:16,19 54:5,6,10 64:5
  66:25 67:5 68:19,23 73:3,21
  74:18 75:11 76:23 80:1,2
  84:12 90:3,14,21,25
Jail's 41:12
jails 5:15 9:7 13:21 14:3
  17:22,23 46:20 49:16 51:23
  67:12 86:15 90:18

Jana 15:2,13,14,24 16:7,23
  18:3,6,13,18 19:2 26:3
  35:10,21 40:17,23,24 41:4
  44:19 52:1 58:3 59:3,6
  60:14 61:8 63:16 64:6
  67:21,23 68:25 69:10 70:13,
  15,21 73:15,21 74:4,5,11
  79:19 80:13 82:6,19,22 83:3
  84:15 87:9 89:19,21
Jensen 18:4 37:20 42:7
  46:19 49:4 55:5 57:1 63:5
  67:22 69:23 70:14 75:6,11
  86:9
Jensen's 62:15 69:13
  74:20 82:8,13,20
job 18:19
Join 17:17,18 41:14 42:12,
  13 43:7 44:11 46:4 54:1,14
  55:15 59:10 60:18 61:15
  62:19 65:9,10 68:1,2,3
  69:17,18 71:3,5,6 74:25
  75:1,2 82:10 83:8 84:18
Juab 6:13 91:17
July 4:1

K

Kate 16:21
Katie 16:21,23
keeping 78:2,8
Kemmerer 6:19 91:18
Kennon 4:5,14
kind 66:21 83:1
kinds 29:10 36:6 81:16
knee 21:10,11
knew 89:1
knowledge 19:2 32:23,24
  67:21

L

lack 17:15 34:19 42:10 65:8
  69:15 71:2 74:23 84:17
laid 75:7
Lake 4:1 70:9
lapse 6:25
large 43:18
law 9:14,19
laws 23:21
lawsuits 42:8
leave 16:4,10 82:23 83:7
left 27:15 70:12 84:23
legal 45:20
license 10:3
licensed 86:12
Licensing 9:23

licensure 10:25 11:2
lied 36:5
limited 7:11
limp 21:13
Lincoln 6:16,18
liquid 65:25
list 6:11 56:17 79:13
loaded 66:23
location 38:9
Logan 8:4,9,11,14,19,21,24
  9:1,2,4 10:5,10,12,15,23
  11:12,15,16 13:12 14:21,23
  15:17,21 22:1 23:24 24:5
  25:25 26:8 27:1 31:5 32:17,
  24 43:3,8,14 47:17,20 48:16
  56:10 59:7 60:2,15 62:14
  64:18 66:15 74:22 78:10
  80:23 81:1,5,12,13,23 82:7,
  20 87:15 88:2 89:2,7,24
logs 34:21,23,25
long 15:6 18:11 20:19
  45:11,23 54:20 82:24
longer 6:20
looked 36:15 59:25 88:24
  89:4,16
loosely 33:11
Lortab 30:1,10
lot 26:21 54:18 61:2,3,4
  91:23
low 25:6 27:5
LPN 51:16,24 52:3,6,8,11
  73:14,16 77:14,19 79:25
  80:3 83:2
LPNS 85:16

M

M.D. 4:5 78:23 81:2,4,5
made 18:10 46:19 66:24
Madison 37:20 49:4 55:5
  57:1 62:15 63:5 65:4,6
  67:22 69:13,22 70:14 74:20
  75:5,11 82:8,13,20 86:8
  87:10,23 89:22
Madison's 52:23
maintain 11:1 70:22
maintained 78:21
majority 7:25 8:5
make 5:16 7:17 8:15 17:7,
  21,24 31:4 32:15 45:12,23
  46:20 50:11 51:22 52:13
  53:24 54:2,6,7 59:18,24
  61:23 63:8 68:7 72:24 75:6
  78:17 79:6 80:3,18 85:16
  88:9
makes 45:17,24 52:9
making 7:14 30:24 56:9

manner 78:12
manual 74:18
matter 58:15
meals 67:6,15,22 68:9
meaning 27:4 30:5,10
means 76:20 81:4
measures 83:6
mechanism 71:12,13
mediated 71:13
Medicaid 76:18,21,22 77:6
medical 5:2 6:1,3 7:3,6
  9:18 11:1,2,7 12:17 15:15
  21:23 22:2,3,7,8,11,20
  23:10,20 24:3 37:14,19,20
  38:5,18,24 39:7,13,20,24
  40:2,4,5,6,8 41:3,5,9,22
  46:12 56:3,22,23 57:20,25
  58:4 59:4,5 61:20 62:5,15
  63:4,11,12,24 65:4 66:21
  69:7,13,22 70:10,14,22
  72:14,15,16,24 74:12 75:6,
  12 76:18 77:1 78:11,14,15,
  18,25 79:23,24,25 80:2,7
  81:3,9 82:5 85:22
medical-related 13:7
medication 22:23 24:11
  26:24 27:5,14,20,21 28:15,
  24 29:5 39:2 71:21
medications 22:23 24:22
  25:17,18,21,24,25 26:15,17,
  20 27:22,23 28:4 29:16,23
  71:16,17
medicine 5:7 12:5 73:10,
  11,12
meet 14:21
meeting 11:14,15 12:18
  13:17 14:11,17
meetings 12:9,10,11 13:16
  14:23
meets 14:21
memory 12:15
meningitis 72:6
mental 23:1 51:6,13
mentioned 23:5
met 15:4 78:5,20
methadone 29:15,23 71:17
methamphetamine 28:12
middle 7:16
mild 44:4,8,16 84:4
mind 89:1
minimum 42:22 43:25 44:3
minor 60:5,9
minutes 12:18
missed 68:8
Misstates 35:13 42:11 43:5
  62:17 74:2



moderate 44:5 84:4
modification 49:14,15
Monday 87:10 89:19,25
monitor 44:16 67:19
monitored 43:24
monitoring 31:1 37:13
  67:14
month 11:13,18 14:12
monthly 11:15,22
morbidity 12:2
morning 24:6
mortality 12:2
mouth 60:23
move 37:24 38:24 39:5,14
moved 38:6 39:20,23 40:4,
  5,9 41:5,9
multiple 68:8
MYLAR 5:22 17:17 34:18
  35:13,24 41:14 42:12 43:5
  44:11 46:3 52:21 54:1,14
  55:15 59:10 60:16 61:15
  62:19 65:7 67:24 68:1 69:15
  71:3,5 72:20 73:25 74:2
  75:1 76:10,12 82:10 83:8
  84:17 87:3,8,14 88:6 89:14,
  15 90:6,11,12 91:1

N

NAEGLE 13:4 16:12 17:15
  34:19 35:17 41:15 42:10,19
  44:12,23 49:6 54:13,15 57:4
  58:15,18,22 59:12 61:16
  62:20 67:25 69:18 71:2,4
  72:16 73:13 74:1,23 75:4,25
  82:17 83:5 84:18 92:14
narcotic 28:15,17,25 29:1,
  16,21,24 30:1 49:17
narcotics 28:16 29:11,25
  30:13 53:9 54:18
nationally 84:10
nature 34:24
nausea 56:13
necessarily 23:17 33:12
  56:7 67:9
needed 40:9 50:4 56:18
nice 27:3
night 87:23,24,25
non-scheduled 7:17
normal 64:17,19 88:23
not-so-obvious 53:15
note 10:17 72:22 73:12 83:5
notes 22:17 63:11,13
notified 64:25
notify 57:24
November 30:16 37:12

41:11,18 42:17 48:6 55:11
  56:6 84:15
number 54:17 76:10
numeral 77:23
nurse 14:15,18 15:9 16:6,
  15,16 17:3,6 18:7,21 31:23
  33:1 34:7 38:14 50:18 53:17
  54:5,6 55:13 56:14 59:14,25
  60:22 64:6,17,18 68:8,14
  69:19 73:3,8 74:6 77:13,16,
  19
nurses 13:19 14:5,7,8,12
  22:18 50:23
nursing 11:14 12:4,5 13:1
  14:21 17:22,23 18:5 20:2
  22:17 25:22 38:10 39:5
  50:13,17,21 51:1,16,19,24
  54:7,9,10,24 64:11 78:1,24
  81:21 82:5 85:16,19 86:16
  90:4

O

object 52:21 63:17 82:21
objection 13:8 17:14,15
  22:13 34:14,18 35:13,24
  38:22 42:9,10 43:5 53:23
  59:8 60:16 62:17 65:7
  67:24,25 69:15 71:2 72:20
  73:25 74:23 84:17 88:4 89:9
  90:1
objective 21:7,12 36:13,17
  72:23
objectively 60:1
obligation 13:3 19:11 78:5
  79:3
observation 37:15,19,20
  38:5,18,24 39:7,13,20,24
  40:4 41:5,9
obstacle 17:12
obtain 13:20 63:6
obtaining 59:17 84:16
obvious 28:24 48:4 53:13
occasion 74:17
occupation 4:23
occurrence 64:14,15
off-the-record 76:2
office 47:5,9,15 73:21
officer 13:19,20 31:19,22,
  23 32:5,7,8 34:6,11 40:12
  54:7 64:20 88:12
officers 13:4,10 34:9,20,25
  38:1,7,11 53:22 54:23 56:3
  57:24 64:5,11 86:10,15,16
offsetting 16:24
oftentimes 74:6
on-call 7:7,11,14 8:15
on-site 7:6 66:8,14,19

on-the-job 82:2
open 64:8
operate 35:15 36:2
operation 14:9 24:3
opiate 24:25 25:1 29:4,11,
  22 30:4 31:2 41:12,20,21,23
  42:17 43:15,18 44:1,8,9,16,
  17,20 45:5,25 46:17,21
  48:20 49:9,13 50:2 52:18
  53:3,18 54:25 65:15 71:1,7,
  13,17,24 72:2,7 83:2,4,11,
  22,25 85:4 90:14
opiate-withdrawal 29:5
opiate-withdrawal-related
  90:23
opiates 30:7 42:23 54:20
opinion 75:14 85:18
opioid 12:12,21,25 29:6
  49:17,21 53:7 71:13 83:12,
  17
opportunity 65:6
opposite 25:6
options 65:5
oral 20:6 35:2 53:14
order 9:16 26:9 39:1 50:11
  67:1 78:18
ordering 65:24 67:2
orderly 78:2,8
orders 31:24 39:4 50:5,7,8
  64:18 66:24 80:4,5,8
organize 79:15
organized 78:12
outline 10:9
outpatient 7:5 22:25
over-the-counter 26:16
  73:11
over-the-phone 7:9
oversee 83:1 91:6
oversight 9:21
Oxycodone 30:11
Oxycontin 30:11 53:9

P

p.m. 4:2 44:24 86:25 92:15
PA 11:16 87:15 88:1 89:24
paid 75:20
pain 12:1 28:24 30:10 51:14
Paragraph 79:3 80:22
part 18:24 21:17 52:5
PAS 46:10
passed 31:5
patient 10:16,17,20 21:3
  22:2,24 23:5,9,25 24:8,20
  25:16 26:12 27:12,13 28:25

31:2,7,11,12,15 32:4,5
  33:15 36:12 38:11,12,15
  39:5,17,24 50:18 51:6
  54:16,17 56:12,16,19 59:15,
  17,25 60:21,22 61:9,11 62:1
  63:7 64:21 65:24 66:11
  68:10,11,15 69:3 72:21,25
  73:11 74:7
patient's 22:6 51:12
patient-doctor 36:8
patients 7:10 8:23 14:8
  20:18 21:21 23:19 24:1,14,
  15,16 25:1,3,8,18 26:14
  28:17,22 30:18 31:13 35:16
  36:3,5,7 39:14 43:14,19,21
  45:11 49:9,16 52:2 54:18
  61:1 72:9 73:8 74:13 76:25
  78:11 79:14,15,17 85:4
  86:14
pay 76:22
payment 76:22
people 28:11 49:24 56:6
  92:4,5
Percocet 29:25 30:11
period 15:12 16:4,11 45:25
  82:24
periodic 82:1
periodically 8:8 17:10
person 15:4 20:25 25:12
  38:17,24 39:18 54:17 55:2
personal 4:20 15:16
personally 15:2 32:15
  36:21 79:4 86:9
pharmacy 25:20 26:14
phone 7:13 8:17 26:1,6
  27:1 40:3,7 41:6 64:9,10
physical 67:2
physician 4:24 5:15 8:4
  9:5,7,10,12,13,14,16,22,24
  10:1,2,25 19:23 23:17 26:12
  27:12 29:2 38:23 39:8 46:9
  50:5,8,11 66:24 67:1
physician's 9:11
physicians 9:24 29:10
  31:13 33:19 46:10
pick 35:8
pill 26:13
pills 30:10
place 30:22 31:4 36:23
  48:5,21 49:21 56:9 67:5
  68:12
places 59:14
plaintiff 4:6
plan 72:23,24
point 6:22 32:7 45:6 87:18,
  19 88:14,20 89:7
policies 74:18
policy 30:24 32:25 33:3,4,5,



6,7,10,11,12 34:4 36:10,11 37:16 41:12,16,23 42:15,18 45:6,25 48:5 49:3,8,13 50:2, 14 53:20 56:8,11 67:17 68:11,14 90:3

position 15:8

positive 30:7,12

possibilities 65:25

Possibility 66:2,4,6

post 5:11

practice 5:8 9:14 21:15 23:5 32:25 33:4,11,19 34:8 37:22 39:22 55:11 67:4,13 68:6 69:14 74:19

practices 30:16

pre-booking 55:5 56:2

pregnancy 72:8

prepare 48:11 56:25 57:2

prepared 91:8

prerogative 46:20

prescribe 24:22 29:10

prescribed 24:7 27:7,13 29:2,3,22

prescription 26:10,12,25 30:10 87:11

prescriptions 25:15,19,22 26:5

present 79:21

pressure 24:12,13,21,24 25:2,4,5,7,10,13 27:4

pretty 64:14

prevented 74:21

previous 22:24,25 35:9 85:12

previously 6:5 49:12

Prilosec 26:17

print 20:2 84:14

prior 12:12,16 18:6 19:3 42:11 43:5 44:19 47:3 62:17 65:24 66:22 69:3 70:20 74:2 79:2 81:11 90:13,20

prison 5:12,13,14 9:5,6 45:3,5,11,12,13,15,23,24 46:13 77:6 90:21

private 5:17

problem 31:10 40:6,8 49:17

problems 70:21

procedure 24:2 30:24 34:9, 16 37:17,22 41:23 48:5,20 52:19 55:12,25 56:11 67:4, 14,17 68:6,11

procedures 12:5 30:21 37:12,13 53:19 56:9 74:18 79:16

proceedings 27:16 28:2 84:24 86:7 87:2,13

process 23:23 25:14 34:16 36:19,22 45:20 53:19 56:2

produced 47:4,7,11

programs 45:18

protocol 8:20 31:4 45:6 46:18 52:18,20 53:2,8,12 54:12 83:4 85:4

protocols 12:1 13:1 30:21 31:6 56:8 79:1,23,24 80:1,2, 4,7 81:9 83:2

provide 7:3,5,6,7,8 10:23 11:11,14 19:12,15 20:2 44:19 66:8 76:23 77:7 78:23 80:13,21 82:4,19 84:19 85:22

provided 37:6 55:20,23 58:3 59:4 65:6,20 73:12 83:2 85:2

provider 14:18 22:16 25:23 27:7 31:9 50:7 66:14,16,22 72:22 81:1,3,4

providers 22:16

providing 18:12 21:1

Provo 5:4

Prozac 26:17,18,19

psychiatrists 23:1

psychological 12:6

Public 9:23

pucking 58:6

puking 58:6 60:10

pull 84:13

put 30:22 31:7 48:1 52:18 53:7,11 54:12 60:8 66:15

— Q —

qualified 54:2,6 55:1 86:20

quality 76:16,18

question 10:19 13:13 23:23 32:10 33:22 35:18 36:4 39:19 42:3 43:13 46:16 47:4 48:4 49:12 55:8,10 58:3 59:3 61:22 64:21 66:21 75:3 82:11,12,17,18 91:8

questionnaires 19:25 20:16

questions 7:9 20:20 35:9 76:8 87:3 88:13,15 91:1 92:14

quick 44:22

— R —

rare 64:16

read 10:18 58:4,17,20 59:4 74:17

reading 59:16 61:8

reads 50:21 59:14

real 27:19 39:22

reason 18:1 34:5 35:9 39:15 60:25 73:5 85:14 88:1 89:23

reasonable 34:6

reasons 20:23 27:9 28:22 39:10

recall 12:13 44:21 47:14

receive 82:6

received 62:9 64:10

receiving 32:12

recently 16:3 23:6,10

receptor 71:14

recess 44:24 86:25

recognize 48:8 76:4

recognized 84:10

recommend 19:8

recommendation 17:7,9, 21 18:11

recommended 17:6,25

record 4:13 69:20 72:25 75:12 83:5

recorded 43:16 72:14

recording 69:6 73:4

records 12:14,18 19:24 20:10 21:20 22:24 23:1,4,7, 20,22,25 24:1,2,3,4 69:6,12 77:21 78:2,9,11,14,15,18

recreational 28:10

recreationally 28:13

reduce 24:12

refer 81:3

refresh 12:14

regard 13:6 30:17 41:20 52:17 55:24 56:6

registered 17:3,6

regular 10:23 42:24 64:14, 15

regulate 28:16

relates 43:23

relationship 9:2,11 15:16

released 23:11,22

relieves 24:14

rely 11:2 20:17

remedial 19:5 83:6

remote 58:12

renew 17:9

repeat 43:13

report 25:17 31:15,17 57:21 62:16 68:12 86:17

reported 23:6 56:10 65:4 68:18

reportedly 55:10

reporter 92:3

reporting 30:18 73:22

reports 33:23 34:3 35:12,23

request 23:7,15,25 31:8 38:23 56:12,14,15,22,23 57:20 58:2,4 59:4,5,14,15, 16,17 60:6,8,20 61:20 62:7, 9 63:4,7,9,11,14,25 65:5,12, 14 68:12 74:6,7,8,12,14 79:5 88:25

requested 20:11 22:25 33:14 77:5

requesting 74:14 76:25

requests 7:7 22:19 39:1 60:4,5 61:2 63:19 79:11

require 14:17,18 50:8 65:15,16 66:21

required 11:5 13:18 34:21

requirement 14:1 69:2

requires 9:13 10:25 13:18 14:11

residence 4:20

residency 5:3,6,11

respect 23:4

responds 25:15 89:3

response 20:6 35:2 53:14

responsibility 78:4

responsible 18:12,16,18 46:15 78:1

result 49:4 82:8,13,20

returned 28:1 82:25 86:6 87:12

review 12:2 21:16,20 24:4 56:15

reviewed 48:18 75:12,13 78:18 80:14

RN 16:18 50:21 51:18,21 66:7,19 73:14 80:7 83:1,2,3 85:15 86:2

RNS 14:6,8 51:19,23 80:1 85:10 86:5

rodeo 54:19

role 9:22 78:24

roles 10:9

rolling 74:9

Roman 77:23

room 54:22 59:20

roommate 58:12

routinely 21:22

rules 9:24

run 81:14,15

rundown 4:25 5:10

runs 58:7 60:11



## S

safe 78:2,8
Salt 4:1 70:9
sample 33:15
satisfy 79:3
save 33:1,6 36:19
saving 36:16
scale 83:12,17,19,21 86:17
schedule 16:25
scheduling 17:1
school 5:2 18:15 51:1
scope 11:22 52:22,24 74:19
score 83:10,11 84:2,9 85:7,
  18,23 86:10
scores 84:16 86:12
scoring 84:10 85:4
sealed 70:11
Section 76:16 77:21,22
  78:23
secure 78:2,8
seek 57:24
sees 10:16 34:11
self-diagnose 55:1
self-reported 26:15 27:12
self-reporting 53:11
self-reports 68:10
sell 75:17
send 56:19 68:19
sending 64:24
sense 7:2 45:17,24 51:22
sentence 77:25
sentenced 45:22
service 10:17
services 7:3,5,9 10:8 76:16
  77:1,2,3,4 85:22
set 51:14
sets 9:23
setting 29:3
settings 82:1
severe 44:5,9,17 84:4
shaking 35:5
sheet 83:22
sheriff's 13:18 47:5,8,9
  70:5
shift 38:9 89:1
shifts 34:10
short 16:11 61:1 75:17
shortly 9:4 82:23
show 30:3 36:20

shows 30:5
sic 89:19,21
sick 8:11 43:20,21 56:7,17
  59:19 62:11 66:11,17 77:13,
  17 78:25 79:5,13,17,21
  81:9,14 86:14 88:12,25
sign 23:21 29:11
signs 22:18 39:2 51:8,9,11,
  12,15 52:1,3,6,7 53:3,6 56:7
  69:19 83:22 87:17
similar 13:15 14:1 71:1
simply 71:21 84:2
single 47:1 68:15
single-page 46:25
situation 25:12 32:1 33:21
  38:6 90:8
situations 29:22
Sixty 91:16
skin 36:15 83:24
slash 79:1
slightly 87:17
smoking 24:15
snort 28:11
sort 7:2 9:20 10:13,23 11:21
  15:12 19:14,18,25 26:8
  30:21 34:10 36:18,22 37:7,
  21 38:9 41:19 53:19 55:24
  56:8 59:25 60:1 61:12,20,22
  68:6 82:2 84:6
sorts 81:12
South 4:18
speaking 22:11
specific 10:19 14:25 19:4,6
  28:22,24 39:1,8,10 50:16
  51:11 79:5,10 82:24
specifically 28:16 30:6,13,
  19 41:4,7 50:20 80:12
spectrum 43:19 60:9
speculation 17:16 34:18
  38:22 46:3 59:9 60:17 62:20
  65:7 67:25 69:16 74:24
  84:18
speed 83:3
staff 11:13,14,15,22 12:9,
  10,11,18,22 13:3,4,6,10,16,
  17 14:4,11,17,22,24 17:22,
  23 18:5,9 20:2,5 22:17
  23:17,24 25:22 30:22 31:1,
  16,17 33:2 36:20 38:10
  39:5,12,19 44:8,16 53:16,
  17,20 54:24 56:4 63:3 64:11
  66:8 78:1,24 81:21 82:5
  85:15 86:16 90:4
stand 83:14
standard 43:25 44:3 76:23
standards 76:18 78:3
standing 80:5,8

stands 83:12,15
start 9:6 88:15
started 5:12,14
starve 67:7
state 4:13 5:4,12,13,14 9:19
  45:3,5,11,13,14,24 46:12
  77:6
statement 89:9 90:2
states 33:5 77:16
stating 23:21 68:12
status 9:3
sticker 47:25
stomach 58:12,13,24
stool 33:15
stop 67:20 71:21
stories 77:11
story 60:23 61:2,3,5
straight 58:7 60:11 77:10
streets 53:9
stressful 25:12
strike 67:10,18,19,20 68:18
strikes 67:11
strongly 89:23
subject 19:6 27:18
subjective 21:6 72:23
submit 56:14
Suboxone 29:20 71:18
subpoena 47:10
subsequent 83:6
substantiate 36:14
Subutex 29:18,19
sued 49:14
suing 42:6
Summit 6:14 86:1 91:15
Sunday 87:10
supervise 10:12
supervising 9:7,10,12,14,
  16,22,24
supervision 52:2
supervisor 9:5
supervisory 10:9 78:24
support 78:24 80:22
supposed 36:23
sweating 83:24
Sweet 6:16
Sweetwater 86:4 91:15,17
sworn 4:7
symptom 71:25 72:2,12
symptomatic 72:11
symptoms 24:16,24 31:2,3
  43:19,23 53:3,7,10,18
  54:19,22,25 56:13 60:1,14

65:17,21,22 70:25 71:24
  83:21,22,25 84:1
system 84:10 90:21,22
systems 45:14

## T

takes 45:21
taking 23:10 25:17 27:13
  30:10,12 31:17 38:16 42:23
  52:1
talk 12:1,4 14:22 70:15
  81:17
talked 12:20
talking 18:13 51:7 53:15
  54:9 56:22,23 57:21 59:17
  67:7 73:14,15
talks 59:15 60:22
teach 11:9 81:8
telephone 7:11 59:7
telling 36:14
template 57:7
ten 6:1 9:8 14:3 91:7
term 9:9 33:10 37:19,21,23
  39:22 50:13,14,15,16 72:18
test 30:6,12,13 33:20
tested 30:7 33:16
testified 4:7 22:1 35:10,21
  43:3,14 45:2 67:21 80:17
testimony 35:13 42:11
  43:6 49:3,7 62:18 74:2
  87:22 89:19
Teton 6:15 91:17
text 7:13
therapy 66:16,22 67:2
thing 19:25 34:10 56:18
  65:11 90:17
things 8:18 12:6 45:19
  50:22 61:1 76:22
thought 58:16,20 89:4
thousands 90:24 91:9
throw 32:4 37:3
throwing 31:20,23 32:2
  34:7
thumbs-up 26:9 27:2
Thursday 7:24 8:1
time 6:9,22 7:24 10:16 16:4,
  11 38:2 41:1 45:6 46:1
  47:23,24 53:17 54:20 58:2
  60:2 61:5 63:24 79:25 80:7
  82:25 85:11 90:25 91:21
  92:1
times 15:20,22,24,25 17:11
  20:20 25:2 39:3 53:9 61:1
  67:12 76:25 80:18 92:5
today 48:21



toilet 37:1,5,11
toilets 36:25
told 39:19 40:25 64:9 70:2 87:21 89:18
top 53:2
total 84:3
tough 49:18
town 6:19
tracking 67:14
traditional 30:13
train 13:3 83:3
trained 50:23 51:1 52:6 84:16 86:11
training 10:24 11:3,4,6,11, 16,21 12:9,22,24 13:1,7,10, 13,16,19,20 14:14 18:13,14, 16,18,23 19:4,5,6,12,15 44:20 50:23 52:15 55:20,24 78:7,23 79:11,14 80:13,22 81:12,25 82:2,6,19,24 85:2
trainings 11:23 12:8,15 13:17 14:19,25
tramadol 28:14,15,18,22 29:3 30:3,5,6,8,12,14
treat 18:14 21:4
treated 71:8,14,15
treating 21:21 35:16 36:2
treatment 20:18 41:21 45:18 49:22,23 65:5,16,20 66:1 71:1,23,25 72:10,12 75:11
treatments 65:24 72:11
tremors 83:23
triage 12:5 61:9,11,12,19 62:1 63:7,12,19 74:11 78:25 79:6,9 81:9,15
triaged 22:20 31:8 60:7,20 61:6 74:21 79:7,8,11
triages 59:16
true 21:3,4 36:15,16 60:14 65:5,14
trumps 83:1
truth 34:1,2
truthful 36:7
truthfully 20:20
Tubbs 4:5,14 45:2 82:18 87:4 91:6
Tuesday 89:20
turn 55:4 89:17
turned 37:1
Two-minute 86:24
type 7:3 11:9 28:12 55:6 59:5 65:20,24 79:16 85:20
types 11:16 14:19 22:12 49:24 51:10 53:24 54:3 55:7

typically 8:21 22:2 25:23 45:11 63:13

U

UAS 21:18
Uh-huh 86:4
uhm 7:1 10:21 11:13 12:13, 25 13:9 16:25 30:19 36:4 48:14 60:5 61:22 82:16 83:24 85:16 86:1,9 87:22 88:3
Uinta 6:15
Uintah 6:20 47:5,7,9
Ultram 29:25
unable 10:21 82:24
unaware 33:6
undergo 54:19
undergoing 66:22
undergrad 5:5
understand 9:9,12,21 24:6 35:7 44:8 46:16
understanding 38:5
understood 14:10 30:15 33:22 63:18 67:3
undertaken 75:9 79:3
unit 37:25 38:2
University 5:5
urgent 60:9
urinalysis 30:3
urine 21:16 36:5
user 53:8,11 54:25
Utah 4:1,18 5:12,13 6:13,20 9:19 11:14,16,24 12:8,19 13:15,17,18,21,24 13:4,7 16:15 45:2,5,11,13,24 46:12 49:23 76:17 77:6 80:1 85:6, 7 86:2 91:11,13

V

vacation 8:5
vague 13:8 22:13 36:4 39:22 75:1
valid 20:19 25:22
veracity 33:23,25
verbal 19:20 80:4
verbally 10:20 40:12,25
verified 60:14
verify 33:2 60:1 92:5
versus 38:2 44:9,17
vetting 52:19
videos 75:13
violation 69:13

viral 71:12
visibly 89:25
visit 7:18 72:25 73:4,23
visits 7:14 10:18 22:16
visual 38:15 51:5
visualized 38:3,7,25
visually 38:1
vital 22:18 39:2 51:8,9,10, 15 52:1,3,6,7 87:17
vitals 38:16 42:23 43:15,20, 21 44:1,4,6 51:12 69:6,12, 19 79:18 87:17 88:23
vomit 25:9 33:1,6,20 35:10, 11,22 36:16,20 92:4
vomited 87:23,24,25 92:5
vomiting 25:9 30:18,23 31:3,15 33:23 34:3,11 35:1 36:6 38:19 56:8,13 57:22 70:25 72:6,8,9 73:22 83:24
vomits 91:21 92:1

W

wait 89:12
walk 88:12
walked 88:11
walking 51:7
wanted 58:16 59:3 79:11
Wasatch 5:14,15,20 6:4,6, 8,14 46:18 84:12 86:11 91:16
wasting 60:2
watched 88:22
water 6:16 36:25 58:8
Wednesday 88:24 89:25
week 7:5,8,16,19,23 8:3,22, 23 14:22 56:17 59:19 66:15
weeks 7:25
Wellbutrin 28:4,8,9,18
withdrawal 12:12,25 24:16, 25 25:1 29:4,6,11,16,22,25 30:2 31:2 41:12,20,22 42:18 43:15,18 44:2,4,5,9,17,20 45:6,25 46:17 48:20 49:9, 13,21 50:2 52:18 53:3,7,8, 19 54:19,21,22,25 55:9 65:15 71:1,7,13,24 72:2,7 83:11,12,17,22 84:1,5 85:4
withdrawals 12:21 41:23 46:21 90:15
withdrawing 42:23 56:7
wondering 22:5
word 58:9,13
words 46:8
work 5:10,14 9:15,16 10:13 16:23 80:25 87:9

worked 5:13 10:15 45:2 81:13 90:18,21
working 16:8,14 40:24 63:21
write 34:21 61:1,5,6
written 10:4 22:18 33:13 40:19
wrong 18:22 88:19
wrote 22:17,19 60:21
Wyoming 6:15,16,17

X

X,y,z 23:11

Y

year 15:20,24 48:25 49:1 80:18
years 5:13,16 6:24 9:8 10:16 15:7 40:24 81:14 90:22

Z

Zofran 66:3 72:4,5

