# THE ESTATE OF MADISON JODY JENSEN

## vs

# DUCHESNE COUNTY

## Civil No. 2:17-cv-01031

## JANA

## CLYDE

## May 23, 2018

ADVANCED REPORTING SOLUTIONS

801-746-5080 | office@advancedrep.com | advancedrep.com

**SALT LAKE** | 159 West Broadway, Broadway Lofts, Suite 100 | Salt Lake City, Utah 84101
**PROVO** | 3507 North University Avenue, Suite 350-D | Provo, Utah 84604
**ST. GEORGE** | 20 North Main Street, Suite 301 | St. George, Utah 84770


REPORTING SOLUTIONS
ADVANCED

Jana Clyde
May 23, 2018

```
 1                  IN THE UNITED STATES DISTRICT COURT

 2                  DISTRICT OF UTAH, CENTRAL DIVISION

 3                          *   *   *

 4  THE ESTATE OF MADISON JODY    :
    JENSEN, by her personal       :   Deposition of:
 5  representative Jared Jensen,  :
                                  :   JANA D. CLYDE
 6              Plaintiff,         :
                                  :
 7  vs.                           :
                                  :
 8  DUCHESNE COUNTY, a Utah       :   Civil No. 2:17-cv-01031
    governmental entity; DAVID    :
 9  BOREN, an individual; JARED   :   Judge Dale A. Kimball
    HARRISON, an individual; JASON:
10  CURRY, an individual; JANA    :
    CLYDE, an individual; LOGAN   :
11  CLARK, an individual; and JOHN:
    DOES 1-20,                    :
12                                :     May 23, 2018
                Defendants.       :      10:05 a.m.
13                                :

14                          *   *   *

15

16                        Held at the
                   County Administration Building
17                    734 North Center Street
                          Duchesne, Utah
18

19                          *   *   *

20

21                      Jamie R. Brey
               - Registered Professional Reporter -
22

23

24

25
```

```
 1                    A P P E A R A N C E S

 2

    For the Plaintiff:          RYAN B. HANCEY
 3                              KESLER & RUST
                                Attorneys at Law
 4                              200 McIntyre Building
                                68 South Main Street
 5                              Salt Lake City, Utah  84101

 6

 7  For the Defendant           MICHAEL M. HOMER
       Duchesne County:         BRITTON R. BUTTERFIELD
 8                              SUITTER AXLAND
                                Attorneys at Law
 9                              200 Judge Building
                                8 East Broadway
10                              Salt Lake City, Utah  84111

11

12  For the Defendant           FRANK D. MYLAR
       Jana Clyde:              MYLAR LAW
13                              Attorneys at Law
                                2494 Bengal Boulevard
14                              Salt Lake City, Utah  84121

15

16  For the Defendant           KATHLEEN J. ABKE
       Logan Clark:             STRONG & HANNI
17                              Attorneys at Law
                                102 South 200 East, Suite 800
18                              Salt Lake City, Utah  84111

19

    Also Present:               Jared Jensen
20                              Heather Jensen
                                David Boren
21                              Jared Rigby
                                Steve Loos
22                              Tyler Allred

23

24                            *  *  *

25
```

```
 1                          I N D E X

 2    WITNESS                                             PAGE

 3    JANA D. CLYDE
```

 4        Examination by Mr. Hancey                        4
          Examination by Ms. Abke                        153
 5        Examination by Mr. Homer                       212
          Examination by Mr. Mylar                       216
 6        Further Examination by Mr. Hancey              221

```
 7

 8

 9

10                        E X H I B I T S

11    NUMBER                  DESCRIPTION                 PAGE

12
```

         2      Pre-booking form                           31
13       3      Inmate intake questionnaire/responses      33
         4      Investigative report from the Office of the  123
14              Medical Examiner
         5      Medical request form                       92
15       6      Mental health questionnaire                38
        10      Inmate notes by date                      131
16      11      Inmate transfer form                       84
        13      Opiate and/or heroin withdrawal sheet     132
17      14      Transcript of interview with Logan Clark  113
        17      Transcript of interview with Liz Richens  221
18      22      Suicide watch form                        140
        25      Responses to discovery from Duchesne County 144
19      31      Duchesne County Jail policy               146
        34      Record of trainings received               27
20      37      Requests for admission                     46
        38      Answers to interrogatories to Logan Clark  23
21      39      Opiate withdrawal policy                   25
        40      Response to written discovery requests     26

```
22

23

24                            *  *  *

25
```

```
 1                                          Duchesne, Utah
                                            May 23, 2018
 2                                          10:05 a.m.

 3

 4                    P R O C E E D I N G S

 5                        JANA D. CLYDE,

 6   called as a witness for and on behalf of the plaintiff,

 7   being first duly sworn, was examined and testified as

 8   follows:

 9

10                    E X A M I N A T I O N

11

12   BY MR. HANCEY:

13        Q.    Good morning.  My name is Ryan Hancey; I

14   represent the plaintiffs in this case.  Can you start off by

15   stating your name for the record.

16        A.    Jana Clyde.  Jana D. Clyde.

17        Q.    What is your current address?

18              MR. MYLAR:  I'm just going to object.  She can

19   give her work address.

20              MR. HANCEY:  That's fine.

21              MR. MYLAR:  So you can give your work address.

22              THE WITNESS:  I only know the box number.  PO

23   Box 10, Duchesne Sheriff's Office.  84021.

24   BY MR. HANCEY:

25        Q.    What is your education?
```

1          A.      I am a LPN, licensed practical nurse.

2          Q.      When did you get that certification?

3          A.      In May of 2005.

4          Q.      From what institution?

5          A.      Uintah Basin Applied Technology Center, UBATC.

6          Q.      Do you have any other education besides that

7    post high school?

8          A.      I was an EMT.

9          Q.      Where did you get that certification?

10         A.      From Uintah Basin Medical Center.  They just

11   had an EMT -- paramedic training.

12         Q.      Can you describe briefly what you are able to

13   do medically and how, as opposed to what a registered nurse

14   can do?

15         A.      Basically I do whatever the registered nurse

16   tells me to do.  I don't get to prescribe, diagnose, assess,

17   anything along those lines.  I just get told what to do and,

18   therefore, do it.

19         Q.      Now, if you are working as an LPN in a facility

20   that doesn't have an RN on staff, then from whom do you take

21   instruction?

22         A.      Uhm, I would use like some -- from the PA Logan

23   Clark or from the doctor, which is Tubbs, those.  And also

24   whatever the sheriff's office policies and procedures are in

25   place.

```
 1          Q.      What if they're not around to give you

 2   instruction on a particular issue?

 3          A.      Then I just basically follow policy and

 4   procedure.  I can't go above and beyond; that would be out of

 5   my scope of practice.

 6          Q.      Is it your position that the policies and

 7   procedures constitute assessments of a particular patient?

 8                  MR. MYLAR:  Object to --

 9                  MS. ABKE:  Object to the form.  Foundation.

10                  MR. MYLAR:  Yeah, same objection.

11                  MR. HANCEY:  You can answer.

12                  THE WITNESS:  I have never -- no, I don't do

13   assessments on patients.  I have questionnaires that I

14   follow, but I myself do not give a personal assessment.

15   BY MR. HANCEY:

16          Q.      I guess my question is this.  You've told me

17   that you -- with your level of certification, being an LPN,

18   you're not allowed to assess or diagnose patients.  Is that

19   correct?

20          A.      Correct.

21          Q.      And I asked you, well, what would you do if you

22   needed to treat a patient, and Dr. Tubbs or PA Logan isn't

23   around for you to get instruction from, what would you do?

24   You responded, I'd follow policies and procedures.  Did I

25   hear you correctly?
```

1          A.      Yeah, I would follow what I've been -- the

2   policy and procedures that I've been -- that I've known that

3   were -- that I was made aware of to follow, correct.

4          Q.      When you say policies and procedures in that

5   context, are you referring to policies and procedures of the

6   jail --

7          A.      Yes.

8          Q.      -- at the time in question?

9          A.      Yes.

10         Q.      You're currently employed with the Duchesne

11  County Jail; is that right?

12         A.      Duchesne Sheriff's Office, yes.

13         Q.      Okay.  How long have you been employed there?

14         A.      Five years.

15         Q.      Where did you work before that?

16         A.      Uintah Basin Medical Center -- well, excuse me,

17  Alma Parker's office in a clinic in Vernal.

18                 MS. ABKE:  Can you say that again?

19                 THE WITNESS:  Alma Parker.

20                 MS. ABKE:  Thank you.

21  BY MR. HANCEY:

22         Q.      How long did you work for Alma Parker?

23         A.      Five months.

24         Q.      What about before that?

25         A.      I worked for Uintah Basin Medical Center,

```
 1   Dr. Maready.  I was with him and the hospital both.  They

 2   copaid my wages together.

 3          Q.     How long did you work at that hospital?

 4          A.     Well, I started with the hospital in June of

 5   2005, and I stayed there until we moved to Vernal for a

 6   little bit.  That's when I started with Alma Parker.

 7   However, my positions there changed for the tenure that I was

 8   there.  Sometimes I was in different areas of that hospital.

 9          Q.     Were you ever disciplined at any of those

10   you've just listed?

11          A.     No.

12          Q.     Have you been disciplined by the jail or by the

13   sheriff's office?

14          A.     No.

15          Q.     Now, are you related to any jail employees or

16   sheriff's office employees that are there, that are working

17   there right now?

18          A.     Maybe you need to define "related."  Is this by

19   blood or by marriage?

20          Q.     Either.

21          A.     Okay.  Uhm, the Lieutenant Jeremy Curry is my

22   stepson-in-law.

23          Q.     Anybody else?

24          A.     At that current time, I don't believe so.

25          Q.     What about now?
```

```
 1          A.      I have a son who is working as a controller.

 2   And then, of course, Jeremy Curry is still there.

 3          Q.      And Lieutenant Jason Curry is Jeremy Curry's

 4   brother; is that right?

 5          A.      Yes.  No relation to me.

 6          Q.      Is your son Monty Clyde?

 7          A.      No -- well, that's Monty Clyde.  He's not

 8   employed there at the time.  My other son is Justin Clyde.

 9          Q.      Has Monty Clyde ever been employed by the jail?

10          A.      Yes.

11          Q.      When was that?

12          A.      I believe it was from two years ago until about

13   two months ago.

14          Q.      Why did he leave the jail, do you know?

15                  THE WITNESS:  Is that something we need to get

16   into?  Is that relevant to this?

17                  MR. MYLAR:  Yeah.  I'm just going to --

18   actually, I'm going to just ask that that be placed as

19   confidential to the extent you're asking about an employment

20   record of some other individual.  That we mark that as

21   private and protected.

22                  MR. HANCEY:  Oh, I'm not going to agree to

23   that.

24                  But you can answer the question.

25                  THE WITNESS:  I believe he was let go due to
```

1   some errors on his time card.

2   BY MR. HANCEY:

3        Q.      Describe for me generally what your day-to-day

4   responsibilities at the jail were in 2016.

5        A.      Do you want me to just go through how my -- a

6   day works, the schedule?

7        Q.      A week.

8        A.      A week?

9        Q.      Yes.

10       A.      That's pretty much just a day.  I come in, go

11   into my office.  I would gather up any papers that would be

12   put in my box up front, bring them in.  Sit down at my

13   computer, scan through those.  I would get on the computer

14   and go into a system that I can see if any inmates have put

15   in requests to see medical.

16           I can determine if those, you know, are a nurse

17   issue or need to go on and be referred to PA Logan Clark.

18   And then I would, you know, go on with my med pass for the

19   day and just go on throughout the duties of the day.  It

20   ranges from anywhere from, uhm, refilling medications to

21   receiving new medications that might have came in.

22           If I know about new inmates that have came in,

23   if they have any medical issues that I've been made aware of,

24   I would possibly address them.  That's pretty much how the

25   day goes.  Because we have inmates coming in and out all day.

1          Q.       What was your work schedule in 2016?

2          A.       I worked Monday through Thursday, four tens.

3          Q.       And for what time each day?

4          A.       From 6:30 to 4:30.

5          Q.       So 6:30 a.m. to 4:30 p.m., Monday through

6    Thursday?

7          A.       Uh-huh.

8          Q.       Is that yes?

9          A.       Yes.

10         Q.       Who handled medical issues on the -- at the

11   jail on the days that you didn't work there?

12         A.       The officers, deputies.

13         Q.       How would they handle those, do you know?

14         A.       Uhm, they are somewhat trained in a few things,

15   vital signs, things like that.  Whenever they would obtain

16   that information and stuff, then they would call PA Logan

17   Clark.  Sometimes me, but mostly PA Logan Clark because I'd

18   just be a middleman in that situation.

19         Q.       Okay.  Now I just want to walk through what you

20   told me about an average day at the jail in 2016.  Did I hear

21   you correctly that the first thing you would normally do is

22   check your box?

23         A.       Yes.

24         Q.       Okay.  Describe what you mean by your box.

25         A.       There's a box up in booking that if there's any

1   papers that the deputies want me to have, they just put them

2   there.

3          Q.     That's the Jana Clyde box?

4          A.     It's the nurse box.

5          Q.     The nurse box?

6          A.     Yep.

7          Q.     Okay.  What kind of paperwork would be at that

8   box in any given time?

9          A.     Uhm, anywhere from mental health assessments to

10  if somebody was on a suicide watch, there's the records of

11  that.  You know, who signed, what time, when they saw them.

12  Sometimes I would have booking reports put in there.  It's

13  just whatever the officers wanted to put in there for me to

14  have.  Sometimes they ended up in the booking files,

15  sometimes they ended up back in medical files.

16         Q.     Sometimes what would?

17         A.     Any of the paperwork that the officers have.

18         Q.     So let's just take one example.  A new inmate

19  is booked in?

20         A.     Yes.

21         Q.     Fills out a mental health questionnaire?

22         A.     Yes.

23         Q.     Okay.  You're telling me that depending on some

24  circumstance, that form could either end up in that inmate's

25  booking file or in your medical file?

```
 1          A.      Correct.

 2          Q.      And what would those circumstances be to

 3   dictate that?

 4          A.      You'd have --

 5                  MR. HOMER:  Objection.  Foundation.

 6                  THE WITNESS:  I was going to say, you'd have to

 7   ask an officer --

 8                  (Court reporter interrupted for clarification.)

 9                  MR. HOMER:  Yeah.  And objection, foundation.

10                  MR. HANCEY:  Just say you don't know if you

11   don't know.

12                  THE WITNESS:  I don't know.

13   BY MR. HANCEY:

14          Q.      So you don't know what would cause an officer

15   who books an inmate in to determine where to put the

16   paperwork?

17          A.      No.

18          Q.      Are there any jail policies and procedures that

19   you're aware of, ma'am, that would dictate where the

20   paperwork goes?

21                  MR. HOMER:  Objection.  Foundation.

22                  THE WITNESS:  Not to my knowledge.

23   BY MR. HANCEY:

24          Q.      Not to your knowledge.  Are you familiar with

25   the policies and procedures the jail had in 2016?
```

 1          A.      No.   Not -- not so much as in regards to what

 2   the officers' duties are, no.

 3          Q.      But this is also something that impacts you,

 4   because if a medical record doesn't work its way into your

 5   box, then I guess there's a chance you wouldn't see it.

 6   Would that be correct?

 7          A.      That would be correct.

 8          Q.      How would you describe your level of

 9   familiarity with the jail policies and procedures that

10   existed in 2016?

11          A.      I am only familiar with the ones that are --

12   which would be my duties.

13          Q.      And describe for me what policies and

14   procedures you think those are.

15          A.      Uhm, in regards to...

16          Q.      Your duties.

17          A.      That would be to pass meds, uhm.

18          Q.      So any policies concerning inmate medications?

19          A.      Yes.

20          Q.      What else?

21          A.      Policies regarding a suicide.

22          Q.      What else?

23          A.      Uhm, any requests from -- like if the doctor

24   has ordered daily vital signs for any reasons, I do those.

25          Q.      Is that a -- was that a written policy in 2016?

 1        A.      I have no idea.

 2        Q.      Well, my question is about what policies and

 3  procedures that relate your job duties you're familiar with

 4  as of 2016.

 5        A.      Uhm, that's kind of a broad question for me.

 6  I'm sure there's a lot.  In regards to -- if you could tell

 7  me, I could tell you what I had knowledge of about policies

 8  and procedures.

 9        Q.      Fair enough.  We'll get to that, then, in a

10  second.

11        A.      Okay.

12        Q.      In 2016, if you had a question about a jail

13  policy or procedure, where would you go to find an answer to

14  your question?

15        A.      I would generally go to my sergeants or a

16  lieutenant.

17        Q.      Would you consult a policy and procedures

18  manual?

19        A.      No.

20        Q.      Why not?

21        A.      Because I would go to my sergeants or

22  lieutenant.

23        Q.      Did you have access to a written policy and

24  procedures manual in 2016?

25        A.      I'm sure I did.

```
 1          Q.      Do you know if the County provided you with
 2  one --
 3          A.      No.
 4          Q.      -- when you were hired on?
 5          A.      No.
 6          Q.      No, you didn't receive one?  Or, no, you don't
 7  know?
 8          A.      No, I did not receive a policies and procedures
 9  manual.
10          Q.      Did you ever receive one between the time you
11  were hired and the time of the incident in 2016?
12          A.      No.
13          Q.      Do you know whether or not in 2016 the jail had
14  any unwritten policies and procedures or customs concerning
15  inmate care?
16                  MR. HOMER:  Objection.  Foundation.
17                  MR. MYLAR:  Also objection, vague.
18                  MR. HANCEY:  You can answer.
19                  THE WITNESS:  I'm sure they did, but that's,
20  uhm -- it would depend on in what regards, I mean...
21                  MR. HANCEY:  Well, I don't know what regard.
22                  THE WITNESS:  To a certain subject?
23                  MR. HANCEY:  Okay.
24  BY MR. HANCEY:
25          Q.      Well, your responsibilities in 2016 were over
```

1    inmate care.  Right?

2          A.    Yes.

3          Q.    You've told me you think that there were some

4    written policies and procedures that would dictate aspects of

5    your responsibilities in that regard.  Correct?

6          A.    Correct.

7          Q.    Okay.  My next question is, were there any

8    unwritten policies or procedures that dictated how you would

9    administer care to inmates back in 2016?

10               MR. HOMER:  Objection.  Foundation.

11               MR. HANCEY:  You can answer.

12               THE WITNESS:  Uhm, yes.  I mean, there was

13   things that we did, that I did that I honestly never saw a

14   policy or procedure on.

15   BY MR. HANCEY:

16         Q.    Give me some examples of those things.

17         A.    Okay.  I'm sure this is where this question is

18   going, but it would be regarding to if I felt somebody needed

19   Gatorade, I would give it.  That is not a policy or

20   procedure, it was just something I did.

21         Q.    Okay.  What else?

22         A.    Uhm, if an inmate was complaining of something,

23   such as in this situation, nausea, vomiting, diarrhea, uhm,

24   our policy -- mine was to save it so I can see it.  I don't

25   know if that's a policy and procedure, but that is something

1  I held to.  Because so many inmates come in with issues.

2         Q.     Can you think of anything else?

3         A.     No.  I mean, if an inmate needed me to check a

4  blood pressure because they felt something, I would do it.  I

5  don't know if that is policy and procedure.  I --

6         Q.     If an inmate asked you to take their blood

7  pressure?

8         A.     Uh-huh, yeah.  If they said, I'm not feeling

9  good; do you think you could check my blood pressure?  I'd do

10 it.  That's why I'm saying I don't know policies and

11 procedures along those lines; that was just the care I gave.

12        Q.     Can you think of anything else that you might

13 have done for which you're not sure whether there was a

14 policy?

15        A.     No.

16        Q.     You mentioned -- when I was asking about

17 unwritten policies, you mentioned that at least it was your

18 practice to give Gatorade to patients that you felt needed

19 it.  Is that right?

20        A.     I don't -- did not say "felt needed," I don't

21 believe.  Uhm, when they stated that they were having certain

22 symptoms, I would.

23        Q.     Did anybody prior to November 2016 instruct you

24 to do that?

25        A.     It was just something they did when they

```
 1   came -- when I started that job.  So there was that unwritten
 2   procedure that you've talked about, yes, the officers
 3   practiced that before I came also.
 4        Q.    Do you know if your -- was there a predecessor
 5   nurse?
 6        A.    No.
 7        Q.    Okay.
 8              You also mentioned it was at least your
 9   practice, Ms. Clyde, to -- when you learned that an inmate,
10   perhaps, was suffering from vomiting or diarrhea, something
11   similar, you would ask them to save evidence of that vomit or
12   diarrhea for you to see.  Is that right?
13        A.    That's correct.
14        Q.    Is that something that you were instructed to
15   do at any time prior to November 2016?
16        A.    It was a general practice of the facility.
17   Because we would often get inmates complaining of that, and
18   then you -- there would be no evidence to support their
19   claims.
20        Q.    When you say it was a general practice, do you
21   mean that it was something, to your understanding, officers
22   would do prior to your being hired there?
23        A.    Yes.  They taught me to do that.
24        Q.    The officers did?
25        A.    When I got trained, uh-huh.  They said that
```

1  that's one of the things that they did.

2         Q.      The purpose being to weed out people who might

3  be...

4         A.      Telling stories.

5         Q.      Telling stories about their symptoms.  Right?

6         A.      Yes.

7         Q.      Did you receive any training at all about what

8  responsibilities you would be undertaking upon becoming the

9  nurse for the facility at the time of your hire?

10         A.      I believe at the time of my hire, they knew

11  what I did as an LPN, and so, no, I -- they did not train me

12  before I started that job.

13         Q.      You were expected to bring with you your

14  existing LPN knowledge and experience.  Is that right?

15         A.      Correct.

16         Q.      Did you receive any training from the time that

17  you were hired at the jail until November 2016, training of

18  any kind?

19         A.      There is statewide medical meetings that we go

20  to.  I don't necessarily -- would call them training.  As in

21  we would discuss topics that were happening on Capitol Hill,

22  what's going on in other jails.  It was more of a discussion

23  than trainings.

24         Q.      Anything else?

25         A.      Uhm, I went to the sheriff's convention once.

 1 | Medical was lacking down there that first convention I went

 2 | to.  It was more on how to bill for Medicaid, Medicare, those

 3 | type of situations, so pretty much didn't involve me in that

 4 | situation.

 5 |         The second time I went down, we had some

 6 | training on EKGs, which we do not have at our facility.  So

 7 | most of these things were above and beyond what we do at our

 8 | facility.  They were more geared to jails and prisons that

 9 | have actual infirmaries.

10 |         Q.    Infirmaries?

11 |         A.    Yes.

12 |         Q.    And either doctors or registered nurses?

13 |         A.    Yes.  Full-time staff.

14 |         Q.    From the time you were hired until November

15 | 2016, do you recall receiving any training on jail policies

16 | and procedures?

17 |         A.    No.

18 |         Q.    Now, you're aware of the circumstances

19 | surrounding the death of Madison Jensen at the jail on

20 | December 1st, 2016.  Correct?

21 |         A.    Yes.

22 |         Q.    Based on your understanding of the jail's

23 | policies and procedures that existed at that time, which

24 | policies do you believe applied in any way to Madison's

25 | incarceration?

```
 1                  MR. MYLAR:  Objection.  Vagueness and lack of

 2    foundation.

 3                  MS. ABKE:  Join.

 4                  MR. HANCEY:  You can answer.

 5                  THE WITNESS:  We had no policies and procedures

 6    in regards to this set in place at that time.

 7    BY MR. HANCEY:

 8         Q.    Did you understand my question?  I'm talking

 9    about policies and procedures relating to how a patient like

10    Madison Jensen could and should be treated at that time.

11         A.    Medically or by overall?

12         Q.    Medically.

13         A.    Medically?  No, there was no policies and

14    procedures in place that I am aware of.

15         Q.    I think my other questions have already covered

16    this, but I'm going to ask it anyway.  As of November 2016,

17    did the jail, to your knowledge, have a opiate withdrawal

18    policy?

19         A.    No.

20                  MR. HOMER:  Objection.  Foundation.

21                  MR. HANCEY:  I'll ask a similar question.

22    BY MR. HANCEY:

23         Q.    If there was an opiate withdrawal policy in

24    place as of November 2016, were you aware of it?

25                  MR. MYLAR:  Objection.  Calls for speculation
```

```
 1   and lack of foundation.

 2              MS. ABKE:  Join.

 3              MR. HOMER:  Join.

 4              MR. HANCEY:  You can answer.

 5              THE WITNESS:  No.

 6   BY MR. HANCEY:

 7        Q.    And you've already stated that if there was

 8   such a policy in place, you didn't receive any training on it

 9   as of November 2016.  Correct?

10        A.    Correct.

11              (Off-the-record discussion)

12              (Whereupon, Exhibit No. 38 was marked for

13   identification.)

14   BY MR. HANCEY:

15        Q.    Ms. Clyde, you've been handed what has been

16   marked as Exhibit No. 38.  Could I please direct your

17   attention to the sixth page, please?  You'll know you're on

18   the right page if, at the bottom, you see the words

19   Interrogatory No. 6 in bold.

20        A.    Okay.

21        Q.    Okay.  Are you there?

22        A.    Uh-huh.

23        Q.    Let me direct your attention to a couple of

24   sentences at the bottom of the last large paragraph.  Now,

25   this, just so you know, is a statement that Logan Clark has
```

1   made in the course of discovery in this case.  He says this:

2   "Defendant," meaning Logan Clark, "has also provided

3   instruction and direction as to what jail staff should do in

4   the event of an inmate exhibiting or complaining of signs,

5   symptoms of opiate withdrawal.  This instruction was provided

6   at the Duchesne County Jail in or about 2014."

7            Did I read that correctly?

8       A.    Yes.

9       Q.    Do you agree or disagree with what I just read?

10      A.    Both.

11      Q.    Tell me what you mean by that.

12      A.    Uhm, I had seen these forms before, but we did

13   not use them in -- they were not put into policy and

14   procedures.

15      Q.    Are you talking about a physical written form

16   that Logan Clark provided to the jail?

17      A.    When I seen these, he said that we would be

18   using them at some point.  But they were not instated at that

19   time, no.

20      Q.    Have they been since?

21      A.    Since when?

22      Q.    Since the incident.

23      A.    Yes, they were instated about a month and a

24   half after the incident, I believe.

25      Q.    Logan Clark's recommendations on what to do?

1          A.      Yes.

2          Q.      What do you remember about what Logan Clark

3    provided the jail in 2014?

4          A.      I honestly don't remember.  I do -- I don't

5    know if this was the exact date.  I do remember at one point,

6    he said there is some score sheets that we'll be eventually

7    using and stuff, but they were not -- like I said, he did not

8    say, Use these, this is our policy now, this is what we're

9    doing.

10              (Whereupon, Exhibit No. 39 was marked for

11   identification.)

12   BY MR. HANCEY:

13         Q.      Okay.  Ms. Clyde, you've been handed what's

14   been marked as Exhibit No. 39.  Do you recognize that

15   document?

16         A.      Yes, I do.

17         Q.      What do you recognize it as?

18         A.      As the opiate withdrawal.

19         Q.      Policy.  Right?

20         A.      Well, it says Duchesne County Jail opiate

21   withdrawals.

22         Q.      Where have you seen this before?

23         A.      This was given to us.

24         Q.      By whom?

25         A.      Logan Clark.

1          Q.      When?

2          A.      To the best of my knowledge, January of 2017.

3          Q.      So your recollection is that you were provided

4    this Exhibit 39 by Mr. Clark after Madison had passed away?

5          A.      Correct.

6          Q.      Prior to November 2016, Ms. Clyde, do you

7    remember or do you recall getting any instruction or

8    direction from either Dr. Tubbs or PA Clark about what to do

9    when you were faced with an inmate that was suffering from

10   vomiting or diarrhea or possibly dehydration?

11         A.      Outside of giving Gatorade, no.

12                 MR. HANCEY:  This is 40.

13                 (Whereupon, Exhibit No. 40 was marked for

14   identification.)

15   BY MR. HANCEY:

16         Q.      Okay.  Ms. Clyde, you've been handed what's

17   been marked as Exhibit 40.

18         A.      Okay.

19         Q.      And I'll represent to you that this is your

20   responses to the written discovery requests that we've

21   provided to you in this case.  Do you recall answering these

22   questions?

23         A.      Uhm, through my lawyer, yes.

24         Q.      Do you recall participating in any way on how

25   these were responded?  In other words, did you provide the

 1   information used to answer these questions?

 2         A.    Part of them, yes.

 3         Q.    Okay.  Let me direct your attention to Page 2.

 4   In this first interrogatory, I asked you a question about

 5   your training and education.  Let me just direct your

 6   attention down to the last line of your answer there.  One of

 7   the trainings that you identified in your answer here is

 8   withdrawal protocol with a date of September 20th, 2016.  Do

 9   you see that?

10         A.    I do.

11         Q.    Is that a training that you received on that

12   date?

13         A.    That was at the sheriff's convention, and once

14   again, as I state, that was geared more towards the policies

15   and procedures of those facilities that have 24-hour

16   infirmary care for inmates.  It was more of a discussion than

17   a training.

18         Q.    Thanks for that clarification.

19         A.    Uh-huh.

20               (Whereupon, Exhibit No. 34 was marked for

21   identification.)

22   BY MR. HANCEY:

23         Q.    Ms. Clyde, you've been handed what's been

24   marked as Exhibit No. 34.  Let me have you flip through those

25   pages, and then I'll ask you a series of questions about this

1  exhibit.

2              MR. HOMER:  Ryan, what's the exhibit number?

3              MR. MYLAR:  34.

4              MR. HANCEY:  34.

5              THE WITNESS:  Okay.

6  BY MR. HANCEY:

7       Q.    Now, in discovery in this case, I asked the

8  County to produce records concerning your training, and this

9  is what I received.  My question to you is whether or not

10 Exhibit 34, to the best of your recollection, constitutes the

11 totality of your training received for the years 2015, '16

12 and '17.  And '18.

13      A.    The year '18?

14      Q.    Two thousand -- 2015 through 2018.

15      A.    Yeah.  To the best of my knowledge, yes.

16      Q.    What I noticed is absent in this exhibit is any

17 reference to training that you might have received in the

18 calendar year 2016.

19      A.    Okay.

20      Q.    Is that because you didn't receive any training

21 at all that year?

22      A.    Uhm, I have no --

23              (Whereupon, Mr. Steve Loos left the deposition

24 proceedings.)

25              THE WITNESS:  I have no knowledge.

1    BY MR. HANCEY:

2         Q.    You don't remember one way or the other?

3         A.    No, huh-uh.

4              (Whereupon, Ms. Heather Jensen left the

5    deposition proceedings.)

6    BY MR. HANCEY:

7         Q.    Do you have any reason, as we sit here today,

8    to dispute the completeness of this training record?

9         A.    Uhm, possibly.  What do you consider training,

10   I guess, is what I need to define?  I mean, we would have

11   meetings, the sheriff's office all together.  Sometimes we'd

12   go over, you know, some of the things going on which would

13   involve medical a little bit.  So is that training?

14        Q.    Did you receive instruction on how to do your

15   job in those meetings?

16        A.    We all did, yes.

17        Q.    Okay.  What kind of instruction would you

18   receive?

19        A.    If things had changed, if they were changing

20   anything, uhm, yeah.  I mean, just -- it was sometimes just a

21   refresher course of how things should be done to follow up.

22   And, you know, they were following up to see that things were

23   being done as expected.

24        Q.    Per policy?

25        A.    I would assume, yes.

1        Q.      In any of those meetings that you've just

2   described, did you receive instruction on how to handle

3   patients that were manifesting symptoms of vomiting, diarrhea

4   or dehydration?

5        A.      No.

6        Q.      Is that a no?

7        A.      No.

8        Q.      Thank you.

9                (Whereupon, Mr. Steve Loos returned to the

10  deposition proceedings.)

11  BY MR. HANCEY:

12       Q.      Now, I understand that you're not a booking

13  officer, but can you please describe for me your

14  understanding of the process in place in 2016 by which a new

15  inmate would be booked into the facility?

16               MR. MYLAR:  Objection.  Lack of foundation and

17  vagueness.

18               MR. HOMER:  Objection.  Foundation.

19               MR. HANCEY:  You can answer.

20               THE WITNESS:  Well, as you said, I'm not a

21  booking.

22  BY MR. HANCEY:

23       Q.      Right.

24       A.      And I've never booked anyone in.  I have been

25  in the vicinity when somebody is booked in.  They ask them a

```
 1   range of questions.  The inmates answer yes or no.  They're

 2   booked in.

 3        Q.    Have you ever seen firsthand a new inmate being

 4   booked in?

 5        A.    Not through totality, no.

 6        Q.    Do you know what forms an inmate was required

 7   to fill out upon booking in 2016?

 8        A.    Are you referring to medical forms?

 9        Q.    Yes.

10        A.    Uhm, they -- they were not required to fill out

11   any medical forms unless there was a flag, something flagged

12   on the booking form.  I don't know how that works.  And then

13   they would be asked to fill something out.  Sometimes it was

14   the Mental Health 1 and 2.  Those are the only two forms that

15   I have knowledge of.

16              MR. HANCEY:  This is Exhibit 2.

17              (Whereupon, Exhibit No. 2 was marked for

18   identification.)

19   BY MR. HANCEY:

20        Q.    You've been handed what's been marked as

21   Exhibit 2.  Do you recognize what that is?

22        A.    No.

23        Q.    It's a document called Pre-booking Form.  Do

24   you see that?

25        A.    Uh-huh.
```

```
 1          Q.      Is that a yes?

 2          A.      Yes, I do.

 3          Q.      Have you ever seen, before today, a prebooking

 4   form for the Duchesne County Jail?

 5          A.      No.

 6          Q.      Have you ever seen, before today, the

 7   prebooking form for Madison Jensen?

 8          A.      No.

 9          Q.      So this is the first time you've ever seen this

10   document I just handed you?

11          A.      Okay, let me clarify.

12          Q.      Okay.

13          A.      Outside of my civil case.  I have not seen this

14   prior to my other lawyer having this.

15          Q.      All right.  Thank you for the clarification.

16                  Now, I take it, then, you wouldn't know the

17   circumstances under which one of these forms would be filled

18   out for a new inmate.  Is that right?

19          A.      That's right.

20          Q.      Okay.  Let me direct your attention to No. 3

21   there in kind of the middle of the page.  There's a question

22   on this form that says, "Are you under the influence or going

23   through withdrawals from drugs or alcohol," and a place for

24   whoever is filling this out to answer yes or no.  Do you see

25   that?
```

1           A.      Yes.

2           Q.      Do you know whether or not this question is one

3   of the flags that would then trigger, by policy, an inmate

4   filling out additional medical forms?

5           A.      I have no idea.  This is filled out by an

6   officer, not a deputy back in our jail.  This is from the

7   arresting officer.

8           Q.      Okay.  Do you know where the arresting officer

9   would get the information to fill out this form?

10          A.      No.

11                  MR. MYLAR:  Objection.  Lack of foundation.

12                  MR. HANCEY:  Okay.

13                  (Whereupon, Exhibit No. 3 was marked for

14  identification.)

15  BY MR. HANCEY:

16          Q.      You've been handed what's been marked as

17  Exhibit 3.  Do you recognize that document?

18          A.      Yes.

19          Q.      And what is it?

20          A.      It's a booking document.

21          Q.      Does this particular document have -- go by a

22  certain name within the jail?

23          A.      It says Inmate Intake Question/Responses.

24          Q.      I have seen references in materials in this

25  case to a medical intake form.  Would you construe this as a

```
 1   medical intake form?

 2        A.     Uhm, I guess so.  It has medical questions on

 3   it.

 4        Q.     Do you know the circumstances under which a

 5   document like Exhibit No. 3 would be filled out?

 6        A.     I believe everyone fills it out that's booked

 7   in.  I believe.  I'm not sure.

 8        Q.     Is that something that you have any

 9   responsibility over?

10        A.     No.

11        Q.     Is this form something that you've seen in your

12   box before?

13        A.     Yes.

14        Q.     And the same would be true in 2016, I assume?

15        A.     Sometimes.

16        Q.     Okay.

17        A.     Sometimes they made it to my box.

18        Q.     And I think you've already testified that you

19   wouldn't know in 2016 what would make a correctional officer

20   put this -- put a form like Exhibit 3 in your box as opposed

21   to somewhere else.  Is that right?

22        A.     That's right.

23        Q.     What was your practice in 2016 when you came in

24   the morning and you saw one of these Exhibit 3 forms in your

25   box?
```

```
 1            A.      I would read through the form.  Familiarize
 2    myself with the patient.
 3            Q.      And then what?
 4            A.      Pretty much, that's it.
 5            Q.      Where would you put the form?
 6            A.      In their medical chart.
 7                    (Whereupon, Ms. Heather Jensen returned to the
 8    deposition proceedings.)
 9    BY MR. HANCEY:
10            Q.      Would you create a medical file for each inmate
11    in the jail in 2016?
12            A.      No.
13            Q.      Would you create a medical file during that
14    time period for some inmates?
15            A.      Correct.
16            Q.      And what would determine whether you created a
17    medical file for an inmate or not?
18            A.      If they had medical issues.
19            Q.      How would you know if they had medical issues?
20            A.      Uhm, from this form or from a request to see
21    the doctor or medication sheets, anything to do with those.
22    Progress notes from the doctor.
23            Q.      Are you aware of what the jail -- of whether
24    there were any jail policies and procedures concerning what
25    to do with the forms like we see in Exhibit 3?
```

```
 1          A.      No.

 2          Q.      Prior to November 2016, had you received any

 3   training relating to the Exhibit 3 form?

 4          A.      No.

 5          Q.      Look at the third question that's asked on

 6   Exhibit 3.  Now, you understand that this is the actual --

 7   I'll call it medical intake form for Madison Jensen.  Right?

 8          A.      Correct.

 9          Q.      Okay.  Let me ask you this:  Had you ever seen

10   this particular Madison Jensen medical intake form prior to

11   litigation?

12          A.      Yes.

13          Q.      When did you first see it?

14          A.      After the death of Madison Jensen, I printed

15   off things that were asked to be put into the file to give to

16   Uintah County, the investigators.

17          Q.      How did you go about the -- describe the

18   process by which you were able to print this form off.

19          A.      I went into Madison's records on our computer

20   system and found where to print this off at and printed it.

21          Q.      Do you know how an electronic copy of an

22   Exhibit 3 form would make its way into the jail computer?

23          A.      No.  I mean, they asked these questions from a

24   computer.  So I assume they answer them there, and I don't

25   know.  Like I say, I do not book them in.
```

1          Q.     Let me direct your attention to the third

2    question on this Exhibit 3.  It says, "Are you having any

3    withdrawals from drugs or alcohol?"  Right?

4          A.     Correct.

5          Q.     And over to the left, the answer provided is

6    yes.

7          A.     Correct.

8          Q.     Are you taking the position that you didn't see

9    either that question or that answer prior to Madison's death?

10         A.     Correct.

11         Q.     A few lines down, there's another question that

12   says, "What is your drug of choice?"  And you can see that it

13   says yes, and then underneath it says heroin.  Right?

14         A.     Correct.

15         Q.     Same question.  Did you see that question or

16   answer at any time prior to Madison's death?

17         A.     No.

18         Q.     If you had seen those questions and answers

19   prior to her death, would how you treated or cared for

20   Madison Jensen changed in any way?

21         A.     No.  I believe that we were treating her just

22   the same way.  Gatorade is treating diarrhea and vomiting.

23         Q.     And that was based on your training and

24   experience at the time of the incident.  Correct?

25         A.     Correct.

```
 1              MR. HANCEY:  This is Exhibit 6.

 2              (Whereupon, Exhibit No. 6 was marked for

 3   identification.)

 4   BY MR. HANCEY:

 5       Q.     Before you look at that new exhibit, Ms. Clyde,

 6   let me have you look one more time at Exhibit 3.  I want to

 7   ask you if you recognize the signature in the bottom

 8   left-hand corner.

 9       A.     No.  It's unrecognizable to me.

10       Q.     Okay.  Very good.

11              Let me have you look at Exhibit 6.  Do you

12   recognize Exhibit 6?

13       A.     Yes.

14       Q.     What is that?

15       A.     It is the mental health questionnaire.

16       Q.     For Madison Jensen.  Right?

17       A.     Correct.

18       Q.     Now, I think you mentioned earlier something

19   about mental health questionnaires 1 and 2.  Did I hear you

20   correctly?

21       A.     Correct.

22       Q.     What did you mean by that distinction?

23       A.     Well, we have a medical health questionnaire 1,

24   questionnaire 2.

25       Q.     Is Exhibit 6 1 or 2 or both?
```

```
 1          A.      It is -- let's look and see.

 2                  It is just the MH 1.

 3          Q.      What do you understand to be the difference

 4   between forms 1 and 2?

 5          A.      One is when the person fills it out.  And 2, we

 6   have them fill it out if they're suicidal.

 7          Q.      If they're expressing suicidal thoughts at the

 8   moment of filling out the form?

 9          A.      We ask them, Are you suicidal, do you want to

10   hurt yourself?  Then if they say yes, then it goes on.  I,

11   once again, do not have them fill this out.  This is done up

12   in booking.  So this is not filled out by me.  So that is

13   my -- what I assume is how that works.

14          Q.      Do you know if every mental health

15   questionnaire for a booked inmate goes into your box?

16          A.      No.

17          Q.      No, it doesn't?  Or, no, you don't know?

18          A.      No, it doesn't.

19          Q.      As of November 2016, are you aware of any

20   policies or procedures relating to the Exhibit 6 form?

21          A.      No.

22          Q.      In November 2016, what was your practice,

23   Ms. Clyde, upon receiving a form like Exhibit 6 in your box?

24          A.      If I would have received this in my box, I

25   would look through it.  I'd see what was up, what medications
```

1  they were on.  It would already have been determined by

2  whoever booked them in if they needed to fill out the MH 1 --

3  or I mean the MH 2.  They would decide if they were suicidal.

4  So this, basically I look at it, and then I would put it into

5  their medical file and have the doctor review it when he

6  comes.

7       Q.    Do you know if an Exhibit 6 form like this one

8  is filled out by an officer or the inmate?

9       A.    It is handed to the inmate for them to fill

10 out.

11      Q.    Now, underneath Madison Jensen's name at the

12 top there, there's a box checked next to inmate completion

13 and another box checked next to observation by jail staff.

14 Am I to take it, then, that this form would have been filled

15 out by Madison herself while being watched by a correctional

16 officer?

17      A.    That's what this implies, correct.

18      Q.    This Exhibit 6 form is a mechanism for the

19 inmate to inform the jail of any mental health conditions

20 they might have.  Correct?

21      A.    Correct.

22      Q.    Their psychiatric history.  Right?

23      A.    Correct.

24      Q.    As well as their history of illicit drug use?

25      A.    Correct.

1        Q.      Back in 2016, Ms. Clyde, would your -- if you

2   had seen Exhibit 6 and noted that Madison had an illicit drug

3   history of heroin, marijuana, pills and meth, would your care

4   of her changed in any way?

5        A.      No.

6        Q.      Again, because of the training and experience

7   that you possessed at the time of the incident?

8        A.      Correct.

9        Q.      Do you recall reviewing the Exhibit 6 form at

10  any time prior to Madison's death?

11       A.      I don't remember.  Sorry, no knowledge.

12       Q.      Do you recall whether or not you asked Madison

13  about the illicit drug history information in her Exhibit 6

14  form?

15       A.      Not in regard to this, no.  I did ask her about

16  her drug history.

17       Q.      We're going to get to that in a little bit.

18       A.      Okay.

19       Q.      Now, you've told me, Ms. Clyde, that in 2016,

20  sometimes an inmate's medical intake form would be put in

21  your box and sometimes it wouldn't, and the same for their

22  mental health questionnaire.  Is that correct?

23       A.      Correct.

24       Q.      My question to you is, if you learned back in

25  2016 that there was an inmate being housed at the jail for

1  which you had not seen either a medical intake form or a

2  mental health questionnaire, would you take any steps to try

3  to track down those documents?

4          A.      Not unless it was, uhm, brought to my attention

5  of a medical issue.

6          Q.      And let's say that somebody came to you and

7  alerted you that an inmate for which you had not seen either

8  of those documents I just referenced was, in fact, having a

9  medical issue, then what would you do?

10         A.      I usually just treat the inmate for their

11  medical issue.  We have them brought down.  I don't usually

12  go about hunting down forms.  The inmate is going to be your

13  best reference.

14         Q.      Now, you told me earlier that you would create

15  a medical file for some of the inmates.  Right?

16         A.      Correct.

17         Q.      And tell me what the -- what would be -- what

18  would determine whether or not you created a medical file for

19  an inmate or not back in 2016?

20         A.      If they had been seen by PA Logan Clark, if

21  they were taking medications, if they had any paperwork come

22  in from the hospital, anything that would -- was medical.  We

23  often call -- have to call hospitals where patients were seen

24  to see how to treat their broken arm, how to -- you know.

25         Q.      You did create a medical file for Madison

Jana Clyde
May 23, 2018                                                    Page 43

1    Jensen.  Right?

2         A.      The morning of her death.  Well, actually,

3    excuse me, the night before, when I prepared the inmates that

4    were going to be seeing Logan Clark the next day.

5         Q.      Okay.  So the afternoon of Wednesday, November

6    30th, before you left for the day?

7         A.      Yes.

8         Q.      When you say that you created a medical file at

9    that time, help me understand what it is that you did.

10        A.      I just pulled out an envelope, a file.  I put

11   Madison's request, attached it to that.  So that that would

12   create the -- the -- Logan's appointment, that's actually,

13   you know, like how we would schedule an appointment for PA

14   Logan Clark to see them.

15        Q.      Okay.  So if I understand correctly, then, you

16   took an empty folder --

17        A.      Correct.

18        Q.      -- wrote Madison's name on it?

19        A.      And birth date.

20        Q.      And birth date.  And then put her medical

21   request form in it?

22        A.      Yeah.  Well, on top of it.

23        Q.      On top of it?

24        A.      Uh-huh.

25        Q.      Anything else?

1          A.      At that time, no.

2          Q.      And then later after she passed away, I believe

3    you told me at that time you printed off her medical intake

4    form and her mental health questionnaire?

5          A.      I went to booking and tracked down the mental

6    health form, and I printed off the booking form.  Uintah

7    County had requested that they have any of that information.

8          Q.      And you put those in the same medical file?

9          A.      Correct.

10         Q.      Help me understand just one thing you said

11   earlier.  I believe you mentioned when I asked you what

12   criteria you would use to determine whether or not to open a

13   medical file for an inmate, you said one of those criteria

14   was if the inmate was taking medications.  Right?

15         A.      Correct.

16         Q.      Okay.

17         A.      But that is after the medical -- the inmate has

18   left or another month has started, then that medication file

19   then goes into their medical chart.  So it would not need to

20   be created prior to that.  Because we would have nothing to

21   put in it.

22         Q.      So the mere fact that, say, in this instance,

23   Madison had been prescribed clonidine early in her

24   incarceration, that would not be in and of itself a basis for

25   you to create a medical file?

1        A.      No.  Not until that paper would be taken out of

2    the file where we record.  That is due to them leaving the

3    jail or a new month beginning, because it is recorded by

4    month.

5        Q.      How would you determine whether a new inmate

6    needed prescription medications in 2016?

7        A.      They either come in with prescription

8    medications or they report to me that they're on medications

9    or the PA Logan Clark prescribes medications.

10       Q.      Are you aware of any policy or procedure that

11   existed in 2016 concerning the dispensing or prescribing of

12   medications to inmates?

13       A.      Once again, I don't prescribe.  That would be

14   done through PA Logan Clark; he's the only one who can

15   prescribe medications once the inmate is incarcerated.

16   Dispensing medications, as in how I give them?

17       Q.      Yes.

18       A.      We have, uhm -- at that time, we had

19   four-times-a-day med call.  The inmates would come down to

20   the med room, would receive their medication.  We would chart

21   it.  They would take it.  We would check to make sure that

22   their mouths were clean and clear.  They would go back.

23       Q.      Do you understand that Madison was booked into

24   the jail on Sunday, November 27th, 2016?

25       A.      Yes.

```
 1            Q.      You were not working that day.  Correct?

 2            A.      No.  I was not.

 3                    MR. HANCEY:  37.

 4                    (Whereupon, Exhibit No. 37 was marked for

 5   identification.)

 6   BY MR. HANCEY:

 7            Q.      Okay.  Ms. Clyde, you've been handed what's

 8   been marked as Exhibit No. 37.

 9            A.      Okay.

10            Q.      These are a second part of your answers to the

11   discovery requests that I sent out in this case called

12   Requests For Admission.  Do you know if you participated at

13   all in the responding to these requests?

14            A.      Yes.

15            Q.      Okay.  Let me direct your attention to Request

16   for Admission No. 17.  It's a few pages back.  I think it's

17   Page 5.

18            A.      Okay.

19            Q.      In your answer to that request, you say this:

20   "Admit," meaning you admit, "that Jana Clyde observed

21   defendant" -- I think you meant Madison, but you can tell me

22   if I'm wrong -- "each day she was at work during Ms. Jensen's

23   incarceration from November 28th, 2016, to December 1st,

24   2016."

25                    Do you see that?
```

1          A.      Yes.

2          Q.      By "defendant" there, do you think you're

3     referring to Madison?

4          A.      Yes.

5          Q.      Okay.  Is it a true statement that you observed

6     Madison each and every day from November 28th to

7     December 1st, 2016?

8          A.      I observed Madison Monday, Tuesday, Wednesday,

9     and then that's it.

10         Q.      Thursday, you saw her deceased?

11         A.      Yes.  Of course, I wasn't working Sunday, so I

12    could not observe her that day.

13         Q.      Correct.  Okay.

14                 To your recollection, did you ever observe

15    Madison on more than one occasion in a given day?

16         A.      No.  Not to my recollection.

17         Q.      Did you first learn that Madison was a new

18    inmate at the jail on Monday, November 28th, when you came in

19    for work?

20         A.      It was a couple hours after I came in.

21    Correct.

22         Q.      How did you learn that she was a new inmate?

23         A.      A deputy asked if I -- had an inmate that had

24    reported some vomiting, and they wanted me to see them.

25         Q.      Who reported that?

```
 1           A.      I believe it was Deputy Richens.

 2           Q.      Look back, if you would, quickly at Exhibits 2,

 3    3 and 6.

 4           A.      Okay.

 5           Q.      Were any of those three forms in your box when

 6    you came to work on Monday, November 28th?

 7           A.      No.

 8           Q.      Are you sure about that?

 9           A.      To the best of my knowledge.

10           Q.      Let me have you go back to Exhibit 37 there.

11    Okay?  And direct your attention to Page 2, Request for

12    Admission No. 3?

13           A.      Okay.

14           Q.      In that request, I asked you to admit that

15    prior to Madison's death on December 1st, 2016, you reviewed

16    the prebooking form, talking about Exhibit No. 2.  So the

17    question is, admit that you looked at Exhibit 2 sometime

18    before Madison's death?

19           A.      No.

20           Q.      And your answer, let me just show you your

21    answer.

22           A.      Okay.

23           Q.      It's not a deny.  It's a deny for lack of

24    knowledge.

25           A.      Okay.  So can I explain?
```

Jana Clyde
May 23, 2018                                                                    Page 49

1        Q.      Yeah, sure.

2        A.      I didn't know this was a prebooking form.  To

3   me, a booking form was what the booking people do when they

4   put in.  This is something that officers out on the road do.

5   This has nothing do with me.  I would never see these.  I

6   have never seen these prior to this case.

7        Q.      Do you think that the more appropriate answer,

8   then, would be just simple deny?

9        A.      Now that I know what I prebooking form is, yes.

10       Q.      Okay.  Very good.  Let me direct your attention

11  to Request for Admission No. 4.

12       A.      Okay.

13       Q.      Now I'm asking you about the inmate intake

14  question response form; we've also referred to that as the

15  medical intake form, and it's Exhibit No. 3.  Okay?

16       A.      Uh-huh.

17       Q.      I asked whether or not you had seen that prior

18  to December 1st, 2016.  Again, your answer, deny for lack of

19  knowledge.  Can you explain your answer?

20       A.      I have no knowledge that I had seen that prior

21  to that.

22       Q.      So is the real answer, then, that you just

23  don't remember one way or another?

24       A.      I can remember that that was not in my box

25  because I had to print it up later for her file.  If it would

1  have been in my box, that file would have already been

2  created.

3          Q.     And you say that not because it was a policy

4  but because it was your practice to do that.  Correct?

5          A.     Correct.

6          Q.     But this question isn't necessarily geared

7  towards whether or not the form was in your box.  It's simply

8  whether you ever reviewed Madison's medical intake form at

9  some point prior to her death, prior to December 1st, and

10  you're denying for lack of knowledge.  And my question is, is

11  that because you just don't remember either way?

12          A.     I did not review that.

13          Q.     So this --

14          A.     I have -- I mean, lack of knowledge is, no, I

15  didn't review that until that day.

16          Q.     Until after her death?

17          A.     Yes.

18                 I guess what I need to clarify is when they

19  throw all these terms at me, I don't know booking form,

20  prebooking form.  I can just -- lack of knowledge.

21          Q.     That's the beauty of a deposition.  We can get

22  these things straightened out.

23          A.     Exactly.

24          Q.     Do you recall being interviewed by the attorney

25  general investigators on June 1st, 2017?

1        A.      Yes, I do.

2        Q.      Now, there's a recording of that interview, and

3    the investigators also took the liberty of summarizing your

4    statements from that discussion.  Okay?

5        A.      Okay.

6        Q.      In their summary, they say that you stated that

7    you were unsure whether you received Madison's medical intake

8    form.  If that's true, do you believe that you were being

9    truthful to the investigators?

10       A.      When I went into that interview, uhm, I was not

11   told it was a criminal investigation.  When I got in there,

12   uhm, found out where this was going.  I -- I will be honest

13   with you here presently, it frustrated me, blew my mind.  I

14   was not clear of mind that day.  I was scared to death.

15              I -- so I -- I was not being not truthful.  I

16   was -- I don't know how -- what you would like me to answer

17   to that other than when I got in there and I believed that

18   when I would say certain things, they would twist them.

19   Correct.  So at that point, I was so confused because I was

20   not aware of what I was walking into or prepared for that

21   situation.

22       Q.      But what you're telling me now is, it's not

23   accurate that you are unsure whether you received it, you're

24   adamantly denying that you received it?

25       A.      Exactly.  If I would have had time to prepare

1  for that, I would have been just like this.  I would have

2  remembered when I made that medical report and what I put in

3  it and what Uintah County requested of me.  I got in there,

4  and they started throwing questions at me, and my mind just

5  blew.

6       Q.    You also told the attorney general

7  investigators that you did receive the Exhibit 6 mental

8  health questionnaire in your box.  Do you remember saying

9  that?

10      A.    It was later when I went up, yes.  It was not

11 in my box.  It was later when I went up to find it.

12      Q.    After her death?

13      A.    Yes.

14      Q.    So that wasn't in your box?

15      A.    No, it was not.  I pulled it out of her booking

16 file.

17      Q.    But you did tell the investigators from the

18 attorney general's office that you personally went over

19 Madison's mental health questionnaire with Madison.

20      A.    I went over mental health questions with

21 Madison, not the questionnaire.  Yes.

22      Q.    So if the inter -- in the interview you told

23 them you went over the questionnaire --

24      A.    Which I know --

25      Q.    -- you were confused?

1        A.        -- the questions on the questionnaire.  So I

2    went over the questions from the questionnaire.  I did not

3    have the questionnaire, I did not have the pages in hand.  I

4    do know what these questions are.

5        Q.        You would have done that, you would have gone

6    over those questions with her on Monday, November 28th?

7        A.        Monday morning when deputy -- like I said, I

8    believe it was Richens that brought her down to the med room.

9        Q.        Did you find any of Madison's prescription

10   medications in your box on Monday, November --

11       A.        They --

12       Q.        -- 28th?

13       A.        -- were in my office.  They had put them on the

14   counter in my office.

15                 MR. MYLAR:  Let me just instruct you to wait

16   until he finishes the question.

17                 THE WITNESS:  Okay.  Sorry.

18                 MR. MYLAR:  You're jumping in a little bit

19   quick.

20   BY MR. HANCEY:

21       Q.        Are you aware that Madison submitted to a

22   urinalysis upon being booked into the jail?

23       A.        I am aware of it now.

24       Q.        Do you know under what circumstances a new

25   inmate would be subjected to such a test back in 2016?

1         A.      At that time?

2         Q.      Yes.

3         A.      It would have been upon the request of the

4    arresting officer, AP and P, or one of our officers for

5    whatever reason they would have.

6         Q.      Back in 2016, how would you be made aware of

7    the results of such a urinalysis?  If at all?

8         A.      If at all?

9         Q.      Yes.

10        A.      It would probably just be brought to my

11   attention by an officer mentioning it.

12        Q.      To your knowledge, was there any policies or

13   procedures in place in 2016 at the jail that would dictate

14   what happened, say, if an inmate takes a urinalysis and the

15   results are dirty for drugs?

16        A.      (No oral response.)

17               MR. MYLAR:  You have to speak audibly.

18               THE WITNESS:  No.  I'm sorry, my throat -- I

19   have a very sore throat today.

20               (Off-the-record discussion)

21   BY MR. HANCEY:

22        Q.      So I take, then, that if Madison had submitted

23   to a urinalysis upon booking, the results of that test would

24   not have been put in your box.  Correct?

25        A.      Correct.

```
 1                  MR. MYLAR:  Is this a good time to take a break

 2   right now for a few minutes?

 3                  MR. HANCEY:  If you want to, sure, that's fine.

 4   We can take a quick break.

 5                  (Recess taken from 11:20 a.m. to 11:34 a.m.)

 6                  (Whereupon, Mr. Tyler Allred were absent from

 7   the deposition proceedings.)

 8   BY MR. HANCEY:

 9        Q.    Okay.  Ms. Clyde, your first personal

10   interaction with Madison was on Monday, November 28th.  Is

11   that correct?

12        A.    Correct.

13        Q.    At what time?

14        A.    Sometime in the morning.

15        Q.    And where was that interaction?

16        A.    In the medical room.

17        Q.    Is that the same thing as your office?

18        A.    Yes.

19        Q.    Who was present?

20        A.    I, Madison and Lieutenant Richens -- or Deputy

21   Richens.

22        Q.    And what was the purpose of this particular

23   encounter?

24        A.    Madison had told Deputy Richens that she had

25   thrown up the night before and just wanted me to talk to her.
```

```
 1        Q.      So your understanding is that Madison had

 2   requested to meet with you?

 3        A.      I think it was more upon Deputy Richens's

 4   request because of what Madison had stated to her.

 5        Q.      I see.  What did you observe about Madison's

 6   appearance at that time?

 7                (Whereupon, Mr. Tyler Allred returned to the

 8   deposition proceedings.)

 9                THE WITNESS:  She ambulated down to the med

10   room on her own.  She, uhm, appeared possibly sick, you know,

11   like if somebody had flu or cold or something.

12   BY MR. HANCEY:

13        Q.      Why do you say that?

14        A.      Just pale.  You know, pale, mostly.

15        Q.      Was she exhibiting any other symptoms that you

16   were able to see at that time?

17        A.      No.

18        Q.      Anything else that you would describe as

19   peculiar about her appearance?

20        A.      Extremely thin.

21        Q.      Sunken eyes?

22        A.      Not that I remember recalling.

23        Q.      Did she look like a drug addict to you?

24        A.      Possibly.

25        Q.      Did she look weak to you?
```

1        A.        Like I said, she ambulated down to the med room

2    on her own.  But I would -- did she appear weak?  No.

3        Q.        Not to you?

4        A.        I would assume she was just due to her weight

5    and her paleness.  An assumption

6        Q.        Did you actually see her ambulate down to your

7    office?

8        A.        No.  Just from walking in my door to where she

9    sat down.

10       Q.        Describe for me everything you can remember

11   about that first encounter with Madison on the morning of

12   November 28th.

13       A.        Brought her into the med room, had her sit on a

14   stool.  Talked to her about the report that Richens had give

15   me about her vomiting the night before.  She stated that she

16   had a little bit; she hadn't thrown up that day, prior at

17   that time, any more.

18                 Uhm, I asked her if she was coming off of

19   anything.  She denied.  She stated that she thought she had

20   the stomach bug.  She said, I -- and I asked her once again

21   if she was coming off of anything.  I generally tell them,

22   I'm the nurse, I'm the person you need to be honest with; you

23   know, this isn't going to affect your charges or anything.

24   And she once again said, I know my body, I am not detoxing;

25   I -- I have the stomach bug.

1              Then I afterwards talked to her about leave

2    puking or vomiting.  I need to see it; we have to observe

3    that.  Asked her if there was anything else I could do for

4    her.  I opened the cabinet to where I keep all of my

5    over-the-counter medications.  Showed her what we had.  Made

6    her aware of ibuprofen, Tylenol.  What else do we have up

7    there?  Pepto-Bismol, antacids.

8              You know, and I said, These are here; all you

9    have to do is ask me for them.  And made her aware of that.

10   I asked her at that point if she would like anything.  And

11   she said no.  At that point, uhm, Deputy Richens then took

12   her back.

13        Q.    Was one of the purposes of that first encounter

14   to find out more about Madison's medications?

15        A.    Oh, correct.  That was part of that.

16        Q.    Tell me what you remember about that.

17        A.    She had a couple of medications.  I made her

18   aware that the ones would not be given in our facility.  They

19   were not allowed.  Clonidine, however, I would get an

20   approval, it was -- to call the provider for approval.  And

21   that we would start that as soon as I heard back from him.

22        Q.    So just to be clear, you told Madison at that

23   time that her tramadol and Wellbutrin prescriptions would not

24   be approved?

25        A.    Were not approved in our facility.  Did not say

1   would not be, but were not approved in our facility.

2         Q.     What's the difference between were not approved

3   and would not be approved?

4         A.     Uhm, sometimes when the PA Logan sees an

5   inmate, he may change that for whatever reason.  But he

6   won't -- he will never change that until he has assessed and

7   seen the inmate himself.

8         Q.     You later contacted Logan Clark and asked for

9   approval of the clonidine prescription.  Correct?

10        A.     Correct.

11        Q.     But my recollection, from looking through the

12  case materials, is that you did not at that time inform Logan

13  Clark that Madison had the other two prescriptions.  Is that

14  right?

15        A.     No.  He was -- he was informed.

16        Q.     Did you tell him about all three prescriptions

17  that she had when you called him?

18        A.     Yes.  And he said he would review them when he

19  got there.

20        Q.     To the best of your recollection, did you call

21  Logan Clark about approving the clonidine prescription on

22  Monday or on Tuesday?

23        A.     It was Monday.  And I don't know if it was a

24  text or a phone call.

25        Q.     Was it -- did it happen after Madison left your

1    office?

2           A.      Yes.

3           Q.      And your testimony is that when you reached out

4    to Logan Clark that day about Madison's prescriptions,

5    whether by phone or by text, you mentioned to him that

6    Madison at that time was on three -- all three medications?

7           A.      Correct.

8           Q.      Now, Ms. Clyde, I've watched a video of, again,

9    your interview with the attorney general investigators.  And

10   when you were talking about this first encounter you had with

11   Madison, you say the following:  My first thought when I saw

12   her was you have been doing serious drugs, and I know you are

13   lying to me.

14                  Do you remember saying that?

15          A.      I don't know if I remember saying that exactly.

16   but...

17          Q.      Does that sound like something you might have

18   said?

19                  MR. MYLAR:  Just for the record, are you

20   reading a summary or is that a transcript?

21                  MR. HANCEY:  That is from the summary.

22                  MR. MYLAR:  Okay.

23   BY MR. HANCEY:

24          Q.      So that's why my question is, do you remember

25   saying something like that?

1         A.      To them?

2         Q.      Yes.

3         A.      I don't recall.

4         Q.      Okay.  Do you recall thinking something like

5   that when you first saw Madison?

6         A.      I do not recall thinking that.  Is it something

7   that I have thought before?  Yes.

8         Q.      Do you remember thinking in your first

9   encounter with Madison -- you say that you asked her if she

10  was detoxing or taking drugs, and she denied that.  Correct?

11        A.      Correct.

12        Q.      Do you remember thinking at that moment in

13  time, She's lying about that?

14        A.      Yes.

15        Q.      Was your basis for thinking that she was lying

16  about that, at least in part, on her looking to you like she

17  had been doing some serious drugs?

18        A.      Possibly, and her mannerisms at that time.

19        Q.      What do you remember about her mannerisms at

20  that time?

21        A.      Not looking me in the eye.

22        Q.      What else?

23        A.      Not -- keeping her head down.  Not looking me

24  in the eye.  Did not seem like she was forthright with her

25  answers to me.

1          Q.      In your training and experience, those are

2   common symptoms of somebody who is a habitual drug user.

3   Right?

4                  MR. MYLAR:  Objection.  Lack of foundation.

5   BY MR. HANCEY:

6          Q.      Is that true?

7          A.      Not being forthright with me?

8          Q.      All of the mannerisms that you just described.

9          A.      It can be a mannerism of about almost any

10  inmate that comes into jail whether it be about use of drugs

11  or about how long they're going to even be there.

12         Q.      Well, then help me understand, because when I

13  asked you why you thought at that time Madison was lying to

14  you, you told me first it was because you might have thought

15  she was doing serious drugs but also because of her -- so how

16  she looked but also because of her mannerisms?

17         A.      Yes.

18         Q.      So I asked you what mannerisms.

19         A.      Uh-huh.

20         Q.      So help me understand how those mannerisms that

21  you described in Madison informed your belief that she was

22  doing serious drugs?

23         A.      They did not inform my belief they were doing

24  serious drugs.  They informed my belief that she was not

25  being truthful with me to the questions which I had asked.

1        Q.      About drug use?

2        A.      About drug use.

3        Q.      Madison did tell you that she was -- she had

4   thrown up the night before during that encounter?

5        A.      Yes.

6        Q.      Did she tell you that she had thrown up on the

7   morning of Monday the 28th?

8        A.      She denied that to me.

9        Q.      Okay.  Do you recall Madison telling you during

10  that first encounter that she couldn't keep anything down,

11  meaning liquids or food?

12       A.      No.  Not to my knowledge.

13       Q.      Is it possible she said that, something like

14  that, you just don't remember?

15       A.      Possible.

16       Q.      I mean, I'll represent to you that that's Liz

17  Richens's recollection of that first encounter.  So is it

18  possible Madison said something like that?

19       A.      Very possible.  She could also have told Liz

20  Richens that while she was walking down the hall or had got

21  her out of her cell.

22       Q.      Did Madison tell you how many times she had

23  thrown up the previous night, Sunday night?

24       A.      Not to my recollection.

25       Q.      When she told that you she had thrown up that

 1   night, did you ask her how many times?

 2        A.    She just stated, I had thrown up the night

 3   before -- I have thrown up the night before.

 4        Q.    Did you ask her how many times?

 5        A.    No.

 6        Q.    Is the number of times a person throws up in a

 7   given period of time indicative of anything medically?

 8              MS. ABKE:  Object to form.

 9              MR. HANCEY:  Do you understand my question?

10              MR. MYLAR:  I'm also going to object.  Lack of

11   foundation.

12              THE WITNESS:  Yeah, repeat, please.

13   BY MR. HANCEY:

14        Q.    Do you believe that how many times a person

15   vomits over a given period of time is important information

16   in trying to determine that person's medical needs?

17        A.    Yes.  Yeah.

18        Q.    You've stated that Liz Richens was also present

19   during this Monday morning encounter.  Correct?

20        A.    Yes.

21        Q.    In your office?

22        A.    Uh-huh.

23        Q.    Do you remember -- is it Officer Richens?

24        A.    Deputy Richens.

25        Q.    Deputy Richens.  Do you remember Deputy Richens

1   telling you during that encounter that Madison had used

2   heroin five days earlier?

3        A.     I don't know if it was during that encounter or

4   after the encounter.  But she, uhm, had told me that she had

5   tested positive for opiates.

6        Q.     Based on her urinalysis.  Correct?

7        A.     Correct.

8        Q.     But did she also tell you specifically that

9   Madison had taken heroin five days earlier?

10       A.     Not that I recall.  Not to my knowledge.

11       Q.     You just don't remember?

12       A.     Correct.

13       Q.     Do you remember Liz Richens telling you that

14  Madison was obviously coming off some kind of drug in that

15  Monday meeting?

16       A.     Once again, I just -- the thing I remember is

17  that she said she had tested positive for opiates.

18       Q.     Okay.  So you don't remember that then?

19       A.     No.

20       Q.     No?

21       A.     No.

22       Q.     Now, you said that while you remember Deputy

23  Richens telling you about urinalysis results, you don't

24  remember whether or not she told you that during the meeting

25  when Madison was present or sometime after?

```
 1          A.      She would have told me about the urinalysis

 2   results, I would assume, sometime after, but I do not recall.

 3          Q.      Was it on Monday, November 28th?

 4          A.      Yes.  It would have been -- it would have been

 5   shortly after that visit.  I know it was that morning.

 6          Q.      Based on your medical training and experience,

 7   Ms. Clyde, do you believe that how a patient should be

 8   treated should be based on what the patient is subjectively

 9   telling you or based on your objective observations?

10          A.      Both.

11                  MR. MYLAR:  Objection.  Lack of foundation.

12                  MR. HANCEY:  She's not qualified as an LPN?

13                  MR. MYLAR:  She is qualified as an LPN.

14   BY MR. HANCEY:

15          Q.      You said both?

16          A.      Yes.

17          Q.      Okay.  And tell me why you think it's both.

18          A.      Uhm, what the patient tells me and what I

19   see are relevant.  Signs and symptoms.

20          Q.      So really what it boils down to is objective

21   evidence of their condition.  Right?

22          A.      Subjective and objective.

23          Q.      I thought you said it comes down to signs and

24   symptoms --

25          A.      Yes.
```

1        Q.      -- and those are objective things.  Right?

2        A.      Yeah.

3        Q.      So, then, here's a hypothetical.  If you're

4   looking at a patient who you strongly believe is a drug user

5   and/or is detoxing from drugs, exhibiting some of those signs

6   and symptoms, but the patient adamantly denies drug use,

7   based on your training and experience, do you treat them

8   as if -- in accordance with your objective findings or their

9   subjective statements?

10              MR. MYLAR:  Objection.  Calls for speculation,

11  an incomplete hypothetical, and lack of foundation.

12              MR. HANCEY:  You can answer.

13              THE WITNESS:  Will you put -- revise that again

14  for me, reword it.

15              MR. HANCEY:  Sure.

16  BY MR. HANCEY:

17       Q.      Based on your training and experience, if

18  you're encountering a patient who denies drug use or denies

19  that they're detoxing but your objective observations point

20  the opposite direction, do you treat that person based on

21  your objective observations or on what they're telling you?

22              MR. MYLAR:  Same objections.

23              MR. HANCEY:  You can answer.

24              THE WITNESS:  Both.

25                        *

1    BY MR. HANCEY:

2          Q.      How would you treat them based on both if those

3    are opposite conclusions?

4                  MS. ABKE:  Object to the form.  Foundation.

5                  MR. HANCEY:  You can answer.

6                  THE WITNESS:  I cannot treat a patient that

7    that does not want to be treated.  We cannot force-medicate.

8    I, uhm -- so then I can only do what I did.

9    BY MR. HANCEY:

10         Q.      Which is what?

11         A.      Which is go off of what Madison has told me.

12   And per, at that point, she stated to me she is vomiting, so

13   we gave her her first Gatorade at that point.  And then asked

14   her to save her vomit or her diarrhea so that we can observe

15   it and see it.  And often I tell them so that they don't

16   maybe think that I'm questioning them of whether they're

17   being truthful, but I also want to see if there's blood in

18   those -- in that also.

19         Q.      When you asked Madison to save any samples of

20   her vomit or diarrhea, was Liz Richens present?

21         A.      Yes, it was in that meeting.

22         Q.      Okay.  Did you take any steps to communicate

23   that directive to any of the other jail staff?

24         A.      Uhm, no.

25         Q.      Did you give Madison some kind of a container

 1  to hold her vomit or diarrhea?

 2          A.     No.  We tell them -- they use the toilet.  We

 3  say, Don't flush it; push the control, the button to get into

 4  control, and we'll be right down.  And that is what I told

 5  her.

 6          Q.     What about the vomit?  How would she --

 7          A.     They vomit in the toilet or they vomit on their

 8  bed or on the floor, we see it.

 9          Q.     But she did vomit on her bed and on the floor.

10  And so there was evidence of vomit that was saved, but how

11  did that change anything?

12          A.     It was not reported to me.  I never saw any

13  vomit or diarrhea.

14          Q.     So then --

15          A.     If Madison -- Madison must have not reported it

16  to control for me to go down.

17          Q.     Or another possibility would be that the

18  correctional staff that did observe that didn't convey that

19  information to you.  Right?

20                 MS. ABKE:  Object to form.

21                 MR. BUTTERFIELD:  (Inaudible) and join.

22                 (Court reporter interrupted for clarification.)

23                 MR. BUTTERFIELD:  I said incomplete

24  hypothetical.

25                               *

1  BY MR. HANCEY:

2        Q.    Is that a possibility?

3        A.    I would assume that could be a possibility.

4        Q.    Well, let me ask you this:  Do you know,

5  sitting here today, that Madison vomited and/or went diarrhea

6  every single day she was incarcerated?

7        A.    No, I do not know that.

8        Q.    You still don't know sitting here today?

9        A.    Correct.  I never saw it.  I can't testify to

10 something I didn't see.

11       Q.    You've been telling me about this encounter

12 with Madison on the morning of November 28th, Monday.  Did

13 you take her vitals at that time?

14       A.    Yes.

15       Q.    Okay.  Which -- how did you do that?

16       A.    With a blood pressure cuff, with my

17 stethoscope, with a pulse oximeter.

18       Q.    Did you record those findings?

19       A.    Yes, I did.

20       Q.    Where?

21       A.    On the computer.

22       Q.    Did you note that Madison's blood pressure was

23 high?

24       A.    Yes.

25       Q.    You've told me that sometime on Monday,

1   November 28th, you reached out to Logan Clark, either by

2   phone or text, to get the medication approved.  Correct?

3        A.     Correct.

4        Q.     During that phone call, did you communicate

5   anything to Logan Clark about the signs and symptoms that

6   Madison had either told you about or that you had observed in

7   person?

8        A.     I do not know, outside of the clonidine

9   approval, what was said.  I don't have any recollection.  I

10  don't remember.

11       Q.     Let me be more specific.  Do you remember

12  whether or not you told Logan Clark on that occasion that

13  Madison appeared pale and/or weak?

14       A.     That could be a possibility.

15       Q.     Do you remember whether or not you told Logan

16  Clark on that occasion that Madison had reported vomiting?

17       A.     Yes.

18       Q.     That had been corroborated by Deputy Richens.

19  Right?

20       A.     Yes.  Just that she had stated that she had

21  vomited the prior night before, yes.

22       Q.     Do you remember how Logan Clark responded to

23  those comments by you?

24       A.     No, I don't.

25       Q.     So if you had communicated on that occasion

Jana Clyde
May 23, 2018                                                        Page 72

1  with Logan Clark by text, then would you have texted your --

2  you would have texted the information we just talked about.

3  Right?

4          A.     In some format.

5          Q.     Okay.  Have you saved your text messages from

6  that time period?

7          A.     No.

8          Q.     Did you give Madison Gatorade --

9          A.     Yes.

10          Q.     -- in that Monday encounter?

11          A.     Yes.

12          Q.     Was that because you were concerned about her

13  hydration?

14          A.     No.  It was stated -- because she stated she

15  had vomited the night before.  And sometimes Gatorade is the

16  only thing they can hold down.

17          Q.     After that visit in your office, was Madison

18  sent back to her cell?

19          A.     Yes.

20          Q.     That was in H Block.  Correct?

21          A.     I don't know what block she was in.

22          Q.     Do you know if you made any notes of your

23  Monday encounter with Madison?

24          A.     I -- outside of the vital signs?  No.

25          Q.     So again, you logged those into the computer

1   electronically?

2          A.      Yes.

3          Q.      But no other written or electronic notes of any

4   kind?

5          A.      No.

6          Q.      Did you see Madison on Tuesday, November 29th?

7          A.      Yes.

8          Q.      Was that also in your office?

9          A.      Yes.

10         Q.      What time of day?

11         A.      I do not remember.

12         Q.      How did she get to your office?

13         A.      She would have walked down.

14         Q.      Who was she accompanied by?

15         A.      Once again, I would -- I believe that it was

16  Liz Richens.

17         Q.      Was Liz Richens present, to the best of your

18  recollection, during the Tuesday encounter?

19         A.      Yes.

20         Q.      Tell me what you remember about the Tuesday

21  encounter with Madison in your office.

22         A.      Basically just reviewed things again.  I asked

23  her if she wanted to see the doctor.  She once again stated

24  she had the stomach bug.  She was feeling better; she did not

25  believe she wanted to see the doctor.  Then I went over,

1   again, about the if you're having nausea and vomiting,

2   diarrhea, I need to see the vomit and diarrhea; you need to

3   save that for me.  And that's about all I really can

4   remember.

5        Q.    All right.  Let's try to drill down a little

6   bit.  During that Tuesday encounter -- well, who initiated

7   the Tuesday encounter, you or Madison?

8        A.    I...

9        Q.    Or somebody else?

10       A.    I honestly don't remember.

11       Q.    So you don't know, you don't remember, sitting

12   here today, why she was in your office?

13       A.    I -- a follow-up, would be my assumption, to

14   what our encounter was the day before.  That's generally what

15   I do.

16       Q.    But if it was a follow-up, that would have been

17   initiated by you.  Right?

18       A.    Or Richens.

19       Q.    Or Liz Richens?

20       A.    Uh-huh.  She might have, you know, got it

21   sooner than I would have during the day, yeah.

22       Q.    Did you tell me a minute ago that during the

23   Tuesday encounter, Madison stated she did not want to see a

24   doctor?

25       A.    Correct.

1          Q.      What signs and symptoms, if any, did Madison

2     report to you on Tuesday, November 29th?

3          A.      She didn't report any to me.

4          Q.      Did she tell you on her own initiative that she

5     had vomited or had diarrhea that day?

6          A.      When I asked her that question, she denied it.

7          Q.      Did Liz Richens provide you any information

8     about whether Madison had vomited or went diarrhea on

9     Tuesday, November 29th?

10         A.      I can't remember.

11         Q.      Do you recall observing any differences in

12    Madison's physical appearance between Monday and Tuesday?

13         A.      No.

14         Q.      Did you take her vitals again on Tuesday?

15         A.      No.

16         Q.      Now, you told the attorney general

17    investigators that on Tuesday, Madison looked pale, and you

18    said that her color wasn't good.  Is that something that --

19    is that true?

20         A.      It could be.

21         Q.      Liz Richens told the investigators that Madison

22    looked weaker than she had the previous day, being Monday.

23    Do you agree with that?

24         A.      I did not see her walk down to my office.  I

25    have no knowledge of that.

1        Q.      Did Liz Richens tell you on Tuesday, November

2    29th, that she had to assist Madison in ambulating back to

3    her cell?

4        A.      Not to my knowledge.

5        Q.      You don't remember?

6        A.      No, I don't.  Not to my knowledge.  She did not

7    report that to me.

8        Q.      Did you ask Madison on Tuesday how she was

9    feeling?

10       A.      I'm sure I did.

11       Q.      Do you remember how she responded?

12       A.      No.

13       Q.      Did you give her a Gatorade?

14       A.      Yes.  She got a Gatorade every day she was

15   there, a couple of times a day.

16       Q.      Did you make any notes of your Tuesday

17   encounter or -- or other records of your Tuesday encounter

18   with Madison?

19       A.      No.

20       Q.      Is the encounter in your office that we've just

21   talked about the only time on Tuesday that you personally

22   observed Madison that day?

23       A.      Other than when she was moved.

24       Q.      Do you recall Liz Richens telling you on

25   Tuesday that Madison was still really weak and was unable to

1  hold fluids down?

2          A.      No.

3          Q.      You just don't remember?

4          A.      She did not tell me, to my recollection,

5  correct.

6          Q.      Do you recall her telling you that Madison was

7  throwing up a lot?

8          A.      No.

9          Q.      Do you recall Liz Richens telling you on

10 Tuesday that every time she checked on Madison, Madison was

11 just lying in bed, not getting up?

12         A.      No.

13         Q.      Now, do you remember Liz Richens telling you

14 that Madison wouldn't eat on Tuesday?

15         A.      I never had any report of what she ate.

16         Q.      All of these statements that I just attributed

17 to Liz Richens and you said you don't remember, are you

18 taking the position that Liz Richens absolutely did not make

19 those statements to you on Tuesday?  Or is your testimony

20 that you don't remember, she might have?

21         A.      My testimony is I do not recall her telling me

22 any of that.

23         Q.      So you don't remember?

24         A.      So...

25         Q.      Right?

1           MR. MYLAR:  Objection.  Asked and answered.

2           MS. ABKE:  I don't think she has answered that.

3           MR. HANCEY:  I don't think she has.

4    BY MR. HANCEY:

5       Q.    You don't remember.  Correct?

6       A.    If that's what recall means, I do not recall.

7       Q.    Do you recall whether Liz Richens told you on

8    Tuesday that she was going to give Madison a Gatorade?

9       A.    I don't remember.

10      Q.    Do you remember Liz Richens telling you on

11   Tuesday that she was going to get Madison new bedding because

12   Madison had vomited all over the set in her cell?

13      A.    No.

14      Q.    You don't remember that either?

15      A.    She did not tell me that.

16      Q.    You're positive?

17      A.    Positive.  I can honestly -- I will answer

18   positive to that, yes.

19      Q.    Okay.  Now, at some point on Tuesday, Madison

20   filled out one of the jail's medical request forms.  Correct?

21      A.    Correct.

22      Q.    Was that at your suggestion or was that at

23   Deputy Richens's suggestion, do you remember?

24      A.    My suggestion.

25      Q.    Tell me the circumstances leading up to your

1    making that suggestion.

2          A.      She had stated that she had vomited on Sunday

3    night.

4          Q.      When did she tell you that?

5          A.      Monday morning.

6          Q.      So you're referring to the Monday conversation?

7          A.      Yes, uh-huh.

8          Q.      Okay.  What else?

9          A.      Just her coloring, how she looked.

10         Q.      On Tuesday?

11         A.      Both days.

12         Q.      Okay.

13         A.      And after our encounter with her, Deputy

14   Richens and I talked about it.  And, uhm, Deputy Richens

15   asked, uhm, how I'd feel if we moved her.  I agreed that that

16   would be a good idea.  Maybe Madison, if she was throwing up

17   or vomiting, which she had denied, would be more relevant to

18   save that so I could see it in a separate cell.  So that

19   would -- that was my -- my whole medical reason for moving

20   her, is to possibly be able to see vomit and diarrhea if she

21   was having it.

22         Q.      Okay.  What I think I heard you say is that

23   after Madison left on Tuesday, you were talking with Deputy

24   Richens?

25         A.      Yes.

1        Q.      She brought up the idea of moving Madison to --

2   for medical observation, and you agreed that that was a good

3   idea --

4        A.      Yep.

5        Q.      -- is that correct?

6        A.      Correct.

7        Q.      And so your reasoning for agreeing with Liz

8   Richens's suggestion to move Madison was really for medical

9   observation reasons?

10        A.      I wanted to see vomit and diarrhea if she was

11   having it, correct.

12        Q.      Now, let me touch on that for a second.  Liz

13   Richens had told you that she had seen Madison vomit on

14   Monday.  Right?

15        A.      No.

16        Q.      Or on Sunday night, I mean?

17        A.      No.  Madison reported to me that she had

18   vomited Sunday night.

19        Q.      Did Liz Richens not corroborate that on Monday?

20        A.      No.

21        Q.      Okay.  In 2016, what is your under -- well, are

22   you aware, first of all, of any policies or procedures or

23   unwritten policies about what a correctional officer was

24   supposed to do if they observed evidence that an inmate was

25   vomiting or had diarrhea?

1          A.          To my knowledge of the policies and procedures,

2     an in -- a correctional officer should have contacted

3     PA Logan or Dr. Tubbs.  That's what I was --

4          Q.          What if it was -- sorry.  What if she observed

5     that same thing at a time when you were working?  Was the

6     policy to contact you?

7          A.          The policy is still to contact PA Logan or

8     Dr. Tubbs.

9          Q.          And when you talk about that as being a policy

10    in 2016, is it your understanding that that was a written

11    policy at the jail or an unwritten protocol?

12         A.          That's the written policy.

13         Q.          That existed in 2016?

14         A.          Correct.

15         Q.          If you see -- if anybody sees an inmate vomit

16    or have diarrhea, to contact PA Logan Clark?

17         A.          If a deputy has any concerns regarding a

18    medical issue, they are to contact PA Logan or Dr. Tubbs.

19    Yes, that is the written policy.

20         Q.          So they're supposed to bypass you in those

21    situations?

22         A.          It's what the policy said.

23         Q.          What time on Tuesday was Madison moved for

24    medical observation?

25         A.          I don't know.

1          Q.       In the records in this case, I have seen

2    reference made to the cell she was moved to as the

3    court-holding cell.  Is that an appropriate term?

4          A.       Yes.

5          Q.       Is it your understanding that the medical

6    observation of an inmate can be more easily done in court

7    holding than in, say, a cell on H Block?

8          A.       Yes.

9          Q.       Why?

10         A.       Uhm, because in court holding, they are alone,

11   they have a cell to themselves.  It's visible through glass.

12   To get to a cell in H Block, you have to go into the block,

13   into the common area, and then over to the cells.

14         Q.       And look through the individual --

15         A.       And look through the glass.

16         Q.       -- cell --

17         A.       Individual cell.

18         Q.       -- door glass?

19         A.       Correct.

20         Q.       You said that there's glass in the

21   court-holding cells.  Right?

22         A.       In the window, glass, Plexiglas, something.

23   Something you see through.

24         Q.       That separates the court-holding cell from

25   what?

```
 1          A.      A hallway.

 2          Q.      So an officer, to observe Madison in court

 3   holding, still has to walk down a hallway in order to look

 4   through the Plexiglas?

 5          A.      Correct.

 6          Q.      How is that any easier than walking down to

 7   H Block and looking through the door window?

 8          A.      They make rounds.  Also, uhm, court holding has

 9   an individual camera that can be observed in control.

10          Q.      In the control room?

11          A.      Yes.

12          Q.      Is that camera running 24/7?

13          A.      Yes.

14          Q.      Is there a person in the control room 24/7?

15          A.      Yes.

16          Q.      To your knowledge, how many cells at the jail

17   have a camera that relays real time to the control room?

18          A.      Individual cells?

19          Q.      Yes.

20                  MR. HOMER:  Objection.  Foundation.

21   BY MR. HANCEY:

22          Q.      If you know.

23          A.      Uhm, I -- I think five.

24          Q.      Court-holding cells.  Right?

25          A.      Yes.
```

```
 1          Q.      What else?

 2          A.      Three in booking.

 3          Q.      Are there two court-holding cells?

 4          A.      Yes.

 5                  (Whereupon, Exhibit No. 11 was marked for

 6  identification.)

 7  BY MR. HANCEY:

 8          Q.      Ms. Clyde, you've been handed what's been

 9  marked as Exhibit 11.  Have you ever seen that before?

10          A.      No.

11          Q.      Are you familiar with this form?

12          A.      No.

13          Q.      To the best of your knowledge, what cells was

14  Madison housed in during her stay at the jail?

15                  MR. HOMER:  Objection.  Foundation.

16  BY MR. HANCEY:

17          Q.      Do you know?

18          A.      According to this or according to what I know?

19          Q.      According to what you know.

20          A.      I would -- she was held in H Block and in court

21  holding.

22          Q.      This Exhibit 11 form, and I know you haven't

23  seen it, but it seems to reflect that Madison was moved for

24  medical reasons on Tuesday, November 29th, at 1619 hours.  Do

25  you see that?
```

```
 1            A.      Uh-huh.

 2            Q.      Is that consistent with your independent memory

 3    of about when she was moved?

 4            A.      I -- as I stated before, I don't remember what

 5    time she was moved that day.

 6            Q.      Do you know who would have put the reason

 7    assigned as being medical in a form like this?

 8            A.      I don't.

 9            Q.      Is that something that you would have

10    communicated to --

11            A.      No.

12            Q.      -- the person who fills this form out?

13            A.      No.

14            Q.      In 2016, did a correctional officer have, to

15    your knowledge, the authority to move an inmate from

16    something like an H Block cell to court holding on their own

17    initiative without getting your approval?

18            A.      Yes.

19            Q.      Do you recall being interviewed by somebody

20    named John Crowley, an investigator with the Office of the

21    Medical Examiner?

22            A.      No.

23            Q.      I'm going to read to you something from John

24    Crowley's report.  He says that he talked to you.

25                    MR. HOMER:  Counsel, what's the exhibit?
```

```
 1                    MR. HANCEY:  Yeah.  It's Exhibit No. 4, and
 2   it's on page Bates No. 36.
 3   BY MR. HANCEY:
 4        Q.     Second paragraph from the bottom under medical
 5   records.
 6                    MR. MYLAR:  Where's -- second paragraph?  Okay.
 7   BY MR. HANCEY:
 8        Q.     So this is what John Crowley says about his
 9   interview with you.  Okay?  He says, In talking with the jail
10   nurse Jana Clyde, she stated that when Madison came into the
11   jail, she started going through withdrawal-type symptoms, and
12   they had in the court -- and they had her, I think, in the
13   court-holding cell to watch her.  Jana stated that she was
14   not eating and that they were giving her Gatorade drinks to
15   help Madison.
16                    Is that consistent with your memory?
17        A.     No.
18        Q.     Why not?
19        A.     I was never told if she's eating or not.  The
20   only people that know that she's eating is the lunch ladies.
21   No -- none of them came and reported to me.
22        Q.     So John Crowley's report is wrong?
23        A.     I don't know.
24        Q.     Well --
25        A.     To the best of my knowledge, I did not -- I was
```

1   not told whether she was eating or not.

2          Q.     Is it possible that you were, though, and that

3   you told John Crowley that?

4          A.     No.

5          Q.     It's not -- so again, I just --

6          A.     Okay.  No.

7          Q.     I have to pin you down.

8          A.     Please do.

9          Q.     Are you adamantly denying that you ever knew

10  that Madison wasn't eating before she passed away?  Or do you

11  just not remember if you were told?

12         A.     I was not told.

13         Q.     Is it true that Madison was moved into the

14  court-holding cell to be watched because she started going

15  through withdrawal-type symptoms?

16         A.     That would have been up to Deputy Richens, who

17  moved her.

18         Q.     But you did tell me that you approved that --

19         A.     I did.

20         Q.     -- suggestion.  Right?

21         A.     Correct.

22         Q.     So would your reason have been what's described

23  in what I read?

24         A.     My recollection of that thing was, once again,

25  if she was having nausea and vomiting -- vomiting and

1   diarrhea, I needed to see it.  This is the best place for me

2   to observe that.  She can push the button for me to come

3   down.  That was my sole objective for me putting her there.

4   In agreeing to put her there.

5          Q.     In 2016, if an inmate told you five days in a

6   row that they had vomited and/or had diarrhea, but you never

7   saw evidence of that with your own eyes, would the way that

8   you treat that inmate change at all?

9               MR. MYLAR:  Objection.  Calls for speculation

10  and also incomplete hypothetical.

11              MR. HOMER:  Join.

12              MR. HANCEY:  You can answer.

13              THE WITNESS:  If an inmate would have reported

14  to me that they were having this -- these symptoms, that

15  inmate still would have been given the Gatorades and have

16  full access to her meals and water.

17  BY MR. HANCEY:

18         Q.     Anything else?

19         A.     No.

20         Q.     So just to be clear, in 2016, if an inmate told

21  you five days running that they had vomited or went diarrhea,

22  your response would have been to give them Gatorade and make

23  sure they had access to food and water?

24              MR. MYLAR:  Objection.  Again, incomplete

25  hypothetical and calls for speculation.

Jana Clyde
May 23, 2018                                                    Page 89

```
 1                MR. HANCEY:  Well, now I'm just clarifying her
 2   other answer.
 3                So is that what you said?
 4                MR. MYLAR:  Well, five days running, I don't
 5   think, was --
 6                MR. HANCEY:  It was.
 7                MR. MYLAR:  -- even in evidence.
 8                MR. HANCEY:  Yeah, it was -- well, no, it was
 9   part of the hypothetical.
10   BY MR. HANCEY:
11        Q.    But do you understand my question?
12        A.    Yes.  If I would have known, not been reported
13   but known, seen, that probably would have been treated
14   different.  But just reported to me without visual, no.
15   Nothing would have changed.
16        Q.    Okay.  Thank you.
17                Do you remember telling Lieutenant Jason Curry
18   that you had moved Madison to court holding because she
19   either had the flu or was experiencing heroin withdrawals?
20        A.    I remember telling Jason Curry that we moved
21   her there, stating what the patient had told me.  I cannot
22   tell you if a patient is having withdrawals with heroin.  So,
23   no, I know I did not tell him that.  We -- I had no proof
24   that she had heroin in -- on her system.
25        Q.    Once Madison had transferred to court holding
```

1   for medical observation, did you personally observe her at

2   all?

3          A.     Yes.

4          Q.     And that was on Wednesday, November 30th.

5   Correct?

6          A.     I went and saw her on Wednesday, November 30th,

7   yes.

8          Q.     Would that be the extent of your personal

9   observation of Madison after the move to court holding?

10         A.     I went down to -- to control on Wednesday a

11  couple times earlier that day just to look in the cameras.

12         Q.     Do you remember whether or not you looked in

13  the camera in Madison's cell --

14         A.     That was my particular reason for going to

15  control, yes.

16         Q.     Do you remember what you observed on the

17  cameras on those occasions?

18         A.     Both times she was laying down.

19         Q.     Describe for me what you remember about your

20  personal observation of Madison on Wednesday, November 30th.

21         A.     When I went to the court-holding cell, I

22  knocked on the window.  And asked -- and told Madison I had a

23  Gatorade for her.  She got up from her bed, walked over.

24  Uhm, I handed her the Gatorade, asked her if there was

25  anything else I could do for her at that time, and she said

1    no.  She then ambulated back to her bed.  I left after that.

2          Q.     So your recollection is that you had a brief

3    conversation with Madison?

4          A.     Correct.

5          Q.     Would you say that the entire encounter lasted

6    ten seconds or less?

7          A.     I don't know.  It was brief.

8          Q.     Did you ever contact Logan Clark to inform him

9    that Madison had been moved to court holding?

10         A.     No.

11         Q.     In 2016, are you aware of any policies and

12   procedures that would dictate a change in how you were to

13   treat inmates once they were moved for medical observation?

14         A.     No.

15         Q.     Now, you told me that at least in 2016, one of

16   the ways in which an inmate that was on medical observation

17   would be observed was by a camera in their cell.  Right?

18         A.     If they were moved to that cell, yes.

19         Q.     Okay.  What other policies and procedures, if

20   any, were in place in 2016 on how an inmate on medical

21   observation should be observed?

22         A.     I have no knowledge of that.

23         Q.     Was there any policy, for instance, written or

24   unwritten at that time, that would dictate how often an

25   inmate in medical observation should be checked on?

 1          A.       Not to my knowledge.

 2          Q.       Was there any policy or procedure in place,

 3  same time frame, about how to record the results of any

 4  checks on such an inmate?

 5          A.       Other than when the officers make their rounds

 6  and control record it, no.  Outside of that, no, none.

 7                   MR. HANCEY:  That's Exhibit 5.

 8                   (Whereupon, Exhibit No. 5 was marked for

 9  identification.)

10  BY MR. HANCEY:

11          Q.       You've been handed what's been marked as

12  Exhibit 5.  Is this an example of the medical request form

13  that the jail used in 2016?

14          A.       One of them.

15          Q.       To your understanding, what is the purpose of a

16  medical request form?

17          A.       To request to see the nurse and/or the doctor.

18  Or request medications, anything along these lines.

19          Q.       As of November 2016, had you received any

20  training that related in any way to these medical request

21  forms?

22          A.       Your use of the word "training" confuses me.

23  Was I told when I was hired how I handle these?  Yes.

24          Q.       By who?

25          A.       By those who trained me.

```
 1          Q.      Who trained you?

 2          A.      Several staff members.

 3          Q.      Officers?

 4          A.      Yes.

 5          Q.      What did they train you in particular about

 6   this form when you were hired?

 7          A.      This form in particular?  That it was one that

 8   they used in the areas where there was not a kiosk available

 9   to them.  And this is that form that the inmate would fill

10   out and give to me.  Or that the officers would then have to

11   give to me.

12          Q.      Anything else?

13          A.      That this is the request to be seen by the

14   doctor.

15          Q.      Are you aware of any policies that were in

16   place at the jail in 2016 relative to this form?

17          A.      Not to my knowledge.

18          Q.      Now, back in 2016, under what circumstances

19   would an inmate be given one of these forms to fill out?

20          A.      When -- these inmates -- these are given to

21   inmates who are put in a area where they don't have access to

22   a kiosk.

23          Q.      What's a kiosk?

24          A.      It's, for lack of me knowing better, a little

25   computer system in the housing areas of each cell where they
```

1  can type in a request to several different places in the

2  jail.

3        Q.    It's just an electronic version of what we see

4  in Exhibit 5?

5        A.    Correct.

6        Q.    Okay.  I understand that the Exhibit 5 form

7  would be given to inmates if they didn't have access to a

8  kiosk.  My question now, though, is, under what circumstances

9  would an inmate be given one of these to fill out?

10       A.    Upon their request or upon the request of a

11 deputy or a nurse.  On the request of somebody.

12       Q.    Whether a staff member or the inmate

13 themselves?

14       A.    Yes.

15       Q.    So if an inmate asked to fill out one of these

16 forms, as a matter of course, they'd be given one to fill

17 out?

18       A.    Correct.

19       Q.    How would you learn whether -- when one of

20 these forms had been filled out by an inmate --

21       A.    They would --

22       Q.    -- in 2016?

23       A.    They would bring it to my office or they would

24 leave it in my box up in booking.

25       Q.    Which you would check daily?

Jana Clyde
May 23, 2018

1       A.      Yes.  Uh-huh.

2       Q.      And then in 2016, what would you do once you

3   received a filled out medical request form?

4       A.      I would decide if it is something that the

5   nurse should handle or the doctor should handle.

6       Q.      Were there any policies in place at that time

7   that would dictate whether you went the former route or the

8   latter route?

9       A.      Not to my knowledge.

10      Q.      Had you been trained, as of November 2016, on

11  whether a given medical request form is something for the

12  doctor to handle or something for the nurse to handle?

13      A.      No.

14      Q.      So really, in 2016, then, it would have been

15  left up to your discretion and judgment whether or not to get

16  a doctor involved.  Is that right?

17      A.      Uhm, yes, the doctor comes once a week, and

18  that's when these are turned to him.  Correct.

19      Q.      Describe for me the process -- well, strike

20  that.

21              Logan Clark was the one who usually made weekly

22  rounds to the jail in 2016.  Is that right?

23      A.      That's correct.

24      Q.      And your understanding is that he's affiliated

25  with Dr. Tubbs's office?

```
 1        A.     Yes.

 2        Q.     Was the day of the week that he would make his

 3   rounds in 2016 Thursday?

 4        A.     Yes.

 5        Q.     What is your recollection of what Logan Clark

 6   would do during his weekly rounds in 2016?

 7               MS. ABKE:  Object to foundation.

 8   BY MR. HANCEY:

 9        Q.     Do you know what he did?

10        A.     I know what he did while I was with him.

11        Q.     Were you with him the entire time he was there

12   during his weekly rounds?

13        A.     Most of the time.  Not all the time.

14        Q.     Okay.  Well, tell me what you know.

15        A.     He would come.  I would present to him the

16   folders of the -- the medical folders of the people that had

17   put in requests.  He would review them, decide who was going

18   to be seen, who was not.  Then we would call these inmates

19   down.  He sees them.  He sends them back.  He dictates and

20   orders medications and leaves.

21        Q.     So am I to understand from what you just said,

22   then, that Logan Clark wouldn't be told who he was going to

23   be seeing on a given Thursday until you gave him that

24   information when he arrived on Thursday morning?

25        A.     Correct.
```

1          Q.      In other words, you wouldn't somehow

2   communicate the medical request forms for a given Thursday in

3   advance?

4          A.      Yes, I want them in advance so that I can be

5   prepared for him to see them.  So those are usually done on

6   Wednesdays.

7          Q.      I'm sorry, I -- you didn't understand my

8   question because it was a bad one.

9                  What I'm saying is you didn't provide the

10  medical request forms that you would prepare in a given week

11  to Logan Clark prior to Thursday morning?

12         A.      Correct.

13         Q.      Was there any circumstances in 2016 under which

14  you would send Logan Clark a medical request form earlier in

15  the week than Thursday morning?

16         A.      No.

17         Q.      Were there any policies in place in 2016 that

18  would dictate when you were supposed to provide a medical

19  request form that had been filled out by an inmate to

20  Dr. Tubbs's office?

21         A.      Not to my knowledge.

22         Q.      Had you been trained on when to do that?

23         A.      Yeah.  When the doctor arrived that morning.

24         Q.      And that training was given to you by the

25  officers upon your hire.  Correct?

1        A.      Yes.

2        Q.      In 2016, do you recall Logan Clark ever making

3   a visit to the jail facility to see one or more inmates that

4   was not on a Thursday?  In other words, a special visit?

5        A.      Not to my knowledge.

6        Q.      Do you understand that Exhibit 5 is a medical

7   request form that Madison Jensen filled out while she was

8   incarcerated at the jail?

9        A.      Upon my request, yes.

10       Q.      Okay.  And she filled this out on Tuesday,

11  November 28th.  Correct?

12       A.      To the best of my knowledge.

13       Q.      You told me earlier that you would have

14  received this form and then created the medical file you told

15  me about, put this on top of the file, and you did that

16  Wednesday, November 30th, in the afternoon before you left

17  for the day?

18       A.      Correct.

19       Q.      In preparation for Logan Clark arriving the

20  next morning?

21       A.      Correct.

22       Q.      Is it your testimony that when Logan Clark

23  arrived in the morning of Thursday, December 1st, that you

24  gave him Madison Jensen's file along with the other files

25  that you had prepared for that purpose?

 1        A.     Correct.

 2        Q.     Did you receive this Exhibit 5 filled out by

 3   Madison on Tuesday, November 29th?

 4        A.     I do not recall if it was Tuesday or Wednesday.

 5        Q.     When you did receive it, did you take occasion

 6   to read what she had written?

 7        A.     Yes.

 8        Q.     So you read that she wrote, "Puking for four

 9   days straight"?

10        A.     Correct.

11        Q.     "Runs, diarrhea, can't hold anything down, not

12   even water."  Right?

13        A.     Correct.

14        Q.     How did you determine, specifically with regard

15   to this medical request form by Madison, whether or not this

16   would fall into the category of those request forms to be

17   treated by the doctor or to be handled under yourself?

18        A.     Because this is issues for a doctor.  The ones

19   that would be handled by myself is, I have a headache; can I

20   get an over-the-counter ibuprofen right now?  This was a

21   doctor's issue.

22        Q.     That's, in part, because you don't believe you

23   were qualified to either assess, diagnose or treat a patient

24   manifesting the kinds of symptoms described in Exhibit 5?

25        A.     That's kind of a two-part answer for me.

1          Q.      Go ahead and answer.

2          A.      Uhm, per following procedures at the jail that

3    I had been taught, uhm, is to give Gatorade, to make sure

4    that they have access to water.  And we do not do IVs.  I

5    cannot diagnose or no -- give -- or write prescriptions for.

6    So under the scope of practice I was at that time, I was

7    doing the best to my knowledge.  Yes.

8          Q.      You were doing, in your opinion, everything

9    that you could do as an LPN?

10         A.      Correct.

11         Q.      Administer Gatorade and make sure Madison had

12   access to food and water.  Right?

13         A.      According to the availability of the things we

14   had at the jail, correct.

15         Q.      Anything else that Madison might have needed

16   for her medical needs would have had to have been provided,

17   in your belief, by somebody at Dr. Tubbs's office?

18         A.      PA Logan.  I always refer to PA Logan.

19         Q.      PA Logan.  Okay.

20              MR. MYLAR:  Should we break for lunch now?  Is

21   it a good stopping time?

22              MR. HANCEY:  Sure.

23              (Lunch recess from 12:37 p.m. to 1:32 p.m.)

24              (Whereupon, Mr. Steve Loos was absent from the

25   deposition proceedings.)

 1  BY MR. HANCEY:

 2        Q.    Ms. Clyde, before the break, we were looking at

 3  Exhibit No. 5.  We noted that one of the things Madison wrote

 4  on that form was that she had been puking for four days

 5  straight, runs, diarrhea, can't hold anything down, not even

 6  a water.  Based on your medical experience and training, if a

 7  patient was, in fact, experiencing the things that Madison

 8  describes there, does that run the risk of inflicting

 9  dehydration?

10              MR. MYLAR:  Objection.  Lack of foundation.

11  BY MR. HANCEY:

12        Q.    Can you answer that question with your medical

13  experience and knowledge?

14        A.    If the person had stated to me they were having

15  these?  That would be a concern.

16        Q.    Okay.

17              Four days straight would be -- could pose

18  serious risks for a person.  Right?  If the person wasn't

19  holding down fluids?

20        A.    I can't say to seriousness.

21        Q.    Okay.

22              In 2016, were you aware of any jail policies

23  that would have dictated that upon receiving a medical

24  request form with the kind of symptoms identified here in

25  Exhibit 5, that you were to immediately contact PA Logan

 1  Clark or somebody from Dr. Tubbs's office?

 2          A.      Not to my knowledge, there wasn't a policy.

 3          Q.      Okay.  Had you received any training to do what

 4  I just said as of November 2016?

 5          A.      Training --

 6          Q.      Yes.

 7          A.      -- and taught to me are two different things.

 8          Q.      Okay.

 9          A.      Uhm, training is a very official thing that you

10  go to and you're trained.  So no.

11          Q.      Had you been taught, prior to November 2016,

12  that if an inmate had been complaining of puking for four

13  days straight, runs, diarrhea, can't hold anything down, not

14  even water, that you were to immediately call PA Logan Clark

15  or somebody from Dr. Tubbs's office?

16          A.      If I had been made aware of this situation,

17  that would have been what I had done -- would have done, yes.

18          Q.      Would you have done that because you were

19  taught you do that or just because it made common sense to

20  you?

21          A.      Both.

22          Q.      Tell me what you had been taught in that regard

23  prior to November '16.

24          A.      Taught?

25          Q.      Yes.

```
 1          A.      Unprofessionally?  This is -- to me, this is

 2   something that we experience every day.  Uhm, that there

 3   would be a risk of dehydration with these symptoms.

 4          Q.      Now, when you say "taught," then, you're

 5   talking, it sounds like, about taught when you were going

 6   through your LPN certification process?

 7          A.      Not necessarily just then, no.

 8          Q.      Okay.  Did you get taught by anybody at the

 9   jail on these issues?

10          A.      No.

11          Q.      Let's talk a little bit more about Wednesday,

12   November 30th, 2016.  You told me earlier that you, on that

13   day, walked down to Madison's cell one time.  Right?

14          A.      In the afternoon, correct.

15          Q.      You also told me, I believe, that you observed

16   Madison laying on her bed a couple of different occasions

17   through surveillance cameras in the control room?

18          A.      Correct.

19          Q.      Do you remember what time of day on Wednesday

20   it was that you walked down to her cell?

21          A.      Yes.

22          Q.      What time?

23          A.      4:00.

24          Q.      In the afternoon?

25          A.      Yes.
```

1        Q.      On the video image I've seen, it looks like

2   you're handing something through the door slot --

3        A.      Correct.

4        Q.      -- to somebody inside.  Was that a Gatorade?

5        A.      Yes, it was.

6        Q.      Did you wait around at that point to see if

7   Madison drank any of that Gatorade?

8        A.      No.  I asked her if there was anything else I

9   could do for her, because I was leaving for the day.  And she

10  denied needing anything at that time.  And I walked away.

11  But I did observe her turning around and, you know, heading

12  back to where she would sit or lay down.

13       Q.      You didn't know on Wednesday, November 30th,

14  whether she either drank any of the Gatorade that you had

15  given her or was able to keep it down?

16       A.      No.

17       Q.      And you didn't enter her cell on that occasion.

18  Correct?

19       A.      I can't enter their cells.  Not by myself.

20       Q.      Did you take occasion on that November 30th to

21  look through the glass of her cell door -- or the window of

22  her cell door, rather, to look for evidence of vomiting or

23  diarrhea?

24       A.      The only evidence that I saw was that there was

25  a couple of empty Gatorade bottles laying on the -- around.

1    I just remember glancing at that.  But I did not notice any

2    vomit or evidence of such.

3             Q.    Were you looking for those things specifically?

4             A.    I do.  I -- well, when you see an inmate and

5    you go down, you just take in the whole picture and observe

6    it.

7             Q.    So if I were to tell you that your encounter at

8    Madison's cell door lasted about ten seconds, then, you're

9    saying in that ten seconds you would have had a brief

10   conversation with Madison, handed her a Gatorade and quickly

11   scoped --

12            A.    Yes.

13            Q.    -- what her room looked like?

14            A.    Correct.

15            Q.    Do you remember having a discussion on

16   Wednesday, November 30th, with Deputy Caleb Bird about

17   Madison?

18            A.    No.

19            Q.    Nothing at all about any interaction with

20   Deputy Bird?

21            A.    Yes.

22            Q.    Concerning Madison?

23            A.    A conversation?  No.  Something he said in

24   passing, yes.

25            Q.    Tell me what you remember about that encounter.

```
 1          A.      He had just taken -- went down to the area to

 2   make his rounds.

 3          Q.      To court holding?

 4          A.      Yes.

 5          Q.      Okay.

 6          A.      To court-holding area to make his rounds.  And

 7   on his way back by, he said, She looks sick.  And I said,

 8   Yeah, we know.  It was in passing.  It was not a -- what I

 9   would consider a conversation.

10          Q.      Were you in your office when that happened?

11          A.      Yes.

12          Q.      What time of day did it happen?

13          A.      I want to say it was during a med pass, but I'm

14   not for sure.

15          Q.      Did Deputy Bird tell you on that occasion that

16   Madison had been too weak to stand up and get the medications

17   from him through the door?

18          A.      No.

19          Q.      Did he tell you that he went inside her cell to

20   give Madison her medication?

21          A.      No.

22          Q.      Did you tell Deputy Bird on that occasion that

23   you knew Madison was coming down from heroin?

24          A.      No.  I agreed with him that she looked sick.

25          Q.      In one of the reports, the investigative
```

1   reports concerning this case, it says that on Wednesday

2   evening at 2123 hours, an officer came to Madison's cell and

3   went inside carrying new bedding and a plunger.  Are you

4   aware of that?

5        A.    No.

6        Q.    Did anybody at the jail ever report to you

7   that -- of doing something like that?

8        A.    No.

9        Q.    So I take it, then, that if an officer did go

10  down and do those things I just said, it wasn't based on

11  instructions from you?

12       A.    I am not at work at that time.

13       Q.    But you didn't give that instruction to any

14  officer before you left for the day on Wednesday either?

15       A.    No.

16       Q.    Now, Sergeant Purdy reports that on Thursday

17  morning, December 1st, she asked you if she could give

18  Madison a Gatorade because the night shift had told her

19  Madison was sick and vomiting.  Do you remember that

20  conversation?

21       A.    I remember Purdy asking if Madison could get a

22  Gatorade.  And I said yes because she hadn't received one yet

23  that morning.

24       Q.    Do you remember anything else about the

25  conversation?

```
 1          A.      I don't.

 2          Q.      Now, Logan Clark arrived at the jail on

 3   Thursday morning.  Correct?

 4          A.      Correct.

 5          Q.      Do you remember what time?

 6          A.      I don't.

 7          Q.      Does he have a usual time that he arrives on

 8   those days?

 9          A.      Anywhere from 7:30 in the morning until 10:00

10   depending upon how his other runs have went for the day, how

11   he's running his route.

12                  (Court reporter interrupted for clarification.)

13                  THE WITNESS:  How he's running his route.  You

14   see, he go to other jails.  I'm sorry.

15   BY MR. HANCEY:

16          Q.      Do you have any kind of understanding about

17   where Logan Clark might go before he comes to the Duchesne

18   jail on Thursdays?

19                  MS. ABKE:  Object to foundation.

20   BY MR. HANCEY:

21          Q.      Do you know?

22          A.      I know it changes.  I mean, he can -- I don't

23   know how he sets his schedule.

24          Q.      All right.  You were with Logan Clark when you

25   found Madison deceased in her cell.  Correct?
```

```
 1          A.      Correct.

 2          Q.      That was around 1:30 in the afternoon?

 3          A.      I'm not sure the time.  But it was midday, yes.

 4          Q.      Describe what you remember doing together with

 5   Logan Clark, if anything, from the time that he arrived at

 6   the jail on Thursday morning until the time you found Madison

 7   in her cell.

 8          A.      We seen inmates.

 9          Q.      Were those visits taking place in your office?

10          A.      Yes.

11          Q.      Just one after the other?

12          A.      Uh-huh.

13          Q.      Okay.  Do you remember about how many inmates

14   you two saw before finding Madison?

15          A.      No.

16          Q.      Do you think it's more than ten?

17          A.      Some days, yes; some days, no.

18          Q.      Well, how long does a normal -- is there a

19   normal time that a visit like that would last on a Thursday?

20          A.      No.  They vary depending upon if the -- the --

21   uhm, if it's a mental health visit or a well or a doctor

22   visit.  He does both.  Visits vary in times.

23          Q.      Okay.  Did you communicate anything to Logan

24   Clark on Thursday about Madison prior to finding her in her

25   cell?
```

Jana Clyde
May 23, 2018                                                     Page 110

1          A.      Yes.

2          Q.      Describe for me all communications you had with

3    Logan Clark on that day about Madison before you found her

4    deceased.

5          A.      To the best of my recollection, I remember --

6    we go through the files, the inmate files, before he calls

7    them down.  I will tell him a little bit about each inmate.

8    So I told him that she was getting Gatorade; that she, uhm,

9    wrote down that she's having nausea -- or diarrhea and

10   vomiting, but yet when I ask her that, she denies it.  And

11   that we needed to see her at -- in our visits.

12         Q.      So on Thursdays when Logan Clark comes to the

13   jail, do you and he go through the list of the medical files

14   that you've told me you had ready for him first thing in the

15   morning?

16         A.      Yes.

17         Q.      You go through all of them before you see any

18   patients?

19         A.      Yes.

20         Q.      So then your testimony would be that one of the

21   medical files that you discussed with Logan Clark upon his

22   arrival and before seeing any patients would have been

23   Madison Jensen's Exhibit 5 request form?

24         A.      Yes.

25         Q.      On that occasion when you went over Madison's

1   medical request form with Logan Clark on Thursday morning,

2   did you -- do you know whether or not Logan Clark actually

3   received or had the opportunity to review what she had

4   written?

5          A.     Yes.  That's how he decides what inmates he's

6   going to see or not.

7          Q.     Did you observe him read Madison Jensen's?

8          A.     I was in the room.  I don't know whether I

9   actually witnesses him or if I was doing work on the

10  computer.  I couldn't tell you.

11         Q.     So then you believe that Logan Clark, when he

12  arrived at the jail first thing on Thursday morning, read

13  Madison's statement, puking for four days straight, runs,

14  diarrhea, can't hold anything down, not even water?

15         A.     Would I assume that?

16         Q.     Yes.

17         A.     Yes.

18         Q.     Did Logan Clark set the order for which he

19  would see patients that day?

20         A.     Yes.

21         Q.     Did he discuss that order with you?

22         A.     No.

23         Q.     Do you know anything about how he set his

24  schedule that morning as far as what order he would see

25  patients?

Jana Clyde
May 23, 2018                                                    Page 112

1          A.      His routine?

2          Q.      Yes.

3          A.      He would see all the patients from the blocks

4    would come down.  We would see them.  Then we make our rounds

5    to the outlying cells, as in court holding, booking and iso.

6          Q.      So are you saying the normal practice that was

7    followed in November 2016 was that when Logan Clark came on

8    Thursdays for his weekly visits, the inmates being housed in

9    the letter cells would be seen before the inmates that were

10   in the outlying cells specifically for medical observation

11   reasons?

12         A.      No.  I didn't say they for -- were for medical

13   observation reason.  Some of them are just housed for who

14   knows what reasons.

15         Q.      Okay.

16         A.      But yes, he does see those in the general

17   population, and then we go to the other areas.

18         Q.      Do you know if that routine that you just

19   described, as far as order, was Logan Clark's own or

20   something that the jail dictated to him?

21         A.      I have no idea.

22         Q.      Did you tell Logan Clark to do it that way?

23         A.      No.

24         Q.      But the upshot of what you've just told me is

25   that if an inmate was, in fact, being housed inside court

1   holding for medical observation reasons, they would be one of

2   the last people seen by PA Clark.  Is that right?

3        A.     At this time, yes.

4        Q.     In November of '16.  Right?

5        A.     Yes.

6               (Whereupon, Exhibit No. 14 was marked for

7   identification.)

8   BY MR. HANCEY:

9        Q.     Ms. Clyde, you've been handed what's been

10  marked as Exhibit No. 14.  This is a transcript of Logan

11  Clark's interview with investigators from the attorney

12  general's office.  Can I direct your attention to Page 11 of

13  that document?  Are you there?

14       A.     Uh-huh.

15       Q.     Okay.  In about the middle of the page, Logan

16  Clark says that he -- he thinks he arrived at the jail, and

17  he's talking about December 1st, at about 9:30 or something

18  like that.  Do you see that?

19       A.     Yep.

20       Q.     Is that consistent with your independent

21  recollection of when he might have arrived?

22       A.     I have no recollection.  He arrived at

23  different times.  But it was usually by morning -- through

24  the morning hours.

25       Q.     Let me read to you now the next big paragraph,

```
 1  okay?  This is Clark speaking.

 2              MS. ABKE:  What page are we on, again?

 3              MR. HANCEY:  Page 11.  It's Bates 47.

 4              MS. ABKE:  Thank you.

 5  BY MR. HANCEY:

 6       Q.    And I'm going to start at the very end of the

 7  line, okay?  He says, "I came in um, and uh, there was quite

 8  a few patients to see and then I was seeing them, doing some

 9  mental health, talking to some of the uh, girls and uh, some

10  of the other people knew of this suicide and then went

11  through my list and then um, as finishing up Jana said, uh,

12  something to the effect of uh, we got this uh, girl down

13  court holding, that's uh, been uh, really sick um, I think

14  you, she said something like, she's been complaining of

15  having the flu, but she might be going through withdrawals,

16  Would you mind seeing her?  Sure, that would be great and so,

17  uh, at that time uh, left the" -- and he goes on.  So let me

18  just stop there.

19              Well, and then he talks about when he walks

20  down to the cell and finds Madison.  But let me just ask you.

21  Concerning the part of his statement that I just read, do you

22  agree or disagree?

23       A.    So this statement is kind of confusing to me.

24  When he came, we had talked about a suicide that had

25  previously happened in the jail with a few of us, kind of
```

1    assessing that situation.  Then he went on and went through

2    the files of the inmates.  Yes, we addressed Madison Jensen.

3    Then we saw inmates.  Then he went down.

4         Q.    Logan Clark's statement at least makes it

5    appear as though you mentioned Madison to him almost in

6    passing near the end of his visit, and that's what prompted

7    him to walk down to her cell.  Do you remember it that way?

8         A.    No.

9         Q.    If you look at the next paragraph on that page,

10   and I'm just paraphrasing here, Clark describes walking to

11   Madison's cell, looking through the window, and based on what

12   he sees, before he even enters the cell, asks for an

13   ambulance to be called.  Is that your recollection?

14        A.    Not exactly to that, no.

15        Q.    How is your recollection different?

16        A.    We walked down.  I approached the door first.

17   I looked in.  I seen Madison.  And then I knocked on the

18   window and was yelling at her trying to, you know, get her

19   attention.  Then Logan peeked in, and he started -- I believe

20   he started knocking.  I'm not sure.

21             He turned to me, and he says, Get help.  I

22   went -- I hollered down the hall and ran for the staff office

23   where we have somebody to have keys to get us in that cell.

24   And then he asked for an ambulance at some point.

25        Q.    Do you know who called the ambulance?

```
 1         A.      I don't.

 2         Q.      But it sounds like you and Clark were

 3  eventually able to get in the cell?

 4         A.      Correct.

 5         Q.      Did you both then initiate CPR?

 6         A.      Actually, I believe Sergeant Gibbons was the

 7  one who initiated CPR, because he's the one that brought the

 8  keys to get us in.

 9         Q.      Logan Clark didn't?

10         A.      No.  The -- it was initiated by Sergeant

11  Gibbons.

12         Q.      Please turn the page in that exhibit to

13  Page 12.

14         A.      Okay.

15         Q.      It's Bates No. 48.  And let me direct your

16  attention to the big paragraph in the middle of that page.

17         A.      Uh-huh.

18         Q.      And in this paragraph, Logan Clark is

19  describing conversations that he's had with you, and about in

20  the middle of that paragraph, he says that you told him that

21  on Monday Madison's vitals were normal.

22                 Do you see that?

23         A.      Correct.  I see that.

24         Q.      Is that something that you told Logan Clark?

25         A.      I don't recall.
```

1        Q.      But it wouldn't have been a true statement if

2  you said that because her blood pressure was high on Monday.

3  Correct?

4        A.      Correct.  That's why I don't recall saying

5  that.  I don't believe I would have said that.

6        Q.      You're not in the practice, or you weren't at

7  that time, of describing vitals that weren't true or

8  accurate?

9        A.      Correct.

10       Q.      In the next line, he attributes this statement

11 to you.  "Then Jana said something like, I've been checking

12 on her every day, she hasn't really been getting worse, but

13 she isn't really getting better, so we wanted you to see her

14 today."

15              Do you remember saying something like that to

16 Logan Clark at some point?

17       A.      Yes.

18       Q.      When?

19       A.      It would have been during our visit.

20       Q.      After Madison was deceased?

21       A.      No.  It would have been before.

22       Q.      So Thursday morning?

23       A.      I would assume, yes.

24       Q.      Turn to the next page, please.  This is Bates

25 No. 49.  In about the middle of the page, there's a two-line

```
 1   paragraph starting with Clark saying, "Uhm, I, I."  Do you

 2   see that?

 3           A.     Yes.

 4           Q.     Okay.  He says there, and I'm paraphrasing, If

 5   they were concerned enough to move her to medical, I should

 6   have gotten a phone call.

 7                  Do you agree that when Madison was moved to

 8   court holding for medical observation, somebody at the jail

 9   should have contacted PA Logan Clark?

10                  MR. HOMER:  Objection.  Foundation.

11   BY MR. HANCEY:

12           Q.     I'm asking for your opinion.

13           A.     No.

14           Q.     And why do you say no?  Why do you disagree

15   with Logan Clark?

16           A.     She had not gotten worse.  She had not changed

17   from when I seen her on Monday.  If she had declined, gotten

18   worse, then that's where things was.  Once again, I stated I

19   was not aware of vomiting or diarrhea; she had not saved any

20   for me to see.  So in my mind, nothing had changed.

21                  If things had changed, if things had declined,

22   then he would have been in -- you know, gotten a phone call.

23   Otherwise, she was -- from all, uhm, points of view I seen,

24   she was stable.

25           Q.     But do you disagree more generally with his
```

1   assertion that if an inmate is moved somewhere for medical

2   observation reasons, that he should be contacted?  In 2016?

3        A.     Yes and no.  Once again, depending upon the

4   reason the patient was moved there and the -- the -- what the

5   patient was going through.  Some patients just get moved

6   there because of a -- a small thing.  So, yeah -- no, I

7   guess, would be my answer.

8        Q.     Let me have you look at Bates Page 54 of this

9   same exhibit.  By the way, before I go there, at any time

10  prior to November of 2016, did Logan Clark ever communicate

11  to you an expectation that any time an inmate was moved

12  somewhere for medical observation, that he be contacted?

13       A.     No.

14       Q.     Okay.  Looking at page Bates 54.  The -- near

15  the bottom, about a three-line paragraph, Clark says at the

16  end there, "So if someone is throwing up, I would want a

17  phone call."

18              Prior to November 2016, did Logan Clark ever

19  communicate to you an expectation that any time an inmate was

20  throwing up, he should be contacted?

21       A.     No.

22       Q.     Has that been communicated to you since?

23       A.     Yes.

24       Q.     Turn the page, Bates No. 55.  About ten lines

25  down, Clark says this:  "And they have before.  I mean, I

1  certainly received many phone calls on patients that are

2  throwing up."

3              You see that?

4      A.     Uh-huh.

5      Q.     Is it true that prior to November 2016, you had

6  contacted Logan Clark on occasions where patients were

7  throwing up in the jail?

8      A.     Not to my knowledge.

9              (Whereupon, Ms. Heather Jensen left the

10 deposition proceedings.)

11 BY MR. HANCEY:

12     Q.     Turn to Bates 58, please.  All right.  The

13 third paragraph down, Logan Clark says this starting with the

14 second line.  He says, "I'm pretty sure that uh, the officer

15 was checking on her," meaning Madison, "once an hour, or

16 that's what their goal was, that, that they walk around and

17 check on anybody in booking, isolation or court holding once

18 an hour."

19             Is that your understanding of what the jail's

20 policy or practice was in November 2016?

21     A.     Yes.

22     Q.     Tell me how that practice -- how that would

23 work in real life.  How would those checks take place?

24     A.     You'd probably have to talk to a deputy.  I

25 don't do those checks.

1          Q.     Well, you did say that you knew that it

2     happened.  What do you know about it?

3          A.     They -- I just heard them talk about making

4     rounds.  I know that they're supposed to make rounds once an

5     hour.

6          Q.     How do you know that?

7          A.     I just hear them talking about making rounds.

8     The radio, the controller would say, you know, We need an 11

9     o'clock round.  I have never made rounds.  Those are the

10    responsibilities of a deputy.

11         Q.     Would you say that Madison's physical condition

12    had noticeably deteriorated between November 28th and

13    December 1st?

14         A.     No.  That's why PA Logan didn't get a phone

15    call.

16         Q.     Then let me ask this.  Apart from being

17    deceased, when you saw Madison dead on December 1st,

18    physically did she look like you remember seeing her on

19    Monday, November 28th?

20         A.     Yes.

21         Q.     You have Exhibit 14 there.  Let me have you

22    turn to Bates No. 49.  This is Logan Clark talking about what

23    he observed when he saw Madison dead.  Okay?  And it's about

24    12 lines down.  He says, "You could see that she had sunken

25    cheeks, sunken eyes.  She looked under weight.  She looked

1  like she had been using a lot of drugs."

2          Would you agree with his description?

3      A.    Yes.

4      Q.    So then would you agree that she looked like

5  that when you first saw her on Monday?

6      A.    Yes.

7      Q.    Did you fill out a report or prepare a report

8  on the day that Madison was found dead in her cell?

9      A.    Yes.

10      Q.    Did somebody ask you to do that?

11      A.    Yes.

12      Q.    Who?

13      A.    It could have been Sergeant Gibbons, Sergeant

14  Atford or Lieutenant Curry.

15      Q.    You don't remember?

16      A.    No.

17          (Whereupon, Ms. Heather Jensen returned to the

18  deposition proceedings.)

19  BY MR. HANCEY:

20      Q.    Obviously, when you filled out that report, the

21  events that you were writing about were fresh in your mind.

22  Right?

23      A.    Fresh and confused at the same time, yes.

24      Q.    Were you trying to be truthful and accurate in

25  that statement?

1        A.        To the best I could, yes.

2        Q.        At any time during Madison's incarceration,

3    were you made aware that jail personnel were trying to get

4    Madison to take a shower, but she was responding that she

5    wasn't feeling up to it?

6        A.        No.

7        Q.        From November 27th to Madison's death on

8    December 1st, did you create any documents or records

9    pertaining to Madison or her health, symptoms or the

10   treatment you had given her?

11       A.        Outside of the vital signs, no.

12                 (Off-the-record discussion)

13                 (Whereupon, Exhibit No. 4 was marked for

14   identification.)

15   BY MR. HANCEY:

16       Q.        Ms. Clyde, you've been handed what's been

17   marked as Exhibit 4.  This is a report from the Office of the

18   Medical Examiner concerning Madison.  I'd like to direct your

19   attention to Bates Page 35, please.

20                 Okay.  Now, this is a report given by

21   investigator John Crowley or Crowley.  At the very top there,

22   he says, "On December 1st, 2016, at about 1333 hours, I was

23   contacted by the Duchesne County Jail about a female that had

24   overdosed and was unresponsive and found in a holding cell."

25                 My question to you is, did you -- are you the

1    one that contacted John Crowley?

2           A.     No.

3           Q.     Did you contact the Office of the Medical

4    Examiner?

5           A.     No.

6           Q.     Do you know who did?

7           A.     No.

8           Q.     Under the heading Scene Description a few lines

9    down, at the very end of that paragraph, he says, "I was

10   informed that the decedent, Madison Jensen, was down

11   there" -- I think meaning court holding -- "because she was

12   coming down off of heroin and going through withdrawals."

13          Did you ever tell that to John Crowley?

14          A.     No.

15          Q.     Do you know who did?

16          A.     No.

17          Q.     Look at the next page, page Bates 36.  At the

18   very top of the page, John Crowley reports this:  "The body

19   was discovered by PA Logan Clark and Jana Clyde when they

20   went to check on her at 1328 hours.  They were to check on

21   her because Madison was so sick."  I'm just going to stop

22   there.

23          Did you report that to John Crowley?

24          A.     No.

25          Q.     Is that consistent with your recollection of

1    what happened?

2           A.      No.

3           Q.      Do you know whether or not you discovered the

4    body at about 1328 hours?

5           A.      I would assume sometime during the day that

6    we -- like I said, it was mid day.  I don't know the exact

7    time.

8           Q.      Two paragraphs down, I asked you about this

9    already, but he says, "I noticed her hair was very dirty and

10   I did find that the jail staff had been trying to get her to

11   take a shower but she did not feel up to it."

12                  And your testimony is that you had no knowledge

13   of that fact.  Right?

14          A.      Correct.

15          Q.      Now, in the second paragraph from the bottom,

16   under Medical Records, second paragraph there.

17          A.      Uh-huh.

18          Q.      Crowley says this:  "In talking with the Jail

19   nurse Jana Clyde she stated that when Madison came into the

20   jail she started going through withdrawal type symptoms and

21   they had in the court holding cell" -- they had her "in the

22   court holding cell to watch her.  Jana stated that she was

23   not eating and that they were giving her Gatorade drinks to

24   help Madison."

25                  Did you convey that information to Crowley?

1       A.      No, I did not.  I have no report of -- never

2  got any report of what she was or was not eating.

3       Q.      Well, let's break it down.  Did you tell

4  Crowley that Madison started going through withdrawal-type

5  symptoms when she came into the jail?

6       A.      Not to my knowledge.

7       Q.      You don't remember?

8       A.      No.

9       Q.      Did you tell Crowley that you had Madison in

10  the court-holding cell to watch her?

11      A.      Yes.

12      Q.      Did you tell Crowley that you were giving

13  Madison Gatorade drinks to help her?

14      A.      That was probably a possibility.  I told him we

15  were giving her Gatorade.  I don't know if I defined why.

16      Q.      But you deny telling Crowley that Madison was

17  not eating?

18      A.      Correct.

19      Q.      Are you familiar with the term "call button" as

20  that may be used in the context of the Duchesne County Jail?

21      A.      Yes.

22      Q.      Okay.  Describe for me what a call button is

23  and what it does.

24      A.      Uhm, to my knowledge, I don't know exactly

25  where they're found.  I -- if they're in each cell or not.

1   But in regards to the court holding, there's a call button on

2   the inside of the court-holding cell, and an inmate can push

3   that at any time to get to control and ask them anything they

4   need.

5          Q.     So does pushing the call button open a channel

6   of communication between the inmate and somebody in the

7   control room?

8          A.     To the best of my knowledge, yes.

9          Q.     Do you know whether or not there are call

10  buttons in the letter cells?

11         A.     I know they have them.  I don't know where

12  they're located.  I don't know if they're in general

13  population, in the commons area, or if they're in the each

14  cell.  I have no idea.

15         Q.     Do you know how many jail staff members are

16  working in the control room at any given time?

17         A.     Are working in there or are in there?  Deputies

18  are often in there doing work.

19         Q.     Or assigned to be in there?

20         A.     Okay.  There's a controller in there at all

21  times.

22         Q.     I see.  Okay.  Is that just a regular deputy on

23  rotation?

24         A.     No.

25         Q.     Or is it an assigned?

```
 1          A.      It's an assigned job.

 2          Q.      What do you know, if anything, about what the

 3   controller's responsibilities are?

 4          A.      I don't.  I've never worked control.  I

 5   couldn't tell you what the responsibilities are.

 6          Q.      In the time that -- from the time that you were

 7   hired by the jail until November of 2016, did a jail

 8   controller ever contact you about something medically related

 9   to an inmate?

10          A.      Yes.

11          Q.      And on how many occasions?  Does it happen a

12   lot?

13          A.      I was going to say, you're asking me to tell

14   you over a five-year period?

15          Q.      Did it happen frequently?

16          A.      Often.  I don't know if I'd say frequently, but

17   it happened.

18          Q.      Describe for me a couple of instances, the

19   facts about a couple instances that you can remember when you

20   were so contacted.  What kinds of things would the controller

21   report to you?

22          A.      Someone having a seizure.  That's probably one

23   of the ones I get the most calls on.

24          Q.      Okay.  Anything else?

25          A.      Uhm, if somebody was -- there was a fight, and
```

1    somebody was down, possibly.  If someone was down for an

2    unknown reason.  If there was some reason that the inmate

3    was unable -- they were unable -- to call me down there to

4    see an inmate that wasn't able to get up and come see me, I

5    would say, would be kind of a good description.

6            Q.    Do you recall any occasions where the

7    controller contacted you for -- because the controller

8    witnessed an inmate vomiting?

9            A.    No.

10           Q.    Because the controller witnessed an inmate

11   having diarrhea?

12           A.    I don't know how a controller would witness a

13   inmate having diarrhea.  It's not...

14           Q.    So I guess the answer is no?

15           A.    Exactly.

16           Q.    Are you aware of any policies that the jail had

17   in place in November 2016 about the kinds of things a

18   controller was supposed to report to you?

19           A.    No.

20           Q.    Do you know whether or not instances in which

21   an inmate presses the call button are recorded by the jail in

22   some way?

23           A.    I have no idea about that.

24           Q.    Do you know whether or not the reasons for

25   which an inmate pushes the call button are recorded by the

```
 1   jail in any way?

 2        A.    No.

 3        Q.    Have you ever been seen documents from an

 4   inmate who has pressed the call button for medical reasons?

 5              (Court reporter asked for clarification.)

 6              (Record read)

 7              (Off-the-record discussion)

 8   BY MR. HANCEY:

 9        Q.    Have you ever seen documentation identifying

10   medical reasons for which an inmate pressed the call button?

11        A.    Not to my recollection.

12        Q.    Are you aware of any policies that might have

13   been in place at the jail in 2016 concerning the

14   circumstances under which the controller was to report

15   certain observations to you as the nurse?

16        A.    No.

17        Q.    If I were to represent to you that Madison's

18   first cell was in the H Block at the jail, do you know

19   whether or not H Block cells have call buttons?

20              MR. MYLAR:  Asked and answered.

21              THE WITNESS:  Yeah.

22              MR. HANCEY:  You can answer.

23              THE WITNESS:  Like I stated earlier, I don't

24   know.  I know every block has a call button.  I don't know if

25   it's one call button in the commons area or if they're
```

 1   individual ones in each cell.  I don't know.

 2   BY MR. HANCEY:

 3          Q.     I didn't understand that was your answer.  So

 4   there may be a block that has one call button for the entire

 5   block?

 6          A.     I don't know.

 7          Q.     You don't know.  Okay.

 8          A.     I just know that there's access in each block

 9   to a call button.

10          Q.     Okay.  Better question for somebody else?

11          A.     True.

12          Q.     Okay.

13                 For the entire duration of Madison's

14   incarceration, were you ever informed by anybody that Madison

15   had pressed the call button?

16          A.     No.

17                 (Whereupon, Exhibit No. 10 was marked for

18   identification.)

19   BY MR. HANCEY:

20          Q.     Ms. Clyde, you've been handed what's been

21   marked as Exhibit No. 10.  Have you ever seen that before?

22          A.     No.

23          Q.     Have you ever seen a record called inmate notes

24   by date for any inmate?

25          A.     In -- inmate notes by date?

1          Q.      That's what the front page says.

2          A.      I have not seen this front page ever.

3          Q.      Are you aware whether or not correctional

4   officers are supposed to record notes for certain things

5   concerning inmates?

6          A.      I don't know what the correctional officers are

7   required to do.

8          Q.      Okay.

9                  MR. HANCEY:  This is Exhibit 13.

10                 (Whereupon, Exhibit No. 13 was marked for

11  identification.)

12  BY MR. HANCEY:

13         Q.      You've been handed what has been marked as

14  Exhibit 13.  Do you recognize what that is?

15         A.      It is an opiate and/or heroin withdrawal.

16         Q.      Have you ever seen it?

17         A.      Yes.

18         Q.      When?

19         A.      To the best of my knowledge, it was in January

20  of 2017.

21         Q.      Is it your understanding, ma'am, that

22  Exhibit 13 represents the opiate and/or heroin withdrawal

23  policy was implemented in the jail sometime after Madison's

24  death?

25         A.      Uhm...

```
 1                 MR. MYLAR:  I think you already asked these

 2    questions about this exhibit.

 3                 MR. HANCEY:  This is a new exhibit.

 4                 MR. MYLAR:  It's the same one.

 5                 MR. HANCEY:  It's a new exhibit.

 6                 MR. HOMER:  It's similar to 39.

 7                 MR. HANCEY:  It's different.

 8                 MR. HOMER:  On this line of questioning, I'll

 9    just object on foundation as a running objection.

10                 MR. HANCEY:  Okay.

11                 THE WITNESS:  Yes, it looks to be the one that

12    was implemented.

13                 MR. HANCEY:  Okay.

14    BY MR. HANCEY:

15         Q.    Let me have you go back to Exhibit 14 that we

16    looked at a little earlier.  Again, this is the Logan Clark

17    transcript of an interview he had with the attorney general

18    investigators.  And let me have you look at Bates No. 39, if

19    you would.

20                 In the big paragraph in the middle of the page,

21    second line down at the end, Clark says that we're on call

22    coverage 24 hours a day.  Was that your understanding in

23    November of 2016?

24         A.    Yes.

25         Q.    Was it your understanding at that point in time
```

1   that people from the jail could contact Logan Clark or

2   somebody else at Dr. Tubbs's office regardless of what time

3   of day it was?

4        A.     Yes.

5        Q.     Seven days a week?

6        A.     Yes.

7        Q.     Is it also your understanding that either you

8   or any correctional officer could contact Logan Clark as need

9   be?

10       A.     Yes.

11       Q.     Look at Bates No. 41.  About ten lines up from

12  the bottom, Clark is asked about a -- whether he had any

13  phone calls with you about Madison.  His answer is, "I

14  believe I received one phone call, maybe Monday um, on a

15  medication approval for Clonidine and that was uh, the only

16  was just uh, a quick phone call."

17              Is that consistent with your recollection?

18       A.     Yes.

19       Q.     But you would add to this that you also brought

20  up her other two prescriptions at that time to Logan Clark.

21  Right?

22       A.     Yes.

23       Q.     Look at Bates No. 43.  The first -- the first

24  large paragraph.  Logan Clark is describing sort of the

25  protocol for opiate -- opioid withdrawals, and he says this.

1   "So opioid withdrawals we typically, you know when they book

2   in um, they say they're opioid withdrawals we'll do some uh,

3   vital signs, they will be placed uh, maybe uh, in uh,

4   observation um, you know they will uh, receive the vital

5   signs if they start making complaints of uh, symptoms, then

6   we'll treat those symptoms and then we'll monitor them

7   closely, make sure they fluid.  Um, we do Gatorades um, you

8   know, we tell them drink plenty of water, let us know if this

9   isn't working.

10          "We try to do kind of a liquid diet, maybe an

11  uh, soft diet, something they can try to keep food down.  If

12  symptoms don't improve, you know we start medication and then

13  you know typically that includes Clonidine um, maybe some

14  Zofran um, for some nausea they're having some diarrhea,

15  those are the typical main symptoms that you have on an

16  opioid withdrawal."

17          Is that consistent with what you understood the

18  practice to be for inmates displaying symptoms of opioids

19  withdrawals in 2016?

20      A.    No.  This was implemented in January 2017.

21      Q.    Okay.  In 2016, was it your practice to --

22  well, was it your experience that Logan Clark would prescribe

23  Zofran for inmates that you reported were vomiting?

24      A.    On pregnant females.

25      Q.    What about non-pregnant females?

Jana Clyde
May 23, 2018                                                            Page 136

```
 1          A.      Not often, no.

 2          Q.      Look on page -- Bates Page 44.  At the end of

 3   the first big paragraph there, Logan Clark says this:

 4   "Again, vital signs once a day and being checked on routinely

 5   during the day by officer and/or medical.  But the big is if

 6   symptoms progress or worsen, then I should be notified."

 7                  Is that your understanding of what the jail's

 8   policy was in November of 2016 for inmates displaying

 9   symptoms of opioid withdrawal?

10          A.      No.

11          Q.      Because you didn't take Madison's vitals signs

12   once a day for the time she was in there.  Correct?

13          A.      Correct.

14          Q.      Your recollection is that you took them on

15   Monday and then no other day?

16          A.      I took them initially on Monday.  I do believe

17   that I took one on Tuesday, but it was not recorded, and it

18   was normal.  She had started the clonidine which is also a

19   blood pressure medication.

20          Q.      Okay.  Now, I asked you before whether you took

21   her vitals on Tuesday, and I thought you said no.  But your

22   recollection is you might have?

23          A.      No.  I said no, I -- as in, you asked me when I

24   recorded -- if I recorded my vital signs.  I did Monday's.

25          Q.      I see.
```

 1          A.      I did not record them on Tuesday because the

 2   vital sign was normal.

 3          Q.      Was that the normal practice to not record if

 4   they were normal?

 5          A.      Under this, yes.

 6          Q.      What do you mean, "under this"?

 7          A.      Well, if it's -- a person's on lisinopril, a

 8   blood pressure medication, and I've been ordered by the

 9   doctor to take it daily, then I record it daily.  So this was

10   a different situation.

11          Q.      But you weren't aware of any policy nor had you

12   been trained as November 2016, as I understand your

13   testimony, that if an inmate was displaying signs of opioid

14   withdrawal, vomiting, diarrhea, et cetera, that you were

15   required to take that person's vitals daily?

16          A.      No.

17          Q.      What I said is correct, that's not your

18   understanding at the time --

19          A.      Correct.

20          Q.      -- right?

21                  A couple lines down from where we read on this

22   Page 44, Clark says this:  "We had this before where a

23   patient is just not responding, and we've sent them to the

24   hospital.  And again that is definitely an option that we use

25   quite a bit."

```
 1                    Do you agree that in 2016 a common option that
 2   the jail used for inmates displaying signs of opioid
 3   withdrawal were sent to the hospital?
 4        A.     No.
 5        Q.     Are you aware of that ever being done in 2016
 6   for those kinds of symptoms?
 7        A.     Not to my knowledge in regards to opiate.  Yes,
 8   we've sent others to hospital for other situations.
 9        Q.     But what about for vomiting and diarrhea and
10   signs of withdrawals?
11        A.     Not to my knowledge that year, no.
12        Q.     Have you been instructed since Madison's death
13   to consider that as an option?
14        A.     Yes.
15        Q.     In the next paragraph on Page 44, Clark is
16   asked to describe the symptoms of heroin withdrawal.  He
17   says, "Shaking, sweating, nausea, diarrhea, hallucinations,
18   you know, things like that.  There's neurological and
19   physical changes that can happen.  Difficulty sleep,
20   difficulty eating."
21                    Do you agree with his description of heroin
22   withdrawal symptoms?
23        A.     Yes.
24        Q.     Is that consistent with your personal
25   experience and training?
```

 1        A.      Once again, training?

 2        Q.      I'm sorry.

 3        A.      I have not been to a formal training in opiate

 4   withdrawal.

 5        Q.      Is it consistent with your -- the training you

 6   received as you were getting certified as an LPN?

 7        A.      These are typical withdrawal symptoms of any --

 8   any withdrawal symptoms.

 9        Q.      He then goes on to say, "We ensure that

10   dehydration, that's our main thing is to avoid."

11              Is it your understanding -- was it your

12   understanding in 2016 that somebody experiencing the symptoms

13   of opioid withdrawal or heroin withdrawal was a -- had an

14   increased risk of becoming dehydrated?

15        A.      Anybody that's experiencing vomiting, diarrhea,

16   has an increased risk.  Whether they're the flu or a

17   withdrawal, has an increased risk of dehydration, correct.

18        Q.      I think you've already said this, but just to

19   be clear.  In 2016, at least, the Duchesne County Jail was

20   not equipped to administer IV fluids if an inmate needed that

21   treatment.  Is that right?

22        A.      Correct.

23        Q.      That person would need to be shipped off to a

24   facility that could do that?

25        A.      Yes.

```
 1              MR. HANCEY:  This is Exhibit 22.

 2              (Whereupon, Exhibit No. 22 was marked for

 3   identification.)

 4   BY MR. HANCEY:

 5       Q.    You've been handed what has been marked as

 6   Exhibit 22.  Have you ever seen a form like this before?

 7       A.    Yes.

 8       Q.    What is it?

 9       A.    A suicide watch form.

10       Q.    Now, on this particular example, you see that

11   the word "suicide" was crossed out and somebody has

12   handwritten above it the words "medical observation."  Right?

13       A.    Yes.

14       Q.    Have you ever seen this done -- that done

15   before?

16       A.    Not to my knowledge.

17       Q.    Do you know who filled out this Exhibit 22?

18       A.    No.  Oh, it says Deputy Roberts.

19       Q.    Now, I understand that this just an example.

20   This is an inmate that has nothing do with this case.

21       A.    Correct.

22       Q.    But what would -- at least in November of 2016,

23   what would a form like this typically be used for?

24       A.    The suicide form?

25       Q.    Yes.
```

```
 1         A.      For somebody who is on suicide watch.

 2         Q.      How would it be used in practice?

 3         A.      As in regards to...

 4         Q.      Well, so I take it that one of these would be

 5  filled out if the jail learns that an inmate is suicidal?

 6         A.      Correct.

 7         Q.      And then what is done with the completed form?

 8         A.      Once it's all filled out or before?

 9         Q.      Once the --

10         A.      This is just -- this is filled out on top

11  saying what the suicide watch.  It is then taped or clipped

12  to the cell of which the inmate that is on suicide watch.

13  Then officers date, time and initials what that inmate was

14  doing during their checks.

15                 This one was on Q hour checks, every hour

16  checks.  That's what was circled on this one.  So every hour,

17  they would have to check and note on this sheet every hour,

18  the date, the time, what that inmate was doing, what they

19  observed the inmate doing and then initial it.

20         Q.      When a particular inmate is on suicide watch

21  and has one of these forms clipped to their door, how does

22  your involvement with that particular inmate change, if at

23  all?

24         A.      Because the form -- once they're put on suicide

25  watch or...
```

1          Q.      Well, I assume that every inmate that is on

2    suicide watch has a form --

3          A.      Correct.

4          Q.      -- this like on their door.  Is --

5          A.      Yes.

6          Q.      -- that right?

7          A.      Yes.

8          Q.      Okay.  So once that happens, how does your

9    involvement change, if at all?

10         A.      I also am one of the ones that would check

11   them.  I make a practice of, you know, checking on them a

12   couple of times a day.  Uhm, I would also, then, with certain

13   inmates who are on suicide watch, I would talk to them, see

14   if they could commit to safety.

15                 Then I would get hold of PA Logan, and he would

16   decide whether or not if that inmate could be moved to

17   another -- a different type of suicide watch, which would

18   be -- I don't know if this was -- well, this isn't even in

19   regards to a suicide.  This is just a -- but in regards to

20   suicide, then we would take them from a full suicide watch to

21   a modified suicide watch.

22         Q.      In 2016, I take it, there were several inmates

23   that were put on medical observation watch.  Is that right?

24         A.      I have no record of who or what.

25         Q.      Is that something that happens relatively

1  frequently?

2       A.    No.

3       Q.    Okay.  When it did happen in 2016, was the

4  practice at the jail to take one of these forms and cross out

5  suicide and make it a medical observation watch form?

6       A.    No.

7             MR. HOMER:  Objection.  Foundation.

8  BY MR. HANCEY:

9       Q.    Do you know whether or not one of these forms,

10 whether identified as a suicide watch or medical observation

11 watch, was clipped to the outside of Madison's cell at any

12 time during her incarceration?

13      A.    No.

14      Q.    It wasn't or you don't know?

15      A.    It was not.

16      Q.    If Madison was on medical observation watch in

17 November of 2016, why wasn't one of these forms --

18      A.    This is not --

19      Q.    -- on her door?

20      A.    -- common practice.  I don't know why this was

21 done.  We don't put up a form for a medical watch.

22      Q.    So this is an anomaly, this exhibit here?

23      A.    Yes.

24      Q.    I see.

25                          *

```
 1                    (Whereupon, Exhibit No. 25 was marked for

 2     identification.)

 3     BY MR. HANCEY:

 4          Q.     Okay.  Ms. Clyde, you've been handed what has

 5     been marked as Exhibit 25.  This is the responses that I got

 6     back from the County, okay, in discovery in this case.  Let

 7     me direct your attention first to Page 6.  In the second

 8     paragraph of Response No. 3, the County says this:  "Jana

 9     Clyde saw Madison multiple times each day."

10                    Is that a true statement?

11          A.     No.

12          Q.     The last line says this:  "Jana Clyde, Logan

13     Clark and Dr. Tubbs were responsible for inmates' medical

14     care."  Do you agree with that?

15          A.     Uhm, let me clarify.  I am only responsible for

16     the inmates' medical care while I'm on shift.

17          Q.     Otherwise, who is?

18          A.     The corrections officers.

19          Q.     Turn a couple of pages to Page 8, if you would.

20     In the middle of Response No. 5, the County says, "Madison

21     looked like a typical heroin addict."

22                    Do you agree or disagree?

23          A.     I agree.

24          Q.     Do you know who Andy Minerod is?

25          A.     Yes.
```

 1          Q.      Who?

 2          A.      He is somebody that works for Uintah County.

 3          Q.      Do you understand that he participated in the

 4   outside agency investigation into this incident?

 5          A.      Yes.

 6          Q.      Do you remember speaking with him, as well as

 7   Logan Clark, on December 1st after Madison had passed away?

 8          A.      Yes, I remember speaking with him.

 9          Q.      Do you recall Logan Clark being there?

10          A.      Yes.

11          Q.      Do you recall Logan Clark telling Mr. Minerod

12   that Madison was on the jail's heroin withdrawal protocol?

13          A.      I do not.

14          Q.      If he said that, would you agree with that

15   statement?

16          A.      No.

17          Q.      Why not?

18          A.      Because I don't have evidence that she was on

19   heroin.  She denied it.

20          Q.      Did the jail have a heroin withdrawal protocol

21   at that time?

22          A.      No.

23                  MR. HANCEY:  This is Exhibit 31.

24                  (Whereupon, Exhibit No. 31 was marked for

25   identification.)

Jana Clyde
May 23, 2018                                                    Page 146

```
 1   BY MR. HANCEY:

 2        Q.    Ms. Clyde, you've been handed what has been

 3   marked as Exhibit 30, and I'll represent to you that this is

 4   a --

 5              MR. MYLAR:  Excuse me, I think it was 31.

 6              MR. HANCEY:  31.  Thank you.

 7   BY MR. HANCEY:

 8        Q.    One of the Duchesne County Jail policies that

 9   was produced to me in this litigation.  Okay?

10        A.    Okay.

11        Q.    This looks to me like it was the jail's policy

12   pertaining to healthcare records from 2016.  Do you recognize

13   it as such?

14        A.    I have -- I am not familiar with this.

15        Q.    Had you -- do you remember ever seeing the

16   jail's policy on healthcare records before November 2016?

17        A.    No.

18        Q.    Did you receive any training from the jail

19   about its healthcare records policy prior to November 2016?

20        A.    Once again, the key word, training.  I was --

21        Q.    Was it ever explained to you?

22        A.    Not the policy, as in this, but I was taught on

23   how they do things.  So whether that conflicts with this or

24   not, I don't know.

25        Q.    Tell me, then, for starters, what you were
```

1  taught before November 2016 about healthcare records of jail

2  inmates.

3          A.      Things that I need to record or what I do with

4  their records?

5          Q.      All of the above.

6          A.      All of the above?

7          Q.      Yes.

8          A.      We record medications, whether they take them

9  or not.  We contact doctors' offices for records and verify

10 medications that they're on.  These are all things that are

11 part of the medical records that I did.  Medical records as

12 in health -- PA Logan's -- what do I want to call them?

13 Dictations, I re -- I keep them.  I keep all the medication

14 sheets.  Is that what you're referring to?

15         Q.      Is that all you can remember right now?

16         A.      At the moment, yeah.

17         Q.      Well, let's go through this Exhibit 31 a little

18 bit.  Look at the first letter "A" on Bates 1884.  Are you

19 there?

20         A.      Uh-huh.

21         Q.      Okay.  This is talking about the jail's way of

22 documenting healthcare.  And it says, "It is the policy to

23 create and maintain individual healthcare files on each

24 prisoner including a continuous record of all of the medical

25 care provided for inmate patients at the jail facility."

```
 1                     Was that policy ever taught to you before

 2    November of 2016?

 3          A.     No.

 4          Q.     Were you aware that it was your obligation by

 5    policy in November of 2016 to create and maintain a

 6    healthcare file on every prisoner?

 7          A.     No.  Just the one with medical.

 8          Q.     And did you know that you were required to

 9    create and maintain a continuous record of all medical care

10    provided for each inmate?

11          A.     No.

12          Q.     Would you agree with me that you didn't create

13    any records about the reasons why Madison was given Gatorade?

14          A.     Correct.

15          Q.     Would you agree with me that there are no

16    records that you created concerning the reasons why Madison

17    was moved to court holding or put on medical observation?

18          A.     I cannot agree with that.  I don't know if

19    Richens recorded anything or not.

20          Q.     But I'm asking about what you might have

21    created.

22          A.     No.

23          Q.     Would you agree with me that you didn't create

24    any records about Madison's two visits with you apart from

25    your recording her vitals electronically on Monday?
```

```
 1         A.      Correct.

 2         Q.      Are there any records that you created about

 3   how Madison's medications were or were not approved?

 4         A.      Unsure.

 5                 (Court reporter interrupted for clarification.)

 6                 THE WITNESS:  Unsure.  Sorry.

 7                 MS. ABKE:  Can we please take a five-minute

 8   restroom break?

 9                 MR. HANCEY:  Sure.

10                 (Recess taken from 2:51 p.m. to 3:03 p.m.)

11   BY MR. HANCEY:

12         Q.      You're looking at Exhibit 38.  Correct?

13         A.      Correct.

14         Q.      Let me direct your attention to -- these are

15   not paginated but this, again, is Logan Clark's discovery

16   responses.  I would like you to turn to his response to

17   Interrogatory No. 9.  It goes on to a second page, so if

18   you'd flip over to the second part of his response and look

19   at that first paragraph.

20                 Logan Clark says this about your phone call

21   with him on November 28th.  He says, "Ms. Clyde was seeking

22   defendant," meaning Logan Clark's, "approval that the

23   medication could be given, which defendant approved.

24   Ms. Clyde did not identify the inmate or state that the

25   inmate was taking any other medications."
```

1              Based on your prior testimony, do you disagree

2    with that assertion?

3         A.    Yes.

4         Q.    Now, in the next paragraph, he says this:  "On

5    December 1st, 2016, when defendant was present at the jail

6    for his weekly visit, Ms. Clyde mentioned an additional

7    inmate, Madison Jensen, was in court holding and was feeling

8    sick and experiencing flu-like symptoms.  Madison was not on

9    the list of inmates who had submitted a medical request to be

10   seen that day, and defendant was not provided a medical file

11   for Madison."

12              Disagree?

13        A.    Yes.

14        Q.    Your testimony is that Madison's medical file

15   was included in the packet of files that you gave to Logan

16   Clark upon his arrival.  Correct?

17        A.    Correct.

18        Q.    And also that he reviewed each of those files

19   before he started seeing inmates?

20        A.    Yes.  That's generally what he does.

21        Q.    And that Madison's medical file was in that

22   packet?

23        A.    Correct.

24        Q.    Turn two pages over to the response to

25   Interrogatory No. 12.  I'm going to read to you the very last

1   paragraph on that page.  Logan Clark says this:  "To the

2   extent that Jail staff, including Jana Clyde, was aware that

3   Madison was exhibiting urgent and/or emergent symptoms of

4   severe nausea/vomiting, diarrhea, dehydration, that Madison

5   was likely withdrawing from opiates, and/or that Madison had

6   not eaten for 3 or more days, Defendant was not notified of

7   such symptoms as he would have expected to be and as he has

8   advised the Jail staff to do."

9            My question to you is, had Logan Clark advised

10  to you at any time before November 2016 that if an inmate was

11  exhibiting urgent and/or emergent symptoms of severe nausea,

12  vomiting, diarrhea, dehydration, or any of the other things

13  listed in here, that he had advised you to call him?

14        A.    I don't recall when he would have told me that,

15  like the time.

16        Q.    Would that have been your practice before

17  November 2016?

18            (Whereupon, Mr. Steve Loos returned to the

19  deposition proceedings.)

20            THE WITNESS:  In an emergent situation, yes.

21  BY MR. HANCEY:

22        Q.    What about an urgent situation?

23        A.    Yes.

24        Q.    Do you believe that if jail policies that have

25  been implemented since Madison's death were in place at the

1   time of her incarceration, her death could have been

2   prevented?

3              MS. ABKE:  Object to foundation.

4              MR. HOMER:  Foundation.  Calls for speculation.

5              MR. MYLAR:  I'll join on both of those.

6              MR. HANCEY:  You can answer.

7              THE WITNESS:  I can't speculate on that.

8              MR. HANCEY:  Okay.

9              I don't have any other questions.  Thank you.

10             (Off-the-record discussion)

11

12                 E X A M I N A T I O N

13

14  BY MS. ABKE:

15        Q.    Okay, Jana, you testified earlier -- and I'm

16  going to jump around a little bit so bear with me.  You

17  testified earlier at the beginning of your deposition today

18  that you previously worked at Uintah Basin Medical Center?

19        A.    Correct.

20        Q.    How many years did you work at Uintah Basin?

21        A.    From 2005 until 2012 as a nurse.  I worked

22  prior to that for them as an EMT.

23        Q.    Okay.  So between 2005 and '12, seven years you

24  worked at the hospital over there, what departments did you

25  work in?

```
 1          A.      Med surge, ICU and clinic.

 2          Q.      And clinic?

 3          A.      Yeah.

 4          Q.      Is that the outpatient clinic?

 5          A.      Yes.  I worked there for a Dr. Maready.

 6          Q.      Was there one of those areas that you just

 7   identified that you worked in for a longer period of time

 8   than the others?

 9          A.      Med surge.

10          Q.      How long were you in med surge?

11          A.      Well, med surge and ICU are combined.  So I was

12   mostly in med surge but would float into ICU upon need, so...

13          Q.      Can you quantify the amount of time that you

14   were in med surge, slash, ICU of the seven years you worked

15   at Uintah Basin?

16          A.      2010, I believe I left and went to the clinic.

17          Q.      Okay.  In the context of your work in those --

18   in that department, med surge, slash, ICU, did you ever have

19   occasion to treat any patients who had come in with either

20   opioid or opiate overdose or withdrawal?

21          A.      Those were typically treated in the ER, so I

22   did not have experience with that.

23          Q.      Never in those two units?

24          A.      Not to my recollection.

25          Q.      How about in the outpatient clinic?  Did you
```

1   ever deal with a patient who came in complaining of

2   withdrawal symptoms or symptoms of overdose on -- of those

3   kinds of medications?

4        A.     No.

5        Q.     In the context of your work at -- as an EMT,

6   how many years was that?

7        A.     From '97 to 2005.

8        Q.     So about eight years as an EMT?

9        A.     Uh-huh.

10       Q.     In those -- in that context when you were

11   working as an EMT, did you ever go on any calls relating to

12   opioid or opiate overdose?

13       A.     I may have but not that I can recollect, like

14   one individual incident.

15       Q.     So your collective experience before 2005 --

16   and that's when you started at the jail?

17       A.     Uh-huh.

18       Q.     Is that yes?

19       A.     Yes.

20       Q.     You had never medically dealt with anyone who

21   was experiencing symptoms or complaints of opiate overdose?

22       A.     Correct.

23       Q.     And had never dealt with any person who was

24   experiencing opiate withdrawal?

25       A.     To my knowledge, correct.

1      Q.      Okay.  In the years leading up to 2016, had you

2   had occasion to assist inmates or treat inmates at the

3   Duchesne County Jail who were withdrawing from any substance?

4      A.      Yes.

5      Q.      Was that something that you saw on a regular

6   basis?

7      A.      Alcohol more than -- was generally the one that

8   we saw the most.

9      Q.      But I -- so is that something you saw on a

10  regular basis, withdrawal from any substance?

11     A.      More so alcohol, yes.  I don't know -- that was

12  more what we have -- had dealt with.

13     Q.      Had you dealt with an inmate that was

14  withdrawing from opiates prior to November 2016?

15     A.      Uhm, I'm sure a couple times I had.  To think

16  of one individual offhand, I cannot at this time.

17     Q.      Can you recall about how many times per year

18  that an inmate would come in with -- would come in and have

19  symptoms of withdrawal from either drugs or alcohol?

20     A.      I can't.

21     Q.      You can't quantify it at all?

22     A.      No.

23     Q.      Could you say it was more than once a year?

24     A.      Yes.

25     Q.      Was it more than twice a year?

1          A.      Yeah.

2          Q.      Was it more than once a month?

3          A.      I wouldn't -- I couldn't say to that.

4          Q.      So can you say that it was somewhere between

5    twice and 12 times a year that an inmate would have symptoms

6    of withdrawal?

7          A.      Yeah, I could agree to that.

8          Q.      You had been working at the Duchesne County

9    Jail for 11 years prior to --

10         A.      Oh, no.

11         Q.      No?

12         A.      No.

13         Q.      So how many years had you been working --

14         A.      I think prior to this, three and a half.

15         Q.      What year did you start at the jail?

16         A.      2013.

17         Q.      Oh, okay, 2013.  Sorry.  So about three

18   years --

19         A.      Yeah.

20         Q.      -- you had been working at the jail?

21         A.      Uh-huh.

22         Q.      Prior to dealing with Madison and your

23   interactions with her in November 2016, what would you do if

24   you were made aware or if you observed an inmate with signs

25   or symptoms of withdrawal from a drug or alcohol?

1         A.      Uhm, most inmates admit when they're

2  withdrawing because they want the help.  Then we would

3  monitor them, just pay closer attention to it.  Tell them to

4  please report nausea, vomiting, diarrhea, to us.  We need to

5  see it; save it.  You know, they were responsible to report

6  their health to me so I knew what was going on.  And then we

7  would treat with Gatorade, pretty much, and just -- yeah.

8         Q.      If you learned that an inmate was withdrawing

9  and they admitted that they were withdrawing from drugs or

10  alcohol, is that something you would call or notify Logan

11  Clark or Dr. Tubbs about?

12        A.      If I knew?  Yes.

13        Q.      Okay.  Do you remember being interviewed by --

14  I believe it was the Uintah County Sheriff's Office in 2016?

15  That was shortly after this incident.

16        A.      I remember being interviewed.  I can't say I

17  remember everything that was in the interview.

18        Q.      Sure.  But you remember you had an interview?

19        A.      Yes.

20        Q.      In that interview -- I'll represent to you I

21  viewed it last night.  I don't know if you had an opportunity

22  to review that before your deposition today?

23        A.      (No oral response.)

24        Q.      No?

25        A.      No.

1          Q.      Have you ever seen it?

2          A.      No.

3          Q.      In that interview, you mentioned a heroin

4    protocol.

5          A.      Okay.

6          Q.      Do you remember telling the officers about

7    heroin protocol that existed at the Duchesne County Jail at

8    that time?

9          A.      No.

10          Q.      Is it your position or is it your belief that

11   there was not such a heroin protocol in place in December

12   2016?

13          A.      I believe we were discussing getting one in

14   place, but it was not in place yet.

15          Q.      So in your interview on December 7th, 2016,

16   with the Uintah County Sheriff's Office, you stated that you

17   had been instructed by Mr. Clark about the heroin protocol,

18   and then you mentioned these are the things that you would do

19   if you were implementing that policy -- or protocol, I should

20   says.  That twice a day, you would check blood pressure.  You

21   would call PA Clark or Dr. Tubbs and let them know that you

22   were instituting that protocol.

23                  Do you disagree that that was what you would

24   have done in November of 2016 if you knew that an inmate was

25   withdrawing from an opiate like heroin?

1        A.      No, I would agree with that.

2        Q.      That's something that you would do?

3        A.      Uh-huh.

4        Q.      Yes?

5        A.      Yes.  I guess my uh-huhs don't count.

6        Q.      That's right.  They don't.

7        A.      Sorry.

8        Q.      So when you said earlier today in your

9   deposition that the Duchesne County Sheriff's Office, or the

10  Duchesne County Jail at least, has no policy or protocol

11  about how to deal with individuals who are withdrawing, was

12  that accurate?

13       A.      Yes.  This was -- I think what you're speaking

14  of was one that we were working on.  So Logan and I -- I had

15  talked to Logan about, you know, some of the things that we

16  would work on.  So that's where my answer to the Uintah

17  County sheriff was the medical knowledge I had at that time.

18  But the protocol was not implemented fully until January

19  2017.

20       Q.      How often had you worked on prior to -- so at

21  least as of December 2016, tell me about what you had worked

22  on with respect to this protocol.

23       A.      Logan just told me of some of the ideas that

24  were used at other facilities and that we would be doing.

25       Q.      When did you have that conversation?

1          A.     I have no idea.

2          Q.     Was it months before this --

3          A.     No.

4          Q.     -- interview?

5          A.     I don't believe so.

6          Q.     Was it days before?

7          A.     I would say within -- to the best of my

8     knowledge, I would say it was probably within about a month

9     of that.  I believe it was that fall.

10         Q.     Sometime in the fall of 2016?

11         A.     Correct.

12         Q.     But as of November of 2016, your personal

13    practice and protocol when someone was known to be

14    withdrawing from heroin or suspected to be withdrawing from

15    heroin was to check blood pressure twice a day and to call PA

16    Clark and let him know about that?

17         A.     If I knew they were withdrawing from heroin, if

18    the inmate had admitted it.

19         Q.     So I wanted to ask you about that.  You

20    mentioned a couple times that you instruct inmates who are

21    vomiting or have diarrhea to save --

22         A.     Yes.

23         Q.     -- their vomit or diarrhea --

24         A.     Yes.

25         Q.     -- so that you can take a look at it?

1          A.      Yes.

2          Q.      What is the purpose of you wanting them to save

3    it?

4          A.      Because so many inmates come in and are looking

5    for a free ride on an ambulance to the hospital or special

6    treatment or -- I'll have these issues.  So for us to find

7    out who is truly exhibiting these symptoms, we have to see

8    it.

9          Q.      Is there any other purpose served by them

10   saving the vomit or diarrhea?

11         A.      Well, if they're vomiting or having diarrhea

12   profusely, there might be blood in it, and I would like to

13   observe that.

14         Q.      So is it your position that if you don't see

15   vomit or diarrhea, you don't personally lay eyes on it, you

16   don't believe that it's happened?

17         A.      If after I've instructed the inmate to save it,

18   basically, yes.  Because they've been instructed to save that

19   so that I can help them.

20         Q.      You work from 6:30 in the morning to 4:30 in

21   the afternoon, Monday through Thursday; correct?

22         A.      Correct.

23         Q.      If an inmate vomits on a Friday, you're not

24   going to be in until Monday?

25         A.      Exactly.

1        Q.      So they are instructed not to flush their

2    toilet for four days?

3        A.      No.  Then a deputy has the opportunity to go

4    in.  They are told that I can see it or a deputy can see it.

5        Q.      Okay.  So previously when I was asking you

6    whether you had to personally --

7        A.      No.

8        Q.      -- put eyes on the vomit or -- hold on.  If I'm

9    talking, don't talk.

10       A.      I'm sorry.

11       Q.      Okay.  It makes the record a little bit clear.

12               So when I asked you before a question about

13   whether you need to personally see it in order to believe it,

14   can you clarify what your answer was?

15       A.      My answer was that I needed to see it.  But

16   that is only when I'm present.  I obviously can't see it if

17   I'm not there.  Then a deputy has the right to observe that

18   and let PA Logan know.

19       Q.      So they have -- so the deputy, if they observe

20   vomit or diarrhea, they are to let their -- they're

21   instructed or they are supposed to know to let Logan Clark

22   know about that?

23       A.      If we have asked the inmate to save it,

24   correct.

25       Q.      How does a deputy know that you have asked an

1  inmate to save their vomit or diarrhea?

2        A.     I would tell them.

3        Q.     How would -- you would just tell every single

4  one that's on shift?

5        A.     I tell the corporal, and it is his

6  responsibility, then, to let his deputies under him know and

7  pass that on to the next shift.

8        Q.     Did you tell the corporal in this case about

9  your request to have Madison save her vomit or diarrhea?

10       A.     I believe so.  But I was there for the four

11 days that she was there.

12       Q.     Well, you weren't there at night; true?

13       A.     True.

14       Q.     So that would have -- that would be a time when

15 you would need --

16       A.     Yes.

17       Q.     -- to communicate -- sorry.  Again, just wait

18 until I'm done.

19              So at night when you're not there, that would

20 be a time when it was the deputy's responsibility to check

21 for that?

22       A.     Correct.

23       Q.     It's your testimony that you did instruct

24 deputies or the corporal to have the deputies check for that?

25       A.     I believe in this instant, I asked Deputy

 1   Richens.  She knew that that is the request I had of Madison.

 2         Q.     Doesn't Deputy Richens only work day shifts?

 3         A.     No.  They rotate shifts.  But when I would tell

 4   her that, then it would be their responsibilities to pass it

 5   on to the next crew because I'm not there when the next crew

 6   comes on.

 7         Q.     Whose responsibility is it to pass it on to the

 8   night shift?

 9         A.     The day shift.

10         Q.     How many people are on a shift?  How many

11   deputies are on a shift?

12         A.     Three to four.

13         Q.     So you told Deputy Richens at some point to --

14   that Madison was instructed to save her vomit or diarrhea,

15   and you also told her to have the next shift notified of that

16   instruction.  Correct?

17         A.     Uhm, Ms. Richens, Deputy Richens, was in there

18   when I asked Madison.  So she knew that that request had been

19   put out.  And I don't tell them to pass it on.  That is just

20   common practice.  They pass on.

21         Q.     You didn't directly tell Deputy Richens, Hey, I

22   need you to watch out for this; I need you to have her save

23   her vomit or diarrhea, I need you to see it?

24         A.     Directly, no.  But once again, she was in there

25   when we made that request.

```
 1          Q.     During the time that Madison was in the

 2   Duchesne County Jail, Deputy Richens reported to you that

 3   Madison had been vomiting or had diarrhea.  Correct?

 4          A.     No.

 5          Q.     She never told you that?

 6          A.     Not to my knowledge.

 7                 MR. HANCEY:  What was your question, Kat?  I'm

 8   sorry.

 9                 MS. ABKE:  I just asked if Richens ever

10   reported to her that Madison had nausea or vomiting or

11   diarrhea.

12                 THE WITNESS:  Just from Sunday night upon the

13   admittance night.

14   BY S. ABKE:

15          Q.     Okay.  So that would count, wouldn't it?

16          A.     Just the one time, correct.

17          Q.     So one time Deputy Richens told you that she

18   had been vomiting?

19          A.     Yes.

20          Q.     Did any other deputy tell you that Madison had

21   been vomiting at any point during her stay in the jail?

22          A.     No.

23          Q.     I have a few questions just generally about --

24   not about Madison but just generally how your practice works

25   in the jail.  When new inmates come into the jail and they're
```

1  booked in over the weekend when you're not there, and it's an

2  inmate that comes in and they are taking medications from the

3  outside; they are prescribed a medication.  Do you have an

4  expectation that the booking officers or the deputies who are

5  in charge of that inmate contact you and let you know that an

6  inmate has been booked in who is on -- taking medications?

7          A.      The expectation is that they notify Logan

8  Clark.

9          Q.      When you come in on a Monday morning, I assume

10 you have times where there's going to be inmates who are new

11 to the jail; they come in over the weekend.  Correct?

12         A.      Correct.

13         Q.      How do you determine which inmates you will see

14 that day?

15         A.      By their medical requests or the request of an

16 officer.

17         Q.      How does an officer make a request to -- for

18 you to see a particular inmate?

19         A.      They come and get me.

20         Q.      So they just have to tell you?

21         A.      Uh-huh.

22         Q.      Is that a yes?

23         A.      Yes.

24         Q.      You don't have a messaging system or anything

25 like that?  Like they can't send you some sort of electronic

1    message?

2          A.      No.

3          Q.      Do they ever put sticky notes or anything on

4    your desk?

5          A.      Sometimes.

6          Q.      And medical requests, are those the documents

7    that would be put in your in-box?

8          A.      Uhm, the handwritten ones?  Yes.  The kiosk

9    ones, I print up each morning when I get there.

10         Q.      So if an inmate has gone to a kiosk and

11   submitted a medical request electronically, you print those

12   on a daily basis?

13         A.      Yes.

14         Q.      Do you review when you come in in the morning

15   and determine who you're going to see that day?  I assume

16   that's part your job duties.  Correct?

17         A.      Correct.

18         Q.      Do you make any effort to look at that inmate

19   intake questionnaire where they're answering medical

20   questions?

21         A.      If that question would be on that intake, if

22   what they're wanting to see the nurse for would be on that

23   intake question, questionnaire, then I would review that.

24         Q.      I think you said earlier that the -- medical

25   intake questionnaire, I want to use the right words to

```
 1   describe it.

 2         A.      Exactly.

 3         Q.      So I think it's...

 4                 MR. HANCEY:  Three.

 5                 MS. ABKE:  Number 3.  Ah, inmate intake

 6   questions.

 7   BY MS. ABKE:

 8         Q.      You're familiar with the questions that on the

 9   sheet?

10         A.      Yes.

11         Q.      These are things that you sometimes go over

12   with inmates.  Right?

13         A.      Correct.

14         Q.      Do you make any effort -- when you come in to

15   determine who you're going to see that day, do you try to

16   find this inmate intake questionnaire and read it and see if

17   there's a reason why you need to see that person?

18         A.      That is to be put in my box.  I don't know the

19   inmates that have came and gone over the weekend or are new

20   over the weekend.  So the only way I know who new inmates are

21   is if I have an intake questionnaire in my box.

22         Q.      Do you have access to this inmate intake

23   questionnaire electronically?

24         A.      I could go under that inmate and look it up.

25         Q.      But you don't try to go in and say, Here's the
```

1   list of all the new people in jail; let me see if there's

2   medical issues for any of them?

3          A.     No.

4          Q.     So the only one way you're advised of a -- the

5   only two ways that you're advised of an new inmate needing

6   your attention would be a request from an officer or a

7   medical request from the inmate themselves?

8          A.     Correct.

9          Q.     Do you have information available to you about

10  why a particular inmate is -- has been put in jail?  Like do

11  you know the reason why they're there?

12         A.     Not usually, no.

13         Q.     Is that something you have access to?

14         A.     I guess I could snoop through for it.  But it's

15  not something I -- I access.

16         Q.     I'm not familiar with the record-keeping system

17  on the computer.  You've alluded to it a few times today.  So

18  I just didn't know if when you type in a person's name,

19  there's something that comes up that tells you why a person

20  is there.

21         A.     I'm sure there's somewhere you can go to see

22  why they're there.  If it's -- I don't know, I mean, could

23  be, I guess, warrants or why they were picked up.  But that

24  is not my practice to see why every inmate is brought in.

25         Q.     When you're not at the jail, can officers or

1   deputies give over-the-counter medications without asking you

2   first?

3          A.    Yes.

4          Q.    Can officers provide Gatorade to an inmate

5   without asking you first?

6          A.    Yes.

7          Q.    Is that documented, the provision of

8   over-the-counter medications or Gatorade, anywhere?

9          A.    Uhm, up and prior to November of 2016, Gatorade

10  had not been documented.  But over-the-counters, the people

11  had to sign for them.

12         Q.    Who has to sign for them?

13         A.    The inmate, at that time, would sign a sheet,

14  and we would write down what over-the-counter medication they

15  were getting.

16         Q.    Where did you say that was documented?

17         A.    It's just a -- it was just on sheets, a little

18  sheet of paper.  And the inmate would put the

19  over-the-counter medication.  They had a list of check -- you

20  know, am I getting cough drops or am I getting ibuprofen.

21  They would check that.  Then the inmate would sign it.  Then

22  the deputy giving it would sign it.  And then that would come

23  to me.

24         Q.    The sheet would come to you?

25         A.    Yes.  And it was kept in their medical file.

Jana Clyde
May 23, 2018                                                                Page 171

 1        Q.      Prior to this incident and during the time that

 2   you worked at the Duchesne County Jail, what was your

 3   understanding as to the circumstances when you should contact

 4   Logan?

 5        A.      Uhm, in an event that we would determine

 6   needed, uhm, his input or his regard into what we need to do.

 7   Or if a person needed to be sent on an ambulance.  He made

 8   that decision whether a person would be sent on an ambulance

 9   or not, typically.

10        Q.      What would be circumstances that required

11   Logan's input include?

12        A.      Like seizures?  Is that --

13        Q.      I'm asking you.

14        A.      -- what you mean?  Well, is that what you're

15   searching for?  Like --

16        Q.      Yes, specific --

17        A.      -- medical incidents?

18        Q.      -- situations.  I mean, clearly there were

19   some times when you knew you should call Logan or Dr. Tubbs.

20   Right?

21        A.      Yes.

22        Q.      So tell me, what are those circumstances?  What

23   would be going on with a particular inmate that would prompt

24   you to make that phone call?

25        A.      Seizures.  Heart problems.  Accidents as in

1   needing stitches or medical care along the -- for an acute

2   injury.  Things along those lines.

3          Q.    If -- if an inmate was extremely sick, let's

4   say they have, you know, violent vomiting that you had seen

5   for 12 hours, would you call Logan for that situation?

6          A.    If I had seen the violent vomiting, yes.

7          Q.    Only if you had seen it, though?

8          A.    Yeah.

9          Q.    What about if a deputy reported it to you?

10         A.    Yes.  And the deputy has the right to call

11  Logan.

12         Q.    If you're on shift, do the deputies typically

13  come to you first and let you know if there's a medical issue

14  going on?

15         A.    Typically.

16         Q.    Would it be fair to say that anytime an inmate

17  has an urgent or concerning symptom, that you would contact

18  Logan Clark, and that's been your practice?

19         A.    Yes.

20         Q.    That's because you can't assess or diagnose or

21  do anything to treat that condition.  Correct?

22         A.    Correct.

23         Q.    I want to talk about the creation of Madison's

24  medical file.  What day did you initiate creating Madison's

25  medical file?

Jana Clyde
May 23, 2018                                                    Page 173

```
 1          A.      I would have -- when we receive a request to
 2    see the doctor via handwriting or kiosk, those all go into a
 3    certain spot, a certain file.  The night before Logan comes,
 4    the day before Logan comes, that afternoon, I created the new
 5    files that need to be created and add those requests to that
 6    file or I add those requests to existing files.  So that
 7    would have been when Madison's was created.
 8          Q.      Do you have a specific memory of creating
 9    Madison's file?
10          A.      Yes, I do.
11          Q.      Okay.  So tell me, when did you do that?
12          A.      Wednesday afternoon.
13          Q.      Do you know what time it was?
14          A.      No.
15          Q.      When did you receive -- well, what triggered
16    you to create her medical file on Wednesday afternoon?
17          A.      I was preparing to -- the inmate files for
18    Logan to see.
19          Q.      So how did you know which inmates he needed to
20    see?
21          A.      Because of the requests that they put in.
22          Q.      Where do you keep the requests before you
23    prepare the files on Wednesday?
24          A.      In a file folder in a file on the wall.
25          Q.      Is this in the med room?
```

```
 1          A.      Uh-huh.   Correct.

 2          Q.      You have a file on the wall that you keep all

 3   of the requests in until Wednesday night?

 4          A.      Until Wednesday night.

 5          Q.      So you just go through that, and then you

 6   create each patient's individual file?

 7          A.      I don't have to create a lot of them because

 8   they're preexisting.  But I would add it to that file.  And

 9   then that's when I pull them out so that Logan would be able

10   to have those accessible to him the next morning.

11          Q.      All right.  So you had already had Madison's

12   medical request form.  Do you know what time you received

13   that request form?

14          A.      I don't.

15          Q.      You have no memory of receiving that?

16          A.      I have memory of receiving it.  I don't have a

17   memory of what time I received it.

18          Q.      What is your recollection of how you received

19   that form?

20          A.      A deputy brought it down.

21          Q.      And you don't remember who?

22          A.      I don't.

23          Q.      Did you read it at the time that you received

24   it?

25          A.      Yes.
```

 1          Q.      Do you believe that you received Madison's

 2    medical request form after you saw her on Tuesday, which I

 3    think would have been November 29th?

 4          A.      Yes.

 5          Q.      So sometime between Tuesday morning and

 6    Wednesday afternoon?

 7          A.      It would have been Tuesday afternoon, after she

 8    was moved.  Because she had access to a kiosk in each block.

 9    So if this is a handwritten request, it would be after she

10    had been moved to court holding.

11          Q.      So the kiosks are in the H Block?

12          A.      All the cells.

13          Q.      Okay.

14          A.      All the -- all the -- what do we call them?

15    All A, B, C, D, E, F, G, all have their kiosks.  All the

16    blocks.

17          Q.      Kiosks are not in court holding?

18          A.      Correct.

19          Q.      So we know that this was sometime after she was

20    moved to court holding that you received this?

21          A.      Correct.

22          Q.      It could have been Wednesday, it could have

23    been Tuesday?

24          A.      According to when she was moved into court

25    holding on Tuesday, I would assume that I got this on

 1  Wednesday.  Because I leave at 4:30, and she was moved just

 2  right before that.

 3          Q.      All right.  So you received this form sometime

 4  on Wednesday, and you read it.  It says that she's reporting

 5  symptoms on this form.  Correct?

 6          A.      Uh-huh.  Correct.

 7          Q.      And it says that she's -- she's reporting that

 8  she'd been vomiting for multiple days, has diarrhea; she

 9  can't hold anything down.  Is it your testimony that that

10  report of symptoms from her medical request form is different

11  from what she told you on Tuesday?

12          A.      Yes.

13          Q.      And on Tuesday, your testimony is that she said

14  she didn't have any symptoms?

15          A.      She denied the -- denied the nausea, vomiting

16  and diarrhea.

17          Q.      When you received this request form on

18  Wednesday, did you go to Madison's cell?  Or did you ask that

19  she be brought to the medical room to ask her about these

20  symptoms?

21          A.      I saw her later on that Wednesday before I went

22  home, and that's when I asked her if there was anything I

23  could do for her.  It was her opportunity to tell me, show

24  me.  Like again, it goes back to I did not see any vomit or

25  diarrhea, and she was asked to save that.

Jana Clyde
May 23, 2018                                                    Page 177

1          Q.      You didn't see it on her blankets or on her

2     clothes or anything?

3          A.      No.

4          Q.      Did you ask Madison specifically, did you say,

5     Have you been vomiting?

6          A.      I don't recall if I did on Wednesday night.

7     But I do remember in Monday and Tuesday, I did.

8          Q.      Did you ask her on Wednesday when you saw her

9     at her cell, did you say, Have you been having diarrhea?

10         A.      That's what I do not recall.

11         Q.      Okay.  You --

12         A.      I remember --

13         Q.      -- just don't know either way?

14         A.      I don't on that, no.

15         Q.      Did you attempt to talk to any of the deputies

16    who had been keeping tabs on Madison, whether she had been

17    having symptoms of vomiting or diarrhea?

18         A.      They come to me with these symptoms.

19         Q.      I'm not asking what they do.  I'm asking what

20    you did.

21         A.      No, I do not attempt to find them.  If they

22    have a report, they bring it to me.

23         Q.      So essentially, you were not concerned with her

24    report of symptoms in this medical request form?

25         A.      Yes, but she had denied them profusely days

1   before.  And on that request form, it states that she had had

2   that for several days.  Well, the day before and the day

3   before that, she had denied it.

4        Q.    Did you think that Madison was not being

5   truthful in her medical request form?

6        A.    I didn't know whether she was being truthful to

7   that or to me.

8        Q.    Did you form a belief as to whether that was --

9   these were truthful statements in her medical request form at

10  the time when you saw this form on Wednesday?

11       A.    When I seen that form on Wednesday, and then I

12  saw her Wednesday afternoon, she had not changed from when

13  she was -- I first saw her Monday morning to Wednesday.  I

14  would believe if somebody was experiencing these severe

15  diarrhea and nausea, vomiting, that there would have been

16  some changes.

17       Q.    You also said that on Tuesday when you spoke to

18  Madison, correct me if I'm wrong, I think you testified that

19  on Tuesday when you saw Madison, that she said that she did

20  not want to see a doctor.  Is that right?

21       A.    Correct.

22       Q.    Do you have any explanation for why she would

23  fill out a medical request form to see a doctor if she didn't

24  want to see a doctor?

25       A.    I asked her to.

Jana Clyde
May 23, 2018

1      Q.      So you think she was just following your

2  instruction?

3      A.      Correct.

4      Q.      Do you have an opinion as to whether the

5  statements that Madison put on this medical request form

6  suggest that she'd like to see a doctor?

7      A.      Uhm, once again, I can't suggest what Madison

8  was thinking.  I do know I requested that this form be filled

9  out.  I give it to the deputy take down and have her fill it

10 out.  I knew that Logan would see her over her medications.

11 And this, I just asked if she would fill out a request form.

12     Q.      On Monday, the 28th, when you first saw

13 Madison, you described her appearance, and we've talked about

14 that.  Did you feel that she needed to be seen by PA Clark at

15 that point?

16     A.      Not at that point.

17     Q.      And then on Tuesday, you saw Madison again, and

18 her condition was not changed.  Correct?

19     A.      Correct.

20     Q.      And she denied further symptoms of vomiting and

21 diarrhea?

22     A.      Correct.

23     Q.      So I would assume that you did not think that

24 Madison needed to be seen, as of Tuesday, by Logan Clark?

25     A.      Okay.  Let me correct.  Logan Clark did need to

1    see her because he needed to verify her medications.

2          Q.    So that was the only reason?

3          A.    That was the reason at that point I was wanting

4    PA -- PA Logan would need to see her at his visit.

5          Q.    Okay.  So as of Tuesday, then, you've

6    changed -- you're like, she needs to be seen because he needs

7    to review her other medications?

8          A.    That would have even been on Monday.

9          Q.    Okay.

10         A.    Because she was on medications, and he reviews

11   medications.

12         Q.    As of Tuesday, when you saw Madison for the

13   second time, did you believe that Madison needed to be seen

14   by Logan because she was ill?

15         A.    No.

16         Q.    How about on Wednesday, same question, did you

17   think that PA Clark needed to see Madison on Wednesday

18   because she was sick?

19         A.    No.  Because she denied it to me.  She denied

20   having these symptoms of being sick.  And I was wanting her

21   to fill this out so that Logan could review these medications

22   with her, and maybe she would tell him something different

23   than she was telling me.

24         Q.    On Thursday, we've looked at some statements

25   that were made, I believe, by Mr. Clark in various places,

1   interviews and whatnot, that he mentioned to you -- or that

2   on Thursday, when he arrived, that you said, You need to see

3   this girl down in court holding; she's sick.  Do you disagree

4   that that statement was made?

5         A.      She looks sick.

6         Q.      Okay.  She looks sick?

7         A.      Correct.

8         Q.      Did you make that statement to Logan?

9         A.      Yes.

10        Q.      So as of Thursday, December 1st, you felt that

11  Madison needed to be seen because she was sick.  Correct?

12        A.      That she looked sick, but it was also for her

13  medications.  I agreed that she looked sick when she came in.

14  That did not change.

15        Q.      Would you agree that something changed between

16  Monday and Thursday, because on Monday you said she didn't

17  need to be seen for illness.  Correct?

18        A.      Okay.  Correct.

19        Q.      And then Thursday, you said she needs to be

20  seen because she looks sick?

21        A.      Okay.  I agree with that.  But I also on

22  Monday, if Logan would have been coming, I would have had her

23  see him because she looked sick.  But I can't force them to

24  see a doctor or take medications or use over-the-counter when

25  they deny what is going on.

```
 1          Q.      So nothing in Madison's condition, based on

 2  your knowledge, your personal knowledge of Madison from

 3  Monday to Thursday, had changed?

 4          A.      Correct.

 5          Q.      I think you said -- I'm trying to find where I

 6  wrote this down.  That...

 7                  That Madison looked like a typical heroin

 8  addict.  Correct?

 9          A.      I don't know if I said that, but -- in what

10  statement does that say?

11                  MR. HANCEY:  The County said that in its

12  discovery responses.

13                  MS. ABKE:  Right.

14  BY MS. ABKE:

15          Q.      And you agreed with it on your --

16                  (Announcement over PA system)

17                  MS. ABKE:  Someone's leaving in 15 minutes.

18  BY MS. ABKE:

19          Q.      We were looking at an exhibit, and you agreed

20  with that statement that Madison looked like a typical heroin

21  addict when you saw her on Monday?

22          A.      I would agree to that, yes.

23          Q.      So what does a typical heroin addict look like

24  to you?

25          A.      They're usually slight of weight, they're
```

1    skinnier.  Uhm, I don't know.  They just look poor.  That's

2    my best description of it.  They just look poor.

3         Q.    Poor as in financial assets or poor as in --

4         A.    They're poor as in their look.  They are pale,

5    they're skinnier, they're not as well-kept at -- that is just

6    an observation, correct.

7         Q.    How do you know what a typical heroin addict

8    looks like?

9         A.    Because I see them all the time.

10        Q.    Where do you see them?

11        A.    Family members.  On the street.  Yes.

12        Q.    Okay.  So you're familiar with people who have

13   a heroin or an opiate --

14        A.    Correct.

15        Q.    -- addiction?

16        A.    Uh-huh.

17        Q.    So a person who has an opiate addiction, is it

18   your understanding that that means that they take that

19   substance on a regular basis?  Like if you're an addict,

20   you're using every day?

21        A.    An addict is they use a lot.  I can't say if

22   it's every day.  I don't -- I wouldn't know to that.  But I

23   would assume they use a lot if it's an addiction.

24        Q.    Sure.  And when a person who has an addiction

25   stops taking whatever that substance is that they're addicted

1   to, is it your understanding that they're going to suffer

2   from withdrawals?

3           A.      Yes.

4           Q.      So I'm just trying to understand that at the

5   time when you first saw Madison on Monday, you thought she

6   looked like a typical heroin addict.  Right?

7           A.      Correct.

8           Q.      And you knew that she would not be taking any

9   heroin while she was in the jail.  Right?

10          A.      Correct.

11          Q.      So did you suspect that she might suffer from

12  some withdrawal symptoms at that point?

13          A.      Not when she denied use of heroin to me for

14  five days.  Your withdrawals happen prior to that.

15          Q.      When do withdrawals occur?

16          A.      Usually from day two to day four.

17          Q.      You stated earlier that you thought that

18  perhaps -- and again, correct me if I'm wrong, but I thought

19  I heard you say that you were not sure if Madison was being

20  completely truthful with you during that first meeting on

21  Monday?

22          A.      Correct.

23          Q.      Did you suspect that she had maybe used heroin

24  sooner than four days prior -- four days or five days ago?

25          A.      At that point.  But then I called the hospital

 1  and verified that they had seen her on Thursday, I believe it

 2  was, because that's where she got her medications.  So then I

 3  was apt to believe that she hadn't used since then.

 4          Q.    When did you call the hospital?

 5          A.    Monday.

 6          Q.    What time?

 7          A.    I don't know.

 8          Q.    Where did you document that?

 9          A.    I didn't.

10          Q.    Do you know who you spoke to?

11          A.    It would have been the ER nurse.

12          Q.    Do you know the name?

13          A.    No.

14          Q.    Did you at that point -- obviously you were

15  doing some investigation as to whether Madison may have been

16  taking heroin?

17          A.    No.  I was investigating her prescription pills

18  to make sure that that's where they --

19          Q.    Oh, okay.

20          A.    -- they were from, and that these were -- I

21  verified them.

22          Q.    So did you call and verify prescription pills

23  or did you call and verify what she was in for?

24          A.    I called and verified prescription pills.

25          Q.    Okay.  So going back, I think you were just

1   saying that when you called the hospital, that allayed your

2   concerns about heroin -- about Madison having taken heroin

3   within just a day or two of coming to the jail?

4         A.    Madison stated to me on Monday morning that she

5   had been seen Thursday in to ER.  She did not tell me to

6   what.  But that's where she got her prescriptions from.  That

7   is why I contacted the ER to verify that that's where these

8   prescriptions came from.  Uhm, but I didn't know what she had

9   been seen for.

10               So in my opinion, if Madison had been seen for

11  heroin at that time, that she -- and she's denying it to me

12  now and said that she hadn't used in five days, I just put

13  two and two together and would assume that's when she was --

14  what she would have been seen for, possibly, there.

15        Q.    I think you previously just testified that you

16  were concerned that Madison had perhaps taken heroin shortly

17  before she came into the jail?

18        A.    No.

19        Q.    No?  You were never concerned about that?

20        A.    She denied it.  I -- I have lots of concern and

21  assumptions of inmates.  But I can only go off of what I

22  know.

23        Q.    You're familiar with the medical intake

24  questions; you've already testified to that.  One of the

25  questions is whether you're having withdrawals from drugs or

1   alcohol.  As of the time when you saw Madison on Monday, did

2   you try to find this intake questionnaire to determine how

3   she had answered that question?

4       A.    No.  Because she told me no.

5       Q.    She told you that she was not experiencing

6   withdrawal?

7       A.    Correct.  She said, I know my body; I'm not

8   withdrawing, I have a bug.

9       Q.    But you were concerned that she might not be

10  truthful with you.  Right?

11      A.    (No oral response.)

12      Q.    Wasn't that your prior testimony?

13      A.    Yes.

14      Q.    But you didn't go back and try to find this

15  record?

16      A.    No.

17      Q.    And you didn't talk to any of the deputies that

18  booked her in to see whether they had any additional

19  information about a urine drug screen or anything like that?

20      A.    I don't know the deputies that booked her in.

21  As far as I'm aware, that would have been a night shift, and

22  I don't see those deputies.  I don't know what time she was

23  booked in.

24      Q.    I want to talk about the call to Logan Clark to

25  approve the clonidine.  When did you make that phone call?

Jana Clyde
May 23, 2018                                                      Page 188

1          A.        Sometime Monday.

2          Q.        Do you have any idea what time?

3          A.        It was in the morning.  It was, uhm, after I

4    had seen Madison.

5          Q.        There's a document that we looked at today that

6    shows that Madison received her morning clonidine medication

7    at 8 a.m. on Monday.  Is that accurate?

8          A.        Uhm, she received her morning medication, but

9    it was after I verified.  On our med sheets, those times are

10   already set.  So, yes, it was taken, not necessarily at

11   8 a.m. at that point.  However, after I verified with

12   PA Logan Clark that that would be an approved medication, at

13   this time, I gave it to her.  Actually, one of the deputies

14   took it down to her.

15         Q.        So the medication received or administered list

16   is just indicating that they received it sometime that day?

17         A.        Generally it is during that morning med pass.

18   But when I come in and there's meds from the night before, I

19   cannot verify all of those meds prior to morning med pass

20   between 7:30 and 8:00, because many pharmacies -- none are

21   open at that time.  So we have to wait.

22              And then according to the verification of that

23   med or from PA Logan Clark, then that med could be given

24   shortly after that conversation.  Unless it would be too

25   close to an afternoon med, and the time would be too short.

1   Which clonidine was not.

2          Q.     So when you -- tell me about the conversation

3   that you had with PA Clark.  Do you actually have a specific

4   memory of that call?

5          A.     No.  I mean, I remember calling him.  The

6   conversation, precisely?  I talked about medications.  Uhm,

7   but outside of that, I -- I don't know what we -- if we

8   talked about anything more.

9          Q.     Do you have a specific memory, as you sit here

10  today, of telling Logan Clark about these other medications

11  that -- the other prescriptions that Madison was taking at

12  the time besides clonidine?

13         A.     Yes.

14         Q.     So that's the only part of the conversation

15  that you have a specific memory of?

16         A.     I have a memory of talking to him about those

17  three medications.

18         Q.     What was the purpose of telling him about the

19  other two medications, the tramadol and the Wellbutrin?

20         A.     To see if they should be put in her property or

21  held out, if he would want to review them when he came on

22  Thursday.  Because at our facility, those are not approved

23  medications until the physician sees the inmate.

24         Q.     Right.  So he wasn't going -- Logan was not

25  going to approve tramadol or Wellbutrin over the phone.

Jana Clyde
May 23, 2018                                                    Page 190

```
 1    Correct?

 2         A.     Correct.

 3         Q.     So what was the purpose of mentioning them?

 4    Just to determine where they should be kept?

 5         A.     Well, and to let him know what he -- the three

 6    medications that she came in on.  When I call PA Logan, I

 7    just don't report the medications she can take.  I report all

 8    the medications they come in on.

 9         Q.     Do you do that for every inmate that you see

10    who comes in with medications?

11         A.     That are not approved or are on the call

12    provider list.  If they're not approved, we -- Logan would

13    not even address them.  We don't call him on them because

14    they're not approved.  It's not an issue.

15               On the call provider, yes.  Then if they're

16    taking other meds, we -- I let him know what those are along

17    with them.  It gives him an idea of the patient.

18         Q.     And tramadol is a medication that's generally

19    not approved; correct?

20         A.     Correct.

21         Q.     So again, I'm just wondering why you mentioned

22    that to him if you know that's not going to be approved?

23         A.     Because like I said, I give him all the

24    medications that they are on.  And then I -- it's just the

25    practice I do.
```

1       Q.      Sure.

2       A.      It's important for the doctor to know the

3  medications they're on.

4       Q.      What did Mr. Clark respond to you about the

5  other two medications?  What did he tell you to do with them?

6  You were wondering where to keep them?

7       A.      Yeah.  He said that he would review them when

8  he came on Thursday.  So I held them in the med room.

9       Q.      You have a specific recollection of saying, She

10  also has these other two prescriptions, and you have a

11  specific memory as you sit here today of him saying, Keep

12  them in this location?

13      A.      Very much so, yes.

14      Q.      Okay.  That's the only part of the

15  conversation, though, that you remember?

16      A.      I don't believe we had any more conversation

17  than that.

18      Q.      Okay.  Well, when I first asked you, you just

19  said you didn't remember the --

20      A.      That's what I'm saying.  I don't believe we had

21  any more conversation that I remember.  But I do remember the

22  medications.

23      Q.      So you also testified earlier that you told

24  Logan Clark over the phone that Madison was vomiting or had

25  reported symptoms of vomiting the day before?

1     A.     Correct.

2     Q.     Do you remember having that conversation?

3     A.     No.  And if he states it, I would believe that.

4     Q.     So do you actually remember saying that,

5  though?

6     A.     I would assume that I did.  That was one of the

7  signs that I had been told about from the deputies.

8     Q.     You would assume that, but you don't know?

9     A.     Exactly.

10    Q.     So it's possible that you didn't tell him that?

11    A.     Possible, but no.

12    Q.     When Madison was brought into the med room on

13  Monday, the 28th of November, did Deputy Richens say anything

14  to you about what had been going on the night before?  Or did

15  she only give you information after you saw Madison?

16    A.     While Madison was in there, she did say that

17  Madison had vomited the day before.

18    Q.     All right.  Did you ask Madison if she was

19  keeping down food, if she was able to eat?

20    A.     At that point, I verified if she had vomited

21  the night before.  And at -- I mean, 12 hours is not going to

22  be a concern at this point.  That's when I offered her to see

23  if there was anything over the counter that might -- I

24  offered her, like, Pepto-Bismol, you know, things that might

25  settle a stomach.  Because she reported a flu bug.

1       Q.      Did you specifically ask her if she was keeping

2   down food and able to eat?

3       A.      No.

4       Q.      You said earlier that Richens, Deputy Richens,

5   told you that Jana had -- that Madison had tested positive

6   for opiates when she came into the jail?

7       A.      Yeah, she told me that later after the visit.

8       Q.      Okay.  So let's talk about the conversation

9   that you had with Deputy Richens after the visit.  Where were

10  you when you had that conversation?

11      A.      I believe the med room.

12      Q.      What time of day was it?

13      A.      Sometime after Madison's visit.

14      Q.      How did Deputy Richens end up coming back to

15  the med room?  Did she just wander in there or --

16      A.      Yeah.  I assume.  I -- I'm just sitting in my

17  med room, and she walked in.

18      Q.      So you didn't call her --

19      A.      No.

20      Q.      -- and ask her for more information?

21      A.      No.

22      Q.      So Deputy Richens came by.  Did she say, Hey, I

23  wanted to let you know X, Y, Z?

24      A.      Yes.

25      Q.      What do you remember her saying to you?

 1        A.      That she had tested positive for opiates from

 2   what she understood from a UA that had been done prior

 3   before -- the day before.

 4        Q.      Did that report of information raise any

 5   concerns to you about whether Madison would be withdrawing

 6   from opiates while she was staying in the jail?

 7        A.      No.  Because they can test positive for several

 8   days after the use of an opiate, and she denied using it for

 9   five days.

10        Q.      How many days can they test positive?

11        A.      Four.

12        Q.      Where did you learn that?

13        A.      The jail.

14        Q.      When?

15        A.      When they -- I was taught to give UAs.  And I

16   also have a poster on my board on the door in my office that

17   says how long you can find drugs in systems.

18        Q.      I was curious about when you're instructed on

19   UAs just because I thought you said before that you didn't

20   receive any training on how to --

21        A.      It's not --

22        Q.      -- do your job?

23        A.      -- a training.  It's a taught.  The person

24   pees.  The officers are usually the one that does it.  They

25   observe them.  And then I see the UA cup.  I mean, they show

1  me how that works.  Did I have specific training in that?

2  No.  It was just kind of a hands-on, this is how it's done

3  situation.

4        Q.    So would you agree that you received

5  instruction from the jail or from Duchesne County about

6  certain aspects of how do your job when you -- over the

7  course of time that you've been employed?

8        A.    Yes.

9        Q.    One of those things was how to do a urine drug

10  screen and learn kind of about how long drugs would stay in

11  the system and show up on a drug screen?

12        A.    They didn't teach me that.  Like I said, it's

13  on the board; it's been a poster that's been hanging on my

14  door even before I got to the jail.  And so in curiosity, I

15  started learning that.  I'd be like, Oh, they -- this stays

16  in for this long and this stays in for this long.  So when

17  they would -- somebody would test positive for something, I

18  could refer to that of how long it would be in the system.

19        Q.    So when you said just a couple seconds ago that

20  you learned about how long drugs stay in the system in the

21  context of being instructed about how to conduct UAs, was

22  that accurate?

23        A.    In knowing how to conduct UAs?  Yes.  Knowing

24  how long they stay in the system, I refer to the thing on the

25  wall.

1          Q.      Okay.  Just strictly the thing on wall, then?

2          A.      Yes.

3          Q.      When you contacted Logan Clark on Monday, the

4    28th, did you use a cell phone to call him?

5          A.      I don't know if I used my cell phone or the

6    jail phone.

7          Q.      What do you typically use to call Logan?

8          A.      When I'm in the office, I would typically use

9    the jail phone because service is pretty sparse in there for

10   a cell phone.  If I text, of course, I then use the cell

11   phone.  And I'll step -- when I step away from the office, it

12   goes through.

13         Q.      Is that a personal phone, cell phone, that you

14   use?  Or is it one that's issued by the jail?

15         A.      It's a personal.

16         Q.      What's your cell phone service provider?

17         A.      Uhm, at that time?

18         Q.      Yes.

19         A.      It was Verizon.

20         Q.      What was your phone number at the time?

21         A.      (435) 671-0163.

22                 MR. MYLAR:  For the record, I want to keep that

23   phone number protected and mark that private --

24                 MS. ABKE:  Absolutely.

25                 MR. MYLAR:  -- in deposition, please.

1    BY MS. ABKE:

2         Q.    When you evaluated or when you took Madison's

3    blood pressure on Monday, the 28th, her blood pressure was

4    elevated.  Correct?

5         A.    Yes.

6         Q.    Is that a known symptom of withdrawal from

7    opiates that you're aware of?

8         A.    Uhm, not -- I don't know.

9         Q.    You don't know?  Okay.

10        A.    At that time.

11        Q.    Do you know now?

12        A.    Uh-huh.

13        Q.    Is that a yes?

14        A.    Yes.

15        Q.    Is that a symptom of withdrawal from opiates?

16        A.    Not always but, yes, it can be.

17        Q.    Can be.

18              After your call to Logan on November 28th, on

19    Monday, you never called him again regarding Madison Jensen.

20    Correct?

21        A.    Correct.

22        Q.    On Tuesday, the 29th, when you saw Madison for

23    the second time, how did she come to see you?  I was a little

24    unclear because it said it was maybe a follow-up, but I

25    wasn't sure if that was something that you would say, Hey, I

 1  need to see her, please bring her here?  Or where you would

 2  go to see?

 3       A.    No.  Liz Richens.  Once again, Deputy Richens

 4  brought her down to the med room.

 5       Q.    Before Deputy Richens brought her down to the

 6  med room, did she say, Hey, I want you to see Madison again?

 7       A.    I think if I remember correctly, we had a

 8  discussion about Madison.

 9       Q.    What do you remember about that discussion?

10       A.    Just, you know, anything new, anything I need

11  to know, things along that line.

12       Q.    What did Deputy Richens tell you?

13       A.    I didn't get a report of anything different.

14       Q.    She didn't report that any vomiting --

15       A.    No.

16       Q.    -- or continuation of symptoms?

17       A.    No.

18       Q.    So when -- so then did you have her, Deputy

19  Richens, bring Madison down?

20       A.    Correct.

21       Q.    How long did Madison come down to the med

22  room -- or how long was she there on Tuesday?

23       A.    Five minutes, possibly.  I don't recall for

24  sure.

25       Q.    Did you ask her about her symptoms?

1        A.      Yes.

2        Q.      Did you -- and you didn't take her vitals?

3        A.      No.

4        Q.      Did you ask her whether she was able to eat or

5    keep any food down at that point?

6        A.      Yeah.  She said that she -- I asked her more

7    specifically, not in regards to eating but to the Gatorade.

8    And she stated that she was doing fine with that, was able

9    to, uhm, keep that down.  She felt that she was feeling

10   better.  And I told her that we would continue to provide her

11   Gatorade.

12              MS. ABKE:  We've been going for an hour.  Does

13   anyone want a break?

14              MR. MYLAR:  I could use a break.  How about two

15   minutes?

16              MS. ABKE:  Sure.

17              (Recess taken from 4:04 p.m. to 4:10 p.m.)

18   BY MS. ABKE:

19       Q.      Let's talk about the circumstances of Madison

20   being moved from the general population to the court holding.

21   That was at your request, that move?

22       A.      It was kind of a group decision.

23       Q.      How did that come about?

24       A.      Uhm, because I thought if she was actually

25   having diarrhea and vomiting, she -- if -- it would be a more

1  comfortable place for her to save that.  I -- you know, kind

2  of, Are you being truthful with me?  Or are you not?  And is

3  this something that we would encourage, you know, if you were

4  in here, it might be an easier place for you to save your

5  diarrhea or vomit for me to see, was kind of -- was my

6  thought process.

7        Q.    Was this a discussion that you had at the time

8  you saw Madison on Tuesday?

9        A.    I believe it happened later in the day.

10       Q.    Do you know what time it happened?

11       A.    I don't.

12       Q.    Do you know where the conversation happened?

13       A.    I believe the med room.

14       Q.    So this was, again, a conversation with just

15 you and Deputy Richens?

16       A.    Uhm, I don't know if it was just Deputy Richens

17 or I or if Sergeant Purdy was involved.  I couldn't tell you.

18 But I know Richens and I was both.

19       Q.    Did you call Deputy Richens or Sergeant Purdy

20 and say, Hey, I want to talk about her location and -- her

21 housing location in jail?

22       A.    I don't know how the conversation came up.  I

23 can't remember.

24       Q.    So basically your first memory is just all of

25 you are there in the med room having this conversation?

1          A.      Correct.

2          Q.      And you raised the concern that maybe it would

3   be better to have her in court holding in the event that she

4   is having symptoms of vomiting and diarrhea?

5          A.      (No oral response.)

6          Q.      Yes?

7          A.      Correct.

8          Q.      Did Deputy Richens say anything?

9          A.      I mean, I'm sure she agreed with me.

10         Q.      Well, you said it was kind of a group

11   discussion --

12         A.      Yeah, I mean --

13         Q.      -- so I assume someone else said something?

14         A.      -- like a group idea.  I, you know, present it,

15   and then we all agree to it type thing.  And, uhm, so like I

16   said, I don't know exactly what was said from anyone else's

17   part.  But obviously they agreed, and the inmate was moved.

18         Q.      Are you allowed to authorize moving an inmate

19   or does, like, another person in the jail, like maybe a

20   sergeant or a commander or something that, have to make that

21   approval?

22         A.      They have to make that approval.  I just can't

23   say, Move them.  Because I don't know what the whole

24   situation is with other inmates in certain areas.

25         Q.      That's what I was assuming.

1        A.      Yeah.

2        Q.      So you expressed your sort of opinion --

3        A.      Uh-huh.

4        Q.      -- that maybe it would be a good idea to move

5    Madison.  Yes?

6        A.      Yes.

7        Q.      And then that was communicated to Deputy

8    Richens?

9        A.      I believe Deputy Richens was there.  Like I

10   said, it was a discussion.  I'm not sure how it all came

11   about.  But that was the final contribution.

12       Q.      So you didn't direct anyone to say, Hey, take

13   this for approval with whomever needs to approve this?

14       A.      I believe that's where Sergeant Purdy came in.

15       Q.      Did she physically came into the med room?

16       A.      I don't know.  Like I said, I honestly cannot

17   remember, but I don't know if Liz then -- or, excuse me,

18   Deputy Richens then went down and discussed with her

19   corporal.  I can't say what she did.  So I can only confirm

20   with -- with that conversation I was involved in.

21       Q.      Did you see Madison after she was moved to

22   court holding on Tuesday?

23       A.      No.

24       Q.      When you were testifying earlier today about

25   policies, about jail policies and things like that, and you

1   said no, there's not a policy sometimes or, yes, there is a

2   policy, have you ever read, personally read, the jail

3   policies?

4          A.     No.

5          Q.     So when you said earlier that there's not a

6   policy about something or there is a policy, is that based on

7   your general understanding?

8          A.     My, uhm -- when you were talking about policies

9   of opiate watch, if that's what you're talking about, that

10  would --

11         Q.     There's been -- we've talked about all kinds of

12  policies.

13         A.     I know, that's what I'm saying.  In regards to

14  something like that, that would actually be brought in by PA

15  Logan and Dr. Tubbs.  What the jail standards and policy are

16  is something different.  You know, that policy of an opiate

17  watch and an alcohol withdrawal would be brought in, approved

18  by the jail commander, and then implemented.  Did that answer

19  your question?

20         Q.     Not really.

21         A.     Sorry.

22         Q.     So I'm just asking whether -- if you've never

23  physically read the policies, you've never personally taken

24  those policies in your hand and read them line by line, do

25  you actually know what jail policies say as you sit here

1    today?

2           A.     No.

3           Q.     Okay.

4                  So when did you tell Madison to fill out the

5    medical request form?

6           A.     It would have been taken by a deputy after she

7    was moved to court holding and filled out.  So it was

8    sometime after she was moved to court holding or on

9    Wednesday.

10          Q.     Did you tell Madison personally to fill it out?

11          A.     I told Madison on Tuesday that I would like her

12   to put in a request.  And on -- you know, it wasn't there.  I

13   had also told her on Monday.  It was not on the kiosk to

14   print up so, therefore, I knew she hadn't.

15                 So that's when I -- we moved her to court

16   holding.  I handed her the -- the handwritten where she would

17   handwrite.  Handed it to the deputy and said, See if Madison

18   will fill this out for a doctor's request.  And a lot of the

19   times, I tell them it would create a paper trail in the

20   medical chart.

21          Q.     You just told me that you did not see Madison

22   after she --

23          A.     A deputy took --

24          Q.     -- was moved to court -- wait, let me finish.

25          A.     Sorry.

1        Q.      You just told me that you did not see Madison

2   after she was moved to court holding?

3        A.      Correct.

4        Q.      So how did you see her in court holding and

5   hand her the medical request form?

6        A.      Deputy took it from my med room to them.  I

7   gave it to the deputy, told them to have Madison fill it out.

8        Q.      Okay.  So you did not personally hand it to --

9        A.      Correct.

10       Q.      -- Madison?

11               How many times did you personally give Madison

12   a Gatorade?  That you -- that you actually remember?

13       A.      That I actually remember?  Twice.

14       Q.      And were those both times when she was in the

15   med room?

16       A.      No.  The med room Monday morning and Wednesday

17   afternoon.  I forgot to give her one on Tuesday; that is when

18   I believe it was Sergeant Purdy came in and asked, and I

19   said, Yes, take one down to her; I forgot to give it to her.

20       Q.      If the inmate intake questionnaire form had

21   been placed in your in-box when she was -- when Madison was

22   booked in on Sunday, would you have reviewed it?

23       A.      Yes.

24       Q.      Would you have reviewed it on Monday when you

25   came in?

Jana Clyde
May 23, 2018                                                     Page 206

```
 1          A.      Correct.

 2          Q.      Would you have called Logan and reported that

 3   we have an inmate who is reporting symptoms of withdrawal?

 4          A.      I would have talked to the inmate first.

 5          Q.      Before calling?

 6          A.      Uh-huh.

 7          Q.      Is that a yes?

 8          A.      Correct.

 9          Q.      All right.  So the Wednesday, I just want to

10   clear up a couple things about the Wednesday interaction.  I

11   wrote down that you walked to her cell in the afternoon at

12   four.  You gave her a Gatorade, and you asked if she could --

13   if you could do anything else for her, and she said no?

14          A.      Correct.

15          Q.      That's the extent of your interaction that day?

16          A.      To the best of my knowledge, yes.

17          Q.      You didn't ask her if she was still vomiting?

18          A.      Correct.

19          Q.      You didn't ask if she were able to eat or

20   drink?

21          A.      Correct.

22          Q.      You didn't ask if she had diarrhea?

23          A.      Correct.

24          Q.      Is there a reason why you didn't ask?

25          A.      Because she had denied it.  And I wasn't
```

1   getting report that she had been.

2        Q.      Well, at that point, you had gotten her medical

3   request form, right, and you read it?

4        A.      (No oral response.)

5        Q.      Yes?

6        A.      Correct.

7        Q.      So I don't understand why you didn't ask if you

8   got that symptom report.

9        A.      I think I explained this in one of my

10  testimonies earlier.  She had denied two days adamantly that

11  she did not have this.  So then I get the report that she is;

12  yet, I have instructed her to save her vomit and diarrhea for

13  me to see, and she hadn't.  So I had no reason to believe

14  that she was experiencing this, and that the report would be

15  same as the previous two days.

16       Q.      You had no reason to believe other than that,

17  her medical request form.  Right?

18       A.      Correct.

19       Q.      When Logan came in on Thursday to see inmates,

20  the inmates that he's going to see for the day are brought to

21  the med room.  Correct?

22       A.      Most of them.  Not all, no.

23       Q.      Which ones are not brought to the med room?

24       A.      The ones that are in court holding, iso and

25  booking -- isolation and booking.

1       Q.     So does Logan always see the patients who are

2  not in -- who are in general population first?  Or does it

3  just depend?

4       A.     Generally, he always sees them first.

5       Q.     Is that --

6              MR. MYLAR:  I'm just going to object.  I think

7  these were already asked.

8              MS. ABKE:  Okay.  I'm just -- I was just

9  clarifying because I'm just making sure I have this stuff

10 down.

11 BY MS. ABKE:

12      Q.     Does Logan have keys to the court-holding cell?

13      A.     No.

14      Q.     How do you know that Logan saw the medical

15 request forms on Thursday morning when he came in?

16      A.     I gave them to him.

17      Q.     So did you physically sit there while he went

18 through them?

19      A.     Yes.

20      Q.     Did you talk about any of the forms?

21      A.     I'm sure we did.  We always do.

22      Q.     Do you remember having a conversation on that

23 December 1st?

24      A.     Yes.

25      Q.     Well, what do you remember?

Jana Clyde
May 23, 2018                                                    Page 209

```
 1        A.      That we talked about inmates.  And I

 2  specifically remember talking about Madison, that we -- she

 3  was now in court holding, that she was denying seeing him,

 4  but I had her fill out this medical request anyway.  And she

 5  was the one that I had talked to him previously about on the

 6  medications, and that we would need to see her.

 7        Q.      Do you remember when during -- when you had

 8  that conversation?  I mean, is that just first thing when he

 9  comes in?

10        A.      Yes.

11        Q.      Okay.

12                Do you remember what the -- if Logan said

13  anything in response to you when you explained what was going

14  on with Madison?

15        A.      I do know he responded.  I cannot remember to

16  what it was.

17        Q.      So your memory is pretty much limited to what

18  you said to him on that day on December 1st?

19        A.      (No oral response.)

20        Q.      Yes?

21        A.      Yes.

22        Q.      What information is typically in a patient's

23  medical file?  Are there certain documents that always go in

24  there?

25        A.      Uhm, Logan's notes that he's dictated.  Their
```

1    medical requests, their medication sheets.  Any documents

2    that -- if we have medical releases.  Anything from a

3    doctor's office that has been faxed in.

4          Q.     How about their medical intake questionnaire?

5          A.     If I have them, I'll put them in the file.

6          Q.     So you don't go in and try to print those out

7    and put those in the file?

8          A.     No.

9          Q.     Why not?

10         A.     Well, first off, I don't know all the inmates

11   that come in.  And then once they come in, we've already

12   addressed the inmate and talked to them.

13         Q.     If you're --

14         A.     I have, so...

15         Q.     If you're preparing an inmate medical file

16   because you received a medical request, then you could go in

17   and grab that -- you can go in the computer system and grab

18   that intake form.  Right?

19         A.     Yes, I could.

20         Q.     But that's not something that you typically do?

21         A.     Correct.

22                MS. ABKE:  I think I'm almost done.  I just

23   want to look at this one last thing.

24                Okay.  That's all the questions I have.  Thank

25   you.

```
 1                    (Off-the-record discussion)

 2

 3                    E X A M I N A T I O N

 4

 5   BY MR. HOMER:

 6        Q.    So I just have a few follow-up questions, and

 7   that's all.  You were asked by counsel for Logan Clark

 8   whether you are familiar with all of the written policies and

 9   procedures of the jail, and you said no.  Right?

10        A.    No.

11        Q.    So I just want to confirm that you're not aware

12   of any policy and procedure that was in effect in November,

13   December 2016 that specifically addressed diarrhea or

14   vomiting or things like that?

15        A.    Correct.

16        Q.    You're not aware of anything like that.  Right?

17        A.    Correct.

18        Q.    Okay.  Then I'd like you to look at Exhibits 39

19   and 13.

20              MR. HOMER:  Does she have those?

21              MR. MYLAR:  Which one first?

22              MR. HOMER:  Yeah.  Just pull them both out.

23              I'm just trying to figure something out here.

24              THE WITNESS:  Did you say 39?

25              MR. HOMER:  Yes.
```

```
 1                    MR. MYLAR:  It should look like the opiate
 2   policy.  You pulled that out, didn't you?
 3                    THE WITNESS:  So that's 38, 40.
 4                    MR. HANCEY:  I pulled out 39 and 13.
 5                    MR. HOMER:  That's what I thought.
 6                    THE WITNESS:  There's 34, there's 6.
 7                    MR. HOMER:  Ryan, you pulled that out.
 8                    MR. HANCEY:  I pulled out 39 and 40.
 9                    THE WITNESS:  3, 2, 37, 11, 5, 14, 4, if I --
10   if I talk loud, 10.  Excuse me, I've got a chocolate.  22, 25
11   and 31.
12                    MR. HOMER:  So you're missing which one?
13                    THE WITNESS:  39.
14                    MR. HOMER:  I'll just pull out my copy.
15                    (Off-the-record discussion)
16   BY MR. HOMER:
17        Q.     Let's start with 39.  Okay?
18        A.     Okay.
19        Q.     That appears to have been produced by Logan
20   Clark.  Do you see down at the bottom, the Bates stamp?
21        A.     Correct.
22        Q.     Have you seen that document before?
23        A.     Yes.
24        Q.     When did you see it?
25        A.     Uhm, to the best my knowledge, the first time I
```

1   saw this document would have been in January of 2017.

2          Q.     Okay.  So is it -- do you remember who showed

3   it to you?

4          A.     It would have been PA Logan Clark.

5          Q.     Did Mr. Clark actually pull it out and give you

6   a copy of it?  Or how did you receive it?

7          A.     Uhm, generally, when he brings something to the

8   jail, he brings me the copy to have.

9          Q.     Okay.  All right.

10         A.     Correct.

11         Q.     And then look at the 13, which has the same

12  heading but appears to be a little bit different document.

13  Would you agree with that?

14         A.     Yes.

15         Q.     Can you -- do you have any information or

16  knowledge concerning which document was prepared before the

17  other?  In other words, was 13 prepared after 39 or do you

18  know?

19         A.     I don't know.

20         Q.     Okay.  Look at 39, at the outline there.  It

21  says nurse or officers -- well, let me back up.

22                Did Mr. Clark indicate he had prepared this?

23         A.     I don't know where he got this from.  I don't

24  know if he prepared or if it was something that had been in

25  practice somewhere else or he found.  I don't know.

```
 1            Q.      All right.  Had anybody in the jail at that
 2     point received a copy to the best of your knowledge?
 3            A.      No.
 4            Q.      And then you look at 13.  And I don't know the
 5     answer to this.  This appears to have been produced by the
 6     Uintah County Sheriff.  Do you see that down there?
 7            A.      Yes.
 8            Q.      Do you have any knowledge concerning that, the
 9     copy they had in their possession at the time that they
10     produced it?
11            A.      No.
12            Q.      Okay.  And at the bottom of that exhibit, see
13     where it says "without prior" and then it just -- there's
14     nothing?  Do you know if there's a second page to this
15     document?
16            A.      No idea.
17            Q.      Do you have either of these two documents in
18     your personal possession at this time?
19            A.      No.
20            Q.      Did you have anything like this, either one of
21     these documents, that you gave to counsel to produce in
22     response to request for production of documents?
23            A.      Uhm, I believe I obtained one from the jail
24     when he asked for what he wanted.  But I can't remember what
25     all I -- I got from that.
```

```
 1          Q.      Okay.

 2                  MR. HOMER:  All right.  That's all I have.

 3                  MR. MYLAR:  I just have a couple of follow-ups.

 4                  MR. HANCEY:  And I do, too, but I have like six

 5     questions, so -- and I can do it from here or whatever.

 6                  MR. HOMER:  Go ahead.

 7                  (Off-the-record discussion)

 8

 9                  E X A M I N A T I O N

10

11     BY MR. MYLAR:

12          Q.      Prior to December 1st of 2016, had you ever

13     heard of an inmate dying from heroin while they were

14     detoxing?

15          A.      No.

16          Q.      All right.  Had you ever heard of an inmate

17     dying because of dehydration as a result of using heroin?

18          A.      No.

19          Q.      If you ever thought that an inmate needed

20     urgent or emergency medical care at the jail, what would you

21     do?

22          A.      I would contact PA Logan Clark or call an

23     ambulance.

24          Q.      Okay.  So you could call an ambulance if you

25     needed to?
```

```
 1          A.      Correct.

 2          Q.      Did you ever think during the time Madison was

 3   in the jail that there was ever emergent or urgent medical

 4   condition for her?

 5          A.      No.

 6          Q.      Is that based upon your observations and your

 7   discussions with her?

 8          A.      Correct.

 9          Q.      Did you ever observe Madison shaking while she

10   was at the jail?

11          A.      No.

12          Q.      Did you ever observe Madison sweating while she

13   was at the jail?

14          A.      No.

15          Q.      When you met with her in the medical area on

16   Monday or Tuesday, did she appear to you to be somebody that

17   was currently affected by heroin or in her system?

18          A.      She didn't exhibit any signs while she was in

19   the med room.

20          Q.      All right.  And did she appear to be detoxing

21   from heroin when she -- when you were meeting with her in the

22   medical room?

23          A.      No.

24          Q.      Did you ever know -- when Madison was in the

25   jail and when you were there, were you ever aware of any
```

1   urgent or emergency situations with respect to her vomiting,

2   diarrhea or dehydration?

3        A.     No.

4        Q.     As far as you know, was she drinking the

5   Gatorade every time that was given to her?

6        A.     Yes.

7        Q.     Did you believe that would be sufficient for

8   her hydration?

9        A.     Yeah.  She was getting two and three a day

10  along with the access to the water she had in her cell.

11       Q.     At one point, I think it was Wednesday, when

12  plaintiff's counsel was asking you questions, I think you

13  said that you saw bottles of Gatorade, empty bottles, in the

14  cell.  Is that correct?

15       A.     Correct.

16       Q.     That was on Wednesday, when you last saw her

17  Wednesday afternoon?

18       A.     Wednesday afternoon.

19       Q.     You also, I think, when plaintiff's counsel was

20  asking you questions, I think you said you took some vital

21  signs also on Tuesday, but that they were normal.  Is that

22  correct?

23       A.     I'm sorry.  I did.  When -- I can't remember --

24  Kat asked me that question.  Uhm, I did take vital signs on

25  Tuesday, but they were normal and not recorded.

1          Q.      Okay.  So you didn't report them because they

2    were normal?

3          A.      Correct.

4          Q.      I think you had also said to plaintiff's

5    counsel because she was on the blood pressure medication?

6          A.      Correct.

7          Q.      So did you just presume that the blood pressure

8    medication was working at that time?  Or what was your

9    thinking?

10         A.      Correct.  Also at one -- I had advised Madison

11   Tuesday morning that if she felt she needed her blood

12   pressure checked at any time, I would be glad to do that.

13   But as of at that point, they were normal.

14         Q.      All right.  And you had said a couple times

15   that Madison had emphatically said to you that she was not

16   withdrawing from heroin; I know my body.  Had you ever had

17   another inmate ever say that emphatically to you?

18         A.      No.  They all want help.

19         Q.      Did you believe that she was withdrawing from

20   heroin when she said that emphatically?

21         A.      No.

22         Q.      You said that if there was an emergency

23   situation, that you would call the ambulance.  Do you know,

24   based upon your experience, do other corrections officers

25   also have the ability to call an ambulance if they believe

1   there's an urgent or emergent medical condition of the

2   inmate?

3           A.      Absolutely.

4           Q.      Has that been done in the past?

5           A.      Yes.

6           Q.      Have you done that in the past?

7           A.      Yes.

8           Q.      When you saw her on Wednesday, you said that

9   she looked to not have deteriorated from when you saw her

10  Monday and Tuesday.  What did you observe?  Did you see her

11  move?  What was the circumstances?

12          A.      When I knocked on her door, she got up from the

13  position that she was in over there, walked to the door,

14  ambulated fine.  Took the Gatorade from me.  Re -- you know,

15  denied me needing to give her anything else that day.  And

16  then she ambulated back to her -- walked back to her, uhm,

17  area where she sat down.

18          Q.      Did she speak fluently and well?

19          A.      Yes.

20          Q.      Did she move normally?  Was she limping or was

21  she moving normally?

22          A.      It was moving normally.

23          Q.      So she wasn't dragging or anything like that?

24          A.      No.

25          Q.      Wasn't saying, I can't get up?

```
 1        A.      Correct.

 2        Q.      She never asked for help getting up?

 3        A.      Correct.

 4        Q.      All right.

 5                MR. MYLAR:  Just one second.

 6                (Off-the-record discussion between Mr. Mylar

 7   and Mr. Jared Rigby.)

 8                MR. MYLAR:  I have no further questions.

 9                MR. HANCEY:  I have just a few more.

10

11              F U R T H E R   E X A M I N A T I O N

12

13   BY MR. HANCEY:

14        Q.      Let me direct your attention to Exhibit No. 17,

15   if you would.

16                THE WITNESS:  Which one is this?

17                MR. MYLAR:  This one.  The transcript.  It

18   should be in order.  Actually, these are in order.

19                MR. HANCEY:  It's the interview of Deputy

20   Richens.

21                MR. MYLAR:  It's not there.

22                THE WITNESS:  I go from 14 to 22.  This does

23   not look like anything I've seen.

24                MR. MYLAR:  I wonder, was this marked?  Did you

25   mark as an exhibit?
```

```
 1                 THE WITNESS:  I don't remember that.

 2                 (Off-the-record discussion)

 3                 (Whereupon, Exhibit No. 17 was marked for

 4  identification.)

 5                 MR. MYLAR:  What page?

 6                 MR. HANCEY:  Page 16.  Bates 165.

 7                 MR. MYLAR:  This is No. 16.

 8                 THE WITNESS:  Okay.

 9  BY MR. HANCEY:

10         Q.    This is the Liz Richens interview.  I want to

11  direct your attention, there are line numbers on the

12  left-hand column there, to Line 418.  Okay?  And there,

13  Deputy Richens says, From watching her you know, because she

14  came in normal, just whatever, you know Monday, yes, she was

15  throwing up.  Tuesday, she changed quite a bit.

16                 Was that consistent with your observations?

17         A.    No.

18         Q.    Going down further in the page, on -- starting

19  on Line 424, Richens says this:  She just seemed um, because

20  she didn't have any struggles coming in you know.  She was

21  walking doing her thing with us, just her color seemed fine

22  um, and then Monday, you know, she seemed doing something,

23  and then Tuesday it was just like, oh, she doesn't look good.

24  Like she was losing her color, she, just seemed, she looked

25  really weak.  And so I just, you know, I told Jana I was just
```

1    like, you know, She's throwing up a lot.  So because every

2    time I go do a section, I look in her cell, and she's just

3    lying in bed.  She just hasn't really got up.

4                    Then she says on 431, "She wouldn't eat."  And

5    on Line 433, she says, "So, Jana she just said okay."

6                    Do you agree with Deputy Richens's account that

7    I just read to you?

8          A.     I can't agree to what Richens saw or what she

9    speculates.

10         Q.     Well, then let's take it a piece at a time.  Do

11   you agree with Deputy Richens that the difference in

12   Madison's appearance from Monday to Tuesday changed from she

13   looked okay to she was losing her color and looked really

14   weak --

15         A.     No.

16         Q.     -- do you agree with that?

17         A.     No.

18         Q.     Do you agree with Deputy Richens that she told

19   you that Madison's throwing up a lot, every time she looks in

20   her cell, she's just lying in bed, she hasn't gotten up, she

21   wouldn't eat, and you responded just okay?  Do you agree with

22   that?

23         A.     No.

24         Q.     Let me have you look at Page 13 of that same

25   exhibit.  On Line 331, Deputy Richens is talking about the

1   Tuesday meeting in your office with Madison.  And she says,

2   "I noticed that she," meaning Madison, "looked weaker on

3   Tuesday.  She had a hard time walking, walking back, because

4   I ended up walking her back to her cell."

5              Is that something that you observed?

6        A.    No.

7        Q.    Did Deputy Richens ever report something like

8   that happening to you?

9        A.    No.

10             MR. HOMER:  Ryan, where are we at?  Which page?

11             MR. MYLAR:  Page 13.

12             MR. HANCEY:  That was on Page 13, Lines 331 and

13   332.

14             MR. HOMER:  Thank you.

15   BY MR. HANCEY:

16        Q.    Now let me have you look at Exhibit 14, if you

17   would.  This is the Logan Clark transcript.  Look at Bates

18   No. 49 on that.  In the last big paragraph on that page,

19   Logan Clark says that at any given time, there's probably

20   five or six people withdrawing from something at Duchesne.

21             Do you agree or disagree with that statement?

22             (Whereupon, Ms. Heather Jensen left the

23   deposition proceedings.)

24   BY MR. HANCEY:

25        Q.    As of November 2016?

```
 1          A.      I would disagree.

 2          Q.      Why you disagree?  Do you think there's less or

 3  more?

 4          A.      I would say less.

 5          Q.      Do you agree with Logan Clark, though, that the

 6  occurrence of multiple withdrawing people at any given time

 7  at the facility is true or false?

 8          A.      True.

 9          Q.      And do those people that are withdrawing from

10  something at any given time exhibit symptoms that include

11  vomiting and diarrhea?

12          A.      Yes.

13          Q.      Now, we've looked at Exhibit No. 3 -- sorry,

14  we've looked at Exhibits No. 2 and 3.  And if you'll recall,

15  on the prebooking form, which you've told me you never saw,

16  an inmate was asked the question, are you under the influence

17  or going through withdrawals from drugs or alcohol, and that

18  would be marked yes or no.  Right?

19               MR. MYLAR:  Objection.  I don't think it was

20  established this prebooking form was asked to an inmate.  I

21  think it was prebooking at that time.

22               MR. HANCEY:  All right.  Okay.

23  BY MR. HANCEY:

24          Q.      To somebody that was going to be booked into

25  jail.  Do you understand my question?
```

```
 1          A.      Yes.

 2                  (Whereupon, Ms. Heather Jensen returned to the

 3   deposition proceedings.)

 4   BY MR. HANCEY:

 5          Q.      Okay.  That's a question that new inmates are

 6   asked upon booking.  Right?

 7          A.      I -- I believe that this is asked before they

 8   are booked in by their arresting officer.  I don't know if

 9   it's completed in their vehicle or -- I have never seen this

10   filled out in our facility.

11          Q.      Okay.  But it is your understanding that this

12   is a question that the officer would ask of Madison and then

13   record the potential inmate's response.  Right?

14          A.      It is now that I've seen this.

15          Q.      Okay.  And then on Exhibit No. 3, which is the

16   medical intake form, your understanding is that this is a

17   form, a series of questions, that is asked of an inmate when

18   they're booked into jail?

19          A.      Correct.

20          Q.      And again, one of the questions that is asked

21   is are you having any withdrawals from drugs or alcohol, yes

22   or no.  Right?

23          A.      Correct.

24          Q.      Okay.  As of November of 2016, would you expect

25   a booking officer who had asked an inmate this question, are
```

1    you having any withdrawals from drugs or alcohol, and the

2    answer was yes, to communicate that information to you?

3          A.    Yes.

4          Q.    Do you think it was important information for

5    you to know in November of 2016?

6          A.    Yes.

7          Q.    Because when you were being questioned by Kat a

8    few minutes ago, you told her that it was important for you

9    to hear an admission from the inmate themselves, an

10   admission, so to speak, as to whether or not they had been on

11   drugs or were withdrawing.  Right?

12         A.    Correct.

13         Q.    If you heard that statement from their own

14   mouth, you would give that some weight and credence and then

15   act accordingly, perhaps by contacting PA Logan Clark.  Is

16   that true?

17         A.    Correct.

18         Q.    So we have here an instance where it looks like

19   Madison communicated that very response that you think is so

20   important to somebody at the jail.  Your testimony is that

21   wasn't ever communicated to you.  Is that right?

22         A.    Correct.

23         Q.    Do you know if any policies were in place as of

24   November 2016 that dictated whether or not the information

25   contained in a medical intake form should be communicated to

Jana Clyde
May 23, 2018                                                                                     Page 227

```
 1   you as the nurse?
 2           A.      I have no knowledge of that.
 3           Q.      Were you ever given that advice or counsel by
 4   anybody at the jail?
 5           A.      Not that I recall.
 6           Q.      When Kat was questioning you, you were asked a
 7   series of questions about how an officer who observed
 8   something like vomiting or diarrhea, or perhaps something
 9   that would warrant your attention, would communicate that
10   information to you.  Do you remember being asked about that?
11           A.      Yes.
12           Q.      Okay.  And you said sometimes they'll stick a
13   Post-it on your desk?
14           A.      Correct.
15           Q.      Sometimes they'll come into your office and
16   tell you in person?
17           A.      Correct.
18           Q.      Are there any other ways that they might
19   communicate such information to you?
20           A.      If I were to see them, they might verbally.
21           Q.      Outside of the office?
22           A.      Outside of the med room but inside the
23   facility, correct.
24           Q.      My question to you is, at any point in time
25   during Madison's incarceration, did any correctional officer
```

```
 1   at the jail communicate to you anything that you would expect

 2   to find in a officer-initiated medical request?  Does that

 3   make sense to you?

 4          A.      Rephrase that.

 5          Q.      Let me ask it again.

 6          A.      Yeah.

 7          Q.      Strike that question.

 8                  Do I correctly understand that, in some

 9   instances, an inmate can fill out a medical request form but,

10   in others, an officer who sees something can also fill one

11   out and give that to you?

12          A.      That's incorrect.

13          Q.      Okay.  It's always done by an inmate?

14          A.      Correct.

15          Q.      What do you call a communication from a

16   corrections officer to you along the lines of what might be

17   put in a Post-it or told to you in person concerning medical

18   care?  What would you call that?

19          A.      Well, if they talk to me verbally, it's a

20   verbal.  If they write something down, then it's a written

21   note.

22          Q.      But in either instance, you would agree with me

23   that it's an officer telling you that an inmate needs medical

24   care.  Correct?

25          A.      Correct.
```

Jana Clyde
May 23, 2018                                                      Page 229

```
 1          Q.      Okay.  So at any time during Madison's
 2  incarceration, prior to her passing away, did any
 3  correctional officer communicate to you that Madison needed
 4  medical assistance?
 5          A.      No.
 6          Q.      That she had any medical needs that were out of
 7  the ordinary?
 8          A.      No.
 9          Q.      That Madison was vomiting, outside of Monday?
10          A.      Outside of when I spoke with Madison on Monday
11  and she told me about Sunday?
12          Q.      Right.
13          A.      No.
14          Q.      That there was diarrhea in her toilet?
15          A.      No.
16          Q.      That there was vomit on her blankets, her
17  bedding or her roommate's bedding?
18          A.      No.
19          Q.      That there was vomit on the walls?
20          A.      No.
21          Q.      There was vomit on the floor?
22          A.      No.
23          Q.      That she hadn't been eating?
24          A.      No.
25          Q.      On Monday during your meeting with Madison when
```

1   you learned that she had gone to the hospital the Thursday

2   before to get her medical prescriptions.  Right?

3        A.     Correct.

4        Q.     Did you ask Madison on that occasion why she

5   had gone to the hospital?

6        A.     Uhm, she, uhm, told me that her medication -- I

7   verified medications were from a doctor at UVMC.  So, uhm, I

8   didn't verify why Madison was there.  I just verified what

9   the medications were for.

10        Q.     I understand that that's what happened in your

11   phone call to the hospital.

12        A.     Okay.

13        Q.     My question is, do you remember whether or not

14   you asked Madison at that time why she had gone to the

15   hospital on Thursday?

16        A.     I don't remember.

17        Q.     In questioning by Kat, you mentioned that the

18   opiate withdrawal policy that you first saw in January 2017

19   would be something that would be initiated by Dr. Tubbs's

20   office and then brought to you at the jail.  Do you remember

21   saying that?

22        A.     "Initiated," you mean when we instituted it?

23        Q.     Yes.

24        A.     Yes.

25        Q.     Is it your understanding that because you're an

```
 1   LPN, you can't come up with an opiate withdrawal policy on

 2   your own?

 3         A.     Correct.

 4         Q.     Is that your understanding as to why there

 5   wasn't one in place in November of 2016?

 6                MR. MYLAR:  Objection.  Calls for speculation.

 7   BY MR. HANCEY:

 8         Q.     If you know.

 9                MR. MYLAR:  And lack of foundation.

10                Go ahead.

11   BY MR. HANCEY:

12         Q.     Do you know?

13         A.     No.

14         Q.     You don't know?

15         A.     I can't create protocols.

16         Q.     No civilian can.  Right?

17                MR. MYLAR:  Objection.  Lack of foundation.

18                THE WITNESS:  I -- I have no knowledge if what

19   a -- if a civilian can or not.

20                MR. HANCEY:  All right.  One more question or

21   two.

22                MR. MYLAR:  I'm going to hold you to that.

23   BY MR. HANCEY:

24         Q.     You've testified that if a correctional officer

25   observes a medical emergency or something that they think
```

1    might warrant care of some kind, they have the ability on

2    their own, without you being there, to contact an ambulance

3    or a hospital.  Is that right?

4            A.      Correct.

5            Q.      They can also call PA Logan or Dr. Tubbs?

6            A.      Correct.

7            Q.      There is a report or a statement in this case

8    from Caleb Bird.  Do you know who he is?

9            A.      Yes.

10           Q.      He's a deputy at the jail.  Right?

11           A.      Correct.

12           Q.      He states, essentially, that he saw Madison on

13   Wednesday, November 30th; he was down there to give her her

14   medication.  Right?  Do you know that?

15           A.      I believe he's the one that took them down

16   there.

17           Q.      Okay.  And in his report, he says that after

18   his encounter with her, he went home and told his wife that

19   he thought Madison was dying.  Under a circumstance like

20   that, if true, would you expect a correctional officer to

21   contact an ambulance --

22                   MR. MYLAR:  Objection.

23   BY MR. HANCEY:

24           Q.      -- in November of 2016?

25                   MR. MYLAR:  Objection.  Calls for speculation

 1   and also lack of foundation.

 2                MR. HOMER:  Same objection.

 3                MR. HANCEY:  You can answer.

 4                THE WITNESS:  Uhm, I would believe that if

 5   Officer Bird really believed that, he would have called an

 6   ambulance.  However, he later stated in my criminal case that

 7   that was figure of speech and do -- that he did not mean it

 8   literally.

 9        Q.    If you observed medical conditions in November

10   of 2016 that made you think this person is dying, what would

11   you have done?

12        A.    If I thought they were dying, I would have

13   called an ambulance.

14                MR. HANCEY:  I don't have any other questions.

15   Thank you.

16                MR. MYLAR:  You done?

17                MS. ABKE:  No follow-up.

18                MR. HOMER:  Nothing further.

19                MR. MYLAR:  My client wants to review and sign

20   the deposition also.

21                (Deposition concluded at 4:57 p.m.)

22                          * * *

23

24

25

```
1                     C E R T I F I C A T E

2   STATE OF _____)
                                 : ss.
3   COUNTY OF _____)

4

5            I HEREBY CERTIFY that I have read the foregoing
    testimony consisting of 230 pages, numbered from 4 through
6   233, inclusive, and the same is a true and correct
    transcription of said testimony with the exception of the
7   corrections I have listed below in ink, giving my reasons
    therefor.
8
       1.   Page _____ Line _____ Correction_____
9           Reason _____
      2.    Page _____ Line _____ Correction_____
10          Reason _____
      3.    Page _____ Line _____ Correction_____
11          Reason _____
      4.    Page _____ Line _____ Correction_____
12          Reason _____
      5.    Page _____ Line _____ Correction_____
13          Reason _____
      6.    Page _____ Line _____ Correction_____
14          Reason _____
      7.    Page _____ Line _____ Correction_____
15          Reason _____
      8.    Page _____ Line _____ Correction_____
16          Reason _____
      9.    Page _____ Line _____ Correction_____
17          Reason _____
      10.   Page _____ Line _____ Correction_____
18          Reason _____
      11.   Page _____ Line _____ Correction_____
19          Reason _____
      12.   Page _____ Line _____ Correction_____
20          Reason _____

21

22                              _____
                                      JANA D. CLYDE
23           SUBSCRIBED AND SWORN to at _____,
    this _____ day of _____, 20___.
24

25                              _____
                                      NOTARY PUBLIC
```

```
 1                    C E R T I F I C A T E

 2   STATE OF UTAH        )
                          :
 3   COUNTY OF SALT LAKE )

 4

 5            THIS IS TO CERTIFY that the deposition of
     JANA D. CLYDE, the witness in the foregoing deposition named,
 6   was taken before me, JAMIE R. BREY, a Certified Shorthand
     Reporter and Registered Professional Reporter in and for the
 7   State of Utah, residing at Salt Lake City, Utah.

 8            That the said witness was by me, before
     examination, duly sworn to testify the truth, the whole truth
 9   and nothing but the truth in said cause.

10

11            That the testimony of said witness was reported
     by me in Stenotype and thereafter caused by me to be
12   transcribed into typewriting, and that a full, true and
     correct transcription of said testimony so taken and
13   transcribed is set forth in the foregoing pages numbered from
     4 through 233, inclusive, and said witness deposed and said
14   as in the foregoing annexed deposition.

15            I further certify that I am not of kin or
     otherwise associated with any of the parties to said cause of
16   action, and that I am not interested in the events thereof.

17

18            WITNESS MY HAND at Salt Lake City, Utah, this
     19th day of June, 2018.

19

20

21            _____
              JAMIE R. BREY, CSR, RPR
22            Utah license No. 361682

23

24

25
```

**Exhibits**

**Exhibit 2**  31:16,17,21
48:16,17

**Exhibit 3**  33:13,17 34:5,
20,24 35:25 36:3,6,22
37:2 38:6 49:15 224:13
225:15

**Exhibit 4**  86:1 123:13,17

**Exhibit 5**  92:7,8,12 94:4,
6 98:6 99:2,24 101:3,25
110:23

**Exhibit 6**  38:1,2,11,12,
25 39:20,23 40:7,18
41:2,9,13 52:7

**Exhibit 10**  131:17,21

**Exhibit 11**  84:5,9,22

**Exhibit 13**  132:9,10,14,
22

**Exhibit 14**  113:6,10
121:21 133:15 223:16

**Exhibit 17**  220:14 221:3

**Exhibit 22**  140:1,2,6,17

**Exhibit 25**  144:1,5

**Exhibit 31**  145:23,24
147:17

**Exhibit 34**  27:20,24
28:10

**Exhibit 37**  46:4,8 48:10

**Exhibit 38**  23:12,16
149:12

**Exhibit 39**  25:10,14 26:4

**Exhibit 40**  26:13,17

**1**

**1**  31:14 38:19,23,25
39:2,4 40:2

**10**  4:23 131:17,21
212:10

**10:00**  108:9

**10:05**  4:2

**11**  84:5,9,22 113:12
114:3 121:8 156:9 212:9

**11:20**  55:5

**11:34**  55:5

**12**  116:13 121:24 150:25
152:23 156:5 172:5
192:21

**12:37**  100:23

**13**  132:9,10,14,22
211:19 212:4 213:11,17
214:4 222:24 223:11,12

**1328**  124:20 125:4

**1333**  123:22

**14**  113:6,10 121:21
133:15 212:9 220:22
223:16

**15**  182:17

**16**  28:11 102:23 113:4
221:6,7

**1619**  84:24

**165**  221:6

**17**  28:12 46:16 220:14
221:3

**18**  28:12,13

**1884**  147:18

**1:30**  109:2

**1:32**  100:23

**1st**  21:20 46:23 47:7
48:15 49:18 50:9,25
98:23 107:17 113:17
121:13,17 123:8,22
145:7 150:5 181:10
208:23 209:18 215:12

**2**

**2**  27:3 31:14,16,17,21
38:19,24,25 39:4,5 40:3
48:2,11,16,17 212:9
224:14

**2005**  5:3 8:5 152:21,23
154:7,15

**2010**  153:16

**2012**  152:21

**2013**  156:16,17

**2014**  24:6 25:3

**2015**  28:11,14

**2016**  10:4 11:1,20 13:25
14:10,25 15:4,12,24
16:11,13,25 17:9 18:23
19:15 20:17 21:15,20
22:16,24 23:9 26:6 27:8
28:18 30:14 31:7 34:14,
19,23 35:11 36:2 39:19,
22 41:1,19,25 42:19
45:6,11,24 46:23,24
47:7 48:15 49:18 53:25
54:6,13 80:21 81:10,13
85:14 88:5,20 91:11,15,
20 92:13,19 93:16,18
94:22 95:2,10,14,22
96:3,6 97:13,17 98:2
101:22 102:4,11 103:12
112:7 119:2,10,18
120:5,20 123:22 128:7
129:17 130:13 133:23

Jana Clyde
May 23, 2018

135:19,21 136:8 137:12
138:1,5 139:12,19
140:22 142:22 143:3,17
146:12,16,19 147:1
148:2,5 150:5 151:10,17
155:1,14 156:23 157:14
158:12,15,24 159:21
160:10,12 170:9 211:13
215:12 223:25 225:24
226:5,24 231:5 232:24
233:10

**2017** 26:2 50:25 132:20
135:20 159:19 213:1
230:18

**2018** 4:1 28:14

**20th** 27:8

**2123** 107:2

**22** 140:1,2,6,17 212:10
220:22

**23** 4:1

**24** 133:22

**24-hour** 27:15

**24/7** 83:12,14

**25** 144:1,5 212:10

**27th** 45:24 123:7

**28th** 46:23 47:6,18 48:6
53:6,12 55:10 57:12
63:7 66:3 70:12 71:1
98:11 121:12,19 149:21
179:12 192:13 196:4
197:3,18

**29th** 73:6 75:2,9 76:2
84:24 99:3 175:3 197:22

**2:51** 149:10

---

**3**

**3** 32:20 33:13,17 34:5,

20,24 35:25 36:3,6,22
37:2 38:6 48:3,12 49:15
144:8 151:6 168:5 212:9
224:13,14 225:15

**30** 146:3

**30th** 43:6 90:4,6,20
98:16 103:12 104:13,20
105:16 232:13

**31** 145:23,24 146:5,6
147:17 212:11

**331** 222:25 223:12

**332** 223:13

**34** 27:20,24 28:3,4,10
212:6

**35** 123:19

**36** 86:2 124:17

**37** 46:3,4,8 48:10 212:9

**38** 23:12,16 149:12
212:3

**39** 25:10,14 26:4 133:6,
18 211:18,24 212:4,8,
13,17 213:17,20

**3:03** 149:10

---

**4**

**4** 49:11 86:1 123:13,17
212:9

**40** 26:12,13,17 212:3,8

**41** 134:11

**418** 221:12

**424** 221:19

**43** 134:23

**431** 222:4

**433** 222:5

**435 671-0163** 196:21

**44** 136:2 137:22 138:15

**47** 114:3

**48** 116:15

**49** 117:25 121:22 223:18

**4:00** 103:23

**4:04** 199:17

**4:10** 199:17

**4:30** 11:4,5 161:20 176:1

**4:57** 233:21

---

**5**

**5** 46:17 92:7,8,12 94:4,6
98:6 99:2,24 101:3,25
110:23 144:20 212:9

**54** 119:8,14

**55** 119:24

**58** 120:12

---

**6**

**6** 23:19 38:1,2,11,12,25
39:20,23 40:7,18 41:2,9,
13 48:3 52:7 144:7
212:6

**6:30** 11:4,5 161:20

---

**7**

**7:30** 108:9 188:20

**7th** 158:15

---

**8**

**8** 144:19 188:7,11

**84021** 4:23

**8:00** 188:20

---

**9**

**9** 149:17

**97** 154:7

**9:30** 113:17

---

**A**

**a.m.** 4:2 11:5 55:5 188:7, 11

**ability** 218:25 232:1

**ABKE** 6:9 7:18,20 22:3 23:2 64:8 68:4 69:20 78:2 96:7 108:19 114:2, 4 149:7 152:3,14 165:9, 14 168:5,7 182:13,14, 17,18 196:24 197:1 199:12,16,18 208:8,11 210:22 233:17

**absent** 28:16 55:6 100:24

**absolutely** 77:18 196:24 219:3

**access** 15:23 88:16,23 93:21 94:7 100:4,12 131:8 168:22 169:13,15 175:8 217:10

**accessible** 174:10

**Accidents** 171:25

**accompanied** 73:14

**accordance** 67:8

**account** 222:6

**accurate** 51:23 117:8 122:24 159:12 188:7

195:22

**act** 226:15

**actual** 21:9 36:6

**acute** 172:1

**adamantly** 51:24 67:6 87:9 207:10

**add** 134:19 173:5,6 174:8

**addict** 56:23 144:21 182:8,21,23 183:7,19,21 184:6

**addicted** 183:25

**addiction** 183:15,17,23, 24

**additional** 33:4 150:6 187:18

**address** 4:17,19,21 10:24 190:13

**addressed** 115:2 210:12 211:13

**administer** 17:9 100:11 139:20

**administered** 188:15

**admission** 46:12,16 48:12 49:11 226:9,10

**admit** 46:20 48:14,17 157:1

**admittance** 165:13

**admitted** 157:9 160:18

**advance** 97:3,4

**advice** 227:3

**advised** 151:8,9,13 169:4,5 218:10

**affect** 57:23

**affected** 216:17

**affiliated** 95:24

**afternoon** 43:5 98:16 103:14,24 109:2 161:21 173:4,12,16 175:6,7 178:12 188:25 205:17 206:11 217:17,18

**agency** 145:4

**agree** 9:22 24:9 75:23 114:22 118:7 122:2,4 138:1,21 144:14,22,23 145:14 148:12,15,18,23 156:7 159:1 181:15,21 182:22 195:4 201:15 213:13 222:6,8,11,16, 18,21 223:21 224:5 228:22

**agreed** 79:15 80:2 106:24 181:13 182:15, 19 201:9,17

**agreeing** 80:7 88:4

**ahead** 100:1 215:6 231:10

**alcohol** 32:23 37:3 155:7,11,19 156:25 157:10 187:1 203:17 224:17 225:21 226:1

**alerted** 42:7

**allayed** 186:1

**allowed** 6:18 58:19 201:18

**Allred** 55:6 56:7

**alluded** 169:17

**Alma** 7:17,19,22 8:6

**ambulance** 115:13,24, 25 161:5 171:7,8 215:23,24 218:23,25 232:2,21 233:6,13

Jana Clyde
May 23, 2018                                    Index: ambulate..aware

ambulate 57:6

ambulated 56:9 57:1
91:1 219:14,16

ambulating 76:2

amount 153:13

and/or 67:5 70:5 71:13
88:6 92:17 132:15,22
136:5 151:3,5,11

Andy 144:24

announcement 182:16

anomaly 143:22

answering 26:21 167:19

answers 37:18 46:10
61:25

antacids 58:7

anytime 172:16

AP 54:4

appearance 56:6,19
75:12 179:13 222:12

appeared 56:10 71:13

appears 212:19 213:12
214:5

applied 5:5 21:24

appointment 43:12,13

approached 115:16

approval 58:20 59:9
71:9 85:17 134:15
149:22 201:21,22
202:13

approve 187:25 189:25
202:13

approved 58:24,25 59:1,
2,3 71:2 87:18 149:3,23
188:12 189:22 190:11,
12,14,19,22 203:17

approving 59:21

apt 185:3

area 82:13 93:21 106:1,6
127:13 130:25 216:15
219:17

areas 8:8 93:8,25 112:17
153:6 201:24

arm 42:24

arresting 33:7,8 54:4
225:8

arrival 110:22 150:16

arrived 96:24 97:23
98:23 108:2 109:5
111:12 113:16,21,22
181:2

arrives 108:7

arriving 98:19

asks 115:12

aspects 17:4 195:6

assertion 119:1 150:2

assess 5:16 6:18 99:23
172:20

assessed 59:6

assessing 115:1

assessment 6:14

assessments 6:7,13
12:9

assets 183:3

assigned 85:7 127:19,25
128:1

assist 76:2 155:2

assistance 229:4

assume 29:25 34:14
36:24 39:13 57:4 66:2
70:3 111:15 117:23

approving 59:21

125:5 142:1 166:9
167:15 175:25 179:23
183:23 186:13 192:6,8
193:16 201:13

assuming 201:25

assumption 57:5 74:13

assumptions 186:21

ate 77:15

Atford 122:14

attached 43:11

attempt 177:15,21

attention 23:17,23 27:3,
6 32:20 37:1 42:4 46:15
48:11 49:10 54:11
113:12 115:19 116:16
123:19 144:7 149:14
157:3 169:6 220:14
221:11 227:9

attorney 50:24 52:6,18
60:9 75:16 113:11
133:17

attributed 77:16

attributes 117:10

audibly 54:17

authority 85:15

authorize 201:18

availability 100:13

average 11:20

avoid 139:10

aware 7:3 10:23 13:19
21:18 22:14,24 35:23
39:19 45:10 51:20
53:21,23 54:6 58:6,9,18
80:22 91:11 93:15
101:22 102:16 107:4
118:19 123:3 129:16

130:12 132:3 137:11
138:5 148:4 151:2
156:24 187:21 197:7
211:11,16 216:25

**B**

**back** 12:15 17:9 33:6
41:1,24 42:19 45:22
46:16 48:2,10 53:25
54:6 58:12,21 72:18
76:2 91:1 93:18 96:19
104:12 106:7 133:15
144:6 176:24 185:25
187:14 193:14 213:21
219:16 223:3,4

**bad** 97:8

**based** 21:22 37:23 65:6
66:6,8,9 67:7,17,20 68:2
101:6 107:10 115:11
150:1 182:1 203:6 216:6
218:24

**basically** 5:15 6:3 40:4
73:22 161:18 200:24

**Basin** 5:5,10 7:16,25
152:18,20 153:15

**basis** 44:24 61:15 155:6,
10 167:12 183:19

**Bates** 86:2 114:3 116:15
117:24 119:8,14,24
120:12 121:22 123:19
124:17 133:18 134:11,
23 136:2 147:18 212:20
221:6 223:17

**bear** 152:16

**beauty** 50:21

**bed** 69:8,9 77:11 90:23
91:1 103:16 222:3,20

**bedding** 78:11 107:3

229:17

**beginning** 45:3 152:17

**behalf** 4:6

**belief** 62:21,23,24
100:17 158:10 178:8

**believed** 51:17 233:5

**big** 113:25 116:16
133:20 136:3,5 223:18

**bill** 21:2

**Bird** 105:16,20 106:15,
22 232:8 233:5

**birth** 43:19,20

**bit** 8:6 29:13 41:17 53:18
57:16 74:6 103:11 110:7
137:25 147:18 152:16
162:11 213:12 221:15

**blankets** 177:1 229:16

**blew** 51:13 52:5

**block** 72:20,21 82:7,12
83:7 84:20 85:16
130:18,19,24 131:4,5,8
175:8,11

**blocks** 112:3 175:16

**blood** 8:19 18:4,6,9
68:17 70:16,22 117:2
136:19 137:8 158:20
160:15 161:12 197:3
218:5,7,11

**board** 194:16 195:13

**body** 57:24 124:18 125:4
187:7 218:16

**boils** 66:20

**bold** 23:19

**book** 36:25 135:1

**booked** 12:19 30:15,24,
25 31:2,4 34:6 39:15

40:2 45:23 53:22 166:1,
6 187:18,20,23 205:22
224:24 225:8,18

**booking** 11:25 12:12,14,
25 30:12,21 31:7,12
33:20 39:12 44:5,6 49:3
50:19 52:15 54:23 84:2
94:24 112:5 120:17
166:4 207:25 225:6,25

**books** 13:15

**bottles** 104:25 217:13

**bottom** 23:18,24 38:7
86:4 119:15 125:15
134:12 212:20 214:12

**box** 4:22,23 10:12 11:22,
24,25 12:3,4,5,8 14:5
34:12,17,20,25 39:15,
23,24 40:12,13 41:21
48:5 49:24 50:1,7 52:8,
11,14 53:10 54:24 94:24
168:18,21

**break** 55:1,4 100:20
101:2 126:3 149:8
199:13,14

**briefly** 5:12

**bring** 10:12 20:13 94:23
177:22 198:1,19

**brings** 213:7,8

**broad** 15:5

**broken** 42:24

**brother** 9:4

**brought** 42:4,11 53:8
54:10 57:13 80:1 116:7
134:19 169:24 174:20
176:19 192:12 198:4,5
203:14,17 207:20,23
230:20

**bug** 57:20,25 73:24

187:8 192:25

**BUTTERFIELD** 69:21,23

**button** 69:3 88:2 126:19, 22 127:1,5 129:21,25 130:4,10,24,25 131:4,9, 15

**buttons** 127:10 130:19

**bypass** 81:20

---

**C**

**cabinet** 58:4

**Caleb** 105:16 232:8

**calendar** 28:18

**call** 11:16 20:20 36:7 42:23 45:19 58:20 59:20,24 71:4 96:18 102:14 118:6,22 119:17 121:15 126:19,22 127:1, 5,9 129:3,21,25 130:4, 10,19,24,25 131:4,9,15 133:21 134:14,16 147:12 149:20 151:13 157:10 158:21 160:15 171:19,24 172:5,10 175:14 185:4,22,23 187:24,25 189:4 190:6, 11,13,15 193:18 196:4,7 197:18 200:19 215:22, 24 218:23,25 228:15,18 230:11 232:5

**called** 4:6 31:23 46:11 59:17 115:13,25 131:23 184:25 185:24 186:1 197:19 206:2 233:5,13

**calling** 189:5 206:5

**calls** 22:25 67:10 88:9, 25 110:6 120:1 128:23 134:13 152:4 154:11

231:6 232:25

**camera** 83:9,12,17 90:13 91:17

**cameras** 90:11,17 103:17

**Capitol** 20:21

**card** 10:1

**care** 16:15 17:1,9 18:11 27:16 41:3 144:14,16 147:25 148:9 172:1 215:20 228:18,24 232:1

**cared** 37:19

**carrying** 107:3

**case** 4:14 24:1 26:21 28:7 32:13 33:25 46:11 49:6 59:12 82:1 107:1 140:20 144:6 163:8 232:7 233:6

**category** 99:16

**cell** 63:21 72:18 76:3 78:12 79:18 82:2,3,7,11, 12,16,17,24 85:16 86:13 87:14 90:13,21 91:17,18 93:25 103:13,20 104:17, 21,22 105:8 106:19 107:2 108:25 109:7,25 114:20 115:7,11,12,23 116:3 122:8 123:24 125:21,22 126:10,25 127:2,14 130:18 131:1 141:12 143:11 176:18 177:9 196:4,5,10,13,16 206:11 208:12 217:10, 14 222:2,20 223:4

**cells** 82:13,21 83:16,18, 24 84:3,13 104:19 112:5,9,10 127:10 130:19 175:12

**Center** 5:5,10 7:16,25 152:18

**certification** 5:2,9 6:17 103:6

**certified** 139:6

**cetera** 137:14

**chance** 14:5

**change** 59:5,6 69:11 88:8 91:12 141:22 142:9 181:14

**changed** 8:7 29:19 37:20 41:4 89:15 118:16,20,21 178:12 179:18 180:6 181:15 182:3 221:15 222:12

**changing** 29:19

**channel** 127:5

**charge** 166:5

**charges** 57:23

**chart** 35:6 44:19 45:20 204:20

**check** 11:22 18:3,9 45:21 94:25 120:17 124:20 141:17 142:10 158:20 160:15 163:20, 24 170:19,21

**checked** 40:12,13 77:10 91:25 136:4 218:12

**checking** 117:11 120:15 142:11

**checks** 92:4 120:23,25 141:14,15,16

**cheeks** 121:25

**chocolate** 212:10

**choice** 37:12

**circled** 141:16

**circumstance** 12:24
232:19

**circumstances** 13:2
21:18 32:17 34:4 53:24
78:25 93:18 94:8 97:13
130:14 171:3,10,22
199:19 219:11

**civil** 32:13

**civilian** 231:16,19

**claims** 19:19

**clarification** 13:8 27:18
32:15 69:22 108:12
130:5 149:5

**clarify** 32:11 50:18
144:15 162:14

**clarifying** 89:1 208:9

**Clark** 5:23 10:17 11:17
23:25 24:2,16 25:2,25
26:4,8 42:20 43:4,14
45:9,14 59:8,13,21 60:4
71:1,5,12,16,22 72:1
81:16 91:8 95:21 96:5,
22 97:11,14 98:2,19,22
102:1,14 108:2,17,24
109:5,24 110:3,12,21
111:1,2,11,18 112:7,22
113:2,16 114:1 115:10
116:2,9,18,24 117:16
118:1,9,15 119:10,15,
18,25 120:6,13 121:22
124:19 133:16,21 134:1,
8,12,20,24 135:22 136:3
137:22 138:15 144:13
145:7,9,11 149:20
150:16 151:1,9 157:11
158:17,21 160:16
162:21 166:8 172:18
179:14,24,25 180:17,25
187:24 188:12,23 189:3,
10 191:4,24 196:3 211:7
212:20 213:4,5,22

215:22 223:17,19 224:5
226:15

**Clark's** 24:25 112:19
113:11 115:4 149:15,22

**clean** 45:22

**clear** 45:22 51:14 58:22
88:20 139:19 162:11
206:10

**client** 233:19

**clinic** 7:17 153:1,2,4,16,
25

**clipped** 141:11,21
143:11

**clonidine** 44:23 58:19
59:9,21 71:8 134:15
135:13 136:18 187:25
188:6 189:1,12

**close** 188:25

**closely** 135:7

**closer** 157:3

**clothes** 177:2

**Clyde** 4:5,16 9:6,7,8,9
12:3 19:9 23:15 25:13
26:6,16 27:23 38:5
39:23 41:1,19 46:7,20
55:9 60:8 66:7 84:8
86:10 101:2 113:9
123:16 124:19 125:19
131:20 144:4,9,12 146:2
149:21,24 150:6 151:2

**cold** 56:11

**collective** 154:15

**color** 75:18 221:21,24
222:13

**coloring** 79:9

**column** 221:12

**combined** 153:11

**comfortable** 200:1

**commander** 201:20
203:18

**comments** 71:23

**commit** 142:14

**common** 62:2 82:13
102:19 138:1 143:20
164:20

**commons** 127:13
130:25

**communicate** 68:22
71:4 97:2 109:23
119:10,19 163:17 226:2
227:9,19 228:1 229:3

**communicated** 71:25
85:10 119:22 202:7
226:19,21,25

**communication** 127:6
228:15

**communications** 110:2

**complaining** 17:22
19:17 24:4 102:12
114:14 154:1

**complaints** 135:5
154:21

**completed** 141:7 225:9

**completely** 184:20

**completeness** 29:8

**completion** 40:12

**computer** 10:13 36:19,
22,24 70:21 72:25 93:25
111:10 169:17 210:17

**concern** 101:15 186:20
192:22 201:2

**concerned** 72:12 118:5

Jana Clyde
May 23, 2018                                    Index: concerns..correct

177:23 186:16,19 187:9

**concerns** 81:17 186:2
194:5

**concluded** 233:21

**conclusions** 68:3

**condition** 66:21 121:11
172:21 179:18 182:1
216:4 219:1

**conditions** 40:19 233:9

**conduct** 195:21,23

**confidential** 9:19

**confirm** 202:19 211:11

**conflicts** 146:23

**confused** 51:19 52:25
122:23

**confuses** 92:22

**confusing** 114:23

**consistent** 85:2 86:16
113:20 124:25 134:17
135:17 138:24 139:5
221:16

**constitute** 6:7

**constitutes** 28:10

**construe** 33:25

**consult** 15:17

**contact** 81:6,7,16,18
91:8 101:25 124:3 128:8
134:1,8 147:9 166:5
171:3 172:17 215:22
232:2,21

**contacted** 59:8 81:2
118:9 119:2,12,20 120:6
123:23 124:1 128:20
129:7 186:7 196:3

**contacting** 226:15

**contained** 226:25

**container** 68:25

**context** 7:5 126:20
153:17 154:5,10 195:21

**continuation** 198:16

**continue** 199:10

**continuous** 147:24
148:9

**contribution** 202:11

**control** 69:3,4,16 83:9,
10,14,17 90:10,15 92:6
103:17 127:3,7,16 128:4

**controller** 9:1 121:8
127:20 128:8,20 129:7,
10,12,18 130:14

**controller's** 128:3

**convention** 20:25 21:1
27:13

**conversation** 79:6 91:3
105:10,23 106:9 107:20,
25 159:25 188:24 189:2,
6,14 191:15,16,21 192:2
193:8,10 200:12,14,22,
25 202:20 208:22 209:8

**conversations** 116:19

**convey** 69:18 125:25

**copaid** 8:2

**copy** 36:21 212:14
213:6,8 214:2,9

**corner** 38:8

**corporal** 163:5,8,24
202:19

**correct** 6:19,20 7:3 13:1
14:6,7 17:5,6 19:13
20:15 21:20 23:9,10
26:5 35:15 36:8 37:4,7,

10,14,24,25 38:17,21
40:17,20,21,23,25 41:8,
22,23 42:16 43:17 44:9,
15 46:1 47:13,21 50:4,5
51:19 54:24,25 55:11,12
58:15 59:9,10 60:7
61:10,11 64:19 65:6,7,
12 70:9 71:2,3 72:20
74:25 77:5 78:5,20,21
80:5,6,11 81:14 82:19
83:5 87:21 90:5 91:4
94:5,18 95:18,23 96:25
97:12,25 98:11,18,21
99:1,10,13 100:10,14
103:14,18 104:3,18
105:14 108:3,4,25 109:1
116:4,23 117:3,4,9
125:14 126:18 136:12,
13 137:17,19 139:17,22
140:21 141:6 142:3
148:14 149:1,12,13
150:16,17,23 152:19
154:22,25 160:11
161:21,22 162:24
163:22 164:16 165:3,16
166:11,12 167:16,17
168:13 169:8 172:21,22
174:1 175:18,21 176:5,6
178:18,21 179:3,18,19,
22,25 181:7,11,17,18
182:4,8 183:6,14 184:7,
10,18,22 187:7 190:1,2,
19,20 192:1 197:4,20,21
198:20 201:1,7 205:3,9
206:1,8,14,18,21,23
207:6,18,21 210:21
211:15,17 212:21
213:10 216:1,8 217:14,
15,22 218:3,6,10 220:1,
3 225:19,23 226:12,17,
22 227:14,17,23 228:14,
24,25 230:3 231:3
232:4,6,11

Jana Clyde
May 23, 2018

Index: correctional..days

**correctional** 34:19 40:15 69:18 80:23 81:2 85:14 132:3,6 134:8 227:25 229:3 231:24 232:20

**corrections** 144:18 218:24 228:16

**correctly** 6:25 11:21 24:7 38:20 43:15 198:7 228:8

**corroborate** 80:19

**corroborated** 71:18

**cough** 170:20

**counsel** 85:25 211:7 214:21 217:12,19 218:5 227:3

**count** 159:5 165:15

**counter** 53:14 192:23

**County** 7:11 16:1 24:6 25:20 28:8 32:4 36:16 44:7 52:3 123:23 126:20 139:19 144:6,8,20 145:2 146:8 155:3 156:8 157:14 158:7,16 159:9, 10,17 165:2 171:2 182:11 195:5 214:6

**couple** 23:23 47:20 58:17 76:15 90:11 103:16 104:25 128:18, 19 137:21 142:12 144:19 155:15 160:20 195:19 206:10 215:3 218:14

**court** 13:8 69:22 82:6,10 83:2,8 84:20 85:16 86:12 89:18,25 90:9 91:9 106:3 108:12 112:5,25 114:13 118:8 120:17 124:11 125:21, 22 127:1 130:5 148:17

149:5 150:7 175:10,17, 20,24 181:3 199:20 201:3 202:22 204:7,8, 15,24 205:2,4 207:24 209:3

**court-holding** 82:3,21, 24 83:24 84:3 86:13 87:14 90:21 106:6 126:10 127:2 208:12

**coverage** 133:22

**covered** 22:15

**CPR** 116:5,7

**create** 35:10,13 42:14,25 43:12 44:25 123:8 147:23 148:5,9,12,23 173:16 174:6,7 204:19 231:15

**created** 35:16 42:18 43:8 44:20 50:2 98:14 148:16,21 149:2 173:4, 5,7

**creating** 172:24 173:8

**creation** 172:23

**credence** 226:14

**crew** 164:5

**criminal** 51:11 233:6

**criteria** 44:12,13

**cross** 143:4

**crossed** 140:11

**Crowley** 85:20 86:8 87:3 123:21 124:1,13,18,23 125:18,25 126:4,9,12,16

**Crowley's** 85:24 86:22

**cuff** 70:16

**cup** 194:25

**curiosity** 195:14

**curious** 194:18

**current** 4:17 8:24

**Curry** 8:21 9:2,3 89:17, 20 122:14

**Curry's** 9:3

**customs** 16:14

---

**D**

**daily** 14:24 94:25 137:9, 15 167:12

**date** 25:5 27:8,12 43:19, 20 131:24,25 141:13,18

**day** 10:6,10,19,25 11:3, 20 43:4,6 46:1,22 47:6, 12,15 50:15 51:14 57:16 60:4 70:6 73:10 74:14, 21 75:5,22 76:14,15,22 85:5 90:11 96:2 98:17 103:2,13,19 104:9 106:12 107:14 108:10 110:3 111:19 117:12 122:8 125:5,6 133:22 134:3 136:4,5,12,15 142:12 144:9 150:10 158:20 160:15 164:2,9 166:14 167:15 168:15 172:24 173:4 178:2 183:20,22 184:16 186:3 188:16 191:25 192:17 193:12 194:3 200:9 206:15 207:20 209:18 217:9 219:15

**day-to-day** 10:3

**days** 11:11 65:2,9 79:11 88:5,21 89:4 99:9 101:4, 17 102:13 108:8 109:17 111:13 134:5 151:6 160:6 162:2 163:11 176:8 177:25 178:2

184:14,24 186:12 194:8,
9,10 207:10,15

**dead** 121:17,23 122:8

**deal** 154:1 159:11

**dealing** 156:22

**dealt** 154:20,23 155:12,
13

**death** 21:19 36:14 37:9,
16,19 41:10 43:2 48:15,
18 50:9,16 51:14 52:12
123:7 132:24 138:12
151:25 152:1

**deceased** 47:10 108:25
110:4 117:20 121:17

**decedent** 124:10

**December** 21:20 46:23
47:7 48:15 49:18 50:9
98:23 107:17 113:17
121:13,17 123:8,22
145:7 150:5 158:11,15
159:21 181:10 208:23
209:18 211:13 215:12

**decide** 40:3 95:4 96:17
142:16

**decides** 111:5

**decision** 171:8 199:22

**declined** 118:17,21

**defendant** 24:2 46:21
47:2 149:22,23 150:5,10
151:6

**define** 8:18 29:10

**defined** 126:15

**dehydrated** 139:14

**dehydration** 26:10 30:4
101:9 103:3 139:10,17
151:4,12 215:17 217:2

**denied** 57:19 61:10 63:8
75:6 79:17 104:10
145:19 176:15 177:25
178:3 179:20 180:19
184:13 186:20 194:8
206:25 207:10 219:15

**denies** 67:6,18 110:10

**deny** 48:23 49:8,18
126:16 181:25

**denying** 50:10 51:24
87:9 186:11 209:3

**department** 153:18

**departments** 152:24

**depend** 16:20 208:3

**depending** 12:23 108:10
109:20 119:3

**deposition** 28:23 29:5
30:10 35:8 50:21 55:7
56:8 100:25 120:10
122:18 151:19 152:17
157:22 159:9 196:25
223:23 225:3 233:20,21

**deputies** 11:12 12:1
127:17 163:6,24 164:11
166:4 170:1 172:12
177:15 187:17,20,22
188:13 192:7

**deputy** 33:6 47:23 48:1
53:7 55:20,24 56:3
58:11 64:24,25 65:22
71:18 78:23 79:13,14,23
81:17 87:16 94:11
105:16,20 106:15,22
120:24 121:10 127:22
140:18 162:3,4,17,19,25
163:25 164:2,13,17,21
165:2,17,20 170:22
172:9,10 174:20 179:9
192:13 193:4,9,14,22
198:3,5,12,18 200:15,

16,19 201:8 202:7,9,18
204:6,17,23 205:6,7
220:19 221:13 222:6,11,
18,25 223:7 232:10

**deputy's** 163:20

**describe** 5:12 10:3
11:24 14:8,13 30:13
36:17 56:18 57:10 90:19
95:19 109:4 110:2
126:22 128:18 138:16
168:1

**describes** 101:8 115:10

**describing** 116:19 117:7
134:24

**description** 122:2 124:8
129:5 138:21 183:2

**desk** 167:4 227:13

**deteriorated** 121:12
219:9

**determine** 10:16 13:15
35:16 42:18 44:12 45:5
64:16 99:14 166:13
167:15 168:15 171:5
187:2 190:4

**determined** 40:1

**detoxing** 57:24 61:10
67:5,19 215:14 216:20

**diagnose** 5:16 6:18
99:23 100:5 172:20

**diarrhea** 17:23 19:10,12
26:10 30:3 37:22 68:14,
20 69:1,13 70:5 74:2
75:5,8 79:20 80:10,25
81:16 88:1,6,21 99:11
101:5 102:13 104:23
110:9 111:14 118:19
129:11,13 135:14
137:14 138:9,17 139:15
151:4,12 157:4 160:21,

23 161:10,11,15 162:20 163:1,9 164:14,23 165:3,11 176:8,16,25 177:9,17 178:15 179:21 199:25 200:5 201:4 206:22 207:12 211:13 217:2 224:11 227:8 229:14

**dictate** 13:3,19 17:4 54:13 91:12,24 95:7 97:18

**dictated** 17:8 101:23 112:20 209:25 226:24

**dictates** 96:19

**Dictations** 147:13

**diet** 135:10,11

**difference** 39:3 59:2 222:11

**differences** 75:11

**difficulty** 138:19,20

**direct** 23:16,23 27:3,5 32:20 37:1 46:15 48:11 49:10 113:12 116:15 123:18 144:7 149:14 202:12 220:14 221:11

**direction** 24:3 26:8 67:20

**directive** 68:23

**directly** 164:21,24

**dirty** 54:15 125:9

**disagree** 24:9 114:22 118:14,25 144:22 150:1, 12 158:23 181:3 223:21 224:1,2

**disciplined** 8:9,12

**discovered** 124:19 125:3

**discovery** 24:1 26:20 28:7 46:11 144:6 149:15 182:12

**discretion** 95:15

**discuss** 20:21 111:21

**discussed** 110:21 202:18

**discussing** 158:13

**discussion** 20:22 23:11 27:16 51:4 54:20 105:15 123:12 130:7 152:10 198:8,9 200:7 201:11 202:10 211:1 212:15 215:7 220:6 221:2

**discussions** 216:7

**dispensing** 45:11,16

**displaying** 135:18 136:8 137:13 138:2

**dispute** 29:8

**distinction** 38:22

**doctor** 5:23 14:23 35:21, 22 40:5 73:23,25 74:24 92:17 93:14 95:5,12,16, 17 97:23 99:17,18 109:21 137:9 173:2 178:20,23,24 179:6 181:24 191:2 230:7

**doctor's** 99:21 204:18 210:3

**doctors** 21:12

**doctors'** 147:9

**document** 25:15 31:23 32:10 33:17,20,21 34:5 113:13 185:8 188:5 212:22 213:1,12,16 214:15

**documentation** 130:9

**documented** 170:7,10, 16

**documenting** 147:22

**documents** 42:3,8 123:8 130:3 167:6 209:23 210:1 214:17,21,22

**door** 57:8 82:18 83:7 104:2,21,22 105:8 106:17 115:16 141:21 142:4 143:19 194:16 195:14 219:12,13

**dragging** 219:23

**drank** 104:7,14

**drill** 74:5

**drink** 135:8 206:20

**drinking** 217:4

**drinks** 86:14 125:23 126:13

**drops** 170:20

**drug** 37:12 40:24 41:2, 13,16 56:23 62:2 63:1,2 65:14 67:4,6,18 156:25 187:19 195:9,11

**drugs** 32:23 37:3 54:15 60:12 61:10,17 62:10, 15,22,24 67:5 122:1 155:19 157:9 186:25 194:17 195:10,20 224:17 225:21 226:1,11

**Duchesne** 4:1,23 7:10, 12 24:6 25:20 32:4 108:17 123:23 126:20 139:19 146:8 155:3 156:8 158:7 159:9,10 165:2 171:2 195:5 223:20

**due** 9:25 45:2 57:4

Jana Clyde
May 23, 2018

**duly** 4:7

**duration** 131:13

**duties** 10:19 14:2,12,16 15:3 167:16

**dying** 215:13,17 232:19 233:10,12

---

**E**

**earlier** 38:18 42:14 44:11 65:2,9 90:11 97:14 98:13 103:12 130:23 133:16 152:15, 17 159:8 167:24 184:17 191:23 193:4 202:24 203:5 207:10

**early** 44:23

**easier** 83:6 200:4

**easily** 82:6

**eat** 77:14 192:19 193:2 199:4 206:19 222:4,21

**eaten** 151:6

**eating** 86:14,19,20 87:1, 10 125:23 126:2,17 138:20 199:7 229:23

**education** 4:25 5:6 27:5

**effect** 114:12 211:12

**effort** 167:18 168:14

**EKGS** 21:6

**electronic** 36:21 73:3 94:3 166:25

**electronically** 73:1 148:25 167:11 168:23

**elevated** 197:4

**else's** 201:16

**emergency** 215:20

217:1 218:22 231:25

**emergent** 151:3,11,20 216:3 219:1

**emphatically** 218:15,17, 20

**employed** 7:10,13 9:8,9 195:7

**employees** 8:15,16

**employment** 9:19

**empty** 43:16 104:25 217:13

**EMT** 5:8,11 152:22 154:5,8,11

**encounter** 55:23 57:11 58:13 60:10 61:9 63:4, 10,17 64:19 65:1,3,4 70:11 72:10,23 73:18,21 74:6,7,14,23 76:17,20 79:13 91:5 105:7,25 232:18

**encountering** 67:18

**encourage** 200:3

**end** 12:24 114:6 115:6 119:16 124:9 133:21 136:2 193:14

**ended** 12:14,15 223:4

**ensure** 139:9

**enter** 104:17,19

**enters** 115:12

**entire** 91:5 96:11 131:4, 13

**envelope** 43:10

**equipped** 139:20

**ER** 153:21 185:11 186:5, 7

**errors** 10:1

**essentially** 177:23 232:12

**established** 224:20

**evaluated** 197:2

**evening** 107:2

**event** 24:4 171:5 201:3

**events** 122:21

**eventually** 25:6 116:3

**evidence** 19:11,18 66:21 69:10 80:24 88:7 89:7 104:22,24 105:2 145:18

**exact** 25:5 125:6

**examined** 4:7

**Examiner** 85:21 123:18 124:4

**examples** 17:16

**excuse** 7:16 43:3 146:5 202:17 212:10

**exhibit** 23:12,16 25:10, 14 26:4,13,17 27:20,24 28:1,2,10,16 31:16,17, 21 33:13,17 34:5,20,24 35:25 36:3,6,22 37:2 38:1,2,5,6,11,12,25 39:20,23 40:7,18 41:2,9, 13 46:4,8 48:10,16,17 49:15 52:7 84:5,9,22 85:25 86:1 92:7,8,12 94:4,6 98:6 99:2,24 101:3,25 110:23 113:6, 10 116:12 119:9 121:21 123:13,17 131:17,21 132:9,10,14,22 133:2,3, 5,15 140:1,2,6,17 143:22 144:1,5 145:23, 24 146:3 147:17 149:12 182:19 214:12 216:18

220:14,25 221:3 222:25
223:16 224:10,13
225:15

**exhibiting** 24:4 56:15
67:5 151:3,11 161:7

**Exhibits** 48:2 211:18
224:14

**existed** 14:10 21:23
45:11 81:13 158:7

**existing** 20:14 173:6

**expect** 225:24 228:1
232:20

**expectation** 119:11,19
166:4,7

**expected** 20:13 29:23
151:7

**experience** 20:14 37:24
41:6 62:1 66:6 67:7,17
101:6,13 103:2 135:22
138:25 153:22 154:15
218:24

**experiencing** 89:19
101:7 139:12,15 150:8
154:21,24 178:14 187:5
207:14

**explain** 48:25 49:19

**explained** 146:21 207:9
209:13

**explanation** 178:22

**expressed** 202:2

**expressing** 39:7

**extent** 9:19 90:8 151:2
206:15

**extremely** 56:20 172:3

**eye** 61:21,24

**eyes** 56:21 88:7 121:25

161:15 162:8

---

# F

---

**faced** 26:9

**facilities** 27:15 159:24

**facility** 5:19 19:16 20:9
21:6,8 30:15 58:18,25
59:1 98:3 139:24 147:25
189:22 224:7 225:10
227:23

**fact** 42:8 44:22 101:7
112:25 125:13

**facts** 128:19

**fair** 15:9 172:16

**fall** 99:16 160:9,10

**false** 224:7

**familiar** 13:24 14:11
15:3 84:11 126:19
146:14 168:8 169:16
183:12 186:23 211:8

**familiarity** 14:9

**Familiarize** 35:1

**Family** 183:11

**faxed** 210:3

**feel** 79:15 125:11 179:14

**feeling** 18:8 73:24 76:9
123:5 150:7 199:9

**felt** 17:18 18:4,18,20
181:10 199:9 218:11

**female** 123:23

**females** 135:24,25

**fight** 128:25

**figure** 211:23 233:7

**file** 12:25 35:10,13,17

36:15 40:5 42:15,18,25
43:8,10 44:8,13,18,25
45:2 49:25 50:1 52:16
98:14,15,24 148:6
150:10,14,21 170:25
172:24,25 173:3,6,9,16,
24 174:2,6,8 209:23
210:5,7,15

**files** 12:14,15 98:24
110:6,13,21 115:2
147:23 150:15,18 173:5,
6,17,23

**fill** 31:7,10,13 33:9 39:6,
11 40:2,9 93:9,19 94:9,
15,16 122:7 178:23
179:9,11 180:21 204:4,
10,18 205:7 209:4
228:9,10

**filled** 32:17 33:5 34:5
39:12 40:8,14 78:20
94:20 95:3 97:19 98:7,
10 99:2 122:20 140:17
141:5,8,10 179:8 204:7
225:10

**filling** 32:24 33:4 39:8

**fills** 12:21 34:6 39:5
85:12

**final** 202:11

**financial** 183:3

**find** 15:13 52:11 53:9
58:14 125:10 161:6
168:16 177:21 182:5
187:2,14 194:17 228:2

**finding** 109:14,24

**findings** 67:8 70:18

**finds** 114:20

**fine** 4:20 55:3 199:8
219:14 221:21

finish 204:24

finishes 53:16

finishing 114:11

firsthand 31:3

five-minute 149:7

five-year 128:14

flag 31:11

flagged 31:11

flags 33:3

flip 27:24 149:18

float 153:12

floor 69:8,9 229:21

flu 56:11 89:19 114:15 139:16 192:25

flu-like 150:8

fluently 219:18

fluid 135:7

fluids 77:1 101:19 139:20

flush 69:3 162:1

folder 43:16 173:24

folders 96:16

follow 6:3,14,24 7:1,3 29:21

follow-up 74:13,16 197:24 211:6 233:17

follow-ups 215:3

food 63:11 88:23 100:12 135:11 192:19 193:2 199:5

force 181:23

force-medicate 68:7

forgot 205:17,19

form 6:9 12:24 24:15 31:12,23 32:4,7,22 33:9, 25 34:1,11,20 35:1,5,20 36:3,7,10,18,22 39:8,20, 23 40:7,14,18 41:9,14, 20 42:1 43:21 44:4,6 48:16 49:2,3,9,14,15 50:7,8,19,20 51:8 64:8 68:4 69:20 84:11,22 85:7,12 92:12,16 93:6,7, 9,16 94:6 95:3,11 97:14, 19 98:7,14 99:15 101:4, 24 110:23 111:1 140:6, 9,23,24 141:7,24 142:2 143:5,21 174:12,13,19 175:2 176:3,5,10,17 177:24 178:1,5,8,9,10, 11,23 179:5,8,11 204:5 205:5,20 207:3,17 210:18 224:15,20 225:16,17 226:25 228:9

formal 139:3

format 72:4

forms 24:12 31:6,8,11, 14 32:17 33:4 34:24 35:25 39:4 42:12 48:5 78:20 92:21 93:19 94:16,20 97:2,10 99:16 141:21 143:4,9,17 208:15,20

forthright 61:24 62:7

found 36:20 51:12 108:25 109:6 110:3 122:8 123:24 126:25 213:25

foundation 6:9 13:5,9,21 16:16 17:10 22:2,20 23:1 30:16,18 33:11 62:4 64:11 66:11 67:11 68:4 83:20 84:15 96:7 101:10 108:19 118:10

133:9 143:7 152:3,4 231:9,17 233:1

four-times-a-day 45:19

frame 92:3

free 161:5

frequently 128:15,16 143:1

fresh 122:21,23

Friday 161:23

front 10:12 132:1,2

frustrated 51:13

full 88:16 142:20

Full-time 21:13

fully 159:18

## G

gather 10:11

Gatorade 17:19 18:18 26:11 37:22 68:13 72:8, 15 76:13,14 78:8 86:14 88:22 90:23,24 100:3,11 104:4,7,14,25 105:10 107:18,22 110:8 125:23 126:13,15 148:13 157:7 170:4,8,9 199:7,11 205:12 206:12 217:5,13 219:14

Gatorades 88:15 135:7

gave 18:11 68:13 96:23 98:24 150:15 188:13 205:7 206:12 208:16 214:21

geared 21:8 27:14 50:6

general 19:16,20 50:25 52:6 60:9 75:16 112:16 127:12 133:17 199:20

203:7 208:2

**general's** 52:18 113:12

**generally** 10:3 15:15
57:21 74:14 118:25
150:20 155:7 165:23,24
188:17 190:18 208:4
213:7

**Gibbons** 116:6,11
122:13

**girl** 114:12 181:3

**girls** 114:9

**give** 4:19,21 6:1,14
17:16,19 18:18 36:15
45:16 57:14 68:25 72:8
76:13 78:8 88:22 93:10,
11 100:3,5 106:20
107:13,17 170:1 179:9
190:23 192:15 194:15
205:11,17,19 213:5
219:15 226:14 228:11
232:13

**giving** 26:11 86:14
125:23 126:12,15
170:22

**glad** 218:12

**glancing** 105:1

**glass** 82:11,15,18,20,22
104:21

**goal** 120:16

**good** 4:13 18:9 38:10
49:10 55:1 75:18 79:16
80:2 100:21 129:5 202:4
221:23

**grab** 210:17

**great** 114:16

**group** 199:22 201:10,14

**guess** 6:16 14:5 29:10

34:2 50:18 119:7 129:14
159:5 169:14,23

---

## H

**habitual** 62:2

**hair** 125:9

**half** 24:24 156:14

**hall** 63:20 115:22

**hallucinations** 138:17

**hallway** 83:1,3

**Hancey** 4:12,13,20,24
6:11,15 7:21 9:22 10:2
13:10,13,23 16:18,21,
23,24 17:11,15 22:4,7,
21,22 23:4,6,14 25:12
26:12,15 27:22 28:4,6
29:1,6 30:11,19,22
31:16,19 33:12,15 35:9
38:1,4 46:3,6 53:20
54:21 55:3,8 56:12
60:21,23 62:5 64:9,13
66:12,14 67:12,15,16,23
68:1,5,9 70:1 78:3,4
83:21 84:7,16 86:1,3,7
88:12,17 89:1,6,8,10
92:7,10 96:8 100:22
101:1,11 108:15,20
113:8 114:3,5 118:11
120:11 122:19 123:15
130:8,22 131:2,19
132:9,12 133:3,5,7,10,
13,14 140:1,4 143:8
144:3 145:23 146:1,6,7
149:9,11 151:21 152:6,8
165:7 168:4 182:11
212:4,8 215:4 220:9,13,
19 221:6,9 223:12,15,24
224:22,23 225:4 231:7,
11,20,23 232:23 233:3,
14

**hand** 53:3 203:24 205:5,
8

**handed** 23:15 25:13
26:16 27:23 31:20 32:10
33:16 40:9 46:7 84:8
90:24 92:11 105:10
113:9 123:16 131:20
132:13 140:5 144:4
146:2 204:16,17

**handing** 104:2

**handle** 11:13 30:2 92:23
95:5,12

**handled** 11:10 99:17,19

**hands-on** 195:2

**handwrite** 204:17

**handwriting** 173:2

**handwritten** 140:12
167:8 175:9 204:16

**hanging** 195:13

**happen** 59:25 106:12
128:11,15 138:19 143:3
184:14

**happened** 54:14 106:10
114:25 121:2 125:1
128:17 161:16 200:9,10,
12 230:10

**happening** 20:21 223:8

**hard** 223:3

**head** 61:23

**headache** 99:19

**heading** 104:11 124:8
213:12

**health** 12:9,21 31:14
38:15,19,23 39:14 40:19
41:22 42:2 44:4,6 52:8,
19,20 109:21 114:9
123:9 147:12 157:6

Jana Clyde
May 23, 2018

**healthcare** 146:12,16,19 147:1,22,23 148:6

**hear** 6:25 11:20 38:19 121:7 226:9

**heard** 58:21 79:22 121:3 184:19 215:13,16 226:13

**Heart** 171:25

**Heather** 29:4 35:7 120:9 122:17 223:22 225:2

**held** 18:1 84:20 189:21 191:8

**heroin** 37:13 41:3 65:2,9 89:19,22,24 106:23 124:12 132:15,22 138:16,21 139:13 144:21 145:12,19,20 158:3,7,11,17,25 160:14,15,17 182:7,20, 23 183:7,13 184:6,9,13, 23 185:16 186:2,11,16 215:13,17 216:17,21 218:16,20

**Hey** 164:21 193:22 197:25 198:6 200:20 202:12

**high** 5:7 70:23 117:2

**Hill** 20:21

**hire** 20:9,10 97:25

**hired** 16:4,11 19:22 20:17 21:14 92:23 93:6 128:7

**history** 40:22,24 41:3, 13,16

**hold** 69:1 72:16 77:1 99:11 101:5 102:13 111:14 142:15 162:8 176:9 231:22

**holding** 82:7,10 83:3,8 84:21 85:16 89:18,25 90:9 91:9 101:19 106:3 112:5 113:1 114:13 118:8 120:17 123:24 124:11 125:21,22 127:1 148:17 150:7 175:10,17, 20,25 181:3 199:20 201:3 202:22 204:7,8,16 205:2,4 207:24 209:3

**hollered** 115:22

**home** 176:22 232:18

**HOMER** 13:5,9,21 16:16 17:10 22:20 23:3 28:2 30:18 83:20 84:15 85:25 88:11 118:10 133:6,8 143:7 152:4 211:5,20, 22,25 212:5,7,12,14,16 215:2,6 223:10,14 233:2,18

**honest** 51:12 57:22

**honestly** 17:13 25:4 74:10 78:17 202:16

**hospital** 8:1,3,4,8 42:22 137:24 138:3,8 152:24 161:5 184:25 185:4 186:1 230:1,5,11,15 232:3

**hospitals** 42:23

**hour** 120:15,18 121:5 141:15,16,17 199:12

**hours** 47:20 84:24 107:2 113:24 123:22 124:20 125:4 133:22 172:5 192:21

**housed** 41:25 84:14 112:8,13,25

**housing** 93:25 200:21

**huh-uh** 29:3

**hunting** 42:12

**hurt** 39:10

**hydration** 72:13 217:8

**hypothetical** 67:3,11 69:24 88:10,25 89:9

---

**I**

---

**ibuprofen** 58:6 99:20 170:20

**ICU** 153:1,11,12,14,18

**idea** 15:1 33:5 79:16 80:1,3 112:21 127:14 129:23 160:1 188:2 190:17 201:14 202:4 214:16

**ideas** 159:23

**identification** 23:13 25:11 26:14 27:21 31:18 33:14 38:3 46:5 84:6 92:9 113:7 123:14 131:18 132:11 140:3 144:2 145:25 221:4

**identified** 27:7 101:24 143:10 153:7

**identify** 149:24

**identifying** 130:9

**ill** 180:14

**illicit** 40:24 41:2,13

**illness** 181:17

**image** 104:1

**immediately** 101:25 102:14

**impacts** 14:3

**implemented** 132:23

133:12 135:20 151:25
159:18 203:18

**implementing** 158:19

**implies** 40:17

**important** 64:15 191:2
226:4,8,20

**improve** 135:12

**in-box** 167:7 205:21

**Inaudible** 69:21

**incarcerated** 45:15 70:6
98:8

**incarceration** 21:25
44:24 46:23 123:2
131:14 143:12 152:1
227:25 229:2

**incident** 16:11 24:22,24
37:24 41:7 145:4 154:14
157:15 171:1

**incidents** 171:17

**include** 171:11 224:10

**included** 150:15

**includes** 135:13

**including** 147:24 151:2

**incomplete** 67:11 69:23
88:10,24

**incorrect** 228:12

**increased** 139:14,16,17

**independent** 85:2
113:20

**indicating** 188:16

**indicative** 64:7

**individual** 9:20 82:14,17
83:9,18 131:1 147:23
154:14 155:16 174:6

**individuals** 159:11

**infirmaries** 21:9,10

**infirmary** 27:16

**inflicting** 101:8

**influence** 32:22 224:16

**inform** 40:19 59:12
62:23 91:8

**information** 11:16 27:1
33:9 41:13 44:7 64:15
69:19 72:2 75:7 96:24
125:25 169:9 187:19
192:15 193:20 194:4
209:22 213:15 226:2,4,
24 227:10,19

**informed** 59:15 62:21,24
124:10 131:14

**initial** 141:19

**initially** 136:16

**initials** 141:13

**initiate** 116:5 172:24

**initiated** 74:6,17 116:7,
10 230:19,22

**initiative** 75:4 85:17

**injury** 172:2

**inmate** 12:18 13:15
14:18 16:15 17:1,22
18:3,6 19:9 24:4 26:9
30:15 31:3,6 32:18 33:3,
23 35:10,17 39:15 40:8,
9,12,19 41:25 42:7,10,
12,19 44:13,14,17 45:5,
15 47:18,22,23 49:13
53:25 54:14 59:5,7
62:10 80:24 81:15 82:6
85:15 88:5,8,13,15,20
91:16,20,25 92:4 93:9,
19 94:9,12,15,20 97:19
102:12 105:4 110:6,7

112:25 119:1,11,19
127:2,6 128:9 129:2,4,8,
10,13,21,25 130:4,10
131:23,24,25 137:13
139:20 140:20 141:5,12,
13,18,19,20,22 142:1,16
147:25 148:10 149:24,
25 150:7 151:10 155:13,
18 156:5,24 157:8
158:24 160:18 161:17,
23 162:23 163:1 166:2,
5,6,18 167:10,18 168:5,
16,22,24 169:5,7,10,24
170:4,13,18,21 171:23
172:3,16 173:17 189:23
190:9 201:17,18 205:20
206:3,4 210:12,15
215:13,16,19 218:17
219:2 224:16,20 225:17,
25 226:9 228:9,13,23

**inmate's** 12:24 41:20
225:13

**inmates** 10:14,22,25
17:9 18:1 19:17 27:16
31:1 35:14 42:15 43:3
45:12,19 91:13 93:20,21
94:7 96:18 98:3 109:8,
13 111:5 112:8,9 115:2,
3 132:5 135:18,23 136:8
138:2 142:13,22 147:2
150:9,19 155:2 157:1
160:20 161:4 165:25
166:10,13 168:12,19,20
173:19 186:21 201:24
207:19,20 209:1 210:10
225:5

**inmates'** 144:13,16

**input** 171:6,11

**inside** 104:4 106:19
107:3 112:25 127:2
227:22

**instance** 44:22 91:23 226:18 228:22

**instances** 128:18,19 129:20 228:9

**instant** 163:25

**instated** 24:18,23

**instituted** 230:22

**instituting** 158:22

**institution** 5:4

**instruct** 18:23 53:15 160:20 163:23

**instructed** 19:14 138:12 158:17 161:17,18 162:1, 21 164:14 194:18 195:21 207:12

**instruction** 5:21 6:2,23 24:3,5 26:7 29:14,17 30:2 107:13 164:16 179:2 195:5

**instructions** 107:11

**intake** 33:23,25 34:1 36:7,10 41:20 42:1 44:3 49:13,15 50:8 51:7 167:19,21,23,25 168:5, 16,21,22 186:23 187:2 205:20 210:4,18 225:16 226:25

**inter** 52:22

**interaction** 55:10,15 105:19 206:10,15

**interactions** 156:23

**interrogatory** 23:19 27:4 149:17 150:25

**interrupted** 13:8 69:22 108:12 149:5

**interview** 51:2,10 52:22 60:9 86:9 113:11 133:17

157:17,18,20 158:3,15 160:4 220:19 221:10

**interviewed** 50:24 85:19 157:13,16

**interviews** 181:1

**investigating** 185:17

**investigation** 51:11 145:4 185:15

**investigative** 106:25

**investigator** 85:20 123:21

**investigators** 36:16 50:25 51:3,9 52:7,17 60:9 75:17,21 113:11 133:18

**involve** 21:3 29:13

**involved** 95:16 200:17 202:20

**involvement** 141:22 142:9

**iso** 112:5 207:24

**isolation** 120:17 207:25

**issue** 6:2 10:17 42:5,9, 11 81:18 99:21 172:13 190:14

**issued** 196:14

**issues** 10:23 11:10 18:1 35:18,19 99:18 103:9 161:6 169:2

**IV** 139:20

**IVS** 100:4

---

**J**

---

**jail** 7:6,11 8:12,15 9:9,14 10:4 11:11,20 13:18,25 14:9 15:12 16:13 20:17

21:15,19 22:17 24:3,6, 16 25:3,20 32:4 33:6,22 35:11,23,24 36:22 40:13,19 41:25 45:3,24 47:18 53:22 54:13 62:10 68:23 81:11 83:16 84:14 86:9,11 92:13 93:16 94:2 95:22 98:3,8 100:2, 14 101:22 103:9 107:6 108:2,18 109:6 110:13 111:12 112:20 113:16 114:25 118:8 120:7 123:3,23 125:10,18,20 126:5,20 127:15 128:7 129:16,21 130:1,13,18 132:23 134:1 138:2 139:19 141:5 143:4 145:20 146:8,18 147:1, 25 150:5 151:2,8,24 154:16 155:3 156:9,15, 20 158:7 159:10 165:2, 21,25 166:11 169:1,10, 25 171:2 184:9 186:3,17 193:6 194:6,13 195:5,14 196:6,9,14 200:21 201:19 202:25 203:2,15, 18,25 211:9 213:8 214:1,23 215:20 216:3, 10,13,25 224:25 225:18 226:20 227:4 228:1 230:20 232:10

**jail's** 21:22 78:20 120:19 136:7 145:12 146:11,16 147:21

**jails** 20:22 21:8 108:14

**Jana** 4:5,16 12:3 46:20 86:10,13 114:11 117:11 124:19 125:19,22 144:8, 12 151:2 152:15 193:5 221:25 222:5

**January** 26:2 132:19 135:20 159:18 213:1

230:18

**Jared** 220:7

**Jason** 9:3 89:17,20

**Jensen** 21:19 22:10 29:4
32:7 35:7 36:7,10,14
37:20 38:16 43:1 98:7
115:2 120:9 122:17
124:10 150:7 197:19
223:22 225:2

**Jensen's** 40:11 46:22
98:24 110:23 111:7

**Jeremy** 8:21 9:2,3

**job** 15:3 19:1 20:12
29:15 128:1 167:16
194:22 195:6

**John** 85:20,23 86:8,22
87:3 123:21 124:1,13,
18,23

**join** 22:3 23:2,3 69:21
88:11 152:5

**judgment** 95:15

**jump** 152:16

**jumping** 53:18

**June** 8:4 50:25

**Justin** 9:8

---

**K**

**Kat** 165:7 217:24 226:7
227:6 230:17

**keeping** 61:23 177:16
192:19 193:1

**key** 146:20

**keys** 115:23 116:8
208:12

**kind** 12:7 15:5 20:18
29:17 32:21 65:14 68:25

73:4 99:25 101:24
108:16 114:23,25 129:5
135:10 195:2,10 199:22
200:1,5 201:10 232:1

**kinds** 99:24 128:20
129:17 138:6 154:3
203:11

**kiosk** 93:8,22,23 94:8
167:8,10 173:2 175:8
204:13

**kiosks** 175:11,15,17

**knew** 20:10 87:9 106:23
114:10 121:1 157:6,12
158:24 160:17 164:1,18
171:19 179:10 184:8
204:14

**knocked** 90:22 115:17
219:12

**knocking** 115:20

**knowing** 93:24 195:23

**knowledge** 13:22,24
15:7 20:14 22:17 26:2
28:15,25 31:15 41:11
48:9,24 49:19,20 50:10,
14,20 54:12 63:12 65:10
75:25 76:4,6 81:1 83:16
84:13 85:15 86:25 91:22
92:1 93:17 95:9 97:21
98:5,12 100:7 101:13
102:2 120:8 125:12
126:6,24 127:8 132:19
138:7,11 140:16 154:25
159:17 160:8 165:6
182:2 206:16 212:25
213:16 214:2,8 227:2
231:18

---

**L**

**lack** 22:1 23:1 30:16

33:11 48:23 49:18
50:10,14,20 62:4 64:10
66:11 67:11 93:24
101:10 231:9,17 233:1

**lacking** 21:1

**ladies** 86:20

**large** 23:24 134:24

**lasted** 91:5 105:8

**lawyer** 26:23 32:14

**lay** 104:12 161:15

**laying** 90:18 103:16
104:25

**leading** 78:25 155:1

**learn** 47:17,22 94:19
194:12 195:10

**learned** 19:9 41:24
157:8 195:20 230:1

**learning** 195:15

**learns** 141:5

**leave** 9:14 58:1 94:24
176:1

**leaves** 96:20

**leaving** 45:2 104:9
182:17

**left** 28:23 29:4 37:5 43:6
44:18 59:25 79:23 91:1
95:15 98:16 107:14
114:17 120:9 153:16
223:22

**left-hand** 38:8 221:12

**letter** 112:9 127:10
147:18

**level** 6:17 14:8

**liberty** 51:3

**licensed** 5:1

**lieutenant** 8:21 9:3 15:16,22 55:20 89:17 122:14

**life** 120:23

**limited** 209:17

**limping** 219:20

**lines** 5:17 18:11 37:11 92:18 119:24 121:24 124:8 134:11 137:21 172:2 223:12 228:16

**liquid** 135:10

**liquids** 63:11

**lisinopril** 137:7

**list** 110:13 114:11 150:9 169:1 170:19 188:15 190:12

**listed** 8:10 151:13

**literally** 233:8

**litigation** 36:11 146:9

**Liz** 63:16,19 64:18 65:13 68:20 73:16,17 74:19 75:7,21 76:1,24 77:9,13, 17,18 78:7,10 80:7,12, 19 198:3 202:17 221:10

**located** 127:12

**location** 191:12 200:20, 21

**Logan** 5:22 6:22 10:17 11:16,17 23:25 24:2,16, 25 25:2,25 42:20 43:4, 14 45:9,14 59:4,8,12,21 60:4 71:1,5,12,15,22 72:1 81:3,7,16,18 91:8 95:21 96:5,22 97:11,14 98:2,19,22 100:18,19 101:25 102:14 108:2,17, 24 109:5,23 110:3,12,21 111:1,2,11,18 112:7,19,

22 113:10,15 115:4,19 116:9,18,24 117:16 118:9,15 119:10,18 120:6,13 121:14,22 124:19 133:16 134:1,8, 20,24 135:22 136:3 142:15 144:12 145:7,9, 11 149:15,20,22 150:15 151:1,9 157:10 159:14, 15,23 162:18,21 166:7 171:4,19 172:5,11,18 173:3,4,18 174:9 179:10,24,25 180:4,14, 21 181:8,22 187:24 188:12,23 189:10,24 190:6,12 191:24 196:3,7 197:18 203:15 206:2 207:19 208:1,12,14 209:12 211:7 212:19 213:4 215:22 223:17,19 224:5 226:15 232:5

**Logan's** 43:12 147:12 171:11 209:25

**logged** 72:25

**long** 7:13,22 8:3 62:11 109:18 153:10 194:17 195:10,16,18,20,24 198:21,22

**longer** 153:7

**looked** 48:17 62:16 75:17,22 79:9 90:12 105:13 106:24 115:17 121:25 122:4 133:16 144:21 180:24 181:12, 13,23 182:7,20 184:6 188:5 219:9 221:24 222:13 223:2 224:13,14

**Loos** 28:23 30:9 100:24 151:18

**losing** 221:24 222:13

**lot** 15:6 77:7 122:1 128:12 174:7 183:21,23 204:18 222:1,19

**lots** 186:20

**loud** 212:10

**LPN** 5:1,19 6:17 20:11, 14 66:12,13 100:9 103:6 139:6 231:1

**lunch** 86:20 100:20,23

**lying** 60:13 61:13,15 62:13 77:11 222:3,20

---

**M**

**made** 7:3 10:23 24:1 34:17 52:2 54:6 58:5,9, 17 72:22 82:2 95:21 102:16,19 121:9 123:3 156:24 164:25 171:7 180:25 181:4 233:10

**Madison** 21:19 22:10 26:4 32:7 36:7,10,14 37:20 38:16 40:11,15 41:2,12 42:25 44:23 45:23 46:21 47:3,6,8,15, 17 52:19,21 53:21 54:22 55:10,20,24 56:1,4 57:11 58:22 59:13,25 60:6,11 61:5,9 62:13,21 63:3,9,18,22 65:1,9,14, 25 68:11,19,25 69:15 70:5,12 71:6,13,16 72:8, 17,23 73:6,21 74:7,23 75:1,8,17,21 76:2,8,18, 22,25 77:6,10,14 78:8, 11,12,19 79:16,23 80:1, 8,13,17 81:23 83:2 84:14,23 86:10,15 87:10,13 89:18,25 90:9, 20,22 91:3,9 98:7,24 99:3,15 100:11,15

101:3,7 103:16 104:7
105:10,17,22 106:16,20,
23 107:18,19,21 108:25
109:6,14,24 110:3,23
111:7 114:20 115:2,5,17
117:20 118:7 120:15
121:17,23 122:8 123:4,
9,18 124:10,21 125:19,
24 126:4,9,13,16 131:14
134:13 143:16 144:9,20
145:7,12 148:13,16
150:7,8,11 151:3,4,5
156:22 163:9 164:1,14,
18 165:1,3,10,20,24
177:4,16 178:4,18,19
179:5,7,13,17,24
180:12,13,17 181:11
182:2,7,20 184:5,19
185:15 186:2,4,10,16
187:1 188:4,6 189:11
191:24 192:12,15,16,17,
18 193:5 194:5 197:19,
22 198:6,8,19,21 199:19
200:8 202:5,21 204:4,
10,11,17,21 205:1,7,10,
11,21 209:2,14 216:2,9,
12,24 218:10,15 223:1,2
225:12 226:19 229:3,9,
10,25 230:4,8,14
232:12,19

**Madison's** 21:24 36:19
37:9,16 41:10 43:11,18
48:15,18 50:8 51:7
52:19 53:9 56:5 58:14
60:4 70:22 75:12 90:13
103:13 105:8 107:2
110:25 111:13 115:11
116:21 121:11 123:2,7
130:17 131:13 132:23
136:11 138:12 143:11
148:24 149:3 150:14,21
151:25 172:23,24 173:7,
9 174:11 175:1 176:18

182:1 193:13 197:2
222:12,19 227:25 229:1

**main** 135:15 139:10

**maintain** 147:23 148:5,9

**make** 34:19 36:22 45:21
76:16 77:18 83:8 88:22
92:5 96:2 100:3,11
106:2,6 112:4 121:4
135:7 142:11 143:5
166:17 167:18 168:14
171:24 181:8 185:18
187:25 201:20,22 228:3

**makes** 115:4 162:11

**making** 79:1 98:2 121:3,
7 135:5 208:9

**manifesting** 30:3 99:24

**mannerism** 62:9

**mannerisms** 61:18,19
62:8,16,18,20

**manual** 15:18,24 16:9

**Maready** 8:1 153:5

**marijuana** 41:3

**mark** 9:20 196:23 220:25

**marked** 23:12,16 25:10,
14 26:13,17 27:20,24
31:17,20 33:13,16 38:2
46:4,8 84:5,9 92:8,11
113:6,10 123:13,17
131:17,21 132:10,13
140:2,5 144:1,5 145:24
146:3 220:24 221:3
224:18

**marriage** 8:19

**materials** 33:24 59:12

**matter** 94:16

**meals** 88:16

**meaning** 24:2 46:20
63:11 120:15 124:11
149:22 223:2

**means** 78:6 183:18

**meant** 46:21

**mechanism** 40:18

**med** 10:18 45:19,20 53:8
56:9 57:1,13 106:13
153:1,9,10,11,12,14,18
173:25 188:9,17,19,23,
25 191:8 192:12 193:11,
15,17 198:4,6,21
200:13,25 202:15 205:6,
15,16 207:21,23 216:19
227:22

**Medicaid** 21:2

**medical** 5:10 7:16,25
10:15,23 11:10 12:15,25
14:4 20:19 21:1 29:13
31:8,11 33:4,25 34:1,2
35:6,10,13,17,18,19
36:7,10 38:23 40:5
41:20 42:1,5,9,11,15,18,
22,25 43:8,20 44:3,8,13,
17,19,25 49:15 50:8
51:7 52:2 55:16 64:16
66:6 78:20 79:19 80:2,8
81:18,24 82:5 84:24
85:7,21 86:4 90:1 91:13,
16,20,25 92:12,16,20
95:3,11 96:16 97:2,10,
14,18 98:6,14 99:15
100:16 101:6,12,23
110:13,21 111:1 112:10,
12 113:1 118:5,8 119:1,
12 123:18 124:3 125:16
130:4,10 136:5 140:12
142:23 143:5,10,16,21
144:13,16 147:11,24
148:7,9,17 150:9,10,14,
21 152:18 159:17

Jana Clyde
May 23, 2018

Index: medically..morning

166:15 167:6,11,19,24
169:2,7 170:25 171:17
172:1,13,24,25 173:16
174:12 175:2 176:10,19
177:24 178:5,9,23 179:5
186:23 204:5,20 205:5
207:2,17 208:14 209:4,
23 210:1,2,4,15,16
215:20 216:3,15,22
219:1 225:16 226:25
228:2,9,17,23 229:4,6
230:2 231:25 233:9

**medically** 5:13 22:11,12,
13 64:7 128:8 154:20

**Medicare** 21:2

**medication** 35:21 44:18
45:20 71:2 106:20
134:15 135:12 136:19
137:8 147:13 149:23
166:3 170:14,19 188:6,
8,12,15 190:18 210:1
218:5,8 230:6 232:14

**medications** 10:20,21
14:18 39:25 42:21 44:14
45:6,8,9,12,15,16 53:10
58:5,14,17 60:6 92:18
96:20 106:16 147:8,10
149:3,25 154:3 166:2,6
170:1,8 179:10 180:1,7,
10,11,21 181:13,24
185:2 189:6,10,17,19,23
190:6,7,8,10,24 191:3,5,
22 209:6 230:7,9

**meds** 14:17 188:18,19
190:16

**meet** 56:2

**meeting** 65:15,24 68:21
184:20 216:21 223:1
229:25

**meetings** 20:19 29:11,
15 30:1

**member** 94:12

**members** 93:2 127:15
183:11

**memory** 85:2 86:16
173:8 174:15,16,17
189:4,9,15,16 191:11
200:24 209:17

**mental** 12:9,21 31:14
38:15,19 39:14 40:19
41:22 42:2 44:4,5 52:7,
19,20 109:21 114:9

**mentioned** 18:16,17
19:8 38:18 44:11 60:5
115:5 150:6 158:3,18
160:20 181:1 190:21
230:17

**mentioning** 54:11 190:3

**mere** 44:22

**message** 167:1

**messages** 72:5

**messaging** 166:24

**met** 216:15

**meth** 41:3

**MH** 39:2 40:2,3

**mid** 125:6

**midday** 109:3

**middle** 32:21 113:15
116:16,20 117:25
133:20 144:20

**middleman** 11:18

**mind** 51:13,14 52:4
114:16 118:20 122:21

**mine** 17:24

**Minerod** 144:24 145:11

**minute** 74:22

**minutes** 55:2 182:17
198:23 199:15 226:8

**missing** 212:12

**modified** 142:21

**moment** 39:8 61:12
147:16

**Monday** 11:2,5 47:8,18
48:6 53:6,7,10 55:10
59:22,23 63:7 64:19
65:15 66:3 70:12,25
72:10,23 75:12,22 79:5,
6 80:14,19 116:21 117:2
118:17 121:19 122:5
134:14 136:15,16
148:25 161:21,24 166:9
177:7 178:13 179:12
180:8 181:16,22 182:3,
21 184:5,21 185:5 186:4
187:1 188:1,7 192:13
196:3 197:3,19 204:13
205:16,24 216:16
219:10 221:14,22
222:12 229:9,10,25

**Monday's** 136:24

**monitor** 135:6 157:3

**month** 24:23 44:18 45:3,
4 156:2 160:8

**months** 7:23 9:13 160:2

**Monty** 9:6,7,9

**morning** 4:13 34:24 43:2
53:7 55:14 57:11 63:7
64:19 66:5 70:12 79:5
96:24 97:11,15,23
98:20,23 107:17,23
108:3,9 109:6 110:15
111:1,12,24 113:23,24
117:22 161:20 166:9
167:9,14 174:10 175:5
178:13 186:4 188:3,6,8,
17,19 205:16 208:15

218:11

mouth 226:14

mouths 45:22

move 80:8 85:15 90:9
118:5 199:21 201:23
202:4 219:11,20

moved 8:5 76:23 79:15
81:23 82:2 84:23 85:3,5
87:13,17 89:18,20 91:9,
13,18 118:7 119:1,4,5,
11 142:16 148:17 175:8,
10,20,24 176:1 199:20
201:17 202:21 204:7,8,
15,24 205:2

moving 79:19 80:1
201:18 219:21,22

multiple 144:9 176:8
224:6

Mylar 4:18,21 6:8,10
9:17 16:17 22:1,25 28:3
30:16 33:11 53:15,18
54:17 55:1 60:19,22
62:4 64:10 66:11,13
67:10,22 78:1 86:6 88:9,
24 89:4,7 100:20 101:10
130:20 133:1,4 146:5
152:5 196:22,25 199:14
208:6 211:21 212:1
215:3,11 220:5,6,8,17,
21,24 221:5,7 223:11
224:19 231:6,9,17,22
232:22,25 233:16,19

**N**

named 85:20

nausea 17:23 74:1 87:25
110:9 135:14 138:17
151:11 157:4 165:10
176:15 178:15

nausea/vomiting 151:4

necessarily 20:20 50:6
103:7 188:10

needed 6:22 17:18 18:3,
18,20 40:2 45:6 88:1
100:15 110:11 139:20
162:15 171:6,7 173:19
179:14,24 180:1,13,17
181:11 215:19,25
218:11 229:3

needing 104:10 169:5
172:1 219:15

neurological 138:18

night 43:3 55:25 57:15
63:4,23 64:1,2,3 71:21
72:15 79:3 80:16,18
107:18 157:21 163:12,
19 164:8 165:12,13
173:3 174:3,4 177:6
187:21 188:18 192:14,
21

non-pregnant 135:25

normal 109:18,19 112:6
116:21 136:18 137:2,3,4
217:21,25 218:2,13
221:14

note 70:22 141:17
228:21

noted 41:2 101:3

notes 35:22 72:22 73:3
76:16 131:23,25 132:4
167:3 209:25

notice 105:1

noticeably 121:12

noticed 28:16 125:9
223:2

notified 136:6 151:6
164:15

notify 157:10 166:7

November 18:23 19:15
20:17 21:14 22:16,24
23:9 26:6 36:2 39:19,22
43:5 45:24 46:23 47:6,
18 48:6 53:6,10 55:10
57:12 66:3 70:12 71:1
73:6 75:2,9 76:1 84:24
90:4,6,20 92:19 95:10
98:11,16 99:3 102:4,11,
23 103:12 104:13,20
105:16 112:7 113:4
119:10,18 120:5,20
121:12,19 123:7 128:7
129:17 133:23 136:8
137:12 140:22 143:17
146:16,19 147:1 148:2,5
149:21 151:10,17
155:14 156:23 158:24
160:12 170:9 175:3
192:13 197:18 211:12
223:25 225:24 226:5,24
231:5 232:13,24 233:9

number 4:22 28:2 64:6
168:5 196:20,23

numbers 221:11

nurse 5:1,13,15 10:16
12:4,5 19:5 20:9 57:22
86:10 92:17 94:11 95:5,
12 125:19 130:15
152:21 167:22 185:11
213:21 227:1

nurses 21:12

**O**

object 4:18 6:8,9 64:8,10
68:4 69:20 96:7 108:19
133:9 152:3 208:6

objection 6:10 13:5,9,21
16:16,17 17:10 22:1,20,

25 30:16,18 33:11 62:4
66:11 67:10 78:1 83:20
84:15 88:9,24 101:10
118:10 133:9 143:7
224:19 231:6,17 232:22,
25 233:2

**objections** 67:22

**objective** 66:9,20,22
67:1,8,19,21 88:3

**obligation** 148:4

**observation** 40:13 80:2,
9 81:24 82:6 90:1,9,20
91:13,16,21,25 112:10,
13 113:1 118:8 119:2,12
135:4 140:12 142:23
143:5,10,16 148:17
183:6

**observations** 66:9
67:19,21 130:15 216:6
221:16

**observe** 47:12,14 56:5
58:2 68:14 69:18 83:2
88:2 90:1 104:11 105:5
111:7 161:13 162:17,19
194:25 216:9,12 219:10

**observed** 46:20 47:5,8
71:6 76:22 80:24 81:4
83:9 90:16 91:17,21
103:15 121:23 141:19
156:24 223:5 227:7
233:9

**observes** 231:25

**observing** 75:11

**obtain** 11:15

**obtained** 214:23

**occasion** 47:15 71:12,
16,25 99:5 104:17,20
106:15,22 110:25
153:19 155:2 230:4

**occasions** 90:17 103:16
120:6 128:11 129:6

**occur** 184:15

**occurrence** 224:6

**off-the-record** 23:11
54:20 123:12 130:7
152:10 211:1 212:15
215:7 220:6 221:2

**offered** 192:22,24

**offhand** 155:16

**office** 4:23 5:24 7:12,17
8:13,16 10:11 29:11
52:18 53:13,14 55:17
57:7 60:1 64:21 72:17
73:8,12,21 74:12 75:24
76:20 85:20 94:23 95:25
97:20 100:17 102:1,15
106:10 109:9 113:12
115:22 123:17 124:3
134:2 157:14 158:16
159:9 194:16 196:8,11
210:3 223:1 227:15,21
230:20

**officer** 13:7,14 30:13
33:6,7,8 34:19 40:8,16
54:4,11 64:23 80:23
81:2 83:2 85:14 107:2,9,
14 120:14 134:8 136:5
166:16,17 169:6 225:8,
12,25 227:7,25 228:10,
16,23 229:3 231:24
232:20 233:5

**officer-initiated** 228:2

**officers** 11:12 12:13,17
19:2,21,24 49:4 54:4
92:5 93:3,10 97:25
132:4,6 141:13 144:18
158:6 166:4 169:25
170:4 194:24 213:21
218:24

**officers'** 14:2

**offices** 147:9

**official** 102:9

**open** 44:12 127:5 188:21

**opened** 58:4

**opiate** 22:17,23 24:5
25:18,20 132:15,22
134:25 138:7 139:3
153:20 154:12,21,24
158:25 183:13,17 194:8
203:9,16 212:1 230:18
231:1

**opiates** 65:5,17 151:5
155:14 193:6 194:1,6
197:7,15

**opinion** 100:8 118:12
179:4 186:10 202:2

**opioid** 134:25 135:1,2,
16 136:9 137:13 138:2
139:13 153:20 154:12

**opioids** 135:18

**opportunity** 111:3
157:21 162:3 176:23

**opposed** 5:13 34:20

**opposite** 67:20 68:3

**option** 137:24 138:1,13

**oral** 54:16 157:23 187:11
201:5 207:4 209:19

**order** 83:3 111:18,21,24
112:19 162:13 220:18

**ordered** 14:24 137:8

**orders** 96:20

**ordinary** 229:7

**outline** 213:20

**outlying** 112:5,10

Jana Clyde
May 23, 2018

**outpatient** 153:4,25

**over-the-counter** 58:5
99:20 170:1,8,14,19
181:24

**over-the-counters**
170:10

**overdose** 153:20 154:2,
12,21

**overdosed** 123:24

**oximeter** 70:17

---

**P**

**p.m.** 11:5 100:23 149:10
199:17 233:21

**PA** 5:22 6:22 10:17
11:16,17 26:8 42:20
43:13 45:9,14 59:4 81:3,
7,16,18 100:18,19
101:25 102:14 113:2
118:9 121:14 124:19
142:15 147:12 158:21
160:15 162:18 179:14
180:4,17 182:16 188:12,
23 189:3 190:6 203:14
213:4 215:22 226:15
232:5

**packet** 150:15,22

**pages** 27:25 46:16 53:3
144:19 150:24

**paginated** 149:15

**pale** 56:14 71:13 75:17
183:4

**paleness** 57:5

**paper** 45:1 170:18
204:19

**papers** 10:11 12:1

**paperwork** 12:7,17
13:16,20 42:21

**paragraph** 23:24 86:4,6
113:25 115:9 116:16,18,
20 118:1 119:15 120:13
124:9 125:15,16 133:20
134:24 136:3 138:15
144:8 149:19 150:4
151:1 223:18

**paragraphs** 125:8

**paramedic** 5:11

**paraphrasing** 115:10
118:4

**Parker** 7:19,22 8:6

**Parker's** 7:17

**part** 27:2 46:10 58:15
61:16 89:9 99:22 114:21
147:11 149:18 167:16
189:14 191:14 201:17

**participated** 46:12 145:3

**participating** 26:24

**pass** 10:18 14:17 106:13
163:7 164:4,7,19,20
188:17,19

**passed** 26:4 44:2 87:10
145:7

**passing** 105:24 106:8
115:6 229:2

**past** 219:4,6

**patient** 6:7,22 22:9 35:2
66:7,8,18 67:4,6,18 68:6
89:21,22 99:23 101:7
119:4,5 137:23 154:1
190:17

**patient's** 174:6 209:22

**patients** 6:13,18 18:18
30:3 42:23 110:18,22

111:19,25 112:3 114:8
119:5 120:1,6 147:25
153:19 208:1

**pay** 157:3

**peculiar** 56:19

**peeked** 115:19

**pees** 194:24

**people** 20:2 49:3 86:20
96:16 113:2 114:10
134:1 164:10 169:1
170:10 183:12 223:20
224:6,9

**Pepto-bismol** 58:7
192:24

**period** 35:14 64:7,15
72:6 128:14 153:7

**person** 39:5 57:22 64:6,
14 67:20 71:7 83:14
85:12 101:14,18 139:23
154:23 168:17 169:19
171:7,8 183:17,24
194:23 201:19 227:16
228:17 233:10

**person's** 64:16 137:7,15
169:18

**personal** 6:14 55:9 90:8,
20 138:24 160:12 182:2
196:13,15 214:18

**personally** 52:18 76:21
90:1 161:15 162:6,13
203:2,23 204:10 205:8,
11

**personnel** 123:3

**pertaining** 123:9 146:12

**pharmacies** 188:20

**phone** 59:24 60:5 71:2,4
118:6,22 119:17 120:1
121:14 134:13,14,16

149:20 171:24 187:25 189:25 191:24 196:4,5, 6,9,10,11,13,16,20,23 230:11

**physical** 24:15 75:12 121:11 138:19

**physically** 121:18 202:15 203:23 208:17

**physician** 189:23

**picked** 169:23

**picture** 105:5

**piece** 222:10

**pills** 41:3 185:17,22,24

**pin** 87:7

**place** 5:25 22:6,14,24 23:8 30:14 32:23 54:13 88:1 91:20 92:2 93:16 95:6 97:17 109:9 120:23 129:17 130:13 151:25 158:11,14 200:1,4 226:23 231:5

**places** 94:1 180:25

**plaintiff** 4:6

**plaintiff's** 217:12,19 218:4

**plaintiffs** 4:14

**plenty** 135:8

**Plexiglas** 82:22 83:4

**plunger** 107:3

**PO** 4:22

**point** 24:18 25:5 50:9 51:19 58:10,11 67:19 68:12,13 78:19 104:6 115:24 117:16 133:25 164:13 165:21 179:15, 16 180:3 184:12,25

185:14 188:11 192:20, 22 199:5 207:2 214:2 217:11 218:13 227:24

**points** 118:23

**policies** 5:24 6:6,24 7:4, 5 13:18,25 14:9,13,18, 21 15:2,7 16:8,14 17:4,8 18:10,17 21:15,23,24 22:5,9,13 27:14 35:24 39:20 54:12 80:22,23 81:1 91:11,19 93:15 95:6 97:17 101:22 129:16 130:12 146:8 151:24 202:25 203:3,8, 12,23,24,25 211:8 226:23

**policy** 6:3 7:2 14:25 15:13,17,23 17:14,19, 24,25 18:5,14 22:18,23 23:8 24:13 25:8,19 29:24 33:3 45:10 50:3 81:6,7,9,11,12,19,22 91:23 92:2 102:2 120:20 132:23 136:8 137:11 146:11,16,19,22 147:22 148:1,5 158:19 159:10 203:1,2,6,15,16 211:12 212:2 230:18 231:1

**poor** 183:1,2,3,4

**population** 112:17 127:13 199:20 208:2

**pose** 101:17

**position** 6:6 37:8 77:18 158:10 161:14 219:13

**positions** 8:7

**positive** 65:5,17 78:16, 17,18 193:5 194:1,7,10 195:17

**possessed** 41:7

**possession** 214:9,18

**possibility** 69:17 70:2,3 71:14 126:14

**possibly** 10:24 26:10 29:9 56:10,24 61:18 79:20 129:1 186:14 198:23

**post** 5:7

**Post-it** 227:13 228:17

**poster** 194:16 195:13

**potential** 225:13

**practical** 5:1

**practice** 6:5 18:18 19:9, 16,20 34:23 39:22 50:4 100:6 112:6 117:6 120:20,22 135:18,21 137:3 141:2 142:11 143:4,20 151:16 160:13 164:20 165:24 169:24 172:18 190:25 213:25

**practiced** 19:3

**Pre-booking** 31:23

**prebooking** 32:3,7 48:16 49:2,9 50:20 224:15,20, 21

**precisely** 189:6

**predecessor** 19:4

**preexisting** 174:8

**pregnant** 135:24

**preparation** 98:19

**prepare** 51:25 97:10 122:7 173:23

**prepared** 43:3 51:20 97:5 98:25 213:16,17, 22,24

**preparing** 173:17 210:15

Jana Clyde
May 23, 2018

Index: prescribe..pushes

**prescribe** 5:16 45:13,15
135:22

**prescribed** 44:23 166:3

**prescribes** 45:9

**prescribing** 45:11

**prescription** 45:6,7 53:9
59:9,21 185:17,22,24

**prescriptions** 58:23
59:13,16 60:4 100:5
134:20 186:6,8 189:11
191:10 230:2

**present** 55:19 64:18
65:25 68:20 73:17 96:15
150:5 162:16 201:14

**presently** 51:13

**pressed** 130:4,10
131:15

**presses** 129:21

**pressure** 18:4,7,9 70:16,
22 117:2 136:19 137:8
158:20 160:15 197:3
218:5,7,12

**presume** 218:7

**pretty** 10:10,24 21:3
35:4 120:14 157:7 196:9
209:17

**prevented** 152:2

**previous** 63:23 75:22
207:15

**previously** 114:25
152:18 162:5 186:15
209:5

**print** 36:18,20 49:25
167:9,11 204:14 210:6

**printed** 36:14,20 44:3,6

**prior** 18:23 19:15,22

26:6 32:14 36:2,10 37:9,
16,19 41:10 44:20 48:15
49:6,17,20 50:9 57:16
71:21 97:11 102:11,23
109:24 119:10,18 120:5
146:19 150:1 152:22
155:14 156:9,14,22
159:20 170:9 171:1
184:14,24 187:12
188:19 194:2 214:13
215:12 229:2

**prisoner** 147:24 148:6

**prisons** 21:8

**private** 9:21 196:23

**problems** 171:25

**procedure** 6:4 15:13
17:14,20,25 18:5 19:2
45:10 92:2 211:12

**procedures** 5:24 6:7,24
7:2,4,5 13:18,25 14:9,14
15:3,8,17,24 16:8,14
17:4,8 18:11 21:16,23
22:5,9,14 24:14 27:15
35:24 39:20 54:13 80:22
81:1 91:12,19 100:2
211:9

**proceedings** 28:24 29:5
30:10 35:8 55:7 56:8
100:25 120:10 122:18
151:19 223:23 225:3

**process** 30:14 36:18
95:19 103:6 200:6

**produce** 28:8 214:21

**produced** 146:9 212:19
214:5,10

**production** 214:22

**profusely** 161:12 177:25

**progress** 35:22 136:6

**prompt** 171:23

**prompted** 115:6

**proof** 89:23

**property** 189:20

**protected** 9:21 196:23

**protocol** 27:8 81:11
134:25 145:12,20 158:4,
7,11,17,19,22 159:10,
18,22 160:13

**protocols** 231:15

**provide** 26:25 75:7 97:9,
18 170:4 199:10

**provided** 16:1 24:2,5,16
25:3 26:3,21 37:5
100:16 147:25 148:10
150:10

**provider** 58:20 190:12,
15 196:16

**provision** 170:7

**psychiatric** 40:22

**puking** 58:2 99:8 101:4
102:12 111:13

**pull** 174:9 211:22 212:14
213:5

**pulled** 43:10 52:15
212:2,4,7,8

**pulse** 70:17

**Purdy** 107:16,21 200:17,
19 202:14 205:18

**purpose** 20:2 55:22
92:15 98:25 161:2,9
189:18 190:3

**purposes** 58:13

**push** 69:3 88:2 127:2

**pushes** 129:25

**pushing** 127:5

**put** 10:12,14 12:1,12,13
13:15 24:13 34:20 35:5
36:15 40:4 41:20 43:10,
20 44:8,21 49:4 52:2
53:13 54:24 67:13 85:6
88:4 93:21 96:17 98:15
141:24 142:23 143:21
148:17 162:8 164:19
167:3,7 168:18 169:10
170:18 173:21 179:5
186:12 189:20 204:12
210:5,7 228:17

**putting** 88:3

---

## Q

**qualified** 66:12,13 99:23

**quantify** 153:13 155:21

**question** 6:16 7:8 9:24
15:2,5,12,14 17:7,17
22:8,21 27:4 28:9 32:21
33:2 36:5 37:2,9,11,15
41:24 48:17 49:14 50:6,
10 53:16 60:24 64:9
75:6 89:11 94:8 97:8
101:12 123:25 131:10
151:9 162:12 165:7
167:21,23 180:16 187:3
203:19 217:24 224:16,
25 225:5,12,25 227:24
228:7 230:13 231:20

**Question/responses**
33:23

**questioned** 226:7

**questioning** 68:16 133:8
227:6 230:17

**questionnaire** 12:21
38:15,23,24 39:15 41:22
42:2 44:4 52:8,19,21,23

53:1,2,3 167:19,23,25
168:16,21,23 187:2
205:20 210:4

**questionnaires** 6:13
38:19

**questions** 22:15 26:22
27:1,25 31:1 34:2 36:23
37:18 52:4,20 53:1,2,4,6
62:25 133:2 152:9
165:23 167:20 168:6,8
186:24,25 210:24 211:6
215:5 217:12,20 220:8
225:17,20 227:7 233:14

**quick** 53:19 55:4 134:16

**quickly** 48:2 105:10

---

## R

**radio** 121:8

**raise** 194:4

**raised** 201:2

**ran** 115:22

**range** 31:1

**ranges** 10:20

**reached** 60:3 71:1

**read** 24:7,9 35:1 85:23
87:23 99:6,8 111:7,12
113:25 114:21 130:6
137:21 150:25 168:16
174:23 176:4 203:2,23,
24 207:3 222:7

**reading** 60:20

**ready** 110:14

**real** 49:22 83:17 120:23

**reason** 29:7 54:5 59:5
79:19 85:6 87:22 90:14
112:13 119:4 129:2

168:17 169:11 180:2,3
206:24 207:13,16

**reasoning** 80:7

**reasons** 14:24 80:9
84:24 112:11,14 113:1
119:2 129:24 130:4,10
148:13,16

**recall** 21:15 26:7,21,24
41:9,12 50:24 61:3,4,6
63:9 65:10 66:2 75:11
76:24 77:6,9,21 78:6,7
85:19 98:2 99:4 116:25
117:4 129:6 145:9,11
151:14 155:17 177:6,10
198:23 224:14 227:5

**recalling** 56:22

**receive** 16:6,8,10 20:7,
16 23:8 28:20 29:14,18
30:2 45:20 52:7 99:2,5
135:4 146:18 173:1,15
194:20 213:6

**received** 27:11 28:9,11,
17 36:2 39:24 51:7,23,
24 92:19 95:3 98:14
102:3 107:22 111:3
120:1 134:14 139:6
174:12,17,18,23 175:1,
20 176:3,17 188:6,8,15,
16 195:4 210:16 214:2

**receiving** 10:21 21:15
39:23 101:23 174:15,16

**recess** 55:5 100:23
149:10 199:17

**recognize** 25:14,17
31:21 33:17 38:7,12
132:14 146:12

**recollect** 154:13

**recollection** 26:3 28:10
47:14,16 59:11,20

Jana Clyde
May 23, 2018                          Index: recommendations..request

63:17,24 71:9 73:18
77:4 87:24 91:2 96:5
110:5 113:21,22 115:13,
15 124:25 130:11
134:17 136:14,22
153:24 174:18 191:9

**recommendations**
24:25

**record** 4:15 9:20 14:4
29:8 45:2 60:19 70:18
92:3,6 130:6 131:23
132:4 137:1,3,9 142:24
147:3,8,24 148:9 162:11
187:15 196:22 225:13

**record-keeping** 169:16

**recorded** 45:3 129:21,25
136:17,24 148:19
217:25

**recording** 51:2 148:25

**records** 12:10 28:8
36:19 76:17 82:1 86:5
123:8 125:16 146:12,16,
19 147:1,4,9,11 148:13,
16,24 149:2

**refer** 100:18 195:18,24

**reference** 28:17 42:13
82:2

**referenced** 42:8

**references** 33:24

**referred** 10:17 49:14

**referring** 7:5 31:8 47:3
79:6 147:14

**refilling** 10:20

**reflect** 84:23

**refresher** 29:21

**regard** 16:21 17:5 41:15
99:14 102:22 171:6

**registered** 5:13,15 21:12

**regular** 127:22 155:5,10
183:19

**relate** 15:3

**related** 8:15,18 92:20
128:8

**relating** 22:9 36:3 39:20
154:11

**relation** 9:5

**relative** 93:16

**relays** 83:17

**releases** 210:2

**relevant** 9:16 66:19
79:17

**remember** 25:2,4,5 26:7
29:2 41:11 49:23,24
50:11 52:8 56:22 57:10
58:16 60:14,15,24 61:8,
12,19 63:14 64:23,25
65:11,13,16,18,22,24
71:10,11,15,22 73:11,20
74:4,10,11 75:10 76:5,
11 77:3,13,17,20,23
78:5,9,10,14,23 85:4
87:11 89:17,20 90:12,
16,19 103:19 105:1,15,
25 107:19,21,24 108:5
109:4,13 110:5 115:7
117:15 121:18 122:15
126:7 128:19 145:6,8
146:15 147:15 157:13,
16,17,18 158:6 174:21
177:7,12 189:5 191:15,
19,21 192:2,4 193:25
198:7,9 200:23 202:17
205:12,13 208:22,25
209:2,7,12,15 213:2
214:24 217:23 221:1
227:10 230:13,16,20

**remembered** 52:2

**repeat** 64:12

**Rephrase** 228:4

**report** 45:8 52:2 57:14
75:2,3 76:7 77:15 85:24
86:22 107:6 122:7,20
123:17,20 124:23 126:1,
2 128:21 129:18 130:14
157:4,5 176:10 177:22,
24 190:7 194:4 198:13,
14 207:1,8,11,14 218:1
223:7 232:7,17

**reported** 47:24,25 69:12,
15 71:16 80:17 86:21
88:13 89:12,14 135:23
165:2,10 172:9 191:25
192:25 206:2

**reporter** 13:8 69:22
108:12 130:5 149:5

**reporting** 176:4,7 206:3

**reports** 12:12 106:25
107:1,16 124:18

**represent** 4:14 26:19
63:16 130:17 146:3
157:20

**represents** 132:22

**request** 35:20 43:11,21
46:15,19 48:11,14 49:11
54:3 56:4 78:20 92:12,
16,17,18,20 93:13 94:1,
10,11 95:3,11 97:2,10,
14,19 98:7,9 99:15,16
101:24 110:23 111:1
150:9 163:9 164:1,18,25
166:15,17 167:11 169:6,
7 173:1 174:12,13
175:2,9 176:10,17
177:24 178:1,5,9,23
179:5,11 199:21 204:5,
12,18 205:5 207:3,17

208:15 209:4 210:16 214:22 228:2,9

**requested** 44:7 52:3 56:2 179:8

**requests** 10:15 14:23 26:20 46:11,12,13 96:17 166:15 167:6 173:5,6, 21,22 174:3 210:1

**required** 31:6,10 132:7 137:15 148:8 171:10

**respect** 159:22 217:1

**respond** 191:4

**responded** 6:24 26:25 71:22 76:11 209:15 222:21

**responding** 46:13 123:4 137:23

**response** 49:14 54:16 88:22 144:8,20 149:16, 18 150:24 157:23 187:11 201:5 207:4 209:13,19 214:22 225:13 226:19

**responses** 26:20 144:5 149:16 182:12

**responsibilities** 10:4 16:25 17:5 20:8 121:10 128:3,5 164:4

**responsibility** 34:9 163:6,20 164:7

**responsible** 144:13,15 157:5

**restroom** 149:8

**result** 215:17

**results** 54:7,15,23 65:23 66:2 92:3

**returned** 30:9 35:7 56:7

122:17 151:18 225:2

**review** 40:5 50:12,15 59:18 96:17 111:3 157:22 167:14,23 180:7, 21 189:21 191:7 233:19

**reviewed** 48:15 50:8 73:22 150:18 205:22,24

**reviewing** 41:9

**reviews** 180:10

**revise** 67:13

**reword** 67:14

**Richens** 48:1 53:8 55:20,21,24 57:14 58:11 63:20 64:18,23,24,25 65:13,23 68:20 71:18 73:16,17 74:18,19 75:7, 21 76:1,24 77:9,13,17, 18 78:7,10 79:14,24 80:13,19 87:16 148:19 164:1,2,13,17,21 165:2, 9,17 192:13 193:4,9,14, 22 198:3,5,12,19 200:15,16,18,19 201:8 202:8,9,18 220:20 221:10,13,19 222:8,11, 18,25 223:7

**Richens's** 56:3 63:17 78:23 80:8 222:6

**ride** 161:5

**Rigby** 220:7

**risk** 101:8 103:3 139:14, 16,17

**risks** 101:18

**RN** 5:20

**road** 49:4

**Roberts** 140:18

**room** 45:20 53:8 55:16

56:10 57:1,13 83:10,14, 17 103:17 105:13 111:8 127:7,16 173:25 176:19 191:8 192:12 193:11,15, 17 198:4,6,22 200:13,25 202:15 205:6,15,16 207:21,23 216:19,22 227:22

**roommate's** 229:17

**rotate** 164:3

**rotation** 127:23

**round** 121:9

**rounds** 83:8 92:5 95:22 96:3,6,12 106:2,6 112:4 121:4,7,9

**route** 95:7,8 108:11,13

**routine** 112:1,18

**routinely** 136:4

**row** 88:6

**run** 101:8

**running** 83:12 88:21 89:4 108:11,13 133:9

**runs** 99:11 101:5 102:13 108:10 111:13

**Ryan** 4:13 28:2 212:7 223:10

---

**S**

---

**safety** 142:14

**samples** 68:19

**sat** 57:9 219:17

**save** 17:24 19:11 68:14, 19 74:3 79:18 157:5 160:21 161:2,17,18 162:23 163:1,9 164:14, 22 176:25 200:1,4

207:12

**saved** 69:10 72:5 118:19

**saving** 161:10

**scan** 10:13

**scared** 51:14

**Scene** 124:8

**schedule** 10:6 11:1 43:13 108:23 111:24

**school** 5:7

**scope** 6:5 100:6

**scoped** 105:11

**score** 25:6

**screen** 187:19 195:10,11

**searching** 171:15

**seconds** 91:6 105:8,9 195:19

**section** 222:2

**seeking** 149:21

**sees** 59:4 81:15 96:19 115:12 189:23 208:4 228:10

**seizure** 128:22

**seizures** 171:12,25

**send** 97:14 166:25

**sends** 96:19

**sense** 102:19 228:3

**sentences** 23:24

**separate** 79:18

**separates** 82:24

**September** 27:8

**sergeant** 107:16 116:6, 10 122:13 200:17,19 201:20 202:14 205:18

**sergeants** 15:15,21

**series** 27:25 225:17 227:7

**seriousness** 101:20

**served** 161:9

**service** 196:9,16

**set** 22:6 78:12 111:18,23 188:10

**sets** 108:23

**settle** 192:25

**severe** 151:4,11 178:14

**shaking** 138:17 216:9

**she'd** 176:8 179:6

**sheet** 141:17 168:9 170:13,18,24

**sheets** 25:6 35:21 147:14 170:17 188:9 210:1

**sheriff** 159:17 214:6

**sheriff's** 4:23 5:24 7:12 8:13,16 20:25 27:13 29:11 157:14 158:16 159:9

**shift** 107:18 144:16 163:4,7 164:8,9,10,11, 15 172:12 187:21

**shifts** 164:2,3

**shipped** 139:23

**short** 188:25

**shortly** 66:5 157:15 186:16 188:24

**show** 48:20 176:23 194:25 195:11

**showed** 58:5 213:2

**shower** 123:4 125:11

**shows** 188:6

**sick** 56:10 106:7,24 107:19 114:13 124:21 150:8 172:3 180:18,20 181:3,5,6,11,12,13,20, 23

**sign** 137:2 170:11,12,13, 21,22 233:19

**signature** 38:7

**signed** 12:11

**signs** 11:15 14:24 24:4 66:19,23 67:5 71:5 72:24 75:1 123:11 135:3,5 136:4,11,24 137:13 138:2,10 156:24 192:7 216:18 217:21,24

**similar** 19:11 22:21 133:6

**simple** 49:8

**simply** 50:7

**single** 70:6 163:3

**sit** 10:12 29:7 57:13 104:12 189:9 191:11 203:25 208:17

**sitting** 70:5,8 74:11 193:16

**situation** 11:18 17:23 21:4 51:21 102:16 115:1 137:10 151:20,22 172:5 195:3 201:24 218:23

**situations** 21:3 81:21 138:8 171:18 217:1

**sixth** 23:17

**skinnier** 183:1,5

**slash** 153:14,18

Jana Clyde
May 23, 2018

**sleep** 138:19

**slight** 182:25

**slot** 104:2

**small** 119:6

**snoop** 169:14

**soft** 135:11

**sole** 88:3

**Someone's** 182:17

**son** 9:1,6,8

**sooner** 74:21 184:24

**sore** 54:19

**sort** 134:24 166:25
202:2

**sound** 60:17

**sounds** 103:5 116:2

**sparse** 196:9

**speak** 54:17 219:18
226:10

**speaking** 114:1 145:6,8
159:13

**special** 98:4 161:5

**specific** 71:11 171:16
173:8 189:3,9,15 191:9,
11 195:1

**specifically** 65:8 99:14
105:3 112:10 177:4
193:1 199:7 209:2
211:13

**speculate** 152:7

**speculates** 222:9

**speculation** 22:25 67:10
88:9,25 152:4 231:6
232:25

**speech** 233:7

**spoke** 178:17 185:10
229:10

**spot** 173:3

**stable** 118:24

**staff** 5:20 21:13 24:3
40:13 68:23 69:18 93:2
94:12 115:22 125:10
127:15 151:2,8

**stamp** 212:20

**stand** 106:16

**standards** 203:15

**start** 4:14 58:21 114:6
135:5,12 156:15 212:17

**started** 8:4,6 19:1 20:12
44:18 52:4 86:11 87:14
115:19,20 125:20 126:4
136:18 150:19 154:16
195:15

**starters** 146:25

**starting** 118:1 120:13
221:18

**state** 27:14 149:24

**stated** 18:21 23:7 51:6
56:4 57:15,19 64:2,18
68:12 71:20 72:14 73:23
74:23 79:2 85:4 86:10,
13 101:14 118:18
125:19,22 130:23
158:16 184:17 186:4
199:8 233:6

**statement** 23:25 47:5
111:13 114:21,23 115:4
117:1,10 122:25 144:10
145:15 181:4,8 182:10,
20 223:21 226:13 232:7

**statements** 51:4 67:9
77:16,19 178:9 179:5
180:24

**states** 178:1 192:3
232:12

**statewide** 20:19

**stating** 4:15 89:21

**stay** 84:14 165:21
195:10,20,24

**stayed** 8:5

**staying** 194:6

**stays** 195:15,16

**step** 196:11

**steps** 42:2 68:22

**stepson-in-law** 8:22

**stethoscope** 70:17

**Steve** 28:23 30:9 100:24
151:18

**stick** 227:12

**sticky** 167:3

**stitches** 172:1

**stomach** 57:20,25 73:24
192:25

**stool** 57:14

**stop** 114:18 124:21

**stopping** 100:21

**stops** 183:25

**stories** 20:4,5

**straight** 99:9 101:5,17
102:13 111:13

**straightened** 50:22

**street** 183:11

**strictly** 196:1

**strike** 95:19 228:7

**strongly** 67:4

**struggles** 221:20

**stuff** 11:16 25:7 208:9

**subject** 16:22

**subjected** 53:25

**subjective** 66:22 67:9

**subjectively** 66:8

**submitted** 53:21 54:22 150:9 167:11

**substance** 155:3,10 183:19,25

**suffer** 184:1,11

**suffering** 19:10 26:9

**sufficient** 217:7

**suggest** 179:6,7

**suggestion** 78:22,23,24 79:1 80:8 87:20

**suicidal** 39:6,7,9 40:3 141:5

**suicide** 12:10 14:21 114:10,24 140:9,11,24 141:1,11,12,20,24 142:2,13,17,19,20,21 143:5,10

**summarizing** 51:3

**summary** 51:6 60:20,21

**Sunday** 45:24 47:11 63:23 79:2 80:16,18 165:12 205:22 229:11

**sunken** 56:21 121:24,25

**support** 19:18

**supposed** 80:24 81:20 97:18 121:4 129:18 132:4 162:21

**surge** 153:1,9,10,11,12, 14,18

**surrounding** 21:19

**surveillance** 103:17

**suspect** 184:11,23

**suspected** 160:14

**sweating** 138:17 216:12

**sworn** 4:7

**symptom** 172:17 197:6, 15 207:8

**symptoms** 18:22 20:5 24:5 30:3 56:15 62:2 66:19,24 67:6 71:5 75:1 86:11 87:15 88:14 99:24 101:24 103:3 123:9 125:20 126:5 135:5,6, 12,15,18 136:6,9 138:6, 16,22 139:7,8,12 150:8 151:3,7,11 154:2,21 155:19 156:5,25 161:7 176:5,10,14,20 177:17, 18,24 179:20 180:20 184:12 191:25 198:16, 25 201:4 206:3 224:10

**system** 10:14 36:20 89:24 93:25 166:24 169:16 182:16 195:11, 18,20,24 210:17 216:17

**systems** 194:17

---

**T**

---

**tabs** 177:16

**takes** 54:14

**taking** 37:8 42:21 44:14 61:10 77:18 109:9 149:25 166:2,6 183:25 184:8 185:16 189:11 190:16

**talk** 55:25 81:9 103:11 120:24 121:3 142:13

162:9 172:23 177:15 187:17,24 193:8 199:19 200:20 208:20 212:10 228:19

**talked** 19:2 57:14 58:1 72:2 76:21 79:14 85:24 114:24 159:15 179:13 189:6,8 203:11 206:4 209:1,5 210:12

**talking** 22:8 24:15 48:16 60:10 79:23 86:9 103:5 113:17 114:9 121:7,22 125:18 147:21 162:9 189:16 203:8,9 209:2 222:25

**talks** 114:19

**taped** 141:11

**taught** 19:23 100:3 102:7,11,19,22,24 103:4,5,8 146:22 147:1 148:1 194:15,23

**teach** 195:12

**Technology** 5:5

**telling** 12:23 20:4,5 51:22 63:9 65:1,13,23 66:9 67:21 70:11 76:24 77:6,9,13,21 78:10 89:17,20 126:16 145:11 158:6 180:23 189:10,18 228:23

**tells** 5:16 66:18 169:19

**ten** 91:6 105:8,9 109:16 119:24 134:11

**tens** 11:2

**tenure** 8:7

**term** 82:3 126:19

**terms** 50:19

**test** 53:25 54:23 194:7, 10 195:17

**tested** 65:5,17 193:5 194:1

**testified** 4:7 34:18 152:15,17 178:18 186:15,24 191:23 231:24

**testify** 70:9

**testifying** 202:24

**testimonies** 207:10

**testimony** 60:3 77:19,21 98:22 110:20 125:12 137:13 150:1,14 163:23 176:9,13 187:12 226:20

**text** 59:24 60:5 71:2 72:1,5 196:10

**texted** 72:1,2

**thin** 56:20

**thing** 11:21 44:10 55:17 65:16 72:16 81:5 87:24 102:9 110:14 111:12 119:6 139:10 195:24 196:1 201:15 209:8 210:23 221:21

**things** 11:14,15 17:13, 16 20:1 21:7 29:12,19, 21,22 36:15 50:22 51:18 67:1 73:22 100:13 101:3,7 102:7 105:3 107:10 118:18,21 128:20 129:17 132:4 138:18 146:23 147:3,10 151:12 158:18 159:15 168:11 172:2 192:24 195:9 198:11 202:25 206:10 211:14

**thinking** 61:4,6,8,12,15 179:8 218:9

**thinks** 113:16

**thought** 57:19 60:11 61:7 62:13,14 66:23 136:21 184:5,17,18 194:19 199:24 200:6 212:5 215:19 232:19 233:12

**thoughts** 39:7

**thousand** 28:14

**three-line** 119:15

**throat** 54:18,19

**throw** 50:19

**throwing** 52:4 77:7 79:16 119:16,20 120:2,7 221:15 222:1,19

**thrown** 55:25 57:16 63:4,6,23,25 64:2,3

**throws** 64:6

**Thursday** 11:2,6 47:10 96:3,23,24 97:2,11,15 98:4,23 107:16 108:3 109:6,19,24 111:1,12 117:22 161:21 180:24 181:2,10,16,19 182:3 185:1 186:5 189:22 191:8 207:19 208:15 230:1,15

**Thursdays** 108:18 110:12 112:8

**time** 7:8 8:24 9:8 10:1 11:3 12:8,11 16:10,11 19:15 20:9,10,16 21:5, 14,23 22:6,10 24:19 32:9 35:14 37:16,24 38:6 41:7,10 43:9 44:1,3 45:18 51:25 54:1 55:1, 13 56:6,16 57:17 58:23 59:12 60:6 61:13,18,20 62:13 64:7,15 70:13

72:6 73:10 76:21 77:10 81:5,23 83:17 85:5 90:25 91:24 92:3 95:6 96:11,13 100:6,21 103:13,19,22 104:10 106:12 107:12 108:5,7 109:3,5,6,19 113:3 114:17 117:7 119:9,11, 19 122:23 123:2 125:7 127:3,16 128:6 133:25 134:2,20 136:12 137:18 141:13,18 143:12 145:21 151:10,15 152:1 153:7,13 155:16 158:8 159:17 163:14,20 165:1, 16,17 170:13 171:1 173:13 174:12,17,23 178:10 180:13 183:9 184:5 185:6 186:11 187:1,22 188:2,13,21,25 189:12 193:12 195:7 196:17,20 197:10,23 200:7,10 212:25 214:9, 18 216:2 217:5 218:8,12 222:2,10,19 223:3,19 224:6,10,21 227:24 229:1 230:14

**times** 63:22 64:1,4,6,14 76:15 90:11,18 109:22 113:23 127:21 142:12 144:9 155:15,17 156:5 160:20 166:10 169:17 171:19 188:9 204:19 205:11,14 218:14

**today** 29:7 32:3,6 54:19 70:5,8 74:12 117:14 152:17 157:22 159:8 169:17 188:5 189:10 191:11 202:24 204:1

**toilet** 69:2,7 162:2 229:14

**told** 5:17 6:16 11:20 17:3

41:19 42:14 44:3 51:11
52:6,22 55:24 58:22
62:14 63:19,25 65:4,24
66:1 68:11 69:4 70:25
71:6,12,15 75:16,21
78:7 80:13 86:19 87:1,3,
11,12 88:5,20 89:21
90:22 91:15 92:23 96:22
98:13,14 103:12,15
107:18 110:8,14 112:24
116:20,24 126:14
151:14 159:23 162:4
164:13,15 165:5,17
176:11 187:4,5 191:23
192:7 193:5,7 199:10
204:11,13,21 205:1,7
221:25 222:18 224:15
226:8 228:17 229:11
230:6 232:18

**top** 40:12 43:22,23 98:15
123:21 124:18 141:10

**topics** 20:21

**totality** 28:11 31:5

**touch** 80:12

**track** 42:3

**tracked** 44:5

**trail** 204:19

**train** 20:11 93:5

**trained** 11:14 19:25
92:25 93:1 95:10 97:22
102:10 137:12

**training** 5:11 20:7,16,17,
20 21:6,15 23:8 27:5,11,
17 28:8,11,17,20 29:8,9,
13 36:3 37:23 41:6 62:1
66:6 67:7,17 92:20,22
97:24 101:6 102:3,5,9
138:25 139:1,3,5
146:18,20 194:20,23
195:1

**trainings** 20:23 27:7

**tramadol** 58:23 189:19,
25 190:18

**transcript** 60:20 113:10
133:17 220:17 223:17

**transferred** 89:25

**treat** 6:22 42:10,24 67:7,
20 68:2,6 88:8 91:13
99:23 135:6 153:19
155:2 157:7 172:21

**treated** 22:10 37:19 66:8
68:7 89:13 99:17 153:21

**treating** 37:21,22

**treatment** 123:10 139:21
161:6

**trigger** 33:3

**triggered** 173:15

**true** 34:14 47:5 51:8
62:6 75:19 87:13 117:1,
7 120:5 131:11 144:10
163:12,13 224:7,8
226:16 232:20

**truthful** 51:9,15 62:25
68:17 122:24 178:5,6,9
184:20 187:10 200:2

**Tubbs** 5:23 6:22 26:8
81:3,8,18 144:13 157:11
158:21 171:19 203:15
232:5

**Tubbs's** 95:25 97:20
100:17 102:1,15 134:2
230:19

**Tuesday** 47:8 59:22
73:6,18,20 74:6,7,23
75:2,9,12,14,17 76:1,8,
16,17,21,25 77:10,14,19
78:8,11,19 79:10,23
81:23 84:24 98:10 99:3,

4 136:17,21 137:1
175:2,5,7,23,25 176:11,
13 177:7 178:17,19
179:17,24 180:5,12
197:22 198:22 200:8
202:22 204:11 205:17
216:16 217:21,25
218:11 219:10 221:15,
23 222:12 223:1,3

**turn** 116:12 117:24
119:24 120:12 121:22
144:19 149:16 150:24

**turned** 95:18 115:21

**turning** 104:11

**twist** 51:18

**two-line** 117:25

**two-part** 99:25

**Tylenol** 58:6

**Tyler** 55:6 56:7

**type** 21:3 94:1 125:20
142:17 169:18 201:15

**typical** 135:15 139:7
144:21 182:7,20,23
183:7 184:6

**typically** 135:1,13
140:23 153:21 171:9
172:12,15 196:7,8
209:22 210:20

---

## U

**UA** 194:2,25

**UAS** 194:15,19 195:21,
23

**UBATC** 5:5

**uh-huh** 11:7 18:8 19:25
23:22 27:19 31:25 43:24
49:16 62:19 64:22 74:20

79:7 85:1 95:1 109:12
113:14 116:17 120:4
125:17 147:20 154:9,17
156:21 159:3 166:21
174:1 176:6 183:16
197:12 202:3 206:6

uh-huhs 159:5

uhm 5:22 8:21 10:20
11:14 12:9 14:15,17,23
15:5 16:20 17:12,22,23
18:21 20:25 24:12 26:23
28:22 29:9,20 31:10
34:2 35:20 42:4 45:18
51:10,12 56:10 57:18
58:11 59:4 65:4 66:18
68:8,24 79:14,15 82:10
83:8,23 90:24 95:17
100:2,3 102:9 103:2
109:21 110:8 118:1,23
126:24 128:25 132:25
142:12 144:15 155:15
157:1 164:17 167:8
170:9 171:5,6 179:7
183:1 186:8 188:3,8
189:6 196:17 197:8
199:9,24 200:16 201:15
203:8 209:25 212:25
213:7 214:23 217:24
219:16 230:6,7 233:4

Uintah 5:5,10 7:16,25
36:16 44:6 52:3 145:2
152:18,20 153:15
157:14 158:16 159:16
214:6

unable 76:25 129:3

unclear 197:24

underneath 37:13 40:11

understand 22:8 30:12
36:6 39:3 43:9,15 44:10
45:23 62:12,20 64:9
89:11 94:6 96:21 97:7

98:6 131:3 137:12
140:19 145:3 184:4
207:7 224:25 228:8
230:10

understanding 19:21
21:22 30:14 56:1 81:10
82:5 92:15 95:24 108:16
120:19 132:21 133:22,
25 134:7 136:7 137:18
139:11,12 171:3 183:18
184:1 203:7 225:11,16
230:25 231:4

understood 135:17
194:2

undertaking 20:8

units 153:23

unknown 129:2

Unprofessionally 103:1

unrecognizable 38:9

unresponsive 123:24

unsure 51:7,23 149:4,6

unwritten 16:14 17:8
18:17 19:1 80:23 81:11
91:24

upshot 112:24

urgent 151:3,11,22
172:17 215:20 216:3
217:1 219:1

urinalysis 53:22 54:7,
14,23 65:6,23 66:1

urine 187:19 195:9

user 62:2 67:4

usual 108:7

Utah 4:1

UVMC 230:7

V

vague 16:17

vagueness 22:1 30:17

vary 109:20,22

vehicle 225:9

verbal 228:20

verbally 227:20 228:19

verification 188:22

verified 185:1,21,24
188:9,11 192:20 230:7,8

verify 147:9 180:1
185:22,23 186:7 188:19
230:8

Verizon 196:19

Vernal 7:17 8:5

version 94:3

vicinity 30:25

video 60:8 104:1

view 118:23

viewed 157:21

violent 172:4,6

visible 82:11

visit 66:5 72:17 98:3,4
109:19,21,22 115:6
117:19 150:6 180:4
193:7,9,13

visits 109:9,22 110:11
112:8 148:24

visual 89:14

vital 11:15 14:24 72:24
123:11 135:3,4 136:4,24
137:2 217:20,24

Jana Clyde
May 23, 2018

**vitals** 70:13 75:14 116:21 117:7 136:11,21 137:15 148:25 199:2

**vomit** 19:11 68:14,20 69:1,6,7,9,10,13 74:2 79:20 80:10,13 81:15 105:2 160:23 161:10,15 162:8,20 163:1,9 164:14,23 176:24 200:5 207:12 229:16,19,21

**vomited** 70:5 71:21 72:15 75:5,8 78:12 79:2 80:18 88:6,21 192:17,20

**vomiting** 17:23 19:10 26:10 30:3 37:22 47:24 57:15 58:2 68:12 71:16 74:1 79:17 80:25 87:25 104:22 107:19 110:10 118:19 129:8 135:23 137:14 138:9 139:15 151:12 157:4 160:21 161:11 165:3,10,18,21 172:4,6 176:8,15 177:5, 17 178:15 179:20 191:24,25 198:14 199:25 201:4 206:17 211:14 217:1 224:11 227:8 229:9

**vomits** 64:15 161:23

**W**

**wages** 8:2

**wait** 53:15 104:6 163:17 188:21 204:24

**walk** 11:19 75:24 83:3 115:7 120:16

**walked** 73:13 90:23 103:13,20 104:10 115:16 193:17 206:11 219:13,16

**walking** 51:20 57:8 63:20 83:6 115:10 221:21 223:3,4

**walks** 114:19

**wall** 173:24 174:2 195:25 196:1

**walls** 229:19

**wander** 193:15

**wanted** 12:13 47:24 55:25 73:23,25 80:10 117:13 160:19 193:23 214:24

**wanting** 161:2 167:22 180:3,20

**warrant** 227:9 232:1

**warrants** 169:23

**watch** 12:10 86:13 125:22 126:10 140:9 141:1,11,12,20,25 142:2,13,17,20,21,23 143:5,10,11,16,21 164:22 203:9,17

**watched** 40:15 60:8 87:14

**watching** 221:13

**water** 88:16,23 99:12 100:4,12 101:6 102:14 111:14 135:8 217:10

**ways** 91:16 169:5 227:18

**weak** 56:25 57:2 71:13 76:25 106:16 221:25 222:14

**weaker** 75:22 223:2

**Wednesday** 43:5 47:8 90:4,6,10,20 98:16 99:4 103:11,19 104:13

105:16 107:1,14 173:12, 16,23 174:3,4 175:6,22 176:1,4,18,21 177:6,8 178:10,11,12,13 180:16, 17 204:9 205:16 206:9, 10 217:11,16,17,18 219:8 232:13

**Wednesdays** 97:6

**weed** 20:2

**week** 10:7,8 95:17 96:2 97:10,15 134:5

**weekend** 166:1,11 168:19,20

**weekly** 95:21 96:6,12 112:8 150:6

**weight** 57:4 121:25 182:25 226:14

**well-kept** 183:5

**Wellbutrin** 58:23 189:19, 25

**whatnot** 181:1

**whomever** 202:13

**wife** 232:18

**window** 82:22 83:7 90:22 104:21 115:11,18

**withdrawal** 22:17,23 24:5 25:18 27:8 125:20 132:15,22 135:16 136:9 137:14 138:3,16,22 139:4,7,8,13,17 145:12, 20 153:20 154:2,24 155:10,19 156:6,25 184:12 187:6 197:6,15 203:17 206:3 230:18 231:1

**withdrawal-type** 86:11 87:15 126:4

Advanced Reporting Solutions
801-746-5080

**withdrawals** 25:21 32:23 37:3 89:19,22 114:15 124:12 134:25 135:1,2, 19 138:10 184:2,14,15 186:25 224:17 225:21 226:1

**withdrawing** 151:5 155:3,14 157:2,8,9 158:25 159:11 160:14, 17 187:8 194:5 218:16, 19 223:20 224:6,9 226:11

**witnessed** 129:8,10

**witnesses** 111:9

**wondering** 190:21 191:6

**word** 92:22 140:11 146:20

**words** 23:18 26:25 97:1 98:4 140:12 167:25 213:17

**work** 4:19,21 7:15,22 8:3 11:1,11 14:4 46:22 47:19 48:6 107:12 111:9 120:23 127:18 152:20, 25 153:17 154:5 159:16 161:20 164:2

**worked** 7:25 11:2 128:4 152:18,21,24 153:5,7,14 159:20,21 171:2

**working** 5:19 8:16 9:1 46:1 47:11 81:5 127:16, 17 135:9 154:11 156:8, 13,20 159:14 218:8

**works** 10:6 31:12 39:13 145:2 165:24 195:1

**worse** 117:12 118:16,18

**worsen** 136:6

**write** 100:5 170:14

228:20

**writing** 122:21

**written** 14:25 15:23 17:4 24:15 26:20 73:3 81:10, 12,19 91:23 99:6 111:4 211:8 228:20

**wrong** 46:22 86:22 178:18 184:18

**wrote** 43:18 99:8 101:3 110:9 182:6 206:11

---

**Y**

---

**year** 28:13,18,21 138:11 155:17,23,25 156:5,15

**years** 7:14 9:12 28:11 152:20,23 153:14 154:6, 8 155:1 156:9,13,18

**yelling** 115:18

---

**Z**

---

**Zofran** 135:14,23