# THE ESTATE OF MADISON JODY JENSEN

vs

# DUCHESNE COUNTY, et al.

Civil No. 2:17-cv-01031

DAVID L.

BOREN

June 27, 2018

ADVANCED REPORTING SOLUTIONS

801-746-5080 | office@advancedrep.com | advancedrep.com

**SALT LAKE** | 159 West Broadway, Broadway Lofts, Suite 100 | Salt Lake City, Utah 84101
**PROVO** | 3507 North University Avenue, Suite 350-D | Provo, Utah 84604
**ST. GEORGE** | 20 North Main Street, Suite 301 | St. George, Utah 84770


REPORTING SOLUTIONS
ADVANCED

```
 1              IN THE UNITED STATES DISTRICT COURT

 2              DISTRICT OF UTAH, CENTRAL DIVISION

 3                          *   *   *

 4   THE ESTATE OF MADISON JODY     :
     JENSEN, by her personal        :   Deposition of:
 5   representative Jared Jensen,   :
                                    :   DAVID L. BOREN
 6              Plaintiff,          :
                                    :
 7   vs.                            :
                                    :
 8   DUCHESNE COUNTY, a Utah        :   Civil No. 2:17-cv-01031
     governmental entity; DAVID     :
 9   BOREN, an individual; JARED    :   Judge Dale A. Kimball
     HARRISON, an individual; JASON :
10   CURRY, an individual; JANA     :
     CLYDE, an individual; LOGAN    :
11   CLARK, an individual; and JOHN :
     DOES 1-20,                     :
12                                  :   June 27, 2018
                Defendants.         :      9:02 a.m.
13                                  :

14                          *   *   *

15

16                      Held at the
                County Administration Building
17               734 North Center Street
                     Duchesne, Utah
18

19                          *   *   *
20

21                   Jamie R. Brey
             - Registered Professional Reporter -
22

23

24

25
```

```
 1                    A P P E A R A N C E S

 2

    For the Plaintiff:         RYAN B. HANCEY
 3                             KESLER & RUST
                               Attorneys at Law
 4                             200 McIntyre Building
                               68 South Main Street
 5                             Salt Lake City, Utah  84101

 6

 7  For the Defendant          MICHAEL M. HOMER
       Duchesne County:        BRITTON R. BUTTERFIELD
 8                             SUITTER AXLAND
                               Attorneys at Law
 9                             200 Judge Building
                               8 East Broadway
10                             Salt Lake City, Utah  84111

11

12  For the Defendant          FRANK D. MYLAR
       Jana Clyde:             MYLAR LAW
13                             Attorneys at Law
                               2494 Bengal Boulevard
14                             Salt Lake City, Utah  84121

15

16  For the Defendant          KATHLEEN J. ABKE
       Logan Clark:            STRONG & HANNI
17                             Attorneys at Law
                               102 South 200 East, Suite 800
18                             Salt Lake City, Utah  84111

19
    Also Present:              Jared Jensen
20                             Heather Jensen
                               Tyler Allred
21                             Steve Loos

22

23                             * * *

24

25
```

```
 1                        I N D E X

 2   WITNESS                                        PAGE

 3   DAVID L. BOREN

 4         Examination by Mr. Hancey                  4
           Examination by Mr. Mylar                  92
 5         Examination by Ms. Abke                   95
           Further Examination by Mr. Hancey        115
 6

 7

 8

 9                       E X H I B I T S
10
     NUMBER              DESCRIPTION                PAGE
11
         2      Pre-booking form                     61
12       3      Inmate intake questionnaire/responses 63
         5      Medical request form                 56
13       6      Mental health questionnaire          64
        13      Opiate and/or heroin withdrawal sheet 11
14      14      Transcript of interview with Logan Clark 51
        25      Responses to discovery from Duchesne County 81
15      30      Excerpt of policy and procedures of Duchesne 74
                   County Jail regarding surveillance
16      31      Duchesne County Jail policy          77
        34      Record of trainings received         33
17      38      Answers to interrogatories to Logan Clark 82
        39      Opiate withdrawal policy             34
18      51      Excerpt of 2016 policy and procedures manual 15
                   for Duchesne County Jail
19

20

21                         * * *

22

23

24

25
```

```
 1                                    Duchesne, Utah
                                      June 27, 2018
 2                                    9:02 a.m.

 3

 4                   P R O C E E D I N G S

 5                        DAVID L. BOREN,

 6   called as a witness for and on behalf of the plaintiff,

 7   being first duly sworn, was examined and testified as

 8   follows:

 9

10                   E X A M I N A T I O N

11

12   BY MR. HANCEY:

13        Q.    Good morning, Sheriff Boren.  I'm going to ask

14   you some questions today, and let me just start off by

15   getting you to state your name for the record.

16        A.    David Boren.

17        Q.    Thank you.  You're currently employed with the

18   Duchesne County Sheriff's Office.  Correct?

19        A.    Yes.

20        Q.    You're the sheriff there?

21        A.    Yes.

22        Q.    How long have you been the sheriff?

23        A.    About three and a half years.

24        Q.    Describe generally for me, sir, your

25   responsibilities as the sheriff of the department.
```

1          A.      I'm responsible for all of the court security,

2   whether it be juvenile or district court.  Responsible for

3   serving civil papers within the county for commitments and

4   civil service.  I oversee all of the -- I take them out of

5   the jail and oversee the operations there, prisoners.

6               I oversee the general operations of our office,

7   which would be investigations, patrol unit, animal control.

8   The civil division.

9               (Whereupon, Ms. Heather Jensen left the

10   deposition proceedings.)

11               THE WITNESS:  And any other thing that might

12   come my way as far as having to keep the peace or enforce the

13   law, to make all lawful arrests within the county.  Basically

14   what the State statute would entail, I'm responsible for

15   those.  Search and rescue operations within the county.

16   BY MR. HANCEY:

17          Q.      Now, I heard on that laundry list that you just

18   stated that one of your responsibilities as sheriff is

19   supervision over the Duchesne County Jail.  Is that right?

20          A.      Yes.

21          Q.      Would that kind of be considered the

22   corrections arm of what you do?

23          A.      Yes.

24          Q.      All right.  Now, we heard from Jason Curry

25   yesterday who, at the time of Madison's death, was the

1  commander of the jail.  Is that right?

2        A.    Yes.

3        Q.    Okay.  Is it true that in 2016 he reported

4  directly to you?

5        A.    Yes.  He reported directly to me.  If I was

6  absent or otherwise detained, then he would report to my

7  chief deputy.

8        Q.    All right.  Since your -- during the term of

9  you serving as sheriff here in this county, who has had

10  responsibility over the implementation of policies and

11  procedures at the Duchesne County Jail?

12        A.    Jason Curry would have had -- been responsible

13  for some implementation.  Staff Sergeant Travis Givens and

14  myself.

15        Q.    And among the three of you, how would you

16  describe the allocation of that responsibility?

17        A.    Who would do what?

18        Q.    Yes.

19        A.    Is that what -- okay.  So we have a system in

20  place at the jail where we develop policy.  We have jail

21  standards -- if I can take a minute and maybe explain them,

22  then maybe that will give us a little bit of background to

23  show how policy is implemented.

24             The jail standards were developed for the

25  Sheriffs' Association.  There's 600-plus, I think it's around

1   640 or something, policies and procedures or standards, if

2   you will, that we look at.  Each year at the beginning of the

3   year, those standards are up -- the process of updating those

4   standards goes into effect.

5                   Gary Deland, who works for Sheriffs'

6   Association, develops and looks at those standards.  And then

7   according to case law, new case law, or new methods or

8   practices that come out, he -- he hands those standards down

9   to the jail.  Not just our jail but a number of jails

10  throughout the state.

11                  As those standards are passed down, then we

12  have a system, electronic system, that's put in place.  One

13  of our administrative staff, either Jason at that time or

14  Travis, will pull up those standards in that system and look

15  at those new standards that need to be addressed.  And based

16  on those new standards, his responsibility would be to write

17  policy to comply with that standard.

18                  As that policy is drafted, at some point during

19  that process, when they're completed, then they would be

20  taken to the County attorney's office; they would be reviewed

21  by them and then returned back to me.  And I would sign off

22  on those standards, policies, and they would be implemented.

23          Q.      Assuming that that process was followed through

24  to its completion and you approved and signed off on a

25  policy, then would it be inserted some way into the existing

1    policies and procedures manual?

2         A.    It would.

3         Q.    How does that happen logistically?

4         A.    Logistically, there -- like I say, there is an

5    electronic system that is in place.  As those policies are

6    developed, they are inserted into there.  They have to be

7    completed.

8              Then there is an inspection on those by the

9    Sheriffs' Association inspector who would come and -- well,

10   he'd look at them on-line, basically, to see if they are in

11   compliance with that particular standard.  They also come out

12   and do an inspection on the jail and do verifications if

13   those particular policies are in compliance with the standard

14   that's set.

15             If it is, then they would sign off that that

16   standard is in compliance, and it would show up on a graph

17   within that system.  If there's any incompletions in the

18   policy that addresses that standard, then it would show up on

19   that graph.  And there would be an opportunity for the jail

20   administration to go in there and tweak, if you will, that

21   particular policy so that it is compliant with that standard.

22             Once that's done, then it would go to the

23   County attorney's office, come back to me, and then it would

24   become policy.  It's a continual, working document.  It's

25   really never completed, because it -- it's ever-changing.

 1                It started in January.  They like to have those

 2    policies and procedures completed by May, have them -- the

 3    standards addressed in the policies in place so that, as the

 4    inspectors come out, they can look at those.  Then if there's

 5    any issues with any of those policies and procedures, that

 6    particular facility has an opportunity to address those and

 7    get them in place before a final grade comes out from the

 8    association whether we're in compliance with that, those

 9    standards, or not.

10         Q.    All right.  I appreciate that explanation.

11    Now, as an outsider looking at the policies and procedures of

12    the jail, is the thing that would tell me whether or not

13    something has made it all the way through the process you

14    just described and has become formally a jail policy, the

15    fact that it appears in the policies and procedures manual?

16                (Whereupon, Ms. Heather Jensen returned to the

17    deposition proceedings.)

18                THE WITNESS:  Yes.

19    BY MR. HANCEY:

20         Q.    Now, in discovery in this case, we asked the

21    County to produce a copy of the policies and procedures

22    manual as it existed in 2016.  Do you know whether or not

23    that was produced?

24         A.    I believe it was.

25         Q.    All right.  And that would, then, be, sir,

1   the -- as I understand you, the extent of the jail's policies

2   and procedures as they existed in that year.  Is that right?

3          A.    Yes.

4          Q.    All right.

5          A.    I might want to interject something there.

6          Q.    Okay.  Feel free.

7          A.    As far as the "extent," those are the written

8   policies and procedures.  Obviously we have SOPs, we have

9   general orders.  We have verbal policies and procedures that

10  is given by me or other administrators which is considered

11  policy.

12         Q.    Well, and that was going to be my next

13  question.  So the policies and procedures manual is going to

14  contain written policies of the jail at any given time.

15  Correct?

16         A.    Yes.

17         Q.    Now, in addition to that, you mention SOPs.

18  Standard operating procedures?

19         A.    Yes.

20         Q.    Okay.  And are those written?

21         A.    Some are written.  Some are just directives,

22  verbal directives.

23         Q.    Describe for me the process by which something

24  becomes policy through a standard operating procedure.

25         A.    So, for instance, our medical staff.  There's a

1  document that's in discovery as far as the procedure in

2  handling certain medical issues that arise.  That would be

3  considered an SOP.  That's written.  That's not in our policy

4  manual that I'm -- that I talked about as far as the

5  standard.  It would be an SOP or an operating procedure.

6  That one would be a written document.

7       **Q.    Are you talking about Exhibit 13?**

8       A.    I believe I am, yes.

9       **Q.    Just verify for me, if you would.**

10      A.    Is it this...

11      **Q.    Binder 1, yeah, it would be that one.**

12      A.    Yes.

13      **Q.    Okay.  We see that Exhibit 13 is a written**

14  **document.  It looks a lot like a policy, but the difference**

15  **between this and a policy in the manual is -- simply looks**

16  **like the fact that this isn't formally included in the**

17  **manual?**

18      A.    Right.

19      **Q.    All right.  Now, does the jail house all of its**

20  **written standard operating procedures in one area?**

21      A.    Yes.  Well, a couple of different areas.

22      **Q.    Okay.  And where would I find those?**

23      A.    There would be one in our booking area and

24  there would another one back in control.  They're also on --

25  those are our hard copies.  There would be obviously a

1   electronic copy that could be accessed from any of the

2   computers within the jail.

3        **Q.      Now, you mentioned that there are also verbal**

4   **policies?**

5        A.      Yes.

6        **Q.      Is that right?**

7        A.      Right.

8        **Q.      Tell me about how those work.**

9        A.      For instance, if we change the way we were

10  documenting our time, for instance.  Uhm, the County from

11  time to time changes the way they want us to record that.

12  And so as they change -- make changes like that, obviously we

13  would need to pass that down to our staff.

14              So in an office meeting or an e-mail or a

15  written directive, we would pass that on to our staff.  A

16  verbal directive or verbal policy might be we're going to do

17  time sheets like this today, and from here on out until

18  further notice, that's the way we're going to do it, and we

19  want you to comply with that.  So that would be a verbal

20  policy, just an example of a verbal policy that is handed

21  down to our staff.  Even though it's not written, it's

22  considered policy.

23       **Q.      Is it fair to say that verbal policies are**

24  **reserved for the kind of things that are relatively minor in**

25  **nature?**

1        A.      Some of them.  Not all.

2        Q.      I mean, for instance, would the jail be

3   satisfied with a verbal policy change of something that's in

4   the policies and procedures?

5        A.      I -- you lost me.  I'm sorry.

6        Q.      Well, okay.  So you have a policies and

7   procedures manual at the jail.  Right?

8        A.      Yes.

9        Q.      And I presume that the purpose for that manual

10  is to advise and instruct the jail employees on what the

11  policies are and how they do their jobs.  Right?

12       A.      Right.

13       Q.      Would the jail be satisfied with -- if it wants

14  to change one of the written policies contained in the

15  policies and procedures manual, would it be satisfied with

16  verbally doing that in a staff meeting?  Or would that change

17  need to go through the process that you described earlier to

18  me?

19       A.      It would go through the process that was

20  described earlier.

21       Q.      Okay.  So then the verbal policy process, it

22  sounds to me, would be more like handling administrative

23  matters, minor in nature.  Would you agree with me?

24       A.      Generally speaking, yes.

25       Q.      Okay.

1              Are there any other types of policies -- it

2    seems to me like you mentioned some type of an order that

3    would also fit into the category of policy?

4         A.     General order.

5         Q.     Okay.  What is a general order?

6         A.     That's a written directive from me.  Personal.

7         Q.     Is it directed to the jail as a whole or to an

8    individual within the jail?

9         A.     It can be either.

10        Q.     And under what circumstances would you prepare

11   a general order?

12        A.     If something became apparent to me either

13   through the public or through one of our administrative staff

14   or just a line staff, or a civilian, that affected our

15   operation, any deficiency or anything that we might want to

16   improve on or discontinue that I needed to address

17   immediately, then I might do that by a general order.

18        Q.     Can you think of a general order that you have

19   created in the last two years?

20        A.     Yes.

21        Q.     Tell me about one.

22        A.     Time sheets, for instance.  I did a general

23   order on how we were going to address our time sheets and

24   record our comp time and our overtime.  That was a general

25   order that obviously we need to address right now because

1  people like to get paid.  And we wanted to do it right, so I

2  addressed that with a general order.

3      Q.    I see.  Is there ever a circumstance where a

4  general order could contradict or supersede something

5  contained in the written policy and procedures manual?

6      A.    Yes.

7      Q.    Give me an example of that.

8      A.    For instance, a -- our camera use policy, our

9  video camera use policy.  If -- as we were reviewing new case

10 law or new practices that came out, if there were issues with

11 a -- with that camera use policy, then I could do a general

12 order, and that general order would supersede or replace that

13 particular portion of the policy.  I think it would state in

14 there what it would replace and that this particular order

15 would be now in effect.  And then at the end of the year,

16 then that general order would be implemented into policy.

17     Q.    So it would be like a stop-gap measure to

18 address the situation until the beginning of the next year

19 when you go through the process once again?

20     A.    Right.

21     Q.    Okay.

22           (Whereupon, Exhibit No. 51 was marked for

23 identification.)

24 BY MR. HANCEY:

25     Q.    Sheriff Boren, I've handed you what's been

1   marked as Exhibit 51.  I want you to just look for a minute

2   at the first two pages of that exhibit.  Does that appear to

3   you to be the index page or pages of the policies and

4   procedures manual for the jail from 2016?

5              This is the policy and procedures manual that

6   was produced in discovery.

7        A.    Okay.

8        Q.    This is the index from that.  And it's about a

9   996-page document.  Does that sound right to you?

10       A.    996?

11       Q.    990, somewhere in there, yes.

12       A.    This particular policy that I'm reviewing right

13  here, uhm, is the policy -- part of the policy that would be

14  given to inmates who would be back in the box.

15       Q.    Okay.  But -- and I pulled this -- I pulled all

16  of the pages of this exhibit, except for the first two, out

17  of the body of the policy and procedures manual.

18       A.    Okay.

19       Q.    So it's only -- it's part of that, the one I

20  wanted to focus on later on.

21       A.    Okay.

22       Q.    But the first two pages were to orient you on

23  what this came from.

24       A.    Okay.

25       Q.    Does it appear to be the policy and procedures

David L. Boren
June 27, 2018
Page 17

1  manual in place at the jail --

2       A.     Yes.

3       Q.     -- in 2016?

4       A.     Yes.

5       Q.     Thank you.  Okay.  We'll come back to this

6  momentarily.  I just wanted to lay that foundation.

7              In November of 2016, what was the jail's

8  practice in providing copies of its policy and procedures

9  manual to jail employees and staff members?

10      A.     They would -- as individuals are trained back

11 there, they go through a field training process right after

12 they're hired.  They are provided with an access into the

13 computer where the policies and procedures are kept.  They

14 review those policies.  They have to become acquainted with

15 those policies and show that -- that they understand those

16 policies and procedures.

17             At the end of their field training, then they

18 would sign off that they have reviewed those policies and

19 procedures.  And their field training officer would sign off

20 that they were provided with those policies and procedures

21 and that they had a chance to review them and become

22 acquainted with them.

23             Then that field training would be reviewed by

24 the jail commander or the staff sergeant and then signed off

25 on.  Generally speaking, there is a hard copy there that they

 1   can review now or they can access it by -- through the

 2   computer system.  Either one or both.

 3        **Q.    So there's a hard copy of the manual kept at**

 4   **the jail?**

 5        A.    Yes.

 6        **Q.    And then all of the employees and staff members**

 7   **have access to the electronic version?**

 8        A.    Yes.

 9        **Q.    Now, I think you were present when I took Jana**

10   **Clyde's deposition last month?**

11        A.    Yes.

12        **Q.    One of the things that she testified to was**

13   **that she never received a policy and procedures manual.  It**

14   **sounds like you don't circulate hard copies of the manual to**

15   **employees and staff in any way.  Is that right?**

16        A.    We don't.  Can I explain why?

17        **Q.    Yes.**

18        A.    The reason that it's not distributed to them to

19   take home or to take out into a common area or something like

20   that is because it's safety and security of the jail.

21   Obviously we wouldn't want policies and procedures to be

22   reviewed by individuals that might be contemplating escape or

23   being able to get contraband or other items into the jail.

24   So they're kept in more of a controlled environment, and

25   that's why.

 1        Q.      Now, Jana Clyde is a civilian, not an officer.

 2   Correct?

 3        A.      Yes.

 4        Q.      So would she have gone through the field

 5   training process that you described to me?

 6        A.      Not to the etent that a correctional officer

 7   would.

 8        Q.      Was she mandated to review the policies and

 9   procedures manual and sign something indicating that she had?

10        A.      Yes.

11        Q.      So does the County -- do you believe that the

12   County has a copy of the document signed off by a field

13   training officer indicating that -- and Jana Clyde indicating

14   that she's read and reviewed and understands the policies?

15        A.      She should.  I don't know if there is one.

16   From time to time, as new employees come in, they might

17   review it.  But it's not signed or documented.  But we -- and

18   again, it doesn't necessarily have to be just a -- something

19   that they're oriented with as they come in as a new employee.

20              Again, policies and procedures are updated on a

21   continual basis.  So they are instructed not only in their

22   field training but in office meetings and staff meetings

23   that, you know, this particular policy has been updated.

24              (Whereupon, Mr. Steve Loos left the deposition

25   proceedings.)

 1              THE WITNESS:  You are to become aware of it,

 2     become familiar with it.  Especially if it happens to be in

 3     your realm of responsibilities.

 4     BY MR. HANCEY:

 5         **Q.     Is there any document you could point me to**

 6     **that would indicate whether or not Jana Clyde was provided**

 7     **with the policies and procedures and acknowledged that she**

 8     **read and understood them?**

 9         A.     I can't, no.

10              (Court reporter interrupted for clarification.)

11              THE WITNESS:  Right.  Sorry.  Focusing in on

12     counsel.  I'll try to be a little better.

13     BY MR. HANCEY:

14         **Q.     What is the jail's practice on ensuring that**

15     **its employee and staff members are aware of changes in**

16     **policies as those are made from time to time?**

17         A.     It can be done a number of ways.  An e-mail,

18     verbal instruction in a staff or office meeting that there's

19     new policies that are in place and that they need to be aware

20     of those.

21         **Q.     As far as the updates to the written policy and**

22     **procedures manual that apparently happen annually, is it true**

23     **that the only way an employee or staff member would become**

24     **aware of those new policies would be to get on-line or check**

25     **the hard copy located in the jail and go through them one by**

1    one?

2          A.     Not the only way.

3          Q.     **Well, how -- I mean, the policies and**

4    **procedures manual is 900 pages long.**

5          A.     Right.

6          Q.     **I guess I'm trying to understand how an**

7    **employee would become aware of what all of the policy changes**

8    **were from the prior year to the current year.**

9          A.     They could either be told, which would be one

10   way.  But if they were told, it would be their responsibility

11   to go into that system and review it.  Obviously, not all of

12   the policies are changed every year.

13         Q.     **Sure.**

14         A.     Not all of the policies apply to all employees

15   based on what their responsibility might be.  Obviously a

16   patrol officer doesn't really need to know how to move an

17   inmate in the jail because that's not in his area of

18   responsibility.  So if it has to do with an area of their

19   responsibility, they should be reviewing those particular

20   policies.  Especially if they have been indicated by

21   administrative that they have been changed or updated.

22         Q.     **In 2016, did the jail require its employees and**

23   **staff members to undergo training of any kind on its policies**

24   **and procedures?**

25         A.     Yes.  They're required to go through field

 1  training.

 2          Q.      That's when they're hired.  Is that right?

 3          A.      Uh-huh.

 4          Q.      Okay.  And you haven't done this yet, so why

 5  don't you just quickly describe for me the field training

 6  process for a new employee.

 7          A.      So as a new employee comes into the jail

 8  setting, for instance, they would be oriented into -- it's

 9  quite an extensive process.

10          Q.      How long does it take?

11                  (Whereupon, Mr. Steve Loos returned to the

12  deposition proceedings.)

13                  THE WITNESS:  At least 14 weeks.

14                  MR. HANCEY:  Okay.

15                  THE WITNESS:  Sometimes longer than that

16  depending on the progress of the employee.  Obviously some

17  individuals pick up their job assignments and their

18  responsibilities quicker than others.

19  BY MR. HANCEY:

20          Q.      And you've told me that part of that process is

21  a requirement that the new employee look over the policies

22  and procedures and acknowledge that they read and understood

23  them?

24          A.      Yes.

25          Q.      That's signed off by the field training

 1  officer.  Correct?

 2       A.    Yes.

 3       Q.    Do staff members or civilian members of the

 4  jail staff have to undergo field training?

 5       A.    Not to that extent.  They do receive

 6  orientation and instruction on the job sites.  They would

 7  have to demonstrate that -- you know, that they would -- they

 8  are able to handle their assignments and be proficient in

 9  them.

10       Q.    Okay.  Let's focus on Nurse Clyde for a minute.

11  So she is a civilian member of the jail staff.  Correct?

12       A.    Right.

13       Q.    And her occupation, I mean, she's an LPN, a

14  licensed practice nurse.  Right?

15            MR. MYLAR:  Practical.

16            MR. HANCEY:  Practical nurse, right.

17  BY MR. HANCEY:

18       Q.    Is that correct?

19       A.    Yes.

20       Q.    Okay.  So when she -- and she's worked at the

21  jail for how long?

22       A.    I think she's been there five or six years.

23  She was hired before I became sheriff.

24       Q.    I see.  So when a civilian like Jana Clyde

25  comes on to start working for the jail, do you know if she

1    underwent field training?

2            A.      She would have -- yeah, she would have went

3    through a...

4            Q.      An orientation?

5            A.      An orientation process, yes.

6            Q.      Describe for me what that orientation process

7    would have looked like.

8            A.      Uhm, that would have been done by some of our

9    administrative staff.  It would have been done by some of the

10   correctional staff and, obviously, from our medical provider,

11   Dr. Tubbs and -- and Logan Clark.

12           Q.      So they would have shown her what her

13   responsibilities were going to be on the job.  Is that right?

14           A.      Yes.

15           Q.      They would have answered questions that she

16   had, I suppose?

17           A.      Yes.

18           Q.      Anything else?  Any discussion of policies and

19   procedures of how to handle situations?  Or was that more

20   on-the-job training as circumstances arise?

21           A.      I believed it to be both.  Obviously our jail

22   staff and our administrative staff aren't going to instruct

23   our nurse or our doctors on how to perform their jobs.  It's

24   not our responsibility to be able to dictate to them what

25   medical needs might be.  That would be more their area of

 1   responsibility.  Some of that stuff would have come from --

 2   that she received would have come from Dr. Tubbs and Logan

 3   that she needed to be able to perform her functions at the

 4   jail.

 5        **Q.     Do you believe that any advice or counsel that**

 6   **Jana Clyde would have received during her orientation process**

 7   **on how to handle the medical aspects of her job at the jail**

 8   **would have come from Dr. Tubbs or Logan Clark?**

 9        A.     Yes.

10        **Q.     Other than the field training, slash,**

11   **orientation process we've talked about, in 2016, did the jail**

12   **require its employees and staff to undergo any other training**

13   **concerning its policies and procedures?**

14        A.     We're constantly reviewing policy and

15   procedures, and a lot of that is done with staff meetings or

16   office meetings.  There might be a particular policy that is

17   picked out, and they receive instruction on it, either in

18   depth or general.

19        **Q.     Who would direct the staff meetings you've**

20   **described?**

21        A.     It would either be me, it could be our jail

22   commander, my chief deputy, my patrol lieutenant.  Staff

23   sergeant might conduct that meeting.  Usually an office or

24   staff meeting is conducted by a senior administrative

25   officer.

1       Q.      How often do those take place?

2       A.      Now or back then?

3       Q.      Back then.

4       A.      Back then, they would take place monthly.

5       Q.      Did the staff meetings in 2016 ever touch on

6    policies and procedures related to the medical care of

7    inmates?

8       A.      Yes.

9       Q.      What do you remember about that specifically?

10      A.      I remember some of that being emergency

11   situations where you might need to call an ambulance.

12   Obviously safety and security of the jail is utmost.  There

13   are times when there's inmates out in the common area or in a

14   hall; if there's a medical issue that arises, obviously we

15   wouldn't want to bring emergency medical staff in there where

16   there were inmates still in those common areas.  So it would

17   be -- we would have went over some of those issues that we

18   needed to address as far as making sure that those inmates

19   were secure before we allowed them back in through the

20   sliding doors into our first security portion of the jail.

21           I remember times when we -- during that year,

22   that we addressed documentation, different forms that were

23   used, updated.  I remember booking forms that were updated.

24   Probable cause statements would have been updated.  Officers

25   would have been informed that if there is any medical issue

1   that an inmate is having, arrestee, if you will, is having

2   when they bring them in for booking, that those concerns

3   should be passed on to the booking officer or the booking

4   clerk, either verbally or in writing on the form, so that

5   those issues can be addressed.

6        Q.    Okay.

7        A.    That information that's passed on from the --

8   there's information that's gathered from -- obviously from

9   the arresting officer that the booking clerk wouldn't know.

10  And so we would have addressed making sure that that

11  information was passed on with any other relevant

12  information.

13       Q.    Okay.

14             We've looked at Exhibit No. 13, and my

15  understanding is that represents the jail's opiate and/or

16  heroin withdrawal policy?

17       A.    Yes.

18       Q.    As it currently exists.  Right?

19       A.    Yes.

20       Q.    There's been testimony from other witnesses

21  that this policy came into effect after Madison passed away.

22  Is that right?

23       A.    Yes.

24       Q.    And prior to November of 2016, did the jail

25  have a policy similar to Exhibit 13 to deal with situations

1    involving opiate withdrawals?

2         A.    No.

3         Q.    Prior to November of 2016, was there a policy

4    in the jail that would dictate the circumstances under which

5    Dr. Tubbs or Logan Clark were to be contacted?

6         A.    Yes.

7         Q.    Okay.  Tell me about that policy.

8         A.    It's in our medical portion of the policies and

9    procedures.  It's quite extensive.  If you would like me to

10   review any portion of it, I...

11        Q.    Is that the pages that I took and put in

12   Exhibit 51 under the index?

13        A.    They may have access to mental -- or

14   healthcare?

15        Q.    Yes.  Is that the section you're referring?

16        A.    You're referring to what you attached to --

17        Q.    Yes.  And so, Sheriff, if you'll look on

18   Exhibit 51, as I indicated earlier, the first two pages are

19   the index to the policies and procedures manual as a whole.

20   The rest of the pages in that exhibit constitute the inmate

21   access to healthcare section of the manual.  Do you see that?

22        A.    Uh-huh.

23        Q.    Okay.  Is that the section you were referring

24   to earlier?

25              Do you understand my question, sir?  Is this

1   the section where you would expect to find the instruction on

2   when to call the doctors?

3               MR. HOMER:  I think he's looking right now --

4               MR. HANCEY:  Okay.

5               MR. HOMER:  -- to be able to answer that

6   question.

7               MR. HANCEY:  Sure.

8               THE WITNESS:  Yes.

9   BY MR. HANCEY:

10       Q.    Okay.  And where would we find it in

11  Exhibit 51?

12       A.    What was your specific question again?

13       Q.    Yes.  I'm asking you to help me understand what

14  the jail's policy in 2016 was concerning the circumstances

15  under which Dr. Tubbs or Logan Clark was to be contacted.

16       A.    I don't see it in here.

17       Q.    Okay.  Does that mean that there was no such

18  written policy?

19       A.    No.

20       Q.    What does it mean?

21       A.    It means that, generally speaking, this is the

22  policy that would be in place, but at the time, again, there

23  is general orders, there is verbal orders and there is

24  standard operating procedures that I don't see in here.

25       Q.    Well, I asked for, in discovery, all of the

1  policies and procedures concerning these types of issues.   I

2  didn't see any standard operating procedure or direct orders,

3  general orders that covered this topic.  Are you aware of any

4  as we sit here today?

5        A.    That would cover this particular topic?

6        Q.    Yes.

7        A.    No.

8        Q.    Okay.

9        A.    Not written.

10       Q.    Not written?  Was there a verbal --

11       A.    Yes.

12       Q.    -- understanding?

13       A.    Yes.

14       Q.    Okay.  And what was the verbal understanding in

15  place in 2016?

16       A.    As far as a medical emergency?

17       Q.    No.  As far as when somebody at the jail was

18  supposed to contact Dr. Tubbs or Logan Clark?

19       A.    If the inmate -- if an arrestee was brought

20  into the jail and they had a medical issue that was serious,

21  they should have had a prescreen by the ER doctor before they

22  were even brought to the jail.  Now, that's twofold.  One for

23  our correctional staff, the other for our patrol staff.

24            They shouldn't even be bringing them into the

25  jail if they have a serious medical issue that is prevalent,

1  obvious.  They are to take those individuals to the ER and

2  get a medical clearance before they even come to the jail.

3  If they get to the jail and it's obvious to that booking

4  officer or the booking clerk that that individual is in need

5  of medical attention on a serious issue, they won't accept

6  them into the jail without that medical clearance.

7           And so it's up to the officer to be able to get

8  that.  It can be any agency, UHP, a police department, our

9  own officers; it goes across the board to everyone.  If

10 there's a serious medical issue that was observed there

11 either by any of the staff, booking officers or the booking

12 clerk, or it's communicated to them, then they wouldn't

13 accept them.  It would be that officer or that agency

14 responsibility to transport that individual or deal with that

15 medical issue.

16      Q.    Call the doctor possibly?

17      A.    They could.  If they did receive a medical

18 clearance from the ER and they arrived at the jail, and now

19 they're experiencing something that maybe the doctor wouldn't

20 have been aware of, then they could call the doctor and let

21 them know what they are seeing or experiencing and get

22 instruction from the doctor on how to proceed from there.

23 Whether they wanted to see them back or -- we expected that,

24 we expected, you know, that maybe it would be these signs or

25 symptoms, and then that's okay, go ahead and accept them.

 1                    If they were accepted into the jail, then if

 2    they observed something after the officer, arresting officer,

 3    would have left, then if it's a serious medical issue, they

 4    have a couple of options.  One is that they would call

 5    emergency services, the ambulance, and have them come and

 6    transport that individual to the hospital.  Or they would

 7    call Logan Clark.  Or at the time they could call Nurse

 8    Clyde.  Either of those.  Very rarely would they call

 9    Dr. Tubbs personally.  Logan Clark was the one that was on

10    call.

11         **Q.    Everything you're telling me about right now**

12    **would be dealing with situations that happened when a new**

13    **inmate is being booked in, right, and something is noticed at**

14    **that point in time?**

15         A.    Yes, or after.

16         **Q.    Is it your understanding that in 2016, both**

17    **Nurse Clyde and any correctional officer could contact**

18    **Dr. Tubbs or Logan Clark directly if they thought it was**

19    **necessary?**

20         A.    Yes.  Or they could call an ambulance.

21         **Q.    In Jana Clyde's deposition, I asked her this**

22    **question.  From the time you were hired until November 2016,**

23    **do you recall receiving any training on jail policies and**

24    **procedures?  And her answer was no.**

25                    **Is that consistent with your understanding?**

 1          A.     I don't know.  I haven't reviewed her personnel

 2   file.  I couldn't answer yes or no.

 3          Q.     Let me have you look at Exhibit No. 34.  Now, I

 4   covered this with Jana Clyde.  This appears what the County

 5   produced in response to my request for Jana Clyde's training

 6   records.  It appears to me that the first page of this

 7   exhibit itemizes the training she received in 2015, and the

 8   second page represents the training that she received in

 9   2017.  But there was no such record for the calendar year

10   2016.

11          Is that because Jana Clyde didn't receive any

12   training in that year?

13          A.     She might not have reported it.  It doesn't

14   mean that she didn't receive any; she might not have reported

15   it.

16          Q.     Is the employee or staff member responsible for

17   reporting their own training to the jail?

18          A.     To our office manager in the jail, yeah.

19          Q.     So the jail doesn't keep its own records on

20   what training people receive?

21          A.     I'm trying to think back at the time.  It might

22   be different.  It might have been different than it is now.

23   I don't recall whether the jail was keeping their own

24   training file back there or our office manager was.  She

25   keeps our patrol.  I know that she keeps our patrol.  But I

1  don't recall in 2016 who was keeping their record at that

2  time.

3          Q.      Sitting here today, do you know one way or the

4  other whether Jana Clyde received any training in 2016?

5          A.      No.  Except for what's reported there.

6          Q.      What's reported in Exhibit --

7          A.      2017 and 2015.

8          Q.      Okay.  Did the jail have a heroin withdrawal

9  protocol in place in 2016?

10         A.      No.

11         Q.      Let me have you look at what's been marked as

12  Exhibit No. 39.  Do you know what Exhibit No. 39 is?

13         A.      Appears to been an opiate withdraw protocol.

14         Q.      My question is, had you ever seen this document

15  prior to this lawsuit being filed?

16         A.      Yes.

17         Q.      Okay.  Tell me where you saw it.

18         A.      Oh, excuse me.  Strike that.

19         Q.      Okay.

20                 MR. HOMER:  Counsel, again, I'd ask if he can

21  compare this to the other exhibit.

22                 MR. HANCEY:  Oh, yes, sure.

23                 MR. HOMER:  That's the confusion.

24                 MR. HANCEY:  So you've testified that

25  Exhibit 13 -- sorry, that wasn't intentional.  But the

```
 1  Exhibit 13 is the policy you said that was put into effect
 2  after Madison died.  So go ahead and look at that and then
 3  look at Exhibit 39.
 4                MR. HOMER:  Counsel, if I could just note for
 5  the record, the Bates stamp on Exhibit 13 indicates it was
 6  produced by --
 7                MR. HANCEY:  The County.
 8                MR. HOMER:  -- the County.  And Exhibit 39
 9  indicates it was produced by Clark.
10                MR. HANCEY:  Logan Clark.  Correct.
11                MR. HOMER:  Logan Clark, yeah.
12                THE WITNESS:  Okay.  I've reviewed them both.
13  What was your question?
14  BY MR. HANCEY:
15       Q.    My question is, have you ever seen Exhibit 39
16  prior to this litigation?
17       A.    Prior to the filing of the litigation?
18       Q.    Yes.
19       A.    Which was in 2016?
20       Q.    Yes.
21       A.    No.
22       Q.    No?  Okay.  All right.
23                MR. HOMER:  This case was filed in 2017, wasn't
24  it?
25                MR. HANCEY:  Perhaps.  Yeah.
```

 1          MR. HOMER:  Not that that -- I think the

 2   question was whether he'd seen it before the litigation, and

 3   2016 was mentioned.

 4          THE WITNESS:  I don't know when it was filed.

 5   If you're asking me if I seen this prior to Madison's death?

 6          MR. HANCEY:  Yes.

 7          THE WITNESS:  No.

 8          MR. HANCEY:  Okay.  Fair enough.

 9   BY MR. HANCEY:

10      Q.    Now, let me have you look again at Exhibit 51

11   right there that's loose.  Turn to the third page where we

12   have the policy section on inmate access to healthcare.  Is

13   it your understanding that this section, Section 500.10, is

14   the section of the jail's policies and procedures manual as

15   it existed in 2016 dealing with the healthcare of inmates?

16      A.    I'm sorry, Counsel, I was trying to orient

17   myself a little bit.  Can you ask me that again?

18      Q.    Yes.  Is this Section 500.10 the exclusive

19   section of the jail's policy and procedures manual from 2016

20   that deals with the health or medical care of inmates?

21      A.    Yes.

22      Q.    Now, from your experience and knowledge from

23   being a police officer for many, many years, do you

24   understand that some of the symptoms of opiate withdrawals

25   include vomiting and diarrhea?

1                         MR. MYLAR:  Objection.  Lack of foundation.

2                         MR. HANCEY:  I'm trying to establish some

3    foundation.

4                         MR. MYLAR:  That's fine.

5                         THE WITNESS:  I do now.

6    BY MR. HANCEY:

7          Q.      Okay.  All right.  You didn't in 2016?

8          A.      No.

9          Q.      Now, there are several ways in which a jail

10   employee or a staff member could learn that an inmate was

11   vomiting or had diarrhea.  Do you agree with that?

12         A.      Yes.

13         Q.      One might be that the inmate self-reports?

14         A.      Yes.

15         Q.      One might be that they ask for and fill out a

16   medical request form?

17         A.      Yes.

18         Q.      One might be that an officer in the control

19   room sees it happen on camera?

20         A.      Yes.

21         Q.      One might be that an officer doing hourly

22   checks sees evidence of that through the window of the cell?

23         A.      Yes.

24         Q.      Or they might enter the cell and see evidence

25   of vomit or so forth in the toilet or in the tote in the

1      prisoner's cell.  Right?

2              A.      Yes.

3              Q.      So setting aside opiate withdrawals for a

4      minute and focusing exclusively on those symptoms, the

5      symptoms of vomiting and diarrhea, did the jail have any

6      policies and procedures in place in 2016 dealing with what to

7      do if an inmate was experiencing those symptoms?

8              A.      They would notify the medical staff.

9              Q.      Was that a written policy or something else?

10             A.      It was something else.

11             Q.      What kind of policy was it?

12             A.      It would have been more of a verbal that

13     would -- something would have been addressed both in

14     continual instruction and their initial field training.

15             Q.      Okay.  If I understand your explanation of that

16     instruction, it would have been that if a correctional

17     officer or staff member becomes aware that an inmate is

18     vomiting or has diarrhea, they're to alert somebody on the

19     medical team?

20             A.      Probably not that specifically.  If they see

21     something that would indicate that that individual is

22     experiencing some kind of medical issue, that there would be

23     need to be some intervention, and they should notify medical.

24             Q.      Okay.

25             A.      Or at least a supervisor, if not medical.  If

David L. Boren
June 27, 2018                                                                 Page 39

1  it was a supervisor, obviously they would notify medical.

2          Q.      Yeah.  I think that the disconnect here is that

3  the correctional officers don't have medical training for the

4  most part.  Is that a fair statement?

5          A.      They have had first aid.  As far as any

6  extensive medical training, no.

7          Q.      And so my question goes beyond whether -- I

8  mean, I understand what you're saying, which is that the

9  correctional officers were told to contact medical if they

10 saw something that they deemed to be a medical situation or a

11 medical emergency.  Right?

12         A.      If it's a medical emergency, they would have --

13 they would have had a few options.

14         Q.      My question is much more simple.  Was there a

15 policy in place that said here's what you do if you observe

16 an inmate vomiting or evidence that an inmate has been

17 vomiting?

18         A.      Yes.

19         Q.      Written or verbal?

20         A.      Verbal.

21         Q.      And what was the verbal policy in place at the

22 time?

23         A.      It would have been to notify a supervisor,

24 Nurse Clyde or Logan Clark.

25         Q.      Okay.  So just I want to make sure I understand

1   this.  Your testimony is that --

2        A.    Let me rephrase that because I -- that's not

3   totally accurate.

4        Q.    Okay.  Please do.

5        A.    It depends on the severity of it.  Obviously,

6   if an officer observed an inmate that threw up one time, uhm,

7   they might not feel that it rises to the point where they

8   need to notify medical or even a supervisor.  Or if they see

9   them -- you know, if they see them gag and throw up,

10  obviously, that --

11       Q.    Self-inflicted?

12       A.    A self-inflicted situation, then they wouldn't

13  need to be notifying medical that that was going on.  They

14  might pass that on to the next shift that, you know, I seen

15  this individual doing this; you might want to watch that.  Or

16  give them a written pass-on or something like that.  Just

17  because they saw somebody throw up or something in a tote or

18  in the cell wouldn't -- in itself, wouldn't necessarily mean

19  that they would need to report that to medical.

20       Q.    So then it sounds, really, like what you're

21  saying is it was up to the officer's discretion as to whether

22  or not it was something that was reportable or not?

23       A.    Yes.

24       Q.    Now, these officers have staggered shifts.

25  Right?  I mean, an officer might work seven to five or seven

 1    to seven, leave for the day, and they're replaced by somebody

 2    else who comes on for the next shift.  Correct?

 3         A.    Yes.

 4         Q.    And so if somebody is sick and they vomit one

 5    time during the first officer's shift and one or two times

 6    during the next officer's shift and then another time the

 7    next officer's shift, that's multiple times over a pretty

 8    short period of time.  But every single officer might not, in

 9    their discretion, think that it rises to the level of

10    something they need to report.

11              Did the jail have anything in place to deal

12    with the situation I just described?

13              MR. HOMER:  Objection.  Assumes facts not in

14    evidence.  Calls for speculation.

15              Go ahead.

16              MR. HANCEY:  And it was a long-winded question.

17    But do you understand what I'm getting at?

18              THE WITNESS:  How would the other officers

19    know?

20              MR. HANCEY:  Right.

21              THE WITNESS:  They're briefed when they change

22    shifts.

23    BY MR. HANCEY:

24         Q.    So tell me about how that process works or what

25    the policy was in place as to how officers were to

1    communicate amongst themselves about medical issues they may

2    have seen during their shift.

3         A.     They would have -- when they change shifts,

4    they do a face-to-face and brief any issues that they have

5    encountered during the day.  That's one way.  The other way,

6    they might have wrote it on the board in a -- it's not chalk,

7    but it's a ink Sharpie.  They might have put it on the board.

8    They might have reported it to control to do that pass-on,

9    because they go in and brief in control of any issues that

10   they might need to be aware of.

11             So with your question, if an inmate vomited

12   once under one officer's watch, they should be passing that

13   information to the next shift.  I witnessed this office --

14   this inmate vomit or I witnessed this inmate having limping

15   or whatever that might be.

16        Q.     Diarrhea?

17        A.     Diarrhea.  You might want to check that or keep

18   an eye on it.

19        Q.     Would you describe what you've just said as a

20   policy that was in place or just your expectation?

21        A.     A procedure.

22        Q.     Okay.

23        A.     And an expectation, yes.

24        Q.     Was it a written policy or a verbal one?

25        A.     It would have been a verbal one.

1        Q.      Now, when we heard from Sergeant Purdy

2    yesterday, she described a situation where she came on and

3    the night shift told her that Madison had been vomiting in

4    the night and that the vomit was black.  Do you remember that

5    testimony?

6        A.      Yes.

7        Q.      Would that be an example of the face-to-face

8    meeting between shifts that you just told me about?

9        A.      Yes.

10       Q.      And so in that particular instance, at least,

11   you would say that the verbal policy on this kind of

12   communication was being followed?

13       A.      Yes.

14       Q.      To the extent that officers, then, observed

15   Madison throwing up or evidence of diarrhea during her tenure

16   at the jail, your expectation would have been, and policy

17   would have dictated then, that those officers communicate

18   that information from shift to shift?

19       A.      Yes.

20       Q.      Some of the jail employees have testified in

21   their depositions that their understanding of the procedure

22   if an inmate was vomiting was to give that person a Gatorade.

23   Would you disagree with their testimony?

24       A.      No.

25       Q.      Was that, in fact, the procedure, give them a

 1    Gatorade?

 2         A.        Yes.  One of them.

 3         Q.        Were there any other procedures?

 4         A.        Depending on the circumstance.

 5         Q.        Okay.  Was that outlined somewhere?  I mean,

 6    what direction were the correctional officers given on how to

 7    handle an inmate that was vomiting?  I mean, as I understand

 8    it, they could use their discretion if -- to report it to

 9    medical or not.  Is that right?

10         A.        Depending on the severity of the circumstances,

11    yes.

12         Q.        Do you think that under the circumstances with

13    Madison Jensen, as you understand them, that her medical

14    condition and the fact that she was -- and the fact of her

15    symptoms should have been communicated to medical?

16         A.        Yes.

17         Q.        Do you think that that should have been

18    communicated by any officer who observed her vomiting, have

19    diarrhea or not eat?

20         A.        Initially, probably not.  But as things -- as

21    she had been observed throughout the day and continuing, yes,

22    they should have reported it to medical.

23         Q.        Now, assuming that they -- let's assume for a

24    minute that one or more officers did report Madison's

25    symptoms to Jana Clyde.  She was the medical person on hand

```
 1   at the jail.  Right?

 2        A.    Yes.

 3        Q.    Okay.  What did policy dictate Jana Clyde was

 4   to do, then, with that information?

 5        A.    She would have -- she could either handle it

 6   herself, or she could contact PA Logan Clark and receive

 7   further instruction.

 8        Q.    Would that be a written policy or just a verbal

 9   thing?

10        A.    It would be a verbal.  Yeah.  I'm trying to

11   think if there was anything written in an order or a SOP, but

12   I -- right offhand, I can't think of one.

13        Q.    Is it fair to say, then, that because the jail

14   is hesitant to get involved in medical matters, it hires

15   somebody like Jana Clyde and then gives her the discretion to

16   decide how to handle a given medical situation?

17        A.    We contract with Dr. Tubbs for our management

18   of our medical in the jail.

19        Q.    Well, that's true.  But Dr. Tubbs isn't sitting

20   at the jail getting information from correctional officers.

21   Right?

22        A.    Dr. Tubbs?

23        Q.    Right.

24        A.    Dr. Tubbs isn't, no.

25        Q.    Neither is Logan Clark?
```

1        A.      Yes, he is.

2        **Q.      Well, he's not working at the jail?**

3        A.      But he receives information from our

4   correctional officers on medical issues that he needs to

5   address.

6        **Q.      Under what circumstances or -- strike that.**

7               **What was the policy on when -- in 2016, when a**

8   **correctional officer should contact Logan Clark directly?**

9               MR. MYLAR:  Objection.  Asked and answered.

10              THE WITNESS:  If he -- if a correctional

11  officer observed something -- Jana Clyde doesn't work seven

12  days on, seven days a week -- or 12 hours on -- 24 hours on

13  seven days a week.  And so if she's not there, and they see a

14  medical issue that they feel like that needs to be addressed,

15  then they would contact Logan Clark via phone or a text

16  message.

17  BY MR. HANCEY:

18       **Q.      So then would the circumstance be limited to**

19  **one when Jana Clyde wasn't working?**

20       A.      They could contact Logan themselves even if she

21  was working.

22       **Q.      Okay.**

23       A.      But generally speaking, if she was there, then

24  they would go through her and have her contact Logan, if

25  needed.

1       Q.      Do you recall hearing when Jana Clyde testified

2   that her practice was to ask inmates to save samples of their

3   vomit and diarrhea?

4       A.      I heard that testimony, yes.

5       Q.      Okay.  Would you characterize that as the

6   jail's policy in 2016?

7       A.      No.  That was the first I had heard of it.

8       Q.      So the jail didn't ask Jana Clyde to implement

9   that policy or practice?

10      A.      I didn't.

11      Q.      In 2016, what was the jail's policy in keeping

12  the cells clean and sanitary?

13      A.      They would -- most of the sanitation for the

14  jail is done by the -- each individual inmate.  They're

15  responsible to keep their area clean.  They're provided

16  cleaning supplies, they're provided things to make sure that

17  their area is clean.  They're expected to do that.

18              In their orientation when they're booked in,

19  they're explained by a pamphlet indicating --

20              (Court reporter interrupted for clarification.)

21              (Off-the-record discussion)

22              (Record read)

23              THE WITNESS:  They receive a pamphlet of some

24  of the rules and procedures of the jail.  And part of that

25  orientation is, both verbally and in the pamphlet, it

1    indicates that they're responsible to clean their area or

2    their particular cell and keep it clean from clutter.  And

3    that if they need cleaning supplies or whatever, then they

4    should indicate that through -- to a correctional officer or

5    to control that they can do that.

6    BY MR. HANCEY:

7         Q.    How would that --

8         A.    If --

9         Q.    Go ahead.

10        A.    If an inmate is moved from one cell to another,

11   obviously we wouldn't want any -- if there was vomit or

12   diarrhea in a cell where an inmate was moved out of and

13   another inmate was moved in, we would want to make sure that

14   that was sanitized.  And so inmate crews or inmate workers in

15   the jail would come in and clean that and sanitize that cell

16   before another inmate was moved into it.

17        Q.    How would the sanitation policy you've

18   described apply to a situation where an inmate vomits in

19   their cell on the floor, on their bedding, and the cell is

20   dirty?

21        A.    Again, the inmate could request some cleaning

22   supplies to have that cleaned.  If it was to a point where

23   they were incapable of cleaning that or they had been moved,

24   then an inmate worker would be called down to clean that up.

25              (Whereupon, Mr. Steve Loos left the deposition

1    proceedings.)

2            THE WITNESS:  Bedding would be removed or

3    clothing provided back to the inmate.

4    BY MR. HANCEY:

5        Q.    So if an inmate reported that there was vomit

6    on their bedding or clothing, then that would be replaced?

7        A.    Yes.

8        Q.    Likewise, would that be the case if an officer

9    observed that situation on one of their checks?

10       A.    That there were vomit and -- in the --

11       Q.    Vomit on their clothing or on their bedding or

12   on their floor?

13       A.    Yes.

14       Q.    Is it true that Logan Clark or Dr. Tubbs is on

15   call for the Duchesne County Jail 24 hours a day?

16       A.    Yes.

17       Q.    Was that the case in 2016 as well?

18       A.    Yes.

19       Q.    In 2016, was there any policy in place

20   describing the circumstances under which Nurse Clyde would be

21   required to call Dr. Tubbs or Logan Clark?  Or was it left to

22   her discretion?

23       A.    It would be left to her discretion whether she

24   did or not.

25       Q.    If, in 2016, there was a medical issue and a

1   correctional officer told Nurse Clyde about it, would you

2   consider that that officer complied with existing jail

3   policy?

4          A.    Yes.  Well, again, I guess that's not a yes or

5   no question.  If they told Nurse Clyde, if she was available

6   and she was there and they told her, they would have complied

7   with that.  If there is a serious medical emergency in there,

8   they don't have to go through Nurse Clyde.  They can call

9   emergency services to come and have them take care of that.

10  She's just another tool.  But they had the discretion to call

11  an ambulance if -- without her permission or authority, if

12  they feel like that there is a serious medical emergency that

13  needs to be addressed then.

14         Q.    I'm going to read a few statements to you that

15  Logan Clark has made in one of his interviews in this case.

16  Okay?  And I'm going to ask whether or not you agree or

17  disagree.

18         A.    Okay.

19               MR. HOMER:  Is there a record?

20               MR. MYLAR:  Yeah.  Where are you reading from?

21               MR. HANCEY:  Sure.  We can do that.  Okay.  The

22  first exhibit would be Exhibit No. 49.

23               Sorry.  Not 49.

24               MS. ABKE:  14?

25               MR. HANCEY:  44?  No, that's not right either.

```
 1   Which one is Logan Clark's?

 2                 MS. ABKE:  Isn't it 14?

 3                 MR. HANCEY:  Oh, you may be right.  I'm sorry.

 4                 Let's try Exhibit 14.  That's right.

 5   BY MR. HANCEY:

 6       Q.    Okay.  Let me have you turn to Bates Page 49 of

 7   that exhibit if you would.

 8                 MR. MYLAR:  What's the line?

 9                 MR. HOMER:  Page 13.

10                 MR. MYLAR:  Page 13?

11                 MR. HANCEY:  Yes, Page 13.

12                 THE WITNESS:  Oh, you're referring to the Bates

13   stamp at the bottom?

14                 MR. HANCEY:  I am.

15                 THE WITNESS:  I'm sorry, I'm with you now.

16   BY MR. HANCEY:

17       Q.    Okay.  All right.  So in the last large

18   paragraph on that page, Logan Clark says, "At any given time,

19   there's probably five or six people withdrawing from

20   something at Duchesne."  Do you agree that that was the case

21   in 2016?

22       A.    Yes.

23       Q.    Now let me have you look at Bates Page No. 44.

24       A.    Okay.

25       Q.    In the first large paragraph on that page,
```

1  Logan Clark is talking about inmates that are exhibiting

2  symptoms of withdrawals.  And he says that he expects vital

3  signs to be taken once a day and inmate be checked on

4  routinely during the day.  "And then if symptoms progress or

5  worsen, I should be notified."

6          Do you agree that was what jail staff and

7  officers should have done in 2016?

8      A.    Yes.

9      Q.    So, then, let me ask it more specifically.  If

10  an inmate was known to be withdrawing from drugs or

11  exhibiting those kind of symptoms, vomiting and diarrhea,

12  would you expect Nurse Clyde to take that inmate's vital

13  signs daily?

14              MR. MYLAR:  Objection.  Lack of foundation.

15              MR. HOMER:  Join.

16              THE WITNESS:  You lost me.  I'm not...

17              When you objected, I...

18  BY MR. HANCEY:

19      Q.    If an inmate in 2016 was experiencing the kinds

20  of symptoms associated with drug withdrawals, did jail policy

21  dictate that the inmate's vital signs be taken once a day?

22              MR. MYLAR:  Objection.  Lack of foundation.

23              THE WITNESS:  Well, there would be several

24  types of drug withdrawals.

25              MR. HANCEY:  Okay.

```
 1   BY MR. HANCEY:

 2        Q.      Under any of those -- are you aware of any

 3   circumstances under which policy dictated that an inmate's

 4   vital signs be taken daily?

 5        A.      No.

 6                You were talking 2016.  Right?

 7        Q.      That is right.  Yes.

 8                Look on page -- it's Page 18 or Bates Page 54.

 9   And the last -- about eight lines up from the bottom, he

10   says, "So if someone is throwing up, I would want a phone

11   call."  Do you see that?

12        A.      Okay.  Yeah.

13        Q.      Is that statement consistent with what the

14   jail's policy was in 2016?

15        A.      No.

16        Q.      Logan Clark says that the only time he was

17   contacted about Madison was on Monday, November 28th, to

18   approve a clonidine prescription.  If that statement is true,

19   did Jana Clyde's failure to communicate information about

20   Madison's symptoms to Dr. Tubbs or Logan Clark violate the

21   jail's policies in place at the time?

22                MR. MYLAR:  Objection.  The statement is

23   contrary to the exhibit you just showed which says that he

24   was contacted regarding medication and that he didn't know

25   until Wednesday that she was there.  Which assumes that there
```

1  is more than one contact in this transcript you just read

2  from.

3          MR. HOMER:  And my objection, assumes facts not

4  in evidence.  Calls for speculation.

5          Go ahead.

6          MR. HANCEY:  Okay.  Jamie, go ahead and re-read

7  that question.

8          THE WITNESS:  That was a long question.

9          (Record read)

10         MR. MYLAR:  And I renew the same objection.

11 That was Bates stamp --

12         MR. HANCEY:  You don't need to renew it.  She

13 read the question back, and you're -- you're interrupting his

14 train of thought.  That's the reason why we have to read it

15 back in the first place.

16         MR. MYLAR:  That's fine.

17         MR. HANCEY:  Okay.

18         THE WITNESS:  The answer would be no.

19 BY MR. HANCEY:

20     Q.     **Why not?**

21     A.     Because that was Monday.  She wasn't -- I don't

22 believe she was aware of -- and I'm just speculating, of

23 course -- of what her symptoms entailed.  She was calling to

24 verify prescriptions.

25     Q.     **Well, yeah.  My question isn't to take issue**

```
 1   with what was said in the Monday conversation.  My question
 2   is, if that's the only time those two spoke about Madison,
 3   was there a policy violation given what happened during the
 4   rest of the week?
 5          A.     I don't know.
 6                 MR. HOMER:  Counsel, did you say to Madison?
 7   I -- or about Madison?  Because I wasn't...
 8                 MR. HANCEY:  About Madison.
 9                 MR. HOMER:  Okay.
10   BY MR. HANCEY:
11          Q.     Now, it is true that if an inmate needed IV
12   fluids in 2016, they would need to be taken to a facility
13   that could accommodate that.  Right?
14          A.     Yes.
15          Q.     That wasn't something the jail could do itself?
16          A.     Yes.
17          Q.     You heard Deputy Ross's testimony yesterday
18   about the call button located in inmates' cells.  Right?
19          A.     Yes.
20          Q.     And also how somebody working as the controller
21   would handle those types of calls?
22          A.     Yes.
23          Q.     Do you agree with his testimony?
24          A.     Yes.
25          Q.     One thing I asked him was whether or not there
```

1   was a policy at the jail on documenting the nature of inmate

2   calls from -- using the call button.  Do you know whether or

3   not there was a policy on documenting those calls?

4        A.     No.

5        Q.     You don't know or there was not?

6        A.     I don't know that there was a policy.

7        Q.     Let me have you look at Exhibit No. 5, please.

8        A.     Okay.

9        Q.     Do you recognize that document?

10       A.     Yes.  It's a medical request form.

11       Q.     And this is, in fact, the medical request form

12  that Madison Jensen filled out during her time at the jail.

13  Right?

14       A.     Yes.

15       Q.     Now, in this form, Madison says that she's been

16  puking for four days straight, runs, diarrhea, can't hold

17  anything down, not even water.  You told me before that

18  correctional officers and staff members have to use their

19  discretion to determine whether or not to contact medical

20  about a given situation.  Right?

21       A.     Yes.

22       Q.     Do you think that any jail employee or staff

23  member that received this kind of information concerning an

24  inmate should have contacted medical?

25       A.     Yes.

```
 1          Q.      That would have been consistent with jail
 2   policy at the time?
 3          A.      It would have been consistent with a practice,
 4   yes.
 5          Q.      Now, there's some uncertainty as to whether or
 6   not this form was filled out on Tuesday or Wednesday.  But
 7   regardless of the day, do you think it was appropriate for
 8   jail staff to wait until Logan Clark arrived at the jail on
 9   Thursday morning in his ordinary course to communicate this
10   information to him about Madison?
11          A.      They communicated this information to Nurse
12   Clyde.
13          Q.      Right.
14                  MS. ABKE:  To what?  I didn't hear you.
15                  MR. HANCEY:  To Nurse Clyde.
16                  THE WITNESS:  So they used their discretion in
17   communicating that to her and not contacting PA Clark, which
18   would have been probably what they should have done.  She was
19   there.
20                  MR. HANCEY:  Okay.
21                  THE WITNESS:  She was on duty.
22   BY MR. HANCEY:
23          Q.      Do you think it was appropriate for Nurse Clyde
24   to fail to communicate this information to Logan Clark until
25   the day he arrived in his ordinary course?
```

1                  MR. HOMER:  Objection.  Foundation.

2                  MR. MYLAR:  And also objection, contrary to the

3    evidence.

4                  MR. HOMER:  Go ahead.

5                  THE WITNESS:  I don't know.

6                  MS. ABKE:  What was your answer, I'm sorry?

7                  THE WITNESS:  I said I didn't know --

8                  MS. ABKE:  You didn't know?

9                  THE WITNESS:  -- whether it was appropriate.  I

10   guess that was the question.  Yeah.

11                 (Off-the-record discussion)

12   BY MR. HANCEY:

13        Q.    In 2016, did the jail have a policy on what was

14   to be done with a medical request form filled out by an

15   inmate?

16        A.    Yes.

17        Q.    What was that policy?

18        A.    It was to be given to medical.

19        Q.    To Nurse Clyde?

20        A.    Yes.  Or put in the medical box.  They could

21   have done it a couple different ways.  They could have put it

22   in her box or they could have hand-delivered it.

23        Q.    Okay.  Now, if it was put in the medical box,

24   the only way Dr. Tubbs or Logan Clark would get that is if

25   they physically came to the jail and got it from the box.

1  Right?

2        A.    Or it was back -- it had already been retrieved

3  from the box and was in the medical room.

4        Q.    Okay.  Now, did the jail have a policy during

5  that same time frame on what Nurse Clyde was to do with a

6  filled out medical request form once she received it?

7        A.    She would have made a file, inmate file, put it

8  in the file.  She would have kept that in the medical room.

9  Because of HIPAA laws and stuff, it wouldn't be something

10 that would be readily accessible to just any staff member.

11       Q.    Is that the extent of what she was required to

12 do with the form?

13       A.    Uhm, if she would have seen on the form that

14 there was a medical emergency, she could have contacted

15 Dr. Tubbs or initiated any other medical intervention that

16 she would have deemed appropriate at that time.  But as far

17 as the form itself, that would be -- that would be it.

18       Q.    Now, in 2016, the County had a contract with

19 Dr. Tubbs's office for the provision of medical services to

20 the jail.  Right?

21       A.    Yes.

22       Q.    As I understand it, the day that somebody from

23 Dr. Tubbs's office would come to the jail physically was on

24 Thursdays at that time?

25       A.    Yes.

1     Q.      Are you aware of any occasions during that year

2   on which Logan Clark or somebody else from Dr. Tubbs's office

3   came to the jail on a day other than Thursday?

4     A.      Personally, no, I'm not aware of that.  I'm not

5   back there all the time so I'm not sure whether he could have

6   come another day.  I know that in our contract, it

7   dictates -- or it states that if, because of inclement

8   weather conditions or any other factors -- you know, other

9   factors, that it could be moved to an alternate day.  And I

10  don't recall whether he come on any other day during that

11  period or not.

12    Q.      Generally speaking, though, if in 2016 an

13  inmate was sick and filled out a medical request form on,

14  say, Saturday, that inmate would need to wait until the

15  following Thursday in order to see the doctor?

16    A.      Not necessarily.

17    Q.      Okay.  When would that not be the case?

18    A.      If they experienced a serious medical

19  condition.

20    Q.      As deemed by whom?

21    A.      Uhm, the PA, Logan Clark.  If an inmate felt

22  that they had a serious medical condition, they could convey

23  that to one of our correctional officers, because they do

24  rounds.  They could have filled out one of these request

25  forms and turned it in, which needs to be addressed within 24

 1    hours.

 2                And so if they were experiencing something that

 3    couldn't wait until they seen a physician, then the officer

 4    or the nurse would contact PA Clark, give him the

 5    information, and he could instruct us to either call an

 6    ambulance or to transport that individual to our local

 7    hospital or emergency room.  So not necessarily they would

 8    have to wait.  They could exercise that option.

 9         Q.    Is it fair to say, though, that that would be

10    left up to the discretion of the officer or Nurse Clyde on

11    whether or not to involve medical earlier than on Thursday?

12         A.    Yes.

13         Q.    And is that a written policy of the jail that

14    existed at the time or is that just sort of a general

15    understanding that jail employees had?

16         A.    It was a general understanding.

17         Q.    Will you look at Exhibit No. 2, for me, please?

18    Now, this is the pre-booking form that is completed by the

19    arresting officer.  Right?

20         A.    Yes.

21         Q.    Now, you were telling me something earlier

22    today about the need for an arresting officer to convey

23    certain information to the booking officer or clerk.  Do you

24    remember that?

25         A.    Yes.

1         Q.      Okay.  Is there some kind of a policy on that

2    sort of a communication?

3         A.      No.  It's just a practice only.

4         Q.      And what is the practice?

5         A.      As I explained it before.  If they came in with

6    an issue where they had been cleared by the ER, they would

7    need to let them know.  They would be given a form, the

8    booking clerk would be given or officer would be given a

9    form, indicating that they had had this medical issue and

10   that the ER had evaluated that and felt like that they were

11   safe to be incarcerated.

12        Q.      Okay.

13        A.      If there were other medical issues or safety

14   concerns either to the inmate or to the staff or even public,

15   then they should be relaying that information to the booking

16   officer or clerk.

17        Q.      What about the fact that the inmate answered

18   yes to withdrawing from drugs or alcohol?

19        A.      Okay.  So what's the question?

20        Q.      Is that something that jail practice mandated

21   the arresting officer communicate to the booking officer or

22   clerk?

23        A.      Yes.  They would have done that with this form

24   here.

25        Q.      So to be clear, if the arresting officer, in

 1   filling out a pre-booking form, learned that the inmate had

 2   answered yes to being under the influence or going through

 3   withdrawals from drugs or alcohol, Question No. 3, they were

 4   supposed to communicate that information to the person doing

 5   the booking?

 6        A.    Yes, they would have made sure that they got

 7   this.

 8        Q.    So they would have handed the form to the

 9   booking clerk?

10        A.    The booking clerk, as part of the booking

11   process, if they don't have this form, the officer can't

12   leave.

13        Q.    Okay.  Are the booking clerks and officers

14   required to read the pre-booking form and be familiar with

15   its contents?

16        A.    Yes.

17        Q.    Okay.  Now look at Exhibit No. 3.  This is the

18   intake questionnaire.  Right?

19        A.    Yes.

20        Q.    Okay.  And we've already heard about how this

21   is filled out and that process.  Was there a jail policy in

22   place in 2016 requiring the booking officer or clerk to

23   provide a copy of this filled-out form to Nurse Clyde?

24        A.    Yes.

25        Q.    Describe that policy for me, if you would.

1        A.      They would have -- after they had filled this

2    out, they would have printed it off.  If there was a yes to

3    the having any withdrawals from drugs or alcohol, do you have

4    hypertension or high blood pressure, those type of things, do

5    you have any sexually transmitted diseases, then this form

6    would be printed off and put it in the nurse's box in the

7    booking room.

8        **Q.      Was that a written policy or something else?**

9        A.      It's a practice.  There's -- there's a policy

10   that medical is to keep those files.  And so as part of their

11   training they would have been instructed on this particular

12   document, how to fill it out, what to do with it after they

13   filled it out, and where to -- where it would be kept.

14       **Q.      Look at Exhibit 6, please.  Was there a policy**

15   **in place in 2016 requiring that the booking officer or clerk**

16   **put this in the medical box as well?**

17       A.      Yes.

18               (Off-the-record discussion)

19               (Recess taken from 10:49 a.m. to 11:03 a.m.)

20               (Whereupon, Mr. Steve Loos returned to the

21   deposition proceedings.)

22   BY MR. HANCEY:

23       **Q.      In 2016, Sheriff Boren, did the jail have a**

24   **policy on what to do with prescription medications an**

25   **incoming inmate had prescribed?**

```
 1           A.      Yes.

 2           Q.      What was that policy?

 3           A.      If an arrestee was coming into the jail, the

 4  arresting officer would try to inquire from that individual

 5  whether they were on any kind of medication.  If they were,

 6  and it was available, they would collect that medication,

 7  transport it with the inmate to the jail.  Once at the jail,

 8  they would indicate to the booking clerk or the booking

 9  officer that they had received these medications and what

10  they -- what their understanding was what they were for.

11           Once received by the booking clerk, those

12  medications would be taken back to the medical room and then

13  put into the medical room to be reviewed by the nurse and PA

14  Clark, if he was -- if he were coming.  If they were

15  medications that -- they would review a list of medications

16  on our jail, either approved -- our approved list.  If those

17  medications were approved, on that approved list, then the

18  officer could immediately start to administer that

19  medication.

20           If it was not the approved list, then -- and

21  they -- and it was something that needed to be -- say, for

22  instance, like insulin, they would -- and it wasn't on the

23  approved list, then they would contact PA Clark, let him know

24  what those medications were, and he would either approve or

25  disapprove those.
```

 1              If it was approved, then they would be

 2   administered to the inmate.  If they were not approved

 3   medications, then they would be taken to the inmate's locker

 4   where their personal items were stored and placed there for

 5   them to take with them when they were released.

 6        Q.     Is what you've just described a written policy

 7   in the policies and procedures manual?

 8        A.     I -- I don't think that it is.  I'd have to

 9   review to see.  But I don't think so.

10        Q.     So it may be --

11              MS. ABKE:  Sheriff, can I ask if you could

12   speak up?  The AC turned on and you're soft-spoken, and it's

13   really hard to hear even just down here.  So if I could ask

14   you to yell, that would help.

15              THE WITNESS:  Yes.  Sorry.  I'm sorry.

16   BY MR. HANCEY:

17        Q.     So you don't know if it was a policy or

18   something that was in practice?

19        A.     Right.  Or a procedure.

20        Q.     Or a procedure?

21        A.     Yes, uh-huh.

22        Q.     In this case, Madison came to the jail with

23   three prescription medications.  Right?

24        A.     That was my understanding.

25        Q.     Do you know if -- do you know what those three

 1  medications are?

 2       A.    Not offhand, I'm sorry.

 3       Q.    Okay.  I'll tell you what they are.  They're

 4  tramadol, Wellbutrin --

 5       A.    Okay.

 6       Q.    -- and clonidine.

 7       A.    Okay.

 8       Q.    Do you know whether or not those medications

 9  were on the jail's approved list in 2016?

10       A.    I don't know.

11       Q.    Okay.  The testimony that we've heard in this

12  case so far is that the information on her medications was

13  given to Nurse Clyde, and then Nurse Clyde contacted PA

14  Clark.  Would that have been consistent with the practice in

15  place at the time?

16       A.    Yes.

17       Q.    Okay.  Now, there's a dispute over what

18  medications were discussed between Nurse Clyde and PA Clark

19  on Monday.  Would it have been consistent with policy,

20  though, for Nurse Clyde to discuss all of the medications

21  that Madison had taken with her to the jail with PA Clark?

22       A.    Yes.

23       Q.    And it would have been PA Clark's decision at

24  that time whether or not to approve or disapprove them for

25  Madison's use?

1           A.      Yes.

2           Q.      There's evidence that on Tuesday, Madison was

3    moved to a court holding cell for medical observation.

4    You've heard that testimony.  Right?

5           A.      Yes.

6                   (Whereupon, Ms. Heather Jensen left the

7    deposition proceedings.)

8    BY MR. HANCEY:

9           Q.      In 2016, did the jail have any policy on

10   medical observation?

11          A.      Just medical itself?  Or are we talking

12   about...

13          Q.      Well --

14          A.      Because there would have -- there would have

15   been some policy for suicide or those type of things.  And so

16   is -- specifically, see, I mean --

17          Q.      Let me clarify.

18          A.      Okay.

19          Q.      When we heard Deputy Ross talk yesterday, he

20   was describing a form that was used for suicide watch?

21          A.      Yes.

22          Q.      And we looked at that form and talked about it

23   a little bit.  Remember that?

24          A.      Yes.

25          Q.      Okay.  But there's also been some discrete

1    discussion about people who are moved to a cell or otherwise

2    put on observation for medical reasons that are not related

3    to suicide.  That's been referred to, from more than one

4    officer, as medical observation.  Do you understand what I'm

5    saying?

6          A.    Yes.

7          Q.    Okay.  And there's evidence in this case that

8    Madison Jensen was put on medical observation on Tuesday.

9    And my question to you is, were there any policies in place

10   in 2016 that dealt with the concept of medical observation,

11   what it entailed, what it meant, what was supposed to be

12   done, those kinds of things?

13         A.    I don't know that there was any written policy

14   and procedure in place.  There would have been some

15   practices.

16         Q.    Okay.

17         A.    If it became -- if an officer became aware of a

18   medical problem, a communicable disease or something like

19   that, and they were placed in a holding cell for a medical

20   reason for an observation, if they had an injury that needed

21   to be monitored or treated, then yes, they would be -- there

22   would be a policy that they would move that individual to a

23   cell where they could observe them closer.

24         Q.    Okay.  We know that that happened with Madison

25   Jensen.  Right?

1              A.     Yes.

2              Q.     And so I guess my question, though, is, she's

3    put on medical observation, but what does that mean

4    practically?  How do the officers' responsibility towards

5    that inmate change once they've been put on medical

6    observation?

7              A.     It depends on the circumstances.

8              Q.     Then let's talk about the circumstance of

9    Madison.

10             A.     Okay.

11             Q.     Okay?  Liz Richens testified that she was moved

12   onto medical observation, as did Deputy Ross, because she had

13   been vomiting, had diarrhea, couldn't keep anything down, she

14   couldn't eat, or she wasn't eating.  She was weak and dizzy

15   and so forth, having trouble walking.  All of those things

16   you heard those officers talk about.  So she was put on

17   medical observation so she could be watched more closely.

18                    Do you remember hearing that testimony?

19                    (Whereupon, Ms. Heather Jensen entered the

20   deposition proceedings.)

21                    THE WITNESS:  Yes.

22   BY MR. HANCEY:

23             Q.     Okay.  And so under those circumstances, where

24   Madison was moved on medical observation, what was supposed

25   to be done?

 1        A.      One, she would be -- there's a camera under the

 2   observation -- or the court holding where she was at.  So one

 3   of the things that they would do is periodically check the

 4   camera to observe her.

 5        **Q.      How often?**

 6        A.      As often as they could.

 7        **Q.      Was there a policy that dictated how often the**

 8   **observations had to be?**

 9        A.      No.

10        **Q.      Okay.**

11        A.      With the camera.  Okay?  With -- they would be

12   observed in the observation cell, or court holding,

13   consistent with the other checks unless medical dictated that

14   it should be more frequent.

15        **Q.      Meaning Nurse Clyde?**

16        A.      Or PA Logan.

17        **Q.      Okay.  How would Nurse Clyde or PA Logan Clark**

18   **communicate to the correctional officers how frequently**

19   **checks should take place?**

20        A.      They would tell them.  She would tell them.

21   And if it needed to be more frequent than our regular visits,

22   then that's what the sheet would be hung up there for.  And

23   that briefing would take place that this individual, as

24   they -- the shift changes or that, they would be briefed as

25   to we have this number of cells that need to be observed; we

 1  have suicide in this one, we have a medical observation in

 2  that one.

 3              And so as those officers would go back there,

 4  if there was a sheet held up there, then they would comply

 5  with whatever was on that sheet.  I think there's an exhibit

 6  in here of one of them.

 7      Q.    You heard Deputy Ross testify that there should

 8  have been a sheet put on Madison Jensen's door once she was

 9  moved to medical observation.  Do you agree with his

10  statement?

11      A.    No.

12              MR. MYLAR:  Objection.  That misstates prior

13  testimony.

14  BY MR. HANCEY:

15      Q.    Okay.  Why do you not agree?

16      A.    That there should have been?

17      Q.    Yes.

18      A.    Nurse Clyde was informed of the situation.

19  That would have been a medical call, not his.

20      Q.    So, then, once Nurse Clyde was informed that

21  Madison had been moved to -- for medical observation

22  purposes, it was up to Nurse Clyde to determine whether or

23  not a sheet would be hung on her door or not?

24      A.    Yes.

25      Q.    Where does it say that in the policy manual?

 1         A.      It doesn't.

 2         **Q.      Then where are you getting your information**

 3  **from?**

 4         A.      From what our practice is back then.  And what

 5  I have observed.

 6         **Q.      Do you have any idea how Jana Clyde exercises**

 7  **her discretion to determine whether or not a sheet should be**

 8  **hung on an inmate -- on an inmate being medically observed,**

 9  **on the door?**

10                 MR. MYLAR:  Objection.  Calls for mental

11  impression.

12                 MR. HANCEY:  You can answer.

13                 THE WITNESS:  No, I don't.

14  BY MR. HANCEY:

15         **Q.      Was Nurse Clyde given any instruction by you or**

16  **anyone at the jail on how to determine whether or not a**

17  **medical observation sheet should be put on the door of an**

18  **inmate under medical observation?**

19         A.      She wasn't given any instruction by me.  And I

20  don't know whether there was anybody in our facility that she

21  would have received instruction from or by our medical

22  provider.

23         **Q.      So you just don't know one way or the other**

24  **whether she received instruction on that or not.  Right?**

25         A.      (No oral response.)

1      Q.      Right?

2      A.      Right.

3              I need to clarify.  As I -- I don't know, I was

4  thinking that she probably would have received instruction.

5      Q.      Do you know what that instruction was?

6      A.      Uhm, it would have been given in a -- an office

7  meeting.

8      Q.      Directed by who?

9      A.      One of our administrative staff.

10     Q.      Were you present?

11     A.      Uhm, I'm present at most of them.  Now, whether

12 she was there or not, I don't know.  But there is instruction

13 given -- there was instruction given on some of that, that

14 particular sheet, before and after Madison's death, on -- on

15 that.  Now, whether she received it or not, I don't know.

16 She could have.  So just to clarify that, I -- to say no

17 wouldn't be a fair representation of that.

18     Q.      Now, Logan Clark has said that inmates put on

19 medical observation should be observed every 30 minutes.  Is

20 that consistent with the jail's policy in place in 2016?

21     A.      No.

22     Q.      Can I have you look at Exhibit No. 30, please?

23 At the bottom of that page, the first page, and just to

24 clarify, this is a portion of the jail's policy and

25 procedures manual on surveillance.  Do you see that?

 1      A.      Yes.

 2      Q.      Okay.  So down at the bottom, this is something

 3  I went over yesterday with one of your employees, it says

 4  this:  Prisoners should be individually observed in their

 5  living areas at least once each hour and, whenever possible,

 6  every 30 minutes.

 7              Is that your understanding of what the policy

 8  on checks of inmates was in 2016?

 9      A.      Yes.

10      Q.      So if a regular inmate was, per policy, to be

11  checked on every hour and, when possible, every 30 minutes,

12  then how often was an inmate on medical observation supposed

13  to be checked on in 2016?

14      A.      They should comply with this policy.

15      Q.      So no more frequently than somebody who is not

16  on medical observation?

17      A.      Unless it was a directive from medical.

18      Q.      You've said that the court holding cell Madison

19  was in had a surveillance camera in it.  Correct?

20      A.      Yes.

21      Q.      And is the person who is able to watch that

22  camera, the person who's the controller at the time?

23      A.      (No oral response.)

24              (Court reporter interrupted for clarification.)

25              THE WITNESS:  Yes.  I'm sorry.  I'm going to

```
 1  have to work on that.

 2  BY MR. HANCEY:

 3       Q.     Who was the on-duty controller on the day that

 4  Madison died?

 5       A.     It would have been Sherry Hogan.

 6       Q.     Sherry who?

 7       A.     Thompson, excuse me.  She got divorced.  Sherry

 8  Thompson.

 9       Q.     Sherry Thompson?

10       A.     Uh-huh.

11       Q.     Are you aware that Madison was found deceased

12  inside her cell 30 minutes after she died?

13       A.     I am aware of that.

14       Q.     Can you explain how that could have happened if

15  there was a controller monitoring the camera in her cell

16  continuously?

17       A.     As I reviewed the photos and the video of that,

18  it looked like she was just sitting there.  So if she -- and

19  I'm just speculating.  Because I don't know what she was

20  thinking or how that would happen.  If she looked over there

21  and saw her sitting there, she could have thought that she's

22  just sitting there.

23              When I reviewed the tape as -- when she died,

24  it was within -- that whole process was very short, and for

25  her to sit there and look at that camera continually would be
```

 1    impossible.

 2         Q.     Have you asked Sherry Thompson about what she

 3    was thinking at the time?

 4         A.     No.

 5         Q.     You want to add something?

 6         A.     No.

 7         Q.     Okay.  Let me have you look at Exhibit 31.

 8    Now, this is a portion of the policy and procedures manual

 9    for the jail on healthcare records.  Right?

10         A.     It is.

11         Q.     Now, in the first paragraph there, it uses the

12    term "contracted medical provider."  Do you see that?  It

13    looks like the third line into the policy.

14         A.     Uh-huh.

15         Q.     Okay.  Who is the contracted medical provider?

16         A.     Dr. Kennon Tubbs.

17                (Whereupon, Mr. Steve Loos left the deposition

18    proceedings.)

19    BY MR. HANCEY:

20         Q.     Now, if you look at the first letter "A" in

21    this policy, it says that it's the responsibility of the

22    contracted medical provider to create and maintain individual

23    healthcare files on each prisoner including a continuous

24    record of all of the medical care provided for inmate, slash,

25    patients at the jail facility.  You see that?

 1        A.      Yes.

 2        Q.      Is it your testimony that that policy only

 3   applies to Dr. Tubbs?

 4        A.      No.

 5        Q.      Who else does it apply to?

 6        A.      Nurse Clyde.

 7        Q.      It was, in fact, her responsibility in 2016 to

 8   maintain a continuous record of any care that she provided to

 9   inmates at the jail.  Right?

10        A.      That she provided, yes.  She would have started

11   a file, and then in conjunction with PA Clark and Dr. Tubbs,

12   those records would have been kept by them.

13        Q.      Now, with one exception, there are no records

14   kept by the jail that indicate when Madison was given a

15   Gatorade.  Do you agree with that?

16        A.      Yes.

17        Q.      Okay.  And there's also no document --

18        A.      Actually, no, I don't.

19        Q.      Okay.  Explain yourself.

20        A.      What do you mean by a record?  Because there's

21   video there that is considered a record.

22        Q.      Okay.

23        A.      And there is some indication on that that she

24   was provided Gatorade.  So in a sense, yes, that's a record.

25        Q.      Well, I'm guess I'm talking about records that

1  would probably be --

2       A.    Pertain to this policy?

3       Q.    That would be put in the medical file, right.

4       A.    Okay.  Right.

5       Q.    Are there any?

6       A.    No.

7       Q.    Are there -- is there any kind of medical

8  documentation or record on the reasons for which Madison was

9  put on medical observation?

10      A.    Uhm.

11      Q.    Because I haven't seen any.

12      A.    I don't know.

13      Q.    Have you had the opportunity to look at the

14  file that Nurse Clyde kept on Madison Jensen?

15      A.    No.

16      Q.    Are you aware of whether or not there are any

17  records that document the two visits that Nurse Clyde had

18  with Madison Jensen on Monday and Tuesday at the medical

19  office?

20      A.    I don't know.

21      Q.    Do you know if there are any records kept by

22  the jail that pertain to how Madison's medications were

23  either approved or disapproved?

24      A.    I haven't reviewed any documents pertaining to

25  that.

1        Q.      Do you believe that all of the instances I've

2   just asked you about would constitute the kinds of things for

3   which documentation should be maintained?

4        A.      Yes.

5        Q.      Consistent with jail policy at the time.

6   Correct?

7        A.      It wasn't at the time.

8        Q.      Well, this healthcare record policy that we

9   looked at in Exhibit 31 was the policy in place in 2016.

10       A.      Right.

11       Q.      Okay.

12       A.      But again, you're asking me to speculate on

13  what medical felt like is needed in those files.  That's up

14  to their discretion, not mine.

15       Q.      Well, okay.  Are you saying, then, that in

16  2016, the medical providers, including Nurse Clyde, were

17  given full discretion to determine what documentation they

18  maintained in their inmate files?

19       A.      Yes.

20       Q.      Are you aware of any records kept by the jail

21  that document instances where Madison didn't eat a meal?

22       A.      No.

23       Q.      What about instances when vomit was found in

24  her cell?

25       A.      No.

1        Q.      What about when her bedding was changed due to

2   being soiled?

3        A.      There may have been some inmate notes in the

4   computer.  Right offhand, I can't remember.

5        Q.      Okay.

6                Let me have you look at Exhibit No. 25.  Now,

7   these are the County's responses to discovery requests that I

8   submitted in this case.  Are you the County representative

9   that reviewed and approved these responses?

10       A.      Yes.

11       Q.      Let me have you turn to the County's response

12   to Interrogatory No. 3, which is found on Page 6.

13       A.      Okay.

14       Q.      Okay.  In the second paragraph there, the

15   response reads like this:  "Jana Clyde saw Madison multiple

16   times each day."

17                Do you agree or disagree with that statement?

18       A.      I disagree.

19       Q.      Now look at response to Interrogatory No. 5.

20   In that response, the County says that Madison looked like a

21   typical heroin addict.

22                Do you agree with that statement?

23       A.      That was the information that I had gotten.

24       Q.      Did you receive that information from officers

25   who were working at the jail at the time?

1           A.      Yes.

2           Q.      Did you receive that information from Nurse

3    Clyde as well?

4           A.      I don't remember having any discussion with

5    Nurse Clyde about how she looked.

6           Q.      Okay.  Look at your response to Interrogatory

7    No. 313.  Here, it says, "Duchesne County does not believe

8    that it deviated from any policies, procedures or practices,

9    observations, rules, or preferences regarding Madison's

10   incarceration."

11              After hearing all of the evidence that's come

12   in so far, do you agree with that statement?

13          A.      That we deviated?

14          Q.      Do you think that Duchesne County followed

15   every single one of its policies and procedures respecting to

16   its handling and treatment of Madison?

17          A.      Yes.

18          Q.      Let me have you look at Exhibit 38.  These are

19   Logan Clark's responses to discovery requests in this case.

20          A.      Okay.

21          Q.      Let me have you look at his response to

22   Interrogatory No. 9.  There are no page numbers,

23   unfortunately, in here.

24          A.      Okay.  I think I'm there.

25          Q.      Okay.  Now, just turn one more page.  In the

 1  second full paragraph on that page, Logan Clark says,

 2  "Madison was not on the list of inmates who had submitted a

 3  medical request to be seen that day, and defendant was not

 4  provided a medical file for Madison."  You see that?

 5       A.    Yes.

 6       Q.    If that statement is true, was jail policy

 7  violated?

 8       A.    I don't know.

 9       Q.    Well, then let's break it down.  We know that

10  Madison filled out a medical request form.  We've seen that

11  today.  Right?

12       A.    Yes.

13       Q.    You have Logan Clark saying that he came on

14  Thursday, and her medical request form wasn't in the

15  documents that he received.

16       A.    Okay.

17       Q.    Would that be a violation of jail policy?

18       A.    I -- I don't know where it was kept.  I don't

19  know the documents that he received, I don't know what he

20  received and -- or where that particular document was.  So I

21  guess I couldn't --

22       Q.    Well, I don't know either except that he's

23  saying here that he didn't get it.

24       A.    Okay.

25       Q.    And my question is very simple.  Is the fact --

1    if true, is the fact that nobody from the jail provided Logan

2    Clark with Madison's handwritten medical request form, was

3    that a violation of policy?

4         A.    Yes, it would have been.  If that's true.

5         Q.    If Liz Richens didn't put a copy of Madison's

6    intake questionnaire and/or mental health questionnaire in

7    the medical box when Madison was booked in, would that be a

8    violation of policy?

9         A.    Yes.

10         Q.    If Nurse Clyde received and read Madison's

11   medical request form indicating that she was vomiting and

12   diarrhea for four straight days and couldn't keep anything

13   down and didn't pick up the phone or otherwise contact

14   Dr. Tubbs and Logan Clark immediately, would that be a

15   violation of jail policy?

16              MR. HOMER:  Objection.  Foundation.

17              MR. HANCEY:  You can answer.

18              MR. MYLAR:  Join.

19              MR. HANCEY:  You can answer.

20              THE WITNESS:  I don't know.

21   BY MR. HANCEY:

22         Q.    Why not?

23         A.    Because I don't -- I don't know what the

24   medical...

25         Q.    Well, Sheriff, I'm not going to let you get off

1    the hook with saying you don't know.  You know, you're -- the

2    buck stops with you.

3         A.    It does.

4         Q.    And so I need an answer to the question.  Was

5    there a policy -- let me finish.  Was there any kind of a

6    policy that would have been implicated in Nurse Clyde

7    receiving a medical request form with that very specific

8    information in it and then not contacting the doctors about

9    it?

10             MR. HOMER:  Before you answer, objection,

11   foundation.

12             MR. MYLAR:  Join.

13             MR. HANCEY:  You can answer, please.

14             THE WITNESS:  As far as I know, there wasn't a

15   policy in place specifically addressing that particular

16   issue.  So I can't say that she violated or not.

17             MR. HANCEY:  Okay.

18   BY MR. HANCEY:

19        Q.    Okay.  Same exhibit, Exhibit 38.  Near the end

20   of that document, there's a section called Requests for

21   Admission.  Let me have you find that page, if you would.

22             MR. HOMER:  It's a new pleading.

23             MR. HANCEY:  Sorry there's not page numbers.

24             Okay.  So that's the right page.

25                             *

Page 86

 1  BY MR. HANCEY:

 2          Q.      In Request for Admission No. 1, I ask Logan

 3  Clark to admit that he knew, before the day that Madison

 4  passed away, that Madison may have been going through heroin

 5  withdrawals.  And he denied that statement.  Do you see that?

 6          A.      Yes.

 7          Q.      If true that Logan Clark was not advised that

 8  Madison may have been going through heroin withdrawals until

 9  after she was already dead, would that have been a violation

10  of jail policy?

11                  MR. HOMER:  Objection.  Foundation.

12                  MR. MYLAR:  Join.

13                  MR. HANCEY:  You can answer.

14                  THE WITNESS:  No.

15  BY MR. HANCEY:

16          Q.      Is that because there was not a heroin

17  withdrawal policy in place at the time?

18          A.      Yes.

19          Q.      In Request for Admission No. 3, I asked Logan

20  to admit that he knew before Madison died, before the day

21  that she died, that Madison was not eating or keeping down

22  fluids.  And he denied that statement.

23                  If that information was, in fact, not

24  communicated to Logan Clark before Madison died, would that

25  be a violation of jail policy?

 1                    MR. HOMER:  Objection.  Foundation.

 2                    MR. MYLAR:  Join.

 3                    MR. HANCEY:  You can answer.

 4                    THE WITNESS:  It would be a violation of our

 5  practice, yes.

 6  BY MR. HANCEY:

 7         Q.     It would have been?

 8         A.     Yes.

 9         Q.     Okay.  In what way, sir?

10         A.     If she was -- if she was not keeping food down

11  and it was putting her -- she was to the point where it was a

12  serious medical issue, you're asking me to speculate again,

13  then he should have been informed.

14         Q.     Look at Request for Admission No. 11.

15         A.     Okay.

16         Q.     Logan Clark's response to that request goes as

17  follows:  "Admit that defendant," meaning Logan Clark, "has

18  recommended and/or advised jail staff, including Jana Clyde,

19  to contact Logan Clark and inform him of an inmate

20  experiencing any concerning symptoms which may include

21  vomiting, diarrhea or dehydration regardless of how long the

22  symptoms have been present."

23         A.     Okay.

24         Q.     My first question is, do you know whether or

25  not that's true?

1         A.      That's true now.

2         Q.      **Do you know if that was true as of November**

3    **2016?**

4         A.      It wasn't.

5         Q.      **Okay.  So just to be clear, you're not saying**

6    **you don't know.  You're saying that prior to Madison's death,**

7    **Logan Clark did not provide any such advice or counsel to**

8    **jail staff.  Is that right?**

9         A.      That addresses that specific situation?

10        Q.      **Yes.**

11        A.      I don't know whether he did or not.

12        Q.      **You don't know?**

13        A.      No.  I know that there was instruction given by

14   him periodically that I didn't attend.  So I don't know

15   whether he did or not.

16        Q.      **Was it a -- no, go ahead, sir.  I don't want --**

17        A.      There's a lot in that.  You're saying that

18   concerning an inmate vomiting, diarrhea or dehydration

19   regardless of how long the symptoms have been present.  There

20   wasn't a policy in place prior to it, to Madison dying.  Now,

21   whether he gives some instruction, If you see this or you see

22   that, with our jail staff or our nurse, I don't know.

23        Q.      **Now, you acknowledge -- I think you already**

24   **have acknowledged, that you and the other police officers at**

25   **the jail are not experts in the medical field.  Correct?**

 1          A.      Correct.

 2          Q.      That's, in fact, the reason why you hire

 3   somebody like Nurse Clyde and enter into a contract with

 4   somebody like Dr. Tubbs.  Right?

 5          A.      Yes.

 6          Q.      They're the experts, and you, in -- to a great

 7   extent, rely on their medical expertise to address medical

 8   issues the inmates are having.  Right?

 9          A.      Yes.

10          Q.      Was it a policy of the jail in 2016 that jail

11   employees and staff follow the advice and recommendations

12   given by medical personnel?

13          A.      Yes.

14          Q.      So following that line of logic, if Logan Clark

15   or Dr. Tubbs, for instance, advised jail staff in 2016, If

16   you see an inmate vomit, I want a phone call, then you

17   would -- then the policy would have been for that jail staff

18   member or employee to contact the doctor if, in fact, they

19   saw something like that?

20          A.      Yes.

21          Q.      If I might ask, sir, how did you learn about

22   Madison's death?

23          A.      I received a phone call.

24                  MS. ABKE:  Can you speak up?  Sorry.

25                  THE WITNESS:  I received a phone call.

```
 1                    MS. ABKE:  Thank you.
 2   BY MR. HANCEY:
 3           Q.     From who?
 4           A.     I don't remember exactly.  I think it was my
 5   chief deputy, but I -- it could have been another
 6   administrative staff.
 7           Q.     At any time between Madison's passing and
 8   today, have you had occasion to talk with Jana Clyde about
 9   the incident?
10           A.     No.
11           Q.     You never asked for her explanation on what
12   happened?
13           A.     No.  And let me explain why, if I may.
14           Q.     Sure.
15           A.     One is if there was -- I requested an
16   investigation be conducted on that.
17           Q.     By Uintah County.  Right?
18           A.     By an outside agency.  We have a protocol in
19   place to address those type of incidences; that we would have
20   an outside agency do that investigation.  It would be
21   inappropriate for me to drag Mrs. Clyde into my office and
22   start quizzing her what was done or how she treated this
23   individual or that individual while that investigation was
24   being conducted.
25                    Uintah County conducted their investigation.
```

1   When the AG started to conduct an investigation, then, again,

2   it would be inappropriate for me to drag her in and question

3   her while an investigation was being conducted.  Then she got

4   appointed counsel, and I wouldn't dare speak to your client

5   without your permission in being able to do that.  And so I

6   would give that same consideration to Jana.  And I haven't

7   spoken to her specifically about this case because of that

8   and the pending litigation on it.

9          Q.    Have you had any conversations with -- about

10   Madison and her passing and the circumstances leading up to

11   that with any other member of the jail staff?

12              MR. HOMER:  Outside the presence of counsel.

13   Right?

14              MR. HANCEY:  Of course.

15              THE WITNESS:  No.

16              MR. HANCEY:  Okay.  Let's go off the record.

17              (Recess taken from 11:47 a.m. to 11:58 a.m.)

18              (Whereupon, Mr. Steve Loos was absent from the

19   deposition proceedings.)

20              MR. HANCEY:  I don't have any other questions

21   at this time, Sheriff, thank you.

22              MR. MYLAR:  I just have a couple of question.

23                              *

24                              *

25                              *

```
 1                    E X A M I N A T I O N

 2

 3   BY MR. MYLAR:

 4        Q.    Prior to Madison's death in 2016, had you ever

 5   known of a person in the jail dying because of a heroin

 6   withdrawal?

 7        A.    No.

 8        Q.    Had you ever heard of anyone having serious

 9   medical consequences after going through a heroin withdrawal

10   in the jail?

11        A.    No.

12        Q.    Had you heard of anybody having died from

13   dehydration in the jail prior to Madison's death?

14        A.    No.

15        Q.    Had you ever heard of anyone having serious

16   medical conditions due to dehydration in the jail prior to

17   her death?

18        A.    No.

19        Q.    Is the fact that, the basic fact -- and again,

20   prior to Madison's death, the basic fact that somebody was

21   vomiting and/or having diarrhea, like flu-like symptoms,

22   would that be necessarily a serious medical condition?

23        A.    No.

24        Q.    And if you look just quickly on -- well, you

25   don't even necessarily need to look at it.  But the form you
```

```
 1   looked at earlier, Exhibit 5, it actually says on here that

 2   I'm not detoxing.  She says that she's --

 3        A.   Oh, I lost them.  I was trying to turn and

 4   turned it loose.

 5             (Off-the-record discussion)

 6             THE WITNESS:  Just the medical request?

 7   BY MR. MYLAR:

 8        Q.   Yeah, the medical request form.

 9        A.   Okay.

10        Q.   It was Jana Clyde's testimony that she wanted

11   her to fill this out and actually, in conjunction with Deputy

12   Rider, this was filled out at her request, that they were

13   requesting it -- that Jana Clyde was requesting this medical

14   request so she could see the doctor.  And she got this

15   request and immediately -- testified that she put her on the

16   doctor's list to be seen on Thursday.  Is that in compliance

17   with policy by Jana Clyde to do that?

18        A.   Yes.

19        Q.   And it specifically says here that she -- that

20   she's not detoxing.  Given that, is this necessarily a

21   serious medical condition?

22             MS. ABKE:  Object to foundation.

23             MR. HANCEY:  Same objection.

24             MR. MYLAR:  You can answer.

25             THE WITNESS:  No.
```

```
 1   BY MR. MYLAR:

 2        Q.    Especially given the fact that she's on the

 3   list to see the doctor on Thursday?

 4              MR. HANCEY:  Assumes facts.

 5              MS. ABKE:  Join.

 6              THE WITNESS:  I'm sorry, you lost me.

 7   BY MR. MYLAR:

 8        Q.    It certainly wouldn't be a serious medical

 9   condition given the fact that -- well, strike that.

10              It was appropriate for Jana Clyde to receive

11   this information knowing that she's going to be -- that

12   Madison is going to be seen by the doctor on Thursday?

13              MR. HANCEY:  Foundation.

14              MS. ABKE:  Are you asking if it's appropriate

15   that it seems -- that she got information?

16              MR. MYLAR:  That it was appropriate, her

17   action, in terms of how she treated --

18              MS. ABKE:  I don't think that's the question

19   you asked.

20              THE WITNESS:  About how she handled the

21   information that she got?

22              MR. MYLAR:  Yes.

23              THE WITNESS:  Was it appropriate?

24              MR. MYLAR:  Yes.

25              THE WITNESS:  Yes.
```

 1                    MR. MYLAR:  I don't have any more questions.

 2                    (Off-the-record discussion)

 3

 4                    E X A M I N A T I O N

 5

 6  BY MS. ABKE:

 7          Q.     Sheriff, before you were the sheriff of

 8  Duchesne County, what was your job title with Duchesne

 9  County?

10          A.     Before I was sheriff?

11          Q.     Yes.

12          A.     I was chief deputy.

13          Q.     How long were you the chief deputy?

14          A.     Eight years.

15          Q.     So you were the chief deputy at the time Jana

16  was hired?

17          A.     Yes.

18          Q.     Were you involved in the decision to hire Jana

19  Clyde?

20          A.     Yes.

21          Q.     As far as did -- like did you interview her?

22          A.     I sat on the interview board.

23          Q.     Did you provide any training, you personally,

24  to Jana Clyde when she was hired with the County?

25          A.     I didn't, no --

 1        Q.       Who did?

 2        A.       -- me personally.

 3                 It would -- it would have been our

 4  administrative staff back in the jail at that time, I

 5  believe.

 6        Q.       And who --

 7        A.       And --

 8        Q.       Go ahead.

 9        A.       PA Clark.

10        Q.       Who is the administrative staff in the jail?

11        A.       At that time?

12        Q.       What individuals, I guess, what job titles are

13  the administrative staff?  So like sergeants or...

14        A.       We have corporals, which is our lowest level of

15  supervision, supervisors.  We have sergeants, which is the

16  next level.  And then a staff sergeant and then a lieutenant.

17  Your staff sergeant is basically your assistant jail

18  commander.  So he would take care of the jail in the absence

19  of the commander.

20        Q.       So are corporal, sergeant, staff sergeant and

21  the lieutenant all administrative staff?

22        A.       The sergeants and the lieutenants would be

23  considered administrative staff.

24        Q.       So the sergeants and the lieutenant were the

25  individuals at the jail who provided Jana job training when

1    she was hired.  Correct?

2         A.    Yes.

3         Q.    Who were those individuals?

4         A.    At the time?

5         Q.    Yes.

6         A.    It would have been Jason Curry, who was the

7    jail commander, Travis -- or excuse me, Hollie Purdy was the

8    staff sergeant.  Luke Hackford would have been a sergeant.

9    And Travis Givens would have been a sergeant.

10        Q.    Do you know what training Curry, Purdy,

11   Hackford and Givens provided to Jana when she was hired?

12        A.    No.

13        Q.    You were not present for any of the training?

14        A.    I wasn't present during any of that.

15        Q.    Do you have any documentation of that training,

16   like as far as materials that she might have been provided

17   about that training?  I understand there's records of her

18   receiving training.  But do you actually have the materials

19   that were provided to her?

20        A.    I don't.  As far as the facility have that?  I

21   don't know whether they do or not.

22        Q.    Is providing printed material part of the

23   training for new employees at the sheriff's office?

24        A.    As part of it, yes.

25        Q.    What does it consist of?  What is the printed

1    material that's given?

2         A.    On...

3         Q.    Is there a lot?

4         A.    It depends on the training.

5         Q.    Okay.  So for Jana's case, what kind of printed

6    material was she provided?

7         A.    I don't know.

8         Q.    Okay.  The best person to talk to about that is

9    one of the four individuals that you mentioned?

10        A.    Yes.

11        Q.    Then you said that Logan Clark provided Jana

12   job training.  Correct?

13        A.    I need -- I need to make a clarification.

14        Q.    Sure.

15        A.    When Jana was hired, I would have been the

16   chief deputy.  So at the time, Jeremy Curry would have been

17   the jail commander.  Jason Curry would have been staff

18   sergeant.  Hollie Purdy would have been a sergeant.  Travis

19   Given would have been a sergeant and so would Luke.  I got

20   confused on where we were at.  So that was the chain of

21   command then, and that would have been the jail

22   administration at the time.  I'm sorry, I --

23             MR. HOMER:  I just want to make sure.  So it

24   was Jeremy as opposed to Jason?  Is that your recollection?

25             THE WITNESS:  Yes, that's right.  And so he

1  would have been -- Jeremy, Jason, Travis Givens, Hollie Purdy

2  would have been those individuals that would have provided

3  her that training when she was hired.

4  BY MS. ABKE:

5      Q.      And not Jason Curry?  Or also Jason Curry?

6      A.      Also Jason Curry, I'm sorry.

7      Q.      Both of the Currys?

8      A.      Yes.

9      Q.      Okay.  Going back to my question, you stated, I

10  think, previously, that Logan Clark, you believe, provided

11  Jana with some job training when she was hired?

12      A.      Yes.

13      Q.      Do you know what that job training was?

14      A.      Specifically, no, I don't.

15      Q.      Do you know -- well, how -- Logan Clark is not

16  an employee of Duchesne County.  Correct?

17      A.      Right.

18      Q.      He's a contracted -- he's an independent

19  contractor, essentially.  Correct?

20      A.      Yes.

21      Q.      He works under a delegation of services

22  agreement with Dr. Tubbs; right?

23      A.      Yes.

24      Q.      So what is the scope of what an independent

25  contractor who is not employed by the sheriff's office, what

1    is the scope of what you would expect him to provide as far

2    as job training to Jana Clyde?

3         A.    I would expect him -- it states in the contract

4    that they would provide training.  And so I would expect that

5    they would review any forms that we used.  I would expect

6    that they would give instruction to our nurse because they

7    would be working -- they would be working directly under him.

8    Not necessarily as a supervisor but as medical staff working

9    in conjunction with him to address any medical issue.

10              So I would address -- I would expect there to

11   be some -- at least some verbal communication between the two

12   of them about the problems that might be going on at the

13   time, we were experiencing in the jail at the time.  For

14   instance, if we had somebody in there that had cancer,

15   obviously Jana is not a doctor, and so there would need to be

16   some instruction on how to possibly deal with that particular

17   individual.

18              And so if there were issues like that, I would

19   expect him to give her some instruction, some training on how

20   to deal with that if he wasn't there and...

21        Q.    By "training," are you meaning what he would

22   expect Jana to do as far as helping him do his job, like

23   providing medical services to jail staff?

24        A.    Yes.

25        Q.    Is that what --

    1              A.      Yes.

    2              Q.      Is that generally all we're talking about here?

    3    I mean, is there something else -- you said Logan is not

    4    Jana's supervisor.  Right?

    5              A.      Right.

    6              Q.      Jana doesn't report to Logan or Dr. Tubbs, does

    7    she?

    8              A.      No.

    9              Q.      So there's no way for Logan to ensure that Jana

   10    is complying with, for example, jail policies.  Correct?

   11              A.      I wouldn't say that there's no way of him being

   12    able to see if she's complying.  Because obviously as he

   13    looks at some of the documentation and stuff, he could see

   14    whether she's following those directives.  So to say that,

   15    probably wouldn't be accurate.

   16              Q.      What documentation are you referring to that he

   17    would look at?

   18              A.      Say, for instance, if he had instructed her to

   19    fill out a specific form a certain way, and then he was gone

   20    the rest of the week, when he came back, if those forms

   21    weren't filled out completely or accurately like she had been

   22    instructed by him to do, obviously he could tell at that

   23    point that she wasn't complying with the policy he had given

   24    her.

   25              Q.      So Logan or Dr. Tubbs could see whether Jana

```
 1   was complying with instructions that they had provided to

 2   her.  Correct?

 3        A.     Right.

 4        Q.     Do you know if Logan Clark or Dr. Tubbs has

 5   received any training from the Duchesne County Sheriff's

 6   Office regarding your department's policies and procedures?

 7        A.     I believe they have.  I...

 8        Q.     What makes -- where do you get that

 9   understanding from?

10        A.     Just because of some of the discussion that I

11   have with my supervisory staff.  I meet with them every

12   Monday morning.

13        Q.     Who?

14        A.     My administrative staff.  My jail commander, my

15   staff sergeant, my patrol lieutenant, my detective

16   lieutenant, my office manager.

17        Q.     Not Logan or Dr. Tubbs?

18        A.     Not Logan or Dr. Tubbs.  In some of those

19   discussions, I recall, you know, them mentioning that, you

20   know, we've told Dr. Tubbs about -- or Logan Clark about this

21   specific thing or that specific thing so that we can help

22   the -- a particular situation or comply with a policy here

23   and there.  To be --

24        Q.     Do Logan --

25        A.     -- specific about that, which ones or what they
```

1  told them, I don't know.  Just I know that we've had

2  conversations about that before.

3          Q.      So there may have been some ad hoc discussion

4  with Logan Clark or Dr. Tubbs about specific policies and

5  procedures.  Correct?

6          A.      Right.

7          Q.      But when you first entered into the contract

8  with Dr. Tubbs and, by delegation, Logan Clark, did they go

9  through field training?

10         A.      I don't know.  That was -- they entered into

11 that contract before I was sheriff, and that wasn't part of

12 my responsibility at the time as the chief deputy.

13         Q.      Do you have any reason to believe that they did

14 go through field training, seeing as they're not employees of

15 the County?

16         A.      I don't have any idea either way.

17         Q.      Do you have any knowledge of Dr. Tubbs or Logan

18 Clark being trained on the full policies and procedures and

19 signing some sort of document that says, We are trained on

20 the policies and procedures of the jail?

21         A.      No.

22         Q.      So as far as compliance with jail policies and

23 procedures and whether Jana Clyde or any other corrections

24 officer was complying with those policies and procedures, I

25 take it Logan Clark and Dr. Tubbs would not have any way of

1    knowing what those policies were and ensuring compliance.

2    Correct?

3          A.     No.

4          Q.     In November and December of 2016, could

5    corrections officers, did they have the training to take

6    vitals of an inmate?

7          A.     No.

8          Q.     The only person who was regularly --

9          A.     Let me rephrase that.

10         Q.     Sure.

11         A.     There may have been some of my staff that were

12   EMTs that could have been trained to take vitals.

13         Q.     Are you aware of any corrections officers ever

14   taking vitals of an inmate while in -- they were

15   incarcerated?

16         A.     Prior to that -- prior to Madison --

17         Q.     Around the time, 2016.

18         A.     No.

19         Q.     Was the responsibilities for taking vital signs

20   of an inmate, did that rest with Jana Clyde?

21         A.     Yes, and our medical provider.

22         Q.     Sure.  But they're not there all the time.

23   Right?

24         A.     Right.

25         Q.     I think you said previously that corrections

 1    officers and Ms. Clyde had the discretion as to when they

 2    would call Logan Clark or Dr. Tubbs, if need be, regarding an

 3    inmate's medical condition.  Correct?

 4         A.    Yes.

 5         Q.    So they could decide when they felt it was

 6    necessary to make that call?

 7         A.    If it was an emergency situation, they were

 8    required to.

 9         Q.    That was the only time that they didn't have

10    discretion was in an emergency situation?

11         A.    Right.

12         Q.    What constitutes an emergency situation in your

13    mind?

14         A.    In my mind?

15         Q.    Yes.

16         A.    Somebody that is in immediate distress where

17    they -- their life would be in jeopardy.

18         Q.    Corrections officers don't have medical

19    training beyond basic first aid as a general rule.  Correct?

20         A.    Correct.

21         Q.    And Jana Clyde, I understand she's an LPN, but

22    she's not a registered nurse.  Correct?

23         A.    Correct.

24         Q.    Her medical training is limited.  I think you

25    understand that?

1          A.      Yes.

2          Q.      How would a corrections officer or Ms. Clyde

3    make that determination as to what constitutes an emergency

4    life-threatening situation for an inmate?

5          A.      Just like any other person outside of the

6    correctional setting would.  If it becomes apparent to me,

7    obvious to me as a parent that my child is in immediate peril

8    of having a medical issue that needed immediate attention,

9    say, fall and hit their head and was obviously bleeding to

10   death, I would think that that would be a serious medical

11   emergency, and I would take them to the doctor.  If they fell

12   and broke a bone, obviously that's an immediate medical

13   emergency, and I would take them to the doctor.  I don't see

14   that Nurse Clyde or our correctional staff at that point

15   would be any different than a layperson outside of a

16   correctional facility.

17         Q.      So you're expecting your corrections officers

18   and Ms. Clyde to use their common sense in making that

19   decision.  Correct?

20         A.      Yes.

21         Q.      And do what an ordinary person would do outside

22   of the...

23         A.      The correctional setting.

24         Q.      The correctional setting?

25         A.      Yes.

1          Q.      I think you said when Mr. Mylar was asking a

2    question that vomiting and diarrhea, sort of in a vacuum as

3    far as symptoms, may not be a serious medical condition.

4    Correct?

5          A.      Correct.

6          Q.      Would you defer to a trained medical provider

7    or doctor as to when those symptoms would constitute a

8    serious medical problem?

9          A.      Yes.

10         Q.      Have you reviewed the video observation of

11   Madison in the court holding cell?

12         A.      Yes.

13         Q.      So you've had an opportunity to look at that.

14   Right?

15         A.      Yes.

16         Q.      Would you consider her situation and her

17   symptoms that she was exhibiting as shown on that video to be

18   a serious medical problem?

19         A.      No.

20         Q.      And why is that?

21         A.      I've experienced those same symptoms, and I've

22   had children that experienced them same symptoms, and I've

23   seen it in the jail experiencing those same symptoms.  And

24   it's never been a medical emergency, a serious medical

25   emergency that needed to be addressed.

1      Q.     I know that there's a -- there's a camera that

2  the controllers can look at to see a person who is in a court

3  holding cell.  Correct?

4      A.     Yes.

5      Q.     Is their video feed of the court holding

6  individuals also on a motion sensor like the video that we

7  received in discovery?

8      A.     Yes.

9      Q.     So they can't see anything if the person is not

10 moving?

11     A.     Yes.  It's only activated if there's motion.

12     Q.     You talked about standard operating procedures

13 in the jail?

14     A.     Yes.

15     Q.     Are those -- do those have to be formally

16 adopted?

17     A.     Standard operating procedures?  Are we talking

18 about the operating procedures as far as the standards and

19 the procedures?

20     Q.     You used the term standard operating

21 procedures.  So -- and then I think you identified the opiate

22 withdrawal policy as a standard operating procedure.

23 Correct?

24     A.     Yes.

25     Q.     So tell me how something becomes a standard

1   operating procedure.

2           A.     It's drafted -- in this incident, it would have

3   been drafted by our medical provider.  It would be presented

4   to our administrative staff in the jail, and then I would

5   review it.  Obviously, if there would be -- I'm not a medical

6   professional, so rarely would I interject my thoughts into a

7   procedure that the medical said that we should have.  I would

8   look at it and okay it, and that would be implemented at that

9   point.

10          Q.     Are all --

11          A.     And then it would be sent out to our staff,

12  been addressed in an e-mail.  It might be addressed with

13  handing them a document, put on the computer so they could

14  review it.  Or we would address it in all of those ways and

15  then address it in a staff meeting.

16          Q.     Are all standard operating procedures in

17  written format?

18          A.     No.

19          Q.     Some of them are just orally communicated or

20  e-mail communicated?

21          A.     Yes.

22          Q.     Is there one particular place on, like, the

23  computers where corrections officers or jail staff can go to

24  look at all the standard operating procedures?

25          A.     There is a place on there that they can go,

1  yes.  It's in the file that I told you about where the jail

2  standards and policies are.

3          Q.      What's the name of the file?

4          A.      It's just jail policies.

5          Q.      So it's in the same folder as the --

6          A.      Yes.

7          Q.      This is the official written policy that we've

8  looked at a section of?

9          A.      Yes.

10         Q.      Is there a reason why standard operating

11  procedures are not part of the policies and procedures

12  manual?

13         A.      You mean implemented into it?

14         Q.      Adopted by it or incorporated within it?

15         A.      Part of that is, is every jail is different.

16  And we -- and we go by the standards that were adopted by the

17  Sheriff's Association, those standards.  And so as they come

18  and inspect those, those are the ones that we specifically

19  focus on.  And so we want them separate from the standard

20  operating procedure.

21              And again, some of those are verbal.  And so I

22  don't dict -- we don't dictate a verbal procedure or an

23  operating procedure and then have them transcribed.  We just

24  don't do that.

25         Q.      How does a new employee find out about all the

1    standard operating procedures if some of them are given via

2    e-mail and things like that?  How would they know what

3    applies to their job duties?

4            A.    That would be part of their field training,

5    their field training officer.  They would spend time with

6    their field training officer who would -- as they go down

7    through the FTO training protocol, as they would get to a

8    specific issue, any of those verbal communications that would

9    have been given, they would address with those individuals at

10   that time.

11           If they had any questions about that, they

12   would monitor whether they were -- they were getting their --

13   getting their -- the things that they needed to be trained

14   on.  If they were lacking in an area, then they would address

15   that verbally with them, and they would discuss a particular

16   standard operating procedure that might have been

17   communicated.

18           Again, most of the standard operating

19   procedures that are given verbally aren't something that is

20   of a serious nature.  Or they would be adopted and put right

21   into the standards and the policy.

22           Q.    Or at least it's not something that there's

23   been some sort of legal precedent that needs to be modified

24   by the Sheriff's Association or something like that?

25           A.    Right.  Or we've had an issue with -- like I

 1  say, policies and procedures are an ever -- they're

 2  ever-changing, and the reason that they're ever-changing is

 3  we have different issues or problems or there's case law

 4  that's established.  We have got to go in there and address

 5  those.  If we've never had a problem with them before, then

 6  it might just stay as a verbal communication.

 7          But if something is apparent that we're having

 8  an issue there, there's new case law that comes down, our

 9  officers obviously has to take that into consideration and

10  comply with that.  And so it's written out, it's in the

11  policy form, it's adopted, and it's put into policies and

12  procedures.  And that's why we have the inspection and the

13  standards and that policy every year.  Because it's

14  ever-changing.

15          And we get new officers, and we want to be able

16  to go over that with them.  If they didn't -- if they wasn't

17  present at a particular staff meeting where a verbal

18  directive or a verbal SOP was administered, it's the

19  supervisor's responsibility to get with that officer and

20  communicate that to them and make sure that they understand.

21      Q.      Understood.

22          In order to adopt an operating procedure, who

23  initiates that protocol?  So, for example, an issue comes up

24  and you decide that you need to have a standard operating

25  procedure for something.  Who says, We need to get something

1   in place or we need to notify everyone of what -- this is the

2   way we're going to do things going forward?

3          A.     It could come from a civilian or right with our

4   line staff.  It could --

5          Q.     Would they bring that to your attention?

6          A.     -- it could start at the lowest level.  If they

7   encountered a situation that they thought isn't covered in

8   our policy, that would be a good practice, they could take

9   that to their immediate supervisor and say, Could I make a

10  suggestion?  I see that we are lacking in this area.  You

11  know, I come from this background, and we might be lacking in

12  this area.  Is that something that we should consider maybe

13  looking at as far as policy?  Then it would go up the chain.

14         Q.     So the suggestion to have an SOP could be

15  raised by anyone down to, you know, booking clerks.  Correct?

16         A.     Yes.

17         Q.     But as far as an actual implementation of

18  protocol or procedure, that has to go up to the chain of

19  command; it has to eventually be approved by you?

20         A.     Yes.  It would come -- it might be drafted by

21  one of my command staff, then it would come to me.  I would

22  look at it.  And, generally speaking, I would have our

23  attorney group, one of our attorneys in our County office,

24  review that to make sure that there wasn't any legal problems

25  with it.  And if they felt like that it was sufficient, then

1  I would adopt it.

2        Q.      So again, you're the person who approves any

3  operating procedures as well as any official written

4  policies?

5        A.      Yes.

6        Q.      You're the one that has to approve each of

7  those, give final approval?

8        A.      Yes.

9              MS. ABKE:  I'm just about done.

10 BY MS. ABKE:

11       Q.      So you mentioned -- you listed several ways

12 that corrections officers can learn that an inmate is

13 experiencing a medical problem or medical symptoms.  You said

14 things like they can be told by the inmate, they can receive

15 a medical request form, they can observe it personally when

16 they're doing their job, things like that.  Correct?

17       A.      Yes.

18       Q.      Is it fair to say that the only way that the

19 contracted medical providers would become aware of an inmate

20 having medical symptoms, when they're not present at the jail

21 the one day a week, would be that they have to be notified by

22 jail staff?  Correct?

23       A.      Yes.

24       Q.      And an inmate --

25       A.      Or review a document that would be there.

1        Q.       Sure.  But they would still need to receive

2   that documentation from jail staff.  Right?

3        A.       Yes.

4        Q.       And one way or the other, whether it's written

5   or verbally, they need to be advised somehow that there's an

6   inmate having medical symptoms.  Right?

7        A.       Yes.

8        Q.       There's no way that they can somehow oversee

9   or -- they have no way of knowing what's going on with the

10  inmates inside the jail when they're not present unless

11  they're told something, it's communicated to them.  Correct?

12       A.       Yes.

13       Q.       There's no way for an inmate -- at least at the

14  time in 2016, there was no way for an inmate to get medical

15  care if the providers, contracted providers, were not

16  notified of a need to provide that medical care.  Correct?

17       A.       Yes.

18                MS. ABKE:  That's all the questions I have.

19                MR. HANCEY:  Just a couple more.

20

21             F U R T H E R   E X A M I N A T I O N

22

23  BY MR. HANCEY:

24       Q.       Why is Jason Curry no longer a lieutenant at

25  the jail?

```
 1          A.      I replaced him with Jeremy Curry.

 2          Q.      When did that take place?

 3          A.      About -- it was around the first of this year.

 4          Q.      Was that for disciplinary reasons?

 5          A.      No.

 6          Q.      Has anybody at the jail been disciplined for

 7   anything they did concerning the circumstances surrounding

 8   Madison's death?

 9          A.      No.

10          Q.      Prior to Madison passing away, did you know

11   that vomiting and diarrhea over an extended period of time

12   could lead to dehydration?

13          A.      Yes.

14          Q.      Did the -- do you believe that the correctional

15   officers at your facility also had that knowledge?

16          A.      I don't know.  Personally, I do.  But I don't

17   know what experience they've had to -- I know that because my

18   son years ago, when he was a child, experienced some vomiting

19   and dehydration; he was two.  And they told me that, you

20   know, being that young and that small and being an infant,

21   that that is a concern.

22                  So I don't know what they had.  But I know that

23   because of my experience, so -- I don't know what they know.

24          Q.      Do you know if the jail employees and staff in

25   2016 had received any training from anybody informing them
```

1   about risks of dehydration coming from vomiting or diarrhea?

2          A.      I don't know that they did.

3                  MR. HANCEY:  I don't have any other questions.

4   Thank you.

5                  MR. MYLAR:  I don't have any.

6                  MS. ABKE:  I'm all done.

7                  MR. HOMER:  Thank you.

8                  (Deposition concluded at 12:31 p.m.)

9                              *  *  *

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    C E R T I F I C A T E

 2   STATE OF _____)
                               : ss.
 3   COUNTY OF _____)

 4


 5           I HEREBY CERTIFY that I have read the foregoing
     testimony consisting of 114 pages, numbered from 4 through
 6   117, inclusive, and the same is a true and correct
     transcription of said testimony with the exception of the
 7   corrections I have listed below in ink, giving my reasons
     therefor.
 8
        1.   Page _____ Line _____ Correction_____
 9           Reason _____
        2.   Page _____ Line _____ Correction_____
10           Reason _____
        3.   Page _____ Line _____ Correction_____
11           Reason _____
        4.   Page _____ Line _____ Correction_____
12           Reason _____
        5.   Page _____ Line _____ Correction_____
13           Reason _____
        6.   Page _____ Line _____ Correction_____
14           Reason _____
        7.   Page _____ Line _____ Correction_____
15           Reason _____
        8.   Page _____ Line _____ Correction_____
16           Reason _____
        9.   Page _____ Line _____ Correction_____
17           Reason _____
       10.   Page _____ Line _____ Correction_____
18           Reason _____
       11.   Page _____ Line _____ Correction_____
19           Reason _____
       12.   Page _____ Line _____ Correction_____
20           Reason _____

21

22                              _____
                                 DAVID L. BOREN
23           SUBSCRIBED AND SWORN to at _____,
     this _____ day of _____, 20___.
24
                                _____
25                               NOTARY PUBLIC
```

```
 1              C E R T I F I C A T E

 2   STATE OF UTAH        )
                          :
 3   COUNTY OF SALT LAKE  )

 4

 5             THIS IS TO CERTIFY that the deposition of
     DAVID L. BOREN, the witness in the foregoing deposition
 6   named, was taken before me, JAMIE R. BREY, a Certified
     Shorthand Reporter and Registered Professional Reporter in
     and for the State of Utah, residing at Salt Lake City, Utah.
 7

 8             That the said witness was by me, before
     examination, duly sworn to testify the truth, the whole truth
 9   and nothing but the truth in said cause.

10

             That the testimony of said witness was reported
11   by me in Stenotype and thereafter caused by me to be
     transcribed into typewriting, and that a full, true and
12   correct transcription of said testimony so taken and
     transcribed is set forth in the foregoing pages numbered from
13   4 through 117, inclusive, and said witness deposed and said
     as in the foregoing annexed deposition.

14

15             I further certify that I am not of kin or
     otherwise associated with any of the parties to said cause of
16   action, and that I am not interested in the events thereof.

17

             WITNESS MY HAND at Salt Lake City, Utah, this
18   9th day of July, 2018.

19

20   _____

21   JAMIE R. BREY, CSR, RPR
     Utah license No. 361662
22

23

24

25
```

## 1

**1** 11:11 86:2

**10:49** 64:19

**11** 87:14

**11:03** 64:19

**11:47** 91:17

**11:58** 91:17

**12** 46:12

**12:31** 117:8

**13** 11:7,13 27:14,25 34:25 35:1,5 51:9,10,11

**14** 22:13 50:24 51:2,4

**18** 53:8

## 2

**2** 61:17

**2015** 33:7 34:7

**2016** 6:3 9:22 16:4 17:3,7 21:22 25:11 26:5 27:24 28:3 29:14 30:15 32:16,22 33:10 34:1,4,9 35:19 36:3, 15,19 37:7 38:6 46:7 47:6, 11 49:17,19,25 51:21 52:7, 19 53:6,14 55:12 58:13 59:18 60:12 63:22 64:15, 23 67:9 68:9 69:10 74:20 75:8,13 78:7 80:9,16 88:3 89:10,15 92:4 104:4,17 115:14 116:25

**2017** 33:9 34:7 35:23

**2018** 4:1

**24** 46:12 49:15 60:25

**25** 81:6

**27** 4:1

**28th** 53:17

## 3

**3** 63:3,17 81:12 86:19

**30** 74:19,22 75:6,11 76:12

**31** 77:7 80:9

**313** 82:7

**34** 33:3

**38** 82:18 85:19

**39** 34:12 35:3,8,15

## 4

**44** 50:25 51:23

**49** 50:22,23 51:6

## 5

**5** 56:7 81:19 93:1

**500.10** 36:13,18

**51** 15:22 16:1 28:12,18 29:11 36:10

**54** 53:8

## 6

**6** 64:14 81:12

**600-plus** 6:25

**640** 7:1

## 9

**9** 82:22

**900** 21:4

**990** 16:11

**996** 16:10

**996-page** 16:9

**9:02** 4:2

## A

**a.m.** 4:2 64:19 91:17

**ABKE** 50:24 51:2 57:14 58:6,8 66:11 89:24 90:1 93:22 94:5,14,18 95:6 99:4 114:9,10 115:18 117:6

**absence** 96:18

**absent** 6:6 91:18

**AC** 66:12

**accept** 31:5,13,25

**accepted** 32:1

**access** 17:12 18:1,7 28:13, 21 36:12

**accessed** 12:1

**accessible** 59:10

**accommodate** 55:13

**accurate** 40:3 101:15

**accurately** 101:21

**acknowledge** 22:22 88:23

**acknowledged** 20:7 88:24

**acquainted** 17:14,22

**action** 94:17

**activated** 108:11

**actual** 113:17

**ad** 103:3

**add** 77:5

**addict** 81:21

David L. Boren
June 27, 2018

**addition** 10:17

**address** 9:6 14:16,23,25 15:18 26:18 46:5 89:7 90:19 100:9,10 109:14,15 111:9,14 112:4

**addressed** 7:15 9:3 15:2 26:22 27:5,10 38:13 46:14 50:13 60:25 107:25 109:12

**addresses** 8:18 88:9

**addressing** 85:15

**administer** 65:18

**administered** 66:2 112:18

**administration** 8:20 98:22

**administrative** 7:13 13:22 14:13 21:21 24:9,22 25:24 74:9 90:6 96:4,10,13,21,23 102:14 109:4

**administrators** 10:10

**Admission** 85:21 86:2,19 87:14

**admit** 86:3,20 87:17

**adopt** 112:22 114:1

**adopted** 108:16 110:14,16 111:20 112:11

**advice** 25:5 88:7 89:11

**advise** 13:10

**advised** 86:7 87:18 89:15 115:5

**affected** 14:14

**AG** 91:1

**agency** 31:8,13 90:18,20

**agree** 13:23 37:11 50:16 51:20 52:6 55:23 72:9,15 78:15 81:17,22 82:12

**agreement** 99:22

**ahead** 31:25 35:2 41:15 48:9 54:5,6 58:4 88:16 96:8

**aid** 39:5 105:19

**alcohol** 62:18 63:3 64:3

**alert** 38:18

**allocation** 6:16

**allowed** 26:19

**alternate** 60:9

**ambulance** 26:11 32:5,20 50:11 61:6

**and/or** 27:15 84:6 87:18 92:21

**animal** 5:7

**annually** 20:22

**apparent** 14:12 106:6 112:7

**apparently** 20:22

**appears** 9:15 33:4,6 34:13

**applies** 78:3 111:3

**apply** 21:14 48:18 78:5

**appointed** 91:4

**approval** 114:7

**approve** 53:18 65:24 67:24 114:6

**approved** 7:24 65:16,17, 20,23 66:1,2 67:9 79:23 81:9 113:19

**approves** 114:2

**area** 11:20,23 18:19 21:17, 18 24:25 26:13 47:15,17 48:1 111:14 113:10,12

**areas** 11:21 26:16 75:5

**arise** 11:2 24:20

**arises** 26:14

**arm** 5:22

**arrestee** 27:1 30:19 65:3

**arresting** 27:9 32:2 61:19, 22 62:21,25 65:4

**arrests** 5:13

**arrived** 31:18 57:8,25

**aspects** 25:7

**assignments** 22:17 23:8

**assistant** 96:17

**association** 6:25 7:6 8:9 9:8 110:17 111:24

**assume** 44:23

**assumes** 41:13 53:25 54:3 94:4

**assuming** 7:23 44:23

**attached** 28:16

**attend** 88:14

**attention** 31:5 106:8 113:5

**attorney** 113:23

**attorney's** 7:20 8:23

**attorneys** 113:23

**authority** 50:11

**aware** 20:1,15,19,24 21:7 30:3 31:20 38:17 42:10 53:2 54:22 60:1,4 69:17 76:11,13 79:16 80:20 104:13 114:19

---

**B**

**back** 7:21 8:23 11:24 16:14 17:5,10 26:2,3,4,19 31:23 33:21,24 49:3 54:13,15 59:2 60:5 65:12 72:3 73:4

David L. Boren
June 27, 2018

96:4 99:9 101:20

**background** 6:22 113:11

**based** 7:15 21:15

**basic** 92:19,20 105:19

**basically** 5:13 8:10 96:17

**basis** 19:21

**Bates** 35:5 51:6,12,23 53:8 54:11

**bedding** 48:19 49:2,6,11 81:1

**beginning** 7:2 15:18

**behalf** 4:6

**believed** 24:21

**Binder** 11:11

**bit** 6:22 36:17 68:23

**black** 43:4

**bleeding** 106:9

**blood** 64:4

**board** 31:9 42:6,7 95:22

**body** 16:17

**bone** 106:12

**booked** 32:13 47:18 84:7

**booking** 11:23 26:23 27:2, 3,9 31:3,4,11 61:23 62:8, 15,21 63:5,9,10,13,22 64:7,15 65:8,11 113:15

**Boren** 4:5,13,16 15:25 64:23

**bottom** 51:13 53:9 74:23 75:2

**box** 16:14 58:20,22,23,25 59:3 64:6,16 84:7

**break** 83:9

**briefed** 41:21 71:24

**briefing** 71:23

**bring** 26:15 27:2 113:5

**bringing** 30:24

**broke** 106:12

**brought** 30:19,22

**buck** 85:2

**button** 55:18 56:2

## C

**calendar** 33:9

**call** 26:11 29:2 31:16,20 32:4,7,8,10,20 49:15,21 50:8,10 53:11 55:18 56:2 61:5 72:19 89:16,23,25 105:2,6

**called** 4:6 48:24 85:20

**calling** 54:23

**calls** 41:14 54:4 55:21 56:2, 3 73:10

**camera** 15:8,9,11 37:19 71:1,4,11 75:19,22 76:15, 25 108:1

**cancer** 100:14

**care** 26:6 36:20 50:9 77:24 78:8 96:18 115:15,16

**case** 7:7 9:20 15:9 35:23 49:8,17 50:15 51:20 60:17 66:22 67:12 69:7 81:8 82:19 91:7 98:5 112:3,8

**category** 14:3

**cell** 37:22,24 38:1 40:18 48:2,10,12,15,19 68:3 69:1,19,23 71:12 75:18 76:12,15 80:24 107:11 108:3

**cells** 47:12 55:18 71:25

**chain** 98:20 113:13,18

**chalk** 42:6

**chance** 17:21

**change** 12:9,12 13:3,14,16 41:21 42:3 70:5

**changed** 21:12,21 81:1

**characterize** 47:5

**check** 20:24 42:17 71:3

**checked** 52:3 75:11,13

**checks** 37:22 49:9 71:13, 19 75:8

**chief** 6:7 25:22 90:5 95:12, 13,15 98:16 103:12

**child** 106:7 116:18

**children** 107:22

**circulate** 18:14

**circumstance** 15:3 44:4 46:18 70:8

**circumstances** 14:10 24:20 28:4 29:14 44:10,12 46:6 49:20 53:3 70:7,23 91:10 116:7

**civil** 5:3,4,8

**civilian** 14:14 19:1 23:3,11, 24 113:3

**clarification** 20:10 47:20 75:24 98:13

**clarify** 68:17 74:3,16,24

**Clark** 24:11 25:8 28:5 29:15 30:18 32:7,9,18 35:9,10,11 39:24 45:6,25 46:8,15 49:14,21 50:15 51:18 52:1 53:16,20 57:8,17,24 58:24 60:2,21 61:4 65:14,23 67:14,18,21 71:17 74:18

78:11 83:1,13 84:2,14
86:3,7,24 87:17,19 88:7
89:14 96:9 98:11 99:10,15
102:4,20 103:4,8,18,25
105:2

**Clark's** 51:1 67:23 82:19
87:16

**clean** 47:12,15,17 48:1,2,
15,24

**cleaned** 48:22

**cleaning** 47:16 48:3,21,23

**clear** 62:25 88:5

**clearance** 31:2,6,18

**cleared** 62:6

**clerk** 27:4,9 31:4,12 61:23
62:8,16,22 63:9,10,22
64:15 65:8,11

**clerks** 63:13 113:15

**client** 91:4

**clonidine** 53:18 67:6

**closely** 70:17

**closer** 69:23

**clothing** 49:3,6,11

**clutter** 48:2

**Clyde** 19:1,13 20:6 23:10,
24 25:6 32:8,17 33:4,11
34:4 39:24 44:25 45:3,15
46:11,19 47:1,8 49:20
50:1,5,8 52:12 57:12,15,23
58:19 59:5 61:10 63:23
67:13,18,20 71:15,17
72:18,20,22 73:6,15 78:6
79:14,17 80:16 81:15 82:3,
5 84:10 85:6 87:18 89:3
90:8,21 93:13,17 94:10
95:19,24 100:2 103:23
104:20 105:1,21 106:2,14,
18

**Clyde's** 18:10 32:21 33:5
53:19 93:10

**collect** 65:6

**command** 98:21 113:19,21

**commander** 6:1 17:24
25:22 96:18,19 97:7 98:17
102:14

**commitments** 5:3

**common** 18:19 26:13,16
106:18

**communicable** 69:18

**communicate** 42:1 43:17
53:19 57:9,24 62:21 63:4
71:18 112:20

**communicated** 31:12
44:15,18 57:11 86:24
109:19,20 111:17 115:11

**communicating** 57:17

**communication** 43:12 62:2
100:11 112:6

**communications** 111:8

**comp** 14:24

**compare** 34:21

**completed** 7:19 8:7,25 9:2
61:18

**completely** 101:21

**completion** 7:24

**compliance** 8:11,13,16 9:8
93:16 103:22 104:1

**compliant** 8:21

**complied** 50:2,6

**comply** 7:17 12:19 72:4
75:14 102:22 112:10

**complying** 101:10,12,23
102:1 103:24

**computer** 17:13 18:2 81:4
109:13

**computers** 12:2 109:23

**concept** 69:10

**concern** 116:21

**concerns** 27:2 62:14

**concluded** 117:8

**condition** 44:14 60:19,22
92:22 93:21 94:9 105:3
107:3

**conditions** 60:8 92:16

**conduct** 25:23 91:1

**conducted** 25:24 90:16,24,
25 91:3

**confused** 98:20

**confusion** 34:23

**conjunction** 78:11 93:11
100:9

**consequences** 92:9

**consideration** 91:6 112:9

**considered** 5:21 10:10
11:3 12:22 78:21 96:23

**consist** 97:25

**consistent** 32:25 53:13
57:1,3 67:14,19 71:13
74:20 80:5

**constantly** 25:14

**constitute** 28:20 80:2
107:7

**constitutes** 105:12 106:3

**contact** 30:18 32:17 39:9
45:6 46:8,15,20,24 54:1
56:19 61:4 65:23 84:13

87:19 89:18

**contacted** 28:5 29:15 53:17,24 56:24 59:14 67:13

**contacting** 57:17 85:8

**contained** 13:14 15:5

**contemplating** 18:22

**contents** 63:15

**continual** 8:24 19:21 38:14

**continually** 76:25

**continuing** 44:21

**continuous** 77:23 78:8

**continuously** 76:16

**contraband** 18:23

**contract** 45:17 59:18 60:6 89:3 100:3 103:7,11

**contracted** 77:12,15,22 99:18 114:19 115:15

**contractor** 99:19,25

**contradict** 15:4

**contrary** 53:23 58:2

**control** 5:7 11:24 37:18 42:8,9 48:5

**controlled** 18:24

**controller** 55:20 75:22 76:3,15

**controllers** 108:2

**conversation** 55:1

**conversations** 91:9 103:2

**convey** 60:22 61:22

**copies** 11:25 17:8 18:14

**copy** 9:21 12:1 17:25 18:3 19:12 20:25 63:23 84:5

**corporal** 96:20

**corporals** 96:14

**correct** 4:18 10:15 19:2 23:1,11,18 35:10 41:2 75:19 80:6 88:25 89:1 97:1 98:12 99:16,19 101:10 102:2 103:5 104:2 105:3, 19,20,22,23 106:19 107:4, 5 108:3,23 113:15 114:16, 22 115:11,16

**correctional** 19:6 24:10 30:23 32:17 38:16 39:3,9 44:6 45:20 46:4,8,10 48:4 50:1 56:18 60:23 71:18 106:6,14,16,23,24 116:14

**corrections** 5:22 103:23 104:5,13,25 105:18 106:2, 17 109:23 114:12

**counsel** 20:12 25:5 34:20 35:4 36:16 55:6 88:7 91:4, 12

**county** 4:18 5:3,13,15,19 6:9,11 7:20 8:23 9:21 12:10 19:11,12 33:4 35:7,8 49:15 59:18 81:8,20 82:7, 14 90:17,25 95:8,9,24 99:16 102:5 103:15 113:23

**County's** 81:7,11

**couple** 11:21 32:4 58:21 91:22 115:19

**court** 5:1,2 20:10 47:20 68:3 71:2,12 75:18,24 107:11 108:2,5

**cover** 30:5

**covered** 30:3 33:4 113:7

**create** 77:22

**created** 14:19

**crews** 48:14

**current** 21:8

**Curry** 5:24 6:12 97:6,10 98:16,17 99:5,6 115:24 116:1

**Currys** 99:7

---

## D

**daily** 52:13 53:4

**dare** 91:4

**David** 4:5,16

**day** 41:1 42:5 44:21 49:15 52:3,4,21 57:7,25 59:22 60:3,6,9,10 76:3 81:16 83:3 86:3,20 114:21

**days** 46:12,13 56:16 84:12

**dead** 86:9

**deal** 27:25 31:14 41:11 100:16,20

**dealing** 32:12 36:15 38:6

**deals** 36:20

**dealt** 69:10

**death** 5:25 36:5 74:14 88:6 89:22 92:4,13,17,20 106:10 116:8

**deceased** 76:11

**December** 104:4

**decide** 45:16 105:5 112:24

**decision** 67:23 95:18 106:19

**deemed** 39:10 59:16 60:20

**defendant** 83:3 87:17

**defer** 107:6

**deficiency** 14:15

David L. Boren
June 27, 2018

**dehydration** 87:21 88:18 92:13,16 116:12,19 117:1

**Deland** 7:5

**delegation** 99:21 103:8

**demonstrate** 23:7

**denied** 86:5,22

**department** 4:25 31:8

**department's** 102:6

**depending** 22:16 44:4,10

**depends** 40:5 70:7 98:4

**deposition** 5:10 9:17 18:10 19:24 22:12 32:21 48:25 64:21 68:7 70:20 77:17 91:19 117:8

**depositions** 43:21

**depth** 25:18

**deputy** 6:7 25:22 55:17 68:19 70:12 72:7 90:5 93:11 95:12,13,15 98:16 103:12

**describe** 4:24 6:16 10:23 22:5 24:6 42:19 63:25

**describing** 49:20 68:20

**detained** 6:6

**detective** 102:15

**determination** 106:3

**determine** 56:19 72:22 73:7,16 80:17

**detoxing** 93:2,20

**develop** 6:20

**developed** 6:24 8:6

**develops** 7:6

**deviated** 82:8,13

**diarrhea** 36:25 37:11 38:5,

18 42:16,17 43:15 44:19 47:3 48:12 52:11 56:16 70:13 84:12 87:21 88:18 92:21 107:2 116:11 117:1

**dict** 110:22

**dictate** 24:24 28:4 45:3 52:21 110:22

**dictated** 43:17 53:3 71:7,13

**dictates** 60:7

**died** 35:2 76:4,12,23 86:20, 21,24 92:12

**difference** 11:14

**direct** 25:19 30:2

**directed** 14:7 74:8

**direction** 44:6

**directive** 12:15,16 14:6 75:17 112:18

**directives** 10:21,22 101:14

**directly** 6:4,5 32:18 46:8 100:7

**dirty** 48:20

**disagree** 43:23 50:17 81:17,18

**disapprove** 65:25 67:24

**disapproved** 79:23

**disciplinary** 116:4

**disciplined** 116:6

**disconnect** 39:2

**discontinue** 14:16

**discovery** 9:20 11:1 16:6 29:25 81:7 82:19 108:7

**discrete** 68:25

**discretion** 40:21 41:9 44:8 45:15 49:22,23 50:10

56:19 57:16 61:10 73:7 80:14,17 105:1,10

**discuss** 67:20 111:15

**discussed** 67:18

**discussion** 24:18 47:21 58:11 64:18 69:1 82:4 93:5 95:2 102:10 103:3

**discussions** 102:19

**disease** 69:18

**diseases** 64:5

**dispute** 67:17

**distress** 105:16

**distributed** 18:18

**district** 5:2

**division** 5:8

**divorced** 76:7

**dizzy** 70:14

**doctor** 30:21 31:16,19,20, 22 60:15 89:18 93:14 94:3, 12 100:15 106:11,13 107:7

**doctor's** 93:16

**doctors** 24:23 29:2 85:8

**document** 8:24 11:1,6,14 16:9 19:12 20:5 34:14 56:9 64:12 78:17 79:17 80:21 83:20 85:20 103:19 109:13 114:25

**documentation** 26:22 79:8 80:3,17 97:15 101:13,16 115:2

**documented** 19:17

**documenting** 12:10 56:1,3

**documents** 79:24 83:15,19

**door** 72:8,23 73:9,17

David L. Boren
June 27, 2018

**doors** 26:20

**drafted** 7:18 109:2,3
113:20

**drag** 90:21 91:2

**drug** 52:20,24

**drugs** 52:10 62:18 63:3
64:3

**Duchesne** 4:1,18 5:19 6:11
49:15 51:20 82:7,14 95:8
99:16 102:5

**due** 81:1 92:16

**duly** 4:7

**duties** 111:3

**duty** 57:21

**dying** 88:20 92:5

---

**E**

**e-mail** 12:14 20:17 109:12,
20 111:2

**earlier** 13:17,20 28:18,24
61:11,21 93:1

**eat** 44:19 70:14 80:21

**eating** 70:14 86:21

**effect** 7:4 15:15 27:21 35:1

**electronic** 7:12 8:5 12:1
18:7

**emergency** 26:10,15 30:16
32:5 39:11,12 50:7,9,12
59:14 61:7 105:7,10,12
106:3,11,13 107:24,25

**employed** 4:17 99:25

**employee** 19:19 20:15,23
21:7 22:6,7,16,21 33:16
37:10 56:22 89:18 99:16
110:25

**employees** 13:10 17:9
18:6,15 19:16 21:14,22
25:12 43:20 61:15 75:3
89:11 97:23 103:14 116:24

**EMTS** 104:12

**encountered** 42:5 113:7

**end** 15:15 17:17 85:19

**enforce** 5:12

**ensure** 101:9

**ensuring** 20:14 104:1

**entail** 5:14

**entailed** 54:23 69:11

**enter** 37:24 89:3

**entered** 70:19 103:7,10

**environment** 18:24

**ER** 30:21 31:1,18 62:6,10

**escape** 18:22

**essentially** 99:19

**establish** 37:2

**established** 112:4

**etent** 19:6

**evaluated** 62:10

**eventually** 113:19

**ever-changing** 8:25 112:2,
14

**evidence** 37:22,24 39:16
41:14 43:15 54:4 58:3 68:2
69:7 82:11

**examined** 4:7

**exception** 78:13

**exclusive** 36:18

**exclusively** 38:4

**excuse** 34:18 76:7 97:7

**exercise** 61:8

**exercises** 73:6

**exhibit** 11:7,13 15:22 16:1,
2,16 27:14,25 28:12,18,20
29:11 33:3,7 34:6,12,21,25
35:1,3,5,8,15 36:10 50:22
51:4,7 53:23 56:7 61:17
63:17 64:14 72:5 74:22
77:7 80:9 81:6 82:18 85:19
93:1

**exhibiting** 52:1,11 107:17

**existed** 9:22 10:2 36:15
61:14

**existing** 7:25 50:2

**exists** 27:18

**expect** 29:1 52:12 100:1,3,
4,5,10,19,22

**expectation** 42:20,23 43:16

**expected** 31:23,24 47:17

**expecting** 106:17

**expects** 52:2

**experience** 36:22 116:17,
23

**experienced** 60:18 107:21,
22 116:18

**experiencing** 31:19,21
38:7,22 52:19 61:2 87:20
100:13 107:23 114:13

**expertise** 89:7

**experts** 88:25 89:6

**explain** 6:21 18:16 76:14
78:19 90:13

**explained** 47:19 62:5

**explanation** 9:10 38:15
90:11

David L. Boren
June 27, 2018

**extended** 116:11

**extensive** 22:9 28:9 39:6

**extent** 10:1,7 23:5 43:14 59:11 89:7

**eye** 42:18

---

**F**

**face-to-face** 42:4 43:7

**facility** 9:6 55:12 73:20 77:25 97:20 106:16 116:15

**fact** 9:15 11:16 43:25 44:14 56:11 62:17 78:7 83:25 84:1 86:23 89:2,18 92:19, 20 94:2,9

**factors** 60:8,9

**facts** 41:13 54:3 94:4

**fail** 57:24

**failure** 53:19

**fair** 12:23 36:8 39:4 45:13 61:9 74:17 114:18

**fall** 106:9

**familiar** 20:2 63:14

**feed** 108:5

**feel** 10:6 40:7 46:14 50:12

**fell** 106:11

**felt** 60:21 62:10 80:13 105:5 113:25

**field** 17:11,17,19,23 19:4, 12,22 21:25 22:5,25 23:4 24:1 25:10 38:14 88:25 103:9,14 111:4,5,6

**file** 33:2,24 59:7,8 78:11 79:3,14 83:4 110:1,3

**filed** 34:15 35:23 36:4

**files** 64:10 77:23 80:13,18

**filing** 35:17

**fill** 37:15 64:12 93:11 101:19

**filled** 56:12 57:6 58:14 59:6 60:13,24 63:21 64:1,13 83:10 93:12 101:21

**filled-out** 63:23

**filling** 63:1

**final** 9:7 114:7

**find** 11:22 29:1,10 85:21 110:25

**fine** 37:4 54:16

**finish** 85:5

**fit** 14:3

**floor** 48:19 49:12

**flu-like** 92:21

**fluids** 55:12 86:22

**focus** 16:20 23:10 110:19

**focusing** 20:11 38:4

**folder** 110:5

**follow** 89:11

**food** 87:10

**form** 27:4 37:16 56:10,11, 15 57:6 58:14 59:6,12,13, 17 60:13 61:18 62:7,9,23 63:1,8,11,14,23 64:5 68:20,22 83:10,14 84:2,11 85:7 92:25 93:8 101:19 112:11 114:15

**formally** 9:14 11:16 108:15

**format** 109:17

**forms** 26:22,23 60:25 100:5 101:20

**forward** 113:2

**found** 76:11 80:23 81:12

**foundation** 17:6 37:1,3 52:14,22 58:1 84:16 85:11 86:11 87:1 93:22 94:13

**frame** 59:5

**free** 10:6

**frequent** 71:14,21

**frequently** 71:18 75:15

**FTO** 111:7

**full** 80:17 83:1 103:18

**functions** 25:3

---

**G**

**gag** 40:9

**Gary** 7:5

**gathered** 27:8

**Gatorade** 43:22 44:1 78:15, 24

**general** 5:6 10:9 14:4,5,11, 17,18,22,24 15:2,4,11,12, 16 25:18 29:23 30:3 61:14, 16 105:19

**generally** 4:24 13:24 17:25 29:21 46:23 60:12 101:2 113:22

**give** 6:22 15:7 40:16 43:22, 25 61:4 91:6 100:6,19 114:7

**Givens** 6:13 97:9,11 99:1

**good** 4:13 113:8

**grade** 9:7

**graph** 8:16,19

**great** 89:6

David L. Boren
June 27, 2018

**group** 113:23

**guess** 21:6 50:4 58:10 70:2
  78:25 83:21 96:12

---

## H

**Hackford** 97:8,11

**half** 4:23

**hall** 26:14

**HANCEY** 4:12 5:16 9:19
  15:24 20:4,13 22:14,19
  23:16,17 29:4,7,9 34:22,24
  35:7,10,14,25 36:6,8,9
  37:2,6 41:16,20,23 46:17
  48:6 49:4 50:21,25 51:3,5,
  11,14,16 52:18,25 53:1
  54:6,12,17,19 55:8,10
  57:15,20,22 58:12 64:22
  66:16 68:8 70:22 72:14
  73:12,14 76:2 77:19 84:17,
  19,21 85:13,17,18,23 86:1,
  13,15 87:3,6 90:2 91:14,
  16,20 93:23 94:4,13
  115:19,23 117:3

**hand** 44:25

**hand-delivered** 58:22

**handed** 12:20 15:25 63:8

**handing** 109:13

**handle** 23:8 24:19 25:7
  44:7 45:5,16 55:21

**handled** 94:20

**handling** 11:2 13:22 82:16

**hands** 7:8

**handwritten** 84:2

**happen** 8:3 20:22 37:19
  76:20

**happened** 32:12 55:3 69:24

76:14 90:12

**hard** 11:25 17:25 18:3,14
  20:25 66:13

**head** 106:9

**health** 36:20 84:6

**healthcare** 28:14,21 36:12,
  15 77:9,23 80:8

**hear** 57:14 66:13

**heard** 5:17,24 43:1 47:4,7
  55:17 63:20 67:11 68:4,19
  70:16 72:7 92:8,12,15

**hearing** 47:1 70:18 82:11

**Heather** 5:9 9:16 68:6
  70:19

**held** 72:4

**helping** 100:22

**heroin** 27:16 34:8 81:21
  86:4,8,16 92:5,9

**hesitant** 45:14

**high** 64:4

**HIPAA** 59:9

**hire** 89:2 95:18

**hired** 17:12 22:2 23:23
  32:22 95:16,24 97:1,11
  98:15 99:3,11

**hires** 45:14

**hit** 106:9

**hoc** 103:3

**Hogan** 76:5

**hold** 56:16

**holding** 68:3 69:19 71:2,12
  75:18 107:11 108:3,5

**Hollie** 97:7 98:18 99:1

**home** 18:19

**HOMER** 29:3,5 34:20,23
  35:4,8,11,23 36:1 41:13
  50:19 51:9 52:15 54:3
  55:6,9 58:1,4 84:16 85:10,
  22 86:11 87:1 91:12 98:23
  117:7

**hook** 85:1

**hospital** 32:6 61:7

**hour** 75:5,11

**hourly** 37:21

**hours** 46:12 49:15 61:1

**house** 11:19

**hung** 71:22 72:23 73:8

**hypertension** 64:4

---

## I

**idea** 73:6 103:16

**identification** 15:23

**identified** 108:21

**immediately** 14:17 65:18
  84:14 93:15

**implement** 47:8

**implementation** 6:10,13
  113:17

**implemented** 6:23 7:22
  15:16 109:8 110:13

**implicated** 85:6

**impossible** 77:1

**impression** 73:11

**improve** 14:16

**inappropriate** 90:21 91:2

**incapable** 48:23

**incarcerated** 62:11 104:15

David L. Boren
June 27, 2018

**incarceration** 82:10

**incidences** 90:19

**incident** 90:9 109:2

**inclement** 60:7

**include** 36:25 87:20

**included** 11:16

**including** 77:23 80:16 87:18

**incoming** 64:25

**incompletions** 8:17

**incorporated** 110:14

**independent** 99:18,24

**index** 16:3,8 28:12,19

**indicating** 19:9,13 47:19 62:9 84:11

**indication** 78:23

**individual** 14:8 31:4,14 32:6 38:21 40:15 47:14 61:6 65:4 69:22 71:23 77:22 90:23 100:17

**individually** 75:4

**individuals** 17:10 18:22 22:17 31:1 96:12,25 97:3 98:9 99:2 108:6 111:9

**infant** 116:20

**influence** 63:2

**inform** 87:19

**information** 27:7,8,11,12 42:13 43:18 45:4,20 46:3 53:19 56:23 57:10,11,24 61:5,23 62:15 63:4 67:12 73:2 81:23,24 82:2 85:8 86:23 94:11,15,21

**informed** 26:25 72:18,20 87:13

**informing** 116:25

**initial** 38:14

**Initially** 44:20

**initiated** 59:15

**initiates** 112:23

**injury** 69:20

**ink** 42:7

**inmate** 21:17 27:1 28:20 30:19 32:13 36:12 37:10, 13 38:7,17 39:16 40:6 42:11,14 43:22 44:7 47:14 48:10,12,13,14,16,18,21, 24 49:3,5 52:3,10,19 55:11 56:1,24 58:15 59:7 60:13, 14,21 62:14,17 63:1 64:25 65:7 66:2 70:5 73:8,18 75:10,12 77:24 80:18 81:3 87:19 88:18 89:16 104:6, 14,20 106:4 114:12,14,19, 24 115:6,13,14

**inmate's** 52:12,21 53:3 66:3 105:3

**inmates** 16:14 26:7,13,16, 18 36:15,20 47:2 52:1 74:18 75:8 78:9 83:2 89:8 115:10

**inmates'** 55:18

**inquire** 65:4

**inserted** 7:25 8:6

**inside** 76:12 115:10

**inspect** 110:18

**inspection** 8:8,12 112:12

**inspector** 8:9

**inspectors** 9:4

**instance** 10:25 12:9,10 13:2 14:22 15:8 22:8 43:10

65:22 89:15 100:14 101:18

**instances** 80:1,21,23

**instruct** 13:10 24:22 61:5

**instructed** 19:21 64:11 101:18,22

**instruction** 20:18 23:6 25:17 29:1 31:22 38:14,16 45:7 73:15,19,21,24 74:4, 5,12,13 88:13,21 100:6,16, 19

**instructions** 102:1

**insulin** 65:22

**intake** 63:18 84:6

**intentional** 34:25

**interject** 10:5 109:6

**Interrogatory** 81:12,19 82:6,22

**interrupted** 20:10 47:20 75:24

**interrupting** 54:13

**intervention** 38:23 59:15

**interview** 95:21,22

**interviews** 50:15

**investigation** 90:16,20,23, 25 91:1,3

**investigations** 5:7

**involve** 61:11

**involved** 45:14 95:18

**involving** 28:1

**issue** 26:14,25 30:20,25 31:5,10,15 32:3 38:22 46:14 49:25 54:25 62:6,9 85:16 87:12 100:9 106:8 111:8,25 112:8,23

David L. Boren
June 27, 2018

**issues** 9:5 11:2 15:10 26:17 27:5 30:1 42:1,4,9 46:4 62:13 89:8 100:18 112:3

**itemizes** 33:7

**items** 18:23 66:4

**IV** 55:11

---

### J

**jail** 5:5,19 6:1,11,20,24 7:9 8:12,19 9:12,14 10:14 11:19 12:2 13:2,7,10,13 14:7,8 16:4 17:1,9,24 18:4, 20,23 20:25 21:17,22 22:7 23:4,11,21,25 24:21 25:4, 7,11,21 26:12,20 27:24 28:4 30:17,20,22,25 31:2, 3,6,18 32:1,23 33:17,18, 19,23 34:8 37:9 38:5 41:11 43:16,20 45:1,13,18,20 46:2 47:8,14,24 48:15 49:15 50:2 52:6,20 55:15 56:1,12,22 57:1,8 58:13,25 59:4,20,23 60:3 61:13,15 62:20 63:21 64:23 65:3,7, 16 66:22 67:21 68:9 73:16 77:9,25 78:9,14 79:22 80:5,20 81:25 83:6,17 84:1,15 86:10,25 87:18 88:8,22,25 89:10,15,17 91:11 92:5,10,13,16 96:4, 10,17,18,25 97:7 98:17,21 100:13,23 101:10 102:14 103:20,22 107:23 108:13 109:4,23 110:1,4,15 114:20,22 115:2,10,25 116:6,24

**jail's** 10:1 17:7 20:14 27:15 29:14 36:14,19 47:6,11 53:14,21 67:9 74:20,24

**jails** 7:9

**Jamie** 54:6

**Jana** 18:9 19:1,13 20:6 23:24 25:6 32:21 33:4,5,11 34:4 44:25 45:3,15 46:11, 19 47:1,8 53:19 73:6 81:15 87:18 90:8 91:6 93:10,13, 17 94:10 95:15,18,24 96:25 97:11 98:11,15 99:11 100:2,15,22 101:6,9, 25 103:23 104:20 105:21

**Jana's** 98:5 101:4

**January** 9:1

**Jason** 5:24 6:12 7:13 97:6 98:17,24 99:1,5,6 115:24

**Jensen** 5:9 9:16 44:13 56:12 68:6 69:8,25 70:19 79:14,18

**Jensen's** 72:8

**jeopardy** 105:17

**Jeremy** 98:16,24 99:1 116:1

**job** 22:17 23:6 24:13 25:7 95:8 96:12,25 98:12 99:11, 13 100:2,22 111:3 114:16

**jobs** 13:11 24:23

**Join** 52:15 84:18 85:12 86:12 87:2 94:5

**June** 4:1

**juvenile** 5:2

---

### K

**keeping** 33:23 34:1 47:11 86:21 87:10

**Kennon** 77:16

**kind** 5:21 12:24 21:23 38:11,22 43:11 52:11 56:23 62:1 65:5 79:7 85:5 98:5

**kinds** 52:19 69:12 80:2

**knew** 86:3,20

**knowing** 94:11 104:1 115:9

**knowledge** 36:22 103:17 116:15

---

### L

**Lack** 37:1 52:14,22

**lacking** 111:14 113:10,11

**large** 51:17,25

**laundry** 5:17

**law** 5:13 7:7 15:10 112:3,8

**lawful** 5:13

**laws** 59:9

**lawsuit** 34:15

**lay** 17:6

**layperson** 106:15

**lead** 116:12

**leading** 91:10

**learn** 37:10 89:21 114:12

**learned** 63:1

**leave** 41:1 63:12

**left** 5:9 19:24 32:3 48:25 49:21,23 61:10 68:6 77:17

**legal** 111:23 113:24

**letter** 77:20

**level** 41:9 96:14,16 113:6

**licensed** 23:14

David L. Boren
June 27, 2018

**lieutenant** 25:22 96:16,21, 24 102:15,16 115:24

**lieutenants** 96:22

**life** 105:17

**life-threatening** 106:4

**Likewise** 49:8

**limited** 46:18 105:24

**limping** 42:14

**lines** 53:9

**list** 5:17 65:15,16,17,20,23 67:9 83:2 93:16 94:3

**listed** 114:11

**litigation** 35:16,17 36:2 91:8

**living** 75:5

**Liz** 70:11 84:5

**local** 61:6

**located** 20:25 55:18

**locker** 66:3

**Logan** 24:11 25:2,8 28:5 29:15 30:18 32:7,9,18 35:10,11 39:24 45:6,25 46:8,15,20,24 49:14,21 50:15 51:1,18 52:1 53:16, 20 57:8,24 58:24 60:2,21 71:16,17 74:18 82:19 83:1, 13 84:1,14 86:2,7,19,24 87:16,17,19 88:7 89:14 98:11 99:10,15 101:3,6,9, 25 102:4,17,18,20,24 103:4,8,17,25 105:2

**logic** 89:14

**logistically** 8:3,4

**long** 4:22 21:4 22:10 23:21 54:8 87:21 88:19 95:13

**long-winded** 41:16

**longer** 22:15 115:24

**looked** 24:7 27:14 68:22 76:18,20 80:9 81:20 82:5 93:1 110:8

**Loos** 19:24 22:11 48:25 64:20 77:17 91:18

**loose** 36:11 93:4

**lost** 13:5 52:16 93:3 94:6

**lot** 11:14 25:15 88:17 98:3

**lowest** 96:14 113:6

**LPN** 23:13 105:21

**Luke** 97:8 98:19

---

## M

**made** 9:13 20:16 50:15 59:7 63:6

**Madison** 27:21 35:2 43:3, 15 44:13 53:17 55:2,6,7,8 56:12,15 57:10 66:22 67:21 68:2 69:8,24 70:9,24 72:8,21 75:18 76:4,11 78:14 79:8,14,18 80:21 81:15,20 82:16 83:2,4,10 84:7 86:3,4,8,20,21,24 88:20 91:10 94:12 104:16 107:11 116:10

**Madison's** 5:25 36:5 44:24 53:20 67:25 74:14 79:22 82:9 84:2,5,10 88:6 89:22 90:7 92:4,13,20 116:8

**maintain** 77:22 78:8

**maintained** 80:3,18

**make** 5:13 12:12 39:25 47:16 48:13 98:13,23 105:6 106:3 112:20 113:9, 24

**makes** 102:8

**making** 26:18 27:10 106:18

**management** 45:17

**manager** 33:18,24 102:16

**mandated** 19:8 62:20

**manual** 8:1 9:15,22 10:13 11:4,15,17 13:7,9,15 15:5 16:4,5,17 17:1,9 18:3,13, 14 19:9 20:22 21:4 28:19, 21 36:14,19 66:7 72:25 74:25 77:8 110:12

**marked** 15:22 16:1 34:11

**material** 97:22 98:1,6

**materials** 97:16,18

**matters** 13:23 45:14

**meal** 80:21

**meaning** 71:15 87:17 100:21

**means** 29:21

**meant** 69:11

**measure** 15:17

**medical** 10:25 11:2 24:10, 25 25:7 26:6,14,15,25 28:8 30:16,20,25 31:2,5,6,10, 15,17 32:3 36:20 37:16 38:8,19,22,23,25 39:1,3,6, 9,10,11,12 40:8,13,19 42:1 44:9,13,15,22,25 45:14,16, 18 46:4,14 49:25 50:7,12 56:10,11,19,24 58:14,18, 20,23 59:3,6,8,14,15,19 60:13,18,22 61:11 62:9,13 64:10,16 65:12,13 68:3,10, 11 69:2,4,8,10,18,19 70:3, 5,12,17,24 71:13 72:1,9, 19,21 73:17,18,21 74:19 75:12,16,17 77:12,15,22, 24 79:3,7,9,18 80:13,16

David L. Boren
June 27, 2018

83:3,4,10,14 84:2,7,11,24
85:7 87:12 88:25 89:7,12
92:9,16,22 93:6,8,13,21
94:8 100:8,9,23 104:21
105:3,18,24 106:8,10,12
107:3,6,8,18,24 109:3,5,7
114:13,15,19,20 115:6,14,
16

**medically** 73:8

**medication** 53:24 65:5,6,19

**medications** 64:24 65:9,12,
15,17,24 66:3,23 67:1,8,
12,18,20 79:22

**meet** 102:11

**meeting** 12:14 13:16 20:18
25:23,24 43:8 74:7 109:15
112:17

**meetings** 19:22 25:15,16,
19 26:5

**member** 20:23 23:11 33:16
37:10 38:17 56:23 59:10
89:18 91:11

**members** 17:9 18:6 20:15
21:23 23:3 56:18

**mental** 28:13 73:10 84:6

**mention** 10:17

**mentioned** 12:3 14:2 36:3
98:9 114:11

**mentioning** 102:19

**message** 46:16

**methods** 7:7

**mind** 105:13,14

**mine** 80:14

**minor** 12:24 13:23

**minute** 6:21 16:1 23:10
38:4 44:24

**minutes** 74:19 75:6,11
76:12

**misstates** 72:12

**modified** 111:23

**momentarily** 17:6

**Monday** 53:17 54:21 55:1
67:19 79:18 102:12

**monitor** 111:12

**monitored** 69:21

**monitoring** 76:15

**month** 18:10

**monthly** 26:4

**morning** 4:13 57:9 102:12

**motion** 108:6,11

**move** 21:16 69:22

**moved** 48:10,12,13,16,23
60:9 68:3 69:1 70:11,24
72:9,21

**moving** 108:10

**multiple** 41:7 81:15

**Mylar** 23:15 37:1,4 46:9
50:20 51:8,10 52:14,22
53:22 54:10,16 58:2 72:12
73:10 84:18 85:12 86:12
87:2 91:22 92:3 93:7,24
94:1,7,16,22,24 95:1 107:1
117:5

---

## N

**nature** 12:25 13:23 56:1
111:20

**necessarily** 19:18 40:18
60:16 61:7 92:22,25 93:20
100:8

**needed** 14:16 25:3 26:18

46:25 55:11 65:21 69:20
71:21 80:13 106:8 107:25
111:13

**night** 43:3,4

**note** 35:4

**notes** 81:3

**notice** 12:18

**noticed** 32:13

**notified** 52:5 114:21 115:16

**notify** 38:8,23 39:1,23 40:8
113:1

**notifying** 40:13

**November** 17:7 27:24 28:3
32:22 53:17 88:2 104:4

**number** 7:9 20:17 71:25

**numbers** 82:22 85:23

**nurse** 23:10,14,16 24:23
32:7,17 39:24 49:20 50:1,
5,8 52:12 57:11,15,23
58:19 59:5 61:4,10 63:23
65:13 67:13,18,20 71:15,
17 72:18,20,22 73:15 78:6
79:14,17 80:16 82:2,5
84:10 85:6 88:22 89:3
100:6 105:22 106:14

**nurse's** 64:6

---

## O

**Object** 93:22

**objected** 52:17

**objection** 37:1 41:13 46:9
52:14,22 53:22 54:3,10
58:1,2 72:12 73:10 84:16
85:10 86:11 87:1 93:23

**observation** 68:3,10 69:2,
4,8,10,20 70:3,6,12,17,24

71:2,12 72:1,9,21 73:17,18
74:19 75:12,16 79:9
107:10

**observations** 71:8 82:9

**observe** 39:15 69:23 71:4
114:15

**observed** 31:10 32:2 40:6
43:14 44:18,21 46:11 49:9
71:12,25 73:5,8 74:19 75:4

**obvious** 31:1,3 106:7

**occasion** 90:8

**occasions** 60:1

**occupation** 23:13

**off-the-record** 47:21 58:11
64:18 93:5 95:2

**offhand** 45:12 67:2 81:4

**office** 4:18 5:6 7:20 8:23
12:14 19:22 20:18 25:16,
23 33:18,24 42:13 59:19,
23 60:2 74:6 79:19 90:21
97:23 99:25 102:6,16
113:23

**officer** 17:19 19:1,6,13
21:16 23:1 25:25 27:3,9
31:4,7,13 32:2,17 36:23
37:18,21 38:17 40:6,25
41:8 44:18 46:8,11 48:4
49:8 50:1,2 61:3,10,19,22,
23 62:8,16,21,25 63:11,22
64:15 65:4,9,18 69:4,17
103:24 106:2 111:5,6
112:19

**officer's** 40:21 41:5,6,7
42:12

**officers** 26:24 31:9,11 39:3,
9 40:24 41:18,25 43:14,17
44:6,24 45:20 46:4 52:7
56:18 60:23 63:13 70:16

71:18 72:3 81:24 88:24
104:5,13 105:1,18 106:17
109:23 112:9,15 114:12
116:15

**officers'** 70:4

**official** 110:7 114:3

**on-duty** 76:3

**on-line** 8:10 20:24

**on-the-job** 24:20

**operating** 10:18,24 11:5,20
29:24 30:2 108:12,17,18,
20,22 109:1,16,24 110:10,
20,23 111:1,16,18 112:22,
24 114:3

**operation** 14:15

**operations** 5:5,6,15

**opiate** 27:15 28:1 34:13
36:24 38:3 108:21

**opportunity** 8:19 9:6 79:13
107:13

**opposed** 98:24

**option** 61:8

**options** 32:4 39:13

**oral** 73:25 75:23

**orally** 109:19

**order** 14:2,4,5,11,17,18,23,
25 15:2,4,12,14,16 45:11
60:15 112:22

**orders** 10:9 29:23 30:2,3

**ordinary** 57:9,25 106:21

**orient** 16:22 36:16

**orientation** 23:6 24:4,5,6
25:6,11 47:18,25

**oriented** 19:19 22:8

**outlined** 44:5

**outsider** 9:11

**oversee** 5:4,5,6 115:8

**overtime** 14:24

---

**P**

---

**p.m.** 117:8

**PA** 45:6 57:17 60:21 61:4
65:13,23 67:13,18,21,23
71:16,17 78:11 96:9

**pages** 16:2,3,16,22 21:4
28:11,18,20

**paid** 15:1

**pamphlet** 47:19,23,25

**papers** 5:3

**paragraph** 51:18,25 77:11
81:14 83:1

**parent** 106:7

**part** 16:13,19 22:20 39:4
47:24 63:10 64:10 97:22,
24 103:11 110:11,15 111:4

**pass** 12:13,15 40:14

**pass-on** 40:16 42:8

**passed** 7:11 27:3,7,11,21
86:4

**passing** 42:12 90:7 91:10
116:10

**patients** 77:25

**patrol** 5:7 21:16 25:22
30:23 33:25 102:15

**peace** 5:12

**pending** 91:8

**people** 15:1 33:20 51:19
69:1

**perform** 24:23 25:3

**peril** 106:7

**period** 41:8 60:11 116:11

**periodically** 71:3 88:14

**permission** 50:11 91:5

**person** 43:22 44:25 63:4 75:21,22 92:5 98:8 104:8 106:5,21 108:2,9 114:2

**personal** 14:6 66:4

**personally** 32:9 60:4 95:23 96:2 114:15 116:16

**personnel** 33:1 89:12

**pertain** 79:2,22

**pertaining** 79:24

**phone** 46:15 53:10 84:13 89:16,23,25

**photos** 76:17

**physically** 58:25 59:23

**physician** 61:3

**pick** 22:17 84:13

**picked** 25:17

**place** 6:20 7:12 8:5 9:3,7 17:1 20:19 26:1,4 29:22 30:15 34:9 38:6 39:15,21 41:11,25 42:20 49:19 53:21 54:15 63:22 64:15 67:15 69:9,14 71:19,23 74:20 80:9 85:15 86:17 88:20 90:19 109:22,25 113:1 116:2

**plaintiff** 4:6

**pleading** 85:22

**point** 7:18 20:5 32:14 40:7 48:22 87:11 101:23 106:14 109:9

**police** 31:8 36:23 88:24

**policies** 6:10 7:1,22 8:1,5, 13 9:2,3,5,11,15,21 10:1,8, 9,13,14 12:4,23 13:4,6,11, 14,15 14:1 16:3 17:13,14, 15,16,18,20 18:21 19:8,14, 20 20:7,16,19,24 21:3,12, 14,20,23 22:21 24:18 25:13 26:6 28:8,19 30:1 32:23 36:14 38:6 53:21 66:7 69:9 82:8,15 101:10 102:6 103:4,18,20,22,24 104:1 110:2,4,11 112:1,11 114:4

**policy** 6:20,23 7:17,18,25 8:18,21,24 9:14 10:11,24 11:3,14,15 12:16,20,22 13:3,21 14:3 15:5,8,9,11, 13,16 16:5,12,13,17,25 17:8 18:13 19:23 20:21 21:7 25:14,16 27:16,21,25 28:3,7 29:14,18,22 35:1 36:12,19 38:9,11 39:15,21 41:25 42:20,24 43:11,16 45:3,8 46:7 47:6,9,11 48:17 49:19 50:3 52:20 53:3,14 55:3 56:1,3,6 57:2 58:13,17 59:4 61:13 62:1 63:21,25 64:8,9,14,24 65:2 66:6,17 67:19 68:9,15 69:13,22 71:7 72:25 74:20, 24 75:7,10,14 77:8,13,21 78:2 79:2 80:5,8,9 83:6,17 84:3,8,15 85:5,6,15 86:10, 17,25 88:20 89:10,17 93:17 101:23 102:22 108:22 110:7 111:21 112:11,13 113:8,13

**portion** 15:13 26:20 28:8, 10 74:24 77:8

**possibly** 31:16 100:16

**Practical** 23:15,16

**practically** 70:4

**practice** 17:8 20:14 23:14 47:2,9 57:3 62:3,4,20 64:9 66:18 67:14 73:4 87:5 113:8

**practices** 7:8 15:10 69:15 82:8

**pre-booking** 61:18 63:1,14

**precedent** 111:23

**preferences** 82:9

**prepare** 14:10

**prescreen** 30:21

**prescribed** 64:25

**prescription** 53:18 64:24 66:23

**prescriptions** 54:24

**presence** 91:12

**present** 18:9 74:10,11 87:22 88:19 97:13,14 112:17 114:20 115:10

**presented** 109:3

**pressure** 64:4

**presume** 13:9

**pretty** 41:7

**prevalent** 30:25

**previously** 99:10 104:25

**printed** 64:2,6 97:22,25 98:5

**prior** 21:8 27:24 28:3 34:15 35:16,17 36:5 72:12 88:6, 20 92:4,13,16,20 104:16 116:10

**prisoner** 77:23

David L. Boren
June 27, 2018

**prisoner's** 38:1

**prisoners** 5:5 75:4

**Probable** 26:24

**problem** 69:18 107:8,18 112:5 114:13

**problems** 100:12 112:3 113:24

**procedure** 10:24 11:1,5 30:2 42:21 43:21,25 66:19, 20 69:14 108:22 109:1,7 110:20,22,23 111:16 112:22,25 113:18

**procedures** 6:11 7:1 8:1 9:2,5,11,15,21 10:2,8,9,13, 18 11:20 13:4,7,15 15:5 16:4,5,17,25 17:8,13,16, 19,20 18:13,21 19:9,20 20:7,22 21:4,24 22:22 24:19 25:13,15 26:6 28:9, 19 29:24 30:1 32:24 36:14, 19 38:6 44:3 47:24 66:7 74:25 77:8 82:8,15 102:6 103:5,18,20,23,24 108:12, 17,18,19,21 109:16,24 110:11 111:1,19 112:1,12 114:3

**proceed** 31:22

**proceedings** 5:10 9:17 19:25 22:12 49:1 64:21 68:7 70:20 77:18 91:19

**process** 7:3,19,23 9:13 10:23 13:17,19,21 15:19 17:11 19:5 22:6,9,20 24:5, 6 25:6,11 41:24 63:11,21 76:24

**produce** 9:21

**produced** 9:23 16:6 33:5 35:6,9

**professional** 109:6

**proficient** 23:8

**progress** 22:16 52:4

**protocol** 34:9,13 90:18 111:7 112:23 113:18

**provide** 63:23 88:7 95:23 100:1,4 115:16

**provided** 17:12,20 20:6 47:15,16 49:3 77:24 78:8, 10,24 83:4 84:1 96:25 97:11,16,19 98:6,11 99:2, 10 102:1

**provider** 24:10 73:22 77:12,15,22 104:21 107:6 109:3

**providers** 80:16 114:19 115:15

**providing** 17:8 97:22 100:23

**provision** 59:19

**public** 14:13 62:14

**puking** 56:16

**pull** 7:14

**pulled** 16:15

**Purdy** 43:1 97:7,10 98:18 99:1

**purpose** 13:9

**purposes** 72:22

**put** 7:12 28:11 35:1 42:7 58:20,21,23 59:7 64:6,16 65:13 69:2,8 70:3,5,16 72:8 73:17 74:18 79:3,9 84:5 93:15 109:13 111:20 112:11

**putting** 87:11

**Q**

**question** 10:13 28:25 29:6, 12 32:22 34:14 35:13,15 36:2 39:7,14 41:16 42:11 50:5 54:7,8,13,25 55:1 58:10 62:19 63:3 69:9 70:2 83:25 85:4 87:24 91:2,22 94:18 99:9 107:2

**questionnaire** 63:18 84:6

**questions** 4:14 24:15 91:20 95:1 111:11 115:18 117:3

**quicker** 22:18

**quickly** 22:5 92:24

**quizzing** 90:22

**R**

**raised** 113:15

**rarely** 32:8 109:6

**re-read** 54:6

**read** 19:14 20:8 22:22 47:22 50:14 54:1,9,13,14 63:14 84:10

**readily** 59:10

**reading** 50:20

**reads** 81:15

**realm** 20:3

**reason** 18:18 54:14 69:20 89:2 103:13 110:10 112:2

**reasons** 69:2 79:8 116:4

**recall** 32:23 33:23 34:1 47:1 60:10 102:19

**receive** 23:5 25:17 31:17 33:11,14,20 45:6 47:23 81:24 82:2 94:10 114:14

David L. Boren
June 27, 2018

115:1

**received** 18:13 25:2,6 33:7, 8 34:4 56:23 59:6 65:9,11 73:21,24 74:4,15 83:15,19, 20 84:10 89:23,25 102:5 108:7 116:25

**receives** 46:3

**receiving** 32:23 85:7 97:18

**recess** 64:19 91:17

**recognize** 56:9

**recollection** 98:24

**recommendations** 89:11

**recommended** 87:18

**record** 4:15 12:11 14:24 33:9 34:1 35:5 47:22 50:19 54:9 77:24 78:8,20,21,24 79:8 80:8 91:16

**records** 33:6,19 77:9 78:12,13,25 79:17,21 80:20 97:17

**referred** 69:3

**referring** 28:15,16,23 51:12 101:16

**registered** 105:22

**regular** 71:21 75:10

**regularly** 104:8

**related** 26:6 69:2

**relaying** 62:15

**released** 66:5

**relevant** 27:11

**rely** 89:7

**remember** 26:9,10,21,23 43:4 61:24 68:23 70:18 81:4 82:4 90:4

**removed** 49:2

**renew** 54:10,12

**rephrase** 40:2 104:9

**replace** 15:12,14

**replaced** 41:1 49:6 116:1

**report** 6:6 40:19 41:10 44:8,24 101:6

**reportable** 40:22

**reported** 6:3,5 33:13,14 34:5,6 42:8 44:22 49:5

**reporter** 20:10 47:20 75:24

**reporting** 33:17

**representation** 74:17

**representative** 81:8

**represents** 27:15 33:8

**request** 33:5 37:16 48:21 56:10,11 58:14 59:6 60:13, 24 83:3,10,14 84:2,11 85:7 86:2,19 87:14,16 93:6,8, 12,14,15 114:15

**requested** 90:15

**requesting** 93:13

**requests** 81:7 82:19 85:20

**require** 21:22 25:12

**required** 21:25 49:21 59:11 63:14 105:8

**requirement** 22:21

**requiring** 63:22 64:15

**rescue** 5:15

**reserved** 12:24

**respecting** 82:15

**response** 33:5 73:25 75:23 81:11,15,19,20 82:6,21 87:16

**responses** 81:7,9 82:19

**responsibilities** 4:25 5:18 20:3 22:18 24:13 104:19

**responsibility** 6:10,16 7:16 21:10,15,18,19 24:24 25:1 31:14 70:4 77:21 78:7 103:12 112:19

**responsible** 5:1,2,14 6:12 33:16 47:15 48:1

**rest** 28:20 55:4 101:20 104:20

**retrieved** 59:2

**returned** 7:21 9:16 22:11 64:20

**review** 17:14,21 18:1 19:8, 17 21:11 28:10 65:15 66:9 100:5 109:5,14 113:24 114:25

**reviewed** 7:20 17:18,23 18:22 19:14 33:1 35:12 65:13 76:17,23 79:24 81:9 107:10

**reviewing** 15:9 16:12 21:19 25:14

**Richens** 70:11 84:5

**Rider** 93:12

**rises** 40:7 41:9

**risks** 117:1

**room** 37:19 59:3,8 61:7 64:7 65:12,13

**Ross** 68:19 70:12 72:7

**Ross's** 55:17

**rounds** 60:24

**routinely** 52:4

**rule** 105:19

David L. Boren
June 27, 2018

**rules** 47:24 82:9

**runs** 56:16

**S**

**safe** 62:11

**safety** 18:20 26:12 62:13

**samples** 47:2

**sanitary** 47:12

**sanitation** 47:13 48:17

**sanitize** 48:15

**sanitized** 48:14

**sat** 95:22

**satisfied** 13:3,13,15

**Saturday** 60:14

**save** 47:2

**scope** 99:24 100:1

**Search** 5:15

**section** 28:15,21,23 29:1 36:12,13,14,18,19 85:20 110:8

**secure** 26:19

**security** 5:1 18:20 26:12,20

**sees** 37:19,22

**self-inflicted** 40:11,12

**self-reports** 37:13

**senior** 25:24

**sense** 78:24 106:18

**sensor** 108:6

**separate** 110:19

**sergeant** 6:13 17:24 25:23 43:1 96:16,17,20 97:8,9 98:18,19 102:15

**sergeants** 96:13,15,22,24

**service** 5:4

**services** 32:5 50:9 59:19 99:21 100:23

**serving** 5:3 6:9

**set** 8:14

**setting** 22:8 38:3 106:6,23, 24

**severity** 40:5 44:10

**sexually** 64:5

**Sharpie** 42:7

**sheet** 71:22 72:4,5,8,23 73:7,17 74:14

**sheets** 12:17 14:22,23

**sheriff** 4:13,20,22,25 5:18 6:9 15:25 23:23 28:17 64:23 66:11 84:25 91:21 95:7,10 103:11

**sheriff's** 4:18 97:23 99:25 102:5 110:17 111:24

**Sheriffs'** 6:25 7:5 8:9

**Sherry** 76:5,6,7,9 77:2

**shift** 40:14 41:2,5,6,7 42:2, 13 43:3,18 71:24

**shifts** 40:24 41:22 42:3 43:8

**short** 41:8 76:24

**show** 6:23 8:16,18 17:15

**showed** 53:23

**shown** 24:12 107:17

**sick** 41:4 60:13

**sign** 7:21 8:15 17:18,19 19:9

**signed** 7:24 17:24 19:12,17

22:25

**signing** 103:19

**signs** 31:24 52:3,13,21 53:4 104:19

**similar** 27:25

**simple** 39:14 83:25

**simply** 11:15

**single** 41:8 82:15

**sir** 4:24 9:25 28:25 87:9 88:16 89:21

**sit** 30:4 76:25

**sites** 23:6

**sitting** 34:3 45:19 76:18,21, 22

**situation** 15:18 39:10 40:12 41:12 43:2 45:16 48:18 49:9 56:20 72:18 88:9 102:22 105:7,10,12 106:4 107:16 113:7

**situations** 24:19 26:11 27:25 32:12

**slash** 25:10 77:24

**sliding** 26:20

**small** 116:20

**soft-spoken** 66:12

**soiled** 81:2

**son** 116:18

**SOP** 11:3,5 45:11 112:18 113:14

**SOPS** 10:8,17

**sort** 61:14 62:2 103:19 107:2 111:23

**sound** 16:9

**sounds** 13:22 18:14 40:20

David L. Boren
June 27, 2018

**speak** 66:12 89:24 91:4

**speaking** 13:24 17:25
29:21 46:23 60:12 113:22

**specific** 29:12 85:7 88:9
101:19 102:21,25 103:4
111:8

**specifically** 26:9 38:20
52:9 68:16 85:15 91:7
93:19 99:14 110:18

**speculate** 80:12 87:12

**speculating** 54:22 76:19

**speculation** 41:14 54:4

**spend** 111:5

**spoke** 55:2

**spoken** 91:7

**staff** 6:13 7:13 10:25 12:13,
15,21 13:16 14:13,14 17:9,
24 18:6,15 19:22 20:15,18,
23 21:23 23:3,4,11 24:9,
10,22 25:12,15,19,22,24
26:5,15 30:23 31:11 33:16
37:10 38:8,17 52:6 56:18,
22 57:8 59:10 62:14 74:9
87:18 88:8,22 89:11,15,17
90:6 91:11 96:4,10,13,16,
17,20,21,23 97:8 98:17
100:8,23 102:11,14,15
104:11 106:14 109:4,11,
15,23 112:17 113:4,21
114:22 115:2 116:24

**staggered** 40:24

**stamp** 35:5 51:13 54:11

**standard** 7:17 8:11,13,16,
18,21 10:18,24 11:5,20
29:24 30:2 108:12,17,20,
22,25 109:16,24 110:10,19
111:1,16,18 112:24

**standards** 6:21,24 7:1,3,4,

6,8,11,14,15,16,22 9:3,9
108:18 110:2,16,17 111:21
112:13

**start** 4:14 23:25 65:18
90:22 113:6

**started** 9:1 78:10 91:1

**state** 4:15 5:14 7:10 15:13

**stated** 5:18 99:9

**statement** 39:4 53:13,18,22
72:10 81:17,22 82:12 83:6
86:5,22

**statements** 26:24 50:14

**states** 60:7 100:3

**statute** 5:14

**stay** 112:6

**Steve** 19:24 22:11 48:25
64:20 77:17 91:18

**stop-gap** 15:17

**stops** 85:2

**stored** 66:4

**straight** 56:16 84:12

**strike** 34:18 46:6 94:9

**stuff** 25:1 59:9 101:13

**submitted** 81:8 83:2

**sufficient** 113:25

**suggestion** 113:10,14

**suicide** 68:15,20 69:3 72:1

**supersede** 15:4,12

**supervision** 5:19 96:15

**supervisor** 38:25 39:1,23
40:8 100:8 101:4 113:9

**supervisor's** 112:19

**supervisors** 96:15

**supervisory** 102:11

**supplies** 47:16 48:3,22

**suppose** 24:16

**supposed** 30:18 63:4 69:11
70:24 75:12

**surrounding** 116:7

**surveillance** 74:25 75:19

**sworn** 4:7

**symptoms** 31:25 36:24
38:4,5,7 44:15,25 52:2,4,
11,20 53:20 54:23 87:20,
22 88:19 92:21 107:3,7,17,
21,22,23 114:13,20 115:6

**system** 6:19 7:12,14 8:5,17
18:2 21:11

---

**T**

**taking** 104:14,19

**talk** 68:19 70:8,16 90:8
98:8

**talked** 11:4 25:11 68:22
108:12

**talking** 11:7 52:1 53:6
68:11 78:25 101:2 108:17

**tape** 76:23

**team** 38:19

**telling** 32:11 61:21

**tenure** 43:15

**term** 6:8 77:12 108:20

**terms** 94:17

**testified** 4:7 18:12 34:24
43:20 47:1 70:11 93:15

**testify** 72:7

**testimony** 27:20 40:1 43:5,

23 47:4 55:17,23 67:11
68:4 70:18 72:13 78:2
93:10

**text** 46:15

**thing** 5:11 9:12 45:9 55:25
102:21

**things** 12:24 18:12 44:20
47:16 64:4 68:15 69:12
70:15 71:3 80:2 111:2,13
113:2 114:14,16

**thinking** 74:4 76:20 77:3

**Thompson** 76:7,8,9 77:2

**thought** 32:18 54:14 76:21
113:7

**thoughts** 109:6

**threw** 40:6

**throw** 40:9,17

**throwing** 43:15 53:10

**Thursday** 57:9 60:3,15
61:11 83:14 93:16 94:3,12

**Thursdays** 59:24

**time** 5:25 7:13 10:14 12:10,
11,17 14:22,23,24 19:16
20:16 29:22 32:7,14,22
33:21 34:2 39:22 40:6
41:5,6,8 51:18 53:16,21
55:2 56:12 57:2 59:5,16,24
60:5 61:14 67:15,24 75:22
77:3 80:5,7 81:25 86:17
90:7 91:21 95:15 96:4,11
97:4 98:16,22 100:13
103:12 104:17,22 105:9
111:5,10 115:14 116:11

**times** 26:13,21 41:5,7
81:16

**title** 95:8

**titles** 96:12

**today** 4:14 12:17 30:4 34:3
61:22 83:11 90:8

**toilet** 37:25

**told** 21:9,10 22:20 39:9
43:3,8 50:1,5,6 56:17
102:20 103:1 110:1 114:14
115:11 116:19

**tool** 50:10

**topic** 30:3,5

**totally** 40:3

**tote** 37:25 40:17

**touch** 26:5

**train** 54:14

**trained** 17:10 103:18,19
104:12 107:6 111:13

**training** 17:11,17,19,23
19:5,13,22 21:23 22:1,5,25
23:4 24:1,20 25:10,12
32:23 33:5,7,8,12,17,20,24
34:4 38:14 39:3,6 64:11
95:23 96:25 97:10,13,15,
17,18,23 98:4,12 99:3,11,
13 100:2,4,19,21 102:5
103:9,14 104:5 105:19,24
111:4,5,6,7 116:25

**tramadol** 67:4

**transcribed** 110:23

**transcript** 54:1

**transmitted** 64:5

**transport** 31:14 32:6 61:6
65:7

**Travis** 6:13 7:14 97:7,9
98:18 99:1

**treated** 69:21 90:22 94:17

**treatment** 82:16

**trouble** 70:15

**true** 6:3 20:22 45:19 49:14
53:18 55:11 83:6 84:1,4
86:7 87:25 88:1,2

**Tubbs** 24:11 25:2,8 28:5
29:15 30:18 32:9,18 45:17,
19,22,24 49:14,21 53:20
58:24 59:15 77:16 78:3,11
84:14 89:4,15 99:22 101:6,
25 102:4,17,18,20 103:4,8,
17,25 105:2

**Tubbs's** 59:19,23 60:2

**Tuesday** 57:6 68:2 69:8
79:18

**turn** 36:11 51:6 81:11 82:25
93:3

**turned** 60:25 66:12 93:4

**tweak** 8:20

**twofold** 30:22

**type** 14:2 64:4 68:15 90:19

**types** 14:1 30:1 52:24
55:21

**typical** 81:21

## U

**uh-huh** 22:3 28:22 66:21
76:10 77:14

**uhm** 12:10 16:13 24:8 40:6
59:13 60:21 74:6,11 79:10

**UHP** 31:8

**Uintah** 90:17,25

**uncertainty** 57:5

**undergo** 21:23 23:4 25:12

**understand** 10:1 17:15
21:6 28:25 29:13 36:24
38:15 39:8,25 41:17 44:7,
13 59:22 69:4 97:17

David L. Boren
June 27, 2018

105:21,25 112:20

**understanding** 27:15 30:12,14 32:16,25 36:13 43:21 61:15,16 65:10 66:24 75:7 102:9

**understands** 19:14

**understood** 20:8 22:22 112:21

**underwent** 24:1

**unit** 5:7

**updated** 19:20,23 21:21 26:23,24

**updates** 20:21

**updating** 7:3

**Utah** 4:1

**utmost** 26:12

---

**V**

---

**vacuum** 107:2

**verbal** 10:9,22 12:3,16,19, 20,23 13:3,21 20:18 29:23 30:10,14 38:12 39:19,20, 21 42:24,25 43:11 45:8,10 100:11 110:21,22 111:8 112:6,17,18

**verbally** 13:16 27:4 47:25 111:15,19 115:5

**verifications** 8:12

**verify** 11:9 54:24

**version** 18:7

**video** 15:9 76:17 78:21 107:10,17 108:5,6

**violate** 53:20

**violated** 83:7 85:16

**violation** 55:3 83:17 84:3,8, 15 86:9,25 87:4

**visits** 71:21 79:17

**vital** 52:2,12,21 53:4 104:19

**vitals** 104:6,12,14

**vomit** 37:25 41:4 42:14 43:4 47:3 48:11 49:5,10,11 80:23 89:16

**vomited** 42:11

**vomiting** 36:25 37:11 38:5, 18 39:16,17 43:3,22 44:7, 18 52:11 70:13 84:11 87:21 88:18 92:21 107:2 116:11,18 117:1

**vomits** 48:18

---

**W**

---

**wait** 57:8 60:14 61:3,8

**walking** 70:15

**wanted** 15:1 16:20 17:6 31:23 93:10

**watch** 40:15 42:12 68:20 75:21

**watched** 70:17

**water** 56:17

**ways** 20:17 37:9 58:21 109:14 114:11

**weak** 70:14

**weather** 60:8

**Wednesday** 53:25 57:6

**week** 46:12,13 55:4 101:20 114:21

**weeks** 22:13

**Wellbutrin** 67:4

**window** 37:22

**withdraw** 34:13

**withdrawal** 27:16 34:8 86:17 92:6,9 108:22

**withdrawals** 28:1 36:24 38:3 52:2,20,24 63:3 64:3 86:5,8

**withdrawing** 51:19 52:10 62:18

**witnessed** 42:13,14

**witnesses** 27:20

**work** 12:8 40:25 46:11 76:1

**worked** 23:20

**worker** 48:24

**workers** 48:14

**working** 8:24 23:25 46:2, 19,21 55:20 81:25 100:7,8

**works** 7:5 41:24 99:21

**worsen** 52:5

**write** 7:16

**writing** 27:4

**written** 10:7,14,20,21 11:3, 6,13,20 12:15,21 13:14 14:6 15:5 20:21 29:18 30:9,10 38:9 39:19 40:16 42:24 45:8,11 61:13 64:8 66:6 69:13 109:17 110:7 112:10 114:3 115:4

**wrote** 42:6

---

**Y**

---

**year** 7:2,3 10:2 15:15,18 21:8,12 26:21 33:9,12 60:1 112:13 116:3

**years**  4:23 14:19 23:22
36:23 95:14 116:18

**yell**  66:14

**yesterday**  5:25 43:2 55:17
68:19 75:3

**young**  116:20