Ryan B. Hancey (9101)
Scott S. Bridge (12039)
KESLER & RUST
68 S. Main St., Ste. 200
Salt Lake City, UT 84101
Telephone: (801) 532-8000
rhancey@keslerrust.com
sbridge@keslerrust.com
*Attorneys for plaintiff*

## IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| THE ESTATE OF MADISON JODY JENSEN, by her personal representative Jared Jensen,<br><br>        Plaintiff,<br><br>v.<br><br>DUCHESNE COUNTY, a Utah governmental entity, DAVID BOREN, an individual, JARED HARRISON, an individual, JASON CURRY, an individual, JEREMY CURRY, an individual, JANA CLYDE, an individual, LOGAN CLARK, an individual, KENNON TUBBS, an individual, and JOHN DOES 1-20;<br><br>        Defendants. | **AMENDED COMPLAINT**<br><br>**(JURY DEMAND)**<br><br><br>Civil No. 2:17-cv-01031<br><br>Judge Dale A. Kimball |

Plaintiff, for cause of action against defendants, hereby alleges as follows:

## **PARTIES**

1.     Jared Jensen ("Jared") is an individual who resides in Duchesne County, State of

Utah.  He is the father of Madison Jody Jensen ("Madison") and also the personal representative

of the Estate of Madison Jody Jensen (the "Estate").  The Estate is the plaintiff in this matter, by and through Jared.

2.      Defendant Duchesne County is a county in the State of Utah organized and existing pursuant to Utah law.  At all times relevant herein, Duchesne County was the owner, operator and/or administrator of the Duchesne County Jail (hereinafter "Jail") and the Duchesne County Sheriff's Office ("Sheriff's Office").

3.      Defendant David L. Boren ("Sheriff Boren") was the elected County Sheriff for Duchesne County, with duties prescribed by statute, including operational oversight, management and supervision of the Jail and the Sheriff's Office, its employees, and all independent contractors working therein.  Plaintiff is suing Sheriff Boren in his individual capacity.

4.      Defendant Jared Harrison ("Harrison") was employed by Duchesne County as a corporal in the Sheriff's Office.  Harrison is the officer that arrested Madison and transported her to the Jail.  Plaintiff is suing Harrison in his individual capacity.

5.      Defendant Lieutenant Jason Curry was employed by Duchesne County as the Jail Commander at the time of Madison's death.  His duties included overseeing subordinates in order to ensure policies and procedures were properly implemented and followed.  Plaintiff is suing Jason Curry in his individual capacity.

6.      Defendant Jeremy Curry was employed by Duchesne County as an officer of the Jail at the time of Madison's death.  Upon information and belief, his duties included keeping a watch of inmates according to Jail policies and procedures.  Plaintiff is suing Jeremy Curry in his individual capacity.

7.     Defendant Jana Clyde ("Nurse Clyde") was employed by Duchesne County as the Jail nurse at the time of Madison's death.  Her duties included overseeing the health and safety of the Jail inmates and ensuring they received appropriate and necessary medical care and treatment. Plaintiff is suing Nurse Clyde in her individual capacity.

8.     Defendant Kennon Tubbs ("Dr. Tubbs") is a medical doctor who at all relevant times contracted with Duchesne County to administer the medical needs of inmates housed in the Jail.  His contractual duties included meeting with sick inmates at the Jail once a week, being available to Jail staff 24/7 for medical consultation and triage, and providing training, instruction, support, and supervision to Jail nursing staff in connection with, among other things, triaging and caring for sick inmates, medical policies and protocols, and health care complaints/grievances. Plaintiff is suing Dr. Tubbs in his individual capacity.

9.     Defendant Logan Clark ("Clark") was contracted by Dr. Tubbs as a physician's assistant for the Jail at the time of Madison's death.  His duties included the duties of Dr. Tubbs as delegated by Dr. Tubbs pursuant to contract.  Plaintiff is suing Clark in his individual capacity.

10.     Defendant John Does 1-20 are individuals or entities who may share in the liability for Madison's death, but whose names and identities have not yet been ascertained by plaintiff. Plaintiff prays the Court for leave to amend this complaint when the true names and identities of any such defendants are ascertained through discovery.

## JURISDICTION AND VENUE

11.     This court has jurisdiction over this matter under 28 U.S.C. §§ 1331 and 1343 because plaintiff's claims raise a federal civil rights question pursuant to 42 U.S.C.A. § 1983.

12.     Venue is proper in this court under 28 U.S.C. § 1391 because all defendants reside in Utah, and plaintiff's claims herein arise from acts occurring in Duchesne County, State of Utah.

13.     Under 42 U.S.C. § 1988(b), the Court has authority to award reasonable costs and attorney fees to the prevailing party for claims brought under 42 U.S.C. § 1983.

## GENERAL ALLEGATIONS

14.     On November 27, 2016, Jared called the Sheriff's Office after an altercation with his daughter, Madison, in their home.  Madison was 21 years old at the time.

15.     Earlier that morning, around 3:00 a.m., Jared observed Madison exhibiting odd and erratic behavior, including Madison expressing suicidal thoughts.  Jared also found in Madison's room what appeared to be drug paraphernalia in a tin foil containing burned residue.

16.     Mid-morning on November 27, Harrison arrived at the Jensen home to talk to the family, and Jared showed Harrison the drug paraphernalia.

17.     Harrison spoke with Madison in her bedroom, where she stated she was coming off heroin, and that she had last used heroin four days earlier.  Madison also stated she had gone to the hospital four days earlier and had disposed of her heroin supply that day.

18.     Madison told Harrison that she had been using heroin for approximately 18 months and took between one to one and one-half grams per day.  Madison also told Harrison that she had smoked marijuana a few days earlier.

19.     Madison also told Harrison she was taking tramadol, Wellbutrin, and clonidine. These drugs had been prescribed to Madison by her physician.

20.     Jared told Harrison that Madison suffered from seizures.

4

21.     Harrison arrested Madison for "internal possession" of drugs and indicated that jail would help her detox.  He told Madison she would probably be out in a week, she could bring her medications, and that the Jail would let her take those medications.

22.     Harrison handcuffed Madison, placed her in the patrol car, and drove her to the Jail. Harrison took with him Madison's prescriptions of tramadol, Wellbutrin, and clonidine to the Jail.

23.     On November 27, 2016 at 1:34 p.m., Madison was booked into the Jail for internal marijuana possession, internal heroin possession, and possession of drug paraphernalia.

24.     When Madison was booked, she filled out an inmate mental health questionnaire in which she addressed her depression, anxiety, and weight loss.  Madison stated she was taking Wellbutrin for anxiety and depression, tramadol for pain, and clonidine for high blood pressure. She also stated she had a history of using heroin, pills, marijuana, and meth.

25.     Madison was assigned a cell in "H Block" where she had a cellmate named Maria Hardinger.  Madison and Hardinger spoke to each other and learned they were both withdrawing from opiates.

26.     Upon entering her cell, Madison appeared pale and complained of feeling sick. Within about ten minutes of arriving in H Block, Madison vomited.  She continued to vomit and suffer from diarrhea throughout the day and into the night.

27.     On November 28, 2016, Judge Keith Eddington emailed his approval of Madison's arrest to the Jail.

28.     On November 28, 2016, Madison still felt ill and did not leave her cell to pick up her meals.  Hardinger brought Madison her meals that day; however, Madison did not eat anything.

29.     In her attempts to bring Madison food, Hardinger was yelled at by a jailer to put back the extra tray.

30.     The Jail issued Madison a cup that she could fill with water from her cell, but each time she attempted to drink water, Madison vomited.

31.     Throughout the day on November 28, Hardinger pushed the call button several times and informed a jailer that Madison was ill and vomiting. Madison also pushed the call button once or twice.

32.     Each time the call button was pushed, the jailer responded that the Jail was aware Madison was vomiting, but the Jail did not provide any assistance or medical care.

33.     At approximately 6:00 p.m. on November 28, Madison left her cell to take a shower.

34.     Later that evening, Madison vomited and excreted diarrhea on herself. Madison pushed the call button and asked to take another shower to clean herself from the vomit and diarrhea. The Jail refused her request.

35.     That night, Madison asked Hardinger to check on her throughout the night to ensure Madison was breathing. Hardinger did as Madison requested and observed Madison's breathing was "unnaturally heavy."

36.     On November 29, 2016, Madison refused food, laid on her cell bed, and vomited periodically and violently. On one occasion, Madison vomited so violently that vomit splattered on Hardinger's blanket and pillow.

37.     Hardinger pushed the call button and informed the jailer of the mess caused from Madison's vomiting, stating Madison needed medical attention. The jailer told Hardinger she

could leave the cell to retrieve cleaning supplies to clean up the mess, but also told her to stop pushing the call button because it was interfering with the jailers' duties.

38.     On November 29, 2016, Harrison appeared at the Jensen home to obtain a voluntary witness statement from Jared.  While at the Jensen home, Harrison represented to Jared that Madison was still in jail and doing fine.  Harrison also stated Madison had tested positive for marijuana and heroin.

39.     Jared filled out the witness statement and returned it to Harrison, who then left the Jensen home.

40.     Prior to December 1, 2016, Madison filled out a medical request form provided by the Jail.  Madison dated the request December 31, 2016 as a result of being in a state of delirium.

41.     In that request, Madison stated: "puking for 4 days straight, runs, diarrhea, can't hold anything down not even water." She also wrote, "I know my body and it is not detoxing I am completely detoxed. My roommate caught the stomach bug from me."

42.     Upon information and belief, and despite her obvious symptoms of dehydration, the Jail failed to provide any medical care or treatment to Madison and failed to transport Madison to any medical facility for care or treatment.

43.     Upon information and belief, the Jail did not have any medical personnel on staff that could administer intravenous fluids to treat Madison's severe and obvious dehydration.

44.     On December 1, 2016, the video camera system at the Jail recorded video of Madison in her cell moving around wearing just a blue shirt and her underwear.  At 12:49 p.m., Madison drank some water, then, approximately one minute later, vomited the water along with a brown liquid substance.

45.     At 12:56 p.m., Madison's legs straightened and her feet and toes pointed straight. Her arms crossed, and her wrist locked up in a bent position. Madison rolled off a bench and fell to the floor in a sitting position. Her body continued to seize with her legs and arms locked and continued to twitch until she stopped after a couple minutes and laid flat on the ground.

46.     At 1:28 p.m., Nurse Clyde and Clark went into Madison's cell to check on her because they were aware she was sick and found her dead.

47.     A jailer began CPR on Madison but was told by medical personnel to stop because that Madison was dead.

48.     The Jail requested that an outside agency conduct an independent investigation into the incident, and the Uintah County Sheriff's Office dispatched investigators to the Jail.

49.     Investigator John E. Crowley arrived at the Jail and began investigating the scene. Crowley observed that brown liquid was coming from Madison's mouth and had splattered around the cell including on the bedding and a shoe, exhibiting the force with which it had been discharged.

50.     Crowley observed that Madison's hair was filthy.  The Jail staff told Crowley that they tried to get Madison to take a shower, but that she "did not feel up to it."

51.     Crowley observed that Madison was unusually thin had had very little mass for being 5'11," noting Madison only weighed 87 pounds.

52.     Crowley observed that Madison's hands, fingers, and fingernails were blueish in color.

53.     Crowley noted that although Madison had been on three medications when she was booked into the Jail, she had only received one of them because the Jail had not approved the others.

54.     Nurse Clyde told Crowley that when Madison arrived at the Jail, Madison started going through withdrawal-type symptoms and so the Jail had transferred Madison into a court holding cell to monitor her condition. Nurse Clyde also told Crowley she knew Madison was not eating.

55.     On December 2, 2016, Michael Belenky, M.D. of the Utah Office of the Medical Examiner performed the medical examination of Madison's body. Dr. Belenky determined the immediate cause of death to be cardiac arrhythmia from dehydration due to opiate withdrawal.

56.     Dr. Belenky noted that Madison had gallstones—evidence of extreme dehydration.

57.     The postmortem toxicology was negative for alcohol and drugs of abuse. Dr. Belenky noted that Madison died as a result of complications of profound dehydration due to opiate withdrawal.

58.     Upon booking, Madison weighed 129 pounds. Dr. Belenky documented Madison's postmortem weight at 112 pounds, a difference of 17 pounds.

59.     During Madison's entire stay at the Jail, she was not adjudged guilty of any crime in accordance with due process of law, which means she was a pretrial detainee and was not subject to punishment by defendants.

60.     Each defendant is a "person" as contemplated by 42 U.S.C. § l983.

61.     Each of the defendants' actions above was done under color of law as contemplated by 42 U.S.C. § l983.

62.     Defendants' conduct alleged above was motivated by evil motive or intent and/or involved reckless or callous indifference to the civil rights of Madison.

**CAUSE OF ACTION:**
**Violation of federal Due Process protection against deliberate**
**indifference to serious medical needs**
**(Brought under 42 U.S.C. § 1983 against all defendants)**

63.     Plaintiff incorporates by reference all preceding paragraphs as though set forth verbatim herein.

64.     The Due Process Clause in the Fourteenth Amendment to the United States Constitution protects pretrial detainees against deliberate indifference to their serious medical needs.

65.     Madison was a pretrial detainee at the Jail and was thus entitled to constitutional protection against deliberate indifference to her serious medical needs.

66.     Furthermore, Madison had constitutionally protected rights to showers, clean clothes, and a sanitary cell.

67.     Throughout Madison's time at the Jail, she had various serious medical needs, including dehydration, so obvious that even a layperson would recognize the necessity for immediate medical attention.

68.     The Jail had actual and/or constructive knowledge of Madison's medical condition, prescriptions, symptoms, and need for medical attention, via, at a minimum, Madison's own writings, verbal statements and pleas for help from both Madison and Hardinger, and security cameras that continuously recorded Madison's cell, actions, and whereabouts.

69. Defendants, while acting as persons under color of law as contemplated by 42 U.S.C. § l983, acted with deliberate indifference to Madison's serious medical needs and the obvious risks associated with them, in at least the following particulars:

    a.   failing to provide a level of health care and sanitation consistent with a minimal civilized measure of life's necessities;

    b.   failing to have policies and procedures in place to ensure Madison was provided a level of health care, sanitation, and reasonable safety consistent with a minimal civilized measure of life's necessities, and/or failing to adequately supervise or train employees and contractors in accordance with said policies and procedures, and/or failing to enforce such policies and procedures;

    c.   failing to intervene in a medically reasonable way to prevent Madison's death, even though Madison's peril from extreme dehydration was known and obvious to defendants.

70. Over the four-day period Madison was held at the Jail, defendants were repeatedly and deliberately indifferent to Madison's serious medical needs and the obvious risks associated with them, in that they intentionally denied and/or delayed access to medical care.

71. Defendants' deliberate indifference to Madison's constitutionally protected rights is further evidenced by their failure to provide Madison with showers, clean clothes, and a sanitary cell.

72.     The policies, procedures, and customs developed and administered by defendants were grossly deficient and deliberately indifferent to foreseeable circumstances, such as extreme dehydration caused by opiate withdrawals.

73.     At the time of defendant's conduct, Madison's constitutional protection against deliberate indifference to her serious medical needs was clearly established, such that a reasonable person would know that defendant's conduct violated Madison's rights.

74.     Defendants' deliberate indifference was so incompetent and inadequate that it can be fairly characterized as implementation or execution of a policy statement, ordinance, regulation, or decision adopted and promulgated by Duchesne County and its representatives.

75.     To the extent defendants are supervisors, they were personally involved in the deprivation of Madison's constitutional rights or, at a minimum, there is a sufficient causal connection between those supervisors' wrongful conduct and the constitutional violations to justify their liability under 42 U.S.C. § 1983.

76.     Given that defendants knew about Madison's medical condition, prescriptions, symptoms, and need for medical attention, Madison's death was manifestly foreseeable and preventable by defendants.

77.     Defendants knew of and disregarded excessive and obvious risks to Madison's health and safety, via actual or constructive notice.

78.     As a direct and proximate result of defendants' deliberate indifference, Madison died while in custody from extreme dehydration.

79.     As a result of defendants' conduct, plaintiff is entitled to general and special damages, as well as punitive damages due to defendants' evil motive or intent, and/or reckless or

callous indifference to Madison's constitutionally protected rights, in an amount to be proven at trial of this matter.

## JURY DEMAND

Plaintiff hereby demands a trial by jury for all issues and claims so triable.

## PRAYER

WHEREFORE, plaintiff prays the above-entitled Court for relief as follows:

1. For a money judgment for general and special damages against defendants in an amount to be proven at trial;

2. For an award of punitive damages;

3. For an award of attorney fees and costs incurred herein under 42 U.S.C. §§ 1983 and 1988; and

4. For such other and further relief as the court deems just and equitable.

DATED: September 20, 2018.

KESLER & RUST

/s/ Ryan B. Hancey

_____
Ryan B. Hancey
Scott S. Bridge
*Attorneys for plaintiff*