Ryan B. Hancey (9101)
Scott S. Bridge (12039)
KESLER & RUST
68 S. Main St., Ste. 200
Salt Lake City, UT 84101
Telephone: (801) 532-8000
rhancey@keslerrust.com
sbridge@keslerrust.com
*Attorneys for plaintiff*

---

## IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| THE ESTATE OF MADISON JODY JENSEN, by her personal representative Jared Jensen, | **SECOND AMENDED COMPLAINT** |
| Plaintiff, | **(JURY DEMAND)** |
| v. | |
| DUCHESNE COUNTY, a Utah governmental entity, DAVID BOREN, an individual, JASON CURRY, an individual, an individual, JANA CLYDE, an individual, LOGAN CLARK, an individual, KENNON TUBBS, an individual, ELIZABETH RICHENS, an individual; CALEB BIRD, an individual; HOLLIE PURDY, an individual; GERALD J. ROSS, JR., an individual; and JOHN DOES 1-20; | Civil No. 2:17-cv-01031  Judge Dale A. Kimball |
| Defendants. | |

Plaintiff, for cause of action against defendants, hereby alleges as follows:

## PARTIES

1.      Jared Jensen ("Jared") is an individual who resides in Duchesne County, State of

Utah.  He is the father of Madison Jody Jensen ("Madison") and also the personal representative

of the Estate of Madison Jody Jensen (the "Estate").  The Estate is the plaintiff in this matter, by and through Jared.

2.      Defendant Duchesne County is a county in the State of Utah organized and existing pursuant to Utah law.  At all times relevant herein, Duchesne County was the owner, operator and/or administrator of the Duchesne County Jail ("Jail") and the Duchesne County Sheriff's Office ("Sheriff's Office").

3.      Defendant David L. Boren ("Sherriff Boren") was the elected County Sheriff for Duchesne County at the time of Madison's death, with duties prescribed by statute, including operational oversight, management and supervision of the Jail and the Sheriff's Office, its employees, and all independent contractors working therein, and implementation and enforcement of Jail policies and procedures and training of Jail staff.  Plaintiff is suing Sherriff Boren in his individual capacity.

4.      Defendant Lieutenant Jason Curry ("Curry") was employed by Duchesne County as the Jail Commander at the time of Madison's death.  His duties included overseeing subordinates in order to ensure policies and procedures were properly implemented and followed and that Jail staff was properly trained. Plaintiff is suing Jason Curry in his individual capacity.

5.      Defendant Jana Clyde ("Clyde") was employed by Duchesne County as the Jail nurse at the time of Madison's death.  Her duties included overseeing the health and safety of the Jail inmates and pretrial detainees (collectively "inmates")[1] and ensuring they received

---

[1] Any reference to "inmate" or "inmates" in this document refers to inmates, pretrial detainees, and both, as the context suggests and requires.  Madison was at all relevant times a pretrial detainee entitled to protection under the Fourteenth Amendment of the United States Constitution, as opposed to an inmate under the Eighth Amendment.

appropriate and necessary medical care and treatment, including by communicating with Dr. Tubbs and Logan Clark as needed.  Plaintiff is suing Clyde in her individual capacity.

6.     Defendant Kennon Tubbs ("Dr. Tubbs") is a medical doctor who at all relevant times contracted with Duchesne County to administer the medical needs of inmates housed in the Jail.  His contractual duties included meeting with sick inmates at the Jail once a week, being available to Jail staff 24/7 for medical consultation and triage, and providing training, instruction, support, and supervision to Jail nursing staff in connection with, among other things, triaging and caring for sick inmates, medical policies and protocols, and health care complaints/grievances. Dr. Tubbs could and did delegate his contractual responsibilities to Logan Clark and others from time to time.  Plaintiff is suing Dr. Tubbs in his individual capacity.

7.     Defendant Logan Clark ("Clark") was contracted by Dr. Tubbs as a physician's assistant for the Jail at the time of Madison's death.  His duties included all the duties of Dr. Tubbs as delegated by or shared with Dr. Tubbs pursuant to contract.  At all relevant times, Dr. Tubbs delegated all of the duties identified in the preceding paragraph to Clark, and Clark performed those duties (although not at the exclusion of Dr. Tubbs).  Plaintiff is suing Clark in his individual capacity.

8.     Defendant Elizabeth Richens ("Richens") was employed by Duchesne County as a deputy at the time of Madison's death.  Her duties included managing intake and booking of inmates, checking on inmates, monitoring the safety and health of inmates, and communicating medical issues to Clyde, Dr. Tubbs, and Clark.  Plaintiff is suing Richens in her individual capacity.

3

9.     Defendant Caleb Bird ("Bird") was employed by Duchesne County as a deputy at the time of Madison's death.  His duties included managing the safety and security of inmates, accompanying them to court, booking, passing medications, checking on inmates, monitoring the safety and health of inmates, and communicating medical issues to Clyde, Dr. Tubbs, and Clark. Plaintiff is suing Bird in his individual capacity.

10.    Defendant Hollie Purdy ("Purdy") was employed by Duchesne County as a sergeant in the corrections department at the time of Madison's death.  Her duties included assisting with bookings, releases, medications, security checks, monitoring the safety and health of inmates, and communicating medical issues to Clyde, Dr. Tubbs, and Clark.  Plaintiff is suing Purdy in her individual capacity.

11.    Defendant Gerald J. Ross, Jr. ("Ross") was employed by Duchesne County as a deputy at the time of Madison's death.  His duties included performing controller responsibilities such as opening and closing doors, answering inmate questions through the intercom system, answering the phone, checking on inmates, monitoring the safety and health of inmates, and communicating medical issues to Clyde, Dr. Tubbs, and Clark.  Plaintiff is suing Ross in his individual capacity.

12.    Defendant John Does 1-20 are individuals or entities who may share in the liability for Madison's death, but whose names and identities have not yet been ascertained by plaintiff.  Plaintiff prays the Court for leave to amend this complaint when the true names and identities of any such defendants are ascertained through discovery.

## JURISDICTION AND VENUE

13.      This court has jurisdiction over this matter under 28 U.S.C. §§ 1331 and 1343

because plaintiff's claims raise a federal civil rights question pursuant to 42 U.S.C.A. § 1983.

14.      Venue is proper in this court under 28 U.S.C. § 1391 because all defendants

reside in Utah, and plaintiff's claims herein arise from acts occurring in Duchesne County, State

of Utah.

15.      Under 42 U.S.C. § 1988(b), the Court has authority to award reasonable costs and

attorney fees to the prevailing party for claims brought under 42 U.S.C. § 1983.

## GENERAL ALLEGATIONS

**Arrest and Booking on November 27, 2016**

16.      On Sunday, November 27, 2016, at around 3:00 a.m., Jared observed his 21-year-

old daughter, Madison, exhibiting odd and erratic behavior, including Madison expressing

suicidal thoughts.  Jared also found in Madison's room what appeared to be drug paraphernalia

in a tin foil containing burned residue.

17.      That day, Jared called the Duchesne County Sheriff's Office.

18.      Mid-morning on November 27, Deputy Jared Harrison arrived at the Jensen home

to talk to the family, and Jared showed Harrison the drug paraphernalia.

19.      Harrison spoke with Madison in her bedroom, where she stated she was coming

off heroin and she had last used heroin four days earlier.  Madison also stated she had gone to the

hospital four days earlier and disposed of her heroin supply that day.

20.     Madison told Harrison she had been using heroin for approximately 18 months and took between one to one and one-half grams per day.  Madison also told Harrison that she had smoked marijuana a few days earlier.

21.     Madison also told Harrison she was taking Tramadol, Wellbutrin, and Clonidine. These drugs had been prescribed to Madison by her physician.

22.     Harrison arrested Madison for "internal possession" of drugs and indicated that the Jail would help her detox.  He told Madison she would probably be out in a week, she could bring her medications, and that the Jail would let her take those medications.

23.     Harrison handcuffed Madison, placed her in the patrol car, and drove her to the Jail.  Harrison took with him Madison's prescriptions of Tramadol, Wellbutrin, and Clonidine to the Jail.

24.     On November 27, 2016 at 1:34 p.m., Madison was booked into the Jail for internal marijuana possession, internal heroin possession, and possession of drug paraphernalia.

25.     All inmates who are booked into the Jail fill out a form known as an intake questionnaire, which consists of various questions the person being booked must answer.  The purpose of the intake questionnaire is to, among other things, alert Jail staff as to an inmate's pre-existing medical conditions, active prescriptions, and drug use and withdrawals.

26.     When Madison was booked, she filled out an inmate intake questionnaire in which she noted her depression, anxiety, and weight loss.  Madison stated she was taking Wellbutrin for anxiety and depression, Tramadol for pain, and Clonidine for high blood pressure.

27.     Madison also stated on her intake questionnaire that she had a history of using heroin, pills, marijuana, and meth and had recently used heroin.

28.     Upon booking, Madison weighed 129 pounds.

29.     Jail policy or custom was that when an intake questionnaire was filled out, Jail staff would place it in a medical box designated for Clyde.

30.     Richens, a booking officer who helped Madison fill out the intake questionnaire, put Madison's completed intake questionnaire into Clyde's medical box.

31.     Clyde claims Madison's intake form was not put in her medical box.

32.     If Clyde received Madison's intake form, Clyde did not review it to see how Madison had answered questions concerning drug use and withdrawal.

33.     Madison was assigned a cell in "H Block" where she had a cellmate named Maria Hardinger.  Madison and Hardinger spoke to each other and learned they were both withdrawing from opioids.

34.     Upon entering her cell, Madison appeared pale and complained of feeling sick. Within about ten minutes of arriving in H Block, Madison vomited.  She continued to vomit and suffer from diarrhea throughout the day and into the night.

35.     Richens observed Madison vomiting that day.

**Madison Exhibits Obvious Symptoms of Severe Dehydration on November 28, 2018**

36.     On November 28, Madison still felt ill and told Richens she (Madison) was not feeling well and had been vomiting.

37.     Richens took Madison to visit Clyde at the Jail medical office.

38.     Richens told Clyde that Madison had been vomiting.

39.     Madison also told Clyde she had been vomiting and believed she had a stomach bug.

40. Clyde told Madison to save her vomit and diarrhea for Clyde to observe.

41. Clyde did not communicate to Jail staff that she had asked Madison to save her vomit or diarrhea.

42. Clyde took Madison's vital signs and gave Madison a Gatorade but did not document the Gatorade distribution.

43. After taking Madison's vital signs, Clyde observed that Madison's blood pressure was high.

44. Richens told Clyde that Madison had used heroin a few days earlier and had tested positive for opiates upon being booked into the Jail.

45. When Clyde first encountered Madison, she believed Madison was addicted to drugs and that Madison looked like "a walking skeleton."

46. On November 28, Clyde called Clark to discuss Madison's prescriptions. During the call, Clyde informed Clark that Madison had been vomiting.

47. According to Clyde, she informed Clark about all three of Madison's prescriptions, and Clark approved the Clonidine but not the Tramadol or Wellbutrin.

48. According to Clark, Clyde only mentioned Madison's Clonidine prescription but not the other two.

49. Later that day, Madison did not leave her cell to pick up her meals.

50. Hardinger brought Madison her meals that day; however, Madison did not eat anything.

51. Jail staff knew Madison was not eating.

52.     When Hardinger attempted to bring a tray of food to Madison in her cell, a jailer yelled at Hardinger to put it back.

53.     When Madison attempted to drink water, she vomited.

54.     Throughout the day on November 28, Hardinger pushed the call button several times and informed Jail staff in the control room that Madison was ill and vomiting. Madison also pushed the call button once or twice to report her symptoms.

55.     Each time the call button was pushed, the controller responded that the Jail was aware Madison was vomiting, but the Jail did not provide any assistance or medical care.

56.     Ross observed Madison on November 28 during several security checks and noted that Madison was sick and that her cell smelled of vomit.

57.     Ross did not report his observations to anyone else.

58.     At approximately 6:00 p.m. on November 28, Madison left her cell to take a shower.

59.     Later that evening, Madison vomited and excreted diarrhea on herself. Madison pushed the call button and asked to take another shower to clean herself from the vomit and diarrhea. The Jail refused her request.

60.     That night, Madison asked Hardinger to check on her throughout the night to ensure Madison was breathing. Hardinger did as Madison requested and observed Madison's breathing was "unnaturally heavy."

61.     No Jail staff member contacted Dr. Tubbs or Logan Clark on November 28 except as described herein.

**Madison's Exhibits Obvious Symptoms of Severe Dehydration on November 29, 2016**

62.     On Tuesday, November 29, 2016, Richens observed Madison vomiting again.

63.     Richens observed that Madison looked weak, tired, and pale compared to the previous day.

64.     Richens observed that Madison was having difficulty ambulating and was moving slowly.

65.     Richens accompanied Madison to Clyde's office that morning.  In the office, Richens informed Clyde that Madison was still vomiting.

66.     Madison looked noticeably weaker and paler than she had the previous day.  To Richens, it looked like Madison was going to pass out in the medical room.

67.     That morning, Jail staff member Sandi Mott observed Madison.  To Mott, Madison looked physically worse than anyone else in the Jail that she had ever seen.

68.     Throughout the day on November 29, Madison refused food, laid on her cell bed and vomited periodically and violently.  On one occasion, Madison vomited so violently that vomit splattered on Hardinger's blanket and pillow.

69.     Hardinger pushed the call button and informed the deputy working in the control room of the mess caused from Madison's vomiting, stating Madison needed medical attention. The deputy told Hardinger she could leave the cell to retrieve cleaning supplies to clean up the mess but also told her to stop pushing the call button because it was interfering with Jail staff's duties.

70.     According to Clyde, no Jail staff member ever told Clyde that Madison or Hardinger had pushed the call button or reported what either Hardinger or Madison said.

71.     On either November 28 or November 29, Richens provided Madison with clean sheets because Richens observed Madison's sheets were soiled with vomit.

72.     During the evening of November 29, Richens accompanied Madison to see Detective Monty Nay ("Detective Nay").

73.     While Madison walked down the hallway to see Detective Nay, Richens observed that Madison was using the wall to support herself while she was walking, and Madison informed Richens that she felt dizzy and very weak and was having a hard time walking.

74.     Detective Nay observed Madison and told Richens to watch Madison closely.

75.     Richens knew on November 29 that Madison had not been eating and would not leave her cell to retrieve her meals from the cafeteria.

76.     Richens sent an inmate to Madison's cell to ask Madison if she was going to eat. That inmate reported to Richens that Madison had said she was not going to eat.

77.     Per Jail policy, Jail staff members are required to document any instance in which an inmate refuses to eat or does not eat a meal.

78.     Upon information and belief, Jail staff members rarely if ever documented an inmate's failure or refusal to eat.

79.     On November 29, Richens, along with other Jail staff members including Ross, moved Madison to a medical observation cell where Jail staff could more easily observe Madison's condition.  They moved Madison because they were concerned that she was not eating and was continuing to vomit and experience diarrhea.

80.     Richens informed Clyde that Madison was being moved into a medical observation cell and told her the reasons for the move.  Clyde agreed that moving Madison to a

medical observation cell was a good idea so Madison's condition could be more easily monitored.

81.    Once in the medical observation cell, Madison was isolated from other inmates and was completely reliant on the Jail staff.

82.    Madison's medical observation cell included an individual camera inside the cell that recorded the cell at all times.

83.    The camera footage from Madison's cell could be viewed at any time of the day or night in the Jail's control room.

84.    According to Jail policy or custom, inmates in cells for medical observation were to be checked on every 30 minutes.

85.    According to Ross, if an inmate was placed in a medical observation cell, a medical observation sheet identifying the inmate's medical condition should have been posted on her cell door.

86.    No medical observation sheet was placed on the door of Madison's medical observation cell.

87.    Each time Richens observed Madison on November 29, Madison was lying down and would not get up out of her bed, and Richens observed Madison vomiting several times.

88.    Richens informed Ross and Corporal Sean Sorenson that Madison had been moved to the medical observation cell because she looked "terrible" and "weak."

89.    On November 29, Richens reported her observation of Madison's vomiting, lethargy, weakness, dizziness, and difficulty ambulating to Clyde and requested that Clyde provide Madison with Gatorade.

90.     Clyde suggested to Richens that Madison fill out a medical request form to see Clark on Thursday.  Clyde suggested this because Madison reported that she had vomited and had diarrhea and because Clyde had noticed Madison looked sick on both November 28 and November 29.

91.     Clyde gave Richens a medical request form for Madison to fill out.

92.     The purpose of a medical request form is for an inmate to describe their condition and/or symptoms.  It is typically used when an inmate requests to see a doctor or when Clyde recommends it.

93.     Clyde did not check on Madison on November 29 after learning she had been moved to a medical observation cell.

94.     Clyde did not attempt to observe Madison's vomit or diarrhea after asking her the day before to save it.

95.     Madison filled out the medical request form.

96.     Madison dated the request December 31, 2016 as a result of being in a state of delirium.  On the form, Madison reported that she had been "puking for 4 days straight, runs, diarrhea, can't hold anything down not even water."

97.     Richens watched Madison fill out the medical request form and then hand-delivered the completed form to Clyde.

98.     Clyde read Madison's request form on November 29 when she received it and was aware of its contents.

99.     Neither Clyde nor Richens contacted Clark or Dr. Tubbs to inform them about Madison being moved to a medical observation cell or the information in Madison's medical request form.

100.     Clyde reported to an investigator that Madison began exhibiting withdrawal-type symptoms shortly after she was booked into the Jail and that the decision to move Madison to a medical observation cell was to closely monitor her symptoms.

101.     No Jail staff member contacted Dr. Tubbs or Logan Clark about Madison on November 29.

**Madison's Exhibits Obvious Symptoms of Severe Dehydration on November 30, 2016**

102.     On Wednesday, November 30, 2016, Purdy observed that Madison looked so thin that Purdy believed Madison either had an eating disorder or was addicted to drugs.

103.     On November 30, upon information and belief, Clyde attached Madison's medical request form to a medical file for Clark to review when he arrived at the Jail on December 1.

104.     Clyde visited Madison's cell one time on November 30 to pass her a Gatorade through a slot in the cell door.  The entire encounter lasted less than 30 seconds.

105.     Clyde did not ask Madison about her symptoms or whether she was still vomiting or experiencing diarrhea.

106.     Clyde did not ask to observe Madison's vomit or diarrhea.

107.     Clyde did not ask Madison any questions about the medical request form that Madison had filled out the day before.

108.     Clyde did not document the fact that she gave Madison a Gatorade despite there being a Jail policy or custom to do so.

109.    Clyde did not take Madison's vital signs on November 30.

110.    At no time did Clyde take any steps to monitor Madison's fluid intake.

111.    On November 30, Bird was asked to dispense medication to Madison.

112.    When Bird approached Madison's cell, Madison would not get out of bed to retrieve the medication.  Madison told Bird she could not stand up or she would start vomiting.

113.    Bird entered Madison's cell to hand her the medication while she was lying in bed.

114.    It was a violation of Jail protocol for a deputy to enter an inmate's cell to pass out medications, and Bird knew he was violating protocol by entering Madison's cell to give her medication.

115.    When Bird entered Madison's cell, he observed vomit in a tote next to her bed.

116.    After leaving Madison's cell, Bird walked back to Clyde's office.  He told Clyde he had violated protocol and entered Madison's cell because Madison was too weak to get out of bed to retrieve her medication.

117.    Bird told Clyde that Madison looked very sick and that he had observed vomit in Madison's cell.

118.    Clyde responded by telling Bird she knew Madison was vomiting and withdrawing from heroin.

119.    That evening at home, Bird told his wife there was a girl in the Jail, referring to Madison, who was very sick and looked like she was going to die.

120.    The Jail did not have any medical personnel on staff that could administer intravenous fluids or otherwise treat Madison's severe and obvious dehydration.

121.     Despite Madison's obvious symptoms of severe dehydration being apparent to several Jail staff members by November 30, as described herein, the Jail staff failed to provide any medical care or treatment to Madison, failed to transport Madison to any medical facility for care or treatment, and failed to notify Dr. Tubbs or Clark of Madison's worsening condition.

122.     No Jail staff member contacted Dr. Tubbs or Logan Clark about Madison on November 30.

**After Days of Exhibiting Obvious Symptoms of Severe Dehydration, Madison Dies in Her Jail Cell on December 1, 2016**

123.     On Thursday, December 1, 2016, Purdy overheard other deputies in the control room discussing the fact that Madison had been continuing to vomit and suffer from diarrhea.

124.     Purdy informed Clyde that several Jail employees were reporting Madison had been vomiting through the night and asked Clyde if she could give Madison a Gatorade. Clyde agreed.

125.     Purdy took a Gatorade to Madison and set it on the food pass.

126.     Later that morning, Purdy asked Madison if she wanted to take a shower and Madison said she did not want to shower.

127.     Purdy observed vomit in Madison's cell that morning.

128.     Shortly after Curry arrived on his shift, Clyde told Curry that an inmate had been moved to a medical observation cell because she was sick and possibly had the stomach flu.

129.     Curry asked Clyde if moving Madison to a medical observation cell would be sufficient for Clyde to better monitor Madison. Clyde responded in the affirmative.

130.     Curry asked Clyde if Madison's symptoms were caused by heroin withdrawals, and Clyde said she believed Madison had the stomach flu.

131.    On December 1, a corrections officer checked on Madison at 10:08 a.m.

132.    No other Jail staff member checked on Madison from 10:08 a.m. until 1:27 p.m., when Madison was found dead in her cell.

133.    On December 1, the video camera system at the Jail recorded video of Madison in her cell moving around wearing just a blue shirt and her underwear.  At 12:49 p.m., Madison drank some water, then, approximately one minute later, vomited the water along with a brown liquid substance.

134.    At 12:56 p.m., Madison's legs straightened and her feet and toes pointed straight. Her arms crossed, and her wrist locked up in a bent position.  Madison rolled off a bench and fell to the floor in a sitting position.  Her body continued to seize with her legs and arms locked and continued to twitch until she stopped after a couple minutes and laid flat on the ground.

**Clyde and Clark Discover Madison has Died in her Cell More Than Four Hours after Clark Arrives on December 1, 2016**

135.    Clark arrived at the Jail around 9:00 a.m. on December 1, 2016.

136.    Clark visited the Jail every Thursday, usually arriving in the morning and staying until he had seen all inmates who needed to be seen.

137.    Every Thursday, Clark and Clyde followed the same protocol.  When Clark arrived at the Jail, Clyde would give him the medical files of all inmates who needed to be seen or who had filled out a medical request form.  Clark would then review all of the files to determine what the inmates' needs were and the order in which he would see them.  Clark would then treat the inmates one by one in the medical office.

138.    Clark would generally treat patients being held in medical observation cells last.

139.    According to Clark, Clyde did not provide him with Madison's medical file or medical request form on the morning of December 1.

140.    According to Clyde, she gave Clark Madison's medical file and medical request form on the morning of December 1 with all of the other medical files.

141.    According to Clyde, she and Clark specifically reviewed and discussed Madison's medical request form together before Clark saw any inmates on December 1.

142.    Upon information and belief, Clark was aware of Madison's obvious symptoms of severe dehydration and chose to see her last.

143.    Over the course of Thursday morning and early afternoon, Clark treated all of the inmates represented in the medical files he received from Clyde, with the exception of Madison.

144.    According to Clark, after treating the other inmates he was getting ready to leave the Jail.  At that time, Clyde mentioned there was a female inmate who had not filled out a medical request form but who had been vomiting.  Clyde asked Clark to check on her before leaving.

145.    Clark and Clyde walked to Madison's cell and, at 1:28 p.m., they found Madison deceased.

**Post-Death Investigation and Medical Examination**

146.    After discovering Madison, Clyde told Clark that she had taken Madison's vital signs daily but simply had not recorded them.  That statement was false.

147.    The Jail requested that an outside agency conduct an independent investigation into the incident, and the Uintah County Sheriff's Office dispatched investigators to the Jail.

148.   Medical investigator John E. Crowley arrived at the Jail and began investigating the scene.  Crowley observed that brown liquid was coming from Madison's mouth and had splattered around the cell including on the bedding and a shoe, exhibiting the force with which it had been discharged.

149.   Crowley observed that Madison's hair was filthy.  Jail staff told Crowley that they had tried to get Madison to shower but that she "did not feel up to it."

150.   Crowley observed that Madison was unusually thin and had very little mass for being 5'11," noting Madison's weight at 87 pounds.

151.   Crowley observed that Madison's hands, fingers, and fingernails were blueish in color.

152.   Crowley noted that although Madison had been on three medications when she was booked into the Jail, she had only received one of them because the Jail had not approved the others.

153.   Clyde told Crowley that when Madison arrived at the Jail, Madison started going through withdrawal-type symptoms, so the Jail had transferred Madison into a specific cell to monitor her condition.

154.   Clyde told Crowley she knew Madison had not been eating.

155.   After Madison's death, both Clyde and Clark told investigator Andrew Minerod they knew Madison was withdrawing from heroin and that Madison had been placed on the Jail's heroin withdrawal protocol.

156.   In fact, the Jail had no heroin withdrawal protocol at the time.

157.    On December 2, 2016, Michael Belenky, M.D. of the Utah Office of the Medical Examiner performed the medical examination of Madison's body.  Dr. Belenky determined the immediate cause of death to be cardiac arrhythmia from dehydration due to opiate withdrawal.

158.    Dr. Belenky noted that Madison had gallstones—evidence of extreme dehydration.

159.    The postmortem toxicology was negative for alcohol and drugs of abuse.  Dr. Belenky noted that Madison died as a result of complications of profound dehydration due to opiate withdrawal.

160.    Dr. Belenky documented Madison's postmortem weight at 112 pounds, a difference of 17 pounds from her booking weight.

161.     On or about June 1, 2017, Clyde, Curry, and Clark, among other Jail staff members, were interviewed by the Utah Attorney General's Office.

162.    In Clyde's interview, when asked why Madison had been moved to a medical observation cell, Clyde said she was unsure.

163.    The investigators showed Clyde her own written statement, in which she stated Clyde herself had asked deputies to move Madison to a medical observation cell.

164.    Clyde told investigators Madison was placed in a medical observation cell because she had the flu or flu-like symptoms.

165.    Curry informed investigators that Clyde told him on the morning of December 1 that Madison had been moved to a medical observation cell.

166.     According to Curry, Clyde had stated Madison had been moved there because she either had the flu or was experiencing heroin withdrawals and so Jail staff could ensure she was staying hydrated.

**Written Jail Policies and Procedures Manual**

167.     While some Jail staff members had possession of a policies and procedures manual, others did not.

168.     Clyde was not given a Jail policies and procedures manual when she was hired or at any time prior to Madison's death.

**Clyde's Training and Procedures**

169.     Clyde did not receive any training from any other defendant on the Jail's medical policies and procedures prior to Madison's death.

170.     According to Sherriff Boren, Dr. Tubbs and Clark were responsible for training Clyde regarding her responsibilities as Jail nurse.

171.     Upon information and belief, Clyde did not receive instruction or training from any other defendant on what to do when learning an inmate is exhibiting obvious symptoms of severe dehydration.

172.     If an inmate did not specifically request to see Clyde, or if Jail staff members did not request that Clyde see an inmate, Clyde would generally not visit inmates.

173. Clyde knew she should call Clark or Dr. Tubbs if she witnessed an inmate violently vomiting over a 12-hour period or had seen an inmate's saved vomit.

174.    Any time an inmate had an urgent or concerning symptom, Clyde knew she should contact Clark or Dr. Tubbs because as an LPN, Clyde cannot assess, diagnose, or otherwise treat that inmate.

175.    Clyde believed she was not required to take an inmate's vital signs each day even if she knew the inmate was exhibiting obvious symptoms of severe dehydration.

176.    According to Clark, Clark had advised Clyde take and record vital signs of inmates who were experiencing heroin or opiate withdrawal symptoms, or vomiting, or experiencing diarrhea.

**Policies, Procedures, and Customs regarding Pretrial Detainee Vomiting and Diarrhea**

177.    No Jail policy, procedure, or custom existed at the time of Madison's death to record or track whether an inmate known to be exhibiting obvious signs of severe dehydration was drinking liquids or keeping liquids down.

178.    Upon information and belief, Jail staff members were not trained to record instances of vomiting or diarrhea in inmates known to be exhibiting obvious signs of severe dehydration.

179.    Upon information and belief, the Jail had no policies, procedures, or customs regarding what to do when an inmate exhibited obvious symptoms of severe dehydration.

180.    According to Sherriff Boren, if Jail staff knew someone was experiencing medical issues, they were required to notify Clyde, Dr. Tubbs, or Clark.

181.    According to Sherriff Boren, at the time of Madison's death, neither Clark nor Dr. Tubbs had advised Jail staff to inform them when an inmate was experiencing concerning

symptoms including vomiting, diarrhea, or dehydration, regardless of how long those symptoms had been present.

182.    According to Sherriff Boren, before Madison's death, the fact that an inmate was vomiting and/or experiencing diarrhea or other flu-like symptoms would not necessarily be considered a serious medical condition.

183.    Upon information and belief, before Madison's death, neither Dr. Tubbs nor Clark communicated any expectation or direction that Clyde or other Jail staff contact one of them if they knew an inmate was vomiting, experiencing diarrhea, or exhibiting other obvious signs of severe dehydration.

184.    At the time of Madison's death, the Jail custom was that if an inmate complained of vomiting or diarrhea, Clyde required that inmate to save evidence of their vomit or diarrhea so she could observe it before she would take further action or believe the inmate.

185.    Before Madison's death, it was uncommon for Jail inmates to be sent to the hospital when exhibiting obvious signs of severe dehydration.

186.    Before Madison's death, the Jail employed no on-site medical personnel who could administer intravenous fluids to inmates known to be exhibiting obvious signs of severe dehydration.

**Responsibilities of Jail Staff Members**

187.    According to Sherriff Boren, Jail staff had discretion as to when to contact medical staff.

188.    When Clyde was not on duty, an inmate's medical care was the responsibility of the Jail staff on duty.

189.    All Jail staff members had contact information for both Clark and Dr. Tubbs and knew that any Jail staff member could contact either Clark or Dr. Tubbs any time of the day, seven days a week, for any reason.

190.    In the past, several Jail staff members had contacted Clark or Dr. Tubbs for various reasons.

191.    Per jail policy or custom, all inmates were to be checked on in their cells at least once each hour, preferably every 30 minutes.

192.    During hourly checks, an officer was required to observe the inmate to ensure the inmate was doing well physically.

**Medical Observation Cell Policies and Procedures**

193.    Upon information and belief, the Jail had no policies, procedures, or customs that dictated how an inmate moved to a medical observation cell should be observed or treated, including whether to contact the doctors.

194.    Upon information and belief, when an inmate was placed in a medical observation cell, Jail staff was expected to fill out a medical observation sheet and post it on the cell door. Whenever a deputy checked on the inmate each hour, he or she was expected to record the inmate's observed behavior, as well as the date, time, and signature of the deputy.

195.    According to Clyde, neither Clark nor Dr. Tubbs communicated any expectation that Clyde contact one of them when an inmate was moved to a medical observation cell.

196.    According to Clark, Clyde knew Dr. Tubbs and Clark expected her to contact them whenever an inmate was moved to a medical observation cell.

197.     Neither Dr. Tubbs nor Clark implemented any policy, procedure, or offer training regarding the treatment of inmates moved to a medical observation cell.

198.     Neither Dr. Tubbs nor Clark implemented any policy, procedure, or training in connection with inmates who were vomiting, experiencing diarrhea, not eating or drinking, or exhibiting other obvious symptoms of severe dehydration.

199.     Any Jail staff member could contact the hospital directly if that individual believed an inmate was at risk of serious injury or death.

200.     Upon information and believe, Clark knew Clyde was not documenting inmate care in accordance with policy and/or his expectations but did not report the same to Boren, Curry, or the County.

**Call Button Policies and Procedures**

201.     The deputy working as controller at the Jail sits in the control room and is informed each time an inmate pushes the call button in his or her cell.

202.     Upon information and belief, the Jail had no policies or procedures dictating what a controller should do if an inmate pushed the call button and complained of vomiting or diarrhea.

203.     According to Ross, the Jail had no policies or procedures requiring a controller to document the complaints or reasons reported by an inmate via the call button.

204.     When an inmate or pretrial detainee was known to be withdrawing from alcohol, that inmate would be monitored closely and provided with fluids.

**Jails Policies and Procedures Regarding Drug Withdrawal**

205.    Upon information and belief, before Madison's death, the Jail did not have policies, procedures, or protocols to treat inmates who were known to be withdrawing from drugs such as heroin.

206.    Neither Dr. Tubbs nor Clark created, enforced, or offered training on any policies, procedures, or customs regarding opiate withdrawal.

207.    Neither Dr. Tubbs nor Clark trained Clyde regarding how to treat an inmate exhibiting symptoms of opiate withdrawal.

208.    Clark had informed Jail staff members that a person could not die from opiate withdrawal.

**Jail Medical Request Forms**

209.    One of Clyde's daily tasks was to review inmate medical request forms and determine if she could resolve them as a nurse or if they needed to be referred to Clark or Dr. Tubbs.  But the Jail had no policies or procedures on how to determine what medical issues should be referred to Clark or Dr. Tubbs.

210.    If an inmate completed a medical request form during the week, Clyde put it in a medical file for Clark to review at his next Thursday visit.

211.    Upon information and believe, a no time prior to Madison's death was Clyde instructed to or trained to maintain medical files for inmates that identified symptoms, prescriptions, and medical care provided.

212.    Neither Clark nor Dr. Tubbs provided any instruction or training to Clyde or Jail staff regarding what to do with medical request forms filled out by inmates.

26

**Madison's Status**

213.     During Madison's entire stay at the Jail, she was not adjudged guilty of any crime

in accordance with due process of law, which means she was a pretrial detainee and was not

subject to punishment by defendants.

214.     Each defendant is a "person" as contemplated by 42 U.S.C. § l983.

215.     Each of the defendants' actions above was done under color of law as

contemplated by 42 U.S.C. § 1983.

216.     Each defendant's conduct alleged above was motivated by evil motive or intent

and/or involved reckless or callous indifference to Madison's civil rights.

**FIRST CAUSE OF ACTION:**
**Municipal Liability brought under 42 U.S.C. § 1983**
**(Against defendant Duchesne County)**

217.     Plaintiff incorporates by reference all preceding paragraphs as though set forth

verbatim herein.

218.     Under the Fourteenth Amendment of the United States Constitution, a

municipality cannot show deliberate indifference to the serious medical needs of a pretrial

detainee.

219.     Under 42 U.S.C. § 1983, a government is liable when it, under color of policy,

custom, procedures, widespread practice, ratification, or failure to train and supervise, whether

formal or informal, causes an employee to violate another's constitutional rights.

220.     Madison was a pretrial detainee at the Jail and was thus entitled to constitutional

protection against deliberate indifference to her serious medical needs, including severe

dehydration.

221.    Such protection included the right to receive medical intervention from Jail staff when they learned Madison was exhibiting obvious signs of severe dehydration.

222.    Duchesne County, as owner, operator or administrator of the Jail, had a duty and obligation to create, enforce, or offer training on policies, procedures, or customs, whether formal or informal, regarding medical intervention when learning that an inmate is exhibiting obvious signs of severe dehydration.

223.    Duchesne County failed to create, enforce, supervise, or adequately train Jail staff regarding policies, procedures, or customs addressing medical intervention upon learning an inmate is exhibiting obvious signs of severe dehydration, including protocols about monitoring fluid intake, checking vital signs, and otherwise intervening.

224.    Duchesne County exhibited gross deficiencies in staffing and procedures, including failing to employ a qualified medical professional at the Jail that could administer intravenous fluids to an inmate known to be exhibiting obvious signs of severe dehydration and failing to train Jail staff to medically intervene when learning that an inmate is exhibiting obvious signs of severe dehydration.

225.    Duchesne County employed Clyde, who was the sole medical provider onsite at the Jail and was limited in her abilities and responsibilities as a licensed professional nurse.

226.    Duchesne County contracted one on-call physician, Dr. Tubbs, who also shared all his duties regarding the Jail with Clark, a physician's assistant, meaning both of them could approve medications over the phone, answer any questions the Jail staff may have, and to visit one day each week for approximately two to three hours to provide outpatient services.

227.    Dr. Tubbs frequently recommended that Duchesne County hire a registered nurse, but Duchesne County failed to hire a registered nurse.

228.    Duchesne County had actual or constructive notice that its action or failure to act regarding its obligation to create, enforce, or offer training on policies, procedures, or customs addressing medical intervention upon learning an inmate was exhibiting obvious signs of severe dehydration was substantially certain to result in the severe dehydration of an inmate, and it consciously or deliberately chose to disregard the risk of harm to inmates known to be suffering from obvious signs of severe dehydration.

229.    Jail staff, particularly Richens, first observed Madison vomiting on Sunday, November 27.

230.    Madison continued to experience vomiting and diarrhea for several days, which was observed by several Jail staff members, including Richens and Purdy, who both informed Clyde on several occasions that Madison was vomiting and had diarrhea.

231.    Throughout the day on November 28, Madison's cell mate, Hardinger, pushed the call button several times and informed a jailer that Madison was ill and vomiting.

232.    Madison also pushed the call button several times.

233.    Each time the call button was pushed, a Jail staff member responded that the Jail was aware Madison was vomiting, but the Jail did not provide any assistance or medical care.

234.    On November 29, Hardinger pushed the call button and informed a Jail staff member that Madison needed medical attention.

235.    The Jail staff member told Hardinger to stop pushing the call button because it was interfering with Jail employees' duties.

236.    On Tuesday, November 29, Madison filled out a medical request form stating that she was "puking for 4 days straight, runs, diarrhea, can't hold anything down not even water."

237.    No Jail staff member, including Clyde, contacted Clark or Dr. Tubbs on Tuesday, November 29, upon receiving Madison's completed medical request form.

238.    On November 30, Several Jail staff members, including Purdy and Bird, continued to observe Madison exhibiting obvious sign of severe dehydration and informed Clyde that Madison was still vomiting and suffering from diarrhea.

239.    Despite Madison's obvious symptoms of severe dehydration being apparent to several Jail staff members by Wednesday, November 30, the Jail failed to provide any medical care or treatment to Madison and failed to transport Madison to any medical facility for care or treatment.

240.    One of Clyde's daily tasks was to review inmate medical request forms and determine if she could resolve them as a nurse or if they needed to be referred to Clark or Dr. Tubbs.  But the Jail had no policies or procedures on how to determine what medical issues needed to be referred to Clark or Dr. Tubbs.

241.    All inmates and inmates were to be checked on at least once each hour, preferably every 30 minutes, and never more than two hours.

242.    On December 1, 2016, a corrections officer checked on Madison at 10:08 a.m., but no Jail staff member checked on Madison for over three hours after that until 1:28 p.m. when Madison was found dead in her cell.

243.    The Jail did not have the staff or procedures in place to provide adequate medical care to treat Madison's known and obvious signs of severe dehydration.

244.    The violation of Madison's right to have medical intervention if the Jail learns she is exhibiting obvious signs of severe dehydration is a highly predictable or plainly obvious consequence of Duchesne County's action or inaction.

245.    Duchesne County's duty to provide medical care to an inmate exhibiting plainly obvious symptoms of severe dehydration is not delegable.

246.    Duchesne County's gross deficiencies in staffing and procedures regarding medical intervention when learning that an inmate is exhibiting obvious signs of severe dehydration effectively denied Madison access to adequate medical care and directly caused Madison's death.

247.    Duchesne County was deliberately indifferent to Madison's serious medical needs by denying her constitutional right to receive medical intervention when the Jail learned she was exhibiting obvious signs of severe dehydration.

248.    The combined acts or omissions of several Jail staff members acting under a governmental policy or custom when they failed to provide Madison adequate medical care violated Madison's constitutional right to have the Jail staff medically intervene when she they learned she was exhibiting obvious signs of severe dehydration.

249.    Duchesne County was the moving force behind Madison's death due to dehydration because it failed to create, enforce, or offer training on policies, procedures, or customs addressing medical intervention when learning that an inmate is exhibiting obvious signs of severe dehydration.

250.    Duchesne County was aware that, if it failed to create, enforce, or offer training on policies, procedures, or customs addressing medical intervention when learning that an inmate

is exhibiting obvious signs of severe dehydration, inmates would almost inevitably die from severe dehydration, and Duchesne County disregarded that risk with deliberate indifference.

251.    Duchesne County's deliberate indifference in failing to create, enforce, or offer training on policies, procedures, or customs addressing medical intervention when learning that an inmate is exhibiting obvious signs of severe dehydration led to Madison's almost inevitable death.

252.    A direct causal link exists between, on the one hand, Duchesne County's deliberate indifference in failing to create, enforce, or offer training on pretrial detainee dehydration policies, procedures, or customs addressing what to do when learning that an inmate is exhibiting obvious signs of severe dehydration and, on the other hand, Madison's death.

**SECOND CAUSE OF ACTION:**
**Supervisory Liability brought under 42 U.S.C. § 1983**
**(Against defendant Logan Clark)**

253.    Plaintiff incorporates by reference all preceding paragraphs as though set forth verbatim herein.

254.    Under the Fourteenth Amendment of the United States Constitution, an individual in a supervisory role cannot show deliberate indifference to the serious medical needs of a pretrial detainee.

255.    Madison was a pretrial detainee at the Jail and was thus entitled to constitutional protection against deliberate indifference to her serious medical needs, including severe dehydration.

256.    Such protection included the right to receive medical intervention from Jail staff if they learned Madison was exhibiting obvious signs of severe dehydration.

257.    Clark is a physician's assistant who communicates frequently with Jail medical staff and at the time of Madison's incarceration, Clark visited the Jail weekly to provide medical services.

258.    Clark's supervisory duties at the Jail were delegated to him by and shared with Dr. Tubbs.

259.    Clark was in a supervisory role over Clyde, who was an LPN and the only medical provider onsite at the Jail.

260.    According to Sherriff Boren, Dr. Tubbs and Clark were responsible for training Clyde regarding her responsibilities at the Jail as a nurse.

261.    Upon information and belief, Clyde did not receive instruction from Clark regarding the policies, procedures, or customs regarding medically intervening when learning that an inmate is exhibiting obvious symptoms of severe dehydration.

262.    According to Sherriff Boren, at the time of Madison's death, Clark had not advised Jail staff to inform him when an inmate was experiencing any concerning symptoms that may include vomiting, diarrhea, or dehydration regardless of how long the symptoms have been present.

263.    Clark failed to implement any policy, procedure, or offer training regarding the treatment of inmates who were moved to a medical observation cell.

264.    Upon information and belief, before Madison's death, Clark did not communicate any expectation or direction that Clyde contact him if she knew an inmate was exhibiting obvious signs of severe dehydration.

265.    Clark did not create, enforce, or offer training on any policies, procedures, or customs regarding opiate withdrawal.

266.    Clark failed to train Clyde regarding how to treat an inmate who is exhibiting symptoms of opiate withdrawal.

267.    Clark failed to provide any guidance to Clyde or Jail staff members regarding documenting and processing medical request forms that inmates complete.

268.    As an LPN, Clyde was limited regarding the medical services she could provide without the supervision of Clark or Dr. Tubbs.

269.    If Clark saw a deficiency in Clyde's performance, he was obligated to provide her with proper training.

270.    Clyde frequently communicated with Clark about various medical needs of inmates.

271.    Clark knew that the Jail did not have, enforce, or offer training on any policies, procedures, or customs regarding what do to upon learning that an inmate was exhibiting obvious signs of severe dehydration, including protocols about monitoring fluid intake, checking vital signs, and otherwise intervening.

272.    Clark knew that other county jails and state prisons had, enforced, or offered training on policies, procedures, or customs regarding what to do upon learning that an inmate was exhibiting obvious signs of severe dehydration, including protocols about monitoring fluid intake, checking vital signs, and otherwise intervening.

273.     Clark had an obligation and ability to create, enforce, or offer training regarding the Jail's medical protocols and train Clyde what to do upon learning that an inmate was exhibiting obvious signs of severe dehydration.

274.     Clark knew that vomiting and diarrhea over an extended period of time could lead to severe dehydration.

275.     Clark knew that the Jail did not have any medical personnel on staff that could administer intravenous fluids to treat an inmate's severe and obvious dehydration.

276.     Clark knew or reasonably should have known that if he did not create, enforce, or train Jail medical staff on protocols regarding what to do upon learning that an inmate was exhibiting obvious signs of severe dehydration, an inmate would almost inevitably die from obvious and severe dehydration.

277.     Clark demonstrated personal involvement in Madison's death sufficient for a supervisory claim under 42 U.S.C. § 1983 by completely failing to train Clyde or other Jail medical staff regarding what to do upon learning that an inmate was exhibiting obvious signs of severe dehydration, including monitoring fluid intake, checking vital signs, and otherwise intervening.

278.     When Clark learned that Madison had been vomiting and experiencing diarrhea, Clark did not provide Clyde with any protocols, training, or supervision regarding Madison's obvious signs of severe dehydration.

279.     Clark consciously failed to act when he was presented with an obvious risk of an inmate's severe dehydration, which would have almost inevitably resulted in dehydration-related injuries, including death, which Madison experienced.

280.     Clark was made aware that Madison had been vomiting and experiencing diarrhea and therefore, he could have drawn, and did draw, the inference that Madison faced a substantial risk of severe dehydration and that no protocols or policies had been created or enforced to prevent Madison from suffering from severe dehydration.

281.     Clark was aware of Madison's symptoms of severe dehydration and failed to take reasonable steps to alleviate the risk of dehydration-related injuries, including death.

282.     Clark knowingly created a substantial risk of severe dehydration when he failed to create, enforce, train, or supervise Clyde on Madison's obvious symptoms of severe dehydration of which Clyde had informed him.

283.     Clark acted with deliberate indifference when he failed to implement policies such as monitoring fluid intake, checking vital signs, and otherwise intervening when learning that an inmate was exhibiting obvious signs of severe dehydration.

284.     Clark acted with deliberate indifference when he failed to train Clyde regarding obvious and severe dehydration of an inmate, including monitoring fluid intake, checking vital signs, and otherwise intervening.

285.     Clark's deliberate indifference set in motion a series of events that he knew or reasonably should have known would cause Jail staff to deprive Madison, an inmate, of her constitutional right to intervention upon exhibiting obvious signs of severe dehydration.

286.     Clark knew or reasonably should have known that his deliberate indifference of failing to create, enforce, or offer training would result in dehydration-related injuries similar to Madison's, including death.

287.    Through Clark's deliberate indifference, he consciously disregarded the risk of pretrial detainee dehydration similar to Madison's.

288.    Madison died from dehydration because Clark was deliberately indifferent to the serious medical needs of inmates by failing to implement and train Clyde or other Jail medical staff on protocols and procedures regarding what to do upon learning that an inmate was exhibiting obvious signs of severe dehydration, including monitoring fluid intake, checking vital signs, and otherwise intervening.

289.    If Clark had properly created, enforced, or offered training on protocols, procedures, or customs regarding what to do upon learning that an inmate was exhibiting obvious signs of severe dehydration, Madison's death could have been prevented.

### THIRD CAUSE OF ACTION:
**Supervisory Liability brought under 42 U.S.C. § 1983**
**(Against defendant Kennon Tubbs)**

290.    Plaintiff incorporates by reference all preceding paragraphs as though set forth verbatim herein.

291.    Under the Fourteenth Amendment of the United States Constitution, an individual in a supervisory role cannot show deliberate indifference to the serious medical needs of a pretrial detainee.

292.    Madison was a pretrial detainee at the Jail and was thus entitled to constitutional protection against deliberate indifference to her serious medical needs, including severe dehydration.

293.    Such protection included the right to receive medical intervention from Jail staff if they learned Madison was exhibiting obvious signs of severe dehydration.

37

294.    Dr. Tubbs is a physician who is contracted to provide medical services to and communicates frequently with Jail medical staff.

295.    Dr. Tubbs was in a supervisory role over Clyde, who was an LPN and the only medical provider onsite at the Jail.

296.    Dr. Tubbs was also in a supervisory role over Clark, who was a physician's assistant.

297.    At the time of Madison's incarceration, Dr. Tubbs delegated all his duties to and shared all his duties with Clark.

298.    Dr. Tubbs did not provide any generalized medical training to Jail officers and staff.

299.    According to Sherriff Boren, Dr. Tubbs and Clark were responsible for training Clyde regarding her responsibilities at the Jail as a nurse.

300.    Upon information and belief, Clyde did not receive instruction from Dr. Tubbs regarding the policies, procedures, or customs regarding medically intervening when learning that an inmate is exhibiting obvious symptoms of severe dehydration.

301.    According to Sherriff Boren, at the time of Madison's death, Dr. Tubbs had not advised Jail staff to inform him when an inmate or pretrial detainee was experiencing any concerning symptoms that may include vomiting, diarrhea, or dehydration regardless of how long the symptoms have been present.

302.    Dr. Tubbs failed to implement any policy, procedure, or offer training regarding the treatment of inmates who were moved to a medical observation cell.

303.    Upon information and belief, before Madison's death, Dr. Tubbs did not communicate any expectation or direction that Clyde contact him if she knew an inmate was exhibiting obvious signs of severe dehydration.

304.    Dr. Tubbs did not create, enforce, or offer training on any policies, procedures, or customs regarding opiate withdrawal.

305.    Dr. Tubbs failed to train Clyde regarding how to treat an inmate who is exhibiting symptoms of opiate withdrawal.

306.    Dr. Tubbs failed to provide any guidance to Clyde or Jail staff members regarding documenting and processing medical request forms that inmates and pretrial detainee's complete.

307.    As an LPN, Clyde was limited regarding the medical services she could provide without the supervision of Clark or Dr. Tubbs.

308.    If Dr. Tubbs saw a deficiency in Clyde's performance, he was obligated to provide her with proper training.

309.    Clyde frequently communicated with Dr. Tubbs about various medical needs of inmates.

310.    Dr. Tubbs did not create, enforce, or offer training on any policies, procedures, or customs regarding opiate withdrawal.

311.    Dr. Tubbs did not train Clyde regarding how to treat an inmate who is exhibiting symptoms of opiate withdrawal.

312.    Dr. Tubbs knew that the Jail did not have, enforce, or offer training on any policies, procedures, or customs regarding what to do upon learning that an inmate was

exhibiting obvious signs of severe dehydration, including protocols about monitoring fluid intake, checking vital signs, and otherwise intervening.

313.    Dr. Tubbs knew that other county jails and state prisons had, enforced, or offered training on policies, procedures, or customs regarding what to do upon learning that an inmate was exhibiting obvious signs of severe dehydration, including protocols about monitoring fluid intake, checking vital signs, and otherwise intervening.

314.    Dr. Tubbs had an obligation and ability to create, enforce, or offer training regarding the Jail's medical protocols and train Clark and Clyde on what to do upon learning that an inmate was exhibiting obvious signs of severe dehydration, including monitoring fluid intake, checking vital signs, and otherwise intervening.

315.    Dr. Tubbs knew that vomiting and diarrhea over an extended period of time could lead to severe dehydration.

316.    Dr. Tubbs knew that the Jail did not have any medical personnel on staff that could administer intravenous fluids to treat an inmate's severe and obvious dehydration.

317.    Dr. Tubbs knew or reasonably should have known that if he did not create, enforce, or train Jail medical staff on protocols regarding what to do upon learning that an inmate was exhibiting obvious signs of severe dehydration, an inmate would almost inevitably die from obvious and severe dehydration.

318.    Dr. Tubbs demonstrated personal involvement in Madison's death sufficient for a supervisory claim under 42 U.S.C. § 1983 by completely failing to train Clark, Clyde, or other Jail medical staff regarding what to do upon learning that an inmate was exhibiting obvious signs

of severe dehydration, including monitoring fluid intake, checking vital signs, and otherwise intervening.

319.     Dr. Tubbs consciously failed to act when he was presented with an obvious risk of an inmate's severe dehydration, which would almost inevitably result in dehydration-related injuries, including death, which Madison experienced.

320.     Dr. Tubbs knew that the Jail did not have policies, procedures, or protocols in place regarding what to do upon learning that an inmate was exhibiting obvious signs of severe dehydration and therefore, he could have drawn, and did draw, the inference that an inmate like Madison faced a substantial risk of severe dehydration.

321.     Dr. Tubbs failed to take reasonable steps to alleviate the risk of dehydration-related injuries to inmates at the Jail, including death.

322.     Dr. Tubbs knowingly created a substantial risk of inmates' severe dehydration when he failed to create, enforce, train, or supervise Clark or Clyde on what to do upon learning that an inmate was exhibiting obvious signs of severe dehydration.

323.     Dr. Tubbs acted with deliberate indifference when he failed to implement policies regarding what to do upon learning that an inmate was exhibiting obvious signs of severe dehydration, such as monitoring fluid intake, checking vital signs, and otherwise intervening.

324.     Dr. Tubbs acted with deliberate indifference when he failed to train Clark or Clyde regarding what to do upon learning that an inmate was exhibiting obvious signs of severe dehydration, such as monitoring fluid intake, checking vital signs, and otherwise intervening.

325.    Dr. Tubbs's deliberate indifference set in motion a series of events that he knew or reasonably should have known would cause Jail staff to deprive Madison, an inmate, of her constitutional right to intervention upon exhibiting obvious signs of severe dehydration.

326.    Dr. Tubbs knew or reasonably should have known that his deliberate indifference of failing to create, enforce, or offer training regarding what to do upon learning that an inmate was exhibiting obvious signs of severe dehydration would result in dehydration-related injuries similar to Madison's, including death.

327.    Through Dr. Tubbs's deliberate indifference, he consciously disregarded the risk of severe inmate dehydration similar to Madison's.

328.    Madison died from dehydration because Dr. Tubbs was deliberately indifferent to the serious medical needs of inmates by failing to implement and train Clark or Clyde or other Jail medical staff on protocols and procedures regarding what to do upon learning that an inmate was exhibiting obvious signs of severe dehydration, including monitoring fluid intake, checking vital signs, and otherwise intervening.

329.    If Dr. Tubbs had properly created, enforced, or offered training on protocols, procedures, or customs regarding what to do upon learning that an inmate was exhibiting obvious signs of severe dehydration, Madison's death could have been prevented.

## FOURTH CAUSE OF ACTION:
### Supervisory Liability brought under 42 U.S.C. § 1983
### (Against defendant David Boren)

330.    Plaintiff incorporates by reference all preceding paragraphs as though set forth verbatim herein.

331.     Under the Fourteenth Amendment of the United States Constitution, an individual in a supervisory role cannot show deliberate indifference to the serious medical needs of a pretrial detainee.

332.  Madison was a pretrial detainee at the Jail and was thus entitled to constitutional protection against deliberate indifference to her serious medical needs, including severe dehydration.

333.     Such protection included the right to receive medical intervention from Jail staff if they learned Madison was exhibiting obvious signs of severe dehydration.

334.     At all relevant times, Sherriff Boren was in a supervisory role at the Jail overseeing the general operations of the Jail.

335.     Sherriff Boren supervised Jail staff members, including defendant Curry, and was responsible for implementing and enforcing policies and procedures at the Jail.

336.     Sherriff Boren provided general orders and directives to Jail staff, both verbal and written, which are considered official Jail policies and procedures.

337.     Sherriff Boren approved each operating procedure at the Jail.

338.     Sherriff Boren did not create, enforce, or offer training on any policies, procedures, or customs regarding what to do upon learning that an inmate was exhibiting obvious signs of severe dehydration, including protocols about monitoring fluid intake, checking vital signs, and otherwise intervening.

339.     Sherriff Boren knew that the Jail did not have, enforce, or offer training on any policies, procedures, or customs regarding what to do upon learning that an inmate was

exhibiting obvious signs of severe dehydration, including protocols about monitoring fluid intake, checking vital signs, and otherwise intervening.

340.    Sherriff Boren had an obligation and ability to create, enforce, or offer training regarding the Jail's protocols and train Jail staff on what to do upon learning that an inmate was exhibiting obvious signs of severe dehydration, including protocols about monitoring fluid intake, checking vital signs, and otherwise intervening.

341.    Sherriff Boren knew that vomiting and diarrhea over an extended period of time could lead to severe dehydration.

342.    Sherriff Boren knew that the Jail did not have any medical personnel on staff that could administer intravenous fluids to treat an inmate's severe and obvious dehydration.

343.    Sherriff Boren knew or reasonably should have known that if he did not create, enforce, or train Jail staff on protocols regarding what to do upon learning that an inmate was exhibiting obvious signs of severe dehydration, an inmate would almost inevitably die from obvious and severe dehydration.

344.    Sherriff Boren knew or reasonably should have known that if he did not ensure Dr. Tubbs or Clark created, enforced, or trained Jail staff on protocols regarding what to do upon learning that an inmate was exhibiting obvious signs of severe dehydration, an inmate would almost inevitably die from obvious and severe dehydration.

345.    Sherriff Boren demonstrated personal involvement in Madison's death sufficient for a supervisory claim under 42 U.S.C. § 1983 by completely failing to train Jail staff, or ensure they were trained by Clark or Dr. Tubbs, regarding what to do upon learning that an inmate was exhibiting obvious signs of severe dehydration, including monitoring fluid intake, checking vital

signs, and otherwise intervening when learning that an inmate was exhibiting obvious signs of severe dehydration.

346.     When Sherriff Boren learned that Madison had been vomiting and experiencing diarrhea, Sherriff Boren did not provide Clyde, Curry, or any other Jail staff with any protocols, training, or supervision regarding Madison's obvious signs of severe dehydration.

347.     Sherriff Boren consciously failed to act when he was presented with an obvious risk of an inmate's severe dehydration, which would almost inevitably result in dehydration-related injuries, including death, which Madison experienced.

348.     Sherriff Boren was made aware that Madison had been vomiting and experiencing diarrhea and therefore, he could have drawn, and did draw, the inference that Madison faced a substantial risk of severe dehydration and that no protocols or policies had been created or enforced to prevent Madison from suffering from severe dehydration.

349.     Sherriff Boren was aware of Madison's symptoms of severe dehydration and failed to take reasonable steps to alleviate the risk of dehydration-related injuries, including death.

350.     Sherriff Boren knowingly created a substantial risk of severe dehydration when he failed to create, enforce, train, or supervise Jail staff on what to do upon learning that an inmate was exhibiting obvious signs of severe dehydration.

351.     Sherriff Boren acted with deliberate indifference when he failed to implement policies regarding what to do upon learning that an inmate was exhibiting obvious signs of severe dehydration such as monitoring fluid intake, checking vital signs, and otherwise intervening.

352.    Sherriff Boren acted with deliberate indifference when he failed to train Jail staff regarding what to do upon learning that an inmate was exhibiting obvious signs of severe dehydration, including monitoring fluid intake, checking vital signs, and otherwise intervening.

353.    Sherriff Boren's deliberate indifference set in motion a series of events that he knew or reasonably should have known would cause Jail staff to deprive Madison, an inmate, of her constitutional right to intervention upon exhibiting obvious signs of severe dehydration.

354.    Sherriff Boren knew or reasonably should have known that his deliberate indifference of failing to create, enforce, or offer training regarding what to do upon learning that an inmate was exhibiting obvious signs of severe dehydration would result in dehydration-related injuries similar to Madison's, including death.

355.    Through Sherriff Boren's deliberate indifference, he consciously disregarded the risk of inmate dehydration similar to Madison's.

356.    Madison died from dehydration because Sherriff Boren was deliberately indifferent to the serious medical needs of inmates by failing to create, enforce, train, or supervise Jail staff on protocols and procedures regarding what to do upon learning that an inmate was exhibiting obvious signs of severe dehydration, including monitoring fluid intake, checking vital signs, and otherwise intervening.

357.    If Sherriff Boren had properly created, enforced, or offered training on protocols, procedures, or customs regarding what to do upon learning that an inmate was exhibiting obvious signs of severe dehydration, Madison's death could have been prevented.

**FIFTH CAUSE OF ACTION:**
**Supervisory Liability brought under 42 U.S.C. § 1983**
**(Against defendant Jason Curry)**

358.   Plaintiff incorporates by reference all preceding paragraphs as though set forth verbatim herein.

359.   Under the Fourteenth Amendment of the United States Constitution, an individual in a supervisory role cannot show deliberate indifference to the serious medical needs of a pretrial detainee.

360.   Madison was a pretrial detainee at the Jail and was thus entitled to constitutional protection against deliberate indifference to her serious medical needs, including severe dehydration.

361.   Such protection included the right to receive medical intervention from Jail staff if they learned Madison was exhibiting obvious signs of severe dehydration.

362.   At all relevant times Curry was in a supervisory role at the Jail and was responsible for implementing Jail policies and procedures.

363.   Curry did not create, enforce, or offer training on any policies, procedures, or customs regarding what to do upon learning that an inmate was exhibiting obvious signs of severe dehydration, including protocols about monitoring fluid intake, checking vital signs, and otherwise intervening.

364.   Curry knew that the Jail did not have, enforce, or offer training on any policies, procedures, or customs regarding what to do upon learning that an inmate was exhibiting obvious signs of severe dehydration, including protocols about monitoring fluid intake, checking vital signs, and otherwise intervening.

365.   Curry had an obligation and ability to create, enforce, or offer training regarding the Jail's protocols and train Jail staff on what to do upon learning that an inmate was exhibiting obvious signs of severe dehydration, including protocols about monitoring fluid intake, checking vital signs, and otherwise intervening.

366.   Curry knew that vomiting and diarrhea over an extended period of time could lead to severe dehydration.

367.   Curry knew that the Jail did not have any medical personnel on staff that could administer intravenous fluids to treat an inmate's severe and obvious dehydration.

368.   Curry knew or reasonably should have known that if he did not create, enforce, or train Jail staff on protocols regarding what to do upon learning that an inmate was exhibiting obvious signs of severe dehydration, an inmate would almost inevitably die from obvious and severe dehydration.

369.   Curry demonstrated personal involvement in Madison's death sufficient for a supervisory claim under 42 U.S.C. § 1983 by completely failing to train Jail staff regarding what to do upon learning that an inmate was exhibiting obvious signs of severe dehydration, including monitoring fluid intake, checking vital signs, and otherwise intervening when learning that an inmate was exhibiting obvious signs of severe dehydration.

370.   When Curry learned that Madison had been vomiting and experiencing diarrhea, Curry did not provide Clyde or any other Jail staff with any protocols, training, or supervision regarding Madison's obvious signs of severe dehydration.

371.    Curry consciously failed to act when he was presented with an obvious risk of an inmate's severe dehydration, which would almost inevitably result in dehydration-related injuries, including death, which Madison experienced.

372.    Curry was made aware that Madison had been vomiting and experiencing diarrhea and therefore, he could have drawn, and did draw, the inference that Madison faced a substantial risk of severe dehydration and that no protocols or policies had been created or enforced to prevent Madison from suffering from severe dehydration.

373.    Curry was aware of Madison's symptoms of severe dehydration and failed to take reasonable steps to alleviate the risk of dehydration-related injuries, including death.

374.    Curry knowingly created a substantial risk of severe dehydration when he failed to create, enforce, train, or supervise Jail staff on what to do upon learning that an inmate was exhibiting obvious signs of severe dehydration.

375.    Curry acted with deliberate indifference when he failed to implement policies regarding what to do upon learning that an inmate was exhibiting obvious signs of severe dehydration such as monitoring fluid intake, checking vital signs, and otherwise intervening.

376.    Curry acted with deliberate indifference when he failed to train Jail staff regarding what to do upon learning that an inmate was exhibiting obvious signs of severe dehydration, including monitoring fluid intake, checking vital signs, and otherwise intervening.

377.    Curry's deliberate indifference set in motion a series of events that he knew or reasonably should have known would cause Jail staff to deprive Madison, an inmate, of her constitutional right to intervention upon exhibiting obvious signs of severe dehydration.

378.    Curry knew or reasonably should have known that his deliberate indifference of failing to create, enforce, or offer training regarding what to do upon learning that an inmate was exhibiting obvious signs of severe dehydration would result in dehydration-related injuries similar to Madison's, including death.

379.    Through Curry's deliberate indifference, he consciously disregarded the risk of inmate dehydration similar to Madison's.

380.    Madison died from dehydration because Curry was deliberately indifferent to the serious medical needs of inmates by failing to create, enforce, train, or supervise Jail staff on protocols and procedures regarding what to do upon learning that an inmate was exhibiting obvious signs of severe dehydration, including monitoring fluid intake, checking vital signs, and otherwise intervening.

381.    If Curry had properly created, enforced, or offered training on protocols, procedures, or customs regarding what to do upon learning that an inmate was exhibiting obvious signs of severe dehydration, Madison's death could have been prevented.

**SIXTH CAUSE OF ACTION:**
**Individual Liability brought under 42 U.S.C. § 1983**
**(Against defendant Jana Clyde)**

382.    Plaintiff incorporates by reference all preceding paragraphs as though set forth verbatim herein.

383.    Under the Fourteenth Amendment of the United States Constitution, a government employee cannot show deliberate indifference to the serious medical needs of a pretrial detainee.

384.     Madison was a pretrial detainee at the Jail and was thus entitled to constitutional protection against deliberate indifference to her serious medical needs, including severe dehydration.

385.     Such protection included the right to receive medical intervention from Jail medical staff if they knew Madison was exhibiting obvious signs of severe dehydration.

386.     Obvious signs of severe dehydration, such as continued vomiting and diarrhea when attempting to drink water, are so obvious that even a lay person would easily recognize the necessity for a physician's attention.

387.     Before Clyde would intervene in an inmate's complaint of vomiting or diarrhea, she would request that the pretrial detainee save evidence of such vomit or diarrhea.

388.     Beginning on November 28, 2016, Clyde was aware that Madison had vomited and experienced diarrhea since Sunday, November 27.

389.     Clyde was made aware of Madison's condition on several occasions from November 28 until Madison's death on December 1, as alleged by the facts pled herein, including the following.

>     a.   On Monday, November 28, Richens brought Madison into Clyde's office and told Clyde that Madison had vomited the night before.
>
>     b.   During that same visit, Madison also informed Clyde that Madison had been vomiting and that she believed she had a stomach bug.
>
>     c.   Clyde asked Madison to save her vomit or her diarrhea for Clyde to observe.
>
>     d.   Clyde did not communicate to Jail staff that she had asked Madison to save her vomit or diarrhea.

e.  After taking Madison's vital signs, Clyde observed that Madison's blood
    pressure was considered high.

f.  On Monday, November 28, Richens told Clyde that Madison had used heroin
    a few days earlier and had tested positive for opiates upon being booked into
    the Jail.

g.  Upon information and belief, on November 28, Clyde called Clark to discuss
    Madison's prescriptions and informed Clark that Madison reported that she
    had been vomiting.

h.  On Tuesday, November 29, upon information and belief, Richens reported to
    Clyde that Madison was still vomiting, lethargic, and had difficulty
    ambulating and requested that Clyde provide Madison with Gatorade.

i.  On November 29, Clyde suggested to Richens that Madison fill out a medical
    request form to see Clark on Thursday.  Clyde suggested this because
    Madison reported that she had vomited and had diarrhea and because Clyde
    had noticed Madison looked sick on both November 28 and November 29.

j.  Clyde gave Richens a medical request form for Madison to fill out on
    November 29.

k.  Upon information and belief, Clyde did not check on Madison on November
    29 nor provide Madison with Gatorade.

l.  Upon information and belief, Clyde did not attempt to observe Madison's
    vomit or diarrhea after asking her the day before to save it.

m.  On or about November 29, Madison filled out the medical request form
     stating that she was "puking for 4 days straight, runs, diarrhea, can't hold
     anything down not even water.".

n.  Upon information and belief, Richens watched Madison fill out the medical
     request form and then hand-delivered the completed form to Clyde on
     November 29.

o.  Clyde read Madison's request form on November 29 when she received it and
     was aware of its contents.

p.  When Richens provided the medical request form to Clyde, Richens informed
     Clyde that Madison was being moved to a medical observation cell.  Clyde
     agreed that moving Madison to a medical observation cell was a good idea so
     Madison's condition could be more easily monitored.

q.  Clyde also stated that Richens and Clyde decided to put Madison in a medical
     observation cell because if Madison was vomiting or experiencing diarrhea,
     Madison could call control and Clyde could check on Madison more easily.

r.  Clyde also reported to an investigator after Madison's death that Madison
     began exhibiting withdrawal-type symptoms when she was booked into the
     Jail and the decision to move Madison to a medical observation cell was to
     closely monitor her symptoms.

s.  Clyde did not inform Clark nor Dr. Tubbs that Madison had been moved to a
     medical observation cell.

t.   Clyde did not contact Clark or Dr. Tubbs to inform either of them about Madison's completed medical request form.

u.   On November 30, 2016, upon information and belief, Clyde attached Madison's medical request form to a medical file to schedule an appointment for Clark to meet with Madison.

v.   Upon information and belief, Clyde believed Clark needed to visit Madison to verify her medication and not because Madison was exhibiting obvious signs of severe dehydration.

w.   Upon information and belief, Clyde provided Gatorade to Madison once on November 30, but Clyde did not document any Gatorade distribution or use.

x.   On November 30, Clyde did not ask Madison whether she was still vomiting or experiencing diarrhea.

y.   On November 30, Clyde did not ask Madison any questions about the medical request form that Madison had filled out the day before.

z.   Upon information and belief, on November 30, Clyde did not believe Madison had been exhibiting obvious signs of severe dehydration because Clyde did not personally observe Madison's vomit or diarrhea.

aa.  Clyde did not monitor Madison's fluid intake.

bb.  Clyde did not take and/or record Madison's vital signs except for on November 28.

cc. Upon information and belief, after administering medications to Madison, Bird told Clyde he had violated protocol and entered Madison's cell because Madison was too weak to get up out of bed to get her medication.

dd. Bird also told Clyde that Madison looked very sick and that he had observed vomit in Madison's cell to which Clyde responded that she knew Madison was vomiting and, upon information and belief, Clyde informed Bird that Madison was withdrawing from heroin.

ee. On December 1, Purdy informed Clyde that several Jail employees reported that Madison had been vomiting through the night and asked Clyde if she could give Madison a Gatorade.

ff. That same day, Clyde told Curry that an inmate was moved to a medical observation cell because she was sick and possibly had the stomach flu.

gg. Curry asked Clyde if moving Madison to medical observation would be acceptable for Clyde to better monitor Madison and Clyde said yes.

hh. Curry asked Clyde if Madison's symptoms were caused by heroin withdrawals and Clyde said she believed Madison had the stomach flu.

390. Clyde was responsible for preparing the medical file for each patient Clark saw during his outpatient visit on Thursday, December 1, 2016.

391. Upon information and belief, Clyde did not inform Clark upon his arrival on Thursday that for several days since her conversation with Clark on Monday, Madison continued to experience frequent vomiting and diarrhea.

392.     According to Clark, Clyde did not provide him with Madison's medical file or medical request form with the other medical files Clyde gave him when Clark arrived at the Jail on December 1.

393.     Upon information and belief, Clyde informed Clark at the end of his rounds on Thursday that an inmate in a medical observation cell claimed to be experiencing vomiting and diarrhea.

394.     According to Clark, Clyde told Clark that Madison did not fill out a medical request form.

395.     When Clark and Clyde approached Madison's cell after Clark's rounds with other patients, Madison had already died.

396.     Madison died on Thursday, December 1, from severe dehydration.

397.     While Madison was an inmate, Clyde failed to monitor Madison's fluid intake, consistently take or monitor Madison's vital signs, or otherwise intervene when she learned that Madison was exhibiting obvious signs of severe dehydration.

398.     After Madison's death, Clyde told Clark that she took Madison's vital signs daily but that the vital signs were not recorded.

399.     After Madison's death, Clyde told Crowley that when Madison arrived at the Jail, Madison started going through withdrawal-type symptoms and so the Jail had transferred Madison into a medical observation cell to monitor her condition.

400.     Clyde also told Crowley she knew Madison was not eating.

401.     After Madison's death, Clyde told investigator Andrew Minerod that she knew Madison was withdrawing from heroin and that Madison was on the Jail's heroin withdrawal protocol.

402.     In Clyde's interview on or about June 1, 2017, when asked why Madison had been moved to a medical observation cell, Clyde said she thought that Purdy had moved Madison and was unsure why Madison was moved.

403.     When Clyde told the investigators on or about June 1, 2017 that she did not know why Madison was moved to a medical observation cell, the investigators showed her a statement she wrote on December 1, the day Madison died, that said Clyde had asked officers to put Madison in a medical observation cell.

404.     Clyde also told investigators that Madison was placed in medical observation because she had the flu.  Clyde stated that no medical observation sheet would be posted for the flu because putting Madison in the medical observation cell was to protect other inmates.

405.     Clyde knew that she should call Clark or Dr. Tubbs if she witnessed an inmate violently vomiting over a 12-hour period or had seen an inmate's saved vomit.

406.     Any time an inmate had an urgent or concerning symptom, Clyde knew she should contact Clark or Dr. Tubbs because as an LPN, Clyde cannot assess, diagnose, or do anything to treat that condition.

407.     According to Clark, Clark and Dr. Tubbs expected Clyde to inform one of them if an inmate or inmate was moved to a medical observation cell.

408.    As an LPN, Clyde knew or reasonably should have known that if an inmate was vomiting and/or experiencing diarrhea for four days and was not able to hold any food or liquids down, severe dehydration was an obvious risk.

409.    Clyde knew of and disregarded an excessive risk to Madison's health and safety because she was aware that Madison was vomiting and had diarrhea for several days and drew the inference that a substantial risk of serious harm, including death, existed if Madison's severe dehydration was not treated.

410.    A jail official acting as a gatekeeper for other medical personnel capable of treating the condition may be held liable under § 1983 if she delays or refuses to fulfill the gatekeeper role.

411.    Clyde acted as a gatekeeper for other medical personnel because she knew that her role at the Jail was to solely serve as the only medical provide onsite capable of treating or obtaining treatment for the obvious symptoms of severe dehydration.

412.    Clyde delayed or refused to fulfill her role as a gatekeeper by displaying deliberate indifference to Madison's serious medical needs when she learned that Madison was exhibiting obvious signs of severe dehydration.

413.    Clyde violated Madison's constitutional rights by deliberately denying or delaying Madison's access to medical care in conscious disregard of the obvious risk of harm caused by severe dehydration.

414.    Clyde caused Madison's death through her deliberate indifference to Madison's serious medical needs and failure to intervene when she learned that Madison was exhibiting obvious signs of severe dehydration.

## SEVENTH CAUSE OF ACTION:
### Individual Liability brought under 42 U.S.C. § 1983
### (Against defendant Logan Clark)

415.     Plaintiff incorporates by reference all preceding paragraphs as though set forth verbatim herein.

416.     Under the Fourteenth Amendment of the United States Constitution, a government employee cannot show deliberate indifference to the serious medical needs of an pretrial detainee.

417.     Madison was a pretrial detainee at the Jail and was thus entitled to constitutional protection against deliberate indifference to her serious medical needs, including severe dehydration.

418.     Such protection included the right to receive medical intervention from Jail medical staff if they knew Madison was exhibiting obvious signs of severe dehydration.

419.     Obvious signs of severe dehydration, such as continued vomiting and diarrhea when attempting to drink water, are so obvious that even a lay person would easily recognize the necessity for a physician's attention.

420.     Before Clark would intervene in an inmate's complaint of vomiting or diarrhea, he would request that the pretrial detainee save evidence of such vomit or diarrhea and show it to Clyde who would quantify it and confirm to Clark that she observed vomit or diarrhea.

421.     Upon information and belief, on Monday, November, 28, Clyde informed Clark over the phone that Madison, an inmate, was vomiting or had reported symptoms of vomiting.

422.     On Tuesday, November 29, Madison filled out a medical request form stating that she was "puking for 4 days straight, runs, diarrhea, can't hold anything down not even water."

423.    Clark arrived at the Jail around 9:00 a.m. on December 1, 2016.

424.    When Clark arrived at the Jail each Thursday morning, Clyde would give him the medical files of all inmates and inmates who had filled out a medical request form.  Clark would then review each file and determine who to see and the order in which he would see them.  Clark would then visit the inmates and inmates one by one in the medical office.

425.    Clark would then visit with patients in the medical observation cells last.

426.    According to Clyde, Clyde gave Clark Madison's medical file with Madison's medical request form when she gave him all the other inmates' medical files.

427.    According to Clyde, she and Clark reviewed and discussed Madison's medical request form together before Clark saw any inmates on December 1.

428.    Clark visited with several patients in Clyde's office on December 1, 2016 but did not visit with Madison.

429.    Upon information and belief, Clark chose to see Madison after all his other patients, even though Clark knew she was exhibiting obvious signs of severe dehydration.

430.    After visiting with patients in Clyde's office, Clark and Clyde walked to Madison's cell around 1:28 p.m., which was approximately 4.5 hours after Clark arrived at the Jail.

431.    When Clark and Clyde approached Madison's cell after Clark's rounds with other patients, Madison had already died.

432.    After Madison's death, both Clark told investigator Andrew Minerod that they knew Madison was withdrawing from heroin and that Madison was on the Jail's heroin withdrawal protocol.

433.     Madison died on Thursday, December 1, from severe dehydration.

434.     While Madison was an inmate, Clark failed to monitor Madison's fluid intake, request that Clyde consistently take or monitor Madison's vital signs, or otherwise intervene when he learned that Madison was exhibiting obvious signs of severe dehydration.

435.     Clark knew of and disregarded an excessive risk to Madison's health and safety because he was aware that Madison was vomiting and had diarrhea for several days and drew the inference that a substantial risk of serious harm, including death, existed if Madison's severe dehydration was not treated.

436.     Clark violated Madison's constitutional rights by deliberately denying or delaying Madison's access to medical care in conscious disregard of the obvious substantial risk of harm that caused by severe dehydration.

437.     Clark caused Madison's death through his deliberate indifference to Madison's serious medical needs and failure to intervene when he learned that Madison was exhibiting obvious signs of severe dehydration.

## EIGHTH CAUSE OF ACTION:
### Individual Liability brought under 42 U.S.C. § 1983
### (Against defendant Elizabeth Richens)

438.     Plaintiff incorporates by reference all preceding paragraphs as though set forth verbatim herein.

439.     Under the Fourteenth Amendment of the United States Constitution, a government employee cannot show deliberate indifference to the serious medical needs of a pretrial detainee.

61

440.     Madison was a pretrial detainee at the Jail and was thus entitled to constitutional protection against deliberate indifference to her serious medical needs, including severe dehydration.

441.     Such protection included the right to receive medical intervention from Jail staff if they knew Madison was exhibiting obvious signs of severe dehydration.

442.     Obvious signs of severe dehydration, such as continued vomiting and diarrhea when attempting to drink water, are so obvious that even a lay person would easily recognize the necessity for a physician's attention.

443.     When Clyde is not on duty, an inmate's medical care is the responsibility of the Jail staff on duty.

444.     Upon information and belief, Jail staff members were advised to contact Clark or Dr. Tubbs directly if he or she observed an inmate vomiting or experiencing diarrhea.

445.     Richens knew that she could contact Clark or Dr. Tubbs any time of day during any day of the week.

446.     Richens knew that she could contact the hospital directly if she believed an inmate was at risk for serious injury or death, such as Madison was.

447.     Richens observed Madison vomiting on November 27 and knew that Madison had been experiencing vomiting and diarrhea as an inmate.

448.     On November 28, Madison still felt ill and told Richens that she was not feeling well and had been vomiting.

449.     Richens went with Madison to visit Clyde where Richens told Clyde that Madison had been vomiting.

450.     Richens also told Clyde that Madison had used heroin a few days earlier and had tested positive for opiates upon being booked into the Jail.

451.     On Tuesday, November 29, 2016, Richens observed Madison vomiting again and observed that Madison looked weak, tired, and pale compared to the previous day.

452.     Richens informed Clyde that day that Madison was still vomiting.

453.     On either November 28 or November 29, Richens provided Madison with clean sheets because Richens observed that Madison's sheets were soiled with vomit.

454.     During the evening of November 29, Richens accompanied Madison to see Detective Nay and observed that Madison was having difficulty ambulating and was moving slowly and using the wall to support her while walking.

455.     Madison informed Richens that she felt dizzy and weak.

456.     Richens was also informed on November 29 that Madison had not been eating her meals and would not leave her cell to pick up her meals from the cafeteria, so Richens sent another Jail inmate to Madison's cell to ask Madison if she was going to eat.  Madison said she was not going to eat.

457.     Upon information and belief, on November 29, Richens, along with other Jail staff members, agreed to move Madison to a medical observation cell to allow Jail staff to observe Madison's condition.

458.     Each time Richens observed Madison on November 29, Madison was lying down and would not get up out of her bed and upon information and belief, Richens observed Madison vomiting several times.

459.    Richens informed Officers Ross and Sorenson that Madison was moved to the medical observation cell because she looked terrible and weak.

460.    Upon information and belief, Richens reported her observation of Madison's vomiting, lethargy, and difficulty ambulating to Clyde on November 29 and requested that Clyde provide Madison with Gatorade.

461.    On November 29, Clyde gave Richens a medical request form for Madison to fill out.

462.    Upon information and belief, Richens watched Madison fill out the medical request form and then hand-delivered the completed form to Clyde.

463.    When Richens provided the medical request form to Clyde, Richens informed Clyde that Madison was being moved to a medical observation cell.

464.    Richens knew Clyde was not doing anything to adequately address Madison's symptoms.

465.    Richens recognized Madison's obvious need for further treatment and she disregarded that need.

466.    Richens did not contact Dr. Tubbs or Clark about Madison.

467.    Madison died on Thursday, December 1, from severe dehydration.

468.    While Madison was an inmate, Richens failed to intervene when she learned that Madison was exhibiting obvious signs of severe dehydration and that Clyde was doing nothing to adequately assist Madison.

469.    Richens knew of and disregarded an excessive risk to Madison's health and safety because she was aware that Madison was vomiting and had diarrhea for several days and drew

the inference that a substantial risk of serious harm, including death, existed if Madison's severe dehydration was not properly treated.

470.     Richens violated Madison's constitutional rights by deliberately denying or delaying Madison's access to medical care in conscious disregard of the obvious risk of harm caused by severe dehydration.

471.     Richens caused Madison's death through her deliberate indifference to Madison's serious medical needs and failure to intervene when she learned that Madison was exhibiting obvious signs of severe dehydration.

## NINTH CAUSE OF ACTION:
### Individual Liability brought under 42 U.S.C. § 1983
### (Against defendant Caleb Bird)

472.     Plaintiff incorporates by reference all preceding paragraphs as though set forth verbatim herein.

473.     Under the Fourteenth Amendment of the United States Constitution, a government employee cannot show deliberate indifference to the serious medical needs of an pretrial detainee.

474.     Madison was an inmate at the Jail and was thus entitled to constitutional protection against deliberate indifference to her serious medical needs, including severe dehydration.

475.     Such protection included the right to receive medical intervention from Jail staff if they knew Madison was exhibiting obvious signs of severe dehydration.

476.     Obvious signs of severe dehydration, such as continued vomiting and diarrhea when attempting to drink water, are so obvious that even a lay person would easily recognize the necessity for a physician's attention.

477.     When Clyde is not on duty, an inmate's medical care is the responsibility of the Jail staff on duty.

478.     Upon information and belief, Jail staff members were advised to contact Clark or Dr. Tubbs directly if he or she observed an inmate vomiting or experiencing diarrhea.

479.     Bird knew that he could contact Clark or Dr. Tubbs any time of day during any day of the week.

480.     Bird knew that he could contact the hospital directly if he believed an inmate was at risk for serious injury or death, such as Madison was.

481.     On November 30, Bird learned Madison was an inmate while he was passing out medications.

482.     When Bird approached Madison's cell to pass out her medications, Madison would not get out of bed to get the medication and she told him that she could not stand up or she would start vomiting.

483.     Bird entered Madison's cell to hand her the medications while she was lying in bed, which was a violation of Jail protocol.

484.     When Bird entered Madison's cell, he observed vomit in her tote.

485.     Upon information and belief, after administering medications to Madison, Bird told Clyde he had violated protocol and entered Madison's cell because Madison was too weak to get up out of bed to get her medication.

66

486.   Bird told Clyde that Madison looked very sick and that he had observed vomit in Madison's cell.

487.   Clyde told Bird that she knew Madison was vomiting and upon information and belief, Clyde informed Bird that Madison was withdrawing from heroin.

488.   Bird did not contact Dr. Tubbs or Clark

489.   Bird knew Clyde was not doing anything to adequately address Madison's symptoms.

490.   Bird recognized Madison's obvious need for further treatment, and he disregarded that need.

491.   That evening, Bird told his wife that there was a girl in the Jail who was sick and looked like she was going to die.

492.   Madison died the following day on Thursday, December 1, from severe dehydration.

493.   While Madison was an inmate, Bird failed to intervene when he learned that Madison was exhibiting obvious signs of severe dehydration.

494.   Bird knew of and disregarded an excessive risk to Madison's health and safety because he was aware that Madison was vomiting and had diarrhea for several days and drew the inference that a substantial risk of serious harm, including death, existed if Madison's severe dehydration was not adequately treated.

495.   Bird violated Madison's constitutional rights by deliberately denying or delaying Madison's access to medical care in conscious disregard of the obvious risk of harm caused by severe dehydration.

496.     Bird caused Madison's death through his deliberate indifference to Madison's serious medical needs and failure to intervene when he learned that Madison was exhibiting obvious signs of severe dehydration.

### TENTH CAUSE OF ACTION:
**Individual Liability brought under 42 U.S.C. § 1983**
**(Against defendant Holly Purdy)**

497.     Plaintiff incorporates by reference all preceding paragraphs as though set forth verbatim herein.

498.     Under the Fourteenth Amendment of the United States Constitution, a government employee cannot show deliberate indifference to the serious medical needs of a pretrial detainee.

499.     Madison was a pretrial detainee at the Jail and was thus entitled to constitutional protection against deliberate indifference to her serious medical needs, including severe dehydration.

500.     Such protection included the right to receive medical intervention from Jail staff if they knew Madison was exhibiting obvious signs of severe dehydration.

501.     Obvious signs of severe dehydration, such as continued vomiting and diarrhea when attempting to drink water, are so obvious that even a lay person would easily recognize the necessity for a physician's attention.

502.     When Clyde is not on duty, an inmate's medical care is the responsibility of the Jail staff on duty.

503.     Upon information and belief, Jail staff members were advised to contact Clark or Dr. Tubbs directly if he or she observed an inmate vomiting or experiencing diarrhea.

504.    Purdy knew that she could contact Clark or Dr. Tubbs any time of day during any day of the week.

505.    Purdy knew that she could contact the hospital directly if she believed an inmate was at risk for serious injury or death, such as Madison was.

506.    On Wednesday, November 30, 2016, Purdy observed that Madison looked so thin that Purdy believed Madison either had an eating disorder or was addicted to drugs.

507.    On Thursday, December 1, 2016, Purdy overheard in the control room that Madison had been vomiting excessively and suffering from diarrhea.

508.    Purdy informed Clyde that several Jail employees reported that Madison had been vomiting through the night and asked Clyde if she could give Madison a Gatorade.

509.    Purdy took the Gatorade to Madison and set it on the food pass.  When doing so, Purdy observed vomit in Madison's cell.

510.    Later that morning, Purdy asked Madison if she wanted to take a shower and Madison said she did not want to shower.

511.    Madison died on Thursday, December 1, from severe dehydration.

512.    While Madison was an inmate, Purdy failed to intervene when she learned that Madison was exhibiting obvious signs of severe dehydration.

513.    Purdy did not contact Dr. Tubbs or Clark about Madison.

514.    Purdy knew Clyde was not doing anything to adequately address Madison's symptoms.

515.    Purdy recognized Madison's obvious need for further treatment, and she disregarded that need.

516.    Purdy knew of and disregarded an excessive risk to Madison's health and safety because she was aware that Madison was vomiting and had diarrhea for several days and drew the inference that a substantial risk of serious harm, including death, existed if Madison's severe dehydration was not properly treated.

517.    Purdy violated Madison's constitutional rights by deliberately denying or delaying Madison's access to medical care in conscious disregard of the obvious risk of harm caused by severe dehydration.

518.    Purdy caused Madison's death through her deliberate indifference to Madison's serious medical needs and failure to intervene when she learned that Madison was exhibiting obvious signs of severe dehydration.

## ELEVENTH CAUSE OF ACTION:
### Individual Liability brought under 42 U.S.C. § 1983
### (Against defendant Gerald Ross)

519.    Plaintiff incorporates by reference all preceding paragraphs as though set forth verbatim herein.

520.    Under the Fourteenth Amendment of the United States Constitution, a government employee cannot show deliberate indifference to the serious medical needs of a pretrial detainee.

521.    Madison was a pretrial detainee at the Jail and was thus entitled to constitutional protection against deliberate indifference to her serious medical needs, including severe dehydration.

522.    Such protection included the right to receive medical intervention from Jail staff if they knew Madison was exhibiting obvious signs of severe dehydration.

523.     Obvious signs of severe dehydration, such as continued vomiting and diarrhea when attempting to drink water, are so obvious that even a lay person would easily recognize the necessity for a physician's attention.

524.     When Clyde is not on duty, an inmate's medical care is the responsibility of the Jail staff on duty.

525.     Upon information and belief, Jail staff members were advised to contact Clark or Dr. Tubbs directly if he or she observed an inmate vomiting or experiencing diarrhea.

526.     Ross knew that he could contact Clark or Dr. Tubbs any time of day during any day of the week.

527.     Ross knew that he could contact the hospital directly if he believed an inmate was at risk for serious injury or death, such as Madison was.

528.     Ross observed Madison on November 28 during several security checks and noted that Madison was sick and that her cell smelled of vomit.

529.     On November 29, Ross, along with Richens, agreed to move Madison to a medical observation cell to allow Jail staff to observe Madison's condition because he was concerned about her excessive vomiting and diarrhea.

530.     Ross knew Clyde was not doing anything to adequately address Madison's symptoms.

531.     Madison died on Thursday, December 1, from severe dehydration.

532.     While Madison was an inmate, Ross failed to intervene when he learned that Madison was exhibiting obvious signs of severe dehydration.

533.     Ross did not contact Clyde, Dr. Tubbs, or Clark about Madison.

534.     Ross knew of and disregarded an excessive risk to Madison's health and safety because he was aware that Madison was vomiting and had diarrhea for several days and drew the inference that a substantial risk of serious harm, including death, existed if Madison's severe dehydration was not properly treated.

535.     Ross violated Madison's constitutional rights by deliberately denying or delaying Madison's access to medical care in conscious disregard of the obvious risk of harm caused by severe dehydration.

536.     Ross caused Madison's death through his deliberate indifference to Madison's serious medical needs and failure to intervene when he learned that Madison was exhibiting obvious signs of severe dehydration.

## JURY DEMAND

Plaintiff hereby demands a trial by jury for all issues and claims so triable.

## PRAYER

WHEREFORE, plaintiff prays the above-entitled Court for relief as follows:

1.     For a money judgment for general and special damages against defendants in an amount to be proven at trial;

2.     For an award of punitive damages;

3.     For an award of attorney fees and costs incurred herein under 42 U.S.C. §§ 1983 and 1988; and

4.     For such other and further relief as the court deems just and equitable.

DATED: February 15, 2019.

KESLER & RUST

/s/ Ryan B. Hancey

_____

Ryan B. Hancey
Scott S. Bridge
*Attorneys for plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that I caused the foregoing **SECOND AMENDED COMPLAINT** to be

delivered via electronic filing to all counsel of record on February 15, 2019.

/s/ Ryan B. Hancey