# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF UTAH

| | |
|---|---|
| **ESTATE OF MADISON JODY JENSEN,**<br><br>Plaintiff,<br><br>vs.<br><br>**DUCHESNE COUNTY, ET AL.,**<br><br>Defendants. | **MEMORANDUM DECISION AND ORDER**<br><br>Case No. 2:17CV1031DAK<br><br>Judge Dale A. Kimball |

This matter is before the court on Defendant Kennon Tubbs, M.D.'s Motion to Dismiss Plaintiff's Second Amended Complaint [ECF Docket No. 101] and Defendant Logan Clark's Motion for Judgment on the Pleadings [ECF Docket No. 104]. On July 11, 2019, the court held a hearing on the motion. At the hearing, Ryan B. Hancey represented Plaintiff Estate of Madison Jody Jensen, Cortney Kochevar represented Defendant Kennon Tubbs, and Kathleen Abke represented Defendant Logan Clark. Counsel for other Defendants were present and observed the proceedings. After hearing argument, the court took the matter under advisement. After carefully considering the memoranda and other materials submitted by the parties, as well as the law and facts relating to the motions, the court issues the following Memorandum Decision and Order.

# BACKGROUND[1]

On Sunday, November 27, 2016, Jared Jensen called the Duchesne County Sheriff's Office after he observed his 21-year-old daughter, Madison, exhibiting erratic behavior and he found what he believed to be drug paraphernalia and residue in her room. Deputy Jared Harrison of the Duchesne County Sheriff's Office responded to the call and spoke to Madison. Madison told Harrison that she was "coming off" heroin, had last used four days earlier, and had disposed of her heroin supply that day. She also admitted to recently smoking marijuana and told Harrison she was taking Tramadol, Wellbutrin, and Clonidine as prescribed by her physician. Harrison arrested Madison for internal possession of drugs and possession of drug paraphernalia and took her to the Duchesne County Jail (the "Jail"). He also took her prescription medications.

Madison was booked into the Jail at 1:34pm on November 27, 2016. During the booking process, Madison filled out an inmate mental health questionnaire where she disclosed that she suffered from anxiety and depression for which she had been prescribed and was taking Wellbutrin. Madison also noted that she was taking Tramadol for pain and Clonidine for high blood pressure. She also reported that she had a history of using heroin, pills, marijuana, and admitted that she had recently used heroin.

According to Jail policy or custom, Deputy Elizabeth Richens, a booking officer, placed the intake questionnaire in a medical box designated for the jail nurse. At the time, Duchesne County employed a Jail nurse, Jana Clyde, who was responsible for overseeing the health and safety of the Jail inmates. In addition to the Jail nurse, Duchesne County contracted with an

---

[1] Because the court is analyzing a motion to dismiss and motion for judgment on the pleadings, the following facts are from Plaintiff's Second Amended Complaint.

independent medical provider, Dr. Kennon Tubbs, M.D., to provide on-site medical care to sick inmates at the Jail one day a week and to be on call twenty-four hours a day, seven days a week to assist with medical issues as they arose. Dr. Tubbs subcontracted with physician assistant, Logan Clark, to perform some of Dr. Tubbs' medical care duties at the Jail. The specific details of their subcontract arrangement are unknown.

Jail personnel placed Madison in a cell in the Jail's "H Block" with fellow inmate Maria Hardinger. Madison complained to Hardinger of feeling sick and vomited within ten minutes. She continued to vomit and suffer from diarrhea throughout the day and night. On Monday, November 28, 2016, Richens took Madison to visit Clyde in the Jail's medical office. Madison told Clyde she had been vomiting and believed she had a stomach bug. Clyde told Madison to save her vomit and diarrhea for Clyde to observe. Richens told Clyde that Madison had used heroin a few days before and had tested positive for opiates when she was booked into jail.

Clyde took Madison's vital signs and observed that Madison's blood pressure was high. Clyde gave Madison a Gatorade and called Clark. Clyde informed Clark that Madison had been vomiting. Clyde claims she told Clark about all three of Madison's prescription medications and he only approved administration of the Clonidine. Clark, however, claims that Clyde only mentioned the Clonidine.

The rest of that day, Madison continued to feel ill, stayed in her cell, and did not eat her meals. Jail staff knew she was not eating. When Madison attempted to drink water, she vomited. She and Hardinger used the call button in their cell several times to notify Jail staff that Madison was ill and vomiting. The Jail staff responded that they were aware Madison was ill but they did not provide any specific medical care for her symptoms. Around 6:00 p.m., Madison

3

was able to leave her cell to take a shower but she continued to be ill.

The following day, Monday, November 29, 2016, Madison continued to vomit, stayed in bed, and did not eat her meals. Richens took Madison to Clyde's office again that morning and noted that she looked noticeably weaker and paler than the previous day. Richens informed Clyde that Madison was still vomiting, but it is unclear what care was given. Later that day, Hardinger pushed the call button and informed the deputy in the control room that Madison was continuing to vomit so violently that it was causing a mess. The deputy told her she could leave her cell to retrieve cleaning supplies to clean up the mess but to stop pushing the call button. Clyde claims that no jail personnel ever informed her that Madison and Hardinger were pushing the call button or reporting anything.

During the evening of Tuesday, November 29, 2019, Richens took Madison to see Detective Monty Nay. Madison was dizzy and having a hard time walking. Nay observed Madison and told Richens to watch her closely. Richens knew that Madison had not been eating. Richens moved Madison to a medical observation cell where jail staff could more easily observe her condition. Richens informed Clyde that Madison was being moved to an observation cell, and Clyde agreed to the move. Richens observed Madison lying in bed and vomiting several times. Richens requested that Clyde provide Madison with Gatorade.

Clyde gave Richens a medical request form for Madison to fill out to see Clark on Thursday. Madison filled out the medical request form. She misdated the form and stated that she had been "puking for 4 days straight, runs, diarrhea, can't hold anything down not even water." Richens gave the form to Clyde, who reviewed it. Neither Clyde nor Richens contacted Clark or Dr. Tubbs to inform them that Madison had been moved to a medical observation cell or

that she filled out a medical request form.

On Wednesday, November 30, 2019, Clyde attached Madison's medical request form to a medical file for Clark to review when he arrived at the Jail on December 1, 2019. Clyde visited Madison's cell once that day to pass her a Gatorade, but did not inquire as to her condition or take her vital signs. Deputy Caleb Bird took Madison's medication to her cell and she was unable to get out of bed to take it. Bird entered her room to give her the medication even though it was against jail policy. Bird told Clyde that Madison was too weak to get out of bed. Clyde told Bird that she knew Madison was vomiting and withdrawing from heroin. Again, no jail personnel contacted Clark or Dr. Tubbs about Madison's condition on November 30, 2019.

On December 1, 2019, Jail employees reported that Madison had been vomiting through the night. Sergeant Purdy asked Clyde if she could give Madison a Gatorade, and Clyde agreed. Purdy put a Gatorade on the food pass of Madison's cell. When Lieutenant Jason Curry, the Jail Commander, arrived on his shift that day, he talked to Clyde about Madison. Curry asked Clyde if Madison's symptoms were caused by heroin withdrawals, and Clyde told him she believed Madison had the stomach flu.

The last time an officer checked on Madison was at 10:08 a.m. Just before 1:00 p.m., the Jail's video camera system recorded Madison drinking some water and then vomiting a brown liquid substance. At 12:59 p.m., she had a seizure-like episode which caused her to roll off her cell bed and onto the floor. Her body continued to twitch for a couple of minutes and then she laid flat on the ground. At 1:28 p.m., Physician's Assistant Clark and Nurse Clyde found Madison deceased in her cell.

Clark had arrived at the Jail around 9:00 a.m. that day. He visited the Jail every Thursday

and stayed until he had seen all the inmates who needed to be seen. Clark reviewed the files and determined the order in which he would see them. He would generally treat the patients in the medical observation cells last. According to Clark, Clyde did not provide him with Madison's medical file or medical request form on the morning of December 1, 2019. But, according to Clyde, she and Clark reviewed and discussed Madison's medical request form before Clark saw any inmates that day. Clark claims that after he had treated the other inmates, Clyde told him about Madison and they went to check on her when they found her deceased.

The Jail requested that an outside agency conduct an independent investigation into the incident. The Uintah County Sheriff's Office investigated the matter. Clark and Clyde told the investigator that they knew Madison was withdrawing from heroin and that she had been placed on the Jail's heroin withdrawal protocol. However, the Jail had no heroin withdrawal protocol at the time.

On December 2, 2016, Michael Belenky, M.D., of the Utah Office of Medical Examiner, performed a medical examination of Madison's body and determined the immediate cause of death to be cardiac arrhythmia from dehydration due to opiate withdrawal. Madison had gallstones, which was evidence of extreme dehydration, and her weight was 112 pounds, seventeen pounds less than her booking weight.

Clyde states that she was not given a Jail policies and procedures manual when she was hired or anytime prior to Madison's death. She also did not receive any training from any other defendant on the Jail's medical policies and procedures. According to Sheriff Boren, Dr. Tubbs and Clark were responsible for training Clyde regarding her responsibilities as Jail Nurse. Clyde believed that she was not required to take an inmate's vital signs each day even if she knew the

inmate was exhibiting obvious symptoms of severe dehydration.  But according to Clark, Clark had advised Clyde to take and record vital signs of inmates who were experiencing heroin or opiate withdrawal symptoms or vomiting and experiencing diarrhea.

There appears to have been no written policy, procedure, or custom at the time of Madison's death to record or track the vital signs, liquid intake, vomiting, or diarrhea of an inmate known to be exhibiting signs of severe dehydration.  There was also no policy, procedure, or custom as to how to treat an inmate exhibiting symptoms of severe dehydration.  Although Clyde knew she could contact Clark and Dr. Tubbs with medical questions, she was not expected to contact them when an inmate was vomiting, experiencing diarrhea, or exhibiting signs of dehydration.  According to Sheriff Boren, before Madison's death, the fact that an inmate was vomiting and/or experiencing diarrhea or other flu-like symptoms would not necessarily be considered a serious medical condition.  Before Madison's death, the Jail did not employ on-site personnel who could administer intravenous fluids to inmates exhibiting signs of severe dehydration.

Madison's estate filed the present § 1983 civil rights lawsuit against Duchesne County and several of the individual Jail officers and medical staff.  Among several other claims, the Second Amended Complaint contains supervisory liability claims against Defendants Tubbs and Clark for failure to implement policies, procedures, and training on how to respond to inmates suffering from opiate withdrawal and severe dehydration.  The Second Amended Complaint also contains an individual deliberate indifference claim against Clark for his failure to see Madison within four hours of his arrival at the jail on the date of her death.

**DISCUSSION**

Tubbs brings a motion to dismiss and Clark brings a motion for judgment on the pleadings on the Estate's § 1983 supervisory liability claim. Clark also brings his motion for judgment on the pleadings with respect to the individual § 1983 deliberate indifference claim the Estate asserts against him.

**I. § 1983 Supervisory Liability Claim**

Tubbs and Clark argue that the Estate has not alleged a plausible § 1983 supervisory liability claim against them. The Estate claims that Tubbs and Clark should be liable for supervisory liability based on their failure to implement policies and failure to train Nurse Clyde and other jail staff on how to treat opiate withdrawal and severe dehydration. To establish a claim of supervisory liability under § 1983, Plaintiff must show direct personal responsibility, an affirmative link between the supervisor and the constitutional violation, and the requisite state of mind. *Keith v. Koerner*, 843 F.3d 833, 838 (10th Cir. 2016).

A plaintiff meets the "personal involvement" prong by alleging "a complete failure to train, or training that is so reckless or grossly negligent that future misconduct is almost inevitable." *Id.* Alternatively, a plaintiff may meet this prong by alleging that the supervisor "failed to implement and enforce policies that would have prevented" the violation. *Id.* There is a question as to what duties Tubbs delegated to Clark with respect to creating policies, procedures, and training. However, the Estate's Second Amended Complaint adequately alleges that the County contracted with Tubbs and Clark to establish medical policies and protocols, Tubbs and Clark failed to establish policies and protocols, Tubbs and Clark knew other jails had policies and protocols, and Tubbs and Clark knew policies and protocols were necessary for the

8

safety of the Jail inmates.

Under the "causation" prong, a plaintiff must allege the supervisor "set in motion a series of events that the defendant knew or reasonably should have known would cause others to deprive the plaintiff of his constitutional rights." *Id.* at 847. A complete failure to train cannot be established by allegations of "general deficiencies" in a particular training program. *Keith v. Koerner*, 843 F.3d 833, 838 (10th Cir. 2016). Rather a plaintiff "must identify a specific deficiency in the [entity's] training program closely related to his ultimate injury, and must prove that the deficiency in training actually caused his jailer to act with deliberate indifference to his safety." *Id.*

Tubbs and Clark argue that Plaintiff's failure-to-train theory fails on the basis of causation because Clyde was aware that she should contact Tubbs or Clark if any inmate had an urgent or concerning symptom. The Second Amended Complaint alleges that Clyde knew she could contact Tubbs or Clark if an inmate had concerning symptoms and she frequently communicated with Tubbs about inmates' various medical needs. However, the Second Amended Complaint also alleges that Clyde should have been trained in when to call and trained to know what symptoms or conditions might be serious. The Sheriff stated that Jail staff did not know conditions such as Madison's were serious. The Jail was dependent on Tubbs and Clark to provide policies and protocols for staff to follow, but they did not provide any. Simply telling staff to call when they saw concerning symptoms is inadequate when staff are not trained in what symptoms should be concerning. At the pleading stage, these allegations are sufficient to allege that Tubbs' and Clark's failure to provide protocols and training set in motion a series of events that led to Madison's lack of treatment.

The Estate relies on *Jenkins v. Woody* to argue that failure to train regarding "proper observation" and "when to report" inmates' symptoms can be a basis for supervisory liability. No. 3:15CV355, 2017 WL 342062, at *17 (E.D. Va. Jan. 21, 2017). Tubbs and Clark try to distinguish *Jenkins* by arguing that the Jail staff in this case knew to call Tubbs and Clark. But there are definite similarities between this case and *Jenkins* because the Clyde and the Jail staff in this case apparently did not receive adequate training in when to call Tubbs and Clark.

Tubbs and Clark also argue that they could not have implemented a policy requiring Clyde to assess or identify inmates medical needs because she was an LPN not an RN. As an LPN, Clyde could not assess or identify health care needs. However, Clyde and non-medical personnel could observe that Madison was repeatedly vomiting and unable to hold anything down. Despite being capable of observing Madison's condition and taking notes on it to provide to Tubbs and Clark, Clyde was not trained to do so. The Second Amended Complaint alleges that there were no policies or protocols for tracking symptoms or vitals of inmates in medical observation cells.

Tubbs and Clark contend that they expected Clyde to alert them to inmates' conditions so that they could work with her to assess needs and strategies of care. But the Second Amended Complaint alleges that she was not properly trained in when to alert them. As stated above, the complete lack of training and protocols left Clyde and jail staff with no understanding as to what conditions even required them to call Tubbs and Clark. And, neither Clyde nor other jail staff knew any policies or protocols for documenting any information that may be necessary for Tubbs and Clark in assessing an inmate's medical needs. It can be inferred from the Second Amended Complaint that if Clyde had known to regularly record Madison's vital signs, she may have

10

become concerned enough to contact Tubbs and Clark. If she had known to track fluid intake or the number of times an inmate vomited, she may have become concerned enough to call. But she had not been trained to keep track of vital signs or fluid intake and apparently did not know that the situation was serious enough to call. These allegations and inferences in the Second Amended Complaint are sufficient, at the pleading stage, to allege causation for a supervisory liability claim.

Tubbs and Clark also argue that the Second Amended Complaint's allegations regarding the proper protocol for handling inmates' medical request forms are inconsistent and conflicting. However, those inconsistencies appear to have resulted from the Estate receiving conflicting information from different witnesses. The inferences the court draws from these inconsistencies are that there was a lack of actual policies and lack of adequate training. Rather than forming a basis for finding a failure to allege a claim of deliberate indifference as Tubbs and Clark contend, the court finds these inconsistencies as a basis for supporting the Estate's claims.

Furthermore, Tubbs argues that the Estate has not established a supervisory liability claim regarding Tubbs' alleged failure to train Clark or the Jail staff because the Second Amended Complaint only states that Tubbs was contractually required to train Jail nursing staff. However, such an argument would turn on the actual terms of Tubbs' contract with the County or Jail, not a hyper-technical reading of the complaint. Tubbs' contract, as well as his subcontract with Clark, will need to be explored in discovery and the issue dealt with on summary judgment when actual evidence is submitted to the court.

Finally, a plaintiff meets the "state of mind" prong of a supervisory liability claim by alleging the supervisor "knowingly created a substantial risk of constitutional injury" or

11

"consciously fail[ed] to act when presented with an obvious risk of constitutional injury of the type experienced by the plaintiff." *Keith*, 843 F.3d at 847-48. In identifying the relevant risk, courts do not focus on the risk to a specific inmate by a specific employee; they instead analyze whether the combined circumstances created a risk for inmates in the plaintiff's situation. *Id.* A supervisor cannot be held liable simply because he or she was "in charge of" a facility. *Durkee v. Minor*, 841 F.3d 872, 878 (10th Cir. 2016).

The Second Amended Complaint clearly asserts that (1) Tubbs and Clark were responsible for creating, implementing, and providing training on all medical protocols at the Jail; (2) Tubbs and Clark subjectively knew that if they did not instigate a protocol regarding what Jail staff should do upon learning an inmate was exhibiting obvious signs of severe dehydration, an inmate would almost inevitably die from dehydration; (3) Tubbs and Clark were deliberately indifferent to this risk by choosing not to instigate such a protocol even though they knew other jail's had such protocols; and (4) Madison died from obvious severe dehydration because Tubbs and Clark were indifferent in failing to instigate such protocol. While the state of mind prong may be difficult to establish at the summary judgment or trial phase, the court finds that the allegations of the Second Amended Complaint are sufficient at the pleading stage to allege that Tubbs and Clark knew of the risk that an inmate would have opiate withdrawals and severe dehydration, knew of the need for policies and training on the issue, but failed to train the staff to know that symptoms of opiate withdrawal and severe dehydration were serious enough to call them about, and knew that someone could die from the condition without treatment.

At this stage of the litigation, the court concludes that the Estate has sufficiently alleged the three elements necessary to state § 1983 supervisory liability claims against Tubbs and Clark.

The Estate has alleged a complete failure in training or a failure to implement and enforce policies that would have prevented the alleged constitutional violation. In addition, the Second Amended Complaint adequately alleges an affirmative link between Tubbs' and Clark's failure to act and Madison's death. Tubbs and Clark failed to implement protocols or provide training on what Jail should have done when an inmate was exhibiting obvious signs of severe dehydration for extended periods of time, including monitoring fluid intake, checking vital signs, and when to pass that information along to Tubbs and Clark. At the pleading stage, the Estate has adequately alleged that proper protocols and training would have resulted in medical intervention that would have saved Madison's life. Tubbs' and Clark's assertions that Clyde should have called them is not a sufficient basis for granting a motion to dismiss or motion for judgment on the pleadings. At this stage, the court must accept all well-pleaded facts as true and construe all inferences in favor of the Estate. As medical professionals, Tubbs and Clark knew of the opioid crisis and knew the Jail would inevitably have inmates suffering from opiate withdrawal and severe dehydration. Tubbs and Clark knew other jails had policies and they should have foreseen the need for training and protocols on how to document it, deal with it, or at least on when to contact them. These allegations meet the requirements for alleging a § 1983 supervisory liability claim at the pleading stage. The court, therefore, denies Tubbs' motion to dismiss and Clark's motion for judgment on the pleadings with respect to the Estate's supervisory liability claims.

## II. Individual Deliberate Indifference Claim Against Clark

Clark seeks judgment on the pleadings, arguing that Estate's allegations against him in the Second Amended Complaint fall short of demonstrating a plausible § 1983 deliberate indifference claim against him. To state a claim for individual liability under § 1983, a plaintiff

13

must allege "objective and subjective" deliberate indifference to a serious medical need. *Al-Turki v. Robinson*, 762 F.3d 1188, 1192 (10th Cir. 2014). The objective prong is met if the prisoner's medical condition was "sufficiently serious." *Id.* Clark concedes that the Estate meets the objective prong in this case because Madison's condition was so obvious that even a lay person would easily recognize the necessity for a doctor's attention.

With respect to the subjective prong, Clark asserts that the Estate has not alleged that Clark knew of and disregarded an excessive risk to Madison's health or safety when he was at the Jail on the day of Madison's death. The Second Amended Complaint demonstrates that Clark and Clyde have conflicting recollections of the day Madison died. Clyde claims that she gave Clark Madison's inmate request when he arrived at the Jail around 9:00 a.m. and that she went over Madison's case with him. Clark denies knowing anything about Madison until he had seen all the other patients and was about to leave the Jail around noon.

In any event, Clark argues that his actions in seeing Madison after seeing other inmates does not rise to the level of deliberate indifference that "offends standards of decency" because Clark generally saw the inmates in the medical cells after seeing the other inmates. Clark's arguments in this regard are better suited for summary judgment or trial. While Clark claims that there is no allegation that he deliberately delayed caring for Madison, that is definitely the inference the Second Amended Complaint gives. The Second Amended Complaint alleges that Clyde informed Clark that Madison had been vomiting from Sunday to Thursday but he did not immediately see her. While it was generally his procedure to see inmates in the medical cells last, one can infer that in an emergency situation, he would not delay. Yet he chose to delay treating Madison when he knew that many days of vomiting and no fluids could be life-

14

threatening. Moreover, Clark's subjective deliberate indifference is not necessarily demonstrated by his decision to see others before Madison, it is from his decision to delay Madison's medical treatment knowing her condition. Given the alleged report from Clyde, he could have immediately sent her somewhere to receive intravenous fluids. In addition, the parties can explore the medical needs of the other inmates he saw during discovery. It is not necessary to allege them all in the complaint to state a claim.

Deliberate indifference cases often arise when a plaintiff alleges that jail staff delayed necessary medical treatment. *Mata v. Saiz*, 427 F.3d 745, 751 (10th Cir. 2005); *Kellum v. Mares*, 657 F. App'x 763, 768 (10th Cir. 2016) (unpublished). Given the context and circumstances of the case, even a short delay is sufficient to support a deliberate indifference claim. *Estate of Booker v. Gomez*, 745 F.3d 405, 432 (10th Cir. 2014). *Booker* illustrates the importance of considering the context and the totality of the facts surrounding the alleged delay in medical care. As such, it supports the need for discovery in this case. In *Sanders v Creek Cty. Bd. of Cty. Commissioners*, the court determined that the plaintiff plausibly alleged that she "suffered from a serious medical need in the form of rapidly declining mental state and diarrhea, which medical personnel noted but failed to address," and "the alleged delay or failure in alleviating [the plaintiff]'s known deteriorating health conditions states a claim for deliberate indifference." No. 17-CV-492-JHP-FHM, 2018 WL 3580770, *6 (N.D. Okla. July 25, 2018). Similarly, the court finds that the Estate has alleged a plausible deliberate indifference claim against Clark. Clark's arguments are more suited to summary judgment than a motion for judgment on the pleadings. Accordingly, the court denies Clark's motion for judgment on the pleadings on the Estate's individual deliberate indifference claim against him.

**III. Qualified Immunity**

The parties dispute whether Tubbs and Clark are entitled to assert a qualified immunity claim. The Estate argues that Tubbs and Clark are not entitled to qualified immunity because they merely contracted to provide medical services to the Jail. *See Estate of Grubbs v. Weld Cty. Sheriff's Office*, No. 16-CV-714-PAB-STV, 2017 WL 951149, *5 (D. Colo. Mar. 8, 2017) (noting weight of authority declining to extend qualified immunity "to employees of a private company providing medical services to inmates"). Whereas, Tubbs and Clark claim that they are entitled to qualified immunity because they were performing quintessential functions of government actors, such as a private doctor who was contracted by a prison to perform executions. *See The Estate of Lockett v. Fallin*, 841 F.3d 1098, 1108 (10th Cir. 2016) (finding "the purposes of qualified immunity support its application here: carrying out criminal penalties is unquestionably a traditional function of government").

However, this case is still at the pleading stage, and the court is unaware of the contractual relationship between the County, Jail, Tubbs, and Clark. There is apparently a contract between Tubbs and the County or Jail, but it is not in evidence. The court is unaware of whether there is a contract between Clark and Tubbs or Clark and the County or Jail. Therefore, the court has no evidence as to the actual duties Tubbs and Clark contracted to perform and there are questions of facts as to their contractual responsibilities. Moreover, on the merits of the Estate's claims, there are substantial questions of fact as to what policies, procedures, and/or training were in place and the level of culpability of these defendants. The court recognizes that qualified immunity can be raised early in proceedings. But, given the lack of evidence before the court on these issues, the court concludes it would be premature to determine whether qualified

immunity is in fact an available defense for these defendants and, if so, whether they are entitled to its application in this case.

## CONCLUSION

Based on the above reasoning, Defendant Kennon Tubbs, M.D.'s Motion to Dismiss Plaintiff's Second Amended Complaint [ECF Docket No. 101] is DENIED and Defendant Logan Clark's Motion for Judgment on the Pleadings [ECF Docket No. 104] is DENIED.

DATED this 22nd day of July, 2019.

BY THE COURT:

_____
DALE A. KIMBALL,
United States District Judge