Frank D. Mylar (5116)
MYLAR LAW, P.C.
2494 Bengal Blvd.
Salt Lake City, Utah 84121
Phone: (801) 858-0700
Mylar-Law@comcast.net

Attorney for Defendant Jana Clyde

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH

| | |
|---|---|
| THE ESTATE OF MADISON JODY JENSEN, By her personal representative Jared Jensen,<br><br>Plaintiff,<br><br>v.<br><br>DUCHESNE COUNTY, et al.,<br><br>Defendant. | **DECLARATION OF JANA CLYDE IN SUPPORT OF HER MOTION FOR SUMMARY JUDGMENT**<br><br>Case No. 2:17-CV-01031-DAK-EJF<br><br>Judge Dale A. Kimball |

I, JANA CLYDE, declare that the following statements are true and based upon my personal knowledge:

1.      I began working as a Licensed Practical Nurse (LPN) at the Duchesne County Jail April 15, 2013.  Prior to working at the Duchesne County Jail, I had worked for eight years as an LPN after graduating from Uintah Basin Applied Technology Center (UBATC) in May 2005.

2.      My LPN program was 9 months and was not equivalent to a Bachelor or Associate degree program.

3.      In my LPN program, I was never taught how to handle or deal with patients that are specifically incarcerated in a jail or prison setting, nor did I have any prior training or

experience in working with Jail inmate patients prior to beginning my work at the Duchesne County Jail.

4.      In all my experience and training, prior to the death of Madison Jensen, I had never heard of an inmate dying from opioid withdrawal while in the jail.  I also never heard of anyone dying from being dehydrated in the Jail.  I further had no training in dealing with these issues except that we were to give them water and Gatorade.

5.      Prior to the death of Madison Jensen, I never would have thought the mere fact that an inmate was vomiting might mean that they needed to see a doctor or that I should call a doctor to report that they were vomiting.  To the contrary, vomiting always has been a normal occurrence in the Jail for those who are either sick or withdrawing from some drug substance.  While an inmate may feel terrible when they were withdrawing from various drugs, I always understood and believed it was a necessary part of them getting better.

6.      In fact, prior to Madison Jensen, all inmates had always gotten better after going through withdrawals or detoxing in the Jail and none of them had to be sent to the hospital or needed any urgent or emergency medical care due to their withdrawing.

7.      At no time had I experienced, prior to Madison Jensen's death, that an inmate suffered from a serious medical condition just because they were withdrawing from drugs or alcohol.

8.      At all relevant times I was licensed by the State of Utah. I have never been disciplined as a nurse and I have never had my license suspended or revoked.

9.       As a jail nurse, I primarily facilitated getting doctors or pharmacies to write prescriptions that could be filled in the Jail and I administered medications to inmates, checked

vital signs, and reported to my superiors including higher-ranked nurses, physician's assistants, and doctors when indicated in addition to Jail supervisors.  However, by law, I was not able to prescribe medications for an inmate patient, conduct any assessments, or diagnose or treat any medical condition.  Generally, any diagnosis, treatment, or prescription would have to be done by a Doctor, Physician Assistant, or Nurse Practitioner.  Assessments would have to be completed by a Registered Nurse or higher medical professional.

10.     In addition, not all prescriptions could be filled in the Jail.  I was not involved in determining what prescriptions could or could not be filled and what ones were necessary for an inmate's medical health and wellbeing.

11.     I am familiar with Decedent Madison Jensen and have reviewed the Complaint that Plaintiff Jared Jensen filed on Decedent's behalf against me.

12.     I first learned of Madison on Monday, November 28, 2016 when Deputy Richens informed me that we had a new inmate that had reportedly vomited the prior evening and Richens wanted me to see her.  I only understood that she had vomited one time and that was on Sunday evening, November 27, 2016.

13.     Prior to this visit in the medical area on November 28, 2016, I had never met Madison and had no knowledge of her or her medical history.

14.     Madison walked normally into the medical room sometime in the morning of November 28, 2016.  She was thin but seemed to be walking well.  She also talked to me in a normal manner and did not give any signs of being sick by how she talked and walked and moved.

15.     Madison informed me that she had thrown up a little the night before but had not thrown up since that time.

16.     I asked Madison if she was coming off of anything and she replied that she was not and that it was a stomach bug that was making her feel sick.

17.     I asked Madison a second time if she was coming off of anything and I stressed to her that as the nurse, she needed to be honest with me and that she was not going to get in trouble. She then stated that she knew her body and that she was positive she was not detoxing and that she believed she had a stomach bug. I relied upon these statements because she was so emphatic that she was not detoxing.

18.     Based upon my talking with Madison and seeing and hearing her and watching her walk, I did not see any signs that she was withdrawing from any sort of substance or that she needed urgent medical help or care.

19.     We discussed her medications and I informed Madison that the tramadol and Wellbutrin prescriptions were not approved at the Jail but that I would call to gain approval for Clonidine.

20.     I called on the telephone Physician Assistant, Logan Clark, on Monday November 28, 2016 to obtain approval for Madison's Clonidine prescription and briefly discussed Madison with Logan. Logan Clark authorized the Clonidine prescription and she began receiving her first dose of that prescription on November 28, 2016.

21.     I also directed Madison to save any vomit if she happened to throw up again so that I could observe it. I was taught by Jail staff that had previously been doing my job before I was hired, and in either training that the Jail had sponsored or by Dr. Tubbs or Logan Clark that I was supposed to ask inmates to save their vomit so it could be known how much they were vomiting and if there was any concerning signs like blood in the vomit. I was told that this was appropriate

medical care for inmates in jails.  In fact, it is my understanding that the FTO, or the on the job

training of corrections deputies in 2016, included teaching this practice.

22.     Finally, in an attempt to help meet Madison's medical needs and requests while she

would be at the Jail, I showed Madison all of the over the counter medicines that the Jail could

provide to her upon request and let her know all she needed to do was ask for any of these

medications.  Some of these medications would be helpful for someone who had a stomach bug or

was withdrawing.  However, she declined wanting any of these medications and that was the end

of my interaction with Madison on November 28, 2016.

23.     Sometime after my meeting with Madison, Deputy Richens informed me that

Madison had tested positive for opiates based on her urinalysis, I was never informed about any

potential heroin use.  I never saw the test results.  The positive opiates test did not necessarily

indicate to me that she was in fact withdrawing now from use of opioids, just that she had some in

her system on Sunday, November 27, when she was booked into the Jail.  I also remember Madison

telling me that she had been to the Hospital the prior Thursday, November 24, before she was

arrested, so I did not know whether the opioid was something the hospital may have given her.

24.     On Monday, Tuesday, Wednesday, and Thursday, November 28-December 1, I

instructed Jail staff to give Gatorade drinks to Madison.  Gatorade is something that I was taught

to give to inmates that were either detoxing or withdrawing from a drug substance or for inmates

who had the stomach flu, to ensure they were adequately hydrated and had electrolytes.

25.     At no time was I ever informed by either Madison, or any Jail staff or anybody else,

that Madison was either not drinking her Gatorades or was not able to keep them down.  In fact,

much of what various floor and control officers observed was not communicated to me regarding

her use of the bathroom and vomiting and not eating her food, but I did not find this out until after her death.  I was never told by Jail staff that Madison had vomited or had diarrhea, except for when Deputy Richens told me on Monday, November 28, that Madison had vomited the night before. If anyone had told me they had seen her vomiting or having diarrhea, I would have immediately gone to her cell to see it to determine how much there was and whether there was any blood in it.

26.     The next encounter I had with Madison was on Tuesday, November 29, 2016 when she was brought to my office for a follow-up appointment.  She walked into the medical room without any assistance and in a normal manner.  I did not see her walk down the hall, either coming to medical or leaving.  I was never told by anybody that Madison experienced any difficulty walking or needed assistance walking to or from the medical room.

27.     On November 29, I instructed Madison to fill out a medical request form and ensured that she was provided with a Gatorade.  Deputy Richens then escorted her back to her cell. The reason I wanted Madison to complete a medical request form was because she was prescribed medication by the PA and he would normally want to see the patient when he had just prescribed a medication and that she said she had the flu.  Whether she had the flu or was detoxing, I thought she should see the doctor whether she wanted to or not.  She did not request to see a doctor and she never told me that she had vomited or had any diarrhea and in fact denied that she had either of these symptoms.  Neither did she ever tell me that she was having trouble eating.

28.     Madison informed me that she was feeling better on November 29, but she still thought she had a stomach bug but did not need to see a doctor. I encouraged her to nonetheless fill out the medical request form so that she could see the doctor on Thursday.  I was thinking that she may be well from the stomach bug by then, but if not, she should see the doctor.  Without the

medical request, she could not see the doctor unless there was an obvious emergency.   At no time did Madison ever request to see the doctor or PA.  I did not observe a medical emergency with Madison at that time.

29.     When I asked Madison on November 29 if she had thrown up since our last visit on November 28, she said she had not. I reminded Madison to save her vomit so that someone could take a look if she happened to experience any more vomiting.

30.     I made sure that Madison was provided with a Gatorade and Deputy Richens escorted her back to her cell.  I did not hear any reports about her the rest of that day.

31.     After my follow-up with Madison on November 29, Deputy Richens and I discussed moving Madison to a court holding cell in the booking area so that we and other staff could more easily observe her, even when I was not at work.  Madison was moved later that day.

32.     At no time was I ever informed that Madison was not eating her food or if food was left on her meal trays.  In addition, Madison never told me that she was not eating her food or having a hard time keeping her food down.

33.     I believe I received Madison's completed medical request form either on November 29 after I met with Madison or on November 30 before I saw her.  In the form she again stated that she knew she was not detoxing, but had a stomach bug.  I knew she completed the form on Tuesday after I met with her (because Richens gave it to me and she was not working on Wednesday). In the form she complained about vomiting and diarrhea for four days straight, but I thought Madison was referring back to the previous Friday or Saturday, before she was even in the Jail. I reached this conclusion because she had just told me on Tuesday that she was doing better, and she had denied to me on Tuesday that she was vomiting or having diarrhea.  So I did not think she was still

experiencing these symptoms, but rather she was describing in the form symptoms she had already recovered from before Tuesday.

34. The next day, November 30, I made it a point to physically walk to the control room several times that day to observe Madison through the surveillance cameras in her cell. On all occasions, I did not observe her vomiting, nor did I observe any vomit or diarrhea in her cell.

35. At about 4:05 p.m. on November 30, I knocked on the window signaling for Madison to come get a Gatorade I had brought for her to drink. She got up and walked over to the door of the cell in a normal manner. I handed her the Gatorade and asked if there was anything else that she needed and that I was leaving for the day, giving her an opportunity to address any concerns that she had included in the medical request form. She responded that she did not need anything and then walked back to her bed in a normal manner. She did not look like she needed any urgent medical attention at that time. She never asked to see a doctor or PA at that time or any other time.

36. I did see several empty Gatorade bottles in her cell, indicating to me that she had drank them and that she should be recovering from feeling ill soon.

37. I saw no evidence that she had vomited anywhere in the cell.

38. This was the last time I saw Madison alive, but there was absolutely nothing that I observed that indicated to me that she was suffering from any sort of medical emergency. If I had thought there was even the possibility of a medical emergency, I would have called PA Clark or Dr. Tubbs or sent Madison to the hospital.

39. I finished my day on November 30, by gathering all the inmate medical requests so that they would be ready for PA Clark to review in the morning and I knew that Logan would

know how to best address them.  I got all of them ready for Logan Clark to read which was my practice at the time.  I do not know exactly when Madison's medical request arrived in the medical room.  Madison's request was with the medical request slips that I gathered together on Wednesday at the end of my shift.  I noted again that she said she was not detoxing, but was surprised that she said she was vomiting for four days straight because she said she was feeling better when I saw her on Tuesday, when she completed the form.  I assumed she meant she was vomiting the days before she got to the Jail.

40.     As a practice in the Jail at that time, a medical request form was never submitted for an urgent or immediate need for medical attention since that could be communicated directly to Jail staff any time and could also be communicated directly to a doctor or the hospital.

41.     All Jail staff had the authority and duty to contact a doctor or the hospital at any time if they observed a serious medical need by Madison or any other inmate.  The Jail staff could also, and often did, call me and ask me questions or report information to me about inmates when I was not at the Jail.  Nobody ever called me to report any information about Madison Jensen to me during her time at the Jail.

42.     I further did not expect anything urgent to be put in Madison's medical request form since she said she did not need to see the doctor and it was my insistence that she needed to fill out the request to see the PA on December 1.  Madison also told me that she had a stomach bug but was feeling somewhat better.  After seeing several empty Gatorade bottles in her cell on November 30, I assumed she was getting a sufficient amount of liquids and electrolytes and that she would be fine until the doctor saw her the next day.

43.     On Thursday, December 1, 2016 PA Logan Clark arrived at the jail for his weekly visit in the morning. Once he made it to the medical office I handed him the folders of all of the inmates that had made requests to be seen by him.

44.     Logan and I reviewed the requests and he decided who needed to be seen and who did not. He set an order of who was to be seen and then the inmates in the general Jail population cells were brought to the medical office in that order.

45.     It was Logan Clark's practice at that time to see the inmates in the general population first and then see the inmates in the medical and booking areas last.

46.     After seeing the inmates that were ahead of Madison on PA Clark's visit list we walked down the hallway to Madison's cell.

47.     I approached the door to Madison's cell and saw her laying on the floor so I knocked on the window and called out to her to get her attention.  Nobody had previously told me she was on the floor.

48.     PA Clark then began knocking on the window as well and when there was no movement or response, PA Clark turned to me and instructed me to get help.  I ran down the hall and began yelling for somebody that would have the keys to Madison's cell.

49.     Sergeant Gibbons rushed to the cell, unlocked and entered and immediately began administering CPR, however it was clear that Madison had passed away.  I was extremely surprised and shocked to find Madison in this condition after just seeing her the prior day.

50.     At the time of the incident, the Duchesne County Sheriff's office had no policy regarding opiate withdrawal protocol. While there was a protocol for inmates withdrawing from

10

alcohol, it was not understood that there was a danger of an inmate dying or suffering from a serious medical condition when they were withdrawing from opioids.

51.     In my experience prior to Madison's death, inmates withdrawing from drugs or alcohol wanted to be helped and they always communicated with me as much as possible to help relieve their symptoms. However, even if Madison had told me that she was withdrawing from opioids, our practice was still to watch and observe her to look for any worsening of her symptoms and provide access to water, food, and Gatorade.  This was being done for Madison based upon my knowledge at the time.

52.     Nobody ever taught or trained me to call the doctor or PA just because an inmate reportedly had vomited.  To the contrary, in my experience at the Jail, vomiting was a common occurrence for those who were withdrawing from drugs or alcohol or if an inmate had the stomach flu, and in my experience, these inmates always got better and they never got worse.  It would generally only take a few days of vomiting and they would be better.

53.     Prior to December 1, 2016, I had never been told that an inmate withdrawing from opioids was a serious medical condition.  I had heard that alcohol withdrawal could be, but not opioids.  Both medical professionals and Jail staff told me this.

54.     However, Madison told me emphatically that she absolutely was not withdrawing from drugs but had the stomach flu.  In my experience, the stomach flu was even less serious than withdrawing from drugs or alcohol.

55.     Prior to 2017, I was the first and only LPN that ever worked at the Duchesne County Jail.  There were no Registered Nurses who previously worked at the Jail and none worked at the

11

Jail with me up through the end of 2016. There were no other nurses working at the Jail when I was off duty through the end of 2016.

56. When I was at work at the Jail, I basically took over the job that was being done by corrections staff of checking prescriptions and medications and making sure that the inmates were receiving their various medications. I was not really doing anything more or less than what the Jail Corrections Deputies were doing in terms of checking on inmates and watching their medical care and needs.

## DECLARATION UNDER PENALTY OF PERJURY

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury, that the above sworn statements are true and based upon my personal knowledge and experience.

Dated this 7th day of August, 2019.

/s/ *Jana Clyde*

Jana Clyde
Defendant