# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF UTAH

| | |
|---|---|
| **ESTATE OF MADISON JODY JENSEN,** | |
| **Plaintiff,** | **MEMORANDUM DECISION AND ORDER** |
| **vs.** | **Case No. 2:17CV1031DAK** |
| **DUCHESNE COUNTY, ET AL.,** | **Judge Dale A. Kimball** |
| **Defendants.** | |

This matter is before the court on several motions for summary judgment: Defendant Elizabeth Richens' Motion for Summary Judgment [Docket No. 122]; Defendant Jana Clyde's Motion for Summary Judgment [Docket No. 133]; Defendant David Boren's Motion for Summary Judgment [Docket No. 135]; Defendant Hollie Purdy's Motion for Summary Judgment [Docket No. 136]; Defendant Gerald J. Ross Jr.'s Motion for Summary Judgment [Docket No. 137]; Defendant Jason Curry's Motion for Summary Judgment [Docket No. 138]; Defendant Caleb Bird's Motion for Summary Judgment [Docket No. 139]; Defendant Duchesne County's Motion for Summary Judgment [Docket No. 140]; and Defendant Kennon Tubbs' Motion for Summary Judgment [Docket No. 141]. On December 5, 2019, the court held a hearing on the motions. At the hearing: Ryan B. Hancey and Adam Knorr represented Plaintiff Estate of Madison Jody Jensen; Michael W. Homer and Jesse C. Trentadue represented Duchesne County, Caleb Bird, Jason Curry, Gerald Ross, Hollie Purdy, David Boren, and Elizabeth Richens ("Duchesne County Defendants"); Cortney Kochevar and Clair Di Caro represented Defendant

Kennon Tubbs; and Frank D. Mylar and Andrew Hopkins represented Jana Clyde. The court took the motions under advisement. After carefully considering the memoranda and other materials submitted by the parties, as well as the law and facts relating to the motions, the court issues the following Memorandum Decision and Order.

## BACKGROUND

On November 27, 2016, Jared Jensen observed his 21-year-old daughter, Madison, exhibiting odd and erratic behavior and he found what he believed to be drug paraphernalia and residue in her room. He called the Duchesne County Sheriff's Office, and Deputy Jared Harrison of the Duchesne County Sheriff's Office responded to the call. When Deputy Harrison arrived at the house, he spoke to Madison and found drug paraphernalia in her bedroom. Madison told Harrison that she was "coming off" heroin, had last used four days earlier, and had disposed of her heroin supply that day. She also admitted to recently smoking marijuana and told Harrison she was taking Tramadol, Wellbutrin, and Clonidine as prescribed by her physician. Harrison arrested Madison for internal possession of drugs and possession of drug paraphernalia and took her to the Duchesne County Jail.

Deputy Elizabeth Richens, a corrections officer at the Duchesne County Jail, helped to book Madison into the Jail at 1:34pm on Sunday, November 27, 2016. Deputy Richens completed the Intake Questionnaire for Madison and both she and Madison signed the form. During the booking process, Madison disclosed that she suffered from anxiety and depression for which she had been prescribed and was taking Wellbutrin. Madison also noted that she was taking Tramadol for pain and Clonidine for high blood pressure. Madison had taken the prescription medication with her to the Jail. She also reported that she had a history of using

heroin, pills, marijuana, and that she had recently used heroin. Richens had Madison take a urinalysis test for drugs.

According to jail policy or custom, Richens placed the intake questionnaire in a medical box designated for the jail nurse. At the time, Duchesne County employed a jail nurse, Jana Clyde, who was responsible for overseeing the health of the jail inmates. Nurse Clyde was a Licensed Practical Nurse (LPN) who began working at the Jail in April of 2013. Nurse Clyde's LPN is not the equivalent of an associate's or bachelor's degree program. As a jail nurse, Nurse Clyde primarily facilitated getting doctors or pharmacies to write prescriptions that could be filled in the Jail, administering medications to inmates, checking vital signs, and reporting to her superiors. By law, she was not permitted to prescribe medications, conduct health assessments, or diagnose and treat any medical condition.

In addition to the jail nurse, Duchesne County contracted with an independent medical provider, Dr. Kennon Tubbs to provide medical services to inmates at the Duchesne County Jail. Dr. Tubbs also subcontracted with physician's assistant Logan Clark to perform some of Dr. Tubbs' medical care duties at the Jail. The contract provides that Dr. Tubbs will act as the Medical Director for the Jail and Clark will act as the primary provider for the facility. Clark visited the Jail weekly to provide medical services, including meeting with nursing staff to address any issues. Dr. Tubbs typically did not visit the Jail unless he was filling in for Clark, approximately three to four times a year.

Jail personnel placed Madison in a cell with Maria Hardinger. Madison complained to Hardinger of feeling sick and within ten minutes Madison vomited. She continued to vomit and suffer from diarrhea throughout the day and night. Deputy Richens saw Madison throwing up

before she left work that day.

Deputy Gerald Ross is a Duchesne County Deputy Sheriff, who was performing controller duties at the Jail on Sunday. He saw Madison when she was being booked into Jail. He spoke to the arresting officer and learned that Madison had used heroin four days before she arrived at the Jail. Other than observing her from the control room, Ross had no interactions with Madison on Sunday.

When Richens returned to work on Monday morning, Richens took Madison to visit Clyde in the Jail's medical office. Madison told Clyde she had been vomiting and believed she had a stomach bug. Clyde told Madison to save her vomit and diarrhea for Clyde to observe. Richens told Clyde that Madison had admitted to using heroin a few days before being booked into jail and that her urinalysis test was positive for opiates.

Sergeant Hollie Purdy, another corrections officer assigned to the Duchesne County Jail saw Madison in the medical unit with Clyde and Richens. Purdy thought that Madison looked anorexic or on drugs.

Clyde took Madison's vital signs and observed that Madison's blood pressure was high. Clyde gave Madison a Gatorade and called the jail's physician's assistant, Logan Clark. Clyde informed Clark that Madison had been vomiting. Clyde claims she told Clark about all three of Madison's prescription medications and he only approved administration of the Clonidine. But Clark claims she only mentioned the Clonidine.

Madison told Richens that she had thrown up on her bedding, and Richens gave her new bedding. The rest of that day, Madison continued to feel ill, stayed in her cell, and did not eat her meals. Madison and Hardinger used the call button in their cell several times to notify Jail staff

that Madison was ill and vomiting.  The Jail staff responded that they were aware that Madison

was ill but they did not provide any specific medical care for her symptoms.  Around 6:00 p.m.,

Madison was able to leave her cell to take a shower but continued to be ill.

The following day, Tuesday, Madison continued to vomit, stayed in bed, and did not eat

Deputy Ross saw Madison on Monday drinking a glass of water and throwing up a little

bit.  He knew that she had been taken to the medical unit, that her issues were being addressed by

medical staff, and that she was receiving Gatorade.  Ross thought that Madison was eating a little

bit, but not much.

The following day, Tuesday, Madison continued to vomit, stayed in bed, and did not eat

her meals.  Richens took Madison to Clyde's office again that morning and noted that she looked

noticeably weaker and paler than the previous day.  Sergeant Purdy saw Madison with Clyde and

Richens when she passed by the Jail's medical unit.  Richens informed Clyde that Madison was

still vomiting, but Clyde disputes that she was told of continued vomiting.  Nurse Clyde claims

that if any of the staff had informed her that Madison was throwing up or having diarrhea, she

would have gone to Madison's cell to see how much there was and see whether there was any

blood in it.  Richens continued to check on Madison throughout the day.

Later that day, Hardinger pushed the call button and informed the deputy in the control

room that Madison was continuing to vomit so violently that it was causing a mess.  The deputy

told her she could leave her cell to retrieve cleaning supplies to clean up the mess but to stop

pushing the call button.  Clyde claims that no jail personnel ever informed her that Madison and

Hardinger were pushing the call button or reporting anything.

During that evening, Richens took Madison to see Detective Monty Nay.  She was dizzy

and having a hard time walking.  Nay observed Madison and told Richens to watch her closely.

Richens and Deputy Ross moved Madison to an observation cell where jail staff could more easily observe her condition. Richens informed Clyde that Madison was being moved to an observation cell, and Clyde agreed to the move. Richens observed Madison lying in bed and vomiting several times. Richens got authorization from Clyde to provide Madison with Gatorade. Deputy Ross stated that Madison had not stopped eating but she was not eating well.

Richens claims that she reported to Nurse Clyde that Madison was weak, dizzy, and having a hard time walking. Nurse Clyde asked Richens to have Madison fill out a Medical Request Form to see the Clark on Thursday. Richens took the form to Madison and had her fill it out. Madison misdated the form and stated that she had been "puking for 4 days straight, runs, diarrhea, can't hold anything down not even water." But she stated that she was not detoxing and that she thought it was a stomach bug. Richens gave the form to Clyde, who reviewed it. Clyde claims that she did not know that Madison had been continuing to vomit after Sunday. Clyde states she thought that Madison may have been referring to the dates before she arrived at the Jail. Despite her uncertainty, however, Clyde did not seek more information or clarify the situation with Madison.

Neither Clyde nor Richens contacted Clark or Dr. Tubbs to inform them that Madison had been moved to an observation cell or that she had filled out a medical request form. Although Richens thought that Madison should be closely observed, she did not think that Madison required urgent care from the doctor. At that time, she had never experienced or heard of an inmate dying of heroin withdrawal or dehydration. Richens did not work on Wednesday, November 30, 2016, and did not see Madison again.

On Wednesday, Clyde visited Madison's cell once that day to pass her a Gatorade, but did

not inquire as to her condition or take her vital signs. Clyde attached Madison's medical request form to a medical file for Clark to review when he arrived at the Jail the next day. Deputy Caleb Bird took Madison's medication to her cell and she was unable to get out of bed to take it. Bird entered her room to give her the medication and saw what appeared to be vomit. Bird states that he told Clyde that Madison was too weak to get out of bed and there was vomit in the cell. Bird claims that Clyde told him that she knew Madison was vomiting and withdrawing from heroin. Clyde contends that Jail personnel did not report Madison's condition to her.

In any event, no Jail personnel contacted Clark or Dr. Tubbs about Madison's condition on November 30, 2019. And, other than filling out the request form that Richens had brought her on Tuesday, Madison had not requested to see a doctor.

That night, Bird told his wife that Madison looked like she was going to die because "she was just like a skeleton." Bird, however, told investigators that he did not think that Madison was actually going to die and was shocked to learn of her death the next day. Before Madison's death, Bird had never heard of anyone dying in the jail from heroin withdrawal or dehydration.

On Thursday, December 1, 2019, Jail employees reported that Madison had been vomiting through the night and Sergeant Purdy asked Clyde if she could give Madison a Gatorade. Clyde agreed. Purdy put a Gatorade on the food pass of Madison's cell, and told her it was there, but had no real conversation with her. Purdy said there was not a lot they could do for inmates experiencing drug withdrawal. She stated that they just have to go through the process and that, in her experience, the only thing they could do was give them Gatorade. As far as Purdy knew, Madison had been receiving Gatorade regularly.

When Lieutenant Jason Curry, the Jail Commander, arrived on his shift Thursday, he

talked to Clyde about Madison.  Jason Curry is a sergeant at the Duchesne County Jail.  In 2016, he was a lieutenant and the commanding officer of the Jail.  The majority of Sergeant Curry's duties were administrative.  He did not have any direct contact with Madison during her incarceration.  He learned that she was an inmate on Thursday morning, the day she passed away.

Nurse Jana Clyde told Sergeant Curry that Madison had the stomach flu and had been moved to an observation cell.  They also discussed whether Madison was going through heroin withdrawals, but Nurse Clyde told him she thought it was a stomach flu.  Sergeant Curry understood that someone going through opiate withdrawal could be nauseous, vomiting, or possibly have diarrhea.

Curry testified that, in 2016, the Jail's practice if an inmate was vomiting or experiencing diarrhea was to contact medical, put the inmate in a cell that had water, and give the inmate Gatorade.  Sergeant Curry had experience with inmates withdrawing from heroin and expected the withdrawal to take 3-5 days maximum.  Before Madison died, Sergeant Curry did not know that an individual could die from opiate withdrawal or dehydration.

The last time an officer checked on Madison was at 10:08 a.m.  Purdy stopped by Madison's cell and saw her sitting on the bed with her feet up and back against the wall.  Purdy asked Madison if she wanted to take a shower, and Madison said no.  Purdy told Madison that she would come back in a little bit and see if she wanted to then.  Madison said okay.  Purdy did not think that Madison was in need of urgent care by a physician.  Prior to Madison's death, Purdy had never experienced or heard of an inmate dying from heroin withdrawal or dehydration.


Just before 1:00 p.m., the Jail's video camera system recorded Madison drinking some

water and then vomiting a brown liquid substance.  At 12:59 p.m., she had a seizure-like episode which caused her to roll off her cell bed and onto the floor.  Her body continued to twitch for a couple of minutes and then she laid flat on the ground.  At 1:28 p.m., Physician's Assistant Clark and Nurse Clyde found Madison deceased in her cell.

Clark had arrived at the Jail around 9:00 a.m. that day.  He visited the Jail every Thursday and stayed until he had seen all the inmates who needed to be seen.  Clark reviewed the files and determined the order in which he would see them.  He would generally treat the patients in the medical observation cells last.  According to Clark, Clyde did not provide him with Madison's medical file or medical request form on the morning of December 1, 2019.  But, according to Clyde, she and Clark reviewed and discussed Madison's medical request form before Clark saw any inmates that day.  Nevertheless, Clyde stated that she did not think that Madison's need for care was urgent because Clyde had requested that Madison fill out the request form to see Clark in case she was still feeling unwell on Thursday.  Madison, herself, had not asked to see a doctor.  Clark claims that after he had treated the other inmates, Clyde told him about Madison and they then went to check on her.

In Madison's case, Dr. Tubbs was never contacted by Clyde or any of the Jail personnel.  Dr. Tubbs' specific contractual duties included providing telephone on-call service for consultation regarding triage and appropriate medical care.  Dr. Tubbs also agreed to "provide training, instruction, support, and a supervisory role of nursing staff on how to appropriately handle triage, sick call, medical protocols, and health care complaints/grievances."

At all relevant times, Nurse Clyde was the only nurse working at the Jail.  During the weekly sick calls and meetings with nursing staff, Dr. Tubbs or Clark would provide on-the-job

training and instruction to Clyde regarding how to triage specific healthcare requests.  She was also expected to bring her existing LPN knowledge and experience when she began working at the Jail.  As an LPN, however, Nurse Clyde could not make nursing assessments and could not implement standing orders.  Dr. Tubbs testified that if he or Clark were aware of any Jail nurse performing their job wrong or needing help, they would give that nurse advice, instruction, and training.  Prior to Madison's death, Dr. Tubbs was not aware of any incident that suggested Nurse Clyde needed specific training or a remedial course.

Clyde states that she was not given a Jail policies and procedures manual at anytime prior to Madison's death and she  did not receive any training from any other defendant on the Jail's medical policies and procedures.  But Dr. Tubbs testified that Nurse Clyde knew that she should call Clark or Dr. Tubbs if she witnesses an inmate violently vomiting over a 12-hour period or had seen an inmate's saved vomit.  At her deposition, Nurse Clyde testified that if she had known Madison's actual condition, she would have called Clark or Tubbs based on her training and common sense.

Clyde believed that she was not required to take an inmate's vital signs each day even if she knew the inmate was exhibiting obvious symptoms of severe dehydration.  But according to Clark, Clark had advised Clyde to take and record vital signs of inmates who were experiencing heroin or opiate withdrawal symptoms or vomiting and experiencing diarrhea.  There was no specific written policy in place regarding this practice at the time of Madison's death.  The policy, procedure, or custom for treating an inmate exhibiting symptoms of  dehydration was to provide the inmate with Gatorade and contact medical personnel.  Although Clyde knew she could contact Clark and Dr. Tubbs with medical questions, there is conflicting testimony about

10

when she was expected to contact them regarding an inmate who was vomiting, experiencing diarrhea, or exhibiting signs of dehydration.

Dr. Tubbs did not contract to train anyone other than the Jail nursing staff. In addition, Dr. Tubbs did not contract with the Jail to establish medical protocols, policies, or procedures at the Jail. Jail standards were developed and implemented by the Sheriff's association, the County attorney's office, and the Jail's sheriff. Nevertheless, prior to Madison's death, Dr. Tubbs had never heard of anyone dying at the Duchesne County Jail, or in the prison system, because of opiate withdrawal. Madison's death is the only such death that he is aware of in his 19-year career of working with thousands of inmates.

Sheriff Boren would sign off on standards and policies for the Jail before they were implemented. The Jail had standard operating procedures and general orders, as well as "verbal policies and procedures." Jail policies and procedures were reviewed during monthly staff meetings, which were usually led by a senior administrative officer. Prior to Madison's death, the Jail did not have a policy instructing officers how to handle situations involving inmates withdrawing from opiates. All of the officers knew that they could contact medical personnel if an inmate appeared to need care. All of the officers in this case either contacted Nurse Clyde or knew that she had been contacted about Madison's condition.

According to Sheriff Boren, before Madison's death, the fact that an inmate was vomiting and/or experiencing diarrhea or other flu-like symptoms would not necessarily be considered a serious medical condition. At the time of Madison's incarceration, Sheriff Boren was also unaware that vomiting and diarrhea were symptoms of opiate withdrawal. Jail policy at the time was to notify the medical staff or a supervisor if an inmate was vomiting or experiencing

diarrhea.  Officers would also give Gatorade to an inmate who was vomiting.  Jail officers would brief the next shift of such situations as well.  Sheriff Boren believes that the policies were followed at the time of Madison's incarceration.

Jail personnel also knew they could call an ambulance to transport an inmate needing emergency care to the hospital.  Before Madison's death, the Jail did not employ on-site personnel who could administer intravenous fluids to inmates exhibiting signs of severe dehydration.

In addition, a medical request form completed by an inmate would be reviewed within 24 hours and would result in either an appointment with PA Clark during his Thursday on-site clinic hours or a phone call to Clark to determine if the Jail needed to call an ambulance for transport to the hospital emergency room.  In addition, an inmate who was ill or injured could be moved to a cell enabling medical observation.  Prior to Madison's death, Sheriff Boren had not known of any deaths or serious medical consequences resulting from opiate withdrawal or dehydration.

After Madison's death, the Jail requested an outside agency conduct an independent investigation into the incident.  The Uintah County Sheriff's Office investigated the matter. Clark and Clyde told the investigator that they knew Madison was withdrawing from heroin and that she had been placed on the Jail's heroin withdrawal protocol.

On December 2, 2016, Michael Belenky, M.D., of the Utah Office of Medical Examiner, performed a medical examination of Madison's body and determined the immediate cause of death to be cardiac arrhythmia from dehydration due to opiate withdrawal.  Madison had gallstones, which was evidence of extreme dehydration, and her weight was 112 pounds, seventeen pounds less than her booking weight.

Madison's estate filed the present § 1983 civil rights lawsuit against Duchesne County and several of the individual jail officers and medical staff. Among several other claims, the Second Amended Complaint contains supervisor liability claims against Defendants Tubbs and Clark for failure to implement policies, procedures, and training regarding inmates suffering from opiate withdrawal and severe dehydration. The Second Amended Complaint also contains an individual deliberate indifference claim against Clark for failure to see Madison within four hours of his arrival at the jail on the date of her death.

## DISCUSSION

### Duchesne County's Motion for Summary Judgment

Duchesne County moves for summary judgment on the Estate's municipal liability claim under 42 U.S.C. § 1983. A municipality can be liable under Section 1983 "if the governmental body itself 'subjects' a person to a deprivation of rights or 'causes' a person 'to be subjected' to such deprivation." *Connick v. Thompson*, 563 U.S. 51, 60 (2011) (quoting *Monnell v. NYC Dept. of Social Servs.*, 436 U.S. 658, 692 (1972)). "To establish a municipality's liability under § 1983, a plaintiff must 'prove (1) the entity executed a policy or custom (2) that caused the plaintiff to suffer deprivation of constitutional or other federal rights.'" *Spradley v. LeFlore Cty. Detention Ctr. Pub. Trust Bd.,* 764 Fed. Appx. 692, 703 (10th Cir. 2019) (quoting *Moss v. Kopp*, 559 F.3d 1155, 1168 (10th Cir. 2009)). The Estate claims that the County failed to adequately train Jail staff on policies, procedures, or customs regarding medical intervention when an inmate is exhibiting signs of severe dehydration, including protocols about monitoring fluid intake, checking vital signs, and otherwise intervening.

## 1. Policy or Custom

The County argues that its policies and customs did not violate Madison's constitutional rights.   In the Tenth Circuit, a county's policies and/or customs include, but are not limited to: (1) a formal regulation or policy statement; (2) an informal custom amounting to a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law; (3) the decisions of employees with final policymaking authority; (4) the ratification by such final policymakers of the decisions–and the basis for them–of subordinates to whom authority was delegated subject to these policymakers' review and approval; or (5) the failure to adequately train or supervise employees, so long as that failure results from deliberate indifference to the injuries that may be caused. *Estate of Martinez v. Taylor*, 176 F. Supp. 3d 1217, 1230 (D. Colo. 2016).

"A municipal policy or custom may take the form of . . . the 'failure to adequately train or supervise employees, so long as that failure results from deliberate indifference to the injuries that may be caused.'" *Bryson v. City of Oklahoma City*, 627 F.3d 784, 788 (10th Cir. 2010).  The Supreme Court has explained that a "municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Connick*, 563 U.S. at 61.  "To satisfy the statute, a municipality's failure to train its employees in a relevant respect must amount to 'deliberate indifference to the rights of persons with whom the [untrained employees] come into contact.'" *Id.* (citations omitted).  "Only then 'can such a shortcoming be properly thought of as a city "policy or custom" that is actionable under § 1983,'" *Id.* (citations omitted).

"Deliberate indifference is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Id.*  "The deliberate

indifference standard may be satisfied when the municipality has actual or constructive notice that its actions or failure to act is substantially certain to result in a constitutional violation, and it consciously or deliberately chooses to disregard the risk of harm." *Bryson*, 627 F.3d at 789. In harmony with this standard, the Tenth Circuit has held "[d]eliberate indifference to serious medical needs may be shown by proving there are such gross deficiencies in staffing, facilities, equipment, or procedures that the inmate is effectively denied access to adequate medical care." *Garcia v. Salt Lake Cnty.*, 768 F.2d 303, 308 (10th Cir. 1985).

"In most instances, notice can be established by proving the existence of a pattern of tortious conduct." *Bryson*, 627 F.3d at 789. "In a narrow range of circumstances, however, deliberate indifference may be found absent a pattern of unconstitutional behavior if a violation of federal rights is a highly predictable or plainly obvious consequence of a municipality's action or inaction, such as when a municipality fails to train an employee in specific skills needed to handle recurring situations, thus presenting an obvious potential for constitutional violations." *Id.*

In this case, there is no evidence of a pattern of tortious conduct. The County contracted with medical personnel and had a doctor, physician's assistant, and nurse to deal with medical issues that arose at the Jail. Jail personnel knew to notify medical personnel if an inmate was vomiting or experiencing diarrhea, they knew they could contact PA Clark or Dr. Tubbs directly, they knew to give the inmate Gatorade, and they knew they could move the inmate to an observation cell. Given that there is no evidence of any previous incidents regarding inmates withdrawing from opiates, the training appears to have been sufficient to address recurring situations in the Jail. The County Defendants testified that inmates going through withdrawals

was a common occurrence at the Jail.  Yet there is no evidence of any prior incidents at the Jail involving inmates vomiting to the point of dehydration or death.  The County was not on notice of the potential problem.

Without actual notice, the question is whether "the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." *City of Canton*, 489 U.S. at 390.  The Supreme Court has recognized that such an occurrence is rare.  *Connick*, 563 U.S. at 67.

"The Supreme Court has made clear that merely showing that additional training would have been helpful or could have avoided the injury is not sufficient to establish municipal liability."  *Hunter*, 2019 WL 2422499, Case No. 2:16cv1248, at *10.  "In virtually every instance where a person has had his or her constitutional rights violated by a city employee, a § 1983 plaintiff will be able to point to something the city 'could have done' to prevent the unfortunate incident."  *City of Canton*, 489 U.S. at 392.  "But showing merely that additional training would have been helpful in making difficult decisions does not establish municipal liability."  *Connick*, 563 U.S. at 68.

The single-incident liability the Estate alleges requires evidence that training was so deficient that a constitutional violation was certain to occur.  But, there is no evidence to support that finding.  Dr. Tubbs, PA Clark, and Nurse Clyde all had sufficient medical training to address the situation and the officers at the Jail were adequately trained to report Madison's condition to the medical personnel.  The Supreme Court has recognized that professional training is sufficient training to defend a "failure to train" claim.  *Connick*, 563 U.S. at 68.  This is not a case where

16

there was a complete lack of attention to the inmate's medical needs. The Jail employees made sure Nurse Clyde was aware of Madison's condition, gave her Gatorade, and moved her to an observation cell. While Jail employees had experience with inmates vomiting and withdrawing from opiates, none of them had ever experienced or even heard of someone dying from dehydration or opiate withdrawal. Dr. Tubbs and PA Clark were on call at all times and Nurse Clyde and Jail employees testified that they knew they could call them at any time. The unfortunate fact that Nurse Clyde did not contact them regarding Madison's condition does not rise to the level of deliberate indifference in terms of staffing and training. The court concludes that no reasonable jury could find that the procedures and training were so deficient as to qualify for single-incident liability.

Moreover, there was no need for someone at the Jail to be able to administer intravenous fluids. Dr. Tubbs testified that he would not approve intravenous fluid at the Jail, stating that "if a patient is so sick that they need IV fluid, they need to be at the hospital." The Jail was adequately staffed with on-site medical personnel and medical providers who could be contacted at any time. The procedures were in place for an appropriate response to inmates' medical needs. The fact that a mistake may have occurred in this instance does not mean that the County's procedures were so inadequate as to rise to the level of deliberate indifference to the inmates' medical needs. "'Proving that an injury or accident could have been avoided if an [employee] had had better or more training, sufficient to equip him to avoid the particular injury-causing conduct' will not suffice.'" *Connick v. Thompson*, 563 U.S. 51, 68 (2011) (quoting *Canton*, 489 U.S. at 391. No reasonable jury could conclude that a violation of an inmate's rights was certain to occur given the County's policies and procedures. Accordingly, the court concludes that the

Estate has failed to show municipal liability on the part of Duchesne County. Therefore, the court grants Duchesne County's motion for summary judgment.

## Individual Defendant's Motions for Summary Judgment

All of the individual Defendants, except Clark, moved for summary judgment, arguing that they are entitled to qualified immunity and that they were not deliberately indifferent to Madison's medical needs. There are three general categories of individual defendants: Jail supervisors who did not interact with Madison but may have supervisory liability; Jail staff who had some interaction with Madison at the Jail; and medical personnel.

Because the individual Defendants have raised qualified immunity as a defense, the court must determine whether the undisputed facts demonstrate that each Defendant violated Madison's constitutional rights, and if so, whether the constitutional right at issue was clearly established at the time of the alleged violation.[1] *Pearson v. Callahan*, 555 U.S. 223, 232 (2009). If material facts are not in dispute, the question of qualified immunity is a legal one for the court to decide. *Medina v. Cram*, 252 F.3d 1124, 1129 (10th Cir. 2001).

In determining whether the constitutional right is clearly established, the contours of the right must be sufficiently clear that a reasonable official would understand that he or she was violating that right. *Brousseau v. Haugen*, 543 U.S. 194, 199 (2004). The Estate asserts that each Defendant was deliberately indifferent to Madison's serious medical needs. The Tenth Circuit has defined deliberate indifference as follows: "[A]n official . . . acts with deliberate indifference if [his or her] conduct . . . disregards a known or obvious risk that is very likely to

---

[1] The court will address whether Dr. Tubbs and Nurse Clyde are able to assert qualified immunity as contract medical employees when it specifically analyzes their motions.

result in the violation of a prisoner's constitutional rights." *Barie v. Grand County*, 119 F.3d 862, 869 (10th Cir. 1992). To meet this standard, a plaintiff must "show that prison officials were consciously aware that the prisoner faced a substantial risk of harm and wantonly disregarded the risk by failing to take reasonable measures to abate it." *Farmer v. Brennan*, 511 U.S. 825, 847 (1994).

In determining deliberate indifference, the court is required to employ a two-step analysis involving an objective component and a subjective component. *Sealock v. Colorado*, 218 F.3d 1205, 1209 (10th Cir. 2000). The objective component of deliberate indifference is met if the deprivation is "sufficiently serious." *Farmer*, 511 U.S. at 834. A medical need is sufficiently serious if it is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention. *Hunt v. Uphoff*, 199 F.3d 1220, 1224 (10th Cir. 1999). The subjective component is met only if an official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he [or she] must also draw the inference." *Farmer*, 511 U.S. at 837.

## A. Jail Supervisors – Sheriff David Boren's and Sergeant Jason Curry

Defendants David Boren and Jason Curry move for summary judgment in their favor on the Estate's claims for supervisory liability under Section 1983. Neither Boren nor Curry had any personal interaction with Madison. Rather, the Estate's claims against them are based on their respective supervisory positions as Duchesne County Sheriff and Duchesne County Jail Commander. As such, the Estate asserts they failed to "create, enforce, or offer training on any policies, procedures, or customs regarding what to do upon learning that an inmate was

exhibiting obvious signs of severe dehydration, including protocols about monitoring fluid intake, checking vital signs, and otherwise intervening."

To succeed on a claim of supervisor liability, Plaintiff must "show an 'affirmative link' between" the supervisor and the violation of constitutional rights. *Perry v. Durborow*, 892 F.3d 1235, 1241 (10ᵗʰ Cir. 2011). Section 1983 "imposes liability for a defendant's own actions." *Henry v. Storey*, 658 F.3d 1235, 1241 (10th Cir. 2011). "[T]o demonstrate such an affirmative link, [the Estate] has to establish '(1) personal involvement; (2) causation; and (3) state of mind.'" *Id.*

Personal involvement can be satisfied by showing that an official was "responsible for but failed to create and enforce policies to protect" Madison. *Keith v. Kroener*, 843 F.3d 833, 837 (10th Cir. 2016). To establish causation, the Estate has to show that the official "set in motion a series of events that [he] knew or reasonably should have known would cause others to deprive [inmates] of constitutional rights." *Id.* at 847. Finally, the Estate must "establish the requisite state of mind," which is deliberate indifference. *Id.* at 847-48. To establish that Boren and Curry were deliberately indifferent to Madison's serious medical needs, the Estate must show that Boren and Curry (1) were "aware of facts from which the inference could be drawn that a substantial risk of serious harm existed"; (2) "actually drew the inference"; and (3) were "aware of and fail[ed] to take reasonable steps to alleviate the risk." *Id.* at 848.

### 1. Sheriff Boren

Sheriff Boren created, approved, and enforced Jail policies. When an inmate was vomiting and experiencing diarrhea, he expected that medical personnel would be made aware of the problem, that the inmate would be given Gatorade, and that the inmate would be housed in a

cell allowing medical observation. The evidence before the court is that these practices were routinely followed with all inmates and followed in this case with Madison. There is no evidence of a pattern of officers not following these practices. Therefore, Sheriff Boren had no reason to believe that Jail practices were not being followed or that he needed to enforce these policies or practices. The issue, therefore, is whether these practices were adequate under constitutional standards.

The parties dispute whether, by implementing these practices, Sheriff Boren set a series of events in motion that would have deprived Madison of her constitutional rights. The Estate argues that the Jail's practices were certain to eventually lead to a situation like Madison's. However, it is undisputed that the Jail had been following its practices for several years, the Jail routinely had inmates going through withdrawals, and there had never been a case like Madison's. There is no evidence that the Jail was on notice that its protocol would deprive Madison of her constitutional rights. Sheriff Boren had no reason to believe that such an event would occur if his officers were trained to observe an inmate's condition, notify medical personnel of an inmate's condition, and provide the inmate with Gatorade.

The Estate has not shown that Sheriff Boren was aware of facts from which he could infer that a substantial risk of harm existed to inmates like Madison. He had never heard of an inmate dying from dehydration and believed he had practices in place to prevent that from happening. Even if Sheriff Boren knew that vomiting and diarrhea could lead to dehydration, which in turn could lead to death, this knowledge is not enough to establish that the practices the Jail had in place were not sufficient to address the problem. Staff knew to contact medical personnel, give Gatorade, and observe the inmate. This practice does not establish deliberate indifference.

The Estate argues that courts have found that jail supervisors, like Sheriff Boren, could be liable for deliberate indifference in factual scenarios similar to this case. In *Shadrick v. Hopkins County, Ky*, 805 F.3d 724 (6th Cir. 2015), the court found that a lack of training of LPN nurses as to how to handle recurring situations could subject supervisors to liability for deliberate indifference. *Id.* at 739. Although mere negligence was not enough to show deliberate indifference, the plaintiff did not need to show actual intent to cause harm only something akin to recklessness. *Id.* at 737. The court concluded that "a reasonable jury . . . could determine that SHP's failure to train and supervise its LPN nurses in meeting their constitutional obligations demonstrates SHP's own deliberate indifference to the highly predictable consequence that an LPN nurse will commit a constitutional violation." *Id.* at 740. The court also found that "[r]easonable jurors could . . . determine that SHP's inadequate training and supervision actually caused, or was closely related to, the [inmate]'s injury and death." *Id.* at 743.

In *Shadrick*, the county in that case had no policy on how to deal with a medical emergency. *Id.* at 740. That is not the situation in this case. Every member of the jail staff testified that they knew that they could inform Nurse Clyde of the situation, call PA Clark or Dr. Tubbs directly, or send an inmate with an urgent need for care to the hospital. Every staff member testified that they knew these were proper responses to a medical situation that seemed life-threatening.

The *Shadrick* court said that establishing municipal liability based on a single incident was only available "'in a narrow range of circumstances' where a federal rights violation 'may be a highly predictable consequence of a failure to equip [employees] with specific tools to handle recurring situations.'" *Id.* at 739. "In such cases, 'it may happen that in light of the duties

assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers . . . can reasonably said to have been deliberately indifferent to the need.'" *Id.*

However, in this case, Sheriff Boren was not responsible for training and supervising Nurse Clyde, the LPN employed at the Jail. Under Dr. Tubbs' contract with the County, Dr. Tubbs was responsible for training and supervising Nurse Clyde. There is not an obvious need for additional training in this case with respect to Jail staff. Jail staff notified Nurse Clyde of the situation, placed Madison in an observation cell, and provided her with Gatorade. Jail and medical staff had repeatedly seen and successfully treated inmates who were throwing up, experiencing diarrhea, and/or going through withdrawals. Jail officers received training on how to observe and report to medical personnel. The Jail contracted with medical personnel to deal with serious medical needs.

Each of the officers in this case either reported Jensen's condition to medical or reasonably believed that her condition had been reported to medical and that she was receiving treatment. Nurse Clyde also knew to report an inmate's symptoms to PA Clark or Dr. Tubbs. Based on the record, the Estate cannot establish that Sheriff Boren failed to train or implement Jail policies that set in motion the events that led to Madison's unfortunate death.

The Estate also fails to establish that Sheriff Boren either knew or reasonably should have known that his actions would result in the violation of Madison's constitutional rights. Personal involvement cannot be based on vicarious liability. Accordingly, the court concludes that Sheriff Boren is entitled to qualified immunity because he was not deliberately indifferent to Madison's serious medical needs.

### 2. Jason Curry

Sergeant Jason Curry was a lieutenant in the Jail and the commanding officer of the Jail at the time of Madison's incarceration. The majority of Curry's duties in 2016 were administrative. Curry did not have any direct contact with Madison. He learned of Madison on Thursday morning, the date of her death, because she was in an observation cell. Curry asked Nurse Clyde if Madison was going through heroin withdrawals, and Clyde responded that she thought it was the stomach flu. In 2016, Curry stated that the Jail's practice if an inmate was vomiting or experiencing diarrhea was to contact medical, put the inmate in a cell with water, and give the inmate Gatorade. Before Madison passed away, Curry had never heard of an inmate dying of heroin withdrawals or dehydration.

As with Sheriff Boren, the Estate's claims against Curry are for supervisor liability. Curry argues that the protocols and training that were in place had always been sufficient and were constitutionally appropriate. As the court decided with respect to Sheriff Boren, the Estate has not demonstrated that the Jail policies and training of staff members to report medical conditions to the medical personnel, provide the inmate with Gatorade, and place the inmate in an observation cell was deliberately indifferent to Madison's medical needs. Accordingly, the court grants Curry qualified immunity on the Estate's claims.

## B. Jail Staff – Richens, Purdy, Ross, and Bird

The Jail staff members who had contact with Madison while she was detained also move for summary judgment, arguing that they were not deliberately indifferent to Madison's medical needs and are entitled to qualified immunity.

**1. Deputy Elizabeth Richens**

The Estate argues that Richens is not entitled to qualified immunity because a genuine issue exists as to whether, in violation of clearly established law, Richens knowingly disregarded a substantial risk to Madison's health by not obtaining medical treatment for Madison's obvious dehydration. Jail officials must "ensur[e] inmates receive the basic necessities of adequate food, clothing, shelter, and medical care" and reasonably guarantee inmates' safety. *Barney v. Pulsipher*, 143 F.3d 1299, 1310 (10th Cir. 1998). A prison official violates clearly established law if he or she 'knows of and disregards an excessive risk to inmate health or safety." *Keith v. Koerner*, 707 F.3d 1185, 1188 (10th Cir. 2013). Deputy Richens argues that the Estate cannot meet that subjective component of the deliberate indifference standard because Richens did not know that Madison faced a substantial risk of harm and she did not disregard that risk.

In this case, it is undisputed that Deputy Richens repeatedly took Madison to see Nurse Clyde, gave her Gatorade, and put her in an observation cell. Richens had no knowledge that withdrawing from heroin posed a serious risk to Madison. She had repeatedly done the same things with other inmates who had the same symptoms and none of them had died. In *Stafford v. Stewart*, the Tenth Circuit held that even if the prisoner had complained to the officer about certain symptoms, those symptoms would not prove that the officer knew of the serious risk of harm posed to the prisoner, and the officer was entitled to qualified immunity. 461 Fed. Appx. 767, 770-71 (10th Cir. 2012).

Even if Deputy Richens had known of the substantial risk to Madison's health and safety posed by her possible heroin withdrawal and symptoms of dehydration, Richens responded to Madison's medical complaints and observable physical condition. Richens' response, and not

the ultimate outcome, is what is relevant. Negligence in diagnosing and/or treating an inmate's medical condition is not deliberate indifference. *Estelle v. Gamble*, 429 U.S. 97, 105-06 (1976).

Deputy Richens did not ignore Madison's medical complaints or symptoms. She repeatedly assisted her in seeing the nurse, made sure she had Gatorade, and put her in an observation cell. Prison officials, who are not medical staff capable of treating an inmate, play a gatekeeper role. *Spradley v. LeFlore Cnty. Detention Ctr. Pub. Tr. Bd.*, 764 Fed. Appx. 692, 700 (10th Cir. 2019) (holding that if a prison official "knows that his role in a particular medical emergency is solely to serve as a gatekeeper to other medical personnel capable of treating the condition, and if he delays or refuses to fulfill that gatekeeper role due to deliberate indifference, . . . he may also be liable for deliberate indifference from denying access to medical care."). Richens did not delay or refuse to fulfill that role by denying or delaying Madison access to medical professionals. Richens took Madison to see Nurse Clyde and reported Madison's condition to Nurse Clyde. It was reasonable for Richens to believe that Nurse Clyde would provide Madison with the medical care she needed or report her condition to PA Clark or Dr. Tubbs if additional care was necessary. There was no evidence that Madison appeared to need urgent care when Nurse Clyde was not available. Richens never believed that Madison needed to see a physician immediately. She had never heard of someone dying from heroin withdrawal or dehydration. Richens is judged by what she knew and did in November of 2016, not by 20/20 hindsight. There is no evidence that anything Richens did or did not do resulted in substantial harm to Jensen. She tried to get Madison medical care from Nurse Clyde several times. Under the circumstances, Richens acted reasonably given her lack of knowledge with respect to the risk to Madison's health and safety posed by heroin withdrawal. Accordingly, the court concludes

that Richens is entitled to qualified immunity under the deliberate indifference standard.

### 2. Sergeant Holli Purdy's Motion

Sergeant Purdy was not present when Madison was booked into Jail and only saw her three times over the ensuing days. As with Richens, Sergeant Purdy played what is referred to as a "gatekeeper role." *Spradley v. LeFlore Cnty. Detention Ctr. Pub. Tr. Bd.*, 764 Fed. Appx. 692, 700 (10th Cir. 2019) (holding that if a prison official "knows that his role in a particular medical emergency is solely to serve as a gatekeeper to other medical personnel capable of treating the condition, and if he delays or refuses to fulfill that gatekeeper role due to deliberate indifference, . . . he may also be liable for deliberate indifference from denying access to medical care.").

The Estate alleges that Sergeant Purdy violated Madison's constitutional rights by deliberately denying or delaying her access to medical care in conscious disregard of the obvious risk of harm caused by severe dehydration. But Sergeant Purdy fulfilled her gatekeeper role by reporting Madison's condition to Nurse Clyde. Sergeant Purdy lacked any knowledge of a risk to Madison from vomiting. Sergeant Purdy may have known that Madison was withdrawing from heroin and was vomiting and experiencing diarrhea as a consequence, but had no knowledge of or reason to know that this posed a serious risk to Madison's health. Sergeant Purdy had previously seen numerous inmates with these same symptoms and conditions and none of them had died. Even if Madison complained to Purdy about her symptoms, Purdy did not realize the seriousness of the condition. Purdy had always given a Gatorade for such symptoms and it had always helped. Purdy also knew to forward the symptoms along to Nurse Clyde, which she did. Therefore, Purdy appropriately responded to Madison's needs and provided her access to medical personnel. Purdy did not ignore Madison's needs. Madison did not complain to Purdy of any of

her symptoms. Purdy did learn that Madison was throwing up, but she did not refuse Madison's request for medical treatment or remain inactive. In fact, Purdy acted by asking after Madison when she first saw her, checking on her after she learned she had been vomiting, asking Nurse Clyde if she could give her a Gatorade, and giving her a Gatorade. Purdy also reasonably believed that Madison was receiving treatment from medical personnel, as Nurse Clyde was aware of Madison's condition and seeing her. Purdy knew that Madison looked thin and that she was throwing up, but she did not know the severity of her situation. Purdy attempted to help Madison how she could. Purdy, as a nonmedical corrections officer, performed her duties as a gatekeeper. Although the Estate claims that Purdy should have gone around Nurse Clyde and sought additional medical assistance, that was not constitutionally required in this situation. Purdy's conduct was objectively reasonable in light of what she knew at the time. Accordingly, the court concludes that Purdy is entitled to qualified immunity.

### 3. Gerald J. Ross, Jr.

Deputy Ross saw Madison from the controller room and helped move her into the observation cell because she had been vomiting and having diarrhea. As a nonmedical staff member at the Jail, Ross also had a gatekeeper role. Deputy Ross knew that Richens had contacted medical and that they were addressing the situation.

The Estate argues that there is evidence that Ross was aware of Madison's signs of dehydration, including her consistent vomiting and lack of eating. Deputy Ross saw Madison eat a little but not much. Ross had no knowledge that Madison's symptoms would lead to her death. Ross worked only the Monday and Tuesday of the week Madison was incarcerated. There is no evidence that Madison complained to Ross about any of her symptoms or that he refused her any

request for treatment.  Ross actively helped move her to an observation cell.  He also knew that Richens had reported Madison's condition to Nurse Clyde and that Madison was being treated by medical personnel.  Ross was not required to go around Nurse Clyde to get additional medical treatment for Madison.  Therefore, the court concludes that Ross acted reasonably and is entitled to qualified immunity.

### 4. Caleb Bird

As with the above Jail staff, Deputy Bird had a "gatekeeper role."  Deputy Bird had only one limited encounter with Madison during her incarceration at the Jail.  On Wednesday morning, he brought Madison her daily medication.  When she failed to come to the door, he took it in to her.  When he went in the cell, he saw vomit.  Bird reported what he had seen to Nurse Clyde.

In accordance with his gatekeeper role, Deputy Bird acted reasonably in reporting the vomit to Nurse Clyde.  There is no evidence that he delayed in relaying the information to Nurse Clyde.  Bird did not deny any request from Madison for treatment.   There is no evidence that Madison asked him for help or asked him to take her to get medical treatment.   He affirmatively told Nurse Clyde what he saw and he believed that Madison would get the necessary treatment from Nurse Clyde or that Nurse Clyde would contact PA Clark or Dr. Tubbs.  Although he stated to this wife that he thought Madison looked like she would die, he did not actually think she was going to die.  No reasonable juror could conclude that Bird acted unreasonably or failed to fulfill his gatekeeper role.  Accordingly, the court concludes that Bird is entitled to qualified immunity under the deliberate indifference standard.

**C. Medical Personnel**

**1. Dr. Kennon Tubbs**

The Estate asserts a supervisory liability claim against Dr. TUbbs, alleging that Dr. Tubbs violated Madison's constitutional rights by failing to implement and train Nurse Clyde on protocols and procedures regarding what to do upon learning that an inmate was exhibiting obvious signs of severe dehydration.

As outlined above, to establish a claim of supervisory liability under § 1983, the Estate must show direct personal responsibility, an affirmative link between the supervisor and the constitutional violation, and the requisite state of mind. *Keith v. Koerner*, 843 F.3d 833, 838 (10th Cir. 2016). A plaintiff meets the "personal involvement" pong by alleging "a complete failure to train, or training that is so reckless or grossly negligent that future misconduct is almost inevitable." *Id.* Alternatively, a plaintiff may meet this prong by alleging the supervisor "failed to implement and enforce policies that would have prevented" the violation. *Id.* Under the "causation" prong, a plaintiff must allege the supervisor "set in motion a series of events that the defendant knew or reasonably should have known would cause others to deprive the plaintiff of his constitutional rights." *Id.* at 847. Finally, a plaintiff meets the "state of mind" prong by alleging the supervisor "knowingly created a substantial risk of constitutional injury" or "consciously fail[ed] to act when presented with an obvious risk of constitutional injury of the type experienced by the plaintiff." *Id.* at 848. A supervisor cannot be held liable simply because he or she was "in charge of" a facility. *Durkee v. Minor*, 841 F.3d 872, 878 (10th Cir. 2016).

It is undisputed that no one, including Jail staff, Nurse Clyde, or PA Clark ever notified Dr. Tubbs that Madison was exhibiting concerning symptoms before she died. There is no basis

for any claim against Dr. Tubbs in this case relating to personal involvement.

Dr. Tubbs' contractual duties with Duchesne County were to "provide training, instruction, support, and a supervisory role of nursing staff on how to appropriately handle triage, sick calls, medical protocols, and health care complaints/grievances." Dr. Tubbs argues that Nurse Clyde was appropriately trained to call him or PA Clark if any inmate vomited over an extended period of time. Nurse Clyde testified that she knew that constant vomiting over a multi-day period was a concerning symptom that warranted a call to Dr. Tubbs or PA Clark. However, there is a question of fact as to whether Nurse Clyde knew the extent of Madison's condition. Although she saw Madison several times, she disputes that she knew that she was continuing to vomit over multiple days. Nurse Clyde was limited by her licensure to do anything beyond notifying Dr. Tubbs or PA Clark when an inmate exhibited concerning symptoms or sending an inmate to the hospital. Because she was only an LPN, she could not have been trained to do anything other than call. However, there is a question as to whether the lack of medical care Madison received has an affirmative link to Dr. Tubbs' failure to train Nurse Clyde about how to properly respond to certain observable symptoms.

A plaintiff meets the "state of mind" prong of supervisory liability by alleging that the supervisor knowingly created a substantial risk of constitutional injury or consciously failed to act when presented with an obvious risk of the type experienced by the plaintiff. The Estate has not presented any prior instances where Dr. Tubbs was placed on notice that inmates at the Jail were not receiving adequate medical care. The evidence shows that both Jail staff and Nurse Clyde knew to contact medical personnel when an inmate exhibited concerning symptoms. However, there is no evidence regarding Nurse Clyde's specific training. There were no written

procedures, policies, or training materials.  Although there are no prior instances of  Nurse Clyde failing to ensure adequate medical care at the Jail, there is some question as to whether Dr. Tubbs' failure to have any kind of training materials or written policies for Nurse Clyde to follow knowingly created a substantial risk of constitutional injury.

Given the lack of training materials or policies and the disputed facts in this case regarding Nurse Clyde's knowledge of Madison's condition, any determination regarding the adequacy of Nurse Clyde's training is also called into question.  Dr. Tubbs acknowledges that he was responsible for Nurse Clyde's training.  Nurse Clyde failed to document Madison's condition despite her two visits to the medical clinic and at least one visit to Madison's cell. This lack of documentation calls into question what kind of training Nurse Clyde had received. In addition, Nurse Clyde failed to engage in basic follow up with Madison regarding her condition.  When Madison filled out a medical request form on Tuesday and stated that she had been vomiting for several days, Nurse Clyde claims she thought it must have been before Madison came to the Jail.  However, Nurse Clyde's reliance on her own assumption highlights a lack of training with respect to how to identify or document a patient's condition.  Nurse Clyde should have clarified Madison's statements at the time.  If Nurse Clyde knew she should call Dr. Tubbs or PA Clark when a patient had been vomiting for several days and a patient fills out a form stating that she has been vomiting for several days, but the Nurse does not know when the vomiting occurred, the Nurse should be trained to ask the patient when the vomiting occurred.  A crucial part of patient triage is understanding the situation presented by each patient.  Nurse Clyde's job was to relay information to other medical personnel.  However, there is no evidence that Nurse Clyde was trained in how to find out or document relevant information from patients.

If there were no protocols or training for obtaining relevant information from patients, a constitutional violation was certain to occur at some point. The Estate can meet the personal involvement element by showing training that is so reckless or grossly negligent that future misconduct is almost inevitable. *Keith v. Koerner*, 843 F.3d 833, 838 (10th Cir. 2016). There is a question of fact as to whether Dr. Tubbs failed to implement and enforce policies that would have prevented the constitutional violation. There is also a question of fact as to whether Dr. Tubbs' failure to implement protocol and training set in motion a series of events that Nurse Clyde to deprive Madison of her constitutional rights. A factfinder could conclude that Dr. Tubbs set in motion a series of events he knew would lead to constitutional violations because symptoms like Madison's were inevitable. Dr. Tubbs knew that protocols were necessary. There is a question of fact as to whether Dr. Tubbs failed to implement protocols on what Nurse Clyde should do in documenting and relaying information regarding serious medical conditions. Therefore, there is also a question of fact as to whether Dr. Tubbs knew that a lack of protocols would eventually lead to someone's serious medical needs not being met.

Dr. Tubbs contends that he is entitled to qualified immunity as a matter of law because he was performing quintessential functions of a government actor and did not knowingly violate Madison's constitutional rights. Although Dr. Tubbs was not a county employee, Tubbs claims that he is entitled to qualified immunity when undertaking duties to provide medical care to inmates at the Jail. *See West v. Atkins*, 487 U.S. 42, 50 (1988); *Jenkins v. Utah County Jail*, 2015 WL 164194, *6-7 (D. Utah Jan. 13, 2015). The Estate, however, argues that qualified immunity is not available to him because he merely contracted to provide medical services to the Jail. *See Estate of Grubbs v. Weld Cty. Sheriff's Office*, No. 16-CV-714-PAB-STV, 2017 WL 951149, *5

(D. Colo. Mar. 8, 2017) (noting weight of authority declining to extend qualified immunity "to employees of a private company providing medical services to inmates"). The Tenth Circuit "has yet to decide whether or not qualified immunity is available to employees of a private company providing medical services to inmates." *Kellum v. Mares*, 657 F. Appx. 763, 768 n.3 (10th Cir. 2016). However, whether or not qualified immunity is available to a contract doctor, the questions of fact regarding Dr. Tubbs' potential supervisory liability precludes the application of the qualified immunity defense prior to trial. A genuine issue exists as to whether Tubbs was deliberately indifferent to the risk of constitutional injuries like Madison's by not establishing procedures or providing training on what Nurse Clyde should have done in a case like Madison's. Accordingly, the court denies Dr. Tubbs' motion for summary judgment.

## 2. Nurse Clyde

Nurse Clyde argues that the Estate cannot meet the subjective test for deliberate indifference because Nurse Clyde took action to address Madison's medical needs and she never believed that Madison faced a serious risk of death or medical harm. The Estate must show that Nurse Clyde had actual knowledge of a substantial risk of serious harm to Madison. The civil law standard of "should have known" is insufficient. *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). If Clyde knew of a serious medical risk, but took reasonable action to avert it, even if unsuccessful, she cannot be found to have acted with deliberate indifference. "[I]nadvertent or negligent failure to provide medical care, however serious the consequences, does not rise to deliberate indifference to serious medical needs and is not a constitutional violation." *Hood v. Prisoner Health Servs.*, 180 F. Appx. 21, 25 (10th Cir. 2006). However, the Estate does not need to prove that Clyde acted or failed to act believing that harm actually would befall Madison. It is

34

enough if Clyde acted or failed to act despite her knowledge of a substantial risk of serious harm. *Mata v. Saiz*, 427 F.3d 745, 752 (10th Cir. 2005).

Nurse Clyde contends that she is entitled to qualified immunity because the Estate cannot show that she subjectively knew of and disregarded an excessive risk to Madison's health. Clyde's argument, however, fails because there are questions of fact as to whether she was subjectively aware of Madison's severe dehydration but failed to obtain any medical treatment for Madison. A genuine issue exists as to whether Clyde knowingly disregarded a substantial risk to Madison's health by not obtaining medical treatment for Madison's dehydration.

As the nonmoving party, the Estate is entitled to have the facts reviewed in the light most favorable to it and with all reasonable inferences drawn in its favor. *Jones v. Norton*, 809 F.3d 564, 573 (10th Cir. 2015). Viewing all the facts in favor of the Estate, the court concludes that a reasonable jury could find that Nurse Clyde was deliberately indifferent to Madison's medical needs. Madison complained to her on Monday about vomiting, being unable to keep food and water down, and soiling her sheets. Clyde also observed Madison was sick, extremely thin, pale, weak, and walking like a skeleton. Clyde learned that Madison had opiates in her system and felt like Madison was lying about her symptoms. On Tuesday, Madison continued to look really pale, tired, weak, and moving slowly. Clyde's new declaration claims that she was moving normally, but it contradicts other evidence. When Clyde saw Madison on Wednesday, she did not inquire about the symptoms Madison listed on the form and that had been reported by Bird and Purdy–vomiting, diarrhea, and an inability to hold down food and water. And, on Thursday, Clyde did not tell Clark about Madison until after he had seen every other inmate on his list. While it is certainly possible that Nurse Clyde did all that was necessary, it is also possible that a

reasonable jury could find Clyde was aware of Madison's severe dehydration and disregarded the risk to her by not obtaining adequate treatment. The facts need to be presented to a jury, and the jury can make credibility determinations.

The court also notes that there are questions of fact as to Nurse Clyde's training. If she was not trained properly, she may not have been deliberately indifferent. If she was trained properly, it will weigh on whether she was deliberately indifferent. Because there are several questions of material fact relating to Nurse Clyde, summary judgment and qualified immunity are inappropriate.

## CONCLUSION

Based on the above reasoning, Defendant Elizabeth Richens' Motion for Summary Judgment [Docket No. 122] is GRANTED; Defendant Jana Clyde's Motion for Summary Judgment [Docket No. 133] is DENIED; Defendant David Boren's Motion for Summary Judgment [Docket No. 135] is GRANTED; Defendant Hollie Purdy's Motion for Summary Judgment [Docket No. 136] is GRANTED; Defendant Gerald J. Ross Jr.'s Motion for Summary Judgment [Docket No. 137] is GRANTED; Defendant Jason Curry's Motion for Summary Judgment [Docket No. 138] is GRANTED; Defendant Caleb Bird's Motion for Summary Judgment [Docket No. 139] is GRANTED; Defendant Duchesne County's Motion for Summary Judgment [Docket No. 140] is GRANTED; and Defendant Kennon Tubbs' Motion for Summary Judgment [Docket No. 141] is DENIED.

Dated this 21st day of January, 2020.

BY THE COURT:

_____
DALE A. KIMBALL
United States District Judge