THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH

| | |
|---|---|
| THE ESTATE OF MADISON JODY JENSEN, by her personal representative Jared Jensen,<br><br>　　　　　　　Plaintiff,<br><br>v.<br><br>JANA CLYDE, an individual, and LOGAN CLARK, an individual,<br><br>　　　　　　　Defendants. | **MEMORANDUM DECISION AND ORDER GRANTING IN PART AND DENYING IN PART [208] DEFENDANT LOGAN CLARK'S MOTION FOR SUMMARY JUDGMENT**<br><br>Case No. 2:17-cv-01031-DBB<br><br>District Judge David Barlow |

　　　　Plaintiff, the Estate of Madison Jody Jensen (the "Estate"), filed a complaint in this court asserting § 1983 claims arising out of the death of Madison Jensen while in custody at Duchesne County Jail.[1]

　　　　This matter is now before the court on a motion for summary judgment filed by Defendant Logan Clark ("PA Clark").[2] PA Clark asserts that he is entitled to qualified immunity on the Estate's claims for supervisory liability and deliberate indifference to a pretrial detainee's serious medical needs. For the reasons that follow, PA Clark's motion for summary judgment is granted in part and denied in part. The claim for supervisory liability is dismissed.[3]

---

[1] ECF No. 2.
[2] Defendant Clark's Motion for Summary Judgment, ECF No. 208, filed June 1, 2022.
[3] The Estate has not opposed PA Clark's motion for summary judgment on the Estate's claim for supervisory liability. Resp. 2, ECF No. 209, filed June 22, 2022 ("[T]he Estate agrees dismissal of the supervisory claim against PA Clark is appropriate."). Therefore, the court dismisses that claim.

## BACKGROUND[4]

On Sunday, November 27, 2016, Jared Jensen called the Duchesne County Sheriff's office. His daughter, Madison Jensen ("Ms. Jensen"), was exhibiting odd and erratic behavior, and he had discovered what he believed to be drug paraphernalia and residue in her room.[5] The police arrested Ms. Jensen for possession of a controlled substance and paraphernalia and took her to the Duchesne County Jail (the "Jail").[6]

 Deputy Elizabeth Richens ("Deputy Richens"), a correctional officer at the Jail, booked Ms. Jensen.[7] During the booking process, Deputy Richens had Ms. Jensen complete an intake and health questionnaire.[8] On those forms, Deputy Richens recorded that Ms. Jensen reported she was having withdrawals from drugs and alcohol and that the last time she had used heroin was five days before her arrest.[9] Ms. Jensen also reported that she had three prescription medications: tramadol, Wellbutrin, and Clonidine.[10] Deputy Richens then printed two copies of the electronic intake and health questionnaires and placed one copy of each in the medical box for the Jail's licensed practical nurse Jana Clyde ("LPN Clyde").[11] Sometime after booking, Deputy Richens observed Ms. Jensen vomiting in her cell.[12]

On Monday morning, Ms. Jensen went to see LPN Clyde.[13] When she arrived, Deputy Richens was also present in the medical room.[14] Ms. Jensen reported that she was not feeling

---

[4] The court addresses the record evidence in the light most favorable to the non-moving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007) (quoting *United States v. Diebold, Inc.*, 369 U.S. 654 (1962)).
[5] Second Am. Compl. 5, ECF No. 91.
[6] *Id.* at 6.
[7] Richens Dep. Ex. 2, at 10:3–10:9.
[8] *Id.* at 10:3–13, 16:1–18:2.
[9] *Id.* at 21:25–24:23.
[10] *Id.* at 27:13–27:21.
[11] *Id.* at 24:24–26:23.
[12] *Id.* at 28:21–29:13.
[13] *Id.* at 32:4–32:10.
[14] *Id.* at 31:14–31:17, 32:19–32:20.

well, that she had vomited the night before,[15] and that she could not keep anything down.[16] Ms. Jensen told LPN Clyde that it was a stomach bug, not withdrawal symptoms.[17] LPN Clyde noticed that Ms. Jensen "appeared possibly sick . . . like if somebody had flu or cold or something," was pale, and looked like a possible drug user.[18] Deputy Richens informed LPN Clyde that Ms. Jensen had tested positive on the urinalysis and voiced her opinion that Ms. Jensen was "obviously coming off something."[19] LPN Clyde also believed Ms. Jensen was lying about not withdrawing.[20] For treatment, LPN Clyde gave Ms. Jensen Gatorade and sent her back to her cell with the instruction to collect her vomit and diarrhea.[21]

Later that day, LPN Clyde called PA Clark, a physician's assistant who made weekly visits to the jail to provide medical care.[22] She needed to get his approval for Ms. Jensen's Clonidine prescription.[23] LPN Clyde stated that she informed PA Clark of Ms. Jensen's three prescriptions[24] and "briefly discussed" Ms. Jensen with him,[25] including that Ms. Jensen had reported vomiting.[26] PA Clark does not specifically remember the phone call nor even being told Ms. Jensen's name and denies that LPN Clyde told him about Ms. Jensen's other medications[27] or about Ms. Jensen vomiting the previous night.[28]

---

[15] *Id.* at 32:24–33:10, 38:22–39:4; Clyde Dep. Ex. 3, at 57:10–57:17, 63:25–64:5.
[16] Richens Dep. Ex. 2, at 35:23–36:15.
[17] Clyde Dep. Ex. 3, at 57:18–57:25.
[18] *Id.* at 56:9–57:2.
[19] Richens Dep. Ex. 2, at 35:13–35:22; Clyde Dep. Ex. 3, at 192:12–194:3.
[20] Clyde Dep. Ex. 3, at 61:8–61:14.
[21] *Id.* at 68:12–68:18.
[22] *Id.* at 59:8–60:7; Clark Dep. Ex. 5, at 13:22–14:6.
[23] Clyde Dep. Ex. 3, at 58:17–58:21.
[24] *Id.* at 59:8–60:7, 189:2–191:13. The three prescriptions were Clonidine, Wellbutrin, and tramadol. Richens Dep. Ex. 2 at 27:13–27:20. Ms. Jensen had Wellbutrin "for anxiety and to assist with smoking cessation." Brown Report Ex. 8, at 3. The tramadol was for her painful menstrual periods. *Id.*
[25] Clyde Interrog. Ex. 4, at 4.
[26] Clyde Dep. Ex. 3, at 71:4–71:24, 191:23–192:11.
[27] Clark Dep. Ex. 5, at 108:8–109:9.
[28] *Id.* at 28:25–29:2.

Later, PA Clark testified that if he had been informed Ms. Jensen was vomiting repeatedly, it would have put him "at higher concern that something [wa]s going on."[29] PA Clark's supervisor, Dr. Kennon Tubbs, testified that if LPN Clyde had called and told him an inmate had "vomited once the night before" he "would immediately start asking [LPN Clyde] more questions" and "would like more information."[30]

The following day, Tuesday, Ms. Jensen returned to the medical unit to speak with LPN Clyde.[31] She again complained about experiencing the symptoms of a "stomach bug."[32] With LPN Clyde's authorization, Deputy Richens gave Ms. Jensen more Gatorade to drink because Ms. Jensen was continuing to vomit and could not eat.[33] LPN Clyde also asked Deputy Richens to help Ms. Jensen fill out a Medical Request Form so that Ms. Jensen could see PA Clark during his weekly visit.[34] Ms. Jensen reported on the form that she was "pucking [sic] for 4 days straight, runs, diarrhea, can't hold anything down not even water."[35] That afternoon, Ms. Jensen was moved to a new cell in court holding, referred to as a "medical observation cell," for closer observation.[36]

The next day, Wednesday, LPN Clyde went to the medical observation cell to deliver Gatorade to Ms. Jensen.[37] There was a plastic tote filled with vomit and toilet paper next to the bed, and Ms. Jensen's blanket was visibly streaked with vomit.[38] Ms. Jensen's lunch tray was

---

[29] *Id.* at 28:25–29:9, 32:10–32:15, 92:6–92:7 ("[B]ut in a patient that is vomiting repeatedly, I would ask to be notified.").
[30] Tubbs Dep. Ex. 6, at 87:21–88:18.
[31] Clyde Dep. Ex. 3, at 73:6–73:11.
[32] *Id.* at 73:20–73:25.
[33] Richens Dep. Ex. 2, at 48:10–48:25; Clyde Interrog. Ex. 4, at 5.
[34] Richens Dep. Ex. 2, at 50:17–51:19; Clyde Interrog. Ex. 4, at 6.
[35] Medical Request Form Ex. 7, at 1.
[36] Brown Expert Report Ex. 8, at 6.
[37] Clyde Dep. Ex. 3, at 90:19–91:7.
[38] Brown Expert Report Ex. 8, at 7.

unopened in the cell door aperture.[39] Ms. Jensen "shuffle[d] unsteadily" to the cell door to take

the Gatorade from LPN Clyde.[40] Based on her observations, LPN Clyde did not believe that Ms.

Jensen was in urgent need of medical attention.[41] At the end of her shift that day, LPN Clyde

gathered inmates' Medical Request Forms, including the one Ms. Jensen had completed on

Tuesday, in preparation for PA Clark's Thursday visit.[42]

    The next day, PA Clark arrived at the Jail to make his weekly rounds at 9:00 a.m.[43] PA

Clark did not know which inmates he would see, nor what medical problems they were

experiencing, in advance of his arrival.[44] LPN Clyde stated that she handed him the Medical

Request Forms and medical files of all the inmates who had requested to be seen.[45] LPN Clyde

testified that Ms. Jensen's Medical Request Form was included in the materials she gave PA

Clark.[46] According to LPN Clyde, PA Clark and LPN Clyde then reviewed the requests, and LPN

Clyde informed PA Clark that Ms. Jensen was getting Gatorade and that Ms. Jensen had written

---

[39] *Id.*

[40] *Id.*

[41] Clyde Interrog. Ex. 4, at 8.

[42] *Id.* at 9; Clyde Dep. Ex. 3, at 173:1–173:12.

[43] Clark Dep. Ex. 2, at 36:7–36:9.

[44] *Id.* at 37:3–39:8.

[45] Clyde Interrog. Ex. 4, at 9–10 ("[Ms. Jensen's] request was with the medical request slips that I gathered together on Wednesday . . . . On Thursday, December 1, 2016 PA [] Clark arrived at the jail for his weekly visit in the morning. Once he made it to the medical office I handed him the folders of all of the inmates that had made requests to be seen by him. [PA Clark] and I reviewed the requests and he decided who needed to be seen and who did not."); Clyde Dep. Ex. 3, at 114:23–115:8 ("When he came . . . he went on and went through the files of the inmates. Yes, we addressed Madison Jensen"); Duchesne Co. Jail Written Statements Ex. O at 10, ECF No. 151 ("When PA [Clark] came today I reviewed her stay here with him and what I had been doing with her and had Madison on the list to be seen.").

[46] Clyde Dep. Ex. 3, at 150:14–150:17 ("Q: Your testimony is that [Ms. Jensen]'s medical file was included in the packet of files that you gave to [PA] Clark upon his arrival. Correct? A: Correct.")

down that she was vomiting and having diarrhea.[47] LPN Clyde also told him that Ms. Jensen was in "court holding," the medical observation cell.[48]

PA Clark denied that Ms. Jensen's request was included in the forms LPN Clyde gave him that morning.[49] He insisted that LPN Clyde did not discuss Ms. Jensen's symptoms with him until he had finished seeing all the other inmates.[50] PA Clark also testified that LPN Clyde told him that Ms. Jensen had not submitted a Medical Request Form.[51]

PA Clark's supervisor, Dr. Tubbs, testified that if he learned that an inmate was "moved for medical observation, [he] would assume there's a medical problem," and "would want to

---

[47] Clyde Dep. Ex. 3, at 110:2–110:11 ("Q. Describe for me all communications you had with [PA Clark] on that day about [Ms. Jensen] before you found her deceased. A. To the best of my recollection, I remember – we go through the files, the inmate files, before he calls them down. I will tell him a little bit about each inmate. So I told him that she was getting Gatorade, that she, uhm, wrote down that she's having nausea – or diarrhea and vomiting, but yet when I ask her that, she denies it. And that we needed to see her at – in our visits.); *id.* at 110:20–111:17 ("Q. So then your testimony would be that one of the medical files that you discussed with [PA] Clark upon his arrival and before seeing any patients would have been Madison Jensen's Exhibit 5 request form? A. Yes. Q. On that occasion when you went over [Ms. Jensen]'s medical request form with [PA] Clark on Thursday morning, did you – do you know whether or not [PA] Clark actually received or had the opportunity to review what she had written? A. Yes. That's how he decides what inmates he's going to see or not. Q. Did you observe him read Madison Jensen's? A. I was in the room. I don't know whether I actually witnessed him or if I was doing work on the computer. I couldn't tell you. Q. So then you believe that [PA] Clark, when he arrived at the jail first thing on Thursday morning, read Madison's statement, puking for four days straight, runs, diarrhea, can't hold anything down, not even water? A. Would I assume that? Q. Yes. A. Yes."); *id.* at 114:23–115:3 ("When he came, we had talked about a suicide that had previously happened in the jail with a few of us, kind of assessing the situation. Then he went on and through the files of the inmates. Yes, we addressed Madison Jensen. Then we saw inmates."); *id.* at 150:18–150:23 ("Q. And also that he reviewed each of those files before he started seeing inmates? A. Yes. That's generally what he does. Q. And Madison's medical file was in that packet? A. Correct"); *id.* at 208:14–209:10 ("Q. How do you know that [PA Clark] saw the medical request forms on Thursday morning when he came in? A. I gave them to him. Q. So did you physically sit there while he went through them? A. Yes. Q: Did you talk about any of the forms? A. I'm sure we did. We always do. Q. Do you remember having a conversation on that December 1st? A. Yes. Q. Well, what do you remember? A. That we talked about inmates. And I specifically remember talking about [Ms. Jensen], that we – she was now in court holding, that she was denying seeing him, but I had her fill out this medical request anyway. And she was the one that I had talked to him previously about on the medications, and that we would need to see her. Q. Do you remember when during – when you had that conversation? I mean, is that just first thing when he comes in? A. Yes.").
[48] Clyde Dep. Ex. 3, at 209:1–209:10.
[49] Clark Dep. Ex. 5, at 20:2–20:5, 39:9–39:11, 79:23–80:5.
[50] *Id.* at 38:18–39:23; Clark Interrog. Ex. Q at 9, ECF No. 151 ("[LPN] Clyde mentioned an additional inmate, Madison Jensen, was in court holding and was feeling sick and experiencing flu like symptoms. [Ms. Jensen] was not on the list of inmates who had submitted a medical request to be seen that day and [PA Clark] was not provided a medical file for [Ms. Jensen]."); *see also* Body Cam. Tr. A. Meinrod Ex. K at 12, ECF No. 151 ("And so, you know, came out today, saw other patients, was told that she was feeling sick, so we intended to see her.").
[51] Clark Dep. Ex. 5, at 39:20–40:4, 41:16–41:20.

know what the medical problem is."[52] After Dr. Tubbs reviewed Ms. Jensen's Medical Request Form, he testified that "puking for four days straight, runs, diarrhea, can't hold anything down, I would say that's more emergent."[53] LPN Clyde later admitted that if a person had told her they were puking for four days straight, with runs, diarrhea, and the inability to hold anything down, even water, "that would be a concern" and she would immediately call PA Clark or Dr. Tubbs.[54] PA Clark testified that, based on what Ms. Jensen included in her Medical Request Form, he should have been contacted by "anyone who had read this medical request form."[55] If he had been contacted, PA Clark "would have first just asked some questions to get a better picture . . . and then [he] would have made a medical decision."[56] The Estate's expert opined that Ms. Jensen's "symptoms were clear evidence of a serious medical problem that would have been apparent to a reasonable lay person."[57]

Having assessed the priority needs of patients, PA Clark set the order in which he would see inmates.[58] He was seeing other inmates two and a half hours after he arrived, at 11:26 a.m., the time estimated to be the latest point at which Ms. Jensen's "cardiac arrest could have been easily and straightforwardly averted."[59]

Four and a half hours after PA Clark arrived, he headed to Ms. Jensen's cell with LPN Clyde.[60] Once there, PA Clark looked through Ms. Jensen's cell window and was immediately

---

[52] Tubbs Dep. Ex. 6, at 40:3–40:9.
[53] *Id.* at 60:8–60:12.
[54] Clyde Dep. Ex. 3, at 101:2–102:17.
[55] Clark Dep. Ex. 5, at 80:10–80:19.
[56] *Id.* at 81:1–81:4.
[57] Brown Expert Report Ex. 8, at 5.
[58] Clyde Interrog. Ex. 4, at 10; Clark Dep. Ex. 5, at 38:14–38:22.
[59] Brown Expert Report Ex. 8, at 10.
[60] Clark Dep. Ex. 5, at 43:19–44:1 (noting he had been at the Jail seeing patients for approximately four hours before heading to Ms. Jensen's cell).

concerned.[61] He banged on the cell's plexiglass, calling out Ms. Jensen's name, asking her if she

was okay.[62] He told LPN Clyde to call an ambulance.[63] Officers came to open the cell door and

clear the room, and then PA Clark entered and checked Ms. Jensen for a pulse.[64] An officer

initiated CPR contractions.[65] PA Clark announced Ms. Jensen's death shortly thereafter.[66] Her

cause of death was determined to be "cardiac arrhythmia from dehydration due to opiate

withdrawal."[67] Video recorded by the Jail's surveillance system shows that approximately thirty

minutes before PA Clark and LPN Clyde's arrival, Ms. Jensen gagged or gasped, stopped

breathing, and had a violent seizure that knocked her off her bed and onto the floor.[68]

 PA Clark spent the next two to three hours investigating the circumstances of Ms.

Jensen's death.[69] PA Clark testified that he "made an effort to retrieve [Ms. Jensen's] pre-booking

form" and that he did find and review it as part of his informal investigation.[70] During an

encounter with an officer, PA Clark stated that Ms. Jensen "had just placed one healthcare

request" and "[w]e put a copy in for you guys."[71] PA Clark later denied that he reviewed Ms.

Jensen's Medical Request Form at that time, instead explaining that he was relaying what

someone else had told him.[72] He stated that Ms. Jensen's Medical Request Form was not

---

[61] *Id.* at 42:23–43:2.
[62] *Id.* at 43:2–43:7.
[63] *Id.* at 43:2–43:3.
[64] *Id.* at 43:6–43:16.
[65] *Id.*
[66] *Id.*
[67] Second Am. Compl. 20.
[68] Brown Expert Report Ex. 8, at 8; Duchesne Co. Jail Written Statements Ex. O at 11, ECF No. 151 (PA Clark describing the same video).
[69] Clark Dep. Ex. 5, at 44:13–47:24, 50:1–51:8.
[70] *Id.* at 57:6–57:8, 73:1–74:5.
[71] *Id.* at 55:10–55:25.
[72] *Id.* at 55:13–56:3, 79:1–79:6. On the body camera transcript, LPN Clyde, Officer Meinrod, and PA Clark are having a discussion. PA Clark states that, "So she had just placed one health care request. We put a copy in for you guys. I think we might have given it to you. And then also the intake screening. We do a mental health and a medical, so if they have some questions, and she reported no medical issues, didn't have any problems right then. And then reported her history of back pain, depression and high blood pressure." Body Cam. Tr. A. Meinrod Ex. K

important to his investigation and that he did not attempt to verify it that day.[73] He further

indicated that he did not actually see the Medical Request Form until it was published in a

newspaper article months later.[74]

On September 14, 2017, the Estate filed a complaint in this court raising § 1983 claims

against Duchesne County, LPN Clyde, other Jail employees, and PA Clark.[75] On February 19,

2019, the Estate amended its complaint to add, among other individuals, Kennon Tubbs, the

physician who had contracted to provide medical services for the Jail and for whom PA Clark

was a subcontractor.[76] A month later, PA Clark moved for judgment on the pleadings[77] and Dr.

Tubbs to dismiss,[78] but both motions were denied.[79] A few months later, all defendants except PA

Clark moved for summary judgment.[80] On January 21, 2020, all defendants who filed a motion

were granted summary judgment except for LPN Clyde and Dr. Tubbs.[81]

Shortly thereafter, LPN Clyde and Dr. Tubbs filed an interlocutory appeal, seeking review

of the court's denial of their qualified immunity claims.[82] On March 2, 2021, the court of appeals

reversed the court's decision with regard to Dr. Tubbs but affirmed it with regard to LPN Clyde,

which led LPN Clyde to file a petition for writ of certiorari with the Supreme Court.[83] With the

case back on remand, the court granted Dr. Tubbs' motion for summary judgment on grounds of

---

at 17, ECF No. 151. The next line is LPN Clyde, stating, "and the medical request, I encouraged her to put it in. She didn't do that on her own." *Id.*

[73] Clark Dep. Ex. 5, at 55:22–56:24.

[74] *Id.* at 79:15–79:20.

[75] ECF No. 2.

[76] ECF No. 91.

[77] ECF No. 104.

[78] ECF No. 101.

[79] ECF No. 131.

[80] ECF Nos. 133, 135–40.

[81] ECF No. 168.

[82] ECF Nos. 170–71.

[83] *See generally* ECF No. 185; *see also* ECF Nos. 189–90.

qualified immunity and stayed the case pending LPN Clyde's petition for certiorari.[84] On October 13, 2021, LPN Clyde's petition for certiorari was denied,[85] leaving LPN Clyde and PA Clark as the sole remaining defendants.

PA Clark filed a motion for summary judgment on June 1, 2022.[86] The Estate responded on June 22, 2022,[87] and PA Clark replied on August 26, 2022.[88] In his reply, PA Clark raised new arguments, including judicial estoppel, the law of the case doctrine, and judicial admission.[89] Due to these new arguments, the court granted the Estate an additional opposition brief.[90] The Estate filed a supplemental memorandum in opposition.[91] PA Clark then requested leave to file a surreply,[92] which the court granted.[93] PA Clark subsequently filed his surreply.[94] Having reviewed the parties' briefs and relevant case law, the court concludes that the motion can be resolved without oral argument.[95]

## STANDARD

A party is entitled to summary judgment only if it is able to show there is no genuine dispute as to any material fact and that it is entitled to judgment as a matter of law.[96] A fact is material if it "might affect the outcome of the suit under the governing law."[97] A dispute regarding a material fact is genuine "if the evidence is such that a reasonable jury could return a

---

[84] ECF Nos. 186, 189.
[85] ECF No. 191.
[86] Mot. Summ. J., ECF No. 208.
[87] Resp., ECF No. 209.
[88] Reply, ECF No. 216.
[89] *Id.*
[90] ECF No. 217, entered August 29, 2022.
[91] Surresp., ECF No. 222, filed September 7, 2022.
[92] ECF No. 223, filed September 12, 2022.
[93] ECF No. 225, entered September 13, 2022.
[94] Surreply, ECF No. 226, filed September 13, 2022.
[95] *See* DUCivR 7-1(g).
[96] Fed. R. Civ. P. 56(a).
[97] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

verdict for the nonmoving party."[98] At the summary judgment stage, the court must "view the facts and draw reasonable inferences 'in the light most favorable to the party opposing the motion.'"[99]

"The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"[100] "Because qualified immunity is 'an immunity from suit rather than a mere defense to liability . . . it is effectively lost if a case is erroneously permitted to go to trial.'"[101] The plaintiff's burden of persuasion is accordingly heavy, "in large part because our qualified-immunity inquiry 'is designed to spare a defendant not only unwarranted liability, but [also] unwarranted demands customarily imposed upon those defending a long drawn-out lawsuit.'"[102]

"Thus, at summary judgment, [the court] must grant qualified immunity unless the plaintiff can show (1) a reasonable jury could find facts supporting a violation of a constitutional right, which (2) was clearly established at the time of the defendant's conduct."[103] Because the evidence "will often be controverted," the court "ask[s] whether the conduct attributed to the defendant . . . , which [is] supported by the record . . . , would still entitle the defendant to

---

[98] *Id.*
[99] *Scott v. Harris*, 550 U.S. 372, 378 (2007) (quoting *United States v. Diebold, Inc.*, 369 U.S. 654 (1962)).
[100] *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).
[101] *Id.* (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)).
[102] *Quintana v. Santa Fe Cnty. Bd. of Commrs.*, 973 F.3d 1022, 1028 (10th Cir. 2020) (quoting *Medina v. Cram*, 252 F.3d 1124, 1128 (10th Cir. 2001)); *Est. of Booker v. Gomez*, 745 F.3d 405, 411 (10th Cir. 2014) ("The plaintiff "bear[s] the ultimate burden of persuasion at trial to overcome qualified immunity by showing a violation of clearly established federal law.").
[103] *Est. of Booker*, 745 F.3d at 411; *Est. of Jensen by Jensen v. Clyde*, 989 F.3d 848, 854 (10th Cir. 2021) (citing *Ullery v. Bradley*, 949 F.3d 1282, 1289 (10th Cir. 2020)).

qualified immunity."[104] "Under this two-part test, 'immunity protects all but the plainly

incompetent or those who knowingly violate the law.'"[105]

"If, and only if, the plaintiff meets this two-part test does a defendant then bear the

traditional burden of the movant for summary judgment—showing 'that there are no genuine

issues of material fact and that [the defendant] is entitled to judgment as a matter of law.'"[106]

## DISCUSSION

### I.    Issues Raised for the First Time in a Reply Brief Are Generally Deemed Waived.

"[T]his court ordinarily does not consider arguments raised for the first time in a reply

brief."[107] This is because "[i]t robs the [opposing party] of the opportunity to demonstrate that

the record does not support [the reply's] factual assertions and to present an analysis of the

pertinent legal precedent that may compel a contrary result."[108] "The rule also protects this court

from publishing an erroneous opinion because [it] did not have the benefit of the [opposing

party's] response."[109] Additionally, the rule ensures judicial efficiency.

However, the court makes an exception here to account for the unique posture and

circumstances of this motion. The nature of the new legal arguments PA Clark raised in his reply

suggest that PA Clark was surprised by the Estate's statement of facts in its opposition.[110] PA

Clark apparently assumed that the Estate was precluded from pointing to evidence which he felt

---

[104] *Est. of Jensen*, 989 F.3d at 855 (citing *Behrens v. Pelletier*, 516 U.S. 299, 312–13 (1996)).

[105] *Ullery*, 949 F.3d at 1289 (quoting *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018)).

[106] *Est. of Beauford v. Mesa Cnty., Colorado*, 35 F.4th 1248, 1261–62 (10th Cir. 2022) (quoting *Gutteridge v. Oklahoma*, 878 F.3d 1233, 1239 (10th Cir. 2018)).

[107] *Deseret Tr. Co. v. Unique Inv. Corp.*, No. 2:17-CV-00569, 2018 WL 8110959, at *3 (D. Utah 2018); *Stump v. Gates*, 211 F.3d 527, 533 (10th Cir. 2000) ("This court does not ordinarily review issues raised for the first time in a reply brief.").

[108] *Stump*, 211 F.3d at 533.

[109] *Id.*

[110] *See* Motion for Leave to File Surreply 4, ECF No. 223 ("Whereas, in the *Memorandum* submitted in opposition to [PA] Clark's *Motion for Summary Judgment* Plaintiff suddenly disavowed its claim that [LPN] Clyde had never informed [PA] Clark of Ms. Jensen's medical condition. It was that change of position by Plaintiff that resulted in [PA] Clark raising [new issues in his reply].").

contradicted the Estate's position in the appeal of a separate motion for summary judgment in this case. While the court does not condone assuming—especially without stating—that certain legal doctrines apply, the court decided to consider the issues PA Clark raised in his reply. To address policy concerns of fairness, the court granted the Estate an additional opposition memorandum. The court addresses each of the arguments in the reply before turning to the issue of qualified immunity.

II.    **The Estate Is Not Estopped from Identifying Facts Supported by the Record Solely Because It Identified Contrary Facts, Also Supported by the Record, in an Earlier, Separate Motion for Summary Judgment.**

PA Clark argues, in reply to the Estate's response, that the Estate is estopped from arguing contradictory facts in separate motions for summary judgment.[111] PA Clark points to the Estate's appellate brief to the Tenth Circuit, an appeal concerning a motion for summary judgment based on qualified immunity for two of PA Clark's co-defendants. In that appeal, the Estate prefaced its fact section with: "When viewed in the light most favorable to the Estate, the evidence supports the following facts . . . ."[112] It then stated that on Thursday, December 1, 2016, "While [LPN] Clyde gave [PA] Clark several inmates' medical request forms for review, she withheld [Ms. Jensen's] form. Consequently, because [PA] Clark didn't see [Ms. Jensen's] form, he didn't even consider treating her that day."[113] The Estate cited to PA Clark's interview, deposition, and interrogatories to support these facts.[114] It did not indicate that these statements were contested by LPN Clyde's deposition and interrogatories. In its argument section of the appellate brief, the Estate stated that "[LPN] Clyde did not tell [PA] Clark about [Ms. Jensen]

---

[111] Reply 9–11, 15–17.
[112] Appellee's Resp. Br., Ex. 1 to Reply, at 10, ECF No. 216.
[113] *Id.* at 19.
[114] *Id.* at 19, n.35.

until after he had seen every other inmate on his list. [LPN] Clyde also did not give [PA] Clark [Ms. Jensen]'s form."[115]

The Tenth Circuit "t[ook], as given, the facts that the district court assumed when it denied summary judgment."[116] In the Background section of its opinion, it recited that "[LPN] Clyde did not inform [PA Clark] of Ms. Jensen's condition until after he had treated the other inmates."[117] In the discussion, it observed that LPN Clyde's failure to "inform [PA Clark] about Ms. Jensen's condition until the end of his rounds" was one fact that "sufficiently show[ed] deliberate indifference" on LPN Clyde's part.[118] PA Clark maintains that the court should use its equitable power to estop the Estate from alleging contrary facts, also supported by the record, in its response to PA Clark's motion for summary judgment.[119]

"Under the judicial-estoppel doctrine, '[w]here a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position.'"[120] "[J]udicial estoppel 'is an equitable doctrine invoked by a court at its discretion,'"[121] and "[t]his circuit applies [it] 'both narrowly and cautiously.'"[122] "This is because the doctrine is 'a powerful weapon to employ

---

[115] *Id.* at 62. It is worth noting that in the Appellant's Opening Brief, LPN Clyde indicated the factual dispute regarding whether LPN Clyde and PA Clark had a conversation about Ms. Jensen on Thursday morning and whether LPN Clyde gave PA Clark Ms. Jensen's Medical Request Form at that time. Appellant's Opening Brief at 20, *Est. of Jensen*, 989 F.3d 848 (10th Cir. 2021) (No. 20-4024), 2020 WL 3833303, at *20.

[116] *Est. of Jensen*, 989 F.3d at 854 (citing *Johnson v. Jones*, 515 U.S. 304, 319 (1995)).

[117] *Id.* at 854.

[118] *Id.* at 859.

[119] In his sur-reply, PA Clark argues that "there [is] no evidence to support the alleged competing facts" and that any evidence of PA Clark's knowledge of the Medical Request Form during the morning of December 1, 2016 "would have been rejected out of hand" by the court of appeals. Surreply 3. However, the Estate has offered sworn testimony of a co-defendant (LPN Clyde) to support these facts, and PA Clark does not argue that this evidence is inadmissible.

[120] *United States v. Supreme Ct. of New Mexico*, 839 F.3d 888, 910 (10th Cir. 2016) (quoting *New Hampshire v. Maine*, 532 U.S. 742, 749 (2001)).

[121] *Id.* (quoting *New Hampshire*, 532 U.S. at 750).

[122] *Id.* (quoting *BancInsure, Inc. v. F.D.I.C.*, 796 F.3d 1226, 1240 (10th Cir. 2015)).

14

against a party seeking to vindicate its rights, and there are often lesser weapons that can keep alleged inconsistent statements in check.'"[123]

"While the circumstances that trigger judicial estoppel are 'not reducible to any general formulation,'"[124] there are "three relevant factors."[125] They are: (1) whether "a party's later position [is] 'clearly inconsistent' with its earlier position";[126] (2) "whether the party has succeeded in persuading a court to accept that party's earlier position, so that judicial acceptance of an inconsistent position in a later proceeding would create 'the perception that either the first or the second court was misled'";[127] and (3) "whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped."[128]

Applying these factors, courts have estopped a party from "constru[ing] 'Middle of the River' differently today than it did 25 years ago";[129] from admitting its use of unlawful force while entering a plea in abeyance and then filing suit alleging police did not have probable cause, based on that use of force, to make an arrest;[130] from proceeding with a retaliation claim after a bankruptcy court approved a settlement agreement in which the party failed to disclose the pending claim;[131] from asserting that a bank had stolen millions of dollars from the party after representing to the court that the party was indigent;[132] from arguing that an arbitration clause

---

[123] *Id.* at 910–911 (quoting *Vehicle Mkt. Rsch., Inc. v. Mitchell Int'l, Inc.*, 767 F.3d 987, 993 (10th Cir. 2014)).
[124] *Id.* at 910 (quoting *New Hampshire*, 532 U.S. at 750).
[125] *Id.* (quoting *New Hampshire*, 532 U.S. at 750–51).
[126] *New Hampshire*, 532 U.S. at 750 (quoting *United States v. Hook*, 195 F.3d 299, 306 (7th Cir. 1999)).
[127] *Id.* (quoting Edwards v. Aetna Life Ins. Co., 690 F.2d 595, 599 (6th Cir. 1982)).
[128] *Id.* at 751.
[129] *Id.* at 755.
[130] *Johnson v. Lindon City Corp.*, 405 F.3d 1065, 1070 (10th Cir. 2005).
[131] *Ordonez v. Canyons Sch. Dist.*, 788 F. App'x 613, 618 (10th Cir. 2019) (unpublished).
[132] *Shayesteh v. Raty*, 404 F. App'x 298, 303 (10th Cir. 2010) (unpublished).

applied and later arguing that it did not on subsequent, substantively similar claims;[133] and from convincing a jury that a license agreement was terminated and then arguing that it was not in a later action.[134]

Considering the first factor, clear inconsistency between the party's positions, the Estate's current position is not "diametrically opposed"[135] to its position in LPN Clyde's motion for summary judgment. In both of its oppositions, the Estate argued against granting the defendants summary judgment because there is a genuine issue of material fact. In addition, the analysis for summary judgment based on qualified immunity requires the Estate to identify support from the record to show the defendant is not entitled to qualified immunity. The factual record in this case supports two competing versions of events: one in which LPN Clyde gave PA Clark Ms. Jensen's Medical Request Form, and one in which she did not. The Estate did not waive its ability to argue either while defending against a motion for summary judgment by highlighting a set of facts, which, if credited by a factfinder, would render qualified immunity inapplicable to that defendant.

The second factor, "whether the party has succeeded in persuading a court to accept that party's earlier position," also weighs in favor of the Estate. In the district court's earlier opinion, it observed, "According to [PA Clark, [LPN] Clyde did not provide him with [Ms. Jensen]'s medical file or medical request form on the morning of December 1, 2019[, b]ut, according to [LPN] Clyde, she and [PA Clark reviewed and discussed [Ms. Jensen]'s medical request form

---

[133] *Hicks v. Cadle*, 436 F. App'x 874, 878 (10th Cir. 2011) (unpublished).
[134] *Lab'y Corp. Am. Holdings v. Metabolite Lab'ys, Inc.*, 410 F. App'x 151, 159 (10th Cir. 2011) (unpublished).
[135] *Johnson*, 405 F.3d at 1069.

before [PA] Clark saw any inmates that day."[136] The Tenth Circuit adopted—for purposes of the appeal—the facts that the district court "assumed" when it denied summary judgment.[137] It stated that "the Estate's evidence shows . . . [LPN] Clyde did not inform [PA Clark] about Ms. Jensen's condition until the end of his rounds."[138] The Tenth Circuit did not mention whether PA Clark saw Ms. Jensen's Medical Request Form that morning in its recitation of relevant facts or in its discussion of LPN Clyde's entitlement to qualified immunity. Given the posture and standard of review, the Tenth Circuit was only accepting the Estate's position that a reasonable factfinder could determine that LPN Clyde did not inform PA Clark about Ms. Jensen's condition Thursday morning, rather than finding that fact was definitively established. As the Tenth Circuit observed, facts at that stage "will often be controverted."[139]

The third factor, "whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped," also weighs against judicial estoppel. PA Clark argues that the Estate "now attempts to unfairly disavow those facts to the detriment of" PA Clark, but this court is unable to see how the Estate defending against another defendant's motion for summary judgment by highlighting facts supporting liability for that defendant is unfair to PA Clark. Had PA Clark moved for summary judgment with the other defendants, the Estate still would have been able to identify the same contradictory evidence. The Estate's position—that these facts are contested—does not impose an unfair detriment on PA Clark, nor an unfair advantage to the Estate.

---

[136] *Est. of Jensen v. Duchesne Cnty.*, No. 2:17CV1031, 2020 WL 291398, at *5 (D. Utah 2020), *aff'd in part, rev'd in part and remanded sub nom. Est. of Jensen by Jensen v. Clyde*, 989 F.3d 848 (10th Cir. 2021), *cert. denied sub nom. Est. of Jensen by Jensen v. Tubbs*, 142 S. Ct. 33 (2021).
[137] *Est. of Jensen*, 989 F.3d at 854.
[138] *Id.* at 859.
[139] *Id.* at 855.

Therefore, the Estate is not judicially estopped from identifying contradictory record evidence in opposition to a different motion for summary judgment in the same action.[140]

## III. The Tenth Circuit's Recitation of Supported Facts Is Not the Law of the Case Because It Is Not "a Rule of Law."

PA Clark argues that "[w]hen a case is appealed and remanded, the decision of the appellate court establishes the law of the case and it must be followed by the court on remand."[141] PA Clark asserts that the "Court of Appeals *found* that [LPN] Clyde had never informed either [PA] Clark or Dr. Tubbs of [Ms.] Jensen's medical condition."[142]

The "law of the case is an amorphous concept."[143] "[T]he doctrine posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case."[144] It "signifies, in broad outline, that a decision of an appellate tribunal on a particular issue, unless vacated or set aside, governs the issue during all subsequent stages of the litigation in the nisi prius court, and thereafter on any further appeal."[145] This doctrine counsels against a trial court, on remand, suppressing certain depositions after the court of appeals reversed the trial court's previous decision to suppress those same depositions,[146] allowing the introduction of evidence and using it to reach a certain conclusion after the court of appeals had found the same evidence insufficient to support that conclusion,[147]

---

[140] The court observes that the best practice would have been for the Estate to acknowledge the disputed evidence in its appellate briefing and then note that because the factfinder could credit either witness, LPN Clyde was not entitled to qualified immunity.

[141] Reply 17.

[142] *Id.* at 18 (emphasis added); *see also* Surreply 4–5 ("The Court of Appeals made findings.").

[143] *Arizona v. California*, 460 U.S. 605, 618 (1983).

[144] *Id.*

[145] *United States v. Monsisvais*, 946 F.2d 114, 115–16 (10th Cir. 1991) (quoting *United States v. Rivera-Martinez*, 931 F.2d 148, 150 (1st Cir. 1991)).

[146] *Monsisvais*, 946 F.2d at 116 (discussing *United States v. White*, 846 F.2d 678 (11th Cir. 1988)).

[147] *Id.* (discussing *Baumer v. United States*, 685 F.2d 1318 (11th Cir. 1982)).

or finding that a vehicle stop was legal contrary to the court of appeal's decision which "explicitly decided the issue of the legality of the stop."[148]

Here, the Tenth Circuit held that a reasonable factfinder could conclude, based on what the Estate's evidence shows, that "[LPN] Clyde did not inform [PA Clark] about Ms. Jensen's condition until the end of his rounds." It did not "explicitly decide" the factual issue.[149] It determined, as a matter of law, that the Estate had sufficient evidence to survive LPN Clyde's motion for summary judgment. Therefore, the law of the case doctrine is inapplicable.[150]

### IV.   The Estate's Proffer of Facts for the Purposes of Demonstrating that a Reasonable Factfinder Could Determine LPN Clyde Was Deliberately Indifferent Was Not a Judicial Admission.

PA Clark contends that the Estate's "statements to the Court of Appeals that [LPN] Clyde never informed [PA] Clark or Dr. Tubbs of Ms. Jensen's condition are [] binding judicial admissions."[151] These purported admissions preclude the Estate's ability to identify contradictory facts in this motion.

"Judicial admissions are formal, deliberate declarations which a party or his attorney makes in a judicial proceeding for the purpose of dispensing with proof of formal matters or of facts about which there is no real dispute."[152] While "[s]tatements in briefs 'may be considered

---

[148] *Id.* at 118.
[149] *See Scott*, 550 U.S. at 378 ("As this case was decided on summary judgment, there have not yet been factual findings by a judge or jury.")
[150] PA Clark briefly argues that the Tenth Circuit's finding that Dr. Tubbs' alleged failure to train or implement policies did not cause Ms. Jensen's death "likewise entitle[s] Clark to *qualified immunity*." Surreply 5. This is incorrect. PA Clark's potential liability is predicated on his personal actions—an alleged delay to see Ms. Jensen—not a failure to train or implement policies.
[151] Reply 18.
[152] *Asarco, LLC v. Noranda Mining, Inc.*, 844 F.3d 1201, 1212 n.3 (10th Cir. 2017) (quoting *U.S. Energy Corp. v. Nukem, Inc.*, 400 F.3d 822, 833 n.4 (10th Cir. 2005))

admissions at the court's discretion,'" "inconsistent statements made in the alternative are not formal, deliberate declarations that could reasonably be construed as judicial admissions."[153]

In the Estate's appellate brief, it did not make statements for the "purpose of dispensing with proof of formal matters or of facts about which there is no real dispute." As it noted, it was highlighting facts which, "when viewed in the light most favorable to the Estate," were "supported" by the record.[154] The Estate never made a formal and deliberate declaration that it was dispensing with proof of these facts. Indeed, Defendant LPN Clyde would certainly be surprised to learn that the Estate could waive formal proof of these facts and adopt the version that benefited it. Therefore, the Estate did not make a judicial admission that LPN Clyde never informed PA Clark about Ms. Jensen's medical condition.

## V.   PA Clark Is Not Entitled to Summary Judgment Based on Qualified Immunity Because a Reasonable Jury Could Find That He Was Deliberately Indifferent to Ms. Jensen's Serious Medical Needs.

"Under the Fourteenth Amendment due process clause, 'pretrial detainees are . . . entitled to the degree of protection against denial of medical attention which applies to convicted inmates' under the Eighth Amendment."[155] Under the Eighth Amendment, prison officials "must provide humane conditions of confinement[ and] ensure that inmates receive adequate food, clothing, shelter, and medical care."[156] When a prison official fails to ensure an inmate receives adequate medical care by being "'deliberate[ly] indifferen[t] to [the inmate's] serious medical needs,'" the inmate has a cause of action against the official.[157]

---

[153] *U.S. Energy Corp.*, 400 F.3d at 833 n.4 (10th Cir. 2005) (quoting *Guidry v. Sheet Metal Workers Int'l Ass'n*, 10 F.3d 700, 716 (10th Cir. 1993)).
[154] Ex. 1 to Reply 10.
[155] *Martinez v. Beggs*, 563 F.3d 1082, 1088 (10th Cir. 2009) (quoting *Garcia v. Salt Lake City*, 768 F.2d 303, 307 (10th Cir. 1985)).
[156] *Farmer v. Brennan*, 511 U.S. 825, 832 (1994).
[157] *Martinez*, 563 F.3d at 1088 (quoting *Est. of Hocker v. Walsh*, 22 F.3d 995, 998 (10th Cir. 1994)).

"A claim for deliberate indifference to serious medical needs has an objective and subjective element."[158] "The objective element considers whether the harm suffered was sufficiently serious."[159] "The subjective element asks whether [the defendant] 'knew [the plaintiff] faced a substantial risk of harm and disregarded that risk, by failing to take reasonable measures to abate it.'"[160]

PA Clark does not dispute that the objective component of this test has been met.[161] The issue is whether a reasonable factfinder could determine that PA Clark consciously disregarded Ms. Jensen's serious medical needs.

A. **There Is Sufficient Evidence to Meet the Subjective Component Because a Reasonable Factfinder Could Determine that PA Clark Knew of and Disregarded an Excessive Risk to an Inmate's Health.**[162]

Deliberate indifference requires that "the official *knows of* and *disregards* an excessive risk to inmate health or safety."[163] In other words, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."[164] This "'does not require a finding of express intent to harm,' nor must a plaintiff 'show that a prison official acted or failed to act believing that harm actually would

---

[158] *Est. of Jensen*, 989 F.3d at 859 (citing *Quintana v. Santa Fe Bd. of Comm'rs*, 973 F.3d 1022, 1028–29 (10th Cir. 2020)).

[159] *Id.*

[160] *Id.* (quoting *Quintana*, 973 F.3d at 1029).

[161] Mot. Summ. J. 22–23.

[162] The court notes at the outset that the Estate points to other evidence that is not sufficient to show conscious disregard. This includes the Monday phone call between LPN Clyde and PA Clark and LPN Clyde's comments to PA Clark on December 1, 2016. *See* Resp. 4–5 ("[LPN] Clyde has stated that she discussed multiple aspects of [Ms. Jensen's] condition with [PA] Clark on November 28, 2016. . . . She then spoke with [PA] Clark regarding [Ms. Jensen's] symptoms *again* on December 1, 2016, prior to discovering [Ms. Jensen].").

[163] *Farmer*, 511 U.S. at 837 (emphasis added).

[164] *Id.*

befall an inmate.'"[165] Instead, the plaintiff may show that the prison official "consciously disregarded" a risk to the inmate's health or safety.[166]

The plaintiff may demonstrate the official's state of mind in "the usual ways, including inference from circumstantial evidence, and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious."[167] "The question is: 'were the symptoms such that a prison employee knew the risk to the prisoner and chose (recklessly) to disregard it?'"[168]

Therefore, the court examines whether the Estate has proffered sufficient evidence to support that: (1) PA Clark knew there was a substantial risk to Ms. Jensen's health; and (2) PA Clark consciously disregarded that risk.

### i. There Is Sufficient Evidence that PA Clark Knew There Was a Substantial Risk of Serious Harm to Ms. Jensen's Health.

There are two relevant methods of using circumstantial evidence to prove the knowledge element—that the official *knows of* facts from which the inference could be drawn that a substantial risk of serious harm exists. First, knowledge "can be established when the risks would be obvious to a reasonable person."[169] Second, even if the risks would not have been obvious to a lay person, the plaintiff can establish that a medical professional would have recognized the inmate's symptoms as a potential medical emergency.[170]

---

[165] *Spencer v. Abbott*, 731 F. App'x 731, 742 (10th Cir. 2017) (unpublished) (quoting *Mitchell v. Maynard*, 80 F.3d 1433, 1442 (10th Cir. 1996); *Mata v. Saiz*, 427 F.3d 745, 752 (10th Cir. 2005).

[166] *Spradley v. LeFlore Cnty. Det. Ctr. Pub. Tr. Bd.*, 764 F. App'x 692, 699 (10th Cir. 2019) (unpublished).

[167] *Farmer*, 511 U.S. at 842.

[168] *Martinez*, 563 F.3d at 1089 (quoting *Mata*, 427 F.3d at 753).

[169] *Est. of Jensen*, 989 F.3d at 859 (quoting *Mata*, 427 F.3d at 752); *Farmer*, 511 U.S. at 842 ("[A] factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious.").

[170] *Quintana*, 973 F.3d at 1032 (quoting *Self v. Crum*, 439 F.3d 1227, 1232 (10th Cir. 2006)).

1. **A Reasonable Person Would Have Found the Risk of Harm to Ms. Jensen's Health Was Obvious from the Symptoms Described in the Medical Request Form.**

A "factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious," but this "require[s] that such risks present themselves as 'obvious' to the so-called 'reasonable man.'"[171] Under this standard, the Tenth Circuit has found that a reasonable person would recognize unconsciousness, "a gangrenous hand[,] or a serious laceration" as an obvious risk.[172] While characteristics common to many intoxicated individuals[173] or individuals experiencing withdrawal, such as frequent vomiting, do not present an obvious risk, the presence of additional factors, such as *bloody* vomit, can create an "obvious risk of severe and dangerous withdrawal."[174] Here, the Tenth Circuit already has found that the standard was met for someone in possession of the information in the Medical Request Form, specifically finding that Ms. Jensen's "self-report that she had been vomiting for four days and could not keep down water . . . present[s] a risk of harm that would be obvious to a reasonable person."[175]

2. **A Medical Professional Would Have Found the Risk of Harm to Ms. Jensen's Health Was Obvious from the Symptoms Described in the Medical Request Form.**

For a medical professional, the "need for medical treatment is 'obvious' when '[the professional is] presented with recognizable symptoms which potentially create a medical emergency.'"[176] To prove this obviousness, "contemporary standards and opinions of the

---

[171] *Id.* at 1029 (quoting *Farmer*, 511 U.S. at 842; *Mata*, 427 F.3d at 752).
[172] *Id.* (citing *Garcia v. Salt Lake City*, 768 F.2d 303, 308 (10th Cir. 1985); *Self*, 439 F.3d at 1232).
[173] *Martinez*, 563 F.3d at 1091.
[174] *Quintana*, 973 F.3d at 1030.
[175] *Est. of Jensen*, 989 F.3d at 859. The Medical Request Form also indicated that Ms. Jensen had been experiencing diarrhea for four days. Ex. 7.
[176] *Quintana*, 973 F.3d at 1032 (quoting *Self*, 439 F.3d at 1232).

23

medical profession are highly relevant."[177] If the recognizable symptoms require the medical professional to make a "referral or [administer] minimal diagnostic testing to confirm the symptoms,"[178] "[a]n official 'would not escape liability if the evidence showed that he merely . . . declined to confirm inferences of risk that he strongly suspected to exist.'"[179]

In *Sealock v. Colorado*,[180] a physician's assistant's ("PA") actions met the subjective element when the PA testified that if he knew an inmate had unexplained chest pain, he would have directed the inmate to be sent to the hospital, and there was evidence that the PA had been told about the chest pain.[181] There, an inmate who was experiencing throbbing pressure in his chest visited the prison infirmary and told the nurse that "he had chest pain and couldn't breathe."[182] The nurse took notes about his symptoms and diagnosed him with the flu.[183] The nurse testified that she called the PA two hours later and read him the notes, including the part concerning the inmate's chest pain.[184] The PA testified that the nurse never mentioned the chest pain to him over the phone.[185] The PA then told the nurse to administer a shot of Phenergan, an antihistamine and antiemetic, and to order a 24-hour lay-in.[186] He later testified that, "if there's a nonexplained chest pain, there's a standard thing we all do; that is, they should call the ambulance," and "[i]f I would have been told those words [chest pain], then, there's just one thing we do. . . . we send them."[187] Because the factfinder could credit the nurse's version of

---

[177] *Mata*, 427 F.3d at 757–58 (quoting *Howell v. Evans*, 922 F.2d 712, 719 (1991)).
[178] *Self*, 439 F.3d at 1232.
[179] *Mata*, 427 F.3d at 752 (quoting *Farmer*, 511 U.S. at 843 n.8).
[180] 218 F.3d 1205 (10th Cir. 2000).
[181] *Id.* at 1211.
[182] *Id.* at 1208.
[183] *Id.*
[184] *Id.*
[185] *Id.*
[186] *Id.*
[187] *Id.* at 1211 (second alteration in original).

events—that she had told the PA about the inmate's chest pain—and then determine that the PA, "by his own testimony[, was] deliberately indifferent in failing to summon the ambulance," the Tenth Circuit denied summary judgment.[188]

Here, LPN Clyde, Dr. Tubbs, and PA Clark all testified that the symptoms Ms. Jensen reported in the Medical Request Form were concerning and would warrant timely follow up or attention. PA Clark's supervisor, Dr. Tubbs, testified that if he knew only that an inmate was "moved for medical observation," that would be sufficient for him to "assume there's a medical problem" and to follow up with the patient. Dr. Tubbs further testified that "puking for four days straight, runs, diarrhea, can't hold anything down" were symptoms indicative of an emergency. LPN Clyde admitted that if a person had told her they were puking for four days straight, with runs, diarrhea, and the inability to hold anything down, even water, "that would be a concern," and she would immediately call PA Clark or Dr. Tubbs. PA Clark testified that, based on the symptoms recorded in Ms. Jensen's Medical Request Form, he should have been contacted by "anyone who had read this medical request form" so that he could assess Ms. Jensen's medical condition and make a decision concerning her treatment. In short, there is sufficient record evidence from which a reasonable jury could determine that a medical professional would recognize an obvious need to provide emergency medical treatment.

## ii. There Is Sufficient Evidence that a Jury Could Find that PA Clark Disregarded the Obvious Risk.

"As to disregard, the plaintiff must demonstrate . . . that [the defendant] 'disregarded th[e] risk, by failing to take reasonable measures to abate it.'"[189] This failure to take reasonable measures "is assessed at the time of the alleged omission, [and a defendant's] eventual provision

---

[188] *Id.* at 1212.
[189] *Spradley*, 764 F. App'x at 699 (quoting *Martinez*, 563 F.3d at 1089).

of medical care does not insulate [him] from liability."[190] While this element "arguably requires nothing more than an act (or omission) of indifference to a serious risk that is voluntary, not accidental,"[191] a responsive action that is merely negligent is not sufficient. "[A]ccidental or inadvertent failure to provide adequate medical care, or negligent diagnosis or treatment of a medical condition do not constitute" conscious disregard.[192] "So long as a medical professional provides a level of care consistent with the symptoms presented by the inmate, absent evidence of actual knowledge or recklessness, the requisite state of mind cannot be met."[193]

Therefore, where a prison official fails to act on knowledge about an inmate's symptoms, courts

> have only found a sufficiently extraordinary degree of neglect under three circumstances: *first*, where a doctor "recognizes an inability to treat the patient due to the seriousness of the condition and his corresponding lack of expertise" but refuses or unnecessarily delays a referral; *second*, where a doctor *fails* to treat a medical condition "so obvious that even a layman would recognize the condition"; and *finally*, where a doctor entirely denies care "although presented with recognizable symptoms which potentially create a medical emergency."[194]

The Tenth Circuit has found that a medical professional entirely denied care despite the presence of recognizable symptoms of a potential medical emergency in two cases. In the first,

---

[190] *Est. of Booker*, 745 F.3d at 433 (listing cases where a "few," seven, ten, and fifteen minute delays were sufficient to create liability). Even a brief delay in care can create liability because a factfinder could determine that the defendant "w[as] deliberately indifferent in failing to respond sooner." *Id.* at 432.

[191] *Farmer*, 511 U.S. at 840.

[192] *Spradley*, 764 F. App'x at 699 (quoting *Ramos v. Lamm*, 639 F.2d 559, 575 (10th Cir. 1980)); *id.* at 700 ("'[A] medical professional['s] fail[ure] to treat a serious medical condition properly" is not conscious disregard.).

[193] *Self*, 439 F.3d at 1233. For this reason, the Tenth Circuit has found that evidence of a medical professional changing an inmate's bedsore dressings and providing other treatment for ulcers, *Spradley*, 764 F. App'x at 701, examining an inmate who presents with nonspecific symptoms and providing medication consistent with the symptoms, *Self*, 439 F.3d at 1233–34, or offering an inmate a kit with medications designed to ameliorate the symptoms associated with a withdrawal, even if refused, have precluded finding conscious disregard. *Quintana*, 973 F.3d at 1032.

[194] *Spencer*, 731 F. App'x at 745 (quoting *Self*, 439 F.3d at 1232); *Spradley*, 764 F. App'x at 702 ("We have found deliberate indifference in cases where jail officials, confronted with serious symptoms, took no appropriate action at all to treat them.").

*Mata v. Saiz*,[195] a "patient complain[ed] of chest pains and the prison official, knowing that medical protocol requires referral or minimal diagnostic testing to confirm the symptoms, sen[t] the inmate back to his cell."[196] In *Sealock*, discussed above, the PA was informed that a patient had chest pains and then ordered him a shot of Phenergan and a 24-hour lay-in.[197] The PA did this despite knowing that if a patient reports chest pains, the required action is sending the patient to the hospital.[198]

Here, there is a genuine dispute of material fact about whether PA Clark was aware of the information revealing the obvious risk. LPN Clyde has testified that, around 9:00 a.m. on December 1st, she gave PA Clark Ms. Jensen's Medical Request Form and they discussed Ms. Jensen's symptoms. But PA Clark has testified that LPN Clyde did not give him Ms. Jensen's Medical Request Form that morning. He maintains that LPN Clyde did not even mention Ms. Jensen until early that afternoon, after PA Clark had finished seeing all the other inmates, and that he never saw Ms. Jensen's Medical Request Form that day.

This is a quintessential dispute of material fact. Assessing PA Clark and LPN Clyde's credibility and establishing the timing and order of events on December 1, 2016 is a task distinctly reserved for the factfinder. If the jury credits LPN Clyde's testimony and not PA Clark's, it could find that PA Clark knowingly disregarded an obvious risk and failed to take steps to reasonably abate it. Conversely, if the jury credits PA Clark's testimony and not LPN Clyde's, then it could find that PA Clark set the order for seeing patients that day without

---

[195] 427 F.3d 745 (2005).
[196] *Self*, 439 F.3d at 1232 (discussing *Mata*, 427 F.3d 745).
[197] 218 F.3d at 1208.
[198] *Id.*

knowledge of Ms. Jensen's medical emergency and that he acted reasonably in seeing her when he did.

At summary judgment, it is the task of this court to decide "whether the conduct attributed to the defendant . . . , which [is] supported by the record . . . , would still entitle the defendant to qualified immunity."[199] The court finds that it does not. The Estate's evidence, if credited by the jury, would permit the finding that PA Clark received Ms. Jensen's Medical Request Form—in which Ms. Jensen listed her symptoms as "pucking [sic] for 4 days straight, runs, diarrhea, can't hold anything down not even water"—when he arrived at the Jail around 9:00 a.m. on December 1st. The Tenth Circuit has found that a reasonable lay person with that information would have identified the risk of serious harm to Ms. Jensen's health as "obvious." Additionally, medical professionals including LPN Clyde, Dr. Tubbs, and PA Clark all testified that Ms. Jensen's listed symptoms required timely follow up or attention. Finally, LPN Clyde testified that she discussed Ms. Jensen's condition with PA Clark that morning, including that Ms. Jensen was in the medical observation cell. After that, PA Clark set the order in which he would see patients that day. There is record evidence that Ms. Jensen's death might have been avoided had she been seen before 11:30 a.m. However, PA Clark did not arrive at Ms. Jensen's cell until 1:30 p.m., about four hours after he arrived.

The Estate has proffered sufficient evidence from which a jury could conclude that PA Clark was deliberately indifferent to Ms. Jensen's serious medical needs. This is enough to preclude summary judgment on this claim.

---

[199] *Est. of Jensen*, 989 F.3d at 855 (citing *Behrens v. Pelletier*, 516 U.S. 299, 312–13 (1996)).

**ORDER**

THEREFORE, IT IS HEREBY ORDERED that Defendant Clark's Motion for Summary Judgment is GRANTED in part and DENIED in part. Defendant's motion for summary judgment as to his supervisory liability is GRANTED. Plaintiff's second cause of action for supervisory liability against Defendant is dismissed with prejudice. Defendant's motion for summary judgment as to his liability for deliberate indifference to the serious medical needs of a pretrial detainee is DENIED.

Signed September 15, 2022.

BY THE COURT

_____

David Barlow
United States District Judge

29