Ryan B. Hancey, 9101
Scott S. Bridge, 12039
KESLER & RUST
68 S. Main St., Ste. 200
Salt Lake City, UT 84101
Telephone: (801) 532-8000
rhancey@keslerrust.com
sbridge@keslerrust.com
*Attorneys for plaintiff*

## IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF UTAH

| | |
|---|---|
| **THE ESTATE OF MADISON JODY JENSEN, by her personal representative Jared Jensen,**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**JANA CLYDE, an individual, and LOGAN CLARK, an individual;**<br><br>**Defendants.** | **MOTION TO RECONSDER SUMMARY JUDGMENT DISMISSAL OF DUCHESNE COUNTY**<br><br>**Civil No. 2:17-cv-01031-DBB-DAO**<br><br>Judge David B. Barlow<br><br>Magistrate Judge Daphne A. Oberg |

Pursuant to Federal Rules of Civil Procedure 54(b) and 56(a) and new, controlling law, plaintiff Jared Jensen, personal representative of the Estate of Madison Jody Jensen (the "Estate"), respectfully moves the Court to reconsider its

dismissal of Duchesne County (the "County") in its January 21, 2020 memorandum decision and order (the "2020 Order").[1]

The Estate has two primary bases for asking this Court to reconsider its 2020 Order. First, the Tenth Circuit's decision in *Lance v. Morris*, 985 F.3d 787 (10th Cir. 2021),[2] changed municipal liability under 42 U.S.C. § 1983 in failure-to-train medical situations nearly identical to the situation in this case that led to Madison Jensen's preventable death. Second, the expert evidence obtained in discovery establish that aspects of the 2020 Order are incorrect.

## **INTRODUCTION**

This case arises from the avoidable death of 21-year-old Madison Jensen ("Madison"), who died of severe dehydration after just four days in the Duchesne County Jail (the "Jail"), during which inadequately trained Jail employees were deliberately indifferent to her obvious symptoms of severe dehydration.[3]

In its 2020 Order, this Court granted summary judgment dismissing the Estate's 42 U.S.C. § 1983 claim against the County. Essentially, this Court

---

[1] The 2020 Order is document 168 in the docket. It is also available as *Est. of Jensen v. Duchesne Cnty.*, No. 2:17CV1031DAK, 2020 WL 291398 (D. Utah Jan. 21, 2020) (unpublished).
[2] Which the Estate's counsel first discovered earlier this year.
[3] Any reference to "inmate" or "inmates" in this document refers to inmates, pretrial detainees, and both, as the context suggests and requires. Madison was at all relevant times a pretrial detainee entitled to protection under the Fourteenth Amendment of the United States Constitution, as opposed to an inmate under the Eighth Amendment.

determined the County's medical policies and training were not constitutionally impermissible. There is no dispute that the County's general instruction to Jail staff (including Licensed Practical Nurse Jana Clyde ("Clyde")) was that, if staff had medical concerns, they could contact the Jail's medical providers physician assistant Logan Clark ("Clark") or Dr. Kennon Tubbs ("Tubbs") at any time.[4]

However, there is evidence the Jail never instructed staff on what circumstances amounted to a medical concern worthy of contacting medical providers. As a result, Jail staff that saw obviously serious medical concerns would not contact the Jail's medical providers (i.e., the obviousness of the medical concerns escaped them).[5] Accordingly, when Madison started exhibiting obvious symptoms of severe dehydration and requested medical attention, Jail staff failed to contact the Jail's medical providers, which resulted in Madison's death.[6]

---

[4] Clyde is not a medical provider, as she cannot assess, diagnose, or treat patients. *See* fact 11, below; *see also Abdiasiis v. Lewis*, No. 2:20-CV-3315, 2022 WL 2802412, *9 (S.D. Ohio July 18, 2022) (unpublished) (distinguishing between an "LPN" and "a medical provider licensed to assess a patient").

[5] *See Martinez v. Beggs*, 563 F.3d 1082, 1089 (10th Cir. 2009) (recognizing the obviousness of an inmate's medical condition may escape a prison official).

[6] It is also possible that, as opposed to the obviousness of Madison's medical concerns escaping Jail staff, Jail staff were subjectively aware of Madison's obvious medical concerns and deliberately indifferent to those concerns. However, for purposes of summary judgment against the County, the Estate is entitled to the inference that the obvious escaped Jail staff due to their lack of training on what circumstances amounted to a medical concern worthy of escalation to medical providers.

The Estate made this argument in response to the County's motion for summary judgment, but this Court rejected it. The law in this jurisdiction has changed since this Court took that action. In 2021, the Tenth Circuit in *Lance* explained that a municipality's failure to train jail staff on exactly what circumstances amounted to a medical concern worthy of contacting medical providers is sufficient for a § 1983 claim. Thus, in light of *Lance*, this Court should reconsider and reverse its grant of summary judgment for the County.

## STATEMENT OF FACTS[7]

Madison's fatal five-day course in the Jail

*Sunday (November 27, 2016)*

1.     Elizabeth Richens ("Richens") booked Madison into the Jail on heroin possession charges and recorded weights of 129 and 135 lbs. *See* Madison Jody Jensen Booking Information Sheet[8] (reflecting 129 pounds); Madison Jody Jensen

---

[7] Because the Estate is asking this Court to reconsider an adverse summary judgment determination, the Estate recites the facts in the light most favorable to the Estate as to each defendant. *See Estate of Ceballos v. Husk*, 919 F.3d 1204, 1209 (10th Cir. 2019); *see also Ortega v. Edgman*, No. CIV 21-0728 RB/JHR, 2023 WL 3122460, *1 (D.N.M. Apr. 27, 2023) (unpublished). The Estate acknowledges that contrary evidence exists regarding some of these facts (e.g., Clyde and Clark have differing accounts of what happened on Thursday). However, such disputes are not relevant to this motion.

[8] Document 151-7.

Arrest Report[9] (reflecting 135 pounds); Richens Dep.,[10] 10:7-9; Richens June 8 Interview,[11] 2: 48-49; Richens December 7 Interview,[12] 4:5-6:9.

2.      On two different Jail forms, Madison reported she was going through heroin withdrawals, and Richens provided such forms to Clyde. *See* Pre-booking Form[13] (marking "yes" to "Are you under the influence or going through withdrawals from drugs or alcohol"); Questionnaire[14] (answering yes to a similar question and indicating her drug of choice was heroin); Richens Dep. 24:24-26:23; Richens June 8 Interview, 5:111-113, 7:182-10:254; Richens December 7 Interview, 10:11-12:19; Ross December 7 Interview,[15] 15:14-18; Clyde June 1 Interview,[16] 57:10-17; Curry Dep.,[17] 15:16-19:19, 31:8-15.

3.      Richens also administered a drug test, and Madison tested positive for opioids and admitted to using heroin. *See* Richens Dep. 20:5-21:24, 35:10-36:15;

---

[9] Document 139-1 at 7 (Exhibit B).
[10] Document 122-2.
[11] Document 151-2.
[12] Document 151-1. Citations to this exhibit are to the blue page numbers at the top of each page, which were added by the Court upon filing.
[13] Document 151-13.
[14] Document 122-3.
[15] Document 151-3. Citations to this exhibit are to the blue page numbers at the top of each page, which were added by the Court upon filing.
[16] Document 151-4. Citations to this exhibit are to the blue page numbers at the top of each page, which were added by the Court upon filing.
[17] Document 151-9. Citations to this exhibit are to the blue page numbers at the top of each page, which were added by the Court upon filing.

Richens June 8 Interview, 3:72-74, 5:111-113, 15:391-394; Richens December 7 Interview, 5:21-23, 10:11-15; Hardinger Decl.[18] ¶ 4.

4.    At the time of booking, Richens and Deputy Gerald Ross ("Ross") observed that Madison was "very thin." *See* Richens Dep. 24:5-15; Ross December 7 Interview, 6:3-4.

5.    Madison was placed in a holding cell, and Richens saw Madison vomiting throughout the day. So, when she left work that evening, Richens told the night shift Madison was detoxing from heroin. *See* Richens Dep. 30:8-31:13; Richens December 7 Interview, 5:5-7, 14:9-14; Richens June 8 Interview, 11:277-278.

*Monday (November 28, 2016)*

6.    Sometime in the early morning, Madison was transferred to a cell in the Jail's H Block, which also housed inmate Maria Hardinger. *See* Ross December 7 Interview, 7:21-24.

7.    Madison vomited within 10 minutes of arriving and struggled with vomiting and diarrhea throughout the early morning hours. *See* Hardinger Decl. ¶¶ 5-6.

---

[18] Document 151-5.

8.     Because Richens was concerned about Madison's health, Richens brought Madison to Clyde's medical office on Monday. *See* Clyde Dep.[19] 53:17-54:8, 56:9-57:4; Clyde June 1 Interview, 7:21-23, 15:10-17, 25:24-25. Sergeant Hollie Purdy was also present. *See* Purdy Dep.,[20] 11:5-13:25; Purdy December 7 Interview,[21] 6:16-21.

9.     Clyde's first thoughts upon seeing Madison were, "Chick, you do some serious drugs, and I know you are lying to me," "girl, you do some serious crap. I don't care what you are telling me," and "You're a walking skeleton." *See* Clyde June 1 Interview, 45:9-46:6.

10.    Because of reports from Richens, discussions with Madison, and review of Madison's booking forms, Clyde, Richens, and Purdy knew by the end of Madison's Monday visit that Madison: (1) did not feel well; (2) was throwing up; (3) was unable to keep food and water down; (4) was soiling her sheets with vomit and/or diarrhea; (5) had tested positive for opioids; (6) was withdrawing from heroin; (7) had abnormal blood pressure; and (8) appeared sick, extremely thin, pale, and weak, like "a walking skeleton." *See* Richens Dep. 24:24-26:23,

---

[19] Document 141-5. Citations to this exhibit are to the blue page numbers at the top of each page, which were added by the Court upon filing.
[20] Document 151-14. Citations to this exhibit are to the blue page numbers at the top of each page, which were added by the Court upon filing.
[21] Document 151-21. Citations to this exhibit are to the blue page numbers at the top of each page, which were added by the Court upon filing.

33:17-22, 35:10-36:15, 38:5-39:12; Richens December 7 Interview, 15:1-13;

Richens June 8 Interview, 7:182-10:254, 11:285-12:322, 13:342-344, 15:391-394;

Richens MSJ,[22] 13-14 at ¶¶ 14, 18-19; Clyde Dep. 57:9-58:17, 61:9-67:5, 69:9-19,

71:11-24, 122:21-123:6, 194:4-195:3, 198:2-5; Hardinger Decl. ¶¶ 8-9, 15;

December Written Statements,[23] 10; Clyde June 1 Interview, 7:21-23, 8:20-21, 9:9-

10, 14:20-24, 41:2-7, 45:9-46:6; Clyde December 7 Interview,[24] 45:12-46:6; Purdy

Dep., 11:5-13:25; Purdy December 7 Interview, 5:4-11.

11.    As a Licensed Practical Nurse, Clyde is unable to assess, diagnose, or

treat medical conditions. Rather, her role is to collect information and pass it along

to medical providers (i.e., persons who can provide medical treatment). *See* Clyde

Decl.,[25] ¶ 9 ("[B]y law, I was not able to prescribe medications for an inmate

patient, conduct any assessments, or diagnose or treat any medical condition.");

Clyde Dep. 6:1-18; Tubbs First Dep.[26] 52:3-15, 80:2-16 (explaining "[a]n LPN can

only gather information" and cannot make medical assessments or implement

medical protocols); Utah Code Ann. § 58-31b-302 (describing the different

---

[22] Document 122. Citations to this exhibit are to the blue page numbers at the top of each page, which were added by the Court upon filing.
[23] Document 151-15. Citations to this exhibit are to the blue page numbers at the top of each page, which were added by the Court upon filing.
[24] Document 151-10.
[25] Document 134.
[26] Document 141-4.

licensing qualifications applicable to licensed practical nurses and registered nurses); *Est. of Jensen by Jensen v. Clyde*, 989 F.3d 848 (10th Cir. 2021),[27] ("Ms. Clyde was prohibited from prescribing medications, conducting health assessments, and diagnosing medical conditions."); 2020 Order, 31 ("Nurse Clyde was limited by her licensure to do anything beyond notifying Dr. Tubbs or PA Clark when an inmate exhibited concerning symptoms or sending an inmate to the hospital.").

12.    After the office visit with Madison, Clyde called Clark for a blood pressure prescription. According to Clark,[28] Clyde did not tell him about any of Madison's symptoms or even identify Madison by name. *See* Clark Dep.[29] 25:2-30:10, 28:18-29:2; Clark Interrogatories,[30] 8-9 at Answer to Interrogatory 9; Clark June 13 Interview,[31] 5-6; Clyde Dep. 71:25-72:10.

13.    Later that day, Richens, Clyde, and Purdy discussed Madison's heroin use and symptoms. Clyde believed Madison was lying about drug use and stated that she could, and would, have done more for Madison if she would have been

---

[27] *Cert. denied sub nom. Est. of Jensen By Jensen v. Tubbs*, 142 S. Ct. 339 (2021).
[28] Clyde has disputed this account, but such dispute is not relevant to this motion.
[29] Document 141-6. Citations to this exhibit are to the blue page numbers at the top of each page, which were added by the Court upon filing.
[30] Document 151-17. Citations to this exhibit are to the blue page numbers at the top of each page, which were added by the Court upon filing.
[31] Document 151-16. Citations to this exhibit are to the blue page numbers at the top of each page, which were added by the Court upon filing.

truthful. *See* Richens Dep. 35:13-22; Richens June 8 Interview, 15:391-403; Clyde Dep., 61:8-64:2; Clyde June 1 Interview, 41:21-24, 45:9-46:6.

14.     Upon seeing Madison for the first time, Purdy thought Madison "just looked so thin," which prompted Purdy to ask Clyde what was wrong with Madison. Clyde responded "she [is] going through heroin withdrawals." *See* Purdy December 7 Interview, 5:4-11; Purdy Dep. 11:5-13:25.

15.     Clyde did not check on Madison the rest of the day. *See* Clyde June 1 Interview, 12:11-17.

16.     When Madison returned to her cell from the medical visit, she told Hardinger that the Jail was attributing her symptoms to drug withdrawals and had basically told her to tough it out. Throughout the day, Madison and Hardinger pushed their cell call button several times and informed the responding guard Madison was vomiting and very ill. Each time, the guard simply responded the Jail was aware Madison was vomiting. *See* Hardinger Decl. ¶¶ 11, 14.

17.     That evening, Madison soiled herself. Madison informed the guard through the call button, but the guard refused to let her shower. Madison then asked Hardinger to check her throughout the night to make sure she was still breathing. *See* Hardinger Decl. ¶¶ 15-16.

18.    As Ross was looking through the glass portion of Madison's cell door
on Monday, he could smell vomit. *See* Ross Dep.[32] 14:5-10; Brown Rebuttal,[33] 5
(explaining "[t]he stench of bilious vomitus is not a subtle smell" and those near
Madison's cell likely would have smelled it).

*Tuesday (November 29, 2016)*

19.    In the morning, Madison refused food and just lay on her bed,
vomiting periodically. One time, she vomited so violently the vomit splashed down
the wall and sprayed onto Hardinger's blanket and pillow. Hardinger pushed the
call button to inform the guard and was told she could retrieve cleaning supplies to
clean the mess herself. The guard also admonished Hardinger to stop pushing the
call button because it was interfering with the jailers' duties. *See* Hardinger Decl.
¶¶ 17-20.

20.    Concerned, Richens brought Madison to see Clyde at the medical
office a second time. *See* Clyde Dep. 198:22-199:8.

21.    At or around this time, Madison: (1) had "changed quite a bit" since
Monday, in that Madison now looked "terrible;" (2) looked really tired and pale;
(3) was really weak; (4) had lost her color; (5) moved really slowly as though she

---

[32] Document 151-23.
[33] This document is attached to the Estate's contemporaneously filed appendix as Exhibit A.

was going to "pass out;" (6) was still throwing up consistently; (7) would hold onto the wall for balance; (8) was still unable to keep any food or liquid down; (9) felt dizzy; (10) was still experiencing diarrhea; and (11) was refusing meals. *See* Richens Dep. 40:23-45:24, 49:22-50:16, 55:9-25; Richens December 7 Interview, 18:10-22:2; Richens June 8 Interview, 14:359-18:484; Richens MSJ, 14 at ¶¶ 21-25; Clyde December 7 Interview, 14:2-7; December Written Statements, 10; Clyde Interrogatories,[34] 5 at Answer to Interrogatory 6.

22.    Though Clyde took Madison's vitals on Monday, Clyde neither took them on Tuesday nor obtained any medical treatment for Madison. *See* Clyde Dep. 76:14-15.

23.    After Madison visited the medical office, she saw Detective Monty Nay ("Nay") down the hall. Richens had to physically help her walk down the hall and Madison had to hold onto the wall for balance. After spending just a few minutes with Madison, Nay told Richens to watch Madison "really close[ly]" and log everything. *See* Richens Dep. 43:15-44:9, 49:22-50:12; Richens June 8 Interview, 14:361-366; Richens December 7 Interview, 19:24-20:18.

---

[34] Document 151-18. Citations to this exhibit are to the blue page numbers at the top of each page, which were added by the Court upon filing.

24.     Richens reported Madison's continued deterioration to Clyde. Clyde responded by suggesting Richens give Madison a Gatorade and help her fill a medical request form to see Clark on Thursday (Clark's regular weekly visit). *See* Richens Dep. 50:13-20; Richens June 8 Interview, 16:432-18:484; Richens December 7 Interview 21:17-22:3; Richens MSJ, 14-15 at ¶¶ 25-26.

25.     The Jail considered its medical request forms to be a "request to see the nurse and/or the doctor." Clyde Dep. 93:15-18.

26.     Richens helped Madison fill out a medical request form. In it, Madison wrote she had been throwing up and experiencing diarrhea for "4 days straight" and couldn't "hold anything down[,] not even water." *See* Medical Request Form;[35] Richens Dep. 51:12-19; Richens June 8 Interview, 22:599-23:649; December Written Statements, 10. Given Richens's assistance, it is reasonable to infer she saw what Madison wrote in the medical request form.

27.     Madison also misdated the form, likely due to her progressing encephalopathy[36] brought on by severe dehydration. *See* Brown Rebuttal, 5; 2020 Order, 6.

---

[35] Document 122-5.
[36] Encephalopathy is a term for any disease of the brain that alters brain function or structure.

28.     Richens then took the medical request form from Madison and hand-delivered it to Clyde. It is reasonable to infer Richens saw what Madison wrote on the form while transporting the form. Even though Richens and Clyde read the form, they did not bother contacting the Jail's medical providers. *See* Clyde Dep. 100:2-13; Richens MSJ, 15 at ¶¶ 27-31; December Written Statements, 10 (Clyde stating "I received the Medical Request and in it she said her roommate had the stomach flu and she maybe had it.").

29.     Richens and Ross then decided to move Madison to a special cell used for makeshift medical observation because of Madison's worsening symptoms. Clyde was aware of this move. *See* Richens December 7 Interview, 20:14-21:6; Richens June 8 Interview, 13:350-14:377; Richens Dep. 53:6-23; Ross December 7 Interview, 11:16-12:11; Richens MSJ, 15-16 at ¶¶ 32-33.

30.     When Richens moved Madison to medical observation, Richens knew Madison's condition was more serious than "just the stomach flu or something." *See* Richens June 8 Interview, 14:382-15:387.

31.     Even though Richens reported some concerns to Clyde and others on Monday and Tuesday, Richens knew Clyde was not checking on Madison and that Madison would not receive any medical treatment until Thursday. Richens also knew the others to whom she expressed concerns about Madison had no plans to

obtain medical care for her, merely saying "okay" upon hearing Richens' concerns. *See* Richens Dep. 45:8-20, 50:13-20; 62:17-22; Richens June 8 Interview, 16:432-18:484; Richens December 7 Interview, 18:18-23:5.

32.     Even after observing Madison fail to eat and drink, appear weak and pale, have trouble walking, and vomit and soil herself repeatedly for three days straight, Richens did not call Tubbs or Clark. Instead, Richens left work on Tuesday, knowing she would not work Wednesday, and knowing Madison would not see a medical provider until Thursday. *See id.*; *see also* Richens MSJ, 16 at ¶ 34; Clark Interrogatories, 7-9 at Answers to Interrogatories 8-9.

*Wednesday (November 30, 2016)*

33.     Madison was so sick in the morning she could not get out of bed without vomiting. When Purdy arrived for work, the night shift told her Madison had vomited a black substance during the night. Concerned about dehydration specifically, Purdy asked Clyde if she could give Madison a Gatorade because of her continued vomiting and diarrhea, as well as the black vomit. *See* December Written Statements, 9; Purdy Dep. 16:3-19:2, 24:14-27:3, 39:11-25; Purdy December 7 Interview, 9:10-12:9; Clyde Dep. 108:21-23; Tubbs Second Dep.[37]

---

[37] This document is attached to the Estate's contemporaneously filed appendix as Exhibit B.

156:8-22 (Clyde and Clark's own expert explaining black vomit is concerning and requires emergency treatment).

34.     Purdy told Madison, "Hey, here's another Gatorade. Just drink it slow, you know, *if you can keep it down* and stuff." *See* Purdy December 7 Interview, 12:4-11 (emphasis added). A reasonable inference is that Purdy knew on Wednesday morning that Madison was having difficulty keeping fluid down.

35.     Highlighting the County's lack of training of Jail staff, Purdy, despite knowing of Madison's symptoms on Wednesday morning and knowing Clyde was not immediately obtaining medical treatment for Madison, including vomiting a black substance, did not call Tubbs or Clark on Wednesday. *See* Clark Interrogatories, 7-9 at Answer to Interrogatories 8-9; Purdy December 7 Interview, 9:10-12:9; Purdy Dep. 18:12-25.

36.     Deputy Caleb Bird ("C. Bird") arrived at Madison's cell later in the day to give her blood pressure medication. But Madison could not get out of bed and told him she could not stand up without vomiting. Shocked, C. Bird was concerned enough that he violated Jail policy and entered Madison's cell to give her the pills. As he entered, he observed a container full of "green" vomit next to

Madison's bed. *See* C. Bird December 7 Interview,[38] 4:24-6:23; C. Bird June 1 Interview,[39] 5:3-9:13, 17:4-24; C. Bird Dep.[40] 24:17-28:13.

37.    C. Bird was so troubled he felt he needed to tell someone what he had observed, so upon leaving the cell he relayed his perceptions to Clyde and said that Madison "looks really sick and could use some help." Clyde merely responded that the Jail "knows about her" and Madison "is coming down from heroin." *See* C. Bird December 7 Interview, 4:24-6:23; C. Bird June 1 Interview, 5:3-9:13, 17:4-24; C. Bird Dep. 24:6-27:9, 30:7-14; C. Bird MSJ,[41] 5 at ¶ 16; Clyde Dep. 106:15-107:24.

38.    C. Bird went home that night and told his wife ("B. Bird") that Madison looked "like death," looked "like a skeleton," and "looked like she was going to die." *See* B. Bird Dep.[42] 7:6-10:10; C. Bird June 1 Interview, 7:4-22.

39.    Highlighting the County's lack of training of Jail staff, C. Bird, despite believing Madison was going to die and knowing Clyde was not

---

[38] Document 151-19. Citations to this exhibit are to the blue page numbers at the top of each page, which were added by the Court upon filing.

[39] Document 151-20. Citations to this exhibit are to the blue page numbers at the top of each page, which were added by the Court upon filing.

[40] Document 151-24. Citations to this exhibit are to the blue page numbers at the top of each page, which were added by the Court upon filing.

[41] Document 139. Citations to this exhibit are to the blue page numbers at the top of each page, which were added by the Court upon filing.

[42] Document 151-6. Citations to this exhibit are to the blue page numbers at the top of each page, which were added by the Court upon filing.

immediately obtaining medical treatment for Madison, did not call Tubbs or Clark on Wednesday night. *See* Clark Interrogatories, 7-9 at Answers to Interrogatories 8-9; C. Bird December 7 Interview, 4:24-6:23; C. Bird June 1 Interview, 4:3-6:16; C. Bird Dep., 17:3-7, 24:6-26:5, 30:7-14.

40.     When Clyde saw Madison for less than 20 seconds toward the end of her shift, Clyde asked Madison no questions about her complaints in the medical request form or the problems C. Bird and Purdy had observed and reported to Clyde, i.e., vomiting, diarrhea, and inability to hold down food or water. *See* Clyde Dep. 207:9-208:8.

*Thursday (December 1, 2016)*

41.     On Thursday morning, Clyde told Lieutenant Jason Curry ("Curry") that "she didn't know if it was stomach flu or heroin withdrawals, but [Madison] was sick [and throwing up]." *See* Curry June 1 Interview,[43] 16:12-19:2; Curry Dep. 36:5-40:1, 52:14-53:2.

42.     Clark arrived for his weekly Jail visit around 9:00 a.m. According to Clark,[44] Clyde gave him several medical request forms for review but falsely said

---

[43] Document 151-22. Citations to this exhibit are to the blue page numbers at the top of each page, which were added by the Court upon filing.
[44] Clyde disputes this account, but such dispute is not relevant to the Motion.

Madison had not submitted a form. *See* Clark June 13 Interview, 11; Clark Dep. 8:6-12, 38:7-42:9; Clark Interrogatories, 8-9 at Answer to Interrogatory 9.

43.    According to Clark,[45] as he was leaving around 1 or 1:30 p.m., Clyde mentioned Madison for the first time, telling Clark he might want to see her even though she had not put in a medical request. *See id.*

44.    However, according to Clyde,[46] she provided Madison's medical request form to Clark when he arrived, which included Madison's self-report that she had been vomiting for four days and could not keep down water. *See* Decl. Jana Clyde, ¶¶ 39-46; Clyde Dep. 109:2-114:5.

45.    According to Clyde,[47] Clark deliberately chose to see Madison only after he had seen all other inmates requesting to see him, which resulted in Clark not arriving at Madison's cell until 1:28 p.m.

46.    At 1:28 p.m., Clark and Clyde found Madison dead on the floor of the improvised medical observation cell. She died—alone—around 43 minutes earlier from dehydration. *See* Medical Examiner Report,[48] 13.

---

[45] Clyde disputes this account, but such dispute is not relevant to the Motion.
[46] Clark disputes this account, but such dispute is not relevant to the Motion.
[47] Clark disputes this account, but such dispute in not relevant to the Motion.
[48] Document 122-6. Citations to this exhibit are to the blue page numbers at the top of each page, which were added by the Court upon filing.

19

47.     Based on a postmortem report, Madison weighed 87 pounds, which was 42 pounds less than when she was booked in 5 days earlier. Madison Jody Jensen Booking Information Sheet; Medical Examiner Report, 12; Medical Examiner Photographs;[49] Brown Report,[50] 10 (describing Madison's weight loss).[51]

48.     Contrary to the photographic evidence, Clyde testified that Madison, while dead on Thursday, looked the same as she had three days earlier. *See* Clyde Dep. 122:16-20; *compare* Medical Examiner Photographs (Madison dead on Thursday), *with* Madison Jody Jensen Booking Information Sheet (Madison alive late Sunday evening).

49.     Had Clark seen Madison two hours earlier, he could have saved her life. *See* Brown Report, 12.

50.     After discovering Madison lifeless, Clyde and Clark falsely told investigators Madison had been on a heroin withdrawal protocol. At that time, the Jail did not have a heroin withdrawal protocol.  As discussed below, the Jail

---

[49] Document 151-12.

[50] Document 209-2. Citations to this exhibit are to the blue page numbers at the top of each page, which were added by the Court upon filing.

[51] There are conflicting reports regarding Madison's weight, but there is no genuine dispute that she lost at least 15 pounds while at the Jail. *See* Brown Report, 10. On summary judgment, the Estate is entitled to the inference that she lost even more.

established such a protocol after Madison's death. *See* Body Cam Transcript,[52] 16:5-6, 19:10-12.

51.     According to Ross, Clyde generally knew about Madison's "condition" but "never gave the okay" to put Madison on a formal medical watch. Ross also claimed Clyde was aware Madison was withdrawing, but Clyde was not "too concerned with it." *See* Ross December 7 Interview, 13:1-14, 15:5-9.

Jail Practices

52.     The County owed a non-delegable duty to provide adequate medical care for inmates at the time of Madison's death. *See Estate of Martinez v. Taylor*, 176 F. Supp. 3d 1217, 1231 (D. Colo. 2016) (citing *Nieto v. Kapoor*, 268 F.3d 1208, 1216 (10th Cir. 2001)); *Burke v. Regalado*, 935 F.3d 960, 996 n.17 (10th Cir. 2019) (explaining a "county could be liable for actions of contracted jail medical providers") (citing *Layton v. Bd. of Cty. Comm'rs of Okla. Cty.*, 512 F. App'x 861, 864-72 (10th Cir. 2013) (unpublished);[53] Utah Code Ann. § 17-22-

---

[52] Document 151-11. Citations to this exhibit are to the blue page numbers at the top of each page, which were added by the Court upon filing.
[53] *See also Finlinson v. Millard Cnty.*, No. 2:16-CV-01009-TC, 2018 WL 5438436, *33 (D. Utah Oct. 29, 2018) (unpublished) ("The fact that Wasatch Mental Health is a private contractor for services does not shield the County from liability for Mr. Memmott's (Wasatch Mental Health's) decisions."); *Jenkins v. Utah Cnty. Jail*, No. 2:11-CV-00761, 2015 WL 164194, *7 (D. Utah Jan. 13, 2015) (unpublished).

2(1)(g) ("The sheriff shall . . . take charge of and keep the county jail and the jail prisoners[.]").

53.     Under Sheriff David Boren ("Boren")'s direct supervision, Curry was responsible for implementing Jail policies and procedures. *See* Boren Dep.[54] 6:4-7:14; Curry Dep. 6:20-25, 7:9-12, 9:5-8.

54.     Based on common sense, the fact the Jail had housed numerous inmates experiencing symptoms like vomiting and diarrhea, and the evidence described above, it is reasonable to infer the County knew prior to Madison's death that the Jail would inevitably house inmates suffering from varying degrees of dehydration (whether because of opiate withdrawal and/or countless other issues), including severe dehydration like Madison suffered due to extended periods of vomiting and diarrhea. *See* Boren Dep. 40:14-43:25, 49:10-24, 52:17-22; Purdy Dep. 33:16-21; Richens Dep. 58:23-59:8; Clyde Dep. 225:5-12; Clark June 13 Interview, 13; Curry Dep. 50:8-13, 53:10-13, 61:18-24.; 2020 Order, 33 ("A factfinder could conclude that . . . symptoms like Madison's were inevitable.").

55.     There is evidence that, prior to Madison's death, the County knew that vomiting and diarrhea over an extended period of time could lead to dehydration.

---

[54] Document 141-3. Citations to this exhibit are to the blue page numbers at the top of each page, which were added by the Court upon filing.

*See* Curry Dep. 61:18-24; Boren Dep. 117:10-13("Q. Prior to Madison passing away, did you know that vomiting and diarrhea over an extended period of time could lead to dehydration? A. Yes.").

56.     There is evidence that, prior to Madison's death, the County knew that one of the risks of opiate withdrawals was dehydration. *See* Curry Dep. 58:14-17; Nurse Bernard Report,[55] 11-12 (explaining that, since at least 2008, the National Correctional Commission on Heath Care, NCCHC, an organization of which Tubbs has been a member at all relevant times, suggested opiate withdrawal protocols to jails and explained such withdrawals can be "life-threatening"); Tubbs Report,[56] 1 ("I am . . . a certified provider by the National Correctional Commission on Health Care."); Boren Dep. 25:18-26:9, 46:13-18, 89:23-90:20, 100:24-104:6, 109:25-110:9 (explaining the County relied exclusively on Tubbs to dictate medical procedures at the Jail); Tubbs Second Dep. 34:21-36:1 (explaining the County, through Boren, chose not to be certified by NCCHC or follow all the NCCHC guidelines").

57.     There is evidence that, prior to Madison's death, the County knew the obvious fact that a human can suffer serious injury or death from dehydration. *See*

---

[55] Document 241-2.
[56] Document 241-1.

*Wong v. Belmontes*, 558 U.S. 15, 24 (2009) (explaining juries may use their common sense); *United States v. Torres-Laranega*, 476 F.3d 1148, 1156 (10th Cir. 2007) (same); *Luckow v. State*, No. A-4895, 1995 WL 17220769, *5 n.2 (Alaska Ct. App. Apr. 26, 1995) ("Common sense alone tells us . . . that no parent having physical custody of a child could ignore the drawn-out process of an infant's starvation except under circumstances manifesting extreme indifference to human life."); *see also* Tubbs Second Dep. 106:18-107:14 (acknowledging "poorly treated or managed diarrhea [and/or vomiting] can result in death").

58.     There is evidence that the County, in spite of its aforementioned knowledge and statutory obligations, failed to implement protocols or provide training on what Jail staff should do upon learning an inmate was exhibiting obvious severe dehydration signs, including monitoring fluid intake, checking vital signs, and contacting medical providers. *See* Clyde Dep. 17:8-12, 18:16-20, 22:4-27:11, 31:1-8, 35:23-37:4, 40:14-43:13, 55:12-19, 89:5-16, 92:8-93:8, 94:15-17, 96:10-18, 98:1-23, 102:22-104:10, 119:25-121:8, 130:6-131:16, 136:17-139:11, 143:22-144:23, 146:20-22, 147:8-150:4, 152:1-15, 173:3-8, 207:2-8, 212:6-215:5, 227:23-228:2; Clyde Decl. ¶ 4; Clyde June 1 Interview, 10:2-5, 25:6-9, 30:23-31:16, 52:20-54:8, 57:20-23; Curry Dep. 22:10-15, 26:1-8, 28:15-25, 51:7-10, 57:14-16, 60:16-21, 62:9-63:12; Purdy Dep. 27:5-28:15; Clark Dep. 70:25-71:12,

82:16-83:3, 87:22-89:17; Clark June 13 Interview, 21; Clark Interrogatories, 9-10

at Answer to Interrogatory 10; Purdy December 7 Interview, 22:24-23:5; Ross

Dep. 29:3-17; Boren Dep. 26:5-9, 28:24-29:2, 39:15-23, 41:20-23, 45:17-22, 46:3-

12, 47:7-21, 50:19-24, 54:2-15, 57:15-21, 60:4-17, 62:9-16, 73:20-74:22, 86:4-16,

88:16-89:4, 104:22-108:9, 117:24-118:2; Tubbs First Dep. 30:16-35:4, 40:3-44:21,

55:8-57:25, 67:4-68:16, 74:17-19, 79:23-80:8; Tubbs Second Dep. 34:21-36:1; C.

Bird Dep. 17:9-18:12, 28:9-12, 35:18-24; Richens Dep. 14:4-15:7, 15:8-24, 47:12-

21, 49:5-12.

59.     While the Jail's unwritten "understanding" was that Jail staff had

discretion to contact Tubbs or Clark, the County had no policy or training

concerning how and when Jail staff (including Clyde) should exercise such

discretion, i.e., when to call and what symptoms might warrant a call. *See* Boren

Dep. 40:14-41:23, 45:5-11, 47:6-21, 50:19-24, 60:4-17, 62:9-16, 86:4-16, 105:25-

108:25; Tubbs First Dep. 30:16-32:24, 55:23-57:25; Clyde Dep. 96:10-18, 98:1-23,

152:1-15; Clyde Decl. ¶ 4; Clark Interrogatories, 9-10 at Answer to Interrogatory

10; *Estate of Jody v. Duchesne Cty.*, No. 2:17CV1031DAK, 2019 WL 3288864,

**5-6 (D. Utah July 22, 2019)[57] (unpublished) (explaining this country is in an

"opioid crisis" and "[s]imply telling staff to call when they saw concerning

---

[57] Document 131.

symptoms is inadequate when staff are not trained in what symptoms should be concerning"); 2020 Order, 33 (discussing the failure "to implement protocols on what Nurse Clyde should do in documenting and relaying information regarding serious medical conditions").

60.     The Jail had no policies or procedures requiring action (e.g., notification of medical providers) upon learning an inmate was withdrawing from heroin (or any opioids) and/or had heroin (or other opioids) in their system. *See* Clyde June 1 Interview, 25:6-10, 41:8-17; Curry Dep. 26:1-15, 57:14-16; Clyde Dep. 23:15-27:5, 36:23-37:4, 135:23-137:13, 146:20-22, 159:6-14; Purdy Dep. 27:17-28:15; Richens Dep. 15:8-15:24; Boren Dep. 28:24-29:2, 35:8-10.

61.     The Jail had no policies or procedures regarding what to do if an inmate was experiencing vomiting, diarrhea, or dehydration, such as tracking, documenting, or reporting to medical providers. *See* Curry Dep. 27:1-12; Clyde Dep. 27:6-11, 31:1-5, 212:11-17; C. Bird Dep. 12:4-15:2; Boren Dep. 39:3-23, 41:20-23, 54:8-15, 88:16-89:22, 117:24-118:2; 2020 Order, 33 ("If there were no protocols or training for obtaining relevant information from patients, a constitutional violation was certain to occur at some point.").

62.     Jail staff would not report an inmate experiencing diarrhea. *See* C. Bird Dep. 14:24-15:2, 16:22-17:2.

63.     Jail staff believed they should sometimes, but not always, give an inmate Gatorade for vomiting or diarrhea. There was no formal protocol regarding Gatorade, and, at the time, Gatorade was usually given by request. *See* Richens Dep. 47:8-22; Clyde June 1 Interview, 10:1-14, 49:13-15; Clyde Dep. 18:16-20.

64.     Some Jail staff members believed they needed to ask Clyde for permission to give an inmate Gatorade, while some did not. *See* Purdy Dep. 16:9-21, 17:15-19, 26:24-27:3; C. Bird June 1 Interview, 31:5-16; Richens June 8 Interview,13:342.

65.     Providing Gatorade is grossly inadequate in the face of serious and continued vomiting, especially when coupled with failure to monitor actual intake/retention of such Gatorade. *See* Brown Rebuttal, 13 (explaining Gatorade is "grossly inappropriate in the face of persistent or severe vomiting" and "even at the layperson standard, evaluation of a patient being treated with Gatorade for ongoing vomiting would necessarily include determining whether the Gatorade is meeting the individual's needs"); Tubbs Second Dep. 57: 11-12 ("I mean, to rehydrate someone, you need to absorb the fluid that you're consuming."); *Jensen*, 989 F.3d at 859 (explaining that "plac[ing] [Madison] in a medical observation cell and giving her Gatorade . . . are hardly reasonable measures given the dire circumstances").

66.     Clyde testified she did not receive any training on Jail policies and procedures. *See* Clyde Dep. 22:14-17.

67.     The County did not train Clyde on any medical aspect of her job. Rather, the County expected Tubbs and/or Clark to provide any necessary training, and the County did not ensure Clyde received such training. *See* Boren Dep. 26:5-9, 100:24-105:3; 2020 Order, 32 (explaining "[t]here is some question as to whether . . . [the] failure to have any kind of training materials or written policies for Nurse Clyde to follow knowingly created a substantial risk of constitutional injury" and "there is no evidence that Nurse Clyde was trained in how to find out or document relevant information from patients"); *id.* at 36 ("The court also notes that there are questions of fact as to Nurse Clyde's training. If she was not trained properly, she may not have been deliberately indifferent.").

68.     Despite failing to train Clyde, failing to ensure Tubbs/Clark actually trained Clyde, and Clyde's inability to assess medical conditions, the County expected Clyde (and other jail staff) to subjectively assess an inmate's medical condition (using a "layperson" and "common sense" standard) before contacting medical providers. *See* Clyde June 1 Interview, 52:20-54:8 (Clyde explaining that, if an inmate asks to see a doctor, "then I do a really good evaluation of them . . . without them knowing"); Boren Dep. 46:3-12 (Boren explaining that, if

someone had reported Madison's symptoms to Clyde, Clyde could "either handle it herself" or "contact PA Logan Clark"), 107:2-25 (explaining jail staff, including Clyde, should determine whether to contact medical providers in the same way "a layperson outside of a correctional facility" would, i.e., just use "common sense"); Tubbs Second Dep. 71:19-74:13 (explaining Jail staff, including Clyde, were expected to determine whether an inmate's medical symptom/complaint is "urgent" enough to warrant contact with a medical provider or merely an appointment or the Thursday clinic).

69.   Because Clyde was not a registered nurse, Tubbs did not establish any medical protocols or standing orders at the Jail. *See* Tubbs First Dep. 79:23-80:8; Tubbs Second Dep. 51:13-20. The County had ignored Tubbs's multiple requests that the County hire a registered nurse. *See* Tubbs First Dep. 17:2-11.

70.   Even if an inmate reported violent vomiting over 12 hours, but no Jail official had witnessed such vomiting, Clyde would not have informed Clark. *See* Clyde Dep. 173:3-11.

71.   Clyde operated under the assumption that the Jail generally required an inmate like Madison to "save" vomit and/or diarrhea. However, there was no policy at the Jail requiring an inmate to "save" vomit and/or diarrhea, unless the

inmate reported blood in such substances. *See* Richens Dep. 51:24-52:15; Clark Dep. 31:24-32:6; Boren Dep. 48:1-10; Tubbs First Dep. 32:25-34:4.

72.    There was no policy or training at the Jail regarding when to refer an inmate's request for medical treatment to someone who could actually provide the treatment. *See* Clyde Dep. 96:2-18; Boren Dep. 60:4-17, 62:9-12.

73.    Prior to Madison's death, the Jail had no policies or procedures regarding what medical action to take when confronted with an inmate displaying the medical symptoms Madison was displaying. *See* Clyde Dep. 22:22-23:14; Boren Dep. 86:4-16; 2020 Order, 34 (discussing "the risk of constitutional injuries like Madison's by not establishing procedures or providing training on what Nurse Clyde should have done in a case like Madison's").

74.    There were no policies on how an inmate should be treated if moved to medical observation, nor on whom should receive notice. *See* Clyde Dep. 91:11-92:6, 120:8-13; Boren Dep. 71:2-75:21; Clyde June 1 Interview 35:23-38:2; Tubbs First Dep. 40:3-41:10.

75.    There was no policy at the Jail requiring staff to apprise medical providers when an inmate wasn't eating/retaining food, and the policy requiring staff to log whether an inmate eats was not commonly followed. *See* Richens Dep. 46:7-23, 49:5-12; Clyde June 1 Interview, 30:23-31:16.

76.     According to Curry, the Jail had no policies or procedures regarding how or when to keep track of an inmate's fluid intake and ability to hold fluid. *See* Curry Dep., 62:9-63:12.

77.     There was no policy at the Jail regarding when inmates would receive blood pressure or vital signs checks. *See* Clyde Dep. 19:2-11, 138:11-19; Tubbs Second Dep. 138:21-140:1 (explaining Clyde had discretion as to whether she would take vital signs and which vital signs she would take), 141:1-10 (explaining Tubbs never communicated his expectations of when Clyde should take blood pressure readings).

78.     There was no policy at the Jail regarding what to do when an incoming inmate reported medical issues on his or her booking form. *See* Clyde Dep. 36:23-38:4, 40:14-41:6, 227:23-228:5; Richens Dep. 14:4-15:7; Curry Dep. 22:10-15 ("Q. In 2016, if a completed form like Exhibit 3 was put in the medical box, with Question No. 3 being answered in the affirmative, was there a policy in place that would dictate what medical was supposed to do with that information? A.·Not that I can recall.").

79.     There was no policy at the Jail requiring camera controllers to report certain symptoms to medical personnel. *See* Clyde Dep. 131:12-16.

80.     According to Curry, the Jail had no policies or procedures regarding when or under what circumstances Jail staff should contact medical providers on weekends (i.e., when Clyde was not working). *See* Curry Dep., 60:16-21.

81.     The Jail staff's responses to Madison's obvious condition, as discussed previously, highlight the County's utter failure to institute policies and procedures on how to handle inmates displaying obvious symptoms of dehydration and when to escalate medical issues to medical providers. Where Madison indisputably died from dehydration after exhibiting obvious dehydration signs for days, such protocols and training likely would have saved her. *See* Brown Rebuttal, 6-8 (explaining "Ms. Jensen's dehydration was obviously progressive over the course of her jail stay," "Ms. Jensen's severe and deteriorating dehydration that was obviously life-threatening," and "Ms. Jensen was visibly unsteady on her feet and lost 15 pounds in four days"); *id.* at 16 ("No matter the cause, she was allowed to die under direct observation over the course of four days from severe dehydration."); Brown Report, 11 ("It is frankly astonishing to this reviewer that, in the twenty-first-century United States, a closely observed individual could die of severe dehydration, stained by her own vomit and feces, over the course of several days.").

The 2020 Order

82.     In its 2020 Order, this Court correctly identified a genuine issue of material fact existed regarding whether Clyde was adequately trained to collect information from inmates and pass such information on to medical providers (i.e., Clark or Tubbs) and whether such training would have saved Madison's life.[58] *See* 2020 Order, 31 (stating: "there is a question as to whether the lack of medical care Madison received has an affirmative link to . . . [the] failure to train Nurse Clyde about how to properly respond to certain observable symptoms" and "there is no evidence regarding Nurse Clyde's specific training"); *id.* at 32 (stating "[t]here is some question as to whether . . . [the] failure to have any kind of training materials or written policies for Nurse Clyde to follow knowingly created a substantial risk of constitutional injury" and "there is no evidence that Nurse Clyde was trained in how to find out or document relevant information from patients"); *id.* at 33 (stating: "[i]f there were no protocols or training for obtaining relevant information from patients, a constitutional violation was certain to occur at some point," "[a] factfinder could conclude that . . . symptoms like Madison's were inevitable," and "[t]here is a question of fact as to whether . . . [there was a failure] to implement

---

[58] While the Court made such determinations in the context of Tubbs, because Tubbs was contractually obligated to train Clyde, the determinations are relevant here because of the County's non-delegable duty to train its jail staff (including Clyde).

protocols on what Nurse Clyde should do in documenting and relaying information regarding serious medical conditions"); *id.* at 34 ("A genuine issue exists as to whether . . . [there was deliberate indifference] to the risk of constitutional injuries like Madison's by not establishing procedures or providing training on what Nurse Clyde should have done in a case like Madison's."); *id.* at 36 ("The court also notes that there are questions of fact as to Nurse Clyde's training. If she was not trained properly, she may not have been deliberately indifferent.").

83.    In its 2020 Order, this Court dismissed the Estate's municipal claim against the County because, primarily: (1) "Jail personnel knew to notify medical personnel if an inmate was vomiting or experiencing diarrhea, they knew they could contact PA Clark or Dr. Tubbs directly, they knew to give the inmate Gatorade, and they knew they could move the inmate to an observation cell;" (2) "Given that there is no evidence of any previous incidents regarding inmates withdrawing from opiates, the training appears to have been sufficient to address recurring situations in the Jail;" (3) "Dr. Tubbs, PA Clark, and Nurse Clyde all had sufficient medical training to address the situation and the officers at the Jail were adequately trained to report Madison's condition to the medical personnel;" and (4) "Dr. Tubbs and PA Clark were on call at all times and Nurse Clyde and Jail employees testified that they knew they could call them at any time. The

unfortunate fact that Nurse Clyde did not contact them regarding Madison's condition does not rise to the level of deliberate indifference in terms of staffing and training." *See* 2020 Order, 13-18. These are some of the determinations this Court should reconsider, as argued below.

## **RECONSIDERATION STANDARD**

Federal Rule of Civil Procedure 54(b) expressly allows district courts to "revise[ ] at any time before the entry of a [final] judgment" "any order or other decision, however designated, that adjudicates fewer than all the claims or the rights and liabilities of fewer than all of the parties . . . ."  Fed. R. Civ. P. 54(b). This Court has recognized its discretionary authority under rule 54(b) to review and revise any interlocutory ruling made prior to the entry of final judgment. *See Ellis v. Salt Lake City Corp.*, 553 F. Supp. 3d 990, 997 (D. Utah 2021). Courts often reconsider non-final orders or decisions in light of newly discovered facts, newly released legal authority, or demonstration of an error, all of which are present in this case. *See Phillips v. United States Army Corps of Engineers*, No. 2:21-CV-355-TS-DBP, 2023 WL 2894496, *2 (D. Utah Apr. 11, 2023) (unpublished).

## SUMMARY JUDGMENT STANDARD

Summary judgment is proper only when the evidence establishes there is no genuine issue regarding any material fact and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). The burden of establishing the nonexistence of a genuine issue of material fact is on the moving party. *See Baxter v. Weldotron Corp.,* 840 F. Supp. 111, 113 (D. Utah 1993). An issue of material fact is "genuine" if "there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way." *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998).

In this context, the Court must "view the evidence and draw all reasonable inferences therefrom in the light most favorable to the party opposing summary judgment." *Jackson v. Park Place Condominiums Ass'n, Inc.*, 619 F. App'x 699, 702 (10th Cir.), *cert. denied*, 136 S. Ct. 484 (2015), *reh'g denied*, 136 S. Ct. 887 (2016) (unpublished). The Estate may "defeat summary judgment on the basis of a fact dispute created by an unexplained contradiction in the movant's own sworn statements[.]" *Sorbo v. United Parcel Serv.*, 432 F.3d 1169, 1175 (10th Cir. 2005). Similarly, the Estate can prevent summary judgment by relying on reasonable inferences from the evidence. *See Cone v. Longmont United Hosp. Ass'n*, 14 F.3d 526, 530 (10th Cir. 1994); *Traylor v. Denton*, 39 F.3d 1193 (10th Cir. 1994).

## <u>ARGUMENT</u>

**This Court should reconsider its summary dismissal of the County because the Tenth Circuit established new municipal liability standards and there is evidence the County failed to train its employees regarding when to escalate medical issues to medical providers.**

To succeed on a 42 U.S.C. § 1983 claim against the County,[59] the Estate must prove the County adopted a policy or custom[60] with deliberate indifference that caused Madison to suffer deprivation of her constitutional right to appropriate medical care. *See Spradley v. LeFlore Cty. Detention Ctr. Pub. Trust Bd.*, 764 Fed. Appx. 692, 703 (10th Cir. 2019) (quoting *Moss v. Kopp*, 559 F.3d 1155, 1168 (10th Cir. 2009)) (unpublished).

The Tenth Circuit has held "[d]eliberate indifference to serious medical needs may be shown by proving there are such gross deficiencies in staffing, facilities, equipment, or procedures that the inmate is effectively denied access to adequate medical care." *Garcia v. Salt Lake Cty.*, 768 F.2d 303, 308 (10th Cir.

---

[59] The County is not entitled to qualified immunity. *See Paugh v. Uintah Cnty.*, 47 F.4th 1139, 1171 (10th Cir. 2022).

[60] In the Tenth Circuit, a county's policies or customs include, but are not limited to: (1) a formal regulation or policy statement; (2) an informal custom amounting to a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law; (3) the decisions of employees with final policymaking authority; (4) the ratification by such final policymakers of the decisions—and the basis for them—of subordinates to whom authority was delegated subject to these policymakers' review and approval; or (5) the failure to adequately train or supervise employees, so long as that failure results from deliberate indifference to the injuries that may be caused. *See Estate of Martinez v. Taylor*, 176 F. Supp. 3d 1217, 1230 (D. Colo. 2016); *Brammer–Hoelter v. Twin Peaks Charter Acad.*, 602 F.3d 1175, 1188-89 (10th Cir. 2010).

1985); *see also Olsen v. Layton Hills Mall*, 312 F.3d 1304, 1320 (10th Cir. 2002) (holding a jury could find a county liable for its failure to train jail staff to recognize and respond to individuals with Obsessive-compulsive disorder).

### A. The Tenth Circuit's new test for municipal liability based on failure to train jail staff on when to escalate medical issues to providers

In 2021, the Tenth Circuit adopted a new failure to train test for municipal liability under 42 U.S.C. § 1983. *Lance v. Morris*[61] involved the denial of medical treatment to Dustin Lance at an Oklahoma detention center. *See* 985 F.3d at 792. Over three days, Mr. Lance requested, but did not receive, medical care for priapism.[62] Mr. Lance sued Pittsburg County (i.e., the sheriff in his official capacity), arguing, among other things, the county failed to train its employees how to respond to medical emergencies. *See id.* at 800. The district court granted summary judgment to the county and Mr. Lance appealed. *See id.*

On appeal, the Tenth Circuit identified the three elements necessary to recover for a failure to train; namely: (1) the existence of a county policy or custom involving deficient training; (2) the policy or custom's causation of an injury; and (3) the county's adoption of a policy or custom with deliberate indifference. *See*

---

[61] The Tenth Circuit decided *Lance* after this Court entered the 2020 Order dismissing the County on summary judgment.

[62] Priapism is a persistent, painful erection.

*id.*[63] The court found Mr. Lance satisfied the first element, noting "evidence that the county hadn't trained employees how to determine 'the immediacy of medical complaints,' particularly when medical personnel were away from the detention center." *Id.* at 801. For example, there was "evidence that the employees had obtained no training on when to call a nurse or a doctor when one was not on site." *Id.*[64] The court determined "[a] reasonable factfinder could infer that this deficiency in the training was both obvious and closely related to Mr. Lance's injury." *Id.*

As to the third element about deliberate indifference, the court defined the inquiry as whether "a county fails to train jail guards on how to handle recurring situations presenting an obvious potential to violate the Constitution." *Id.* at 801. To answer this question, the court adopted a three-part test: (A) whether the county's policymakers knew to a moral certainty that their employees will confront a given situation; (B) whether such situation presents the employee with a difficult choice of the sort that training or supervision will make less difficult; and (C)

---

[63] The parties seemingly agreed Mr. Lance satisfied the second element based on evidence his injury could have been avoided if the employees had been trained to determine when a medical issue was serious. *See* 985 F.3d at 800 n.4.

[64] As appellees/defendants' briefing in the *Lance* case reveals, the nurse referenced in the *Lance* appellate opinion was a registered nurse. *See, e.g., Lance v. Morris*, 17-cv-00378-RAW, 2020 WL 995317, **13-14 (10th Cir. Feb. 26, 2020) (describing "registered nurse Doris Crawford"). Thus, unlike Clyde in this case, the nurse in *Lance* could assess, diagnose, and treat (i.e., was a medical provider).

whether the wrong choice will frequently cause the deprivation of a citizen's constitutional rights. *See id.* at 802.

Applying this test, the court first determined a factfinder could find the county policymakers had known to a moral certainty that jail guards would need to independently assess detainees' medical conditions because medical emergencies would obviously occur when the only medical provider (a registered nurse) was off duty. *See id.* Next, the court determined a factfinder could find that training would have helped jail guards make the difficult decision of whether to call medical providers when the registered nurse was off duty. *See id.* at 802-03. Finally, the court determined a factfinder could find the jail guards' lack of training would frequently lead to disregard of serious complaints in violation of detainees' constitutional right to medical care. *See id.* at 803. Ultimately, the Tenth Circuit reversed the district court's grant of summary judgment for the county. *See id.*

Since *Lance*, several other courts have determined that counties' failure to train jail staff (such as guards and LPNs) about when to escalate medical issues to medical providers is actionable under Section 1983. *See Prince v. Sheriff of Carter Cnty.*, 28 F.4th 1033, 1050 (10th Cir. 2022) (describing as constitutionally deficient the practice of leaving "untrained jail guards . . . to apply their own 'common sense' to determine when emergent medical conditions warranted

transport to the hospital"); *Valdez v. Macdonald*, 66 F.4th 796, 812 (10th Cir. 2023) ("[N]ot training jail guards in assessing the immediacy of inmates' medical needs can constitute failure to train[.]"); *Lieberenz v. Bd. of Cnty. Comm'rs of the Cnty. of Saguache*, No. 21-CV-00628-NYW-NRN, 2023 WL 1767260, *28 (D. Colo. Feb. 3, 2023) (unpublished) ("[A] reasonable juror could conclude that a lack of training in elevating care decisions led to Plaintiff's injuries."); *Abdiasiis*, 2022 WL 2802412, *9 ("[A] reasonable jury could conclude NaphCare policy permits LPNs to assess patients and determine whether they should be seen immediately, prioritized above others, or not prioritized and only seen for a routine problem, despite the fact that LPNs are not qualified to assess patients.").

## B. Application of the Tenth Circuit's new test to this case

The County's failure to train Jail staff on when to escalate medical issues is like Pittsburg County's failure to train in *Lance*. In satisfaction of the first element,[65] there is evidence the County failed to train its employees on when a medical issue was serious enough to warrant calling a medical provider. *See* Boren Dep. 46:3-12, 107:2-25 (explaining the Jail staff, including Clyde, were not trained on when to contact medical providers and were simply expected to use "common sense"); 2020 Order, 34 ("A genuine issue exists as to whether . . .  [there was

---

[65] "[T]he existence of a county policy or custom involving deficient training[.]" 985 F.3d at 800.

deliberate indifference] to the risk of constitutional injuries like Madison's by not establishing procedures or providing training on what Nurse Clyde should have done in a case like Madison's."); 985 F.3d at 801 ("Given this evidence, the factfinder could reasonably infer that the county had provided deficient training on how to detect a medical emergency."); 2022 WL 2802412, *9 ("Because of NaphCare's protocols, LPNs Lewis and Davis were permitted to assess Plaintiff and designate his medical issue as routine without oversight from a medical provider licensed to assess a patient.").

In fact, the County's failure to train Jail staff on when to escalate medical issues is worse than Pittsburg County's failure. In *Lance*, an actual medical provider (a registered nurse) was on site during weekday business hours, which limited inmates' vulnerability to untrained jail guards' medical decisions to evenings and weekends. *See* 985 F.3d at 802. In contrast, the County had a medical provider on site only one partial day per week. *See* Clark Dep. 8:6-12. Thus, inmates like Madison were much more often at the mercy of untrained Jail staff's medical decision-making than Pittsburg County inmates.

In satisfaction of the second element,[66] there is evidence that, had the County trained its employees to recognize obvious dehydration symptoms, such training

---

[66] "[T]he policy or custom's causation of an injury[.]" 985 F.3d at 800.

could have saved Madison's life. Indeed, Madison needed only one properly-trained Jail staff to call a medical provider when Clyde did not. *See* Brown Report, 8 (explaining the sheer obviousness of Madison's decline over four days and how any reasonable observer would have noticed, especially one with even limited medical training like Clyde); C. Bird Dep. 18:7-9 (explaining he did not call providers when Clyde was on shift because he passed his concerns to her);[67] *Lance*, 985 F.3d at 800 n.4 (explaining Mr. Lance's injury could have been mitigated if the jail staff had been trained on when a medical issue was serious).

Alternatively, perhaps Clyde herself would have called if she was adequately trained. *See Abdiasiis*, 2022 WL 2802412, *11 (acknowledging evidence "that if an RN or PA assessed Plaintiff instead of an LPN, they would have known his condition was serious and he would have been treated sooner").

---

[67] Jail staff members' mere passing of medical information to Clyde does not automatically discharge their gatekeeper duty. Indeed, a gatekeeper violates their duty if the person to whom they report medical issues does nothing and the gatekeeper fails to continue escalating. *See Est. of Walter by & through Klodnicki v. Corr. Healthcare Companies, Inc.*, 323 F. Supp. 3d 1199, 1212 (D. Colo. 2018) (explaining lay jail staff may have been deliberately indifferent to an inmate's medical needs, despite assurances from medical staff that such inmate's medical needs were addressed, where lay staff believed the inmate needed hospitalization) (relying on *Weatherford ex rel. Thompson v. Taylor*, 347 F. App'x 400, 404 (10th Cir. 2009) (unpublished)); *see also Est. of Beauford v. Mesa Cnty., Colorado*, 35 F.4th 1248, 1265 (10th Cir. 2022) (recognizing the possibility of a "case where it would be evident to a layperson that a prisoner is receiving inadequate or inappropriate treatment"); *see also* Tubbs Second Dep. 130:19-131-4, 182:17-184:10 (explaining that, if a jail guard sees an inmate having an emergency, and the nurse does not address the inmate's emergency to the officer's satisfaction, "the officer still has a responsibility to communicate that inmate's needs higher up").

As to the third and final element of the failure to train claim,[68] there is
evidence satisfying *Lance*'s three-part test (i.e., the County's policymakers knew to
a moral certainty that its employees will confront a given situation, such situation
presents the employee with a difficult choice of the sort that training or supervision
will make less difficult, and the wrong choice will frequently cause the deprivation
of a citizen's constitutional rights).

First, a factfinder could find the County policymakers had known to a moral
certainty Jail staff would need to independently evaluate inmates' medical
conditions because medical emergencies will obviously occur when medical
providers like Tubbs and Clark are not present. *See* Boren Dep. 40:14-43:25,
49:10-24, 52:17-22 (explaining Jail staff regularly confront inmates withdrawing,
detoxing, or suffering from consistent vomiting/diarrhea); 2020 Order, 33 ("A
factfinder could conclude that . . . symptoms like Madison's were inevitable.");
*Lance*, 985 F.3d at 802 (discussing "the inevitability of medical emergencies" at a
jail when no medical provider is onsite); *Abdiasiis*, 2022 WL 2802412, *10
("There is an obvious potential for LPNs to encounter inmates with medical issues
they are not qualified to assess and to encounter inmates who may not be faking

---

[68] "[T]he county's adoption of a policy or custom with deliberate indifference[.]" 985 F.3d at
800.

symptoms."). In fact, as discussed previously, the County's staff was more likely to face medical issues without a medical provider than those in *Lance* because Pittsburg County at least had a registered nurse during business hours.

Also, a reasonable factfinder could find training would have helped Jail staff (including Clyde) decide to call a medical provider in Madison's case because any reasonable person with a modicum of medical training would have called a medical provider upon learning of Madison' symptoms. *See* Clark Dep. 80:10-22 (Clark explaining Jail staff should have called him regarding Madison); Brown Report, 8; 2020 Order, 34 ("A genuine issue exists as to whether . . . [there was deliberate indifference] to the risk of constitutional injuries like Madison's by not establishing procedures or providing training on what Nurse Clyde should have done in a case like Madison's."); 985 F.3d at 802 ("[A] factfinder could reasonably determine that training would have helped jail guards make the difficult decision of whether to call the [registered] nurse when she was off duty."); *Abdiasiis*, 2022 WL 2802412, *11 ("This lack of training led to LPN nurses assessing patients' medical conditions, which is outside their scope of permitted practice.").

Finally, a factfinder could find that the Jail's lack of training would frequently lead to disregard of serious medical issues in violation of inmates' constitutional right to medical care. This is exactly what happened to Madison

when Jail staff mistakenly (at best) refused to contact Clark or Tubbs. *See* Brown Report, 12 (explaining how Madison would have lived if Clark saw her two hours earlier than he did); 2020 Order, 32 ("There is some question as to whether [the] failure to have any kind of training materials or written policies for Nurse Clyde to follow knowingly created a substantial risk of constitutional injury."); 985 F.3d at 803 ("A factfinder could thus reasonably infer that constitutional violations would frequently occur because jail guards would mistakenly choose not to call [the medical provider.]"); *Abdiasiis*, 2022 WL 2802412, *11 ("[I]t is predictable that placing an LPN nurse lacking the specific tools to handle the situations she will inevitably confront in the jail setting will lead to violation of the constitutional rights of inmates.").[69]

## C. Aspects of the 2020 Order this Court should reconsider in light of the discussion above

When dismissing the Estate's failure to train claim against the County in the 2020 Order, this Court made at least seven determinations it should reconsider in light of the new standard and the failure to train evidence. First, this Court said: "Jail personnel knew to notify medical personnel if an inmate was vomiting or experiencing diarrhea[.]" 2020 Order, 15; *see also id.* at 10-11 (making similar

---

[69] Quoting *Shadrick v. Hopkins Cnty., Ky.*, 805 F.3d 724, 740 (6th Cir. 2015).

statements, such as: "The policy, procedure, or custom for treating an inmate exhibiting symptoms of dehydration was to provide the inmate with Gatorade and contact medical personnel."). This is incorrect, especially on summary judgment against the Estate, because there is evidence that Jail staff (including Clyde) had absolutely no training regarding when they should contact medical providers. *See* Boren Dep. 46:3-12, 107:2-25; *see also Jensen*, 989 F.3d at 854 ("But there was a conflict about when jail staff should contact them regarding an inmate who is vomiting or showing signs of dehydration."). In fact, there is specific evidence that Jail staff (including Clyde) received no training regarding an inmate experiencing significant vomiting, diarrhea, or dehydration. *See* Boren Dep. 39:3-23, 41:20-23, 54:8-15, 88:16-89:22, 117:24-118:2; 2020 Order 10-11 ("Although Clyde knew she could contact Clark and Dr. Tubbs with medical questions, there is conflicting testimony about when she was expected to contact them regarding an inmate who was vomiting, experiencing diarrhea, or exhibiting signs of dehydration."). This lack of training is constitutionally impermissible. *See Lance*, 985 F.3d at 802.

Second, this Court said: "Dr. Tubbs, PA Clark, and Nurse Clyde all had sufficient medical training to address the situation and the officers at the Jail were adequately trained to report Madison's condition to the medical personnel." 2020 Order, 16. This is incorrect, especially on summary judgment against the Estate,

because there is evidence Jail staff (including Clyde) had absolutely no training regarding when they should contact medical providers for inmates. *See* Boren Dep. 46:3-12, 107:2-25. Moreover, the guards had no training regarding when they should contact medical providers if Clyde failed to do so (whether because Clyde was oblivious to the obvious due to improper training, not on shift, or deliberately indifferent). *See id.* This refusal to ensure inmates' concerns reached actual medical providers (i.e., those who can assess, diagnose, and treat) is constitutionally impermissible. *See Lance*, 985 F.3d at 802. Also, there is no evidence Clyde had "sufficient medical training to address [Madison's] situation," especially where Clyde cannot assess, diagnose, or treat. *See* 2020 Order, 31 ("Clyde was limited by her licensure to do anything beyond notifying Dr. Tubbs or PA Clark when an inmate exhibited concerning symptoms or sending an inmate to the hospital.").

Third, this Court said: "Dr. Tubbs and PA Clark were on call at all times and Nurse Clyde and Jail employees testified that they knew they could call them at any time." 2020 Order, 17. Though this is true, it ignores the constitutional requirement of training regarding when to escalate a medical issue to a medical provider. *See Lance*, 985 F.3d at 802. Indeed, asking employees to use professional judgment that lies outside their area of expertise can demonstrate deliberate

49

indifference (i.e., expecting police officers to use deadly force without specific training on when deadly force is legally permissible). *See Connick v. Thompson*, 563 U.S. 51, 69-70 (2011).

Fourth, this Court said: "The unfortunate fact that Nurse Clyde did not contact [medical providers] regarding Madison's condition does not rise to the level of deliberate indifference in terms of staffing and training." 2020 Order, 17. This is incorrect, especially on summary judgment against the Estate, because there is evidence Clyde and others failed to contact the medical providers due to the County's violation of its non-delegable duty to train them on when to escalate medical issues. *See* Boren Dep. 46:3-12, 107:2-25; 2020 Order, 31-34 (stating: "there is a question as to whether the lack of medical care Madison received has an affirmative link to . . . [the] failure to train Nurse Clyde about how to properly respond to certain observable symptoms" and "[t]here is a question of fact as to whether . . . [there was a failure] to implement protocols on what Nurse Clyde should do in documenting and relaying information regarding serious medical conditions"). This lack of training is constitutionally impermissible. *See Lance*, 985 F.3d at 802.

Fifth, this Court said: "No reasonable jury could conclude that a violation of an inmate's rights was certain to occur given the County's policies and

procedures." 2020 Order, 17. This is incorrect, especially on summary judgment against the Estate. The Tenth Circuit has expressly determined a factfinder could find that municipalities know that, in situations where no medical provider is on site, medical issues will obviously arise and require jail staff to independently assess such issues. *See Lance*, 985 F.3d at 802.

Sixth, this Court said: "Madison, herself, had not asked to see a doctor." 2020 Order, 9. This is incorrect, especially on summary judgment against the Estate. The medical request form Madison submitted was the only way she could seek care from a medical provider. *See* Clyde Dep. 93:15-18; Tubbs Second Dep. 40:4-9 (explaining there are "barriers in correctional medicine to accessing healthcare" because a patient cannot "just get up and go to the ER"). Further, given the indifference and ridicule Madison received upon first seeking medical attention, she may well have given up. *See* Brown Rebuttal, 2 ("In the setting of encephalopathy, exhaustion, and ongoing attempts to demean her for the substance use disorder she suffered from, it's not at all surprising . . . Ms. Jensen made few requests for medical attention after her initial encounters[.]").

Seventh, this Court said: "Sheriff Boren was not responsible for training and supervising Nurse Clyde, the LPN employed at the Jail." 2020 Order, 23. This is incorrect, especially on summary judgment against the Estate, as there is evidence

the County violated its non-delegable duty to train Nurse Clyde on when she should escalate medical issues. *See* Boren Dep. 46:3-12, 107:2-25. The mere fact the County hired Tubbs to train Clyde does not alter the County's liability for failure to discharge its non-delegable duty, especially where the County failed to ensure Clyde was actually trained. *See Martinez*, 176 F. Supp. 3d at 1231.

Therefore, this Court should reconsider its summary dismissal of the County because the Tenth Circuit established new municipal liability standards and there is evidence the County failed to train its employees regarding when to escalate medical issues to medical providers.

## **CONCLUSION**

In conclusion, when viewed in the light most favorable to the Estate, the evidence supports a finding the County failed to train its employees regarding when to escalate medical issues to medical providers. Thus, this Court should reverse its summary judgment dismissal of the County and allow the Estate's 42 U.S.C § 1983 claim to proceed to trial.

**DATED**: June 5, 2023.

KESLER & RUST

/s/ Ryan B. Hancey

_____

Ryan B. Hancey
Scott S. Bridge
*Attorneys for plaintiff*

## <u>CERTIFICATE OF WORD LIMIT</u>

In accordance with DUCivR 7-1(a)(5)(C), I hereby certify that the foregoing document contains 11,582 total words and therefore complies with the 12,400 word limit in DUCivR 7-1(a)(4)(B)(i).

/s/ Ryan B. Hancey

_____

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I caused to be delivered via the Court's electronic filing system a true and correct copy of the foregoing **MOTION TO RECONSDER SUMMARY JUDGMENT DISMISSAL OF DUCHESNE COUNTY**, this 5th day of June, 2023, to all counsel of record.

/s/ Mckenzie Ujhely