THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH

| | |
|---|---|
| THE ESTATE OF MADISON JODY JENSEN, by her personal representative Jared Jensen,<br><br>Plaintiff,<br><br>v.<br><br>DUCHESNE COUNTY, a Utah governmental entity, JANA CLYDE, an individual, LOGAN CLARK, an individual,<br><br>Defendants. | **MEMORANDUM DECISION AND ORDER GRANTING PLAINTIFF'S [243] MOTION TO RECONSIDER SUMMARY JUDGMENT DISMISSAL OF DUCHESNE COUNTY**<br><br>Case No. 2:17-cv-01031-DBB-DAO<br><br>District Judge David Barlow |

Before the court is Plaintiff Estate of Madison Jody Jensen's (the "Estate") Motion to Reconsider Summary Judgment Dismissal of Duchesne County.[1] The Estate requests the court reconsider its dismissal of Duchesne County (the "County") in its January 21, 2020 Memorandum Decision and Order (the "2020 Order").[2] For the reasons that follow, the court grants the Estate's motion and denies summary judgment to the County.[3]

## RULE 54(b)

## PROCEDURAL BACKGROUND

On September 14, 2017, the Estate commenced this civil action against the County and other defendants.[4] The case was assigned to Judge Kimball.[5] The Estate filed its operative

---

[1] Mot. to Reconsider, ECF No. 243, June 5, 2023.
[2] 2020 Order, ECF No. 168.
[3] Having considered the briefing and relevant law, the court finds that oral argument would not assist the court in reaching a decision. *See* DUCivR 7-1(g).
[4] Compl., ECF No. 2.
[5] ECF No. 35.

complaint on February 15, 2019,[6] alleging municipal liability against Duchesne County for deliberate indifference to the serious medical needs of a pretrial detainee, brought under 42 U.S.C. § 1983.[7] It also alleged supervisory liability against Logan Clark, Kennon Tubbs ("Dr. Tubbs"), David Boren, and Jason Curry[8] and individual liability against Jana Clyde ("LPN Clyde"), Logan Clark ("PA Clark"), Elizabeth Richens, Caleb Bird, Holly Purdy, and Gerald Ross.[9]

On August 9, 2019, all of the defendants—with the exception of PA Clark—moved for summary judgment.[10] The court issued its Memorandum Decision and Order on January 21, 2020.[11] The 2020 Order granted summary judgment to Ms. Richens, Mr. Boren, Ms. Purdy, Mr. Ross, Mr. Curry, Mr. Bird, and the County.[12] It denied summary judgment to LPN Clyde and Dr. Tubbs.[13]

On February 20, 2020, LPN Clyde and Dr. Tubbs filed Notices of Interlocutory Appeal.[14] The Estate petitioned for permission to appeal the district court's grant of summary judgment to the County, but the petition was denied because "pendant appellate jurisdiction is not a 'statute or rule authorizing appeal' for purposes of Federal Rule of Appellate Procedure 5."[15] On June 6, 2020, this court terminated the jury trial date "pending resolution of appeals before the Tenth Circuit."[16]

---

[6] Second Am. Compl., ECF No. 91.
[7] *Id.* at ¶¶ 217–52.
[8] *Id.* at ¶¶ 253–381.
[9] *Id.* at ¶¶ 382–556.
[10] ECF Nos. 122, 133, 135, 136, 137, 138, 139, 140, 141.
[11] 2020 Order.
[12] *Id.* at 36.
[13] *Id.* This case was then reassigned to the undersigned. ECF No. 169.
[14] ECF Nos. 170–71.
[15] ECF No. 182.
[16] Docket Text Order, June 4, 2020.

On March 2, 2021, the Tenth Circuit affirmed the denial of summary judgment for LPN Clyde and reversed the denial of summary judgment for Dr. Tubbs.[17] This court then entered an order vacating the 2020 Order as to Dr. Tubbs and granted him summary judgment.[18] On May 17, 2021, the parties filed a stipulated motion to stay, and the court granted the motion, staying the case until the Estate's petition to the Supreme Court regarding the Tenth Circuit's decision was fully resolved.[19] The writ of certiorari was denied on October 13, 2021, and the stay was lifted.[20]

The court entered a series of scheduling orders extending the deadlines for expert discovery.[21] The Estate informed the court it had "disclosed its retained expert, Samuel Brown, M.D., M.S., to the opposing parties" on April 1, 2022.[22] On September 14, 2022, the Estate disclosed the rebuttal reports of its two retained experts, Dr. Brown and Linda Bernard, RN, LNC, CCHPRN, to the opposing parties.[23]

Meanwhile, on June 1, 2022, PA Clark filed a motion for summary judgment.[24] On September 15, 2022, the court granted in part and denied in part PA Clark's motion.[25] Then on June 6, 2023, the Estate filed the instant Motion to Reconsider Summary Judgment Dismissal of Duchesne County (the "Motion").[26] The Motion was fully briefed as of July 21, 2023.

---

[17] *Est. of Jensen by Jensen v. Clyde*, 989 F.3d 848 (10th Cir. 2021), *cert. denied sub nom. Est. of Jensen by Jensen v. Tubbs*, 142 S. Ct. 339 (2021).
[18] ECF No. 186.
[19] ECF Nos. 187, 189.
[20] ECF No. 192.
[21] *See* Third Am. Sch. Order, ECF No. 194; Fourth Am. Sch. Order 1–2, ECF No. 206; Fifth Am. Sch. Order 1, ECF No. 215.
[22] ECF No. 207.
[23] Pl.'s Rebuttal Experts Disclosed, ECF No. 229.
[24] ECF No. 208.
[25] Mem. Dec. & Order, ECF No. 230.
[26] Mot. to Reconsider.

3

## STANDARD

Federal Rule of Civil Procedure 54(b) "expressly allows for revision of an interlocutory order before entry of final judgment."[27] It provides:

> *[A]ny order or other decision*, however designated, that adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties does not end the action as to any of the claims or parties and *may be revised at any time before the entry of a judgment* adjudicating all the claims and all the parties' rights and liabilities.[28]

So, while the "Federal Rules of Civil Procedure do not recognize a 'motion for reconsideration' . . . that is not to say that such motions are prohibited."[29] "After all, 'a district court always has the inherent power to reconsider its interlocutory rulings' before final judgment is entered."[30]

The Tenth Circuit recently instructed that, in "considering [ ] interlocutory motions [under Rule 54(b)], . . . 'the district court is not bound by the strict standards for altering or amending a judgment encompassed in Federal Rules of Civil Procedure 59(e) and 60(b),' which govern a district court's reconsideration of its final judgments."[31] It has counseled that the court need not determine that there is "intervening authority, new facts, or manifest injustice resulting from the previous ruling" before reconsidering an interlocutory order.[32] Accordingly, while the

---

[27] *Luo v. Wang*, 71 F.4th 1289, 1297 (10th Cir. 2023) (quoting *Elephant Butte Irr. Dist. of N.M. v. U.S. Dep't of Interior*, 538 F.3d 1299, 1306 (10th Cir. 2008)).

[28] Fed. R. Civ. P. 54(b) (emphases added).

[29] *Spring Creek Expl. & Prod. Co., LLC v. Hess Bakken Inv., II, LLC*, 887 F.3d 1003, 1023 (10th Cir. 2018), *as revised* (Apr. 13, 2018); *Price v. Philpot*, 420 F.3d 1158, 1167 n.9 (10th Cir. 2005) ("[E]very order short of a final decree is subject to reopening at the discretion of the district judge." (quoting *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 12 (1983))).

[30] *Spring Creek*, 887 F.3d at 1023 (quoting *Warren v. Am. Bankers Ins.*, 507 F.3d 1239, 1243 (10th Cir. 2007)).

[31] *Id.* at 1024 (quoting *Fye v. Okla. Corp. Comm'n*, 516 F.3d 1217, 1223 n.2 (10th Cir. 2008)). Accordingly, the County's argument that "relief under Rule 54(b) is only appropriate when the movant demonstrates (1) an intervening change in the law; (2) the discovery of new evidence not previously available; or (3) a clear error in the first order" is not correct under Tenth Circuit precedent. *Cf.* Opp'n 23.

[32] *Rimbert v. Eli Lilly & Co.*, 647 F.3d 1247, 1252 (10th Cir. 2011) (finding it "not 'manifestly unreasonable' for the district court to, upon being assigned a new case, independently assure itself of the expert's reliability"). In July

court considers those standards as a broad framework for its analysis, it is not strictly bound by them in coming to its decision.

## DISCUSSION

### I.    The Court Grants the Estate's Motion to Reconsider Because of the Intervening Change in Law.

The Estate asserts it "has two primary bases" for its request: the Tenth Circuit's 2021 decision in *Lance v. Morris*[33] and expert evidence obtained after the court entered its 2020 Order.[34] The County argues that the law-of-the-case doctrine, res judicata, and the reassignment of the case to a new judge are barriers to the Estate's Motion, as is the fact that the Estate "waited years after the 2020 Order to bring this Motion."[35] In reply, the Estate argues that it "discovered *Lance* and its progeny in 2023," and its timing is reasonable because of the appeal, expert discovery, and the time taken for settlement efforts.[36] The County filed an evidentiary objection to the Estate's reply, contending that the appeal did not divest this court of jurisdiction and that expert discovery ended on June 16, 2020.[37] The Estate responded, arguing that it was "under no obligation to seek reconsideration and could have simply waited to raise *Lance* and its progeny

---

2023 the Tenth Circuit published *Luo v. Wang*, a case in which it considered whether a district court abused its discretion in affirming a magistrate judge's decision to reconsider an interlocutory order based on new evidence and a "need to correct error or prevent manifest injustice." 71 F.4th at 1298. In the underlying decision, the district court had performed its analysis by relying on the *Servants of the Paraclete v. Does* principles. *Id.* (citing *Servants of the Paraclete v. Does*, 204 F.3d 1005, 1012 (10th Cir. 2000)). But the Tenth Circuit observed that the *Servants of the Paraclete* principles apply to a motion for reconsideration after a final judgment, which it had previously distinguished from "a district court's discretionary reconsideration of an interlocutory order." *Id.* at 1298–99. "Thus, the district court did not have to apply the *Servants of the Paraclete* principles to its reconsideration of the [protective order]." *Id.* at 1299.

[33] 985 F.3d 787 (10th Cir. 2021).
[34] Mot. to Reconsider 2.
[35] Opp'n 7–8, ECF No. 249.
[36] Reply 15, ECF No. 250.
[37] Evidentiary Objs. 2–3, ECF No. 251.

until appeal"[38] and that expert discovery did not end until September 14, 2022.[39] The court addresses each argument in turn.

A.  **_Lance v. Morris_ Is Intervening Authority that Persuades the Court to Exercise Its Discretion to Reconsider the 2020 Order.**

The Estate argues that "the Tenth Circuit's decision in _Lance v. Morris_ . . . changed municipal liability under 42 U.S.C. § 1983 in failure-to-train medical situations nearly identical to the situation in this case . . . ."[40] In _Lance_, the court "adopted the three-part test for deliberate indifference from _Walker v. City of New York_ . . . which expressly relied on the single-incident exception of _City of Canton_."[41] Applying the _Walker_ test and relying on _Lance_'s application of the test would warrant the denial of summary judgment to Duchesne County, the Estate urges.[42] The County responds: "The _Lance_ decision [is] not . . . an intervening change in the law . . . as it was decided before _Jensen_, and it does not fit the factual scenario of this case[;] . . . unlike _Lance_, the Jail had protocols in place, . . . staff were trained on them, and . . . staff referred Madison Jensen to Nurse Clyde."[43]

In _Lance_, the Tenth Circuit clarified the three-part test for municipal liability for deliberate indifference on a failure-to-train claim, adopting a subtest for the third element.[44] For the overarching structure of the claim, the three elements are: (1) "the existence of a county policy or custom involving deficient training"; (2) "the policy or custom's causation of an

---

38 Resp. to Objs. 2, ECF No. 252.
39 _Id._ at 3.
40 Mot. to Reconsider 2.
41 Reply 7 (quoting _Valdez v. Macdonald_, 66 F.4th 796, 816 n.16 (10th Cir. 2023)).
42 Mot. to Reconsider 42–47.
43 Opp'n 35.
44 985 F.3d 787 (2021).

injury"; and (3) "the county's adoption of a policy or custom with deliberate indifference."[45] Concerning the third element, the court of appeals was "persuaded by the logic" of a three-part subtest devised by the Second Circuit in *Walker v. City of New York*.[46] The three-part subtest for deliberate indifference requires evidence that (1) "[t]he county's policymakers know 'to a moral certainty' that [their] employees will confront a given situation"; (2) "[t]he situation . . .presents the employee with a difficult choice of the sort that training or supervision will make less difficult"; and (3) "[t]he wrong choice . . . will frequently cause the deprivation of a citizen's constitutional rights."[47]

The court is persuaded that this is intervening authority that would constitute grounds for reconsideration even under the "strict standards" of Rules 59(e) and 60(b)[48]: the Tenth Circuit decided *Lance* after this court's summary judgment order, and it expressly adopted a new subtest for a failure-to-train deliberate indifference municipal liability claim, making it "an intervening change in the controlling law."[49] Further, the factual similarity of *Lance*—in which an inmate who exhibited symptoms that constituted a medical emergency was left untreated for three days because the jail guards did not recognize the medical emergency[50]—convinces the court to exercise its discretion under Rule 54(b) to revisit its 2020 Order.

---

[45] *Id.* These elements appeared in a 2019 Tenth Circuit decision, which was published by the time of the 2020 Order. *See Waller v. City & Cty. of Denver*, 932 F.3d 1277, 1283–84 (10th Cir. 2019).
[46] *Lance*, 985 F.3d at 802 (citing *Walker v. City of New York*, 974 F.2d 293, 297–98 (2d Cir. 1992)).
[47] *Id.*
[48] *See Spring Creek*, 887 F.3d at 1024 (quoting *Fye*, 516 F.3d at 1223 n.2).
[49] *Servants of Paraclete*, 204 F.3d at 1012 ("Grounds warranting a motion to reconsider [under Rule 60(b) or 59(e)] include (1) an intervening change in the controlling law, (2) new evidence previously unavailable, and (3) the need to correct clear error or prevent manifest injustice." (citing *Brumark Corp. v. Samson Resources Corp.*, 57 F.3d 941, 948 (10th Cir. 1995))).
[50] *See Lance*, 985 F.3d at 802–03.

**B.  The Law-of-the-Case Doctrine, Mandate Rule, and Res Judicata Do Not Preclude the Court from Reconsidering the 2020 Order.**

The County urges that the law-of-the-case doctrine, the mandate rule, and res judicata "preclude re-litigation of th[is] claim and/or issue."[51] It argues that the Tenth Circuit's decision in *Estate of Jensen*[52] "preclude[s] the Court from revisiting its 2020 Order with respect to the constitutionality of the Jail's medical training and protocols established by Dr. Tubbs."[53] The Estate responds that "[b]ecause the Tenth Circuit did not address the Estate's claims against the County in *Est[ate] of Jensen*, much less make any sort of final adjudication respecting such claims, the County's law of the case, mandate rule, and res judicata arguments against reconsideration necessarily fail."[54]

"Generally, the 'law of the case' doctrine dictates that prior judicial decisions on rules of law govern the same issues in subsequent phases of the same case."[55] "If the original ruling was issued by a higher court, a district court should depart from the ruling only in exceptionally narrow circumstances."[56] But the Tenth Circuit "has rejected the proposition that a district court's interlocutory ruling 'represents the law of the case, which should not be disturbed except in very narrow circumstances.'"[57] Instead, the "law of the case doctrine [i]s inapplicable to reconsideration of interlocutory orders in the district court without regard to the basis for reconsideration."[58]

---

[51] Opp'n 33.
[52] 989 F.3d 848.
[53] Opp'n 7.
[54] Reply 14.
[55] *Been v. O.K. Indus., Inc.*, 495 F.3d 1217, 1224 (10th Cir. 2007) (citing *Homans v. City of Albuquerque,* 366 F.3d 900, 904 (10th Cir. 2004)).
[56] *Id.* at 1225 (citing *McIlravy v. Kerr–McGee Coal Corp.*, 204 F.3d 1031, 1035 (10th Cir. 2000)).
[57] *Luo*, 71 F.4th at 1299 n.9 (quoting *Been*, 495 F.3d at 1224).
[58] *Rimbert*, 647 F.3d at 1252 (citing *Wilson v. Merrell Dow Pharms., Inc.*, 160 F.3d 625, 628 (10th Cir. 1998)).

8

Here, in Dr. Tubbs and LPN Clyde's appeal, the Tenth Circuit did not address the issue that the Estate asks this court to consider: *municipal* liability for the County. Instead, the Tenth Circuit decided that the Estate's evidence was insufficient for its *supervisory* liability claim against Dr. Tubbs,[59] and it expressly declined to consider the grant of summary judgment to the County.[60] The County also contends this court is "preclude[d] . . . from revisiting its 2020 Order with respect to the constitutionality of the Jail's medical training and protocols established by Dr. Tubbs."[61] But the Tenth Circuit's decision noted that Dr. Tubbs "did not specifically contract to create medical protocols or policies for the jail as a whole," and "it was the *county* that was in charge of implementing policies and training its officers."[62] In short, on both the law and the facts, the Tenth Circuit's decision that Dr. Tubbs is entitled to qualified immunity for the supervisory liability claim against him does not preclude the prospect of the County's municipal liability for failure to train. Finally, res judicata is inapplicable because there has not been a final judgment on the merits regarding the Estate's claims against the County "in an *earlier action*."[63] To the extent the County argues this court is bound by its own 2020 Order, neither Rule 54(b) nor Tenth Circuit case law support its argument.[64]

Lastly, the County argues that "it should not go unnoticed by the Court that [the Estate] did not bring this *Motion* until after this case was transferred to a new judge. In these

---

[59] *Est. of Jensen*, 989 F.3d at 857.
[60] Order of the USCA Tenth Circuit, ECF No. 182.
[61] Opp'n 29.
[62] *Est. of Jensen*, 989 F.3d at 856 (emphasis added).
[63] *MACTEC, Inc. v. Gorelick*, 427 F.3d 821, 831 (10th Cir. 2005) (emphasis added) ("The doctrine of res judicata, or claim preclusion, will prevent a party from relitigating a legal claim that was or could have been the subject of a previously issued final judgment. Under Tenth Circuit law, claim preclusion applies when three elements exist: (1) a final judgment on the merits in an earlier action; (2) identity of the parties in the two suits; and (3) identity of the cause of action in both suits." (citations omitted)).
[64] *Rimbert*, 647 F.3d at 1252 (citing *Wilson*, 160 F.3d at 628).

circumstances, the successor judge is discouraged from reconsidering the decisions of the transferor judge."[65] Here, the meritorious basis for reconsideration is new case law handed down after the predecessor judge ruled—the issue is not the case's reassignment to a different judge. Further, the Tenth Circuit has observed that such an argument is "foreclosed by [its] precedent."[66]

Accordingly, the law-of-the-case doctrine, the mandate rule, res judicata, and successor judge considerations do not preclude the court from reconsidering the 2020 Order.

### C.  By the County's Own Admission, any Prejudice in Reconsidering the 2020 Order Is Addressable by Reopening Fact and Expert Discovery.

The County asserts that reconsideration would "sever[ely] prejudice" it: "The delay in this case is further complicated by the fact that the time for discovery and expert designations occurred years ago, and for the Court to vacate the summary judgment order would severally [sic] prejudice the County."[67] It makes no averment that it will be prejudiced if the court reopens fact and expert discovery, arguing only that "it will be extremely prejudicial to the County unless the Court reopens both fact and expert discovery, including the time for designating expert witnesses."[68] The Estate replies that it "is not opposed to reopening fact and expert discovery."[69] Because any prejudice from revisiting the 2020 Order can—by the County's own admission—be cured by reopening discovery, it does not weigh against this court reconsidering its 2020 Order.

---

[65] Opp'n 9.
[66] *Rimbert*, 647 F.3d at 1251 (10th Cir. 2011) (citing *Wilson*, 160 F.3d at 628–29).
[67] Opp'n 8.
[68] *Id.* at 7.
[69] Reply 3.

### D.  The Court Finds that the Timing of the Estate's Motion Does Not Preclude Its Consideration.

The County argues that the Estate's motion is "untimely" because courts have imposed a reasonableness requirement and the Estate's delay is not reasonable: it "waited years after the 2020 *Order* to bring this *Motion*."[70] The Estate responds that its timing is reasonable, considering the appeal, expert discovery, and settlement conference and that the Estate "discovered *Lance* and its progeny in 2023."[71]

"[P]ost-judgment-motion deadlines do not apply to interlocutory orders until after entry of a final judgment," so "Rule 60(c)'s reasonable-time requirement does not apply to a motion seeking reconsideration of a district court's interlocutory order before the entry of a final judgment."[72] "Rather, a district court may revise an interlocutory order 'at any time before the entry of a judgment.'"[73]

The Tenth Circuit recently considered an untimeliness argument related to a motion to reconsider under Rule 54(b). In *Luo v. Wang*, the court of appeals noted that, under the language of the rule, a district court "may revise an interlocutory order 'at any time before the entry of a judgment.'"[74] It noted that a district court may still "consider the timing of a motion in its discretionary analysis whether to reconsider an interlocutory order,"[75] even if there is no reasonable-time requirement or deadline.[76] The court of appeals then considered whether the

---

[70] Opp'n 8.
[71] Reply 15.
[72] *Luo*, 71 F.4th at 1298.
[73] *Id.* (quoting Fed. R. Civ. P. 54(b)); *see Been*, 495 F.3d at 1225 (affirming a district court's decision to overturn an interlocutory order entered 18 months earlier).
[74] *Luo*, 71 F.4th at 1298.
[75] *Id.*
[76] *Id.* at 1297–98.

11

district court "abused its discretion" in concluding that a motion to reconsider filed ten months after the order was entered was timely.[77] Considering the facts—the order was entered in November 2020, the defendant was served in January 2021, the defendant had the "new" evidence by March 2021, and the defendant filed the motion to reconsider in August 2021—the Tenth Circuit concluded that the court's diligence finding was not clearly erroneous.[78]

To begin, the court observes that the Estate's position that a motion's timing is reasonable based on when the party "discovered" case law is unpersuasive. The intervening law was published in January 2021, a year after the court's 2020 Order, and two-and-a-half years before it filed the instant motion. Further, while the Estate argues that some of its expert discovery provided "new evidence" in support of reconsidering the court's 2020 Order, it had exchanged its expert disclosures and report in April 2022—over a year before it filed the instant motion. So, by no later than April 2022, the Estate knew or should have known about its asserted grounds for reconsideration, yet it filed its motion fourteen months later. The Estate's effort to demonstrate timeliness is not persuasive.

But whether the Estate acted diligently in discovering the purported new evidence or binding case law, the Estate's motion for reconsideration was filed within the time provided for by Rule 54(b): "before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities." And while the Tenth Circuit has found that trial courts nevertheless "may" consider timeliness under Rule 54(b), it has not held that a lack of timeliness is outcome determinative.[79]

---

[77] *Id.* at 1291–92, 1297–98.
[78] *Id.* at 1298.
[79] *See id.*

Given this case's factual predicate and procedural posture, it would not be in the interests of justice to accept the County's argument that the court should effectively ignore the post-order development in the case law. Delaying consideration of *Lance* would only waste the time and resources of the parties and the court because of its potential impact on trial preparation, the trial itself, and any appeal. Accordingly, the timing of the Estate's motion does not preclude this court from considering it.

### E. The Estate's Argument that the Expert Discovery Produced "Newly Discovered Facts" Is Undeveloped and Therefore Waived.

The Estate argues that "the expert evidence obtained in discovery establish that aspects of the 2020 Order are incorrect."[80] However, it cites to one of its experts' reports *one* time in its discussion of the seven findings in the 2020 Order it contests.[81] The fact from the 2020 Order which it contests—that Ms. Jensen had not asked to see a doctor—does not appear to have been consequential in that decision.[82] Because "[w]hen issues are not adequately briefed, they are deemed waived,"[83] the court does not further engage with the Estate's assertion that the expert evidence constitutes newly discovered facts.

In conclusion, because the court has not entered "judgment adjudicating all the claims and all the parties' rights and liabilities" in this case, the court may revise its interlocutory 2020 Order. The court finds that the arguments advanced by the County do not bar the court from reconsidering its 2020 Order, and that *Lance v. Morris* is intervening authority that counsels

---

[80] Mot. to Reconsider 2.

[81] *See id.* at 51.

[82] Further, there was record evidence at the time of the 2020 Order that the Estate could have used to contest that fact. *See* Duchesne County Jail Written Statements 10, ECF No. 151-15 (LPN Clyde writing that "I told her the [physician assistant] was coming on Thursday and [Ms. Jensen] verified that she was still sick and wanted to see him . . . .").

[83] *Petrella v. Brownback*, 787 F.3d 1242, 1260 (10th Cir. 2015).

reconsideration. As explained below, *Lance* necessitates a different outcome in this case.

Accordingly, the court exercises its authority to revisit and vacate the interlocutory 2020 Order

as to Duchesne County.[84]

## SUMMARY JUDGMENT

## FACTUAL BACKGROUND[85]

*Madison Jensen*

On Sunday, November 27, 2016, Jared Jensen called the Duchesne County Sheriff's

office. His daughter, Madison Jensen ("Ms. Jensen"), was exhibiting odd and erratic behavior,

and he had discovered what he believed to be drug paraphernalia and residue in her room.[86] The

police arrested Ms. Jensen for possession of a controlled substance and paraphernalia and took

her to the Duchesne County Jail (the "Jail").[87]

Deputy Elizabeth Richens ("Deputy Richens"), a corrections officer at the Jail, booked

Ms. Jensen.[88] During the booking process, Deputy Richens had Ms. Jensen complete an intake

and health questionnaire.[89] On those forms, Ms. Jensen reported she was having withdrawals

from drugs and alcohol and that the last time she had used heroin was five days before her

---

[84] Because of the potential for prejudice to the County if fact and expert discovery are not reopened, the court grants the County leave to seek to reopen discovery. Other case deadlines will be addressed in a subsequent order.

[85] For purposes of summary judgment, the court "construe[s] all facts and make[s] reasonable inferences in the light most favorable to the nonmoving party." *Mincin v. Vail Holdings, Inc.*, 308 F.3d 1105, 1108 (10th Cir. 2002) (citing *Mauldin v. Worldcom, Inc.*, 263 F.3d 1205, 1211 (10th Cir. 2001)). The County contends that "the Court's 2019 [sic] *Order* must be viewed against the facts presented by the parties at the time." Opp'n 12. It does not cite to case law for this proposition. Because the court is aware that granting the Estate a second chance at composing the facts and receiving the benefit of the County's admissions may result in an unwarranted benefit to the Estate, the court instead recites the facts according to the well-developed record before it.

[86] Second Am. Compl. 5.

[87] *Id.* at 6.

[88] Richens Dep. 10:3–10:9, ECF No. 122-2.

[89] *Id.* at 10:3–10:13, 16:1–18:2.

arrest.[90] Ms. Jensen also reported that she had three prescription medications: tramadol,

Wellbutrin, and clonidine.[91] Deputy Richens administered a urinalysis, and the results came back

positive.[92]

       Deputy Richens then printed two copies of the electronic intake and health questionnaires

and placed one copy of each in the medical box for the Jail's licensed practical nurse Jana Clyde

("LPN Clyde").[93] "By law," LPN Clyde "was not able to prescribe medications for an inmate

patient, conduct any assessments, or diagnose or treat any medical condition."[94] "As a jail nurse,

[LPN Clyde] primarily facilitated getting doctors or pharmacies to write prescriptions that could

be filled in the Jail and [she] administered medications to inmates, checked vital signs, and

reported to [her] superiors including higher-ranked nurses, physician's assistants, and doctors

when indicated in addition to Jail supervisors."[95] According to LPN Clyde, her job consisted of

"checking prescriptions and medications and making sure that the inmates were receiving their

various medications," "not really . . . anything more or less than what the Jail Corrections

Deputies were doing in terms of checking on inmates and watching their medical care and

needs."[96]

       Sometime after booking, Deputy Richens observed Ms. Jensen vomiting in her cell.[97]

Deputy Richens "left her there for the rest of the [evening] until the next crew came on shift."[98]

---

[90] *Id.* at 21:25–24:23.
[91] *Id.* at 27:13–27:21.
[92] *Id.* at 20:7–20:11, 35:10–35:22; Richens June 8 Interview 15:391–15:394, ECF No. 151-2.
[93] Richens Dep. 24:24–26:23.
[94] Clyde Decl. ¶ 9, ECF No. 134.
[95] *Id.* at ¶ 9.
[96] *Id.* at ¶ 56.
[97] Richens Dep. 28:21–29:13; Richens June 8 Interview 11:277–11:278.
[98] Richens Dep. 30:19–31:15.

When she was relieved at 7:00 p.m. by the night shift, Deputy Richens told the night shift that Ms. Jensen was detoxing and that she was coming off of heroin.[99] That night, Ms. Jensen was transferred into a cell with Maria Hardinger.[100] Ms. Jensen vomited in the cell toilet within ten minutes of arriving in Ms. Hardinger's cell.[101] Throughout the night, Ms. Jensen went to the toilet several times to "either vomit, dry heave, or relieve what sounded like diarrhea."[102]

On Monday morning, Ms. Jensen went to see LPN Clyde.[103] When she arrived, Deputy Richens and Sergeant Holly Purdy ("Sergeant Purdy") were also present in the medical room.[104] Ms. Jensen reported that she was not feeling well, that she had vomited the night before,[105] and that she could not keep anything down.[106] She told LPN Clyde that it was a stomach bug, not withdrawal symptoms.[107] Deputy Richens also told LPN Clyde that Ms. Jensen had vomited the night before.[108] LPN Clyde noticed that Ms. Jensen "appeared possibly sick . . . like if somebody had flu or cold or something," was pale, and looked like a possible drug user.[109] For treatment, LPN Clyde gave Ms. Jensen Gatorade and sent her back to her cell with the instruction to collect her vomit and diarrhea.[110]

---

[99] Richens Dec. 7 Interview 13:9–13:14, ECF No. 151-1.
[100] Ross Dec. 7 Interview 6:21–6:24, ECF No. 151-3; Hardinger Decl. ¶ 4, ECF No. 151-5.
[101] Hardinger Decl. ¶ 5.
[102] *Id.* at ¶ 6.
[103] Richens Dep. 32:4–32:10.
[104] *Id.* at 31:14–31:17, 32:19–32:20; Purdy Dec. 7 Interview 4:1–4:11, ECF No. 151-21.
[105] Richens Dep. 32:24–33:10, 38:22–39:4; Clyde Dep. 57:10–57:17, 63:25–64:5, ECF No. 208-4; Richens June 8 Interview 11:285.
[106] Richens Dep. 35:23–36:15.
[107] Clyde Dep. 57:18–57:25.
[108] Clyde Decl. ¶ 25; *but see* Clyde Dep. 80:12–80:20 ("Q. . . . Liz Richens had told you that she had seen Madison vomit on Monday. Right? A. No. Q. Or on Sunday night, I mean? A. No. [Ms. Jensen] reported to me that she had vomited Sunday night. Q. Did Liz Richens not corroborate that on Monday? A. No.").
[109] Clyde Dep. 56:9–57:2.
[110] *Id.* at 68:12–68:18.

16

After she left, Deputy Richens informed LPN Clyde that Ms. Jensen had tested positive on the urinalysis[111] and voiced her opinion that Ms. Jensen was "obviously coming off something."[112] According to Sergeant Purdy, she asked LPN Clyde what was "going on" with Ms. Jensen, and LPN Clyde told her that she thought Ms. Jensen was going through heroin withdrawals.[113] However, LPN Clyde has stated that, "[b]ased upon [her] talking with [Ms. Jensen] and seeing and hearing her and watching her walk, [she] did not see any signs that [Ms. Jensen] was withdrawing from any sort of substance" that morning.[114]

Later that day, LPN Clyde called PA Clark, a physician's assistant who made weekly visits to the Jail to provide medical care.[115] She needed to get his approval for Ms. Jensen's clonidine prescription.[116] LPN Clyde stated that she informed PA Clark of Ms. Jensen's three prescriptions[117] and "briefly discussed" Ms. Jensen with him,[118] including that Ms. Jensen had reported vomiting.[119] PA Clark does not specifically remember the phone call nor even being told Ms. Jensen's name and denies that LPN Clyde told him about Ms. Jensen's other medications[120] or about Ms. Jensen vomiting the previous night.[121]

After Ms. Jensen returned to her cell on Monday, Ms. Hardinger pushed the call button several times to inform the Jail employee on duty that Ms. Jensen was vomiting often and

---

[111] *Id.* at 65:3–65:17; Clyde Decl. ¶ 23.
[112] Richens Dep. 35:13–35:22; Clyde Dep. 192:12–194:3.
[113] Purdy Dec. 7 Interview 4:8–4:11.
[114] Clyde Decl. ¶ 18.
[115] Clyde Dep. 59:8–60:7, 13:22–14:6.
[116] *Id.* at 58:17–58:21.
[117] *Id.* at 59:8–60:7, 189:2–191:13. The three prescriptions were clonidine, Wellbutrin, and tramadol. Richens Dep. 27:13–27:20.
[118] Clyde Decl. ¶ 20.
[119] Clyde Dep. 71:4–71:24, 191:23–192:11.
[120] Clark Dep. 108:8–109:9, ECF No. 208-6.
[121] *Id.* at 28:25–29:2.

seemed very ill.[122] Ms. Hardinger states that Ms. Jensen also pushed the button at least once or twice.[123] "Each time the jailer would respond that the jail was aware [Ms. Jensen] was vomiting but then would not respond further."[124] Ms. Hardinger brought Ms. Jensen a breakfast, lunch, and dinner tray because Ms. Jensen did not leave the cell for any of the meals that day.[125] According to Ms. Hardinger, "[o]n one occasion, a jailer yelled at [her] to put back the extra tray," but she "explained [she] was picking up the tray for [Ms. Jensen] because she was sick."[126] Deputy Gerald Ross ("Deputy Ross"), who was performing security checks that day, remembered seeing "Ms. Jensen laying on her bed quite a bit."[127] He also saw "her get up" and "[w]itnessed her take a drink of water at least once."[128] He noticed "the cell itself smelled a little like vomit," but he did not speak with Ms. Jensen.[129] He was aware Ms. Jensen was "having issues eating" because of "what we were told from her cellie . . . and the kitchen."[130]

That evening, either Mr. Jensen or Ms. Hardinger "pushed the call button once again asking for medical help."[131] The cell door was unlocked and Ms. Jensen was told over the intercom to report to the medical office.[132] Ms. Jensen returned ten minutes later and told Ms. Hardinger that the "jail was attributing her symptoms to drug withdrawals and basically told her to tough it out."[133] Ms. Jensen vomited on herself and "could not control her bowels and went

---

[122] Hardinger Decl. ¶ 11.
[123] *Id.*
[124] *Id.*
[125] *Id.* at ¶ 8.
[126] *Id.*
[127] Ross Dep. 12:9–12:20, ECF No. 151-23.
[128] *Id.* at 12:18–12:20.
[129] *Id.* at 13:1–13:9.
[130] *Id.* at 16:24–17:2.
[131] Hardinger Decl. ¶ 13.
[132] *Id.*
[133] *Id.* at ¶ 14.

diarrhea in her pants."[134] She pushed the call button to inform the jail staff and to request to take a shower.[135] Her request was denied.[136]

The following day, Tuesday, Ms. Jensen returned to the medical unit to speak with LPN Clyde.[137] She again complained about experiencing the symptoms of a "stomach bug."[138] According to LPN Clyde, she denied having vomited or having experienced diarrhea.[139] LPN Clyde also stated that Ms. Jensen expressed her desire not to see a doctor.[140] Deputy Richens was present in the medical office, and according to her, Ms. Jensen "said that she was still throwing up."[141] When Ms. Jensen left, Deputy Richens told LPN Clyde, "She looks pretty weak."[142] Deputy Richens noticed Ms. Jensen "had a hard time walking" and she "ended up walking [Ms. Jensen] back to her cell."[143] Deputy Richens checked in on Ms. Jensen throughout Tuesday.[144]

That day, Ms. Jensen refused food and continued to vomit periodically.[145] On one occasion, Ms. Jensen "vomited violently and vomit splashed down the wall and sprayed onto [Ms. Hardinger's] blanket and pillow."[146] Ms. Hardinger alerted the Jail staff, and they unlocked the door for her to get cleaning supplies.[147] A staff member told her to stop pushing the call button because it was interfering with the Jail staff's duties.[148]

---

[134] *Id.* at ¶ 15.
[135] *Id.*
[136] *Id.*
[137] Clyde Dep. 73:6–73:11.
[138] *Id.* at 73:20–73:25.
[139] *Id.* at 74:22–75:6.
[140] *Id.* at 74:22–74:25.
[141] Richens Dec. 7 Interview 17:18–17:20.
[142] *Id.* at 17:18–17:19.
[143] Richens June 8 Interview 13:331–13:332.
[144] Richens Dec. 7 Interview 17:20–17:22.
[145] Hardinger Decl. ¶ 17.
[146] *Id.*
[147] *Id.* at ¶ 18.
[148] *Id.*

Deputy Richens was aware Ms. Jensen "wasn't eating or anything" because "she wasn't coming out of the block . . . to get her meals, and so control would call in to ask her if she was going to eat, and she would just say no."[149] Deputy Richens directed one of the other detainees to go stand by Ms. Jensen's door to ask her again about whether she was going to eat, and Ms. Jensen replied "no."[150] Deputy Ross passed by her cell on security checks and Ms. Jensen told him "she was sick. She was throwing up a little bit. . . . [a]nd she was having issues eating. She was eating a little bit, but not much."[151]

At some point on Tuesday, Deputy Richens escorted Ms. Jensen to booking to speak with a lieutenant.[152] Ms. Jensen told her she was "just really weak."[153] Deputy Richens stayed by Ms. Jensen's side "to make sure she d[idn't] fall, pass out. Because she was . . . pretty weak."[154] Ms. Jensen appeared to be experiencing difficulty walking, and "[s]he was holding onto the wall just to catch her balance."[155] The lieutenant told Deputy Richens, "we just need to watch her a little close, you know, and log everything we do."[156]

Afterward, Deputy Richens sought LPN Clyde's authorization to give Ms. Jensen more Gatorade to drink.[157] She told LPN Clyde that Ms. Jensen "ke[pt] throwing up and couldn't keep anything down."[158] Deputy Richens observed that, when Ms. Jensen was initially booked, "[s]he was walking doing her thing with us, just [sic] her color seemed fine" and then by Tuesday, "it

---

[149] Richens Dec. 7 Interview 18:4–18:15.
[150] Id. at 18:17–18:20.
[151] Ross Dec. 7 Interview 8:9–8:14.
[152] Richens Dep. 43:1–43:4.
[153] Id. at 43:2–43:4.
[154] Id. at 43:15–43:19.
[155] Id. at. 43:20–43:23.
[156] Richens Dec. 7 Interview 19:10–19:13; Richens June 8 Interview 14:362–14:366.
[157] Richens Dep. 48:10–48:25; Clyde Decl. ¶ 24.
[158] Richens Dep. 45:21–45:24; Richens June 8 Interview 14:360–14:361; Richens Dec. 7 Interview 18:1–18:5.

20

was just like, oh, she doesn't look good. Like she was losing her color, . . . she looked really weak."[159] Deputy Richens "told [LPN Clyde. I was just like, . . . she's throwing up a lot so, because every time I go do a section I look in her cell and she's just lying in bed, she . . . hasn't really got up, . . . she wouldn't eat."[160] But, according to Deputy Richens, LPN Clyde "just said okay, she never went down to check on her."[161] LPN Clyde denies that Deputy Richens communicated these symptoms to her.[162]

LPN Clyde asked Deputy Richens to help Ms. Jensen fill out a Medical Request Form so that Ms. Jensen could see PA Clark during his weekly visit.[163] Ms. Jensen reported on the form that she was "pucking [sic] for 4 days straight, runs, diarrhea, can't hold anything down not even water."[164] Deputy Richens delivered the form to LPN Clyde on Tuesday afternoon.[165]

Around the same time, Deputy Richens, in consultation with Deputy Ross[166] and after asking LPN Clyde for authorization, moved Ms. Jensen to a new cell in court holding, referred to as a "medical observation cell," "so we [could] see her on the camera."[167] "Everybody noticed she was getting weaker," and the medical observation cell let them "see her better."[168] Deputy Richens was "concerned" because Ms. Jensen was "progres[sing]," and "she didn't look very good."[169] Deputy Ross noted that Ms. Jensen "wasn't eating much, and she was quite a bit

---

[159] Richens June 8 Interview 16:424–16:429.
[160] *Id.* at 16:426–16:431.
[161] *Id.* at 16:432–16:434.
[162] Clyde Decl. ¶ 25.
[163] Richens Dep. 50:17–51:19; Clyde Decl. ¶ 27.
[164] Medical Request Form 1, ECF No. 208-8.
[165] Duchesne County Jail Written Statements 10; Richens June 8 Interview 24:639–24:645; Clyde Dep. 175:1–175:7.
[166] Ross Dec. 7 Interview 10:16–10:21.
[167] Richens Dec. 7 Interview 19:14–19:18; Richens June 8 Interview 14:376.
[168] Richens Dec. 7 Interview 22:2–22:4.
[169] Richens June 8 Interview 17:466–17:468

underweight, so we wanted to keep a little closer eye on her."[170] Deputy Ross stated that the concern about Ms. Jensen vomiting and experiencing diarrhea was "why she was moved" to the observation cell.[171] Because "medical never g[a]ve the okay" to initiate a "medical watch," none was implemented.[172] Deputy Ross believed that "[LPN] Clyde had known [Ms. Jensen's] condition . . . and [she and PA Clark] were going to evaluate her from there."[173] According to him, "medical was notified of it, and they weren't too concerned with it."[174]

On Wednesday morning, Sergeant Purdy remembers the night shift—in particular, Corporal David Lacey ("Corporal Lacey")[175]—telling her "[t]hat girl in court holding is really sick."[176] They told her "[s]he had thrown up in her bucket or something, and it was, like, black."[177] According to Dr. Kennon Tubbs, the Jail's contracted medical provider, black vomit is "concerning" and "you need to go to the ER."[178] The night shift had not contacted LPN Clyde or PA Clark.[179]

Upon hearing the report from Corporal Lacey, Sergeant Purdy asked, "Did you guys give her . . . anything to drink? And they said no."[180] Sergeant Purdy "looked to see if [Ms. Jensen] had been throwing up" and believed she remembered that "there was throw-up in her cell."[181] At 6:38 a.m., Sergeant Purdy asked LPN Clyde if she could give Ms. Jensen a Gatorade because the

---

[170] Ross Dec. 7 Interview 11:20–11:22.
[171] Ross Dep. 18:10–18:15.
[172] Ross Dec. 7 Interview 12:1–12:24, 13:16–13:25.
[173] *Id.* at 12:11–12:13.
[174] *Id.* at 14:8–14:9.
[175] Purdy Dec. 7 Interview 8:21–9:11.
[176] *Id.* at 8:10–8:14.
[177] *Id.* at 8:12–8:14.
[178] Tubbs Second Dep. 156:13–156:22, ECF No. 243-3.
[179] Clyde Decl. ¶ 41 ("Nobody ever called me to report any information about [Ms.] Jensen to me during her time at the Jail."); Clark Dep. 33:23–34:2.
[180] Purdy Dec. 7 Interview 9:13–9:20.
[181] *Id.* at 9:13–9:15.

night shift had informed Sergeant Purdy that Ms. Jensen had been sick and vomiting.[182]

According to Sergeant Purdy, LPN Clyde responded, "Yeah, I gave her one last night, but you

can give her another."[183] LPN Clyde disputes that Sergeant Purdy told her about Ms. Jensen's

vomiting.[184] At the time she gave Ms. Jensen the Gatorade, Sergeant Purdy told her, "Just drink it

slow, you know, if you can keep it down and stuff."[185]

Later that morning, Deputy Caleb Bird ("Deputy Bird") took Ms. Jensen her blood

pressure medication.[186] Ms. Jensen asked Deputy Bird if he "would bring them to her because

she would throw up if she got out of bed."[187] She told him she was withdrawing.[188] He walked

into her room and noticed vomit in her tote.[189] He returned to see LPN Clyde and told her, "You

know, [Ms. Jensen] looks pretty sick. . . . she's not even . . . able to get up to get her meds."[190]

Concerned about Ms. Jensen, he told LPN Clyde, "She looks like she could use some help or

whatever from you guys."[191] LPN Clyde told him "Yeah, we know."[192] LPN Clyde disputes that

Deputy Bird told her this.[193] After his shift ended, he "went home and [] told [his] wife, 'This

girl looks like she's going to die'" because "she was just like a skeleton."[194]

---

[182] Duchesne County Jail Written Statements 9; Purdy Dec. 7 Interview 10:24–11:3.
[183] Purdy Dec. 7 Interview 11:2–11:3.
[184] Clyde Decl. ¶ 25 ("I was never told by Jail staff that [Ms. Jensen] had vomited or had diarrhea, except for when Deputy Richens told me on Monday, November 28, that [Ms. Jensen] had vomited the night before.").
[185] Purdy Dec. 7 Interview 11:4–11:6.
[186] Bird June 1 Interview 4:3–4:5, ECF No. 151-20.
[187] Id. at 4:11–4:14.
[188] Id. at 4:16–4:17.
[189] Id. at 4:25–5:2.
[190] Id. at 5:3–5:8.
[191] Id. at 5:14–6:16.
[192] Id. at 5:9–5:22.
[193] Clyde Decl. ¶ 25 ("I was never told by Jail staff that [Ms. Jensen] had vomited or had diarrhea, except for when Deputy Richens told me on Monday, November 28, that [Ms. Jensen] had vomited the night before.").
[194] Bird June 1 Interview 6:6–6:10.

LPN Clyde read Ms. Jensen's Medical Request Form that day.[195] LPN Clyde has stated that she believed Ms. Jensen was reporting her symptoms from before she arrived at the Jail, because, according to LPN Clyde, Ms. Jensen "told [her] on Tuesday that she was doing better, and she had denied to [LPN] Clyde on Tuesday that she was vomiting or having diarrhea"[196] and LPN Clyde "did not hear any reports about" Ms. Jensen on Tuesday and "at no time was [LPN Clyde] ever informed that [Ms. Jensen] was not eating her food."[197]

During litigation, when Dr. Tubbs, PA Clark's supervisor and the Jail's contracted medical provider, reviewed Ms. Jensen's Medical Request Form, he stated that "puking for four days straight, runs, diarrhea, can't hold anything down, I would say that's more emergent."[198] PA Clark stated that, based on what Ms. Jensen included in her Medical Request Form, he should have been contacted by "anyone who had read this medical request form."[199] And LPN Clyde has stated that if a person had told her they were puking for four days straight, with runs, diarrhea, and the inability to hold anything down, even water, "that would be a concern" and she would immediately call PA Clark or Dr. Tubbs.[200]

There is evidence that, at some point following her receipt of the Medical Request Form, LPN Clyde told Ms. Jensen the physician's assistant was coming Thursday "and [Ms. Jensen]

---

[195] Duchesne County Jail Written Statements 10; Clyde Dep. 176:3–176:6, 178:8–178:11.
[196] Clyde Decl. ¶ 33.
[197] *Id.* at ¶¶ 30, 32.
[198] Tubbs Dep. 60:8–60:12, ECF No. 208-7.
[199] Clark Dep. 80:10–80:19.
[200] Clyde Dep. 101:2–102:17.

verified that she was still sick and wanted to see him."[201] However, LPN Clyde has also stated "at no time did [Ms. Jensen] ever request to see the doctor or PA."[202]

On Wednesday afternoon, LPN Clyde went to the medical observation cell to deliver Gatorade to Ms. Jensen.[203] There was a plastic tote filled with vomit and toilet paper next to the bed, and Ms. Jensen's blanket was visibly streaked with vomit.[204] Ms. Jensen's lunch tray was unopened in the cell door aperture.[205] Ms. Jensen "shuffle[d] unsteadily" to the cell door to take the Gatorade from LPN Clyde.[206] LPN Clyde has testified that she did not notice any vomit, did not make note of Ms. Jensen's unopened lunch, and did not think Ms. Jensen's gait was abnormal.[207] Based on her observations, LPN Clyde did not believe that Ms. Jensen was in urgent need of medical attention.[208]

The next day, PA Clark arrived at the Jail to make his weekly rounds at 9:00 a.m.[209] LPN Clyde stated that she handed him the medical request forms and medical files of all the inmates who had requested to be seen.[210] LPN Clyde testified that Ms. Jensen's Medical Request Form was included in the materials she gave PA Clark.[211] According to LPN Clyde, PA Clark and LPN Clyde then reviewed the requests, and LPN Clyde informed PA Clark that Ms. Jensen was getting Gatorade and that Ms. Jensen had written down that she was vomiting and having

---

[201] Duchesne County Jail Written Statements 10.
[202] Clyde Decl. ¶ 28; *see* Clyde Dep. 178:17–178:21 (stating Ms. Jensen said she did not want to see a doctor on Tuesday).
[203] Clyde Dep. 90:19–91:7; Clyde Decl. ¶ 35.
[204] Brown Expert Report 7, ECF No. 209-2.
[205] *Id.*
[206] *Id.*
[207] Clyde Decl. ¶¶ 35, 37.
[208] *Id.* at 35.
[209] Clark Dep. 36:7–36:9.
[210] Clyde Decl. ¶ 43; Clyde Dep. 114:23–115:8; Duchesne County Jail Written Statements 10.
[211] Clyde Dep. 150:14–150:17.

diarrhea.[212] LPN Clyde also told him that Ms. Jensen was in "court holding," the medical observation cell.[213] Having assessed the priority needs of patients, PA Clark set the order in which he would see inmates.[214]

PA Clark denied that Ms. Jensen's request was included in the forms LPN Clyde gave him that morning.[215] He insisted that LPN Clyde did not discuss Ms. Jensen's symptoms with him until he had finished seeing all the other inmates.[216] PA Clark also stated that LPN Clyde told him that Ms. Jensen had not submitted a Medical Request Form.[217]

Sometime after 10:45 a.m., Amy Branson, an employee in the Jail's kitchen, notified Deputy Bird that Ms. Jensen did not eat her breakfast and was not eating her lunch.[218] Then, four and a half hours after arriving, PA Clark headed to Ms. Jensen's cell with LPN Clyde, around 1:30 p.m.[219] Video recorded by the Jail's surveillance system shows that approximately thirty minutes before PA Clark and LPN Clyde's arrival, Ms. Jensen began to convulse, seized, and toppled off her bed and onto the floor.[220] PA Clark announced Ms. Jensen's death shortly after his arrival to her cell.[221] Her cause of death was determined to be "cardiac arrhythmia from dehydration due to opiate withdrawal."[222]

[212] Clyde Dep. 110:2–110:11, 110:20–111:17, 114:23–115:3, 150:18–150:23, 208:14–209:10.

[213] *Id.* at 209:1–209:10.

[214] Clyde Decl. ¶ 44; Clark Dep. 38:14–38:22.

[215] Clark Dep. 20:2–20:5, 39:9–39:11, 79:23–80:5.

[216] *Id.* at 39:18–39:23; Clark Interrog. 9, ECF No. 151-17; *see also* Body Cam. Tr. A. Meinrod 12, ECF No. 151-11.

[217] Clark Dep. 39:20–40:4, 41:16–41:20.

[218] Duchesne County Jail Written Statements 8.

[219] Clark Dep. 43:19–44:1 (noting he had been at the Jail seeing patients for approximately four hours before heading to Ms. Jensen's cell); Duchesne County Jail Written Statements 9 (Sergeant Purdy describing a call on the radio at 13:25 about Ms. Jensen's death).

[220] Duchesne County Jail Written Statements 11 (PA Clark describing the video).

[221] *Id.* at 9.

[222] Second Am. Compl. 20.

*Duchesne County Jail Policies and Training*

Sheriff David Boren was responsible for supervision of Duchesne County Jail in 2016.[223] The Jail had written policies and procedures, standard operating practices, general orders, and verbal policies and procedures.[224] Commander Jason Curry was responsible for implementation of the policies and procedures at the Jail, as was Sheriff Boren and Staff Sergeant Travis Givens.[225] The County "was in charge of implementing policies and training its officers."[226]

In 2016, there was a verbal understanding that "[i]f [Jail staff] see something that would indicate that [an] individual is experiencing some kind of medical issue [and] that there would need to be some intervention, and they should notify medical" "[o]r at least a supervisor" who would then notify medical.[227] The policy was not "specifically" about what to do when a staff member became aware that an inmate was vomiting or had diarrhea.[228] And at that time, the Jail did not have a policy to deal with situations involving opiate withdrawals.[229]

Whether or not Jail employees contacted "medical" about a detainee or inmate's medical issue "depend[ed] on the severity of it. Obviously, if an officer observed an inmate that threw up one time, . . . they might not feel that it rises to the point where they need to notify medical."[230] Instead, "[t]hey might pass that on to the next shift that, you know, I seen this individual doing this; you might want to watch that. . . . Just because they saw somebody throw up or something in a tote or in the cell wouldn't—in itself, wouldn't necessarily mean that they would need to

---

[223] Boren Dep. 5:17–5:20, ECF No. 141-3.
[224] *Id.* at 10:7–10:11.
[225] *Id.* at 6:8–6:14.
[226] *Est. of Jensen*, 989 F.3d at 856.
[227] Boren Dep. 38:3–39:1.
[228] *Id.* at 38:15–38:20.
[229] *Id.* at 27:24–28:2.
[230] *Id.* at 40:5–40:8.

report that to medical."[231] It was up to the officer's discretion as to whether something was reportable or not.[232]

The same was true when a person in custody filled out a medical request form: it was left up to the discretion of the officer or LPN Clyde whether or not to involve PA Clark earlier than his weekly Thursday visit.[233] This was pursuant to a "general understanding" that the jail employees had.[234] Dr. Tubbs stated that his expectation was that LPN Clyde would review the medical request form, talk to the patient, and "make a determination as to whether she's appropriate for sick call that week, needs to go to the emergency room immediately or contact us."[235]

For "a serious medical issue," Jail policy gave Jail employees "a couple of options. One is that they would call emergency services, the ambulance, and have them come and transport that individual to the hospital. Or they would call [PA] Clark. Or at the time they could call [LPN] Clyde. Either of those. Very rarely would they call Dr. Tubbs personally."[236] According to Sheriff Boren, the Jail's policy dictating the circumstances under which Dr. Tubbs or PA Clark were to be contacted about a detainee or inmate's medical condition[237] was an unwritten policy[238] where both LPN Clyde and any corrections officer could contact Dr. Tubbs or PA Clark directly *if they thought it was necessary*, or they could call an ambulance.[239] Dr. Tubbs stated that

---

[231] *Id.* at 40:13–40:19.
[232] *Id.* at 40:20–40:23.
[233] *Id.* at 60:12–61:16.
[234] *Id.* at 61:13–61:16.
[235] Tubbs Dep. 59:13–59:20.
[236] Boren Dep. 32:1–32:9.
[237] *Id.* at 28:3–28:6.
[238] *Id.* at 29:13–30:9.
[239] *Id.* at 32:16–32:20.

he "personally ha[d] not done anything to make sure" the Jail employees knew when they should be calling him.[240]

If corrections officers elected to notify LPN Clyde, the Jail had a verbal policy that "she could either handle it herself, or she could contact PA . . . Clark and receive further instruction."[241] If LPN Clyde was not at the Jail, corrections officers who "see a medical issue that they feel like that needs to be addressed, then they would contact [PA] Clark via phone or a text message."[242] While Jail staff "could contact [PA Clark] themselves even if [LPN Clyde] was working," "generally speaking, if she was there, then they would go through her and have her contact [PA Clark], if needed."[243] According to Sheriff Boren, "[i]t would be left to [LPN Clyde's] discretion" whether she called Dr. Tubbs or PA Clark.[244]

The Jail's policy regarding "serious medical emergencies" required Jail staff to call an ambulance, PA Clark, or Dr. Tubbs "*if they feel like* that there is a serious medical emergency that needs to be addressed."[245] A serious medical emergency, accordingly to Sheriff Boren, was "[s]omebody that is in immediate distress where they—their life would be in jeopardy."[246] A corrections officer or LPN Clyde would make a determination about whether something constituted an emergency situation "[j]ust like any other person outside of the correctional setting

---

[240] Tubbs Dep. 32:10–32:16.
[241] Boren Dep. 45:3–45:7.
[242] *Id.* at 46:10–46:16.
[243] *Id.* at 46:18–46:25.
[244] *Id.* at 49:19–49:24.
[245] *Id.* at 50:4–50:13 (emphasis added); *see id.* at 104:24–105:8.
[246] *Id.* at 105:12–105:17.

would."[247] In other words, Sheriff Boren expected them to "use their common sense in making that decision."[248]

In general, the Jail's corrections officers did not have medical training beyond basic first aid.[249] In 2016, Sheriff Boren was not aware of any training for Jail employees about the risks of dehydration coming from vomiting or diarrhea,[250] and LPN Clyde "had no training in dealing with [opioid withdrawal symptoms and dehydration] except that [she knew] to give them water and Gatorade."[251] Commander Curry stated that there was no policy on how to deal with inmates experiencing vomiting or diarrhea in 2016, and he had not personally received any training on that and was not aware of any other staff members having received such training.[252] Deputy Richens had not received any training on it,[253] and Sergeant Purdy stated that there was no protocol for inmates withdrawing from drugs and that "[t]here's not a lot that we can do for them."[254]

Sheriff Boren stated that, once LPN Clyde received and read Ms. Jensen's Medical Request Form indicating that she was vomiting and had diarrhea for four days straight and could not keep anything down, it was not a violation of Jail policy for her not to notify PA Clark or Dr. Tubbs because "there wasn't a policy in place specifically addressing that particular issue."[255] Sheriff Boren felt he was being asked to speculate when asked whether an inmate not eating or

---

[247] Id. at 106:2–106:16.
[248] Id. at 106:17–106:20.
[249] Id. at 105:18–105:20, 39:2–39:6.
[250] Id. at 116:24–117:2.
[251] Clyde Decl. ¶ 4.
[252] Currey Dep. 26:1–26:12, ECF No. 151-9.
[253] Richens Dep. 15:13–15:21.
[254] Purdy Dep. 27:6–27:15.
[255] Boren Dep. 84:10–85:16.

keeping water down for four days "was to the point where it was a serious medical issue" for which PA Clark should have been notified.[256] At the time, "the basic fact that somebody was vomiting and/or having diarrhea" would not necessarily be a serious medical emergency.[257]

The Jail did not have policies surrounding the tracking of an inmate's symptoms or keeping medical records.[258] Instead, it was "up to th[e] discretion" of medical, including LPN Clyde.[259] Consistent with policy at the time, the Jail did not document instances where Ms. Jensen did not eat a meal, instances when vomit was found in her cell, or when she received Gatorade.[260] It was practice for LPN Clyde to exercise her discretion as to when to place a medical observation sheet on the door of an inmate under medical observation.[261]

## STANDARD

Under Federal Rule of Civil Procedure 56(a), the "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[262] "A fact is material if, under the governing law, it could have an effect on the outcome of the lawsuit. A dispute over a material fact is genuine if a rational jury could find in favor of the nonmoving party on the evidence presented."[263]

---

[256] *Id.* at 86:19–86:13.
[257] *Id.* at 92:19–92:23.
[258] *Id.* at 79:3–79:6, 80:1–80:7.
[259] *Id.* at 80:12–80:19.
[260] *Id.* at 78:13–80:25; Curry Dep. 61:9–61:13 ("Q. Did the jail have any policies or procedures in place at the time, though, to record or track whether or not an inmate was actually able to keep those liquids that you are giving them access to down? A: No.").
[261] Boren Dep. 73:4–73:13.
[262] Fed. R. Civ. P. 56(a).
[263] *Doe v. Univ. of Denver*, 952 F.3d 1182, 1189 (10th Cir. 2020) (quoting *Jones v. Norton*, 809 F.3d 564, 573 (10th Cir. 2015)).

"'[A]ll disputed facts must be resolved in favor of the party resisting summary judgment.'"[264] But while "[t]he nonmoving party is entitled to all reasonable inferences from the record; . . . if the nonmovant bears the burden of persuasion on a claim at trial, summary judgment may be warranted if the movant points out a lack of evidence to support an essential element of that claim and the nonmovant cannot identify specific facts that would create a genuine issue."[265]

## DISCUSSION

I.     **The County Is Not Entitled to Summary Judgment Because There Is an Issue of Material Fact Concerning Whether the County Adopted a Failure-to-Train Policy or Custom with Deliberate Indifference.**

"Municipalities are liable under § 1983 only when the constitutional violation is caused by the municipality's policies or customs."[266] "An unofficial policy or custom can trigger municipal liability if the practice is 'so permanent and well settled as to constitute a custom or usage with the force of law.'"[267] "[T]he inadequacy of [employee] training may serve as a basis for § 1983 [municipal] liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the [municipality's employees] come into contact."[268]

"'[D]eliberate indifference' is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action."[269] Only when

---

[264] *McCoy v. Meyers*, 887 F.3d 1034, 1044 (10th Cir. 2018) (quoting *White v. Gen. Motors Corp.*, 908 F.2d 669, 670 (10th Cir. 1990)).

[265] *Id.* (quoting *Patel v. Hall*, 849 F.3d 970, 978 (10th Cir. 2017)).

[266] *Prince v. Sheriff of Carter Cnty.*, 28 F.4th 1033, 1048–49 (10th Cir. 2022) (citing *Monell v. N.Y.C. Dep't of Soc. Servs.*, 436 U.S. 658, 694–95 (1978)).

[267] *Id.* at 1049 (alterations in original) (quoting *Lankford v. City of Hobart*, 73 F.3d 283, 286 (10th Cir. 1996)).

[268] *Allen v. Muskogee*, 119 F.3d 837, 841 (10th Cir. 1997) (quoting *City of Canton v. Harris*, 489 U.S. 378, 388 (1989)).

[269] *Connick v. Thompson*, 563 U.S. 51, 61 (2011) (quoting *Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 410 (1997)).

municipal "policymakers are on actual or constructive notice that a particular omission in their training program causes [its] employees to violate citizens' constitutional rights" may the municipality "be deemed deliberately indifferent if the policymakers choose to retain that program."[270] "A less stringent standard of fault for a failure-to-train claim 'would result in *de facto respondeat superior* liability on municipalities . . . .' "[271] Accordingly, "[t]o recover for a failure to train, [the plaintiff] needs to prove three elements:" (1) "the existence of a county policy or custom involving deficient training," (2) "the policy or custom's causation of an injury," and (3) "the county's adoption of a policy or custom with deliberate indifference."[272]

### A. A Reasonable Fact Finder Could Find the Existence of a County Policy or Custom Involving Deficient Training.

In order to satisfy the first element, the plaintiff "must identify a specific deficiency in the county's training program closely related to his ultimate injury . . . ."[273] "It is not enough [for the plaintiff] to show that there were general deficiencies in the county's training program for jailers."[274] "[T]he focus must be on adequacy of the training program in relation to the tasks the particular officers must perform."[275]

In *Lance*, the Tenth Circuit determined that the plaintiff had provided sufficient evidence when he demonstrated that "the county hadn't trained employees how to determine 'the immediacy of medical complaints.'"[276] There, the plaintiff, who had suffered a medical

---

[270] *Id.* (citing *Brown*, 520 U.S. at 407).
[271] *Id.* at 62 (quoting *City of Canton*, 489 U.S. at 392).
[272] *Lance*, 985 F.3d at 800 (citing *Waller*, 932 F.3d at 1283–84).
[273] *Lopez v. LeMaster*, 172 F.3d 756, 760 (10th Cir. 1999) *abrogated in part on other grounds by Brown v. Flowers*, 974 F.3d 1178, 1182 (10th Cir. 2020).
[274] *Lopez*, 172 F.3d at 760.
[275] *City of Canton*, 489 U.S. at 390.
[276] *Lance*, 985 F.3d at 801.

emergency while in custody, was not treated or taken to a hospital for three days by any of the guards who were aware of his condition.[277] The plaintiff offered evidence that the county had tasked those guards with "independently determin[ing] whether a medical issue is serious" even though the guards "had not obtained any training on *when* a medical condition involved an emergency." [278] "Given this evidence," the court of appeals concluded, "the factfinder could reasonably infer that the county had provided deficient training on how to detect a medical emergency."[279]

Similarly, the Estate has evidence that the County allowed its Jail staff to assess whether a detainee or inmate was experiencing a "serious medical emergency,"[280] but it had not trained employees on "when a medical condition involved an emergency."[281] There is evidence that corrections officers only had first aid training,[282] and LPN Clyde was unable to "conduct any assessments, or diagnose or treat any medical condition."[283] And, according to Sheriff Boren, a corrections officer or LPN Clyde would make a determination about whether something constituted an emergency situation "[j]ust like any other person outside of the correctional setting would."[284] Sheriff Boren expected them to "use their common sense in making that decision."[285]

---

[277] *Id.* at 792.
[278] *Id.* at 801 (emphasis added).
[279] *Id.*; *see Prince*, 28 F.4th at 1050 (finding dispute of fact where there was evidence that "untrained jail guards were left to apply their own 'common sense' to determine when emergent medical conditions warranted transport to the hospital").
[280] Boren Dep. 106:2–106:23.
[281] *Lance*, 985 F.3d at 801; *see* Boren Dep. 106:2–106:23.
[282] Boren Dep. 105:18–105:20.
[283] Clyde Decl. ¶ 9.
[284] Boren Dep. 106:2–106:16.
[285] *Id.* at 106:17–106:20.

From this evidence, the fact finder could "reasonably infer that the county had provided deficient training on how to detect a medical emergency."[286]

### B.  A Reasonable Jury Could Find the Policy or Custom's Causation of an Injury.

On the second element, the plaintiff must "prove that the deficiency in training actually caused the [County employee's] indifference to her medical needs."[287] The plaintiff "need[s] to show that 'the injury [would] have been avoided had the employee been trained under a program that was not deficient in the identified respect.'"[288] "The causation element is applied with especial rigor when the municipal policy or practice is itself not unconstitutional, for example, when the municipal liability claim is based upon inadequate training, supervision, and deficiencies in hiring."[289] The County does not specifically argue the causation element in either its Opposition to the Estate's Motion to Reconsider or its initial Motion for Summary Judgment,[290] and thus, the court declines to grant summary judgment to the County on this ground.[291] Even if the County had argued the causation element, a reasonable jury could find that the County's policy or custom caused a deprivation of Ms. Jensen's constitutional rights.

Here, there is evidence that numerous jail personnel observed Ms. Jensen's symptoms worsening over multiple days but did not get her the needed medical attention—not necessarily because they were indifferent to her plight, but because they did not recognize her symptoms as a

---

[286] *Prince*, 28 F.4th at 1050.
[287] *City of Canton*, 489 U.S. at 391.
[288] *Lance*, 985 F.3d at 801 (quoting *City of Canton*, 489 U.S. at 391).
[289] *Waller*, 932 F.3d at 1284 (quoting *Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 770 (10th Cir. 2013)).
[290] *Cf.* Opp'n 33–35 (arguing only that the court should not grant the Estate's Motion to Reconsider); County's Mot. for Summ. J. 10–16, ECF 140 (arguing only that the County was not deliberately indifferent); *see also* Count's Reply 21–23, ECF 162.
[291] *See Lance*, 985 F.3d, at 800 n.4; *Oldham v. O.K. Farms, Inc.*, 871 F.3d 1147, 1150–51 (10th Cir. 2017) (noting that while a district court may grant summary judgment on a grounds not raised by a party, per Rule 56(f)(2), it is generally disfavored).

35

medical emergency. Indeed, there is evidence that Deputy Richens,[292] Deputy Bird,[293] Sergeant Purdy,[294] Corporal Lacey,[295] and LPN Clyde[296] knew of Ms. Jensen's symptoms. And while the County's contracted medical provider stated that both Ms. Jensen's reported symptoms and the black vomit were indicators of a medical emergency,[297] Jail employees did not recognize it as such—Deputy Bird, Deputy Richens, LPN Clyde, and Sergeant Purdy all believed Ms. Jensen's symptoms were not life-threatening,[298] and failed to escalate the situation to either PA Clark or Dr. Tubbs or call an ambulance. On these facts, a reasonable jury could conclude that the County's failure to train its employees on what constitutes a medical emergency directly and proximately caused Ms. Jensen's death.

### C.  A Reasonable Jury Could Find the County's Adoption of a Policy or Custom with Deliberate Indifference.

"On the third element, the plaintiff must show deliberate indifference."[299] Deliberate indifference requires that "the municipality ha[d] actual or constructive notice that its action or

---

[292] Deputy Richens observed and received reports of Ms. Jensen vomiting, experiencing diarrhea, not eating, being unable to walk steadily, becoming weak, and losing color. Richens June 8 Interview 11:274–17:468.

[293] Deputy Bird observed vomit in Ms. Jensen's tote, heard her complain that she was unable to walk without vomiting, and believed she looked "'like death' because she was just like a skeleton." Bird June 1 Interview 4:11–6:10.

[294] Sergeant Purdy knew Ms. Jensen had vomited repeatedly and had vomited a black substance. Purdy Dec. 7 Interview 8:10–9:25.

[295] Corporal Lacey knew Ms. Jensen had vomited repeatedly and had vomited a black substance. *Id.* at 8:10–9:17.

[296] There is evidence that LPN Clyde read the symptoms reported in Ms. Jensen's Medical Request Form, and that Deputy Richens, Deputy Bird, and Sergeant Purdy all reported Ms. Jensen's symptoms—vomiting, becoming weak and unable to walk unassisted, not eating, experiencing diarrhea—to LPN Clyde on Monday, Tuesday, and Wednesday. Duchesne County Jail Written Statements 10; Clyde Dep. 176:3–176:6, 178:8–178:11; Bird June 1 Interview 5:2–5:22; Purdy Dec. 7 Interview 10:24–11:3; Richens June 8 Interview 14:359–13:371, 16:428–16:433.

[297] Tubbs Dep. 60:8–60:12; Tubbs Second Dep. 156:13–156:22.

[298] Purdy Dep. 33:18–33:25; Clyde Dep. 216: 24–217:3; Richens Dep. 59:9–59:11; Bird Dep. 33:22–34:8.

[299] *Lance*, 985 F.3d at 801.

failure to act [wa]s substantially certain to result in a constitutional violation, and it consciously or deliberately cho[se] to disregard the risk of harm."[300]

> In most instances, notice can be established by proving the existence of a pattern of tortious conduct. In a narrow range of circumstances, however, deliberate indifference may be found absent a pattern of unconstitutional behavior if a violation of federal rights is a highly predictable or plainly obvious consequence of a municipality's action or inaction, such as when a municipality fails to train an employee in specific skills needed to handle recurring situations, thus presenting an obvious potential for constitutional violations.[301]

At issue here is whether there is a dispute of material fact precluding summary judgment in the "narrow range of circumstances" in which "deliberate indifference may be found absent a pattern."[302]

"[E]vidence of a single violation of federal rights, accompanied by a showing that a municipality has failed to train its employees to handle recurring situations presenting an obvious potential for such a violation, is sufficient to trigger municipal liability."[303] Because of the difficulty of ascertaining, "after the fact, that a problem would recur often enough to require training," the Tenth Circuit recently adopted a three-part test from the Second Circuit's *Walker v.*

---

[300] *Bryson v. City of Oklahoma City*, 627 F.3d 784, 789 (10th Cir. 2010) (quoting *Barney v. Pulsipher*, 143 F.3d 1299, 1307–08 (10th Cir. 1998)).

[301] *Id.*

[302] The Supreme Court acknowledged the potential for such a situation in *City of Canton*. 489 U.S. 378. There, it provided an example of single incident liability: municipal policymakers know "to a moral certainty that their police officers will be required to arrest fleeing felons" and they have "armed [their] officers with firearms," so the "need to train officers in the constitutional limitations on the use of deadly force is 'so obvious' that failure to do so could properly be characterized as 'deliberate indifference' to constitutional rights." *Id.* at 390 n.10. Then in *Connick v. Thompson*, the Supreme Court refused to find such single incident liability where the issue was whether the need to train prosecutors on the law of *Brady* violations was "obvious" to result in constitutional violations. 563 U.S. 51 (2011). The Court noted that "[p]rosecutors are not only equipped but are also ethically bound to know what *Brady* entails and to perform legal research when they are uncertain." *Id.* at 66–67. Like *Canton* and unlike *Connick*, the issue here is whether the Jail staff were trained in a subject *different* than the training they undertook to perform the large majority of their job functions.

[303] *Allen*, 119 F.3d at 842 (citing *Brown*, 520 U.S. 397); *City of Canton*, 489 U.S. at 389; *see Olsen v. Layton Hills Mall*, 312 F.3d 1304, 1318 (10th Cir. 2002) (citing *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 823 (1985); quoting *Barney*, 143 F.3d at 1307).

*City of New York* decision.[304] To establish that "a particular problem is likely to recur enough to alert county officials to an obvious deficiency in the training," the plaintiff must show (1) the "county's policymakers know 'to a moral certainty' that [their] employees will confront a given situation,'" (2) the "situation . . . presents the employee with a difficult choice of the sort that training or supervision will make less difficult," and (3) "the wrong choice . . . will frequently cause the deprivation of a citizen's constitutional rights."[305]

In *Lance*, the Tenth Circuit applied this three-part subtest and held that a jury could find a single violation of constitutional rights triggered municipal liability.[306] There, the plaintiff obtained and swallowed a pill from another inmate.[307] He "awoke the next morning with an erection that would not go away" and alerted jail guards over the intercom.[308] "Over the next three days, [the plaintiff] made more requests for medical care, reporting a persistent erection, an intense pain, and a need for medical treatment."[309] There was evidence that the plaintiff had shown his erection to at least one jail guard and explained his pain to multiple guards, but none of the jail guards reported the condition to a medical provider; one testified that he "thought [the plaintiff] was just playing."[310] However, three detainees stated that the plaintiff's pain was obvious.[311] On the fourth day, the detention center's nurse came on duty, examined the plaintiff,

---

[304] *Lance*, 985 F.3d at 802 (quoting *Walker*, 974 F.2d at 297–98).
[305] *Id.*
[306] *Id.*
[307] *Id.* at 792.
[308] *Id.*
[309] *Id.*
[310] *Id.* at 796–798.
[311] *Id.* at 797.

saw that his penis was engorged and purple, and immediately asked jail guards to take him to a local hospital.[312]

The Tenth Circuit observed that, as to the first element of the *Walker* test, "a factfinder could reasonably determine that county policymakers had known 'to a moral certainty' that jail guards would need to independently assess detainees' medical conditions" because "[t]he only medical professional on site was a [registered] nurse, who worked 8–5 during the workweek."[313] "Given the inevitability of medical emergencies after hours, jail guards would frequently need to decide whether a medical condition warranted an after-hours call to the nurse."[314] Second, "a factfinder could reasonably determine that training would have helped jail guards make the difficult decision of whether to call the nurse when she was off duty" because it is difficult to assess the seriousness of a pain complaint.[315] Finally, "a factfinder could reasonably determine that the jail guards' lack of training would frequently lead to disregard of serious pain complaints, violating detainees' constitutional right to medical care" because "jail guards would mistakenly choose not to call the nurse when detainees complain of a subjective sensation like pain."[316] Accordingly, it held that the "district court erred in granting summary judgment to the sheriff on the failure-to-train claim."[317]

---

[312] *Id.*

[313] *Id.* at 802. While the Tenth Circuit does not describe the nurse as a "registered" nurse, the appellees in that case provided the information in their brief. Appellees/Defendants Chris Morris, Daniel Harper, and Dakota Morgan's Corrected Response Brief, *Lance v. Morris*, 17-cv-00378, 2020 WL 995317, *13–14 (10th Cir. Feb. 26, 2020). *See also Prince v. Sheriff of Carter Cnty.*, 28 F.4th 1033, 1050 (10th Cir. 2022) (finding a dispute of material fact when there was evidence that "multiple employees testified that they received no meaningful medical training" and then those employees were "tasked with identifying medical conditions").

[314] *Lance*, 985 F.3d at 802.

[315] *Id.*

[316] *Id.* at 803.

[317] *Id.*

The court addresses each element of the *Walker* test in turn. As to the first element, the facts in this case and in *Lance* are similar: the Jail operated almost entirely without an onsite medical professional who could assess detainees and inmates' medical conditions[318]—LPN Clyde, who was present at the Jail four days a week,[319] could not assess an individual's symptoms,[320] and PA Clark was present for "two or three hours" on Thursdays.[321] Under these conditions, a jury could find that it would be obvious to County policymakers that Jail employees would need to independently assess detainees' medical conditions because it is inevitable that medical emergencies would happen while PA Clark was not present.[322]

Second, as in *Lance*, a fact finder could determine that training would have helped Jail staff, including LPN Clyde, to make the decision of whether to call PA Clark, Dr. Tubbs, or an ambulance. Similar to *Lance*, Jail policy provided for Jail employees to report a detainee or inmate's symptoms, at their discretion, to either LPN Clyde (as jail guards in *Lance* could report to their supervisors) or a medical professional who could independently assess their condition: PA Clark, Dr. Tubbs, or medical providers at a hospital. Jail policy also provided that, if the Jail employee used their "common sense" to determine that the person was experiencing a "serious medical emergency,"[323] the employee was "required" to call PA Clark or Dr. Tubbs.[324] Here, as

---

[318] There is evidence that Dr. Tubbs, the County's contracted medical provider, repeatedly recommended the County hire a registered nurse, beginning in 2008 and renewed "many times." Tubbs Dep. 17:2–17:11. A registered nurse can assess a patient. *Id.* at 51:1–52:15.

[319] Clyde Dep. 11:2–11:9.

[320] Clyde Decl. ¶ 9 ("[B]y law, I was not able to prescribe medications for an inmate patient, conduct any assessments, or diagnose or treat any medical condition.").

[321] Clark Dep. 7:6–7:12, 14:7–15:3.

[322] *See Lance*, 985 F.3d at 802.

[323] Boren Dep. 106:17–106:20.

[324] *Id.* at 104:25–105:8 ("Q. I think you said previously that corrections officers and [LPN] Clyde had the discretion as to when they would call [PA] Clark or Dr. Tubbs, if need be, regarding an inmates' medical condition. Correct? A. Yes. Q. So they could decide when they felt it was necessary to make that call? A. If it was an emergency situation, they were required to.").

noted above, there is evidence that Deputy Richens, Deputy Bird, Sergeant Purdy, Corporal Lacey, and LPN Clyde knew of Ms. Jensen's symptoms and failed to adequately address the situation.[325] Instead, because the corrections officers believed the situation was not an emergency,[326] they used their "discretion" to report Ms. Jensen's condition to LPN Clyde in apparent compliance with existing Jail policy.[327] But like the supervisors in *Lance*, there is evidence that LPN Clyde herself lacked training on how to make the difficult decision of whether to contact PA Clark, Dr. Tubbs, or to call for an ambulance: LPN Clyde stated that she was never aware of any "urgent or emergency situations with respect to [Ms. Jensen's] vomiting, diarrhea, or dehydration,"[328] was unaware that an inmate could die from opioid withdrawal or dehydration, and had received no training on it.[329] From this evidence, a jury could conclude that training on how to recognize medical emergencies would have helped Deputy Bird, Deputy Richens, Sergeant Purdy, and LPN Clyde make the difficult decision of whether an inmate's symptoms required them to call a medical provider.

---

[325] *See supra* notes 292–298.

[326] Purdy Dep. 33:18–33:25; Richens Dep. 59:9–59:11; Bird Dep. 33:22–34:8; Opp'n 12 ("It is also undisputed that none of the medical or non-medical correctional staff at the Duchesne County Jail . . . thought that Jensen was in need of urgent medical care by a physician.").

[327] Boren Dep. 56:17–56:21 ("Q. . . . You told me before that correctional officers and staff members have to use their discretion to determine whether or not to contact medical about a given situation. Right? A. Yes.").

[328] Clyde Dep. 216:24–217:3; Opp'n 12. There also is evidence from LPN Clyde that if she knew an inmate were experiencing the symptoms Ms. Jensen was experiencing (puking for four days straight, runs, diarrhea, can't holding anything down, not even water), she would have immediately called PA Clark or Dr. Tubbs. Clyde Dep. 102:11–102:17. But because there also is evidence that LPN Clyde did know Ms. Jensen was experiencing those exact symptoms—by receiving reports from other Jail staff and from reading Ms. Jensen's Medical Request Form—and yet did not call or inform PA Clark or Dr. Tubbs, a jury could find that she did not recognize Ms. Jensen's symptoms as a serious medical emergency. *See* Duchesne County Jail Written Statements 10; Purdy Dec. 7 Interview 10:24–113 (Sgt. Purdy stating that on Wednesday morning she informed LPN Clyde that night staff told her Ms. Jensen had been vomiting); Bird June 1 Interview 5:3–5:20 (Deputy Bird stating that he told LPN Clyde on Wednesday morning that Ms. Jensen was unable to get up, looked really sick, and needed "help" from "you guys"); Richens June 8 Interview 14:359–13:371, 16:428–16:433.

[329] Clyde Decl. ¶¶ 4–6.

Third, a fact finder could determine that the Jail staff's lack of training would frequently lead to disregard of serious medical emergencies, violating inmates and detainees' constitutional right to medical care.[330] For example, there is evidence that both Corporal Lacey and Sergeant Purdy knew that Ms. Jensen had vomited a black substance.[331] There also is evidence that LPN Clyde read Ms. Jensen's Medical Request Form,[332] in which Ms. Jensen stated she had been "puking for four days straight, runs, diarrhea, can't hold anything down."[333] Likewise, the footage from Ms. Jensen's medical observation cell from Tuesday to Thursday, depicts Ms. Jensen frequently vomiting and having diarrhea, having an unsteady gait and muscle twitches, and not consuming food or much water.[334] Finally, there is the evidence of Ms. Jensen's inability to perform even basic hygiene tasks, along with visible soilage on her body, clothes, bed, and cell.[335] Sheriff Boren, applying the Jail's common sense approach to determining medical emergencies, stated that this video footage of the last days of Ms. Jensen's life did not indicate that Ms. Jensen was experiencing a "serious medical problem."[336] This was because he had "experienced those same symptoms, and [he] has children that experience them [sic] same symptoms, and [he has] seen it in the jail experiencing those same symptoms. And it's never been a medical emergency, a serious medical emergency that need to be addressed."[337]

Yet there is evidence that these facts constituted a medical emergency. Regarding the black vomit, Dr. Tubbs stated that "black vomit is concerning" and "you need to go to the

---

[330] *See Strain v. Regalado*, 977 F.3d 984, 989 (10th Cir. 2020).
[331] Purdy Dec. 7 Interview, 8:10–8:14.
[332] Duchesne County Jail Written Statements 10.
[333] Medical Request Form.
[334] Brown Expert Report 6–8.
[335] *Id.*
[336] Boren Dep. 107:10–107:25.
[337] *Id.*

ER."[338] As to the information contained in Ms. Jensen's Medical Request Form, Dr. Tubbs stated that "that's more emergent" on the spectrum from minor to emergent,[339] and PA Clark believed he should have been contacted by anyone who had read the form.[340] This is evidence from which the jury could conclude that when the Jail staff make the wrong choice—determining an inmate is not experiencing a medical emergency when she in fact is—it will frequently cause the deprivation of a citizen's constitutional right to medical care.

Finally, the County urges the court to focus on LPN Clyde's regular presence at the jail.[341] This is not decisive for summary judgment purposes. As noted earlier, a reasonable jury could conclude that LPN Clyde herself lacked adequate training to perform the role the County gave her. According to LPN Clyde, her role was very limited: she "basically took over the job that was being done by corrections staff . . . . I was not really doing anything more or less than what the Jail Corrections Deputies were doing in terms of checking on inmates and watching their medical care and needs."[342] And there is evidence that Dr. Tubbs advised the County in 2008, and "many times" thereafter, that it should hire a registered nurse for the jail.[343]

The County challenges the conclusion that *Lance* would necessitate a different outcome than the 2020 Order, asserting that *Lance* stands for the proposition that a "reasonable jury could potentially find that [defendants] were deliberately indifferent to an inmate's medical needs as the result of their failure to implement *any* policies or institute *any* training."[344] Here, because

---

[338] Tubbs Second Dep. 156:14–156:22.
[339] Tubbs Dep. 60:4–60:12.
[340] Clark Dep. 80:10–80:22.
[341] County's Mot. for Summ. J. 15.
[342] Clyde Decl. ¶ 56.
[343] Tubbs Dep. 17:2–17:11.
[344] Opp'n 33 (emphasis added); *id.* at 4 (stating that the Tenth Circuit in *Lance* decided "that the utter lack of training for non-medical staff on how to respond to recurring situations might constitute deliberate indifference").

43

"the Jail had protocols in place and staff were trained"—even if those protocols and the training were not "the most robust"—"they met constitutional muster."[345] But the Tenth Circuit, in *Valdez v. Macdonald*, stated that such an "argument conflicts with [its] decisions that have described employees as untrained when they did not receive proper training on a particular aspect of their jobs, not just when they have no training at all."[346] The court of appeals then cited *Lance* for the proposition that "not training jail guards in assessing the immediacy of inmates' medical needs can constitute failure to train," and *Brown v. Gray* for the proposition that "training was deficient due to the 'dearth of instruction' officers 'received on implementing [a particular] policy while off-shift.'"[347] Accordingly, the County's position that only an "utter lack of training" can constitute deliberate indifference is incorrect.

Applying the binding precedent in *Lance* to the facts of this case, the Estate has offered sufficient evidence for a jury to conclude that the County was deliberately indifferent by failing to train its Jail employees on how to recognize a serious medical emergency.

---

[345] *Id.*

[346] 66 F.4th, at 819.

[347] *Id.* (citing *Lance*, 985 F.3d at 801; *Brown v. Gray*, 227 F.3d 1278, 1291 (10th Cir. 2000)).

**ORDER**

IT IS HEREBY ORDERED that Plaintiff's Motion to Reconsider Summary Judgment

Dismissal of Duchesne County is GRANTED. The court's 2020 Order granting summary

judgment to Defendant Duchesne County is VACATED.


Signed August 23, 2023.

BY THE COURT

David Barlow
United States District Judge